## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| FIREFIGHTERS PENSION & RELIEF FUND OF THE CITY OF NEW ORLEANS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>T. PAUL BULMAHN, ALBERT L. REESE, JR., KEITH R. GODWIN, CHRIS A. BRISACK, ARTHUR H. DILLY, GERARD J. SWONKE, BRENT M. LONGNECKER, WALTER WENDLANDT, BURT A. ADAMS, GEORGE R. EDWARDS, ROBERT J. KAROW, and J.P. MORGAN SECURITIES, INC.,<br><br>Defendants. | CIVIL ACTION NO.<br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Firefighters Pension and Relief Fund of the City of New Orleans ("Plaintiff") individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of ATP Oil & Gas Corporation ("ATP" or the "Company") press releases, Securities and Exchange Commission ("SEC") filings, analyst reports, media reports and other publicly disclosed reports, and information about Defendants. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of Plaintiff and other Class members, except for Defendants, who purchased or otherwise acquired 11.875% Senior Second Lien Exchange Notes (the "Notes") pursuant and/or traceable to the Company's December 16, 2010 exchange of approximately $1.5 billion in such Notes (the "Exchange"), seeking to pursue ***strict liability*** remedies under the Securities Act of 1933 (the "Securities Act").

## INTRODUCTION AND BACKGROUND TO THE ACTION

2.      ATP is engaged in the acquisition, development, and production of oil and natural gas properties.  The Company seeks to acquire and develop properties with proven undeveloped reserves in the Gulf of Mexico and North Sea that are economically attractive but not strategic to major or large independent exploration-oriented oil and gas companies.  The Company also has licenses for exploration in the Mediterranean Sea.

3.      On April 20, 2010, the Deepwater Horizon, a deepwater drilling rig operating in the Outer Continental Shelf in the Gulf of Mexico exploded, burned for two days, and sank, resulting in the largest oil spill in the history in the Gulf of Mexico.  As a result of the Deepwater Horizon explosion, on May 6, 2010, the United States Department of the Interior issued a moratorium that essentially halted all drilling in water depths greater than 500 feet in the Gulf of Mexico.  This first moratorium was judicially stayed, but the Department of the Interior issued a second moratorium.  This second moratorium ended on October 12, 2010, with respect to all deepwater drilling activity in the Gulf of Mexico.  These moratoria halted all or most of the Company's operations in the Gulf of Mexico.

4.      On or about October 12, 2010, ATP filed a Form S-4 Registration Statement (the "Registration Statement") with the SEC, indicating its intent to hold the Exchange.  After one

amendment on December 14, 2010, the Company filed a Prospectus (the "Prospectus") on December 16, 2010 on Form 424B3, which was declared effective by the SEC on the same day.

5.     Prior to the Exchange, the Notes involved therein were privately offered and sold in a transaction exempt from the registration requirements of the Securities Act, which occurred in April 2010.

6.     Pursuant to the Registration Statement and Prospectus, ATP executed the Exchange, which offered $1.5 billion worth of Notes.  As of the date of the Exchange, the Notes were registered under the Securities Act and thus became subject to thereto.

7.     The Registration Statement contained false and misleading statements and/or omissions of material fact, as set forth more completely below.

8.     On August 17, 2012, ATP announced that it was filing for Chapter 11 bankruptcy. The Company reported total debts of $3.49 billion and assets of $3.64 billion.  It announced that it was going to continue operating during its financial restructuring using $618 million in debtor-in-possession ("DIP") funding.   The bankruptcy case is *In re ATP Oil & Gas Corp.*, U.S. Bankruptcy Court for the Southern District of Texas, No. 12-36187 (the "Bankruptcy Action").

9.     As set forth more completely herein, during the course of the Bankruptcy Action, the truth was revealed that ATP had: (1) severely downplayed the impact that the United States Department of Interior moratoria had on the Company's business and revenues; (2) violated the provisions of certain credit agreements to which the Company was a party; and (3) issued a Registration Statement that contained false and misleading statements and/or omissions of material fact.

10.     As a result of the false and misleading misstatements and omissions detailed herein, Plaintiff and the Class suffered hundreds of millions of dollars in damages.  As the truth

2

was revealed, the price of the Notes fell precipitously, and as of the date of the filing of this Complaint, the Notes are trading for approximately *four cents* ($0.04) *on the dollar*.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over the causes of action asserted herein pursuant to §22 of the Securities Act, 15 U.S.C. §77v(a).  The claims alleged herein arise under §§11, 12(a)(2) and 15 of the Securities Act.  *See* 15 U.S.C. §§77k, 77l(a)(2) and 77o. Jurisdiction is conferred by §22 of the Securities Act and venue is proper pursuant to §22 of the Securities Act.

12.     This Court has personal jurisdiction over all Defendants named herein because they conducted business in, offered the Exchange in, resided in, and/or were citizens of this District at the time of the Exchange.

13.     Venue is proper in this Court as Defendants purposefully availed themselves of the benefits of this District by offering for sale and selling the Notes into this District.  Moreover, many of the acts complained of, including the dissemination of materially false and misleading statements and reports prepared by or with the participation, acquiescence, encouragement, cooperation, or assistance of Defendants, occurred, at least in part, in this District.

## PARTIES[1]

14.     Plaintiff Firefighters Pension and Relief Fund of the City of New Orleans acquired Notes pursuant and/or traceable to the Exchange and was damaged thereby, as set forth in its Certification attached herewith.

15.     Defendant T. Paul Bulmahn ("Bulmahn") was the Chairman and Chief Executive Officer and Director of ATP.  Bulmahn signed the Registration Statement.

---

[1] Due to the Bankruptcy Action, ATP is not a defendant in this action.  The Company is incorporated and headquartered in Houston, Texas.  The Notes trade under the CUSIP number 00208JAE8.

16.     Defendant Albert L. Reese, Jr. ("Reese") was the Chief Financial Officer of ATP. Reese signed the Registration Statement.

17.     Defendant Keith R. Godwin ("Godwin") was the Chief Accounting Officer of ATP. Godwin signed the Registration Statement.

18.     Defendant Chris A. Brisack ("Brisack") was a Director at ATP. Brisack signed the Registration Statement.

19.     Defendant Arthur H. Dilly ("Dilly") was a Director at ATP. Dilly signed the Registration Statement.

20.     Defendant Gerard J. Swonke ("Swonke") was a Director at ATP. Swonke signed the Registration Statement.

21.     Defendant Brent M. Longnecker ("Longnecker") was a Director at ATP. Longnecker signed the Registration Statement.

22.     Defendant Walter Wendlandt ("Wendlandt") was a Director at ATP. Wendlandt signed the Registration Statement.

23.     Defendant Burt A. Adams ("Adams") was a Director at ATP. Adams signed the Registration Statement.

24.     Defendant George R. Edwards ("Edwards") was a Director at ATP. Edwards signed the Registration Statement.

25.     Defendant Robert J. Karow ("Karow") was a Director at ATP. Karow signed the Registration Statement.

26.     The Defendants identified in ¶¶15 to 25 are referred to collectively as the "Individual Defendants."

4

27.     Defendant J.P. Morgan Securities, Inc. ("J.P. Morgan" or the "Underwriter Defendant") was the underwriter of the Exchange and served as a financial advisor and assistant in the preparation and dissemination of ATP's false and misleading Registration Statement and Exchange materials.  J.P. Morgan is headquartered in New York and conducts business in this District.

28.     The Underwriter Defendant and the Individual Defendants are collectively referred to as "Defendants."

29.     Pursuant to the Securities Act, the Underwriter Defendant is liable for the false and misleading statements and omissions in the Exchange's Registration Statement and Prospectus.   The Underwriter Defendant's failure to conduct adequate due diligence investigations was a substantial factor leading to the harm complained of herein.

a.     The Underwriter Defendant is an investment banking house which specializes, *inter alia*, in underwriting public offerings of securities.  J.P. Morgan served as the underwriter of the Exchange and received compensation therefor. The Underwriter Defendant determined that in return for such compensation, it was willing to underwrite, market, and sell the Notes in the Exchange.

b.     Representatives of the Underwriter Defendant also assisted ATP and the Individual Defendants in planning the Exchange and purportedly conducted an adequate and reasonable investigation into the business and operations of the Company, an undertaking known as a "due diligence" investigation.  The due diligence investigation was required of the Underwriter Defendant to engage in the Exchange.  During the course of its "due diligence," J.P. Morgan had continual access to confidential corporate information

concerning ATP's business sales model, financial condition, internal control, and its future business plans and prospects.

       c.     In addition to availing themselves of access to internal corporate documents, agents of the Underwriter Defendant, including its counsel, met with ATP's lawyers, management, and top executives to determine: (i) the strategy to best accomplish the Exchange; (ii) the terms of the Exchange; (iii) the language to be used in the Registration Statement; (iv) what disclosures about ATP would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement.  As a result of those constant contacts and communications between the Underwriter Defendant's representatives and ATP's management and top executives, the Underwriter Defendant knew, or should have known, of the Company's existing problems and misstatements and omissions contained in the Registration Statement as detailed herein.

       d.     The Underwriter Defendant caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales thereof, including to Plaintiff and the Class.

## SUBSTANTIVE ALLEGATIONS

30.    ATP is a Texas corporation engaged in the acquisition, development, and production of oil and natural gas properties.  The Company seeks to acquire and develop properties with proved undeveloped reserves in the Gulf of Mexico and the North Sea that are economically attractive.  The Company also has licenses in the Mediterranean Sea.

31.     The Exchange of 11.875% Senior Second Lien Exchange Notes due 2015 was effectuated through a Registration Statement on Form S-4 (File No. 333-169880) declared effective by the SEC on December 16, 2010.   Pursuant to the Exchange, ATP executed the exchange of $1.5 billion worth of such Notes.   The Exchange offer expired on January 18, 2011.

32.     In the Registration Statement, Prospectus, and materials incorporated by reference therein, Defendants caused the Company to make several misstatements and omissions, as detailed more completely herein.   These misrepresentations and omissions had a material, adverse impact on ATP and caused the value of the Notes to decline.

33.     The Defendants in this action are the ATP executives and directors who signed the Registration Statement (collectively, the "Individual Defendants") and J.P. Morgan Securities, Inc., the underwriter of the Exchange (the "Underwriter Defendant").   In violation of the Securities Act, Defendants are strictly liable for having issued inaccurate and misleading statements and omitting material facts from the Registration Statement that the Company filed with the SEC in support of the Exchange.   Nor will any of the Defendants be able to meet their burden of establishing an affirmative "due diligence" defense, as all Defendants were at least negligent in allowing the Registration Statement to paint an excessively rosy picture of the Company's future even though all Defendants knew, or should have known, that the problems discussed herein would seriously impair ATP's business and revenues.

34.     Specifically, under the applicable SEC rules and regulations governing the preparation of the Registration Statement (and the financial statements and related SEC filings incorporated therein by reference), the Defendants materially misstated and/or failed to adequately disclose, at the time of the Exchange, the true severity of the problems facing the

Company's business operations and revenues and the Company's failure to comply with other provisions and promises set forth in the Exchange materials.

35.     For all of the claims stated herein, Plaintiff expressly excludes any allegation that could be construed as alleging fraud or intentional or reckless misconduct.  Plaintiff's claims are not based on and do not sound in fraud.

## SUBSTANTIVE ALLEGATIONS

36.     In the Company's Registration Statement released on October 12, 2010, the Company stated:

> On April 20, 2010, a semi-submersible drilling rig operating in the deepwater Outer Continental Shelf ("OCS") in the Gulf of Mexico exploded, burned for two days and sank, resulting in an oil spill in Gulf of Mexico waters.  In response to this crisis, the U.S. Department of the Interior ("DOI"), on May 6, 2010, instructed the Minerals Managements Service ("MMS") to stop issuing drilling permits for OCS wells and to suspend existing OCS drilling permits issued after April 20, 2010, until May 28, 2010, when a report on the accident was expected to be completed.  On May 28, 2010, DOI issued a moratorium, originally scheduled to last for six months, that essentially halted all drilling in water depths greater than 500 feet in the Gulf of Mexico ("Moratorium I").  On June 7, 2010, a lawsuit was filed by several suppliers of services to Gulf of Mexico exploration and production companies challenging the legality of Moratorium I.  This challenge was successful and on June 22, 2010, a Federal District Court issued a preliminary injunction preventing Moratorium I from taking effect.  On July 8, 2010, the United States Court of Appeals for the Fifth Circuit denied the DOI's motion to stay the preliminary injunction against the enforcement of Moratorium I.  This case is still pending on appeal before the Fifth Circuit as of the date of this prospectus.  On July 12, 2010, in response to the Court's actions, the DOI issued a second moratorium ("Moratorium II") scheduled to end on November 30, 2010 that (i) specifically superseded Moratorium I, (ii) suspended all existing operations in the Gulf of Mexico and other regions of the OCS utilizing a subsea blowout preventer ("BOP") or a surface BOP on a floating facility, and (iii) suspended pending and future permits to drill wells involving the use of a subsurface BOP or a surface BOP on a floating facility. Several lawsuits challenging the legality of Moratorium II were subsequently filed in different Federal District Courts, all of which have been consolidated into one case in a Federal District Court that is still pending as of the date of this prospectus.
>
> While Moratorium II is not scheduled to end before November 30, 2010, we cannot predict with certainty when it will end.  In September 2010, the Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEM"), successor

to the MMS, announced the issuance of a new interim "Drilling Safety Rule" and a new final "Workplace Safety Rule" that impact all operations on the OCS. The interim Drilling Safety Rule codifies an earlier notice to lessees and operators issued by BOEM and requires additional testing, third-party verification, training for rig personnel, and governmental approvals to enhance well bore integrity and the operation of BOPs and other well control equipment used in OCS wells. The final Workplace Safety Rule requires all OCS operators to implement all of the formerly voluntary practices in the American Petroleum Institute's Recommended Practice 75, which includes the development and maintenance of a Safety and Environmental Management System.

37.     The Registration Statement further provided, with respect to the Company's

business operations and revenues:

> We have ongoing and planned drilling operations in the deepwater Gulf of Mexico, some of which were permitted prior to April 20, 2010, and some of which are not yet permitted. Such permits, among other required approvals, are necessary prior to commencement of offshore drilling operations. Moratorium II has caused us to delay the third and fourth wells scheduled at our Telemark location and may delay a drilling operation scheduled in 2011 at our Gomez location. During June 2010, we agreed to terminate a contract for services of a drilling rig as a result of Moratorium I. Under the termination agreement, we obtained a full release from our obligations under the contract and incurred net costs of $8.7 million. We are pursuing recovery from BP p.l.c. of these and other direct costs incurred as a result of the accident in the Gulf of Mexico.

> We project a substantial increase in production over the next year as development wells are brought to production. Absent alternative funding sources, achieving our projected production growth is necessary to provide the cash flow required to fund our capital plan and meet our existing obligations, both over the next twelve months and on a longer term basis. Our ability to execute on our plan depends, in part, on our ability to continue drilling for and producing hydrocarbons in the Gulf of Mexico. Our plan is currently based upon resuming suspended activities upon the expiration of Moratorium II currently scheduled to occur on November 30, 2010, obtaining necessary drilling permits, and successfully achieving expected commercial production from existing wells presently scheduled for completion during the remainder of 2010 and the first quarter of 2011. Delays in resuming those activities due to circumstances such as an extension of Moratorium II, delays in receiving necessary permits, reduced access to equipment and services, or weather delays, could have a material adverse effect on our financial position, results of operations and cash flows. In addition to the risks associated with achieving our projected production growth, additional regulatory requirements and increased costs for which funding must be secured, or a negative change in commodity prices and operating cost levels, could also have a material adverse effect on our financial position, results of operations and

cash flows.  While we are pursuing various other sources of funding, including bringing partners into our projects, there is no current assurance that these alternative sources will be available should any of the above risks or uncertainties materialize.

Depending on their duration and extent, these developments could have a material adverse affect on our results of operations, cash flows and liquidity.

38.     Also in the Registration Statement, the Company misleadingly stated:

**The unavailability or increased cost of drilling rigs, equipment, supplies, personnel and oilfield services could adversely affect our ability to execute on a timely basis our development plans and abandonment operations within our budget.**

Shortages or an increase in cost of drilling rigs, equipment, supplies or personnel could delay or adversely affect our operations, which could have a material adverse effect on our business, financial condition and results of operations. Increased drilling activity in the Gulf of Mexico and the North Sea decreases the availability of offshore rigs and associated equipment. In periods of increased drilling activity in the Gulf of Mexico and the North Sea, we may experience increases in associated costs, including those related to drilling rigs, equipment, supplies and personnel and the services and products of other vendors to the industry. These costs may increase further and necessary equipment and services may not be available to us at economical prices. For the years ended December 31, 2009, 2008 and 2007, we recorded losses on abandonment of $2.9 million, $13.3 million and $18.6 million, respectively, primarily as a result of unanticipated increases in service costs in the Gulf of Mexico. Redeployment of drilling rigs to areas other than the Gulf of Mexico as the result of Moratorium I and Moratorium II may also be expected to reduce the availability of offshore rigs, particularly those with deepwater capability, thus increasing costs in future years.

[Emphasis in original.]

39.     Furthermore, with respect to the Company's Credit Agreement and credit

facilities, the Registration Statement provided:

On June 18, 2010, the Company entered into a Credit Agreement (the "Credit Agreement") among the Company, Credit Suisse AG ("CS"), as administrative and collateral agent, and the lenders party thereto, providing for initial term loans of $150 million (the "Term Loans").  Principal outstanding under the Term Loans bears interest at an annual rate of 11.0%.  As security for the Company's obligations under the Credit Agreement, the Company granted the lenders a

security interest in and a first lien on the collateral described under "Description of Exchange Notes—Security."

\*\*\*

The Company is subject to certain negative covenants under the Credit Agreement.  The provisions of the Credit Agreement limit the Company's ability to, among other things:

- incur additional indebtedness;

- pay dividends on the Company's capital stock or purchase, repurchase, redeem, defease or retire the Company's capital stock or subordinated indebtedness;

- make investments;

- incur liens;

- create any consensual restriction on the ability of the Company's restricted subsidiaries to pay dividends, make loans or transfer property to the Company;

- engage in transactions with affiliates;

- sell assets; and

- consolidate, merge or transfer assets.

40.    Also, with respect to the Company's Credit Agreement and credit facilities, the

Registration Statement further provided:

These restrictions may make it difficult for us to successfully execute our business strategy or to compete in our industry with companies not similarly restricted.

There can be no assurance that we will remain in compliance with the covenants under our debt agreements.

A breach of any of these covenants could result in a default under our credit facility and/or the notes.  Upon the occurrence of an event of default under our senior secured credit facility, the lenders could elect to declare all amounts outstanding under our senior secured credit facility to be immediately due and payable and terminate all commitments to extend further credit.  If we were unable to repay those amounts, the lenders could proceed against the collateral granted to them to secure that indebtedness.  We have pledged a significant portion of our assets as collateral under our senior secured credit facility.  If the lenders under our senior secured credit facility accelerate the repayment of borrowings, we may not have sufficient assets to repay our credit facility and our other indebtedness, including the notes.   See "Description of Senior Indebtedness."  Our borrowings under our senior secured credit facility are, and

11

are expected to continue to be, at variable rates of interest and expose us to interest rate risk.  If interest rates increase, our debt service obligations on the variable rate indebtedness would increase even though the amount borrowed remained the same, and our net income would decrease.

41.     The Company released its Prospectus on December 16, 2010.  The Prospectus contained identical, or very nearly identical, language to the Registration Statement.  The Prospectus did not contain any corrections or additional information that would render the above-quoted language from the Registration Statement complete, accurate, or otherwise not false, inaccurate, and/or misleading.

42.     The statements referenced above in ¶¶36-40 were untrue or misleading statements of material fact.  At the time of the Exchange, Defendants were already aware of the truth regarding its business operations and revenues.  Instead of disclosing the truth, Defendants determined to issue false and/or misleading statements and omissions thereon.  Moreover, at the time of the Exchange, Defendants were further aware that it had breached certain of the negative covenants set forth above in its Credit Agreement with Credit Suisse.  Again, instead of disclosing this truth, Defendants' Exchange Materials omitted to disclose this information and, instead, materially misstated or misled investors as to the Company's true condition.

43.      Thus, in the false and/or misleading statements specified above, Defendants either dramatically downplayed the truth or did not disclose the truth at all.

44.     On August 17, 2012, ATP announced that it was filing for Chapter 11 bankruptcy.  The Company reported total debts of $3.49 billion and assets of $3.64 billion and announced that it was going to continue operating during its financial restructuring, using $618 million in DIP funding.  The Bankruptcy Action is captioned *In re ATP Oil & Gas Corp.*, U.S. Bankruptcy Court for the Southern District of Texas, No. 12-36187.

45.     During the course of the Bankruptcy Action, the Company has belatedly begun to reveal the truth regarding its business operations and revenues.  Specifically, Defendants finally began to disclose the true extent of the losses that the United States Department of Interior moratoria caused the Company to incur.  Indeed, Defendant Bulmahn blamed the moratoria for the Company's bankruptcy, saying that it was "directly attributable to what the government did to us."  However, such losses were substantially quantifiable at the time of the Exchange, and the materials used in the Exchange dramatically understated the true impact of the moratoria on its deep water operations in the Gulf of Mexico.

46.     Proceedings in the Bankruptcy Action have also belatedly begun to reveal that the Company had failed to sufficiently disclose its prior involvement in asset sales that the Company now admits were "disguised financing" arrangements designed to evade the requirements of its Credit Agreement with Credit Suisse.  As revealed by a complaint filed in the Bankruptcy Action, "ATP could not have been a party to financings ('disguised' or otherwise) without being in default of its obligations under its credit agreement(s) . . . ."  Docket No. 12-36187, Doc. No. 1558 (S.D. Tex. March 8, 2013).

47.     As of the date of the filing of this Complaint, the $1.5 billion worth of Notes are trading at approximately ***four cents on the dollar***, and in fact, may be worthless.  Plaintiff and the Class have suffered losses of more than one billion dollars since the Exchange.  The false and/or misleading statements or omissions of material fact disclosed herein have caused the losses incurred by Plaintiff and the Class.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

48.     Plaintiff brings this action as a class action on behalf of a Class, consisting of all persons who purchased or otherwise acquired Notes pursuant and/or traceable to the Exchange

and its associated Registration Statement and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

49.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are potentially thousands of members in the proposed Class.  The proposed Class may be identified from records maintained by ATP or its transfer agent and may be notified of the pendency of this action by mail using the form of notice similar to that customarily used in securities class actions.

50.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct.

51.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

52.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.     whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.     whether the Registration Statement, Prospectus, and documents referenced therein contained materially false and misleading statements and/or omissions; and

14

c.      to what extent Plaintiff and members of the Class have sustained

damages and the proper measure of damages.

53.      A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as

a class action.

## FIRST CLAIM

### Violations of Section 11 of the Securities Act Against All Defendants

54.      Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

55.      This Claim is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on

behalf of the Class, against each of the Defendants.

56.      The Registration Statement was inaccurate and misleading, contained untrue

statements of material facts, and omitted facts necessary to make the statements made therein not

misleading and omitted to state material facts required to be stated therein.

57.      The Individual Defendants each signed the Registration Statement.  The

Individual Defendants each had a duty to make a reasonable and diligent investigation of the

truthfulness and accuracy of the statements contained in the Registration Statement.  They had a

duty to ensure that they were true and accurate, that there were no omissions of material facts

that would make the Registration Statement misleading, and that the document contained all

facts required to be stated therein.  In the exercise of reasonable care, the Individual Defendants

should have known of the material misstatements and omissions contained in the Registration Statement and also should have known of the omissions of material fact necessary to make the statements made therein not misleading.  As such, the Individual Defendants are liable to Plaintiff and the Class.

58.    The Underwriter Defendant served as an underwriter in connection with the Exchange.  This Defendant had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  It had a duty to ensure that they were true and accurate, that there were no omissions of material facts that would make the Registration Statement misleading, and that the documents contained all facts required to be stated therein.  In the exercise of reasonable care, the Underwriter Defendant should have known of the material misstatements and omissions contained in the Registration Statement and should have known of the omissions of material facts necessary to make the statements made therein not misleading.  As such, the Underwriter Defendant is liable to Plaintiff and the Class.

59.    By reasons of the conduct herein alleged, each Defendant violated §11 of the Securities Act.

60.    Plaintiff acquired the Notes in reliance on the Registration Statement and without knowledge of the untruths and/or omissions alleged herein and has been damaged thereby, as the price of the Notes has declined substantially as the truth began to emerge.

61.    This action was brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the Registration Statement and Exchange.

62.     By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under §11 as measured by the provisions of §11(e), from Defendants and each of them, jointly and severally.

## SECOND CLAIM

### Violations of Section 12(a)(2) of the Securities Act Against All Defendants

63.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

64.     Defendants were sellers and offerors and/or solicitors of purchasers of the Notes offered pursuant to the Registration Statement and in the Exchange.  Defendants issued, caused to be issued, and signed the Registration Statement in connection with the Exchange.  The Registration Statement was used to induce investors, such as Plaintiff and the other members of the Class, to purchase and/or acquire the Notes.

65.     The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein.  Defendants' actions of solicitation included participating in the preparation of the false and misleading Registration Statement.

66.     As set forth more specifically above, the Registration Statement contained untrue statements of material fact and omitted to state material facts necessary to make the statements, in light of the circumstances in which they were made, not misleading.

67.     Plaintiff and the other Class members did not know, nor could they have known, of the untruths or omissions contained in the Registration Statement.

68.     Defendants were obligated to make a reasonable and diligent investigation of the statements contained in the Registration Statement to ensure that such statements were true and

that there was no omission of material fact required to be stated to make the statements contained therein not misleading.  None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate and complete in all material aspects.  Had they done so, these Defendants could have known of the material misstatements and omissions alleged herein.

69.    This claim was brought within one year after discovery of the untrue statements and omissions in the Registration Statement and Exchange and within three years after the ATP Notes were purchased or otherwise acquired by the Class in connection with the Exchange.

## THIRD CLAIM

**For Violation of Section 15 of the Securities Act Against the Individual Defendants**

70.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

71.    The Individual Defendants acted as controlling persons of ATP within the meaning of §15 of the Securities Act.  By reason of their ownership, senior management positions, and/or directorships at the Company, as alleged above, these Defendants, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause ATP to engage in the conduct complained of herein.  Moreover, the Individual Defendants all signed and thereby approved the false and misleading statements contained in the Registration Statement.  By reason of such conduct, the Individual Defendants are liable pursuant to §15 of the Securities Act.

72.    By reason of such wrongful conduct, the Individual Defendants are liable pursuant to §15 of the Securities Act.  As a direct and proximate result of the wrongful conduct,

Class members suffered damages in connection with their purchases of the Company's securities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23 and certifying Plaintiff as Class representative;

B.      Awarding Plaintiff and other members of the Class compensatory damages;

C.      Awarding Plaintiff and other members of the Class rescission on their §12(a)(2) claims;

D.      Awarding Plaintiff and other members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and disbursements; and

E.      Awarding Plaintiff and other members of the Class any other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: May 24, 2013

                                LEMMON LAW FIRM, LLC

                                /s/ Andrew Lemmon
                                _____
                                ANDREW A. LEMMON (# 18302)
                                IRMA L. NETTING (#29362)
                                LEMMON LAW FIRM, L.L.C.
                                15058 River Road
                                P.O. Box 904
                                Hahnville, Louisiana 70057
                                (985) 783-6789 Telephone
                                (985) 783-1333 Facsimile
                                andrew@lemmonlawfirm.com

GEOFFREY M. JOHNSON
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Telephone: (216) 229-6088
Facsimile: (216) 229-6092
gjohnson@scott-scott.com

JOSEPH P. GUGLIELMO
DONALD A. BROGGI
JOSEPH D. COHEN
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
jguglielmo@scott-scott.com
dbroggi@scott-scott.com
jcohen@scott-scott.com

DAVID R. SCOTT
STEPHEN J. TETI
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 537-5537
Facsimile: (860) 537-4432
david.scott@scott-scott.com
steti@scott-scott.com

*Counsel for Plaintiff*