UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| FIREFIGHTERS PENSION & RELIEF FUND OF THE CITY OF NEW ORLEANS, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>     vs.<br><br>T. PAUL BULMAHN, et al.,<br><br>                              Defendants. | Civil Action No. 2:13-cv-03935-CJB-SS<br><br>CLASS ACTION<br><br>Judge Carl Barbier, Section J<br>Magistrate Judge Sally Shushan, Division 1<br><br><br><br><br>DEMAND FOR JURY TRIAL |

AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

## INTRODUCTION

1.     This is a securities class action brought on behalf of all persons who acquired ATP Oil & Gas Corporation ("ATP" or the "Company") 11.875% Senior Second Lien Exchange Notes (the "Notes") traceable to a false and misleading Form S-4 registration statement and prospectus utilized in connection with ATP's December 16, 2010 exchange offer (collectively, the "Registration Statement").

2.     This case is brought against ATP's senior executives and board of directors, and involves the acquisition of approximately $1.5 billion in Notes by Lead Plaintiff and the Class pursuant to the false and misleading Registration Statement.  The action asserts claims brought pursuant to §§11, 12(a)(2) and 15 of the Securities Act of 1933 (the "1933 Act" or the "Securities Act").[1]

## SUMMARY OF THE ACTION

3.     Prior to 2010, ATP was engaged in the acquisition, development, and production of oil and natural gas properties.  The Company acquired and developed properties with proven undeveloped reserves in the Gulf of Mexico and North Sea.  The majority of the Company's business was in the Gulf of Mexico.

4.     On April 20, 2010, 50 miles off the Louisiana coast, a well blowout from the ultra-deepwater drilling rig Deepwater Horizon caused a fiery explosion, killing 11 rig workers.  After a two-day inferno, the rig sank, fracturing the well's pipe and touching off the largest oil spill in U.S. history.  As a result of the Deepwater Horizon explosion, the United States Department of the Interior ("DOI") issued two moratoria that halted all drilling in water depths greater than 500 feet in

---

[1]   ATP is not named herein as a defendant as on August 17, 2012, ATP filed for Chapter 11 bankruptcy.  The bankruptcy case is *In re ATP Oil & Gas Corp.*, No. 12-36187 (Bankr. S.D. Tex 2012) (the "Bankruptcy Action").

the Gulf of Mexico between May 6, 2010 and October 12, 2010.  Although the moratoria were lifted, as of the Effective Date, the government had yet to approve a new deepwater drilling permit, which was referred to in the industry as the "de facto moratorium."  These moratoria halted all of the Company's exploration and development operations in the Gulf of Mexico through 2010.

5.     On or about October 12, 2010, ATP filed the Registration Statement with the U.S. Securities and Exchange Commission ("SEC"), indicating its intent to conduct an exchange of the Notes for $1.5 billion of privately placed notes which had been sold by ATP in April 2010 in a transaction exempt from the registration requirements of the Securities Act ("the Exchange"). Following a December 14, 2010 amendment, the Registration Statement was declared effective by the SEC and the Exchange was effected on December 16, 2010 (the "Effective Date").  Pursuant to the Registration Statement, ATP executed the Exchange, which offered and exchanged $1.5 billion worth of the Notes.

6.     The Registration Statement utilized in connection with the Exchange was false and misleading in that it misrepresented and/or omitted material facts, including that:

(a)     ATP did not have the liquidity and revenue to survive the moratoria;

(b)     the proved oil and gas reserves as reported by ATP were false and misleading;

(c)     there was no reasonable basis to believe, and defendants did not in fact believe, ATP's forecast of "a substantial increase in production over the next year as development wells are brought to production";

(d)     ATP was in violation of its credit and debt agreements as it had entered into "disguised financings" with various entities, including at least eight conveyances that ATP has now admitted were in fact disguised financings;

(e)     ATP was operating in violation of U.S. environmental laws by unlawfully discharging oil and an unpermitted chemical dispersant into the Gulf of Mexico; and

- 2 -

(f)     the boilerplate "risk disclosures" utilized in the Registration Statement were themselves misleading as detailed in ¶¶45-48.

7.      By May 24, 2013, the date of the filing of the initial complaint in this action, the $1.5 billion worth of Notes acquired by Lead Plaintiff and the Class were trading at just over 1% of par (or approximately 1¢ on the dollar), resulting in more than $1 billion of harm to Lead Plaintiff and the Class which acquired the Notes traceable to the false and misleading Registration Statement and suffered substantial economic loss in connection therewith.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over the causes of action asserted herein pursuant to §22 of the Securities Act, 15 U.S.C. §77v(a).  The claims alleged herein arise under §§11, 12(a)(2) and 15 of the Securities Act.  *See* 15 U.S.C. §§77k, 77l(a)(2) and 77o.  Jurisdiction is conferred by §22 of the Securities Act and venue is proper pursuant to §22 of the Securities Act.

9.      This Court has personal jurisdiction over all defendants named herein because they conducted business in, offered the Exchange in, resided in, and/or were citizens of this District at the time of the Exchange.

10.     Venue is proper in this Court as defendants purposefully availed themselves of the benefits of this District by offering for sale and selling the Notes in this District. Moreover, many of the acts complained of, including the dissemination of materially false and misleading statements and reports prepared by or with the participation, acquiescence, encouragement, cooperation, or assistance of defendants, occurred, at least in part, in this District.

11.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

12.     The Court-appointed Lead Plaintiff Plumbers and Pipefitters National Pension Fund acquired $8.5 million of ATP Notes traceable to the Exchange and was damaged thereby, as set forth in its Certification attached to Docket No. 29-4.

13.     Additional plaintiff Firefighters Pension and Relief Fund of the City of New Orleans acquired Notes pursuant and/or traceable to the Exchange and was damaged thereby, as set forth in its Certification attached to Docket Nos. 1, 18-1.

14.     Defendant T. Paul Bulmahn ("Bulmahn") was the Chairman and Chief Executive Officer and Director of ATP.  Bulmahn signed the Registration Statement.

15.     Defendant Albert L. Reese, Jr. ("Reese") was the Chief Financial Officer of ATP. Reese signed the Registration Statement.

16.     Defendant Keith R. Godwin ("Godwin") was the Chief Accounting Officer of ATP. Godwin signed the Registration Statement.

17.     Defendant Chris A. Brisack ("Brisack") was a Director at ATP.  Brisack signed the Registration Statement.

18.     Defendant Arthur H. Dilly ("Dilly") was a Director at ATP.  Dilly signed the Registration Statement.

19.     Defendant Gerard J. Swonke ("Swonke") was a Director at ATP.  Swonke signed the Registration Statement.

20.     Defendant Brent M. Longnecker ("Longnecker") was a Director at ATP.  Longnecker signed the Registration Statement.

21.     Defendant Walter Wendlandt ("Wendlandt") was a Director at ATP.  Wendlandt signed the Registration Statement.

22. Defendant Burt A. Adams ("Adams") was a Director at ATP. Adams signed the Registration Statement.

23. Defendant George R. Edwards ("Edwards") was a Director at ATP. Edwards signed the Registration Statement.

24. Defendant Robert J. Karow ("Karow") was a Director at ATP. Karow signed the Registration Statement.

25. The defendants identified in ¶¶14 to 24 are referred to collectively as the "Individual Defendants" or "defendants."

26. The Individual Defendants who signed the Registration Statement are strictly liable for the false and misleading statements incorporated into the Registration Statement.

## THE FALSE AND MISLEADING REGISTRATION STATEMENT

27. As defendants have acknowledged, between 2009 and 2010, over 90% of ATP's production was concentrated in the Gulf of Mexico. Likewise, as of December 31, 2009, 68% of ATP's "net proved reserves" were located in the Gulf of Mexico.

28. On or about December 16, 2010, the SEC declared the Registration Statement effective and pursuant thereto members of the Class exchanged $1.5 billion worth of Notes. The Registration Statement was false and misleading when it was declared effective on December 16, 2010 in that it contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, including incorporating by reference prior SEC filings that were themselves false or materially misleading and were not prepared in accordance with applicable rules and regulations.

29. With regard to a registration statement's Management Discussion and Analysis ("MD&A") section, Regulation S-K Item 303(a)(1), 303(a)(3)(ii) and Instruction No. 3 to Paragraph 303(a) require companies to:

*Identify any known trends* or any known demands, commitments, events *or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity* increasing or *decreasing in any material way*.

\*     \*     \*

*Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material* favorable or *unfavorable impact on net sales or revenues* or income from continuing operations.

\*     \*     \*

*The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition*.

30.     In fact, the SEC has stated that "Disclosure is *mandatory* where there is a known trend or uncertainty that is *reasonably likely* to have a material effect on the registrant's financial condition or results of operations."

**The Registration Statement Was False
and Misleading in that ATP Omitted
Material Facts Concerning Its Liquidity
and Revenue**

31.     During 2009, ATP was working to complete development of the ATP Titan floating platform and the associated Telemark Hub in the Gulf of Mexico.[2] The use of a floating production platform with its associated processing hub was a development strategy that ATP had first employed in the Gulf of Mexico with the ATP Innovator and associated Gomez Hub.  As ATP itself emphasized, the Telemark and Gomez Hubs were "fundamental" to ATP's "business plan."

32.     In early 2010, the ATP Titan was positioned to re-enter existing wellbores, then deepen and complete the wells in order to enable production.  By March 2010, the Company had initial production from one well at Telemark.  In the Registration Statement, ATP stated that

---

[2]     The ATP Titan floating platform is a floating production facility that was completed in 2010 and used to extract hydrocarbons in the deepwater Gulf of Mexico.

- 6 -

additional Gulf of Mexico wells were scheduled for completion during the remainder of 2010 and the first quarter of 2011 and as a result, according to ATP, the Company's hydrocarbon production was projected to increase substantially as a result of ATP's Gulf of Mexico operations.

33.     The statement in ¶32 above was false and misleading in that the Registration Statement omitted that, due to the moratoria and the Telemark Hub's underperformance, ATP's liquidity was reasonably likely to decrease in a material way and ATP reasonably expected that the same factors would have a material adverse effect on ATP's revenue.  The true facts were:

(a)     The Telemark Hub, which ATP claimed gave it "a significant competitive advantage . . . over other production companies," was performing materially worse than projected at the time of the Exchange, as detailed in ¶¶33(g)-(h), 36, 47-48;

(b)     On May 6, 2010, as a result of the Deepwater Horizon explosion, the DOI issued a moratorium that essentially halted all drilling in water depths greater than 500 feet in the Gulf of Mexico.  This first moratorium was judicially stayed, but the DOI then issued a second moratorium on July 12, 2010.  This second moratorium ended on October 12, 2010, with respect to all deepwater drilling activity in the Gulf of Mexico.  Although the moratorium was lifted, as of the Effective Date, the government had yet to approve a new deepwater drilling permit, which was referred to in the industry as the "de facto moratorium."  These moratoria halted all of the Company's exploration and development operations in the Gulf of Mexico through the date of the Exchange.

(c)     Reese, ATP's Chief Financial Officer, has testified under oath that during the moratoria ATP stopped exploration and development with respect to all of its Gulf of Mexico wells even though he has also acknowledged that drilling in the Gulf of Mexico

- 7 -

during that time was "very important" to ATP. [3]  Reese has also admitted that ATP knew in

2010 that it could not survive the moratoria, responding with an unequivocal "[n]o" when

asked "[d]id ATP have the liquidity and revenues at that time to absorb a lengthy

moratorium?"

   (d)  As ATP has acknowledged, "[t]he primary reason" for the Company's failure

"began with the Macondo well blowout in April 2010 and the imposition beginning in May

2010 of the moratoria on drilling and related activities in the Gulf of Mexico" and as attested

to by Reese under penalty of perjury, the shutdown in the Gulf "created significant liquidity

problems" for ATP.

   (e)  ATP acknowledged in 2012 that the blowout of the Macondo well and the

subsequent imposition of the U.S. Government's moratoria on further deep-water exploration

had an impact that was "***especially profound on ATP***," as it interrupted drilling operations at

significant cost to ATP while blocking "ATP's ability to generate those new cash flows

while the company continued to endure under significant financing costs."  In fact, ATP's

proposed drilling program which contemplated drilling six wells in 2010 and 2011 could not

"proceed given the moratorium."

   (f)  As admitted by ATP in a lawsuit filed against the United States, during 2010,

ATP's business was materially adversely impacted "[a]s a direct result" of the moratoria, as

ATP "incurred increased costs" and "additional expense[s]" without the benefit of

production.

---

[3] On August 17, 2012, ATP filed for Chapter 11 bankruptcy.  In the bankruptcy filing, defendants admitted what they had known since well before the Exchange – that the moratoria effectively ended ATP's prospects as a viable business.

(g)     For months prior to the Exchange, ATP's Telemark Hub was substantially underperforming due to the undisclosed fact that the Atwater well lacked connectivity, as detailed in ¶¶36, 47-48.  The Atwater well's lack of connectivity and concomitant pressure decline substantially increased the cost of production at Atwater, which pressure decline and cost increases were reasonably expected by defendants to continue to cause the cost of production to exceed estimates.  Atwater's sharp decline in production materially increased the cost of production because of the significant fixed costs associated with Telemark which had a production capacity of 25,000 barrels a day and was reasonably expected to continue to adversely impact ATP's liquidity.

(h)     As detailed in ¶¶36, 47-48, the significant underperformance at ATP's Telemark Hub during 2010 was a known trend or uncertainty that was then having and was reasonably likely to continue to have an unfavorable impact on ATP's revenues and liquidity.  In fact, defendants "reasonably expect[ed]" the moratoria and Telemark Hub underperformance to *decrease* ATP's liquidity in a material way.  Thus, defendants violated SEC disclosure rules, notably Regulation S-K Item 303(a)(1) and 303(a)(3)(ii).

**The Registration Statement Was False**
**and Misleading with Regard to ATP's**
**Reported Proved Oil and Gas Reserves**

34.     Rule 4-10 of Regulation S-X prescribes financial accounting and reporting standards for oil and gas producing activities.  *See* 17 C.F.R. §210.4-10.  Rule 4-10(a)(22) states in pertinent part: "Proved oil and gas reserves are those quantities of oil and gas, which, *by analysis of geoscience and engineering data*, can be estimated with reasonable certainty to be economically producible – from a given date forward, from known reservoirs, and *under existing economic conditions, operating methods, and government regulations* . . . ."  17 C.F.R. §210.4-10(a)(22).  Rule 4-10(a)(22) further states that, in order to qualify as "[p]roved oil and gas reserves," "[t]he

- 9 -

project to extract the hydrocarbons must have commenced or the operator **must be reasonably certain that it will commence the project within a reasonable time**."

35.     The Registration Statement defined "[p]roved reserves" as "the estimated quantities of oil and gas which geological and engineering data demonstrate, with **reasonable certainty**, can be recovered in future years from known reservoirs **under existing economic and operating conditions**. Reservoirs are considered proved if shown to be economically producible by either actual production or conclusive formation tests" (citing Regulation S-X).  Defendants had no reasonable basis to believe, and did not believe, the volume of "proved" oil and gas reserve figures reported in ATP's 2009 Form 10-K (and incorporated by reference into the Registration Statement) complied with SEC regulations or were accurate as of the date the Registration Statement was declared effective.

36.     ATP's Telemark Hub accounted for 36% of ATP's total net proved reserves of 135.2 MMBoe (million barrels of oil equivalent) as of December 31, 2009, which proved reserve figures were incorporated into the Registration Statement.  The Telemark reserve figures were false and misleading in that they were not sufficiently supported by geoscience and engineering data nor estimated with reasonable certainty to be economically producible, as required by SEC regulations. The true facts were:

      (a)     ATP had discovered prior to the Effective Date of the Registration Statement that the Atwater well's reservoirs lacked connectivity;[4]

      (b)     ATP did **not** test for connectivity between the well's reservoirs prior to bringing Atwater onto production in March 2010.[5]  It was only **after** actual production began

---

[4]     Connectivity represents one of the fundamental properties of a hydrocarbon reservoir that directly affects recovery.  If a portion of the reservoir is not connected to a well, it cannot be drained. In addition, sufficient pressure is necessary to viably extract the hydrocarbons.

[5]     In contrast, ATP **did** conduct such well tests prior to bringing its Gomez Hub online.

- 10 -

in April 2010 and prior to the Effective Date that ATP discovered the well's lack of connectivity and concomitant pressure decline.  The lack of connectivity caused the Atwater well's production to plummet and increased the cost of production;

(c)  ATP considered a sidetrack well as a potential solution to Atwater's lack of connectivity but this was not possible as it would have required additional drilling and was prohibited by the moratoria;

(d)  The Company's financial situation made a sidetrack well at Atwater infeasible, even in the absence of the moratoria;

(e)  Production at Atwater began in March 2010 and performed substantially below projected performance levels, as the well's output declined precipitously to nearly nothing within a few months of coming online;

(f)  Telemark, which was projected to see a "stair-step" in production beginning with Atwater, actually experienced a "saw-tooth" in production in which the previously completed well was depleted by the time production at the next well had begun;

(g)  Atwater's sharp decline in production provided ATP with further *indicia* that Telemark's other wells were reasonably likely to ***not*** produce to the levels ATP had projected and that Telemark's reserve figures were not supported by "reasonable certainty"; and

(h)  As a result of (a)-(g) above, ATP "reasonably expect[ed]" the moratoria and Telemark Hub underperformance to decrease the Company's liquidity in a material way and defendants' failure to disclose these facts violated SEC disclosure rules.

37.  The Registration Statement was also false and misleading with respect to ATP's Cheviot Hub as ATP was not "reasonably certain" that it would commence the project to extract the

- 11 -

hydrocarbons at the Cheviot Hub "within a reasonable time," as required by SEC regulations. *See* 17 C.F.R. §210.4-10(a)(22). The true facts known to defendants were:

(a)      That the Cheviot Hub in the North Sea accounted for 29% of ATP's total net proved reserves as of December 31, 2009, yet at the time of the Exchange, ATP's production facility (the "Octabuoy") was being constructed in China and was not planned for deployment to Cheviot until at least 2012 (later pushed back to 2014/2015); and

(b)      That as defendant Reese later admitted, "the shutdown in the Gulf created significant liquidity problems" for ATP which were "exacerbated" by the Octabuoy cost overruns, and ATP did not "have the liquidity and revenues at that time to absorb a lengthy moratorium" and therefore ATP was not reasonably certain to commence the Cheviot drilling project as ATP's own management was not reasonably certain ATP could survive the moratoria, let alone afford to construct, transport, and fully implement the custom-developed Octabuoy at Cheviot.

**The Registration Statement Was False**
**and Misleading as to ATP's Forecast of**
**a Substantial Increase in Production over**
**the Next Year as Development Wells Were**
**Brought to Production**

38.      The Registration Statement also stated that: "[w]e project *a substantial increase in production over the next year* as development wells are brought to production."

39.      The statement in ¶38 above was false and misleading when made. The true facts were that defendants had no reasonable basis to expect, and did not in fact expect, a substantial increase in production over the next year as:

(a)      Leading up to, and at the time of the Exchange, the moratoria and so-called "de facto moratorium" were devastating ATP's current operations and future business prospects, as detailed in ¶¶4, 33, 37(b), 45, 47;

- 12 -

(b)      Defendants were aware that the "de facto moratorium" was continuing to prevent *any* exploratory or developmental drilling in the Gulf of Mexico and had cut into and would continue to cut into anticipated production from the Gulf *for years to come*.  Indeed, at the time of the Exchange, no deepwater drilling permits had been issued;

(c)      Defendants expected that because of (a) and (b) above, the delays created by the government moratoria and related issues were likely to materially adversely impact anticipated production from the Gulf during 2011 and beyond; and

(d)      As detailed in ¶¶33(g)-(h), 36, 47-48, in the months leading up to the Exchange, production at ATP's Telemark Hub declined precipitously due to the lack of connectivity at Atwater and the decline in production at Atwater indicated to ATP that the surrounding Telemark wells would also not produce to the levels ATP had previously projected.

**ATP Was in Violation of Its Credit and
Debt Agreements by Having Entered
into "Disguised Financings"**

40.      The Registration Statement acknowledged that covenants in the Company's credit and debt agreements restricted ATP's business "in many ways."   Specifically, the Registration Statement confirmed that the credit and debt agreements limited ATP's ability to, among other things, "incur additional indebtedness."  The Registration Statement also acknowledged that while "[t]here can be no assurance that we will *remain* in compliance with the covenants under our debt agreements" a "breach of any of these covenants *could* result in a default under our credit facility and/or the notes."

41.      These statements in ¶40 above regarding ATP's compliance with its debt agreement covenants were false and misleading when made in that they misrepresented and/or omitted material facts, including that:

- 13 -

(a)      In 2009 and 2010, defendants had engaged in "disguised financings" that placed ATP in violation of covenants of ATP's credit and debt agreements;

(b)      As of the date of the Exchange, ATP had already breached its compliance with the covenants under its debt agreements; and

(c)      As of the date of the Exchange, ATP had already subjected itself to risk of default under its credit facility.

42.      The "disguised financings" ATP entered into involved various entities and concerned key oil and gas leases operated by ATP, and included:

(a)      On or about August 4, 2008, ATP and Diamond Offshore Company ("Diamond") entered an agreement for Diamond's services in developing certain oil and gas leases operated by ATP.  Before Diamond provided any services to ATP under the agreement, ATP requested Diamond accept an interest in ATP's oil and gas leases in lieu of cash payments.  On or about May 22, 2009, ATP conveyed to Diamond an overriding royalty interest ("ORRI") in certain offshore oil and gas leases operated by ATP, in exchange for Diamond's services.  ATP and Diamond executed five amendments to the ORRI conveyance agreement.  This "disguised financing" remained in effect as of the date of the Exchange: Diamond submitted its final invoice to ATP under the drilling contract in 2011 and ATP owed payments to Diamond under the agreement until (at least) July 30, 2012.

(b)      Effective May 25, 2009, ATP granted to Air Logistics an ORRI entitling Air Logistics to receive a limited net profits interest ("NPI") in the production of hydrocarbons from leased lands operated by ATP, in exchange for Air Logistic's provision of helicopter services to ATP.  Air Logistics accepted the ORRI "in lieu of cash payments for [its] services."

(c)     On or about May 28, 2009, ATP conveyed to SEACOR Marine, LLC ("SEACOR"), an ORRI in and to hydrocarbons produced and attributable to certain oil and gas leases operated by ATP, in exchange for SEACOR's provision of vessels and related services to ATP.  This "disguised financing" remained in effect as of the date of the Exchange, as on or about March 24, 2011, the parties executed and agreed to an amendment to the agreement.

(d)     Effective September 1, 2009, ATP and Bluewater Industries L.P. ("Bluewater") entered into an agreement whereby ATP conveyed to Bluewater an ORRI equal to an applicable royalty percentage of all hydrocarbons produced, saved and sold from or attributable to certain oil and gas leases, in exchange for Bluewater's services in developing the leased land.  Effective November 5, 2009, Bluewater assigned to Macquarie Investments LLC ("Macquarie") all of Bluewater's rights and interests in the agreement and ORRI in exchange for $35 million from Macquarie.  This "disguised financing" remained in effect as of the date of the Exchange.

(e)     Effective January 1, 2010, ATP entered into an agreement under which ATP granted Macquarie an ORRI in certain oil and gas leases and to the NPI attributable to any hydrocarbons produced and saved from the leases, in exchange for $25 million from Macquarie.  This "disguised financing" remained in effect as of the date of the Exchange.

(f)     On or about March 30, 2010, ATP entered an agreement (effective January 1, 2010) to grant TM Energy an ORRI entitling TM Energy to receive a limited net profits interest in the hydrocarbon production from certain oil and gas leases operated by ATP, in exchange for a cash payment of $25 million.  According to ATP, TM Energy's ORRI "terminates when TM Energy has received a designated 21% internal rate of return on its

- 15 -

investment, after which title in the term ORRI reverts back to ATP." This "disguised financing" remained in effect as of the date of the Exchange.

(g)     On or about January 5, 2010, ATP entered in a Purchase and Sale Agreement with GMZ Energy and TM Energy, under which ATP agreed to sell and GMZ Energy agreed to purchase a term ORRI for $27,533,333.33, and TM Energy agreed to purchase a perpetual ORRI for $466,666.67.   The term ORRI GMZ Energy purchased entitles it to receive a monthly royalty payment equal to a percentage of the sale proceeds from certain oil and gas leases operated by ATP.  According to ATP, GMZ Energy's term ORRI "terminates when GMZ Energy receives a designated 12% internal rate of return on its investment in the term ORRI, after which title in the term ORRI reverts back to ATP."  The perpetual ORRI that TM Energy purchased entitles it to receive a monthly royalty payment equal to a percentage of the sale proceeds from certain oil and gas leases operated by ATP.  These "disguised financings" remained in effect as of the date of the Exchange.

(h)     On or about January 26, 2010, ATP entered in a Purchase and Sale Agreement with GMZ Energy and TM Energy, under which ATP agreed to sell and GMZ Energy agreed to purchase a term ORRI for $4,916,667.00 and TM Energy agreed to purchase a perpetual ORRI for $83,333.00.  The term ORRI GMZ Energy purchased entitles it to receive a monthly royalty payment equal to a percentage of the sale proceeds from certain oil and gas leases operated by ATP.  According to ATP, the term ORRI GMZ Energy purchased "terminates when GMZ Energy has received a designated 12% internal rate of return on its investment, after which title in the term ORRI reverts back to ATP."  The perpetual ORRI that TM Energy purchased entitles it to receive a monthly royalty payment equal to a percentage of the sale proceeds from certain oil and gas leases operated by ATP.  These "disguised financings" remained in effect as of the date of the Exchange.

- 16 -

876552_1

43.     ATP has now admitted that the agreements described above which were entered into prior to the Effective Date were "disguised financing" transactions.  In responding to claims against ATP in the Bankruptcy Action, ATP has admitted that, *inter alia*: (1) "*[t]he Conveyances are Financing Agreements*"; (2) "*[w]hether a transaction constitutes a true sale or a disguised financing transaction depends upon the economic substance of the transaction* and *not* on the characterization of the transactions in the conveyance documents alone"; (3) "*[t]he Conveyances and related agreements have the economic characteristics of a financing transaction and not a true sale*" (listing various reasons); and (4) "[b]ased upon consideration of all relevant factors, including, without limitation, those listed above and additional facts to be determined in discovery, *the Conveyances are in economic substance disguised financing transactions and not true sales*."

44.     Furthermore, in connection with ATP's assertion of counterclaims in the Bankruptcy Action, ATP again admitted that, "*the Conveyances and related agreements constitute disguised financing arrangements*."   In addition to ATP's admissions that it engaged in "disguised financings" prior to the Effective Date, Bankruptcy Court Judge Marvin Isgur of the Southern District of Texas has characterized these arrangements as "disguised financings."

**The "Risk Disclosures" Included in the**
**Registration Statement Were Themselves**
**False and Misleading**

45.     **False and Misleading "Risk Disclosure" Concerning the Moratoria.**   The boilerplate "risk disclosure" included in the Registration Statement was itself false and misleading as it was nearly identical to those contained in prior SEC filings.  The "risk disclosure" section of the Registration Statement which stated that the "governmental and regulatory response to the Deepwater Horizon" explosion "*could have*" an adverse impact on ATP's Gulf of Mexico operations, in no way alerted – and in fact misled – investors to the negative impacts that *had already occurred* in ATP's Gulf of Mexico operations at the time of the Exchange.  Thus, the

- 17 -

boilerplate "risk disclosure" was false and misleading as the "U.S. governmental and regulatory response to the Deepwater Horizon" explosion was already, as of the Exchange, severely adversely impacting ATP's business.  Indeed, as detailed in ¶¶33, 37(b), defendants subsequently admitted that the moratoria – that began seven months before the Exchange – effectively ended ATP's business.

46.     **False and Misleading "Risk Disclosure" Concerning the "Disguised Financings."** The Registration Statement also stated: "There can be no assurance that we will remain in compliance with the covenants under our debt agreements.  A breach of any of these covenants could result in a default under our credit facility and/or the note[s]."  This "risk disclosure" was also false and misleading as it failed to disclose the "disguised financings" which placed ATP in breach at the time of the Exchange.  Likewise, the statement that "[t]here can be no assurance that we *will remain in compliance* with the covenants," was false and misleading as ATP was *already in violation of* its credit and debt agreements.

47.     **False and Misleading "Risk Disclosure" Concerning ATP's Telemark Hub.**  The Registration Statement also included a "risk disclosure" which stated that "production curtailment at our material properties including at our Telemark Hub *may* adversely affect our financial position and results of operations."  This statement was false and misleading in that it failed to disclose that production at Telemark was, as of the Effective Date, significantly below expectations and was already having a material adverse effect on ATP's financial position and results of operations and was expected to continue to do so into 2011.

48.     **False and Misleading "Risk Disclosure" Concerning ATP's Production Estimates and Development Costs.**  The Registration Statement also included a "risk disclosure" that asserted that ATP "may experience production that is less than estimated and development costs that are greater than estimated in our reserve reports."  This statement too was false and misleading as it failed to disclose that ATP was, as of the Effective Date, experiencing production that was

- 18 -

materially less than estimated.  Indeed, as detailed in ¶¶33(g)-(h), 36, 47, the Telemark Hub (ATP's

most "significant" property) was severely underperforming due to the lack of connectivity at Atwater

which lack of connectivity also caused significantly higher development costs.  Thus, the boilerplate

risk disclosure that ATP "may experience production that is less than estimated," in no way

informed investors of the fact that ATP was already experiencing production materially less than

anticipated at Telemark.

**ATP's Violations of U.S. Environmental Laws**

49.     The Registration Statement incorporated by reference ATP's Form 10-Q for the

period ending September 30, 2010, which stated that ATP's new credit facility "contains an event of

default if there has occurred a material adverse change with respect to the Company's compliance

with environmental requirements and applicable laws and regulations."

50.     The Registration Statement was false and misleading in that it failed to disclose that,

in violation of U.S. law, ATP had been unlawfully discharging oil and an unpermitted chemical

dispersant into the Gulf of Mexico since *early October 2010*, and before then had been discharging

another unpermitted chemical.  The Registration Statement's failure to disclose this fact and that as a

result thereof ATP was in violation of its debt agreements as of the date of the Exchange based on its

violations of U.S. environmental laws, rendered the Registration Statement materially false and

misleading.  For the same reasons, the statement that one of the potential risks to ATP's business

included "environmental accidents or hazards" was false or materially misleading.

51.     According to the U.S. Department of Justice ("DOJ"), acting at the request of the

Secretary of the DOI and the Administrator of the United States Environmental Protection Agency

("EPA"), from at least October 2010, ATP was in violation of the Clean Water Act ("CWA") and the

Outer Continental Shelf Lands Act ("OCSLA").  During this time, ATP unlawfully discharged "oil

and an unpermitted chemical dispersant from ATP's floating oil and gas production platform, the

- 19 -

'ATP Innovator,' into the Gulf of Mexico." As a result of ATP's violations, the DOJ's complaint is seeking civil penalties of over $53 million.[6]

52.     According to the DOJ, "[t]he metal tubing was connected to a 550-gallon tank of Cleartron ZB-103, an amide surfactant chemical blended with methanol that, as used, acts to break apart oil molecules into smaller, dispersed droplets." "The manufacturer's Technical Data Sheet for Cleartron ZB-103 identifies the substance as a 'dispersant,'" and states that it is "'[h]armful to aquatic life.'" "[T]he Cleartron ZB-103 dispersant was injected into the outfall pipe to mask oil sheen on the ocean surface resulting from ATP's discharge of wastewater containing quantities of oil in excess of its [National Pollutant Discharge Elimination System ("NPDES")] permit limit." "ATP contractors working aboard the ATP Innovator referred to the on-board use of Cleartron ZB-103 as 'the soap' and 'the sheen buster.'" ATP's "NPDES permit does not authorize ATP to discharge Cleartron ZB-103 into the ocean or any other waters." ATP had been regularly purchasing and using significant quantities of Cleartron ZB-103 on the ATP Innovator beginning in *October 2010 and had been using an alternative chemical before then*.

53.     Bureau of Safety and Environmental Enforcement ("BSEE") inspectors aboard the ATP Innovator later identified a metal tube connected to a permitted NPDES outfall pipe used for overboard discharge of the facility's wastewater. "The metal tube and connection to the outfall pipe was hidden in the rafters at a location downstream of the treatment units and the NPDES sampling point. Thus, injections from the tube into the outfall pipe are undetectable in NPDES samples."

54.     Lead Plaintiff and the Class have suffered damages of more than $1 billion as a result of their acquisition of the Notes in connection with the Exchange.

---

[6]     The complaint was filed February 11, 2013. *See United States v. ATP Oil and Gas Corp.*, No. 13-cv-00262 (E.D. La. 2013). By order dated July 1, 2013, Judge Brown denied a motion to dismiss the complaint. *See id.*, Docket No. 53.

## CLASS ACTION ALLEGATIONS

55.     Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who acquired Notes traceable to the Registration Statement and were damaged thereby (the "Class").  Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

56.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by ATP or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

57.     Lead Plaintiff Plumbers and Pipefitters National Pension Fund and additional plaintiff Firefighters Pension and Relief Fund of the City of New Orleans ("Plaintiffs") claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

58.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

59.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        (a)      whether the Registration Statement was false or misleading;

(b)      whether the 1933 Act was violated by defendants' acts as alleged herein; and

(c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

60.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violations of Section 11 of the 1933 Act
### Against All Defendants

61.      Plaintiffs repeat and reallege each and every allegation contained above, except any allegation construed to allege fraud or intentional misconduct.

62.      This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.

63.      Lead Plaintiff and the Class acquired Notes traceable to the Registration Statement.

64.      The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

65.      The defendants named herein were responsible for the contents and dissemination of the Registration Statement.  None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

66.      By reason of the conduct herein alleged, each defendant violated §11 of the 1933 Act.

- 22 -

67.     Lead Plaintiff and the Class have sustained damages as a result of defendants' violations.

68.     At the time they acquired the Notes, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to August 17, 2012.  Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiffs filed the complaint.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time this action was commenced.

## COUNT II

### Violation of Section 12(a)(2) of the 1933 Act
### Against All Defendants

69.     Plaintiffs repeat and reallege each and every allegation contained above, except any allegation construed to allege fraud or intentional misconduct.

70.     This Count is brought pursuant to §12(a)(2) of the 1933 Act on behalf of the Class, against all defendants.

71.     The Registration Statement and the Prospectus incorporated therein contained untrue statements of material fact, and omitted material facts necessary to make the statements made therein not misleading as detailed above.  Defendants owed Lead Plaintiff and the other members of the Class who acquired Notes pursuant to the Registration Statement and the Prospectus incorporated therein the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and the Prospectus incorporated therein to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants, in the exercise of reasonable care, should

- 23 -

have known of the misstatements and omissions contained in the Registration Statement and the Prospectus incorporated therein as set forth above.

72.     Lead Plaintiff and the Class did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Registration Statement and the Prospectus incorporated therein at the time Lead Plaintiff and the Class acquired the Notes.

73.     By reason of the conduct alleged herein, defendants violated §12(a)(2) of the 1933 Act.  As a direct and proximate result of such violations, Lead Plaintiff and the other members of the Class who acquired Notes pursuant to the Registration Statement and the Prospectus incorporated therein sustained substantial damages in connection with their acquisition.  Accordingly, Lead Plaintiff and the other members of the Class who hold such Notes have the right to rescind and recover the consideration paid for their Notes, and hereby tender their Notes to the defendants sued herein.  Class members who have sold their Notes seek damages to the extent permitted by law.

**COUNT III**

**Violations of Section 15 of the 1933 Act**
**Against All Defendants**

74.     Plaintiffs repeat and reallege each and every allegation contained above, except any allegation construed to allege fraud or intentional misconduct.

75.     This Count is brought pursuant to §15 of the 1933 Act against the Individual Defendants.

76.     Each of the Individual Defendants was a control person of ATP by virtue of his or her position as an owner, director and/or senior officer of ATP.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of ATP.  The Individual Defendants, as members of ATP's Board of Directors, had the authority to, *inter alia*: adopt resolutions; declare and pay dividends to owners

- 24 -

of ATP common stock; adopt, amend and repeal ATP's bylaws; and establish committees of the board of directors and appoint members thereto.  The Individual Defendants also held considerable amounts of ATP's common stock, including defendant Bulmahn who beneficially owned more than 10% of ATP's issued and outstanding shares as of March 2010.

77.     Each of the Individual Defendants was a culpable participant in the violations of §11 of the 1933 Act alleged in the Count above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process, which allowed the Exchange to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action and certifying Lead Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding rescission or a rescissory measure of damages; and

E.     Such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.

DATED:  October 10, 2013

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
ROBERT R. HENSSLER JR.
CHRISTOPHER D. STEWART


s/ Robert R. Henssler, Jr.
ROBERT R. HENSSLER JR.

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER M. WOOD
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

Lead Counsel for Plaintiff

ROBEIN, URANN, SPENCER, PICARD
  & CANGEMI, APLC
LOUIS L. ROBEIN
2540 Severn Avenue, Suite 400
Metairie, LA  70002
Telephone:  504/885-9994
504/232-0510 (fax)
lrobein@ruspclaw.com

Liaison Counsel

O'DONOGHUE & O'DONOGHUE LLP
LOUIS P. MALONE
4748 Wisconsin Avenue, N.W.
Washington, DC  20016
Telephone:  202/362-0041
202/362-2640 (fax)

- 26 -

SCOTT + SCOTT LLP
JOSEPH P.  GUGLIELMO
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY  10174
Telephone:  212/233-6444
212/233-6334 (fax)

Additional Counsel for Plaintiff

876552_1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 10, 2013, I authorized the electronic filing of the foregoing

with the Clerk of the Court using the CM/ECF system which will send notification of such filing to

the e-mail addresses denoted on the attached Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed on October 10, 2013.

s/ Robert R. Henssler, Jr.
ROBERT R. HENSSLER JR.

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)
E-mail:  bhenssler@rgrdlaw.com

# Mailing Information for a Case  2:13-cv-03935-CJB-SS Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Yusuf Bajwa**
  ybajwa@kslaw.com,kbryan@kslaw.com,jworsham@kslaw.com

- **Paul R. Bessette**
  pbessette@kslaw.com,ccisneros@kslaw.com

- **Michael J. Biles**
  mbiles@kslaw.com,kbryan@kslaw.com,jworsham@kslaw.com

- **Corby Davin Boldissar**
  nobankecf@lockelord.com

- **Donald A Broggi**
  dbroggi@scott-scott.com,efile@scott-scott.com

- **Roy Clifton Cheatwood**
  rcheatwood@bakerdonelson.com,dpechon@bakerdonelson.com

- **Philip Guy Eisenberg**
  peisenberg@lockeliddell.com

- **Joseph P. Guglielmo**
  jguglielmo@scott-scott.com,tcrockett@scott-scott.com,kjager@scott-scott.com,efile@scott-scott.com

- **Robert R Henssler**
  bhenssler@rgrdlaw.com,stremblay@rgrdlaw.com

- **Tyler W Highful**
  thighful@kslaw.com

- **John William Hite , III**
  jhite@shrmlaw.com,dscardino@shrmlaw.com

- **Lewis Stephen Kahn**
  lewis.kahn@ksfcounsel.com

- **Omer Frederick Kuebel , III**
  nobankecf@lockelord.com

- **Monique M. Lafontaine**
  mlafontaine@lockelord.com,kmillet@lockelord.com,cbrowne@lockelord.com

- **Peyton C. Lambert**
  plambert@shmrlaw.com,dscardino@shmrlaw.com

- **Andrew Allen Lemmon**
  andrew@lemmonlawfirm.com,court@lemmonlawfirm.com

- **Hamilton P Lindley**
  hlindley@deanslyons.com,dstephenson@deanslyons.com

- **Glen Mercer**
  gmercer@shmnola.com

- **Erika Lynn Mullenbach**
  emullenbach@shmnola.com

- **Danielle S Myers**
  dmyers@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Irma L. Netting**
  irma@lemmonlawfirm.com

- **Melinda A. Nicholson**
  melinda.nicholson@ksfcounsel.com

- **Eric J. O'Bell**
  ejo@obelllawfirm.com,ejoatlaw@aol.com

- **Royale Price**
  rprice@kslaw.com,kbryan@kslaw.com,jworsham@kslaw.com

- **Louis Leo Robein , III**
  lrobein@ruspclaw.com,mwilson@ruspclaw.com

- **Matthew A. Woolf**
  mwoolf@bakerdonelson.com,rramm@bakerdonelson.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)