# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| FIREFIGHTER'S PENSION & RELIEF FUND OF THE CITY OF NEW ORLEANS, | CIVIL ACTION NO.  13-3935 c/w No(s). 13-6083, 13-6084 and 13-6233 |
| Plaintiff, | CHIEF JUDGE SARAH S. VANCE, Section R MAGISTRATE JUDGE SALLY SHUSHAN, Division 1 |
| vs. | |
| T. PAUL BULMAHN, ET AL., | **COMPLAINT – CLASS ACTION** |
| Defendants. | **Pertains to Nos. 13-6083, 13-6084 and 13-6233** |

## CONSOLIDATED CLASS ACTION COMPLAINT

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION AND OVERVIEW .......................................................... 2

II.     JURISDICTION AND VENUE ................................................................... 5

III.    PARTIES ...................................................................................................... 6

     A.     Lead Plaintiffs ................................................................................... 6

     B.     Defendants ......................................................................................... 7

     C.     Non-Party ATP .................................................................................. 9

IV.     CLASS ACTION ALLEGATIONS .......................................................... 10

V.      FACTUAL BACKGROUND ..................................................................... 12

     A.     Background on ATP and its Business .............................................. 12

     B.     The Deepwater Horizon Explosion and Resulting Moratoria ........... 14

     C.     ATP's Post Deepwater Horizon Explosion Activities ...................... 18

          (1)    The Clipper Project ............................................................... 18

          (2)    The Telemark Hub ................................................................ 20

     D.     Matt McCarroll's Six Day Tenure as CEO ...................................... 28

     E.     The Registration Statement, Prospectus, and the Exchange .............. 29

     F.     ATP's Undisclosed Deteriorating Financial Condition and Liquidity Crisis ....... 30

          (1)    The Bankruptcy Action Has Revealed That During The Class Period, The Defendants Knew That ATP Could Not Survive The Moratoria ............ 31

          (2)    The Bankruptcy Action Has Revealed That ATP Had Unpaid Obligations During The Class Period ........................ 36

          (3)    The Bankruptcy Action Has Revealed that ATP Failed to Pay Overriding Royalty Interests and Net Profit Interests During the Later Part of the Class Period ................ 42

     G.     ATP Files for Bankruptcy ................................................................ 48

VI.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ... 49

     A.     Relevant Disclosure Requirements ................................................... 50

i

        (1)     Regulation S-K, Item 303 ........................................................ 50

        (2)     SEC Rule 10b-5(b)................................................................. 52

B.    The Registration Statement................................................................. 52

C.    January 5, 2011 Pritchard Capital Partners Energize Conference ........................ 54

D.    Year End 2010 Financial Results......................................................... 55

E.    April 2011 Independent Petroleum Association of American ("IPAA") Oil & Gas Investment Symposium New York Conference ...................................... 59

F.    First Quarter 2011 Financial Results ..................................................... 60

G.    July 2011 Global Hunter Securities Energy, China, Metals and Mining Conference ........................................................................... 62

H.    Second Quarter 2011 Financial Results................................................... 63

I.    August 2011 EnerCom Incorporated The Oil & Gas Conference ...................... 66

J.    September 2011 Rodman Renshaw Global Investment Conference ................... 67

K.    September 2011 Moody's Report and Response .................................... 70

L.    Third Quarter 2011 Financial Results ................................................... 72

M.    January 4, 2012 Pritchard Capital Partner LLC Energize Conference ................. 77

N.    February 2012 JP Morgan High Yield & Leveraged Finance Conference........... 79

O.    Year End 2011 Financial Results......................................................... 80

P.    April 2012 IPAA Oil & Gas Investment Symposium ......................... 87

Q.    First Quarter 2012 Financial Results ................................................... 89

VII.    ADDITIONAL SCIENTER ALLEGATIONS................................................ 99

VIII.    LOSS CAUSATION.................................................................... 101

IX.    NO SAFE HARBOR ................................................................. 106

X.    APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET DOCTRINE ......................................................................... 107

XI.    CAUSES OF ACTION ................................................................. 110

COUNT I (Against All Defendants) Violation of Section 10(b) of the Exchange Act and Rule 10b-5  Promulgated Thereunder .................................................................................... 110

COUNT II (Against All Defendants) Liability Pursuant to Section 20(a) of the Exchange Act 112

XII.    PRAYER FOR RELIEF ............................................................................................ 112

XIII.   JURY TRIAL DEMANDED ...................................................................................... 113

Court-appointed Lead Plaintiffs Brian M. Neiman, William R. Kruse, and the Moshe Issac Foundation ("Lead Plaintiffs"), individually and on behalf of all other persons and entities who purchased the common stock of ATP Oil & Gas Corporation ("ATP" or the "Company") in the public market during the period December 16, 2010 through the Company's bankruptcy filing on August 17, 2012, inclusive (the "Class Period") and who were damaged thereby, by and through their undersigned attorneys, allege the following based upon personal knowledge as to Lead Plaintiffs' own acts, and upon information and belief as to all other matters.

Lead Plaintiffs' allegations are based on the investigation conducted by and through Lead Plaintiffs' attorneys, which included, among other things:  (a) a review and analysis of ATP's public filings with the United States Securities and Exchange Commission ("SEC"); (b) a review and analysis of certain wire and press releases, public statements, and other publications disseminated by or concerning ATP and the defendants named herein and related parties; (c) a review and analysis of ATP's press conferences, analyst conference calls, conferences, presentations, and corporate website; (d) a review and analysis of other publicly available information concerning ATP and the defendants named herein; (e) a review of filings in ATP's Bankruptcy Action (as defined herein); and (f) interviews with individuals possessing specific, personal knowledge of the facts alleged herein, including former ATP employees (individually, "Confidential Witness" or "CW," and collectively, the "Confidential Witnesses" or "CWs"). Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      INTRODUCTION AND OVERVIEW

1.      This federal securities class action concerns the collapse of ATP, a company that, prior to its bankruptcy, was engaged in the acquisition, development, and production of oil and natural gas properties.  Prior to 2010, ATP sought to acquire and develop properties with proven undeveloped reserves in the Gulf of Mexico and North Sea.  The majority of ATP's business was in the Gulf of Mexico.

2.      On April 20, 2010, the Deepwater Horizon, a deepwater drilling rig operating in the Outer Continental Shelf ("OCS") in the Gulf of Mexico exploded, burned for two days, and sank, resulting in the largest oil spill in the history of the Gulf of Mexico. As a result of the Deepwater Horizon explosion, the United States Department of the Interior ("DOI") issued two moratoria that essentially halted all drilling in water depths greater than 500 feet in the Gulf of Mexico between May 6, 2010 and October 12, 2010.  Although both moratoria were eventually lifted, as of December 16, 2010, no new deepwater drilling permits had been issued, resulting in what was referred to in the industry as a "*de facto* moratorium."  It was not until February 2011 when the first permit was issued after the moratoria, and ATP was not issued a permit until on or about March 18, 2011.

3.      These moratoria halted all or most of ATP's operations in the Gulf of Mexico, and had a profound impact on ATP's liquidity, cash flow, and business prospects.  However, ATP and the Defendants (as defined herein) failed to disclose the true effect of the moratoria on ATP's business, liquidity, and ability to continue as a going concern.

4.      On or about October 12, 2010, ATP filed a Form S-4 Registration Statement (the "Registration Statement") with the SEC, indicating its intent to issue 11.875% Senior Second Lien Exchange Notes (the "Notes"), and exchange those notes for $1.5 billion of privately placed

notes which had been sold by ATP in April 2010 (the "Exchange").   After one amendment on December 14, 2010, the Company filed a Prospectus (the "Prospectus") on December 16, 2010 on Form 424B3, which was declared effective by the SEC on the same day.  Pursuant to the Registration Statement and Prospectus, ATP executed the Exchange.

5.     The Registration Statement and Prospectus contained materially false and misleading statements and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ATP and the Defendants continued to make these materially false and misleading statements and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading  throughout the Class Period in SEC filings, press conferences, and other public statements.  For example, Defendants failed to disclose that ATP did not have the liquidity and revenue to survive the moratoria.  Defendants repeatedly characterized ATP's liquidity as "strong" or "sound," and assured investors that it could meet all obligations for the next twelve months.  However, ATP was in a liquidity crisis, could not survive a long moratorium, and was unable to meet its obligations.  ATP was not paying all vendors, and was constantly negotiating to provide vendors with royalty interests instead of payment.

6.     Moreover, on April 17, 2012, less than four months prior to the bankruptcy, Defendant Reese described ATP's liquidity as "sound."  And on May 10, 2012, just over a month before ATP hired bankruptcy advisors and just three months before the Company filed for bankruptcy, Defendant Bulmahn misleadingly stated "we have not missed an interest payment…we have made every payment" and "we believe we can continue to fund our projected capital expenditures and our existing obligations, including our long-term debt and other

obligations . . ., for at least the next twelve months."  In truth, however, when this statement was made ATP was way behind on paying its trade payables and was in the process of unlawfully withholding millions of dollars of overriding royalty interests and net profits interests proceeds from interests holders.

7.      On August 17, 2012, ATP announced that it was filing for Chapter 11 bankruptcy. The Company reported total debts of $3.49 billion and assets of $3.64 billion. It announced that it was going to continue operating during its financial restructuring using $618 million in debtor-in-possession ("DIP") funding. The bankruptcy case is styled *In re ATP Oil & Gas Corp.*, No. 12-36187 (Bankr. S.D. Tex.) (the "Bankruptcy Action").  Once ATP's true financial condition started being revealed through a series of partial disclosures culminating in ATP's bankruptcy, the price of ATP common stock fell, causing the Class damages.

8.      In addition, Defendant Albert L. Reese, the Chief Financial Officer ("CFO") of ATP, made false statements concerning ATP's production rates and ability to pay its debts.  On September 26, 2011, Moody's Investors Service ("Moody's") issued a report that stated ATP had a "high likelihood" of restructuring and its asset base and its cash flow was "not sufficient to cover" ATP's second-lien notes.  The Moody's report was also published in a September 29, 2011 Bloomberg News report.

9.      In response, Defendant Reese gave an interview to Bloomberg News, which published an article on September 29, 2011 stating that ATP "expects to pump enough oil from new wells during the next three years to avoid defaulting on $1.5 billion in debt."   Defendant Reese was quoted as saying "I don't know what Moody's is talking about…Our expectation is that everything is going to be fine."

10.     However, at the time of Defendant Reese's interview and the Bloomberg article's publication, ATP's production was falling, and in fact below production figures it had disclosed publicly in August 2011.  Reese, as CFO, was in a position to know about the lower production and its negative effect on ATP's liquidity and cash flow.  When the truth about ATP's production was revealed in November 2011, the price of ATP's common stock fell, causing the Class damages.

11.     As a result of the materially false and misleading misstatements and omissions detailed herein, the price of the Company's stock fell from $15.36 at the beginning of the Class Period to $0.30 at the time of the bankruptcy filing.

## II.     JURISDICTION AND VENUE

12.     The claims alleged herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a)), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.110b-5.

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

14.     This Court has personal jurisdiction over all Defendants named herein because they conducted business in, resided in, and/or were citizens of this District during the Class Period.  In addition, Defendants have consented to the personal jurisdiction of this District by moving the Southern District of Texas to transfer this litigation to this District.

15.     Venue is proper in this Court pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b), as a substantial part of the events or omissions giving rise to the claims alleged herein, including the dissemination of materially false and misleading statements and reports prepared by or with the participation, acquiescence, encouragement,

cooperation, or assistance of Defendants, occurred, at least in part, in this District.  In addition, Defendants purposefully availed themselves of the benefits of this District by, among other things, moving the Southern District of Texas to transfer this litigation to this District.

## III.   PARTIES

### A.   Lead Plaintiffs

16.   On December 6, 2013, the Court appointed Brian M. Neiman, William Kruse, and the Moshe Issac Foundation to serve as Lead Plaintiffs for the Class in this consolidated class action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

17.   Brian M. Neiman purchased ATP common stock in reliance on Defendants' materially false and misleading statements and omissions of material facts and/or the integrity of the market for ATP common stock at artificially inflated prices during the Class Period, and suffered economic loss and damages when the truth about ATP that was misrepresented and omitted during the Class Period was revealed to the market.  The certification of Brian M. Neiman, with a detailed listing of transactions in ATP common stock during the Class Period, was filed with this Court on November 5, 2013.  (Dkt. No. 103-2.)

18.   William R. Kruse purchased ATP common stock in reliance on Defendants' materially false and misleading statements and omissions of material facts and/or the integrity of the market for ATP securities at artificially inflated prices during the Class Period, and suffered economic loss and damages when the truth about ATP that was misrepresented and omitted during the Class Period was revealed to the market.  In addition, William Kruse has an assignment of claim from his wife, Deborah L. Kruse, who also purchased ATP common stock in reliance on Defendants' materially false and misleading statements and omissions of material facts and/or the integrity of the market for ATP common stock at artificially inflated prices

during the Class Period, and suffered economic loss and damages when the truth about ATP that was misrepresented and omitted during the Class Period was revealed to the market. The certification of William R. Kruse and his assignment of claim from Deborah L. Kruse, with detailed listings of transactions in ATP common stock during the Class Period, was filed with this Court on November 5, 2013. (Dkt. No. 103-2.)

19.    The Moshe Issac Foundation purchased ATP common stock in reliance on Defendants' materially false and misleading statements and omissions of material facts and/or the integrity of the market for ATP common stock at artificially inflated prices during the Class Period, and suffered economic loss and damages when the truth about ATP that was misrepresented and omitted during the Class Period was revealed to the market. The certification of Robert Konig, the Comptroller of the Moshe Issac Foundation, with a detailed listing of transactions in ATP common stock during the Class Period, was filed with this Court on October 24, 2013. (Dkt. No. 95-4.)

**B.    <u>Defendants</u>**

20.    Defendant T. Paul Bulmahn ("Bulmahn") served as the Chairman, Chief Executive Officer ("CEO") of ATP, and a Director of ATP since May 2008. Prior to that point, he served as Chairman and President of ATP since he founded ATP in 1991. During the Class Period, Bulmahn signed the Registration Statement, ATP's annual report for the year ended December 31, 2010 on Form 10-K, filed with the SEC on March 16, 2011 ("2010 10-K"), and ATP's annual report for the year ended December 31, 2011 on Form 10-K, filed with the SEC on March 15, 2012 ("2011 10-K"). In addition, during the Class Period, Bulmahn certified, as Principal Executive Officer, pursuant to Rule 13a-14(a) of the Exchange Act, and certified pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002

(the "Sarbanes-Oxley Act"), the following filings with the SEC by ATP:  the 2010 10-K; the 2011 10-K; ATP's quarterly report for the three month period ended March 31, 2011 on Form 10-Q, filed with the SEC on May 10, 2011 (the "2011 1Q 10-Q"); ATP's quarterly report for the three month period ended June 3, 2011 on Form 10-Q, filed with the SEC on August 9, 2011 (the "2011 2Q 10-Q"); ATP's quarterly report for the three month period ended September 30, 2011 on Form 10-Q, filed with the SEC on November 9, 2011 (the "2011 3Q 10-Q"); and ATP's quarterly report for the three month period ended March 31, 2012 on Form 10-Q, filed with the SEC on May 10, 2012 (the "2012 1Q 10-Q").

21.     Defendant Albert L. Reese, Jr. ("Reese") served as the Chief Financial Officer ("CFO") of ATP since March 1999.  Prior to that point, he served, in a consulting capacity, as ATP's director of finance from 1991 through March 1999.  During the Class Period, Reese signed the Registration Statement, ATP's 2010 10-K; ATP's 2011 1Q 10-Q; ATP's 2011 2Q 10-Q; ATP's 2011 3Q 10-Q; ATP's 2011 10-K; and ATP's 2012 1Q 10-Q.  In addition, during the Class Period, Reese certified, as Principal Financial Officer, pursuant to Rule 13a-14(a) of the Exchange Act, and certified pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act, the 2010 10-K, the 2011 10-K, and each of the foregoing Form 10-Qs. During the Class Period, Reese also signed each Form 8-K that was filed with the SEC (press releases issued by ATP were filed with the SEC as an exhibit to Form 8-Ks).

22.     Defendant Keith R. Godwin ("Godwin") served as ATP's Chief Accounting Officer since April 2004.  Prior to that point, he served as Controller and Vice President from August 2000 to March 2004 and as Controller from 1997 to July 2000.  During the Class Period, Godwin signed the Registration Statement, ATP's 2010 10-K, and ATP's 2011 10-K.

8

23.     Defendant Leland E. Tate ("Tate") served as the President of ATP since May 2008.  Prior to that point, he served as ATP's Chief Operating Officer ("COO") since December 2003 and Sr. Vice President, Operations since August 2000.  During the Class Period, Tate made certain false and misleading statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading .

24.     The individuals listed in paragraphs 20 through 24 are referred to herein collectively as the "Defendants."  The Defendants participated in a fraudulent scheme and course of business that operated as a fraud or deceit upon purchasers of ATP common stock, by disseminating materially false and misleading statements and/or concealing material adverse facts.   The scheme deceived the investing public regarding ATP's accounting, business, revenues, earnings, liquidity, present and future prospects, growth, operations and the intrinsic value of ATP's securities and induced members of the Class to purchase ATP common stock at artificially-inflated prices and caused them to be damaged when the truth about ATP was revealed and ATP's stock price dropped significantly.

## C.     **Non-Party ATP**

25.     ATP is a Texas Corporation with its principal place of business located at 4600 Post Oak Place, Suite 100, Houston, Texas during the Class Period.  During the Class Period, ATP common stock traded and was listed on the NASDAQ stock market under the symbol "ATPG".  ATP common stock currently trades on the Over-the-Counter ("OTC") market under the symbol "ATPAQ".  During the Class Period, ATP's common stock was part of the BI Global Independent E&Ps and Integrated Oils Index ("BI Global Oil Index").  Due to ATP's bankruptcy filing, ATP is not a party to this action.

## IV.    CLASS ACTION ALLEGATIONS

26.    Lead Plaintiffs bring this action as a class action on behalf of a Class, consisting of all persons who purchased ATP common stock on the public market during the Class Period and who were damaged thereby (the "Class").   Excluded from the Class are Defendants, the officers and directors of ATP, at all relevant times, members of their families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

27.    This action is brought pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3).

28.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are potentially thousands of members in the proposed Class.   During the Class Period, approximately 52 million shares of ATP common stock were outstanding and actively traded on the NASDAQ.   The proposed Class may be identified from records maintained by ATP or its transfer agent and may be notified of the pendency of this action by mail using a form of notice similar to that customarily used in securities class actions.

29.    Lead Plaintiffs' claims are typical of the claims of the members of the Class. Lead Plaintiffs purchased ATP common stock on the public market during the Class Period and were damaged by Defendants' violations of the Exchange Act.   All members of the Class are similarly affected by Defendants' wrongful conduct.

30.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

Lead Plaintiffs have no interests antagonistic to or in conflict with the Class they seek to represent.

31.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.   whether Sections 10(b) or 20(a) the Exchange Act, or Rule 10b-5 promulgated thereunder, were violated by Defendants' acts as alleged herein;

b.   whether ATP's filings with the SEC, including the Registration Statement, the Prospectus, and its quarter-end and year-end reports, the documents referenced therein, and/or subsequent public statements by Defendants on behalf of ATP were materially false or misleading;

c.   whether Defendants acted with scienter in misrepresenting and/or omitting to state material facts;

d.   whether the market price of ATP common stock was artificially inflated due to the material misrepresentations and/or non-disclosures complained of herein; and

e.   to what extent Lead Plaintiffs and members of the Class have sustained damages and the proper measure of damages.

32.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

11

## V.    FACTUAL BACKGROUND

### A.    Background on ATP and its Business

33.     Prior to its bankruptcy, ATP was engaged in the acquisition, development, and production of oil and natural gas properties.  ATP sought to acquire and develop properties with proven undeveloped reserves in the Gulf of Mexico and North Sea that are economically attractive, but not strategic to major or large independent exploration-oriented oil and gas companies.  ATP also had licenses for exploration in the Mediterranean Sea.

34.     The majority of ATP's business was in the Gulf of Mexico.  ATP operated and maintained 90% of its oil and gas wells in the Gulf of Mexico.  As of December 31, 2009, ATP had leasehold and other interests in 62 offshore blocks and 104 wells, including 19 subsea wells, in the Gulf of Mexico.  A "well" is the hole drilled in the earth/ocean floor to access oil or natural gas below.  A "block" is "an acreage sub-division that measures approximately 10 x 20 kilometers, forming part of a quadrant."  ATP operated 93 of the wells, and 95% of the subsea wells.  ATP also had interests in 11 blocks and three subsea wells in the North Sea.

35.     As of March 2010, ATP owned an interest in 36 oil platforms, including two floating production facilities named the ATP Innovator and the ATP Titan.  A "platform" is an offshore structure that is permanently fixed to the seabed.  A "floating production facility" is a floating vessel used for the processing of hydrocarbons and the storage of oil that can be moved from location to location.  According to the Registration Statement and Prospectus, "[t]he floating production facilities have longer useful lives than the underlying reserves and are capable of redeployment to new producing locations upon depletion of the reserves where they were initially deployed. Accordingly, they are expected to be moved several times over their useful lives."  ATP was also building a third floating production facility, the Octabuoy, in China,

12

which, according to the Registration Statement and Prospectus, was for "for initial deployment at our Cheviot Hub in the U.K. North Sea during 2012."

36.     As of March 16, 2010, both the ATP Innovator and ATP Titan were operating in the Gulf of Mexico.  The ATP Innovator was operating at ATP's Gomez Hub, and the ATP Titan was operating at ATP's Telemark Hub.  The Telemark Hub and the Gomez Hub were production "hubs" that enabled ATP to drill and extract oil and natural gas from multiple wells from a single production facility (the Titan and the Innovator).

37.     In the Registration Statement and Prospectus, ATP stated that "[t]hese floating production facilities are fundamental to our hub strategy and business plan. The presence of these facilities creates a competitive advantage for us in connection with considering possible additional acquisitions in a large area surrounding each installation."

38.     On March 29, 2010, ATP issued a press release announcing its "first oil production from its deepwater Atwater Valley ("AT 63") #4 well at the Telemark Hub in approximately 4000 feet of water."  ATP's press release further stated that

> "This will be a transforming year for ATP because of the expansive projected production increase," said Mr. Bulmahn. "This development successfully demonstrates our strengths of tenacity, determination and innovation in the deepwater Gulf of Mexico." The next Telemark Hub well scheduled to produce, Mississippi Canyon 941 ("MC 941") #3, was previously drilled to a total depth of 20,043 feet encountering 266 feet of net pay sands, approximately triple the 87 feet of net pay sands found in the original discovery well. The third well at MC 941 #4 and the fourth well at MC 942#2 were both drilled to 12,000 feet and are scheduled to be drilled to total depth and completed in 2010.

39.     On April 19, 2010, ATP issued a press release providing for a Telemark Hub update, and announced

> that subsequent to its initial startup at the Telemark Hub, it has received approval from the Minerals Management Service ("MMS") for the commingling of two zones at the Atwater Valley 63 #4 well. Operations will commence on the Mississippi Canyon 941 #3 well with completion estimated for later this quarter. ATP owns a 100% working interest in the Telemark Hub and is the operator.

13

40.     In addition to its Telemark Hub and Gomez Hub, ATP was developing its "Clipper" project, an ATP exploration and drilling operation in the Gulf of Mexico located at Green Canyon ("GC") Blocks 299, 300, and 344.

### B.     The Deepwater Horizon Explosion and Resulting Moratoria

41.     On April 20, 2010, a well blowout from the ultra-deepwater drilling rig Deepwater Horizon, which was operating in the OCS in the Gulf of Mexico, resulted in an explosion, a two day fire, and the sinking of the drilling rig, which caused the largest oil spill in the history of the Gulf of Mexico.

42.     In response, on May 6, 2010, the DOI instructed the Minerals Managements Service (the "MMS") to stop issuing drilling permits for OCS wells and to suspend existing OCS drilling permits issued after April 20, 2010, until May 28, 2010.  DOI issued a moratorium on May 28, 2010 that essentially halted all drilling in water depths greater than 500 feet in the Gulf of Mexico ("Moratorium I").  Moratorium I was originally scheduled to last for six months, but was later judicially enjoined.

43.     In response to the injunction against Moratorium I, on July 12, 2010, the DOI issued a second moratorium ("Moratorium II") that (i) specifically superseded Moratorium I, (ii) suspended all existing operations in the Gulf of Mexico and other regions of the OCS utilizing a subsea blowout preventer ("BOP") or a surface BOP on a floating facility, and (iii) suspended pending and future permits to drill wells involving the use of a subsurface BOP or a surface BOP on a floating facility.

44.     Moratorium II was lifted on October 12, 2010.  However, no new deepwater drilling permits were issued until February 2011, resulting in what was referred to in the industry as a "de facto moratorium."  The moratoria halted all or most of ATP's operations in the Gulf of

Mexico.    ATP was not issued a permit until on or about March 18, 2011, which it announced in

a press release of that date:

> ATP Oil & Gas Corporation (NASDAQ: ATPG) today announced that it has
> received a permit to resume drilling the Mississippi Canyon ("MC") Block 941 #4
> well in the deepwater Gulf of Mexico.
>
> "This permit for the *ATP Titan* drilling and production platform is the first for a
> stationary deepwater facility since deepwater drilling was allowed to resume on
> February 28, 2011. The previous two permits to drill oil and gas wells approved
> by BOEMRE in 2011, both of them in the last 18 days, are for wells drilled by
> Mobile Offshore Drilling Units (MODU)," stated T. Paul Bulmahn, ATP's
> Chairman and CEO. "We are ready and eager to return to work. ATP has always
> drilled safely and environmentally soundly. We are looking forward to delivering
> on our objectives to generate near-term production growth from these
> developments."
>
> The MC 941 #4 well at ATP's Telemark Hub in 4,000 feet of water was drilled to
> approximately 12,000 feet and cased during 2009. Operations to finalize drilling
> and completion will begin within the next 24 hours. ATP operates the deepwater
> Telemark Hub with a 100% working interest and owns 100% of the subsidiary
> that owns the *ATP Titan* and associated pipelines and infrastructure.

45.    As alleged in a lawsuit filed by ATP against the United States government, *ATP

Oil & Gas Corp. v. USA*, 12-379 (U.S. Fed. Claims Ct. June 14, 2012), prior to the DOI's

imposition of the suspension orders and moratoria, ATP's drilling plans for 2010 included the

following:

(a)    to drill and complete a well on the MC 305 Lease (MC 305 Well No.

SS002 ST 2) in the spring of 2010 using the Diamond Ocean Confidence drilling rig;

(b)    to continue drilling wells on the MC 941 Lease (MC 941 Wells Nos. 3

and 4) and the MC 942 Lease (MC 942 Well No. 2) in the spring and early summer of 2010

using the Nabors 202 Platform Rig from the Titan Platform;

(c)    to drill wells on the MC 711 Lease (MC 711 Well Nos. 9 and 10) after

hurricane season in 2010, using the Diamond Ocean Victory Rig;

(d)     to produce oil and/or gas from the wells on the MC 941 Lease and the MC 942 Lease through the use of the Titan Platform; and

(e)     to produce oil and/or gas from the wells on the MC 711 Lease through the use of the Innovator Platform.

46.     According to ATP, for use of the Ocean Confidence, ATP agreed to pay a day rate and standby daily rate of $500,000.  ATP acquired the use of the Ocean Confidence *via* an assignment of rights from Murphy Exploration & Production Company U.S.A.

47.     According to ATP, for use of the Ocean Victory, ATP agreed to pay a day rate and standby daily rate of $540,000.

48.     According to ATP, for use of the Nabors 202 Platform Rig, ATP agreed to pay a day rate of $64, 500.

49.     As set forth by ATP in its lawsuit against the USA, throughout the moratoria and thereafter, ATP was obligated on the Nabors/ATP Contract and on the Diamond/ATP Ocean Victory Contract. Further, ATP wanted to resume drilling and development activities as soon as possible after the lifting of the moratoria. Even though no drilling application had been approved, ATP continued to pay Nabors for the Nabors 202 Rig and Diamond Offshore for Ocean Victory Rig. ATP was, however, able to negotiate a restructure of the Diamond/ATP Ocean Victory Contract, but still paid Diamond substantial sums over the balance of such contract.

50.     In its lawsuit against the USA, ATP described the effect of the moratoria on the Company:

- From the initiation of the first moratorium until ATP received the permit to drill the MC 941 Well No. 4 on March 11, 2011 (a period of more than nine months), ATP was prohibited from conducting drilling activities on such well.

- ATP planned to use the Nabors 202 Rig to drill wells on the MC 941 Lease and MC 942 Lease. ATP continued to pay Nabors under the Nabors/ATP 202 Contract even though it was prevented from using the Nabors 202 Rig as a result of the moratoria and permitting delays which ensued after the October 12 Directive. The cost to ATP for the Nabors 202's idle time caused by the moratoria and unreasonable permitting delays is in excess of $13 million.

- ATP terminated the ATP/Murphy Assignment at a cost to ATP of in excess of $8 million. ATP continued to pay Diamond Offshore under the Diamond/ATP Ocean Victory Contract even though it was prevented from using the Ocean Victory Rig as a result of the moratoria and permitted delays which ensued after the October 12 Directive. The cost to ATP for the Ocean Victory's idle time caused by the suspensions, moratoria, and the DOIs subsequent delays is in excess of $25 million.

- The imposition of the moratoria caused ATP's Titan Platform and the Innovator Platform essentially to be under-utilized, while ATP continued to incur operating costs for those platforms at the higher anticipated utilization rate. Damages for such costs are believed to be in the millions of dollars. In addition, the imposition of the moratoria caused ATP to incur additional lease operating expenses for the Titan and Innovator Platforms that will service wells on the MC 711 Lease, the MC 941 Lease, and the MC 942 Lease due to the delay in drilling and completing wells planned at the time of the moratoria. Damages for such additional costs are believed to be in the millions of dollars.

- ATP had already incurred drilling costs for the MC 305 Well No. SS002 ST 2 when the DOI directed ATP to suspend operations. In addition, due to the suspension, moratoria, and the current lack of available rigs to drill and complete such well, ATP has lost the opportunity to produce the gas reserves from the reservoir such well was intended to access. Damages for such costs and lost are believed to exceed $22 million.

51.    The suspension and the moratoria interrupted or delayed anticipated revenues from wells ATP planned to drill and complete and bring on line for production. Following imposition of the suspensions and the moratoria, ATP went into the financial markets to obtain additional working capital to operate. The financing costs to ATP for such working capital are in the millions of dollars.

17

52.     As alleged in a lawsuit filed by ATP against DOI, *ATP Oil & Gas Corp. v. BP Exploration & Production, Inc.*, Case No. 13-01962-JB-SS (E.D. La. Apr. 20, 2013), ATP had spent in excess of $1 billion in infrastructure construction and other capital expenditures related to five of these wells, but was denied the planned cash flows from these wells.

## C.     ATP's Post Deepwater Horizon Explosion Activities

### (1)     *The Clipper Project*

53.     On April 7, 2011, ATP issued a press release that announced that "it has received a permit to complete the previously drilled #2 well at Green Canyon ("GC") Block 300 ("Clipper") in the deepwater Gulf of Mexico."

> "We are pleased that the BOEMRE is confident in ATP's commitment to safe and environmentally sound operations," stated T. Paul Bulmahn, ATP's Chairman and CEO. "The Gulf of Mexico is where we refined our deepwater expertise and we are looking forward to generating further production growth."

> The GC 300 #2 well, located in 3,454 feet of water, was sidetracked and encountered a gas reservoir between 15,590 and 15,721 feet total vertical depth in 2006. ATP plans to commence well operations with the Diamond Ocean Victory in 2011. ATP operates GC 300 with a 55% working interest.

54.     On August 7, 2011, ATP issued a press release providing an operations update. As to the Clipper project, ATP announced it had commenced well operations at GC Block 300 #2:

> ATP commenced well operations with the Diamond Ocean Victory drilling vessel at the Green Canyon ("GC") Block 300 ("Clipper") #2 ST#1 during the second quarter of 2011. In July 2011, ATP successfully completed and flow tested the well at 45.6 MMcf per day plus condensate of 4,656 Bbls per day. The well is scheduled to be placed on production in the middle of 2012 after completion of the pipeline and tie-back to existing infrastructure.

> After completion of the GC #2 ST #1, the Diamond Ocean Victory will move to the GC #4 well, re-enter and sidetrack the well to the targeted oil zone. All required permit applications have been submitted to the BOEMRE.

55.     On December 12, 2011, ATP issued a press release and announced it had

completed GC Block 300 #4:

> [T]he successful completion and testing of the second Clipper well at rates of 9,000 Bbls per day and 4.6 MMcf per day. When combined with the first Clipper well this brings the total test rates to approximately 13.7 MBbls of oil per day and 50.2 MMcf of natural gas per day or 22 MBbls equivalent per day (62% oil).

> The second Clipper well is the #4 well located at Green Canyon 300 (GC 300) in the deepwater Gulf of Mexico. The #4 well, located in approximately 3,450 feet of water, logged approximately 56 feet of net oil pay confirming reserves previously booked. The 9-5/8 inch casing was set at 15,778 feet measured depth through the pay intervals. In July 2011, ATP successfully completed and flow tested the first Clipper well, GC 300 #2 ST #1, at a rate of 4,656 Bbls per day and 45.6 MMcf per day.

> The pipeline lay barge for the Clipper wells is contracted for third quarter 2012 and will tie in both the GC 300 #4 and #2 wells to the Murphy Oil-operated Front Runner production facility. ATP operates Clipper and presently owns a 100% working interest.

56.     As discussed herein, ATP numerous times stated that it expected the Clipper wells

to come online for production in 2012.   ATP further alluded to the plentiful reserves at the

Clipper well sites.  However, to monetize the value in those reserves, ATP had to build a pipeline

to the nearest production platform, the Murphy Oil platform called the Frontrunner, which was

located approximately 16 miles away in the Gulf of Mexico.

57.     In truth, ATP did not have nearly the funds necessary to bring those reserves into

production.   As stated under oath by Defendant Reese, the revenues that would result from

completion of the Clipper project were "necessary to begin remedying" ATP's poor financial

situation due to the moratoria.  As stated by Defendant Reese during the First Day Hearings, the

total cost of the project was approximately $140 to $150 million, with approximately $120

million left at the time ATP filed for bankruptcy.  Defendant Reese further testified that he was

aware of that cost "for a year or so" (approximately August 2011) before ATP declared bankruptcy.[1]   ATP, however, lacked the liquidity and cash flow to complete the pipeline and commence production from the Clipper wells.   Reese testified that "[o]ngoing project construction costs, declining oil prices and less than anticipated production put [ATP] in the untenable position of running out of cash before it could complete the Clipper Wells project." Defendants Bulmahn, Reese, Godwin and Tate were, by virtue of their high level management positions, aware of the necessity to bring the Clipper wells online and ATP's lack of funds to complete the pipeline.

### (2)    *The Telemark Hub*

58.    On October 11, 2010, ATP issued a press release announcing its first oil production from Mississippi Canyon ("MC") Block 941 #3 at the Telemark Hub.

59.    On March 18, 2011, ATP issued a press release announcing that "it ha[d] received a permit to resume drilling the [MC] Block 941 #4 well in the deepwater Gulf of Mexico." *See* ¶44.

60.    ATP announced completion of the drilling phase at MC Block 941 #4 (also referred to as MC Block 941 A-2) on May 26, 2011:

---

[1] According the lawsuit filed by ATP against DOI:

> Because the Oil Spill prevented ATP from proceeding with its pre-spill drilling plans, ATP attempted to mitigate its losses by proceeding to complete and test two new wells in Green Canyon Block 300 (the "Clipper Wells") in the deepwater Gulf of Mexico rather than the projects it had planned for 2010 and 2011. ATP completed and tested the Clipper Wells, and production tests at these wells has exceeded expectations. Nevertheless, the Clipper Wells are 16 miles from the sales point and require construction of additional pipeline infrastructure in order to begin production.   The liquidity limitations ATP suffered as a direct and foreseeable result of the Oil Spill have prevented it from generating the funds it needs to complete the necessary pipeline infrastructure.

ATP Oil & Gas Corporation (NASDAQ:ATPG) today announced that it has completed the drilling phase of deepwater Mississippi Canyon ("MC") Block 941 A-2 well located at ATP's Telemark Hub, and all pay sands in the MC 941 A-1 well were present essentially confirming pre-drill estimates. The main pay sands are approximately 500 feet structurally higher than the MC 941 A-1 well and 1000 feet above the original oil-water contact. Plans are to run casing to total depth, install temporary barriers in the well permitting removal of the drilling riser and installation of the production riser. Tie-back of the production casing to the surface and perforating and completing the initial production zones will follow. Installation of production tubing and a subsea tree will be performed prior to testing and initialization of production. First production from this well is expected in the early part of the third quarter.

61.     On August 24, 2011, ATP issued a press release announcing the first production

from MC Block 941 #4:

ATP Oil & Gas Corporation (NASDAQ:ATPG) today announced first oil production at its Mississippi Canyon ("MC") Block 941 A-2 (#4) well in the deepwater Gulf of Mexico. The MC Block 941 A-2 well is located on the Mirage Field and is the third well brought on production at the Telemark Hub location utilizing the ATP Titan floating drilling and production platform. ***The well delivered on ATP's original expectations with an initial rate exceeding 7,000 Boe per day.*** When drilled, the A-2 well encountered four Miocene sands that are approximately 500 feet structurally higher than the same sands in the MC 941 A-1 well. The A-2 well is completed at a measured depth of 17,600 feet in the C and D sands. All permits to immediately begin drilling the fourth well, MC 942 #2, have been approved with production projected later this year. ***Company-wide production now exceeds 31,000 Boe per day.***

"Bringing the third Telemark Hub well to first production again demonstrates ATP's technical expertise and safe operations in the deepwater Gulf of Mexico," said T. Paul Bulmahn, ATP Chairman and CEO. ***"We have finally realized the planned material production revenue of this well that has been much anticipated for 16 months.*** This well was already drilled to 12,000 feet and cased prior to the Macondo spill and became subject to the moratorium. The greater-than-a-billion-dollar investment at Telemark reflects ATP's continuing commitment to develop America's energy resources."

(emphasis added).

62.     On September 26, 2011, Moody's published its report stating that ATP had a

"high likelihood" of restructuring.   Bloomberg News reported on the Moody's analysis on

September 29, 2011 in an article titled "ATP $1.5 Billion of Debt Falls to Yield 23.4%, Trace

Data Show":

> ATP shows a "high likelihood" it may face some type of restructuring, analysts
> from Moody's Investors Service wrote in a Sept. 26 report. The company's asset
> base and cash flows are "not sufficient to cover" the second-lien notes, according
> to the report. Moody's assigns a Caa2 grade to ATP with a "negative" outlook.

The Bloomberg News article further indicated that ATP bond yields "soar[ed] to 23.4% as

Moody's cites restructuring 'likelihood.'"

63.     Defendant Reese promptly issued a response to the Moody's article, in which he

disputed the criticism of ATP by Moody's, and indicated that increasing production would raise

enough money to pay for the 2015 bonds when they came due.  On Thursday September 29,

2011, Bloomberg News published Defendant Reese's response in an article titled "***ATP Says***

***New Gulf of Mexico Oil Wells to Stave Off Default.***"  The article stated, in relevant part:

> ATP Oil & Gas, one of the first oil explorers allowed to resume drilling in the
> U.S. Gulf of Mexico after the Deepwater Horizon disaster, ***expects to pump***
> ***enough oil from new wells during the next three years to avoid defaulting on***
> ***$1.5 billion in debt.***

> Moody's Investors Service this week said ATP shows a "high likelihood" it may
> have to restructure its debt because its cash flow and asset base are insufficient to
> cover notes maturing in 2015. The company's $1.79 billion in net debt exceeds
> that of 97 percent of Houston-based ATP's U.S. peers, according to data compiled
> by Bloomberg.

> ATP expects to begin production from new wells at its Telemark field this year,
> followed by additional output at the Clipper and Gomez projects in 2012, Entrada
> in 2013 and Cheviot a year later, said Albert L. Reese, ATP's chief financial
> officer. All of those fields are in the Gulf of Mexico, except Cheviot, which is in
> the U.K.

> ***"All of that is before the bonds come due in 2015, so I don't know what***
> ***Moody's is talking about," Reese said today in a telephone interview. "I can't***
> ***fight rumors or reports, all I can do is continue to deliver on the promises we've***
> ***made. Our expectation is that everything is going to be fine."***

(emphasis added).

64.     However, contrary to Reese's statements, everything was not fine.  According to data for the MC 941 well obtained form the MMS/Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEM"), at the time of Reese's statements to Bloomberg, the well at MC Block 941 #4 was producing significantly less than the excess of 7,000 barrels of oil equivalent ("BOE") per day that ATP announced in August 2011.

65.     According to the data available on the BOEM production data search website,[2] MC Block 941 produced the following amounts of oil and natural gas in 2011:

| Production Data Searched by Lease Number and Production Year Sorted by Default Sort | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Lease Number | Production Month | Production Year | Lease Oil Production(BBL) | Lease Gas-Well-Gas Production(MCF) | Lease Condensate Production(BBL) | Lease Oil-Well-Gas Production(MCF) | Lease Water Production(BBL) | Producing Completions | Lease Max Water Depth(meters) |
| G16661 | 1 | 2011 | 294,251 | 0 | 0 | 343,964 | 124 | 1 | 1,325 |
| G16661 | 2 | 2011 | 260,755 | 0 | 0 | 290,917 | 3,758 | 1 | 1,325 |
| G16661 | 3 | 2011 | 280,533 | 0 | 0 | 326,296 | 10,541 | 1 | 1,325 |
| G16661 | 4 | 2011 | 260,063 | 0 | 0 | 302,423 | 0 | 1 | 1,325 |
| G16661 | 5 | 2011 | 268,629 | 0 | 0 | 305,314 | 23,985 | 1 | 1,325 |
| G16661 | 6 | 2011 | 244,996 | 0 | 0 | 267,262 | 25,811 | 1 | 1,325 |
| G16661 | 7 | 2011 | 247,245 | 0 | 0 | 261,093 | 29,913 | 1 | 1,325 |
| G16661 | 8 | 2011 | 235,519 | 0 | 0 | 245,378 | 31,324 | 2 | 1,325 |
| G16661 | 9 | 2011 | 312,225 | 0 | 0 | 307,884 | 28,986 | 2 | 1,325 |
| G16661 | 10 | 2011 | 298,301 | 0 | 0 | 293,653 | 31,212 | 2 | 1,325 |
| G16661 | 11 | 2011 | 279,688 | 0 | 0 | 277,351 | 34,396 | 2 | 1,325 |
| G16661 | 12 | 2011 | 190,709 | 0 | 0 | 198,082 | 43,997 | 1 | 1,325 |

66.     In July 2011, the last full month before ATP announced the first production from MC Block 941 #4, MC Block 941 produced 247,245 barrels ("BBLS") of crude oil and 261,093 thousand cubic feet ("MCF") of natural gas (equivalent to 43,516 BOE)[3], for a total of 290,761 BOE, or 9,379 BOE per day (31 days).

---

[2] www.data.boem.gov/homepg/data_center/production/production/master.asp.  The BOEM lease number for the MC Block 941 was OCS-G16661.

[3] ATP's 2010 10-K and 2011 10-K stated that "Natural gas is converted into [BOE] based on [6,000 cubic feet of natural gas] to one barrel of crude oil or other liquid hydrocarbons."

67.     MC Block 941 #4 was brought online and produced its first oil and gas on or about August 24, 2011.

68.     In September 2011, the first full month after ATP announced the first production from MC Block 941 #4, MC Block 941 produced 312,225 BBL of oil and 307,884 MCF of gas (equivalent to 51,314 BOE), equal to a total of 363,539 BOE, or 12,117 BOE per day (30 days). If the 7,000 BOE per day (210,000 for September) of production from MC Block 941 #4 announced by ATP in August 2011 were added to MC Block 941's total July 2011 production, then the total production from MC Block 941 should have been approximately 500,761 BOE (less any expected decline in the wells online in July 2011) or 16,692 BOE per day.

69.     Therefore, when Defendant Reese gave his interview to Bloomberg MC Block 941 #4 was producing only 2,738 BOE per day (12,117-9,379), or 4,262 BOE per day *less* than the 7,000 BOE per day announced by ATP in August 2011 (7,000-2,738).

70.     Defendant Reese, as the CFO of ATP, was in a position to know of the problems at the Telemark Hub, that those problems were exacerbating ATP's significant liquidity problems, and that everything was not going to be fine.  In fact with respect to the day-to-day operations of the Company Defendant Reese testified at the First Day Hearings that "from a business side, the executive side, financial side [he was] very, very well informed."  Defendants Bulmahn, Godwin and Tate, by virtue of their high level management positions, were also aware of the problems at the Telemark Hub and their effect on ATP's liquidity problems.

71.     In light of this considerable decrease in production, which was far lower than the announced 7,000 BOE per day figure, Defendants' representations published in the Bloomberg article that "New Gulf of Mexico Oil Wells [Would] Stave Off Default" and that "ATP expects

24

to pump enough oil from new wells" to avoid default, while citing specifically to the Telemark field, were materially false or misleading statements.

72.     It was not until November 8 and 9, 2011 that ATP finally disclosed the production problems at MC Block 941 #4.  On November 8, 2011, ATP issued a press release announcing its Third Quarter 2011 Results.  The press release stated, in relevant part:

> Oil and gas production for the third quarter 2011 was 2.2 million barrels of oil equivalent (Boe), or 24,200 Boe per day, compared to 1.9 MMBoe (21,100 Boe per day) for the third quarter 2010, reflecting a 15% increase.

73.     This release disclosed that ATP's oil and gas production was 24,200 BOE per day, not the 31,000 BOE per day previously announced in August 2011 and reinforced by Reese in his interview with Bloomberg on or about September 29, 2011.

74.     On November 9, 2011, ATP held its third quarter earnings conference call.  On that call, Defendants further discussed ATP's production, announcing for the first time that the MC Block 941 #4 well was producing only approximately 3,500 BOE per day, not the 7,000 BOE per day previously disclosed, and that Defendants "[did] not believe that it will go back to the 7,000 barrels a day."

> [DEFENDANT BULMAHN]:  Oil and gas production for the third quarter 2011 was 2.2 million barrels of oil equivalent compared to 1.9 million barrels for the third quarter 2010, a 15% increase. Revenues from oil and gas production were $170.1 million for the third quarter 2011 compared with $102.1 million for the third quarter 2010, a 67% increase. Oil represented 69% of total production for the third quarter 2011 compared to 58% of total production for the third quarter 2010.
>
> *     *     *
>
> Q - RAFI KHAN: Leland, if you could perhaps reconcile the production of 31,000 and your target of 40,000 to 45,000 with your current production of 25,000 to 26,000, I mean, where are we losing the production? And the other question I had is can you give us an update and prospect for Atwater, Lady Bug, and Canyon Express. I've noticed in recent months the production on those wells has been even zero in some months.

25

A - LELAND E. TATE: Yes, it's Leland here. I'll start out on the reconciliation and we'll start with the 31,000 and sort of work our way back. There are – we produce somewhere around 24,000 barrels a day out of the shelf, I'm sorry, out of deep water and we produce about one to two out of the shelf in the U.K.  Where we are now is 31,000 was roughly we were at 24,500 at year end – at quarter end last quarter and we *saw a well test that showed us about 7,000 barrels a day that would get added to that. And what happened was during the completion we got – the well test was indicating that. As we brought the well on production, what we saw was a completion efficiency where there was more wellbore drawdown near the well bore than what we had seen during the well test and as a result we can make on a routine basis about 3,500 barrels a day equivalent out of that well*. It's a stabilized and producing at that rate. It could produce more, but we've chosen to restrain it in order to make sure that we don't damage the gravel pack in anyway. So if you think about that, that gets you from 31 down to 27.5 or something like that.

*   *   *

Q - RAFI KHAN: Are you anticipating the 3500 on the Mirage #2 to go back up to the 7,000 or are you looking at it staying at 3500?

A - LELAND E. TATE*: We will increase it some. I do not believe that it will go back to the 7,000 barrels a day based on the drawdown that we're seeing. What we are doing is we are slowly opening it up to see if we can get incremental production from it without taking the risk of damaging it. So, I wouldn't anticipate it going back to 7, but I believe it will come up a little bit.*

75.     On or about November 9, 2011, J.P. Morgan published a report on ATP, which acknowledged that the production details disclosed on November 8 and 9, 2011 were not in line with ATP's previous guidance, and that ATP had "experienced a problem with one or more of its wells" and stated that J.P. Morgan had "concern about the performance at Gomez and/or Telemark":

3Q11 production lower than our model. 3Q production averaged 24.2 Mboepd, which is 7% lower than our estimate of 26.0 Mboepd, and just above the 2Q11 average of 23.6 Mboepd. The two prior production data points are the 2Q11 earnings call (August 9th), during which management indicated current production of 24-25 Mboepd, and ATPG's August 24th press release that indicated current production was over 31 Mboepd. Recall that on August 24th ATPG announced first oil at the third Telemark well, MC 941 #4 (A-2), with an initial well rate exceeding 7.0 Mboepd.

Lack of production details. Given that company-wide production before the third Telemark well was 24-25 Mboepd and that 3Q11 production averaged only 24.2 Mboepd, it appears that ATPG experienced a problem with one or more of its wells. Although the August 24 31+ Mboepd figure likely was a spot rate, overall 3Q11 production still appears low, in our opinion. The lack of production details in the ops update and today's earnings release gives us concern about the performance at Gomez and/or Telemark. ATPG did indicate that 3Q included workover expenses from well work and pipeline remediation at Gomez, but it did not specify any production-related issue at Gomez.

76.     After ATP's lower Company-wide and MC Block 941 #4 production, which undermined Defendant Reese's September 29, 2011 optimistic statements and reinforcement of the August 2011 production announcement, were disclosed on November 8 and 9, 2011, the price of ATP's common stock fell significantly.  On November 9, 2011, ATP's common stock closing price was $8.450 per share, a drop of $2.05, or 19.5%, from the previous day's closing price, and a drop of $2.50, or 22.8%, from its November 9, 2011 intra-day high.  On November 10, 2011, the price of ATP's common stock continued to fall, closing at $7.250 per share, down $1.20 per share, or 14.2% from its previous closing price.

77.     In addition, the lower production from MC Block 941 #4 at the Telemark Hub cost ATP revenue it needed to complete the Clipper wells connecting pipeline.  ATP needed between $120 and $150 million to complete the pipeline from the Clipper wells to the production facility.  Without that pipeline, ATP could not monetize the large reserves present at the Clipper wells.

78.     The average price of West Texas Intermediate Crude Oil ("WTI") in 2011, according to the Report of Collarini Associates attached to ATP's 2011 10-K, was $96.16 per barrel.  Applying the lower production amount of 3,500 BOE from MC Block 941 #4 announced by Defendant Tate in the November 9, 2011 conference call, and assuming that the entire amount was crude oil (although some would be natural gas), ATP was generating approximately $336,560 less per day in September and October 2011, or $20,530,160 in total, than the public

27

was led to believe after ATP's August 2011 announcement and Defendant Reese's September 2011 Bloomberg interview.  That was revenue that ATP needed to fund its Clipper project.[4]

79.      The lower production from Telemark would further cost ATP when ATP would need to shut the wells down to repair them and try and increase production.

80.      Bankruptcy counsel Kelly and Reese acknowledged during the First Day Hearings that the way to solve ATP's liquidity crisis was to bring the Clipper wells online.  As stated by Defendant Reese in his declaration in support of the First Day Motions, "declining production" was one of the reasons ATP was "unable to overcome the impact of the moratoria" and "put [ATP] in the untenable position of running out of cash before it could complete the Clipper Wells project and generate the revenues necessary to begin remedying the situation."

### D.      Matt McCarroll's Six Day Tenure as CEO

81.      On June 1, 2012, ATP issued a press release announcing that Mr. Matt McCarroll had joined ATP as Chief Executive Officer, replacing Defendant Bulmahn.  Defendants Bulmahn and Reese were listed as the individuals to contact on the press release.  The Form 8-K to which the press release was attached was filed with the SEC on June 8, 2012 and signed by Defendant Reese.  In the press release, Defendant ATP Chairman Bulmahn stated:

> We are very pleased to add Matt to our leadership team. His successful and proven talent in offshore property development is an asset to ATP.   His experience in the offshore Gulf of Mexico will be invaluable to moving forward our Clipper and Telemark properties in addition to our international properties. Matt's commitment to ATP has already been shown by his purchase today of 1,000,000 shares of our common stock directly from ATP at market price."

---

[4] This calculation likely under-values the loss in revenue because, as stated in ATP's November 9, 2011 Third Quarter 2011 Earnings Press Release, "ATP continues to sell a majority of its oil production from both Gomez and Telemark hubs at prices of Louisiana Light Sweet pricing, the LLS pricing, currently trading at a substantial premium of approximately $17 per barrel to West Texas Intermediate pricing, WTI."

The release continued, extolling the background and experience of the new CEO.   Defendant Bulmahn was to continue to serve as Chairman and also in the newly created position of Executive Chairman of ATP.

82.     Less than a week later, on June 7, 2012, the new CEO, Mr. McCarroll, abruptly resigned his position and his purchase of 1 million shares of ATP stock touted only a few days before was rescinded.   The supposed reason for the almost immediate resignation of Mr. McCarroll was attributed by the Company in a June 7, 2012 press release as "the company announced that it was unable to reach a mutually agreeable employment agreement with Mr. McCarroll."   No other explanation has been provided for this prompt resignation of ATP's newly appointed CEO.   (ATP personnel indicated on both releases as the contact persons for the releases are Defendants Bulmahn and Reese.)   The Form 8-K to which the press release was attached was filed with the SEC on June 8, 2012 and signed by Defendant Reese.

### E.     The Registration Statement, Prospectus, and the Exchange

83.     On or about October 12, 2010, ATP filed its Registration Statement with the SEC, indicating its intent to issue the Notes and execute the Exchange.   ATP filed one amendment to the Registration Statement on December 14, 2010.   The Registration Statement was signed by Defendants Bulmahn, Reese and Godwin.

84.     On December 16, 2010, ATP filed the Prospectus for the Notes and the Exchange. The Registration Statement and Prospectus were declared effective on December 16, 2010 (the "Effective Date").   Pursuant to the Registration Statement and Prospectus, ATP executed the Exchange.

85.     Although both moratoria were lifted by the Effective Date, as of December 16, 2010, no new deepwater drilling permits had been issued, resulting in what was referred to in the

industry as a "de facto moratorium."  It was not until on or about March 18, 2011, more than 10 months after the inception of the moratoria, that ATP was issued a drilling permit.

86.    As discussed herein, the Registration Statement and Prospectus contained materially false misstatements of fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading , and ATP and Defendants continued to make those materially false misstatements and omitted to state material facts throughout the Class Period in SEC filings, press releases, conference calls, presentations, speeches, and/or interviews.  In essence, despite ATP's and Defendants' statements to the contrary during the Class Period, the moratoria significantly impacted ATP's business and liquidity to the point that ATP could not survive.  Defendants Bulmahn, Reese, Tate and Godwin, however, continued to paint a rosy picture, misrepresented the soundness of ATP's liquidity and never disclosed, and in fact concealed, that ATP could not survive the moratoria.

### F.    ATP's Undisclosed Deteriorating Financial Condition and Liquidity Crisis

87.    Despite the Defendants' public assurances to the contrary, the moratoria had a profound, negative impact on ATP.  According to ATP's lawsuit against DOI:

> The Oil Spill and its devastating effects had real and lasting significance in the way ATP plans and conducts business. …[T]he direct and consequential damages flowing from the spill forced the Company into a Chapter 11 Bankruptcy. This is a monumental change of fortune for a company that in the days leading up to spill was recognized in the financial bond markets as a company on the rise that was well-positioned for a strong 2010 and 2011. Instead, as a result of the spill, ATP's projected revenue streams for these years were deferred and certain revenue streams were lost entirely. While ATP's actual and projected cash flow was significantly impacted by the spill, ATP's obligations and expenses were not similarly constrained.

*        *        *

[T]he oil spill and the aftermath of the spill impacted ATP's development and implementation of numerous oil and gas production projects, as well as devastated its cash flow, credit rating, borrowing capacity, overall liquidity and caused other impacts.

### (1)   *The Bankruptcy Action Has Revealed That During The Class Period, The Defendants Knew That ATP Could Not Survive The Moratoria*

88.     During the August 21, 2012 hearing (the "First Day Hearings") on the Bankruptcy Action's First Day Motions (the "First Day Motions"), ATP's bankruptcy counsel, Charles S. Kelly ("Kelly") acknowledged that the moratoria in the Gulf of Mexico had an "especially profound" impact on ATP.  It interrupted ATP's drilling operations, at significant cost to ATP, while also blocking "ATP's ability to generate those new cash flows while the company continued to endure significant financing costs," Kelly said.  ATP's proposed program to drill six wells in 2010 and 2011 "was not able to proceed given the moratorium."

89.     On August 17, 2012, Defendant Reese submitted a declaration in support of the First Day Motions in the Bankruptcy Action.  That declaration indicated that ATP's problems were pervasive, long-standing and well known to the Defendants.   The Declaration stated in pertinent part that:

> As detailed further below, due to adverse operational exigencies stemming from the 2010 Gulf drilling moratoria as well as subsequent events, ATP finds itself with over $2 billion of indebtedness and less than $10 million in cash as of the Petition Date. ***However, the path to considerable, short-term improvement is clear, as the Debtor has a very promising, already-drilled project – the "Clipper Wells" project – to which it simply has to complete a pipeline. At the time of completion of such pipeline, originally scheduled for October 2012, the Debtor's cash position should measurably improve***, and much of the relief sought in the First Day Pleadings is targeted toward meeting this paramount goal as soon as possible.

> In early 2010, ATP looked to the bond market to raise funds necessary to develop infrastructure and conduct offshore drilling under a program designed to capture known proved reserves and significant revenues. On April 19, 2010, ATP priced the $1.5 billion offering of the Second Lien Notes. These bonds priced the day before the April 20th explosion and blow-out of the Macondo well facility that led to the shutdown of operations in the Gulf of Mexico. Less than two weeks later,

the U.S. government issued the first of three moratoria on further drilling in the Gulf of Mexico.

The delay on operations and the increasingly uncertain regulatory environment adversely affected ATP's operations and planned development that was necessary to service its additional debt. ***Despite statements that the moratoria had been lifted at various points in time, the government did not issue new deepwater drilling permits until February 28, 2011, thus effectively extending the moratorium***. As a result, ATP was unable, despite access to funds, to drill and bring on-line six new wells during 2010 and 2011. In addition to the high costs of interrupted and discontinued drilling operations in deepwater, ATP continued to incur construction costs on the Octabuoy, its newest deepwater production platform, as a discontinuation of work of the platform would have led to significant escalation in cost-to-completion once work resumed. Moreover, as access to deepwater rigs became limited, ATP also experienced higher than expected costs in preserving its access to equipment during the moratoria.

During 2010 and 2011, ATP had commenced and was in the process of drilling and completing six wells in its program, all of which were disrupted by the moratoria: (i) the Mississippi Canyon 941 A-1 well, which was drilled to 20,000 feet total depth but had completion halted during the early stages of the moratorium, (ii) the Mississippi Canyon 941 A-2 well, which was previously drilled to 12,000 feet, but could not be drilled to its targeted total depth of 20,000 feet until March 2011 when the drilling permit was issued, (iii) the Mississippi Canyon 942 A-3 well, which was drilled to approximately 12,000 feet and suffered the same fate as the 941 A-2 well, and did not receive its drilling permit until October 2011, (iv) the Mississippi Canyon 305 (Canyon Express) side track well, which initially received permits in early May 2010 (after the first 30 day moratorium), only to have its permit pulled less than three weeks later, when the first six-month moratorium was issued on May 30, 2010; (v) the Gomez #9 well, which was delayed indefinitely; and (vi) the Gomez #10 well, which was also delayed indefinitely. Each of these wells were targeted because they are located in close proximity to either the *ATP Innovator*, the *ATP Titan* or the Canyon Express pipeline system, and their development was part of the economic model justifying ATP's investment in this infrastructure.

When the moratorium was effectively lifted in March 2011, ATP received permits and attempted to generate production from these projects as quickly as possible. By February 2012, ATP was able to complete the Mississippi Canyon 941 A-1, A-2, and Mississippi Canyon 942 A-3 wells in its Telemark field and connect them to the *ATP Titan*. ***To date, because of liquidity constraints, ATP has not been able to return to drill the Mississippi Canyon 305 well, which is on a very large dry gas reservoir producing through the Canyon Express pipeline system, or either of the Gomez #9 and #10 wells, both of which would have tied in to the ATP Innovator.***

*      *      *

32

*Overall, ATP's inability to complete various wells or commence pipeline construction when planned due to the shutdown in the Gulf created significant liquidity problems, which were exacerbated by less than expected production rates at ATP's Telemark Hub and cost overruns on the Octabuoy. ATP's management, with the assistance of various outside professionals, closely monitored these challenging conditions and evaluated potential alternatives to improve ATP's liquidity position.* ATP diligently sought to solicit potential partners, joint operators, or investors with respect to its foreign operations to share in the development costs of its North Sea and Eastern Mediterranean oil and gas properties. Although it is generally recognized that the reserves and operations of ATP's foreign affiliates have significant value, ATP has not yet been able to complete a transaction with any parties that will bring in enough financing to complete the construction of the necessary infrastructure to start generating new production from these foreign deepwater operations.

*     *     *

*Despite ATP's best efforts, it was unable to overcome the impact of the moratoria when ongoing project construction costs, declining oil prices and less than anticipated production put it in the untenable position of running out of cash before it could complete the Clipper Wells project and generate the revenues necessary to begin remedying its situation. In the period leading up to the Petition Date, ATP found itself facing a severe liquidity crisis, with a cash position of less than $10 million and a substantial backlog of trade payables and amounts due under overriding royalties and net profit interests totaling, in the aggregate, over $70 million[5], along with substantial payments due on the Second Lien Notes later this fall. ATP's inability to make current payments on many of its obligations have resulted in a number of notices of default and lawsuits from its creditors, with some seeking prejudgment relief (such as temporary restraining orders or writs of sequestration) that could further restrict the Company's short-term cash flow and liquidity.*

(emphasis added).   Defendants Bulmahn, Tate and Godwin, by virtue of their high level management roles, were in a position to be aware of these pervasive problems described by Defendant Reese, including ATP's liquidity crisis and inability to survive the moratoria.

90.     According to bankruptcy counsel Kelly, the inability "to drill those wells in that time frame off of the company's business plan shortly after receiving funding of that 1.5 billion

---

[5] Reese clarified in his testimony during the First Day Hearing that number was actually $170 million.

dollars second lien [in April 2010], the effects were especially profound on ATP." "As it is a much smaller company than its principal competitors in the Gulf, it has a heavier concentration of operations in the deep water Gulf of Mexico," Kelley said.

91.     When asked at the First Day Hearings, "[H]ow important is it for ATP's business plan to be able to continue to add new revenues and new reserves," Defendant Reese replied:

> Oh, it's very -- it's very important. For example, in the business plan that we had for the bondholders [noteholders]. During the latter part of 2010 -- excuse me, 2009 and early part of 2010, we were producing around either side of 15,000 barrels per day. By the time -- our projection was by the time we got into the early part of 2011, that was going to be close to either side of 60,000 barrels a day. What actually happened was we produced around 25,000 barrels a day during those quarters.

92.     Defendant Reese further admitted in testimony during the First Day Hearings that ATP knew it could not survive the moratoria.  When asked "Did ATP have the liquidity and revenues at that time to absorb a lengthy moratorium?" he responded "No.  We could not." Defendants Bulmahn, Tate and Godwin, by virtue of their high level management roles, were also in a position to be aware of ATP's lack of liquidity such that it could not survive the moratoria.

93.     Defendant Reese also testified at the First Day Hearings that Jefferies & Co. ("Jefferies") was retained "in the middle of July" 2012 for the purpose of "addressing and considering DIP [debtor in possession] financing."  He further testified that at this time, ATP had a "strained liquidity position" and "a serious cash flow shortage."  ***ATP further retained Mayer Brown LLP to advise it on a potential bankruptcy no later than the last week of June 2012***, as admitted by testimony of John Burton Echols, a consultant retained in that process.

94.     Reese further testified at the First Day Hearings that he knew ***"for a year or so" that ATP was "going to need substantial funds in order to complete the Clipper project."***  He quantified those funds at approximately $140 to $150 million dollars, with $120 million in costs

left at the time of ATP's bankruptcy filing.  He also testified that ATP pursued numerous avenues to borrow money or otherwise obtain financing, including sales of assets throughout 2012, sales of some of the OCS properties, sales of foreign entities, taking on partners, considerations of additional overrides and net profits interests, equity raises, and borrowing against its equity positions in the ATP Titan and ATP Innovator.  Yet despite incurring additional debt obligations, including the sale of $185 million in overrides in the first quarter of 2012,[6] ATP could not generate sufficient capital to maintain operations, let alone complete the Clipper project.

95.    "Our loans do not allow us to incur any more mortgages," Reese testified, adding," "[p]rior to the [bankruptcy] filing, we did not have the ability to go borrow more money or encumber the assets."

96.    Reese testified that ATP's cash position as of March 31, 2012 was about $224 million, and at June 30, 2012, it was about $25 to $30 million.

97.    Defendant Bulmahn blamed the moratoria for the Company's bankruptcy, saying, in an interview with a *Forbes Magazine* reporter, that it was "directly attributable to what the government did to us."  *See Forbes Magazine*, "As Oil Company Files For Bankruptcy, CEO Blames Obama" (August 18, 2012).  However, such losses were substantially quantifiable during the Class Period and Defendants dramatically understated the true impact of the moratoria on its deep water operations in the Gulf of Mexico.  Indeed, during the Class Period, Defendants' misrepresented the Company's business prospects, financial condition and liquidity.

---

[6] This figure was disclosed by ATP in the Company's 2012 1Q 10-Q, filed with the SEC on May 10, 2012.

**(2)** **_The Bankruptcy Action Has Revealed That ATP Had Unpaid Obligations During The Class Period_**

98.    Despite Defendants' claims throughout the Class Period that ATP's liquidity was sound and strong, and statements as late as May 10, 2012 that ATP "believe[s] we can continue to fund our projected capital expenditures and our existing obligations . . ., for at least the next twelve months," it is clear that ATP was insolvent and not current in paying its obligations as they became due.  For instance legal proceedings both inside and outside the bankruptcy reveal numerous creditors seeking remedies against ATP for unpaid obligations:

a.    Greystar Corporation ("Greystar") provided fishing services, labor, equipment, machinery, materials and supplies to ATP prior to and during the Class Period. ATP failed to pay Greystar for certain services, labor, and equipment starting as early as **_April 19, 2007 through August 17, 2012_**, in the aggregate amount of $6,510,143.66.[7]

b.    Bristow U.S., LLC ("Bristow") provided labor, equipment, services, and supplies to ATP during the Class Period.  ATP failed to pay Bristow for invoices dating back at least as early as **_August 31, 2010_**, in the aggregate amount of $4,326,877.[8]

c.    Schlumberger Technology Corporation ("Schlumberger") provided services to ATP prior to and during the Class Period.  According to documents filed in an adversary proceeding against ATP, the Company still owes Schlumberger for

---

[7] See Greystar Corporation v. ATP Oil & Gas Corporation, Barry Graham Oil Service, LLC's Complaint for Declaratory Judgment Regarding Validity, Priority, and to Enforce Liens, Case No. 13-03199 (S.D. Tex. Bankr. Aug 16, 2013) (Doc. No. 1).

[8] See Bristow U.S., LLC v. ATP Oil & Gas Corporation, Complaint for Enforcement of Liens, Case No. 13-03182 (S.D. Tex. Bankr. Aug. 6, 2013) (Doc. No. 1); see also In re ATP Oil & Gas Corporation, Plaintiff's Original Complaint (S.D. Tex. Bankr. Oct. 15, 2012) (Doc. No. 1).

services dating back as early as **March 31, 2011 and continuing through at least May 2012**, in the aggregate amount of $12,136,680.53.[9]

   d.   SEACOR Marine LLC ("SEACOR") provided services to ATP during the Class Period.   According to documents filed in an adversary proceeding, ATP is indebted to SEACOR for services it provided as early as **June 1, 2011 through July 15, 2012**, in the aggregate amount of $7,082,519.76.[10]

   e.   Nabors Offshore Corporation ("NOC") provided services to ATP during the Class Period.   ATP failed to pay NOC for invoices from **December 1, 2011 through August 2012** in the aggregate amount of $16,141,970.14.[11]

   f.   Supreme Service & Specialty Co. Inc. ("Supreme") provided services to ATP during the Class Period.   According to documents filed in an adversary

---

[9] *See Schlumberger Technology Corporation, et al. v. ATP Oil & Gas Corporation,* Schlumberger Technology Corporation, Nabors Offshore Corporation, and Supreme Service & Specialty Co. Inc.'s Original Complaint for Declaratory Judgment Regarding Validity, Priority, and Extent of Liens Under Bankruptcy Rule 7001 and to Enforce Liens Against Certain Term Overriding Royalty Interests and Net Profits Interests in Telemark Leases, Case No. 13-03190 (S.D. Tex. Bankr. Aug. 13, 2013) (Doc. No. 1); *see also Schlumberger Technology Corporation, et al. v. ATP Oil & Gas Corporation,* Case No. 13-3212 (S.D. Tex. Bankr. Aug. 20, 2013) (Doc. No. 1).

[10] *See SEACOR Marine, LLC v. ATP Oil & Gas, et al.,* Plaintiff's Original Complaint, Case No. 13-03247 (S.D. Tex. Bankr. Sept. 5, 2013) (Doc. No. 1).

[11] *See Schlumberger Technology Corporation, et al. v. ATP Oil & Gas Corporation,* Schlumberger Technology Corporation, Nabors Offshore Corporation, and Supreme Service & Specialty Co. Inc.'s Original Complaint for Declaratory Judgment Regarding Validity, Priority, and Extent of Liens Under Bankruptcy Rule 7001 and to Enforce Liens Against Certain Term Overriding Royalty Interests and Net Profits Interests in Telemark Leases, Case No. 13-03190 (S.D. Tex. Bankr. Aug. 13, 2013) (Doc. No. 1); *see also Nabors Offshore Corporation v. ATP Oil & Gas Corporation,* Nabors Offshore Corporation's Original Complaint for Declaratory Judgment Regarding Validity, Priority, and Extent of Liens Under Bankruptcy Rule 7001 and to Enforce Liens, Case No. 13-03186 (S.D. Tex. Bankr. Aug. 9, 2013) (Doc. No. 1).

proceeding against ATP, the Company still owes Supreme for services dating back to *January 18, 2012*, in the aggregate amount of $909,024.94.[12]

g.  Seatrax, Inc. ("Seatrax") provided services to ATP during the Class Period. ATP failed to pay Seatrax for services provided from *January 31, 2012 through July 31, 2012* in the aggregate amount of $238,954.82.[13]

h.  Harvey Gulf International Marine, LLC ("Harvey Gulf") provided towing and transportation services to ATP from May 31, 2009 until April 7, 2012. ATP failed to pay Harvey Gulf for services it provided from *February 14, 2012 until April 7, 2012* in the aggregate amount of $2,885,133.50.[14]

i.  Hornbeck Offshore Services, LLC ("Hornbeck") provided labor, equipment, services, and supplies to ATP from November 27, 2009 until August 17, 2012. ATP failed to pay Hornbeck for services it provided from *February 22, 2012 to August 17, 2012* in the aggregate amount of $4,775,478.94.[15]

---

[12] *See Supreme Service & Specialty Co. Inc. v. ATP Oil & Gas Corporation*, Supreme Service & Specialty Co. Inc.'s Complaint for Enforcement of Liens, Case No. 13-03192 (S.D. Tex. Bankr. Aug. 13, 2013) (Doc. No. 1).

[13] *See Seatrax, Inc. v. ATP Oil & Gas Corporation*, Seatrax, Inc.'s Original Complaint for Judgment Regarding Validity, Priority, and Extend of Liens Under Bankruptcy Rule 7001(2) and to Enforce Liens, Case No. 13-03293 (S.D. Tex. Bankr. Oct. 18, 2013) (Doc. No. 1).

[14] *See Harvey Gulf International Marine, LLC v. ATP Oil & Gas Corporation*, Complaint to Determine Validity, and Priority of Liens and Request for Declaratory Judgment of Harvey Gulf International Marine, LLC, Case No. 13-03244 (S.D. Tex. Bankr. Sept. 4, 2013) (Doc. No. 1).

[15] *See Hornbeck Offshore Services, LLC v. ATP Oil & Gas Corporation*, Complaint to Determine Validity, and Priority of Liens and Request for Declaratory Judgment of Hornbeck Offshore Services, LLC, Case No. 13-03221 (S.D. Tex. Bankr. Aug. 26, 2013) (Doc. No. 1).

j.   Gulf Offshore Logistics, LLC ("GOL") provided services to ATP during the Class Period.  ATP failed to pay GOL for services provided from *March 1, 2012 to August 17, 2012* in the aggregate amount of $1,137,825.[16]

k.   Exterran Energy Solutions, L.P., ("Exterran") provided services to ATP prior to and during the Class Period.  ATP failed to pay for services provided by Exterran dating back to *March 1, 2012* in aggregate amounts of $243,229.16.[17]

l.   ERA Helicopters, LLC ("ERA") provided ATP with transportation services from May 2005 through August 14, 2012.  ATP failed to pay for services from *March 1, 2012 through August 17, 2012*, in the aggregate amount of $2,495,548.44.[18]

m.   Ken-Vac Corporation ("KVC") provided services to ATP from July 2009 through the Class Period.  ATP failed to pay KVC for services it provided from *March 12, 2012 through August 13, 2012,* in the aggregate amount of $236,766.48.[19]

n.   Blanchard Contractors, Inc. ("Blanchard Contractors") provided labor, equipment, services, and supplies to ATP.  ATP failed to pay Blanchard Corporation for

---

[16] *See Gulf Offshore Logistics, LLC v. ATP Oil & Gas Corporation*, Gulf Offshore Logistics, LLC's Original Complaint for Judgment Regarding Validity, Priority, and Extent of Liens, Case No. 13-03191 (S.D. Tex. Bankr. Aug. 13, 2013) (Doc. No. 1).

[17] *See Exterran Energy Solutions, L.P. v. ATP Oil & Gas Corporation*, Exterran Energy Solutions, L.P.'s Original Complaint for Declaratory Judgment Regarding Validity, Priority, and Extent of Liens Under Bankruptcy Rule 7001(2) and to Enforce Liens, Case No. 13-03308 (S.D. Tex. Bankr. Nov. 7, 2013) (Doc. No. 1).

[18] *See ERA Helicopters, LLC v. ATP Oil & Gas Corporation*, Complaint to Determine Validity, and Priority of Liens and Request for Declaratory Judgment of ERA Helicopters, LLC, Case No. 13-03201 (S.D. Tex. Bankr. Aug. 16, 2013) (Doc. No. 1).

[19] *See Ken-Vac Corporation v. ATP Oil & Gas Corporation*, Ken-Vac Corporation's Original Complaint for Judgment Regarding Validity, Priority, and Extent of Liens Under Bankruptcy Rule 7001(2) and to Enforce Liens, Case No. 13-03266 (S.D. Tex. Bankr. Sept. 19, 2013) (Doc. No. 1).

various invoices dated from **March 21, 2012 through May 23, 2012** in the aggregate amount of $66,655.95.[20]

o. Expeditors and Production Services, Inc. ("EPS") provided materials and services to ATP during the Class Period.  According to documents filed in an adversary proceeding against ATP, the Company failed to pay EPS for materials and services from **March 27, 2012 to August 9, 2012**, in the aggregate amount of $194,437.91.[21]

p. Martin Holdings, LLC ("Martin Holdings") provided services to ATP from February 28, 2007 through August 18, 2012.  ATP failed to pay Martin Holdings for services it provided from **March 27, 2012 to August 17, 2012** in the aggregate amount of $253,932.12.[22]

q. Barry Graham Oil Service ("Barry Graham") provided services to ATP during the Class Period.  ATP failed to pay for services provided from **April, 3, 2012 to August 16, 2012**, in the aggregate amount of $896,605.33.[23]

---

[20] *See Blanchard Contractors, Inc. v. ATP Oil & Gas Corporation*, Complaint for Enforcement of Liens, Case No. 13-03217 (S.D. Tex. Bankr. Aug. 23, 2013) (Doc. No. 1).

[21] *See Expeditors and Production Services, Inc. v. ATP Oil & Gas Corporation*, Complaint to Determine Validity Amount, and Priority of Liens and Request for Declaratory Judgment of Expeditors and Production Services, Inc EPS, Cargo Hndlers Company, Inc. and EPS Logistics Company, Inc., Case No. 13-03187 (S.D. Tex. Bankr. Aug. 12, 2013) (Doc. No. 1).

[22] *See Martin Holdings, LLC v. ATP Oil & Gas Corporation*, Martin Holdings, LLC's Original Complaint for Judgment Regarding Validity, Priority, and Extent of Liens Under Bankruptcy Rule 7001(2) and to Enforce Liens, Case No. 13-03194 (S.D. Tex. Bankr. Aug. 14, 2013) (Doc. No. 1).

[23] *See Barry Graham Oil Service v. ATP Oil & Gas Corporation*, Barry Graham Oil Service, LLC's Complaint for Judgment Regarding Validity, Priority, and to Enforce Liens, Case No. 13-03242 (S.D. Tex. Bankr. Sept. 3, 2013) (Doc. No. 1).

r.  Offshore Service Vessels, LLC ("Offshore") provided services to ATP from November 11, 2009 through the Class Period.  ATP failed to pay Offshore for services from **April 13, 2012 to April 15, 2012** in the aggregate amount of $122,650.00.[24]

s.  C-Port/Stone, LLC ("CPS") provided services to ATP from November 10, 2010 and continuing through the Class Period.  ATP failed to pay CPS for services performed from **May 1, 2012 to August 17, 2012**, in the aggregate amount of $1,501,530.66.[25]

t.  RC Logistics, LLC ("RC Logistics") provided services to ATP during the Class Period.  ATP failed to pay RC Logistics for services it provided from **May 3, 2012 through July 30, 2012**, in the aggregate amount of $422,445.25.[26]

u.  Gulf Coast Chemical, LLC ("Gulf Coast") provided services to ATP during the Class Period.  ATP failed to pay Gulf Coast for services it provided from **June 1, 2012 through August 4, 2012**, in the aggregate amount of $868,239.59.[27]

99.   These unpaid invoices, most of which were for services rendered in 2011 or early 2012, amounted to more than $63.3 million, unpaid by ATP.

---

[24] *See Offshore Service Vessels, LLC v. ATP Oil & Gas Corporation*, Plaintiff' Original Complaint, Case No. 13-03247 (S.D. Tex. Bankr. Sept. 5, 2013) (Doc. No. 1).

[25] *See C-Port/Stone, LLC v. ATP Oil & Gas Corporation*, C-Port/Stone LLC's Original Complaint for Judgment Regarding Validity, Priority, and Extent of Liens Under Bankruptcy Rule 7001(2) and to Enforce Liens, Case No. 13-03195 (S.D. Tex. Bankr. Aug. 14, 2013) (Doc. No. 1).

[26] *See RC Logistics, LLC v. ATP Oil & Gas Corporation*, RCL's Complaint for Declaratory Judgment Regarding Validity, Priority, and Extent of Liens Under Bankruptcy Rule 7001(2) and to Enforce Liens, Case No. 13-03273 (S.D. Tex. Bankr. Sept. 24, 2013) (Doc. No. 1).

[27] *See Gulf Coast Chemical, LLC v. ATP Oil & Gas Corporation*, Complaint for Enforcement of Liend, Case No. 13-03267 (S.D. Tex. Bankr. Sept. 19, 2013) (Doc. No. 1).

100.    ATP's unpaid obligations, and the Defendants' knowledge of ATP's lack of liquidity, is supported by the statements of CW1.  CW1 is a former employee of ATP, hired by Bulmahn, who worked at ATP for approximately 15 years (including through the filing of ATP's Bankruptcy Action) in several capacities, including technical and managerial capacities.

101.    CW1 stated that Defendant Bulmahn would hold periodic meetings for staff in the board room where he would discuss ATP's budget.  The meetings would range in frequency from once every month to once every three months.  CW1 further stated that during the moratorium, ATP was spending approximately $1 million per day without hardly any revenue coming in.

102.    CW2, a credit manager of one of the largest oil field service company creditors of ATP, stated that in or around 2011 its service agreement with ATP had to be renegotiated due to, among other reasons, ATP's inability to pay money owed according to the terms of its contract. CW2 further stated that the service agreement was renegotiated to allow ATP to make payments on a periodic (and less frequent) basis, which allowed ATP to continue drilling wells at a time when it did not have the funds to pay its debts on a current basis.

### (3)    *The Bankruptcy Action Has Revealed that ATP Failed to Pay Overriding Royalty Interests and Net Profit Interests During the Later Part of the Class Period*

103.    Both prior to and during the Class Period ATP sold overriding royalty interests ("ORRIs") and net profit interests ("NPIs") to various third parties.  During the Class Period, ATP was obligated to pay revenues to those interest owners, among others, within 30 days of receiving the proceeds.  ATP was not authorized to use, borrow, appropriate, or transfer the proceeds attributable to the third party interest owners for any purpose except delivery of the proceeds.  During the later part of the Class Period, however, ATP failed to pay proceeds to its ORRI and NPI owners.   Indeed, the following testimony from Defendant Reese admits this fact,

and explains that the decision to withhold distribution of the proceeds was made by management

and specifically included Defendants Reese, Bulmahn, Tate, and Godwin:

Q:      Turning to the NPI/ORRI issue, were a lot of these -- weren't some of these NPIs given to vendors?

A:      The -- in 2009, I believe, yes. There were some given to vendors. That would have been the Diamond Override. I think we refer to it as the Bristow Override, and Airlog and those. Those are the only ones that were true vendors.

Q:      I thought you said Seacorp (phonetic) and some other vendors?

A:      Seacorp could have been one of the ones.

Q:      Okay. Weren't those in essence trade creditor financings?

A:      Those were entered into prior to the service being performed and for the service that was performed, they received a like amount of dollars and a net profits interest.

Q:      Wasn't it true you were default well in advance of filing this bankruptcy in some of these NPIs and overrides?

A:      ***Yes. We had failed to make some payments.***

Q:      So interest and default fees and all that stuff had already occurred prior to the filing of the bankruptcy, correct?

A:      You're asking for a technical judgment, and I'm not sure I'm completely qualified to do that, but in general, yes. There were default letters that had been issued and demand for payments and things of that nature.

Q:      And were some lawsuits filed, correct?

A:      Yes.

                              *      *      *

Q:      Mr. Reese, my name is Rhett Campbell and I represent NGP Capital. And I'm sure you know that NGP Capital is a purchaser of certain term override royalty interests at Gomez and Telemark, correct?

A:      Yes.

Q:      And you probably know that we have been assigned a 10.8 percent net revenue interest at Gomez and a five percent net revenue interest at Telemark; is that right?

A:      Those numbers sound correct.

Q:      ***And I believe that the May production proceeds attributable to our net revenue interests were not distributed to us; is that correct?***

A:      ***I believe that is correct.***

Q:      That's the amount that should have been distributed on July 31?

A:      That's what I was trying to think -- Yes, that would be correct.

Q:      Right. And we believe that that's right at 1.5 million; is that roughly correct?

A:      I believe that number is directionally with what I remember. I don't remember the specific amount.

Q:      Yes, sir. Now my specific question is, when the proceeds of production come in that are attributable -- I'm sure that you get one check -- for Gomez for the purchase of -- well, probably for gas and oil and NGL. Probably three different checks, if I had to guess.

A:      That would be correct.

Q:      Okay. And when you get one of those checks from the purchaser of production does it -- what kind of an account does it go into?

A:      It would go into our general receipt account.

Q:      General what?

A:      General receipts. Just general account.

Q:      Generally receipts, okay. Is it segregated at all? Is there -- In other words, we believe that money belongs to us, the 10.8 percent of it belongs to us. So does that go into a segregated account or is it co-mingled with --

A:      No, it's co-mingled.

Q:      Co-mingled. And then it is ultimately distributed to the parties who are entitled to receive it?

A:      Yes, it is.

Q:      Except that on July 31st it did not?

A:      Correct.

Q:      Okay. And who made the decision not to distribute the money on July 31st?

A:      There was no one person that made that decision.

Q:      Well, what would be the group of people that decided that?

A:      ***It would have been effectively the management of the company. At that particular point in time we were basically in a position where we needed to decide what cash we were going to be able to use.***

Q:      Okay. And who would be the individuals in management that made that decision?

A:      ***Well, it would start with Paul Bulmahn who is the chairman -- executive chairman, I'm sorry. He changed title recently. Executive chairman. Leland Tate who's president, myself, Keith Godwin who's chief accounting officer. Those would probably be the primary people that would be involved in that decision process.***

Q:      Yes, sir. And did each of those individuals actually have a discussion about whether to distribute the funds or whether to use them for some other purpose?

A:      We would have had general meetings to determine which checks were going to be issued on which particular day.

*      *      *

THE COURT: Let me. Mr. Reese, when you-all made those decisions about not -- well you made the decision to utilize the funds that would have otherwise gone to the ORRI or the NPI, did the same people make the decisions as to all?

MR. REESE: Yes.

(emphasis added).

104.    Thus, according to this admission from Defendant Reese, ATP's financial position had become so dire during the Class Period that by May 2012, Defendants Bulmahn, Reese, Tate and Godwin made the desperate knowing decision to unlawfully retain ORRI and NPI owed to third parties so that such proceeds could be used to pay ATP's management's salaries and operations.  In fact, at the time these proceeds were being withheld, Defendants materially misled investors by stating that "we have not missed an interest payment . . . we have

45

made every payment" and further stated that "we believe we can continue to fund our projected capital expenditures and our existing obligations, including our long-term debt and other obligations . . ., for at least the next twelve months." *See* ¶¶185-86.

105.   Had ATP's liquidity truly been "sound" as Defendants had repeatedly stated to investors, Defendants would not have resorted to unlawful conversion just to keep the Company afloat. *See* ¶103-04.

106.   Set forth below is a summary of ATP's unpaid ORRIs and NPIs:

a.   On May 22, 2009, ATP executed and delivered a conveyance of overriding royalty interest to Diamond Offshore Company ("Diamond") in exchange for drilling services provided by Diamond.  The conveyance agreement was amended five times.  ATP failed to pay net profit amounts due on July 30, 2012 and August 17, 2012 in the amounts of $2,518,123.14 and $3,093,211.53, respectively.[28]

b.   As explained *supra* Bristow provided services to ATP.  As part of the service arrangement, Bristow owned ORRIs in certain property.   ATP failed to pay Bristow for the periods ending June 20, 2012 and July 31, 2012 in the amounts of $438,044.54 and $139,875.73.[29]

c.   On February 1, 2012, Keba Energy LLC ("Keba") paid ATP approximately $25 million for an overriding royalty interest in certain properties.  ATP failed to pay

---

[28]   *See Diamond Offshore Company v. ATP Oil & Gas Corporation*, Diamond Offshore Company's Complaint for Declaratory Judgment and Alternative Relief Against ATP Oil & Gas Corporation, Case No. 12-03425 (S.D. Tex. Bankr. Dec. 20, 2012) (Doc. No. 1).

[29] *See Bristow U.S., LLC v. ATP Oil & Gas Corporation*, Complaint for Enforcement of Liens, Case No. 13-03182 (S.D. Tex. Bankr. Aug. 6, 2013) (Doc. No. 1); *see also In re ATP Oil & Gas Corporation*, Plaintiff's Original Complaint (S.D. Tex. Bankr. Oct. 15, 2012) (Doc. No. 1).

Keba the proceeds due to it from the ORRI from May 2012 through June 2012 in an aggregate amount of $2,579,293.86.[30]

d. Macquarie Investments LLC ("MILLC") owned several ORRIs, whereby ATP was obligated to pay MILLC for production proceeds.  Beginning in April 2012, ATP failed to pay MILLC for proceeds in an aggregate amount of $7,930,441.61 million.[31]

e. As explained *supra* SEACOR provided services to ATP.  As part of the service agreement, SEACOR owned ORRIs in certain property.  ATP failed to pay SEACOR for proceeds in the amount of $6,591,433.30.[32]

107.    Accordingly, ATP failed to transfer approximately $23.2 million in proceeds to the rightful interest holders.

108.    In response to a question posed at the First Day Hearing, "Could you explain…your role and familiarity with ATP's day-to-day operations," Defendant Reese responded:  "Certainly. As it relates to the financing side, I am the Chief Financial Officer and heavily involved with that, all of our financings. … So certainly from a business side, the executive side, financial side very, very well informed."

109.    Reese further testified that "I was involved deeply in alternative financings."  As Reese acknowledged in his Declaration, "ATP's management, with the assistance of various

---

[30] *See Keba Energy LLC v. ATP Oil & Gas Corporation*, Original Complaint, Case No. 12-03517 (S.D. Tex. Bankr. Oct. 2, 2012) (Doc. No. 1).

[31] *See Macquarie Investments LLC v. ATP Oil & Gas Corporation*, Original Complaint, Case No. 13-03055 (S.D. Tex. Bankr. March 18, 2013) (Doc. No. 1).

[32] *See SEACOR Marine, LLC v. ATP Oil & Gas Corp.*, Plaintiff's Original Complaint, Case No. 12-03450 (S.D. Tex. Bankr. Oct. 26, 2012) (Doc. No. 1).

outside professionals, closely monitored these challenging conditions and evaluated potential alternatives to improve ATP's liquidity position."

### G.    ATP Files for Bankruptcy

110.    Unfortunately for ATP's shareholders and creditors, Defendants could not continue to support their house of cards, even though they were not paying debts and taking third party production proceeds.

111.    On August 10, 2012, ATP's stock price plummeted, closing at $0.36, down $1.13 from its opening price of $1.49, amid reports that the Company may file for bankruptcy.

112.    On August 17, 2012, ATP announced that it was filing for Chapter 11 bankruptcy. The Company reported total debts of $3.49 billion and assets of $3.64 billion and announced that it was going to continue operating during its financial restructuring, using $618 million in DIP funding.

113.    ATP's press release stated that:

HOUSTON, TX – August 17, 2012 – (Business Wire) – ATP Oil & Gas Corporation (NASDAQ: ATPG) today announced that it has filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas. ATP has taken this action in order to undertake a comprehensive financial restructuring. ATP expects its oil and gas operations to continue in the ordinary course throughout the reorganization process and sees the reorganization as a helpful step towards deleveraging the company to position it for future development of its assets. ATP believes that the rights and protections afforded it by a court-supervised reorganization process, including the ability to access new financing, will provide ATP with the time and flexibility it needs to fully address its financial challenges and position ATP for long-term viability.

The primary reason for the reorganization began with the Macondo well blowout in April 2010 and the imposition beginning in May 2010 of the moratoria on drilling and related activities in the Gulf of Mexico. These events prevented ATP from bringing to production in 2010 and in early 2011 six development wells that would have added significant production to ATP. As of the date of this filing, three of these wells are yet to be drilled. Had ATP been allowed to drill and complete these wells ATP believes it would have provided a material production

change in 2010 continuing to today. This projected increase in production should have substantially increased cash flows, shareholder value and allowed the company the ability to withstand normal operational issues experienced by owners of oil and gas properties in the Gulf of Mexico. In addition, these incremental cash flows would have mitigated or prevented the need to enter into many of the financings ATP has closed since the imposition of the moratoria — financings that require relatively high rates of return and monthly payments.

114.    On August 20, 2012, the next trading day, ATP's common stock price fell $0.1593 per share, or 34.7%, to close at $0.30 per share.

## VI.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

115.    Throughout the Class Period, Defendants made several misstatements of material fact and failed to disclose material facts, as detailed more completely herein.  The revelations of these misrepresentations and omissions had a material, adverse impact on ATP and caused the value of its common stock to decline.

116.    The Defendants in this action are the ATP executives who prepared and signed the Registration Statement, and made additional false and misleading statements subsequent to the Registration Statement.  In violation of the Exchange Act, Defendants are liable for having issued inaccurate and misleading statements and omitting material facts which were necessary to be disclosed in order to make the statements that were made not misleading from the Registration Statement that the Company filed with the SEC in support of the Exchange, and SEC filings and other public statements made subsequent to the Registration Statement during the Class Period.   All the Defendants knew the false and misleading nature of the statements and omissions alleged herein, particularly by reason of their executive positions at ATP, and that the problems discussed herein would seriously impair ATP's business and financial condition and results.

A.     **Relevant Disclosure Requirements**

*(1)     Regulation S-K, Item 303*

117.     SEC Regulation S-K (and SEC Forms S-4, 10-K and 10-Q) requires disclosure of

certain information, including information required to be disclosed under Item 303(a) and (b) of

Regulation S-K (17 C.F.R. §229.303), in the non-financial-statement portions of registration

statements filed on SEC Form S-4 under the Securities Act and annual reports filed on SEC

Form 10-K and quarterly reports filed on SEC Form 10-Q under the Exchange Act. 17 C.F.R. §

229.10.

118.     For full fiscal years (*i.e.* annual statements on Form 10-K and registration

statements on Form S-4), Item 303(a) requires the registrant to make the following disclosures:

> (1) Liquidity… Identify any known trends or any known demands, commitments,
> events or uncertainties that will result in or that are reasonably likely to result in
> the registrant's liquidity increasing or decreasing in any material way.

> *                 *                 *

> (3) Results of operations.

> *                 *                 *

> (ii) Describe any known trends or uncertainties that have had or that the registrant
> reasonably expects will have a material favorable or unfavorable impact on net
> sales or revenues or income from continuing operations.

119.     For interim periods (*i.e.* quarterly reports on Form 10Q), Item 303(b), 17 C.F.R.

§303(b), requires disclosure of material changes in those items listed in Item 303(a), including

known trends and uncertainties.

120.     Instruction 3 to paragraph 303(a) provides that "[t]he discussion and analysis shall

focus specifically on material events and uncertainties known to management that would cause

reported financial information not to be necessarily indicative of future operating results or of

future financial condition." 17 C.F.R. § 229.303(a), Instruction 3.  The SEC's interpretive release

regarding Item 303 clarifies that the Regulation imposes a disclosure duty "where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 6835, Exchange Act Release No. 26,831, Investment Company Act Release No. 16,961, 43 SEC Docket 1330 (May 18, 1989).

121.    Instruction 5 to Item 303(a) defines "liquidity" for purposes of Item 303(a) as "the ability of an enterprise to generate adequate amounts of cash to meet the enterprise's needs for cash."

122.    Liquidity has been described by financial experts as "the ability or ease with which [a company can] timely meet its financial obligations and fund its operations with cash on hand, assets readily convertible to cash on hand, cash from operations, or readily accessible sources of debt." *See, e.g., In re Vivendi Universal, S.A. Sec. Litig.,* 634 F. Supp. 2d 352, 366 (S.D.N.Y. 2009)**.**

123.    There were three primary sources of cash flow to the Company – cash from operations (*i.e.,* net income); cash from investing activities (proceeds from the sale of property, plant, equipment); and cash from financing activities (proceeds from additional debt/equity).

124.    Here, Defendants failed to disclose in the Registration Statement and the Forms 10-K and 10-Q the true extent of the affect the moratoria was having on ATP's revenues, cash flows, liquidity and operations and how it could reasonably be expected to materially and adversely affect same in the future.

125.    Because of ATP's highly leveraged operations, which required ATP to bear significant financing costs, its debt restrictions on encumbering its assets, and its heavy

concentration (90%) of its operations in the Gulf of Mexico, the moratoria prevented ATP from generating the cash flows necessary to finance its operations.  ATP failed to disclose that the moratoria were having and could reasonably be expected to continue to have an "especially profound" impact on ATP, severely impacting revenues and liquidity.

### (2)   *SEC Rule 10b-5(b)*

126.   SEC Rule 10b-5, promulgated under Section 10(b) of the Exchange Act, makes it unlawful in connection with the sale of a security

> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading….

127.   Specifically, under the applicable SEC rules and regulations governing the preparation of the Registration Statement and the financial statements and subsequent related SEC filings, the Defendants materially misstated and/or omitted to state material facts regarding the true severity of the problems facing the Company's business operations, revenues and liquidity.

### B.   **The Registration Statement**

128.   ATP's sale of the Notes in the registered offering was effectuated through a Registration Statement on Form S-4 (File No. 333-169880) declared effective by the SEC on December 16, 2010.  The Registration Statement was signed by Defendants Bulmahn, Reese, and Godwin.

129.   In the Company's Registration Statement released on October 12, 2010, the Company stated, with respect to the Company's business operations and revenue:

> ***We project a substantial increase in production over the next year as development wells are brought to production.*** Absent alternative funding sources, achieving our projected production growth is necessary to provide the cash flow required to fund our capital plan and meet our existing obligations, both

over the next twelve months and on a longer term basis. Our ability to execute on our plan depends, in part, on our ability to continue drilling for and producing hydrocarbons in the Gulf of Mexico. ***Our plan is currently based upon resuming suspended activities upon the expiration of Moratorium II currently scheduled to occur on November 30, 2010, obtaining necessary drilling permits, and successfully achieving expected commercial production from existing wells presently scheduled for completion during the remainder of 2010 and the first quarter of 2011. Delays in resuming those activities due to circumstances such as an extension of Moratorium II, delays in receiving necessary permits, reduced access to equipment and services, or weather delays, <u>could</u> have a material adverse effect on our financial position, results of operations and cash flows.*** In addition to the risks associated with achieving our projected production growth, additional regulatory requirements and increased costs for which funding must be secured, or a negative change in commodity prices and operating cost levels, could also have a material adverse effect on our financial position, results of operations and cash flows. While we are pursuing various other sources of funding, including bringing partners into our projects, there is no current assurance that these alternative sources will be available should any of the above risks or uncertainties materialize.

Depending on their duration and extent, these developments could have a material adverse affect on our results of operations, cash flows and liquidity.

(emphasis added).

130.    The Company released its Prospectus on December 16, 2010. The Prospectus contained identical, or very nearly identical, language to the Registration Statement. The Prospectus did not contain any corrections or additional information that would render the above-quoted language from the Registration Statement complete, accurate, or otherwise not false, inaccurate, and/or misleading.

131.    The statements referenced above in ¶¶129-30 were false or misleading statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading because the Defendants knew that ATP could not survive the moratoria.  The moratoria or *"de facto"* moratoria had been in effect for seven months at the time the Registration Statement became effective.  As testified to by Defendant Reese, ATP did not have "the liquidity and revenues at

that time to absorb a lengthy moratoria." *See* ¶¶88-94.  CW1 additionally stated that the moratoria cost the Company $1 million a day without hardly any revenue being generated. Further, given Defendants' knowledge that ATP could not survive a lengthy moratorium, Defendants knew or were severely reckless in not knowing that ATP would not have a "substantial increase in production over the next year."

132.    Indeed the Company's liquidity problems began almost immediately after the Macondo well explosion. According to bankruptcy counsel Kelly, the inability "to drill those wells in that time frame off of the company's business plan shortly after receiving funding [in April 2010] of that 1.5 billion dollars second lien, the effects were especially profound on ATP. Reese has further admitted that: (1) the "primary reason" for the Company's failure began with the Macondo explosion in April 2010; and (2) the moratoria beginning in May 2010, "created significant liquidity problems" for ATP. In addition, ATP's proposed drilling program, which contemplated drilling six wells in 2010 and 2011, could not "proceed given the moratorium." In violation of Item 303, Defendants never disclosed that, at the time the Registration Statement was declared effective, they knew that ATP had inadequate liquidity and that their proposed drilling program would not proceed in 2010.

133.    Thus, in the false and/or misleading statements specified above, Defendants either dramatically downplayed the truth or did not disclose the truth at all.

**C.    January 5, 2011 Pritchard Capital Partners Energize Conference**

134.    On January 5, 2011, Defendant Reese spoke on behalf of ATP at the Pritchard Capital Partners Energize Conference.  During the conference, Defendant Reese made the following materially false or misleading statements:

> We've had consistent reserve growth throughout every cycle you can think of in pricing from $147 oil to probably $20 oil during that period of time, and gas has

54

been just as dramatic with the issues that have hit the industry during 2010 -- talk about those little bit.  We have proven, we have forecasted production growth. You can see our production growth for this year, and as we go into next year, *we do have a strong liquidity position*. And we have in what else -- what you'll see here at the very end -- kind of what I think is a very compelling valuation for the Company itself.

\*       \*       \*

*Strong liquidity to do everything that we've been talking about.*

\*       \*       \*

*We do have a strong liquidity position and let's face it, one of the reasons the stock price I think continues to linger is because of the moratorium*. As the moratorium and the impact gets relieved, I think that uncertainty is going to be reduced. You've seen that happen over the past few weeks, just this week alone with the letter from the BOEM.

135.    The statements referenced above in ¶134 were false or misleading statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading because ATP did not have a strong liquidity position.  In fact, as testified to and stated during the Bankruptcy Action, ATP had "significant liquidity problems" and did not have the liquidity to survive a lengthy moratorium.  *See* ¶¶88-94.

### D.    Year End 2010 Financial Results

136.    On March 15, 2011, the Company held its year-end 2010 earnings conference call.  Defendants Bulmahn, Reese and Tate participated in the call.  During the call Defendants made the following materially false or misleading statements:

PAUL BUHLMAN:  Despite the moratorium from last May through last week, ATP increased its production year-over year just not to the exception[al] level it would have been without the BP spill and governmental over-reaction.  *Through creative, albeit expensive financing, we are now liquid and solvent.* Our operational excellence and prowess are safe environmentally sound drilling stands ready to perform. We have maintained a consistent schedule of construction of the Cheviot/Octabuoy, ATP's second $1 billion dollar Hub, this one designed for the North Sea. . . . . *Not only have we been surviving during this period of time, we*

*have expanded a foundational base to accelerate ATP's strategy into the future*. We are well positioned for success with a deep water permit we expect to receive at any time.

*       *       *

VIVEK PAU: In terms of liquidity, do you expect to go into the market in terms of first lien debt or equity for the remainder of the year…Or do you have enough? Yeah.

AL REESE: This is Al Reese. We have -- on our first lien debt we have already put in place the expansion of our first lien debt. That goes from $150 million to $210 million, so that piece is already done. There are no plans at this point to do any equity transaction this year.

VIVEK PAU: *So that $60 million additional and first lien would be enough to cover your cash-flow requirements for the remainder of the year?*

AL REESE: *Yes, with the existing cash that we have, with that, with the Titan facility. Some other things that we're currently looking at, we feel very comfortable with our liquidity position for the entire 2011 as we go into 2012. That's either with or without permits from a liquidity standpoint.*

(emphasis added.)

137.    On March 16, 2011, the Company filed its 2010 10-K with the SEC.  The 2010 10-K was signed by Defendants Bulmahn, Reese and Godwin.  In addition, Defendants Bulmahn and Reese certified the 2010 10-K pursuant to the Exchange Act and the Sarbanes Oxley Act. The 2010 10-K disclosed in pertinent part:

**1A. Risk Factors.**

*       *       *

Our 2011 development plans in the Gulf of Mexico, as well as our longer term business plan, are dependent on receiving approval for deepwater drilling and other permits submitted to the BOEM. While we believe we can satisfy the permitting requirements for our planned 2011 development wells which will allow us to significantly increase our production from current levels, there is no assurance that they will be received in time to benefit our 2011 results or that permits will be issued in the future. *Should the permitting process in the Gulf of Mexico continue to be delayed, we believe we can continue to meet our existing obligations for at least the next twelve months; however, absent alternative funding sources, our ability to do so is dependent on maintaining existing*

56

*production levels from our currently producing wells and maintaining commodity prices and operating costs near current levels.* …

\*       \*       \*

### Risks and Uncertainties

Our 2011 development plans in the Gulf of Mexico, as well as our longer term business plan, are dependent on receiving approval for deepwater drilling and other permits submitted to the BOEM. While we believe we can satisfy the permitting requirements for our planned 2011 development wells which will allow us to significantly increase our production from current levels, there is no assurance that they will be received in time to benefit our 2011 results or that permits will be issued in the future. ***Should the permitting process in the Gulf of Mexico continue to be delayed, we believe we can continue to meet our existing obligations for at least the next twelve months; however, absent alternative funding sources, our ability to do so is dependent on maintaining existing production levels from our currently producing wells and maintaining commodity prices and operating costs near current levels.***

\*       \*       \*

### Liquidity and Capital Resources

*Overview*

Historically, we have funded our acquisition and development activities through a combination of bank borrowings, proceeds from equity offerings, cash from operations, the sale or conveyance of interests in selected properties and vendor financings. Our ongoing cash requirements consist primarily of servicing our debt and other obligations and funding development of our oil and gas reserves. Cash paid for capital expenditures for oil and gas properties was approximately $598.1 million, $635.4 million and $917.7 million for the years ended December 31, 2010, 2009 and 2008, respectively. In 2010, we refinanced our long-term debt and obtained additional financing from other transactions, all of which are discussed below.

Our 2011 development plans in the Gulf of Mexico, as well as our longer term business plan, are dependent on receiving approval for deepwater drilling and other permits submitted to the BOEM. While we believe we can satisfy the permitting requirements for our planned 2011 development wells which will allow us to significantly increase our production from current levels, there is no assurance that they will be received in time to benefit our 2011 results or that permits will be issued in the future. ***Should the permitting process in the Gulf of Mexico continue to be delayed, we believe we can continue to meet our existing obligations for at least the next twelve months; however, absent alternative funding sources, our ability to do so is dependent on maintaining existing***

57

*production levels from our currently producing wells and maintaining commodity prices and operating costs near current levels.*

(emphasis added).

138.     The statements referenced above in ¶¶136-37 were false or misleading statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading because Defendants knew, or were severely reckless in not knowing, that ATP was not "liquid" and "solvent."   As testified to and stated during the Bankruptcy Action by Defendant Reese and bankruptcy counsel Kelly, ATP had "significant liquidity problems" and did not have the liquidity to survive a lengthy moratorium.   By the time the 2010 10-K was published, the moratoria or *"de facto"* moratoria had been in effect for ten months, and while two permits had been issued, ATP had not yet received a permit to commence drilling in the Gulf of Mexico. According to bankruptcy counsel Kelly, the inability "to drill those wells in that time frame off of the company's business plan shortly after receiving funding [in April 2010] of that 1.5 billion dollars second lien, the effects were especially profound on ATP."     Indeed, although the Company's business plan with its bondholders projected production of approximately 60,000 barrels per day by early 2011, ATP's actual production had only reached approximately 25,000 barrels per day. *See* ¶¶88-97.  At the same time the Company had invested "in excess of $1 billion in infrastructure construction and other capital expenditures related to five of these wells, but was denied the planned cash flows from these wells." *See* ¶52.   Further, given these liquidity problems, Defendants knew, or were severely reckless in not knowing, that the statement that ATP could "continue to meet [its] existing obligations for at least the next twelve months," was materially false and misleading.   In fact, ATP was already unable to meet certain obligations, failing to pay certain vendors as early as April 2007. *See* ¶98(a).

139.    Defendants and ATP also violated their disclosure duties under Item 303(a) of Regulation S-K in that they failed to disclose in its 2010 10-K that the moratoria were having and could reasonably be expected to continue to have an "especially profound" impact on ATP, severely impacting revenues and liquidity.

**E.      April 2011 Independent Petroleum Association of American ("IPAA") Oil & Gas Investment Symposium New York Conference**

140.    On April 13, 2011, Defendant Bulmahn spoke on behalf of ATP at the IPAA Oil & Gas Investment Symposium New York Conference.  During the conference, Bulmahn made the following materially false or misleading statements:

> Our diversified asset base of international reserves and reusable deepwater platforms have a current value exceeding $7.7 billion. ***ATP's liquidity is strong,*** and we are presently reducing our debt with NPI and override payments. As recently as March 2011, ATP increased first-lien capacity by adding $60 million of liquidity.  We also lowered our interest rate from 11% to 9% and we moved out our maturities by four months to January 2015.

> We were able to add a further $50 million of liquidity from the ATP Titan, also in March. And ATP will continue to pursue monetization strategies for other infrastructure assets.

> With major capital expenses already incurred to bring Telemark production online, ***going forward we will be able to manage leverage and liquidity at levels satisfactory to the market***. To maintain our capital structure, we will continue our active oil and gas hedging program and maintain a comprehensive insurance program. But significantly, with higher oil prices coupled with significantly higher production, this should result in a substantial increase to our EBITDA and our cash flow for 2011.

> *               *               *

> ***The first 10 years we developed every project with project financing, which means that a failure would have pulled the plug on the company. Now that we're public, our stock is still valued as if the company will fail, despite the fact that we are presently paying down our debt with NPI payments and we have additional strong liquidity.***

(emphasis added.)

141.    The statements referenced above in ¶140 were false or misleading statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading because ATP's liquidity was not strong and ATP was not and would not be able to manage its liquidity at levels satisfactory to the market.  As testified to and stated during the Bankruptcy Action by Defendant Reese and bankruptcy counsel Kelly, ATP had "significant liquidity problems" and did not have the liquidity to survive a lengthy moratorium.  *See* ¶88-94.

**F.    First Quarter 2011 Financial Results**

142.    On May 10, 2011, the Company filed its 2011 1Q 10-Q with the SEC.  The 2011 1Q 10-Q was signed by Defendant Reese.  In addition, Defendants Bulmahn and Reese certified the 2011 1Q 10-Q pursuant to the Exchange Act and the Sarbanes-Oxley Act.  The 2011 1Q 10-Q disclosed in pertinent part:

**Risks and Uncertainties**

Our 2011 development plans in the Gulf of Mexico as well as our longer term business plan are dependent on receiving additional approvals for deepwater drilling and other permits under applications which have been and will be submitted to the Bureau of Ocean Energy Management, Regulation and Enforcement of the Department of the Interior ("BOEM"). In the first quarter of 2011, we received permits to drill the third well at Telemark and to complete drilling of a well at Green Canyon. Drilling of the third well at Telemark is already underway. Also, while we believe we can satisfy the permitting requirements for the additional planned 2011 development wells, which will allow us to significantly increase our production from current levels, there is no assurance that they will be received in time to benefit our 2011 results or that the permits will be issued in the future. ***Should the permitting process in the Gulf of Mexico continue to be delayed, we believe we can continue to meet our existing obligations for at least the next twelve months based on maintaining existing production levels from our currently producing wells with commodity prices and operating costs near current levels.***

**Liquidity and Capital Resources**

As discussed above, during the first quarter 2011, we received a permit from the BOEM to drill a third well at our Telemark Hub and drilling is already underway.

60

It is our intention to bring the well on production in the second half of 2011, however, there is no assurance that we will be able to do so. ***Whether or not the well is brought on production in 2011 will have a significant impact on our cash flows for the remainder of the year. Even so, we believe we can continue to meet our existing obligations for at least the next twelve months based on maintaining existing production levels from our currently producing wells and maintaining commodity sales prices and operating costs near current levels.*** … We have historically obtained various other sources of funding to supplement our cash flow from operations and we will continue to pursue them in the future, however, there is no assurance that these alternative sources will be available should these risks and uncertainties materialize.

(emphasis added).

143.    The statements referenced above in ¶142 were false or misleading statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading because Defendants knew that ATP could not "continue to meet [its] existing obligations for at least the next twelve months."   As testified to and stated during the Bankruptcy Action by Defendant Reese and bankruptcy counsel Kelly, ATP had "significant liquidity problems" and did not have the liquidity to survive a lengthy moratorium.  *See* ¶¶88-94.  Given these liquidity problems, Defendants knew, or were severely reckless in not knowing, that the statement that ATP could "continue to meet [its] existing obligations for at least the next twelve months," was materially false and misleading   In fact, ATP was already unable to meet certain obligations, failing to pay certain vendors as early as April 2007.  *See* ¶¶98(a)-(c).

144.    Defendants and ATP also violated their disclosure duties under Item 303(a) of Regulation S-K in that they failed to disclose in its 2011 1Q 10-Q that the moratoria were having and could reasonably be expected to continue to have an "especially profound" impact on ATP, severely impacting revenues and liquidity.

### G.   July 2011 Global Hunter Securities Energy, China, Metals and Mining Conference

145.   On July 19, 2011, Defendant Reese spoke on behalf of ATP at the Global Hunter Securities Energy, China, Metals and Mining Conference.   During the conference, Defendant Reese emphasized the strength of ATP's operations and dismissed any concerns over drilling in the Gulf of Mexico, making the following materially false or misleading statements:

We do have substantial asset value.   You see some slides on that.   ***We've got growing production***.   ***We're already over where we were last year***.   We received two of the first 11 permits out on the Gulf of Mexico.

* * *

We'll go through all the details on here with this kind of calculates our reserves. What you see here is the proved and probable reserves.   Over 100 million barrels of proved, 126 million barrels of proved, 211 proved and probable.   PV-10 that's SEC $2.6 billion on the proved, only $4.8 million on proved and probable.   Strip pricing as of June 1, which is more or less about where we are right now, no substantial difference $7.7 billion.   And on this, this highlights one of the things I've mentioned on the previous slide and that is the fact that with these developments, we've got a 98% success rate of being able to take a property that was not producing and to put that property on production.

We do have substantial asset coverage. . . . All of the proved reserves that we have here more than adequately cover any outstanding debt that we have with all of the up-side, everything above the net-debt line available for the equity shareholder.

* * *

We have done a liquidity operation in the second quarter. We did a convertible preferred offering; $172 million here. Really the key of this particular thing was that we also put in place a capped call.

* * *

We have also done a couple of overrides. ***The question would be -- we didn't think you needed liquidity; what did you do that? I will address it head on.***

***And the answer is this. We are in the Gulf of Mexico deepwater. I fully expect to have the permits. I fully expect to have the third well on at Telemark. We fully expect this to be a light hurricane season. I will go into all the reasons why we would not necessarily need to do any form of capital raise.***

*On the other hand, I am 62 years old. I have been in this business for a long, long time. I am seeing some people in the audience that have been in and around for a long, long time also. And things can happen.*

*This literally does nothing more than improve our liquidity. It protects us in the event there are any issues in the Gulf of Mexico this year. And in the longer term, as we begin to see more and more permitting become available, that gives us the ability to move forward with other operations.*

146. The statements referenced above in ¶145 were false or misleading statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading because as testified to and stated during the Bankruptcy Action by Defendant Reese and bankruptcy counsel Kelly, ATP had "significant liquidity problems" and did not have the liquidity to survive a lengthy moratorium. *See* ¶¶88-94.

### H.    Second Quarter 2011 Financial Results

147. On August 9, 2011, the Company filed its 2011 2Q 10-Q with the SEC. The 2011 2Q 10-Q was signed by Defendant Reese. In addition, Defendants Bulmahn and Reese certified the 2011 2Q 10-Q pursuant to the Exchange Act and the Sarbanes-Oxley Act. The 2011 2Q 10-Q disclosed in pertinent part:

**Risks and Uncertainties**

Our near-term operating and development plans in the Gulf of Mexico as well as our longer-term business plan are dependent on receiving additional approvals for deepwater drilling and other permits under applications which have been and will be submitted to the Bureau of Ocean Energy Management, Regulation and Enforcement of the Department of the Interior ("BOEM"). In the first quarter of 2011, we received permits to complete the drilling of the third well in Mississippi Canyon Block 941 at our Telemark Hub and to complete a well at Green Canyon Block 300. Completion activities on the third well at our Telemark Hub are underway. Also, while we believe we can satisfy the permitting requirements for the additional planned 2011 development wells, which we expect will allow us to increase significantly our production from current levels, there is no assurance that the permits will be issued or, if issued, that they will be received in time to benefit our 2011 results. ***Should the regulatory process in the Gulf of Mexico continue to cause delays, we believe we can continue to meet our existing***

63

> *obligations for at least the next twelve months based on forecasted production levels and the continuation of commodity sales prices and operating costs near current levels.*

**Liquidity and Capital Resources**

\*      \*      \*

> As discussed above, during the first quarter 2011, we received a permit from the BOEM to drill a third well at our Telemark Hub and drilling is already underway. It is our intention to bring the well on production in the third quarter of 2011, however, there is no assurance that we will be able to do so. *We believe we can continue to meet our existing obligations for at least the next twelve months based on forecasted production levels and the continuation of commodity sales prices and operating costs near current levels.* … We have historically obtained various other sources of funding to supplement our cash flow from operations and we will continue to pursue them in the future, however, there is no assurance that these alternative sources will be available should these risks and uncertainties materialize.

(emphasis added).

148.    That same day, on August 9, 2011, the Company held its earnings conference call for the second quarter ended June 30, 2011.  Defendants Bulmahn, Reese and Tate participated in the call.  During the call Defendants made the following materially false or misleading statements:

> PAUL BULMAHN:   Regarding our financial performance, *ATP's liquidity remains strong as we produce our reserves, we are reducing our debt with payments to NPI and Override interest holders. In fact, because of increased production and higher oil prices, ATP is paying back its debt at an accelerated pace and even had to recognize additional interest expense this quarter. Revenues from oil and gas production are on target to expectations, although ATP had to forgo 15 months of material production revenues and the earnings loss is higher due to one-time impairments and other adjustments.  In the wake of everything going on in the financial markets, we are managing all controllable elements and addressing everything we can impact.*

\*      \*      \*

> We are not distracted or over reacting to circumstances all around us.  Our focus is long-term. I am confident ATP will overcome the current chaos in the marketplace and our stock price will adjust accordingly as we bring on material production at Telemark.

64

\*       \*       \*

GREGG BRODY: That's helpful. Just coming back to your current CapEx guidance.  I appreciate the update on the second half guidance. Can you remind us how much of that is contingent upon permits and how much is not? Just a lump number.

LELAND TATE: This is Leland. That money gets spent at Gomez, Clipper, Telemark Hub, and Cheviot. Cheviot is not contingent upon permits at all. The Telemark Hub, obviously the next well, we do not have the permit in hand yet, so we have submitted all required documentation. And this is a point where I would like to make a point.

\*       \*       \*

CHUCK BENNETT, ANALYST, IBC: Good morning, guys. I waited a long time, I almost forgot what I had to ask you.  Most of my questions were asked, so I'm glad you saved the best for last.  So, right now, I know you're not going to comment on your stock or anything, but for the last three or four months, you have been getting beaten down pretty good from $16, $17 a share.  And it seems like the perception out there is that they think that -- they are basically pricing in bankruptcy on the Company.  I own a lot of the debt, I've see the bonds come down, but what is horrible is the stock.  Now, that being said, I question, what would you say, and it's a masters position, you've got about a 35% short position, what would you say is the short position out there as something to end of this call on?  Because I've got to tell you guys, there is a big position betting against you.  And if we're going to end this call now, what would you say, a few positives that you would tell the short position just before they would leave?

LELAND TATE: I think that's an excellent question, and *I think it is safe to say that we are very bullish on where we are right now,* and going forward having just drilled a highly successful Clipper well and with the efforts at Gomez and Telemark and the days that we are away from bringing the Telemark well on, I recognize that the last 15 months when we have been unable to bring on this material production to the Company, during that period of time, we've had to do a number of efforts to try to continue to keep the Company going in the face of the delay that we have had in being able to address these two wells, both of which were pre-drilled to 12,000 feet in case.

I think we certainly have very strong emotions about the fact we were unable to address that simple effort for this many months, and I believe those two wells alone, when they come on, and we anticipate both of them coming on before the end of the year, I believe that we'll reestablish what the position ATP should have been in 15 months ago.  *And I believe we are sound and healthy, and we certainly are not flirting with bankruptcy at all.  That I think we certainly are on sound footing and moving forward well and making things happen globally as well.*

(emphasis added).

149.   The statements referenced above in ¶¶147-48 were false or misleading statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading because Defendants knew that ATP could not, as proved true, "continue to meet [its] existing obligations for at least the next twelve months," that ATP's liquidity was not "strong," ATP was not "sound and healthy," and ATP was on the road to bankruptcy, not, as Defendant Tate stated, "not flirting with bankruptcy at all."   As testified to and stated during the Bankruptcy Action by Defendant Reese and bankruptcy counsel Kelly, ATP had "significant liquidity problems" and did not have the liquidity to survive a lengthy moratorium.   *See* ¶¶88-94.   Given these liquidity problems, Defendants knew or were severely reckless in not knowing, that ATP could not "continue to meet [its] existing obligations for at least the next twelve months."   In fact, ATP was already unable to meet certain obligations, failing to pay certain vendors as early as April 2007.   *See* ¶¶98(a)-(d).

### I.   <u>August 2011 EnerCom Incorporated The Oil & Gas Conference</u>

150.   On August 17, 2011, Defendant Bulmahn spoke on behalf of ATP at the EnerCom Incorporated The Oil & Gas Conference.   During the conference, Defendant Bulmahn made the following materially false or misleading statements:

> Clipper, you may have seen an announcement last week, and we will go into that a little bit more, with follow-ons from Entrada and Green Canyon 37 as we move into future years. ***Basically what we've done is timed these assets to meet our cash flow -- to work within our cash flows and be able to develop them.***

(emphasis added).

151.   The statement referenced above in ¶150 was a false or misleading statement of material fact and/or omitted to state material facts necessary in order to make the statements

made, in the light of the circumstances under which they were made, not misleading because ATP was not working within its cash flows and absent extraordinary financing achievements would not be able to meet its development plans through existing and expected cash flows. As testified to and stated during the Bankruptcy Action by Defendant Reese and bankruptcy counsel Kelly, ATP had "significant liquidity problems" and did not have the liquidity to survive a lengthy moratorium. *See* ¶¶88-94.

152. Defendants and ATP also violated their disclosure duties under Item 303(a) of Regulation S-K in that they failed to disclose in its 2011 2Q 10-Q that the moratoria were having and was expected to continue to have an "especially profound" impact on ATP, severely impacting revenues and liquidity.

### J.     September 2011 Rodman Renshaw Global Investment Conference

153. On September 12, 2011, Defendant Reese spoke on behalf of ATP at the Rodman Renshaw Global Investment Conference. During the conference Reese talked favorably about the quality and strength of ATP's operations and financial condition and downplayed any concern about development or debt maturity, making the following materially false or misleading statements:

> This is really to address one of the valuation slots. ***If you look at what is ATP valued at today, we honestly believe that the shares are probably undervalued. I doubt if any company is going to sit up here and tell you they are overvalued, but we honestly believe that there is a very, very large disconnect between the value of our shares and the like.***
>
> \*          \*          \*
>
> Looking at the overall value of the Company, I will let you look at the numbers here. But if you look at our total debt or you look at our net debt, what you find is the net debt is completely covered by our proved reserves.
>
> The infrastructure is all on top of that. On strip pricing, the net debt is about half of our proved reserves. With all the probable sitting on top of that and all the infrastructure on top of that.

***So when it comes to a true valuation we don't just sit here and say we think our shares are undervalued. We try to use charts and graphs that show why.***

*      *      *

May have the time and we'll spend on financials. I know lot of people have asked me a lot about the debt of the company, what do you think your reservoirs and your revenues are going be? Production and the like and hit that reverse order from a production standpoint.

You can see the numbers we have here, 21,000 barrels last year; first half of this year about 25,000 barrels, most recent report, we said 31,000 barrels that's with the new Telemark well. On later this year, we do expect to add the last well at Telemark that should be on by the end of this year, sort of Christmas present and New Year's present and Thanksgiving Day present, too early to tell.

But what we do think is it will be on by the end of this year that will move us toward that 40,000 barrel per day exit rate as we end this year. As you look in the next year, we do expect that we would like to and I'll say we'd like to get the next two wells done at Telemark or excuse me, not Telemark, at Gomez. The nine and the ten well, the two wells at Clipper, I think those are pretty decent wells that we will be doing because those will already be completed, it's just pipeline and a couple other opportunities that we would look like -- look at.

So as you look at us in the past, you look at us where we are today, where we expect to end this year and where you expect us to be going by the end of this year and in the next year, I think you see production up into the right and not just by 2 and 5%, but going from 21 to 25 to 40 and then beyond that on barrels per day.

*      *      *

Long-term debt, I've heard it once, I've heard it twice, I've heard it many, many times. You are a company that has, you have a lot of debt in here. You have a lot of debt in your Company. What do you do about your debt?

The real key here is the structure of the debt. There is nothing more expensive for a company than having inappropriately structured debt. I don't care if it's $1 or $1 billion or more. You do not want debt that is not structured properly….

But Telemark will be fully developed by the end of this year. As we go into Gomez in 2012, we'll add the nine of the ten well hopefully and also we'll start looking at 710. And let's assume that that's a successful well and maybe it comes on in 2012 or 2013. Cheviot that I talked about out in the North Sea, that's scheduled for first production in '14.

*      *      *

68

In addition to that, we also retain the upside associated with those properties. So when that NPI or override is paid off, the residual comes back to us. As a result, GAAP accounting says that is a financing, it is not a sale. So these are on our books.

The real key on this is there is no schedule. Debt service on this, there's no schedule. Interest payments on any of our NPIs or overrides as higher prices come in, higher production, you have a faster payoff of these properties. As lower prices, lower productions, you have smaller payments. If you have no production, there is no payment required.

We expect by the end of 2012 most of these overrides and NPIs will be off the books. Still have a few that will extinguish -- that will go into 2010. Excuse me -- 2012, but most of these will be gone by the end of 2012.

\*       \*       \*

On the other hand, oil got prices stay good, production stays 40ish thousand barrels a day and greater then I think you'll see a lot of these properties come in. As time goes through the remainder of this year, well you will begin to see us put numbers around here, but this is really what we are focused on for next year. ***CapEx will be within the cash flow of the Company.***

In summary, we have got a strong reserve base, for barrels, for BOE of proved and probable reserves per share. Production expects to be ramping not from exploration that we hope to hit, but from execution of properties that we have. ***And we have got a solid capital position, our debt is married with our production program, is married with our development program.***

(emphasis added).

154.   The statements referenced above in ¶153 were false or misleading statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading because ATP's capital position was not solid.   As testified to and stated during the Bankruptcy Action by Defendant Reese and bankruptcy counsel Kelly, ATP had "significant liquidity problems" and did not have the liquidity to survive a lengthy moratorium. *See* ¶¶88-94.

155.   In addition, Defendant Reese's statements concerning Telemark, ATP's production figures, increasing production, bringing the Clipper wells online, and production

covering debt payments were false or misleading statements of fact.  In September 2011, ATP's MC Block 941 #4, which ATP announced initial production form in August 2011 at 7,000 BOE per day, was actually producing no more than half that amount.  *See* ¶¶61-69.  The Defendants knew, or were severely reckless in not knowing, that lower production would result in less revenue to cover debt and finance other operations, including the Clipper wells. Bankruptcy counsel Kelly and Defendant Reese acknowledged during the First Day Hearings that the only way to solve ATP's liquidity crisis was to bring the Clipper wells online.  As stated by Defendant Reese in his declaration in support of the First Day Motions, "declining production" was one of the reasons ATP was "unable to overcome the impact of the moratoria" and "put [ATP] in the untenable position of running out of cash before it could complete the Clipper Wells project and generate the revenues necessary to begin remedying the situation." *See* ¶¶77-80.

156.    Defendant Reese, as the CFO of ATP, was in a position to know, or was severely reckless in not knowing, of the problems at the Telemark Hub, that those problems were exacerbating ATP's significant liquidity problems.   In fact with respect to the day-to-day operations of the Company Defendant Reese testified that "from a business side, the executive side, financial side [he was] very, very well informed." *See* ¶¶70, 108.  Certainly, ATP's production was very important to the financial performance of the Company.

## K.    September 2011 Moody's Report and Response

157.    On September 26, 2011, Moody's issued a report stating that ATP had a "high likelihood" of restructuring.   On September 29, 2011, Bloomberg News published an article covering the Moody's report:

> ATP shows a "high likelihood" it may face some type of restructuring, analysts from Moody's Investors Service wrote in a Sept. 26 report. The company's asset

base and cash flows are "not sufficient to cover" the second-lien notes, according to the report. Moody's assigns a Caa2 grade to ATP with a "negative" outlook.

158.    On Thursday September 29, 2011, Bloomberg published an article, based upon an interview with Defendant Reese, and including quotes from Defendant Reese, which responded to Moody's concerns:

> **ATP Says New Gulf of Mexico Oil Wells to Stave Off Default**
>
> **ATP Oil & Gas, one of the first oil explorers allowed to resume drilling in the U.S. Gulf of Mexico after the Deepwater Horizon disaster, expects to pump enough oil from new wells during the next three years to avoid defaulting on $1.5 billion in debt.**
>
> Moody's Investors Service this week said ATP shows a "high likelihood" it may have to restructure its debt because its cash flow and asset base are insufficient to cover notes maturing in 2015. The company's $1.79 billion in net debt exceeds that of 97 percent of Houston-based ATP's U.S. peers, according to data compiled by Bloomberg.
>
> ATP expects to begin production from new wells at its Telemark field this year, followed by additional output at the Clipper and Gomez projects in 2012, Entrada in 2013 and Cheviot a year later, said Albert L. Reese, ATP's chief financial officer. All of those fields are in the Gulf of Mexico, except Cheviot, which is in the U.K.
>
> "**All of that is before the bonds come due in 2015, so I don't know what Moody's is talking about," Reese said today in a telephone interview. "I can't fight rumors or reports, all I can do is continue to deliver on the promises we've made. Our expectation is that everything is going to be fine**."

(emphasis added).

159.    The statement referenced above in ¶158 was a materially false and misleading statement of fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading because Defendant Reese was in a position to know at this time, due to his role as CFO, that ATP's production was going down, not up.  Production from MC 941 #4 was no more than half what had been announced in August 2011, costing ATP much needed revenue necessary to complete

the Clipper and Gomez projects and to cover ATP's $1.5 billion debt.  *See* ¶¶61-80.  Defendant

Reese, as the CFO of ATP, was in a position to know, or was severely reckless in not knowing,

of the problems at the Telemark Hub, that those problems were exacerbating ATP's significant

liquidity problems, and that everything was not going to be fine.

160.    Further, Defendant Reese testified in the First Day Hearings that ATP was having

significant liquidity problems and could not survive a long moratorium. *See* ¶¶88-94.  Moreover,

the terms of the Company's first and second lien secured debt greatly inhibited, if it did not

eliminate, the Company's ability to obtain financing and further encumber its assets.  *See* ¶95.

### L.    Third Quarter 2011 Financial Results

161.    On November 8, 2011, the Company issued an earnings press release for the third

quarter ended August 31, 2011.  Defendants Bulmahn and Reese were listed as individuals to

contact on the press release.  The Form 8-K to which it was attached was filed with the SEC on

November 9, 2011 and signed by Defendant Reese.  The press release provided in part:

> The second Clipper well, located at Green Canyon (GC) 300 #4, in approximately
> 3,450 feet of water, encountered 56 feet of logged net oil pay confirming reserves
> previously booked. The 9-5/8 inch casing has been set at 15,778 feet measured
> depth through the pay intervals. The well will now be completed and tested. In
> July 2011, ATP successfully completed and flow tested the first Clipper well, GC
> 300 #2 ST #1, at a rate of 45.6 MMcf per day and 4,656 Bbls per day. ***The
> pipeline lay barge for the Clipper wells is contracted for third quarter 2012 and
> will tie in both the GC 300 #4 and #2 wells to the Murphy Oil operated Front
> Runner production facility. ATP operates Clipper and presently owns a 100%
> working interest.***

(emphasis added).

162.    On November 9, 2011, the Company filed its 2011 3Q 10-Q with the SEC.  The

2011 3Q 10-Q was signed by Defendant Reese.  In addition, Defendants Bulmahn and Reese

certified the 2011 3Q 10-Q pursuant to the Exchange Act and the Sarbanes-Oxley Act.  The 2011

3Q 10-Q disclosed in pertinent part:

**Risks and Uncertainties**

Since May 2010 when the federal government imposed the first of a series of moratoriums on drilling in the Gulf of Mexico, we have faced unparalleled difficulties in obtaining permits to continue our development programs. Prior to the moratoriums, we anticipated developing and bringing to production three additional wells at our Telemark Hub and two additional wells at our Gomez Hub by the end of 2010. As of September 30, 2011, we have been able to bring to production two additional wells at the Telemark Hub and the third well has been drilled to total depth. First production of the third well has now been deferred until January of 2012 as we modify completion plans to accommodate additional pay sands discovered during drilling. During the third quarter, the two wells planned for the Gomez Hub were postponed to late 2012/early 2013 as permits have not yet been received for these two wells. *We have also drilled two wells at Clipper—one has been completed, and the second is scheduled to be completed by the end of 2011—with pipeline construction and first production expected in the second half of 2012.*

The new wells that have been placed on production have taken longer to complete and bring to production than originally planned and have not produced at rates that were previously projected. In addition, we have incurred capital and operating costs higher than we expected primarily due to additional regulations imposed since the deepwater Macondo incident and the requirement to sidetrack two of the wells. The new wells have helped us achieve production growth in 2011, and we forecast production and operating cash flow growth during the remainder of 2011 and 2012 as activity continues. While cash flows were lower than previously projected due to lower than expected production rates, the delays in bringing on new production and higher costs, we continued our development operations by supplementing our cash flows from operating activities with funds raised through various financing transactions (see the Consolidated Statement of Cash Flows.) Our projections for the fourth quarter of 2011 and calendar 2012 reflect our expectations for production based on actual production history, the development delays at Telemark and Gomez discussed above, the deferral of certain capital expenditures, the continuation of commodity prices near current levels, the higher anticipated costs associated with maintaining existing production and bringing additional production on-line, and the higher cost of servicing our additional financing and other obligations.

*       *       *

*While we believe we can continue to meet our obligations for at least the next twelve months, our cash flow projections are highly dependent upon numerous assumptions including the timing and rates of production from our new wells, the sales prices we realize for our oil and natural gas, the cost to develop and produce our reserves, and a number of other factors, some of which are beyond our control. Our inability to increase near-term production levels and generate sufficient liquidity through the actions noted above <u>could</u> result in our inability*

73

*to meet our obligations as they come due which would have a material adverse affect on us.* In the event we do not achieve the projected production and cash flow increases, we will attempt to fund any short-term liquidity needs through more of these type transactions; however, there is no assurance that we will be able to repeat these types of transactions in the future if they are required to meet any short-term liquidity needs.

### Liquidity and Capital Resources

Historically, we have funded our acquisition and development activities through a combination of bank borrowings, proceeds from equity offerings, cash from operations, the sale or conveyance of interests in selected properties and vendor financings. Our ongoing cash requirements consist primarily of servicing our debt and other obligations and funding development of our oil and gas reserves. *So far in 2011, we have obtained additional financing from term loans and other sources as discussed below, placed on production the third well at our Telemark Hub and have re-entered and completed drilling the fourth Telemark Hub well, the MC Block 942 #2. We expect these new wells will generate sufficient cash flows to fund subsequent development projects and service our long-term debt and other obligations. We believe we can continue to meet our existing obligations for at least the next twelve months based on forecasted production levels and the continuation of commodity sales prices and operating costs near current levels.* In the event we do not achieve the projected production and cash flow increases, we will attempt to fund any short-term liquidity needs through more of these type transactions; however, there is no assurance that we will be able to repeat these types of transactions in the future if they are required to meet our short-term liquidity needs.

*     *     *

*While we believe we can continue to meet our obligations for at least the next twelve months, our cash flow projections are highly dependent upon numerous assumptions including the timing and rates of production from our new wells, the sales prices we realize for our oil and natural gas, the cost to develop and produce our reserves, and a number of other factors, some of which are beyond our control. Our inability to increase near-term production levels and generate sufficient liquidity through the actions noted above <u>could</u> result in our inability to meet our obligations as they come due which would have a material adverse affect on us.* In the event we do not achieve the projected production and cash flow increases, we will attempt to fund any short-term liquidity needs through more of these type transactions; however, there is no assurance that we will be able to repeat these types of transactions in the future if they are required to meet any short-term liquidity needs.

(emphasis added).

163.    On November 9, 2011, the Company held its earnings conference call for the third

quarter ended September 30, 2011.  Defendants Bulmahn, Reese and Tate participated in the call.

During the call Defendants made the following materially false or misleading statements:

> STEPHEN CARPELL:  And then the second one is just the progress where you
> are on the Clipper pipeline and then getting financing there for some sort of
> monetization weather its pipeline or some interest in the field?
>
> *        *        *
>
> LELAND TATE: Yeah. ***The answer on Clipper is the lay barge is contracted for
> late in July and we have no reason to believe that it won't stay on schedule. It
> actually could be earlier than that, but that's the schedule that we were working
> towards.*** It will take 30 days to 60 days to actually get the pipeline laid and the
> facilities hooked up. So I would say late third quarter is not an unreasonable time
> for startup at Clipper. Al can talk more about the potential financing of the
> pipeline.
>
> *        *        *
>
> AL REESE: I think if you look back in our last several quarters we continue to
> operate at better than $100 million of cash.  As we have moved through this
> period of the moratorium now that the moratorium is behind us, we have wanted
> to maintain as much cash as we can to be able to get the next well on at Telemark
> to get the Clipper projects done.  ***I think as we go into 2012 we may have a little
> more cushion of being able to maintain such a large cash balance.***  But that has
> been the primary reason, that is because of the uncertainty surrounding where we
> were going and being able to get these wells on.

(emphasis added.)

164.    Moreover, during this time Defendant Reese dismissed the suggestion the

Company might file bankruptcy as "punitive."  As reported in a November 10, 2011 *Wall Street

Journal* article, published after the market closed, entitled "ATP CFO Says Oil & Gas Co. in

Control of Destiny:"

> On Thursday [November 10, 2011], Global Hunter Securities put out a note
> downgrading the bonds on "bankruptcy concerns." The firm's analysts have said
> they value ATP at about $3.15 billion.
>
> ***ATP Chief Financial Officer Al Reese Jr. said in an interview Thursday that
> while the Gulf of Mexico-focused explorer has seen tough times since last***

75

*summer's oil spill there, suggestions that the company is sinking into bankruptcy are "punitive."*

 "*Right now we believe we have complete control of our destiny and we have no plans to miss any interest payments*," Mr. Reese said.

(emphasis added).

165.   The statements referenced above in ¶¶161-64 were false or misleading statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading because (a) Defendants knew or were severely reckless in not knowing, due in part to the lower production from the Telemark Hub, that ATP did not have, nor could it generate or borrow, the substantial funds (between $120 million and $150 million) necessary to connect the Clipper to the production facility, and that the Clipper well would not come online in 2012 (*See* ¶¶61-80); (b) ATP was unable to meet its obligations, including unpaid obligations to numerous vendors (starting as early as April 2007) (*See* ¶¶98(a)-(d)); (c) Defendants knew or were severely reckless in not knowing that ATP could not continue to meet its obligations for the next twelve months, especially since MC 941 #4 was producing only 3,500 BOE per day, costing ATP much needed cash revenue (*See* ¶¶61-80); and (d) the Company was not in "control of its own destiny," as Defendant CFO Reese knew, in that the Company could not finance its operations through existing production and was therefore dependent on convincing third parties to provide the necessary financing, and the terms of the Company's first and second lien secured debt greatly inhibited, if it did not eliminate, the Company's ability to obtain financing and further encumber its assets (*See* ¶95).

166.   In addition Defendant Reese's statement that "we have no plans to miss any interest payments," was materially misleading in that Defendants failed to disclose that ATP had

fallen behind on paying its trade payables some of which were delinquent as far back as 2007. *See* ¶¶98(a)-(d).

167. Defendants and ATP also violated their disclosure duties under Item 303(a) of Regulation S-K in that they failed to disclose in its 2011 3Q 10-Q that the moratoria were having and could reasonably be expected to continue to have an "especially profound" impact on ATP, severely impacting revenues and liquidity.

### M. January 4, 2012 Pritchard Capital Partner LLC Energize Conference

168. On January 4, 2012, Defendant Reese spoke on behalf of ATP at the Pritchard Capital Partner LLC "Energize" Conference. During the presentation Reese made the following materially misleading statements:

> Now I want to spend a little time talking about the financial overview of the Company, and yes, I have read all of the information, both pro and con about ATP that's out there. I won't name names either way, but I think there are a lot of people that are not necessarily betting for ATP. I think some understand the story much better, and what we have in looking at all of the reports that have been written about us that are in the market today, I've not heard any of the reports, regardless of how negative they are, that talk about a deterioration of the asset base.

> So when it comes to the assets of the Company, the assets are still strong and intact. You can see here, on the proved and probable reserve base -- and this is based on last year's reserve report, SEC pricing as of last year updated for strip pricing now. *But what you see is that our entire debt is completely covered by our proved reserves. And sitting on top of that is the infrastructure, some more proved reserves, as well as the probable reserves. Net debt and total obligations of $2.4 billion; you'll see a chart in the back in the appendix that lays that out. But when it comes to a valuation of ATP, this is where we think that you will find that there is a very strong, compelling value of the Company.*

> *Our long-term patient corporate structure -- a lot of the things that they are talking about is our ability to make interest payments, the ability to focus on our maturity of the bonds. These occur in 2015. Between now and 2015, we expect to have Telemark in full production, which will be '12, Clipper in full production which will be '12, Entrada at full production, which will be 2013 or 2014, and then Cheviot at full production beginning sometime in 2014, 2015. Those are the production ramps that we see occurring prior to any form of*

*maturity associated with any of our bonds, and the key component on here is in red at the bottom, that there is no financial maintenance covenants, and facilities can be expanded.*

As we look at our first lien basket capacity right now and we look at our PV-10, what you find is that we are expecting maybe as much as $100 million of additional liquidity will be added through the first lien basket based on our initial PV-10 estimates. That's not final at this point. It could be more than that, it could be less than that. *But as we look at it today, when you look at liquidity, and this would be first-quarter liquidity, we're looking at close to $100 million of additional capacity.*

\*     \*     \*

Options for funding our 2012 capital budget, operating cash flow we, do expect strong improvement for once Telemark comes on and gets into full production. Clipper production will commence later in the year. First lien expansion capacity -- I already mentioned $100 million, more or less, that you'll see during the first quarter. Partnerships -- we are in active discussion discussions about bringing partners in on both Clipper and on Cheviot. And we are continuing to tap the NPI and the override markets. We've already closed the $15 million; we did it quietly at the end of last year, just last week. This is an existing override owner that liked what he saw and wanted to put some additional capital to work, and we are always working on monetizations of some of our infrastructure.

In summary, we've got a strong reserve base, over 200 million of proved and probable reserves, 59% oil, in total, so we are an extremely oily company. 6.6 billion of proved and probable reserves -- I would expect that. No promises, I would expect that number to creep up as we get into our final reserve report, plus the infrastructure, a 98% success rate. Israel represents a very low cost, very high reward opportunity. Production is ramping. We do expect that to continue up and to the right in 2012, both from Clipper and at Telemark. *And a strong capital position in the fact that most of our 2012 projects are completely discretionary. We've got many levers to pull to either bring in cash or to reduce CapEx. And the debt that we have that people seem to be so worried about has no maintenance covenants at all that we associate to it.*

(emphasis added).

169.    During the presentation, Defendant Reese showed PowerPoint slides that included the following materially false and misleading representations:

Production ramping

- Expect growth to accelerate in 2012 as more well come online

- Telemark to achieve full production status

- Clipper will add new production

Solid capital position

- Most 2012 capital projects are discretionary

- Many levers to pull to fund capital spending as needed

- Debt has no maintenance covenants

170.    The statements referenced above in ¶¶168-69 were false or misleading statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading because (a) Defendants knew or were severely reckless in not knowing, due in part to the lower production from the Telemark Hub, that ATP did not have, nor could it generate or borrow, the substantial funds (between $120 million and $150 million) necessary to connect the Clipper to the production facility, and therefore had no reasonable belief that the Clipper would come into full production in 2012, production would increase, or that debt would be paid down by pumping provable reserves. *See* ¶¶61-80.  Further, ATP did not have a solid capital position and did not have excess liquidity.  In fact, ATP was having significant liquidity problems. *See* ¶¶88-94, 100-102.  The terms of the Company's first and second lien secured debt greatly inhibited, if it did not eliminate, the Company's ability to obtain financing and further encumber its assets (*See* ¶95).  ATP could not survive the moratoria, and each of the Defendants, by virtue of their positions, knew that ATP could not survive it.  In fact the Company did not have "many levers to pull to fund capital spending as needed."

## N.    February 2012 JP Morgan High Yield & Leveraged Finance Conference

171.    On February 27, 2012, Defendant Reese participated on behalf of ATP in the JP Morgan High Yield & Leveraged Finance Conference.  At the conference, Defendant Reese

presented a PowerPoint, which included the following materially false and misleading representations:

Growing production and cash flow

- Produced 24.6 MBoe/d in 2011 and expect significant uplift in production in 2012 with key new wells at Telemark and Clipper

- Production 70% liquids in 2Q11 and benefits from attractive realizations

- Higher oil prices coupled with higher production expected to result in cash flow growth over time in addition to increased per unit margins

172.   The statements referenced above in ¶171 were false or misleading statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading because Defendants knew or were severely reckless in not knowing that ATP would not have higher production leading to increased cash flow.  Defendants knew or were severely reckless in not knowing, due in part to the lower production from the Telemark Hub, that ATP did not have, nor could it generate or borrow, the substantial funds (between $120 million and $150 million) necessary to connect the Clipper to the production facility.  *See* ¶¶61-80.  The terms of the Company's first and second lien secured debt greatly inhibited, if it did not eliminate, the Company's ability to obtain financing and further encumber its assets (*See* ¶95), limiting or eliminating the Company's ability to complete any of its development projects.  Further, ATP was unable to meet its obligations, including unpaid obligations to numerous vendors (starting as early as April 2007).  *See* ¶¶98(a)-(i), 100-102.

## O.   Year End 2011 Financial Results

173.   On March 9, 2012, the Company issued a press release entitled "**ATP Significantly Expands Liquidity Position**," announcing that its First Lien expansion had been

increased from $140 million to $150 million, that it had received an additional $60 million from asset sales and that it expected to receive additional liquidity in excess of $100 million from asset transactions scheduled to close in March 2012.  Defendants Bulmahn and Reese were listed as the individuals to contact on the press release.  The form 8-K to which the press release was attached was filed with the SEC on March 15, 2012 and was signed by Defendant Reese.

174.  On March 15, 2012, the Company issued an earnings press release for the year ended December 31, 2011.  Defendants Bulmahn and Reese were listed as the individuals to contact on the press release.  The Form 8-K to which it was attached was filed with the SEC on March 16, 2011 and was signed by Defendant Reese.  The press release provided in part:

**Production and Operations Update**

\*       \*       \*

***Capital spending for 2012 includes ongoing expenditures related to ATP's Telemark Hub described above and the completion of the Clipper pipeline targeted for completion in late third quarter or early fourth quarter 2012. Once installed, this pipeline will connect the two Clipper wells to a host platform***. The wells were completed and tested at a combined rate of 16 MBoe per day, net to ATP, in 2011.  Other 2012 capital spending projects include continued construction of the Octabuoy floating production platform which will serve the Cheviot project, additional wells late in 2012 at the Gomez field and ATP's first well in the deepwater offshore Israel area.

***ATP expects to fund these projects through cash flow and additional sources of liquidity already announced or planned, such as the expansion of its first lien and selection of partners to join in property developments.***

(emphasis added).

175.  That same day, on March 15, 2012, the Company filed its 2011 10-K with the SEC.  The 2011 10-K was signed by Defendants Bulmahn, Reese and Godwin.  In addition, Defendants Bulmahn and Reese certified the 2011 10-K pursuant to the Exchange Act and the Sarbanes-Oxley Act.  The 2011 10-K disclosed in pertinent part:

**Item 1A. Risk Factors.**

\*     \*     \*

*We have significant debt, trade payables, other long-term obligations.*

Our trade payables, other long-term obligations and related interest payment requirements and scheduled debt maturities may have important negative consequences. For instance, ***they could***:

- **make it more difficult or render us unable to satisfy these or our other financial obligations;**

- require us to dedicate a substantial portion of any cash flow from operations to the payment of overriding royalties or interest and principal due under our debt, which will reduce funds available for other business purposes;

\*     \*     \*

- ***limit our ability to obtain additional financing required to fund working capital and capital expenditures and for other general corporate purposes.***

Our ability to overcome our negative working capital and to satisfy our financial obligations and commitments depends on our future operating performance and on economic, financial, competitive and other factors, many of which are beyond our control. ***We cannot provide assurance that our business will generate sufficient cash flow or that future financings will be available to provide sufficient proceeds to meet these obligations.*** The inability to meet our financial obligations and commitments will impede the successful execution of our business strategy and the maintenance of our economic viability.

\*     \*     \*

*2012 Operational Objectives*

In the Gulf of Mexico, a primary goal was bringing to production the fourth well at our Telemark Hub. This was accomplished on February 26, 2012. We will continue workover operations on two other wells at the Telemark Hub in an effort to continue to increase production from this location. ***Later in 2012, we expect to complete a pipeline that will bring to production the two wells at our Clipper project.*** These two wells were completed and tested during 2011. ***Workover operations are scheduled at our Gomez Hub and additionally, we are planning to drill of two new Gomez wells starting in late 2012. In the North Sea we are scheduled to begin a development operation at our Blythe location late in 2012. We will continue the construction of our Octabuoy floating production facility with construction completion scheduled in 2013. In Israel we are scheduled to begin drilling our first well during the second quarter of 2012. Additional opportunities in our three core areas plus other opportunities in new areas may***

*be pursued based on available capital, partners and personnel.* All of our 2012 development plans in the Gulf of Mexico are dependent upon receiving deepwater drilling, pipeline, completion and other permits from the BOEM. While we believe it is likely that we will receive permits in 2012 allowing us to execute our plans, there is no assurance that the permits will be received in time to impact our 2012 results of operations.

*     *     *

### Risks and Uncertainties

*     *     *

Our cash flow projections are highly dependent upon numerous assumptions including the timing and rates of production from our new wells, the sales prices we realize for our oil and natural gas, the cost to develop and produce our reserves, our ability to monetize our properties and future production through asset sales and financial derivatives, and a number of other factors, some of which are beyond our control. *Our inability to increase near-term production levels and generate sufficient liquidity through the actions noted above <u>could</u> result in our inability to meet our obligations as they come due which would have a material adverse affect on us.* In the event we do not achieve the projected production and cash flow increases, we will attempt to fund any short-term liquidity needs through other financing sources; however, there is no assurance that we will be able to do so in the future if required to meet any short-term liquidity needs. *We believe we can continue to meet our obligations for at least the next twelve months through a combination of cash flow from operations, continuing to sell or assign interests in our properties and selling forward our production through the financial derivatives markets, and if necessary, further delaying certain development activities.*

*     *     *

### Liquidity and Capital Resources

*Overview*

Historically, we have funded our acquisition and development activities through a combination of bank borrowings, proceeds from equity offerings, cash from operations, the sale or conveyance of interests in selected properties, vendor financings, and proceeds of forward sales of our production in the financial derivatives market. Our ongoing cash requirements consist primarily of servicing our debt and other obligations and funding development of our oil and gas reserves. Cash paid for capital expenditures for oil and gas properties was approximately $436.9 million, $598.1 million and $635.4 million for the years ended December 31, 2011, 2010 and 2009, respectively. In 2011, we obtained additional financing from term loans and other sources as discussed below, placed on production another well at our Gomez Hub, placed on production the third well

83

at our Telemark Hub and re-entered and completed drilling the fourth Telemark Hub well, the MC Block 942 A-3 which commenced production on February 26, 2012. This well was originally projected to come on during the fourth quarter of 2011, but was delayed to complete additional sands found and by operational issues that arose during the completion. The delays in production and the additional well costs led to a higher working capital deficit at December 31, 2011 than originally anticipated. *We expect with these new wells and workovers we will be performing on existing wells in the first quarter and the two new Clipper wells expected to be placed on production later in the year, we will generate higher operating cash flows in 2012 than in 2011.*

*We believe we can continue to fund our projected capital expenditures and our existing obligations, including our long-term debt and other long-term obligations, for at least the next twelve months, using projected cash flows from operations, proceeds from the recently announced committed increase in our First Lien term loans, asset monetizations which include the sale of working interests, net profits interests and overriding royalty interests, and if necessary, additional forward sales of our production in the financial derivative markets.* In certain cases, we will also continue to work with certain vendors to extend out the timing of certain payments to preserve cash. With certain limitations, we may also delay certain anticipated development expenditures to further preserve cash if necessary. While some of the transactions we have planned for 2012 have been completed or committed, others are still planned to be completed in the future. Our ability to complete those transactions is dependent on a number of factors including our production results, commodity prices and general market conditions; therefore there is no assurance that we will be able to repeat these types of transactions in the future if they are required to meet our short-term liquidity needs. Our longer-term liquidity is also dependent on our production levels and the prevailing prices for oil and natural gas which have historically been very volatile. To mitigate future price volatility, we may continue to hedge the sales price of a portion of our future production.

*      *      *

As of December 31, 2011, we had a working capital deficit of approximately $347.5 million, an increase of approximately $241.3 million from December 31, 2010. This deficit is a cumulative result of our capital expenditures exceeding our cash flows from operating and financing activities over the last three years as we have invested heavily in infrastructure and wells that we expect will allow us to increase production and cash flow from operations in future periods. *With the increased production we have experienced from capital investment, we expect this working capital deficit to shrink throughout 2012 and into 2013. With our efforts to seek partners for certain of our major capital intensive projects, we also believe this will further decrease our working capital deficit. While a complete elimination of our working capital deficit is our goal, we believe that we should be able to significantly reduce the deficit during the coming year.*

176.    On March 16, 2012, the Company held its earnings conference call for the year

ended December 31, 2012.   Defendants Bulmahn, Reese and Tate participated in the call.

During the call Defendants made the following materially false or misleading statements, among

others:

> PAUL BULMAHN:   Regarding ATP's 2011 results, I will be brief to enable us to move to questions rapidly.   Our revenues were up 57%.   Production in 2011 was a 17% increase our expenses were managed down.   The value of proved reserves were up.   Cash flow is improving.   ***And we continue to expand our liquidity*** after bringing the fourth Telemark well on production.

*       *       *

> GREGG BRODY, ANALYST, JPMORGAN:  Just touching more on the liquidity, you mentioned a few other things in the past couple weeks. The first one being the overriding royalty interest, that you were discussing possibly raising another $100 million.  Can you tell us where that stands?  And could you provide a little bit more color around anything else that may be liquidity?

> AL REESE: Sure.  Let me go through the liquidity transactions that we have executed this quarter.  I know we have talked about them individually, but just to wrap everything up.  Thus far this quarter, we have executed a new $60 million asset sale of an overriding royalty interest on Gomez, $60 million there that closed earlier in March.  We recently, yesterday, executed a $20 million sale on Gomez. Again, another overriding royalty interest.  And as of this morning, we executed and finalized a $155 million expansion of our first lien. I was on the conference call earlier this morning for the due diligence bring-down.  That has funded, and the money is in the bank on that one.

> What we expect to do, and this is all signed, sealed, and ready to be closed next week, is an additional $100 million.   This will be on Clipper. ***This is for essentially the $100 million that will be used for the installation of the pipeline that is scheduled to take place beginning in the third quarter of this year.*** We've obviously got some expenses before then -- ordering the pipe, getting some of the engineering and things done there.  But that is a $100 million override that should close sometime next week.  And that is, obviously, a very major component of the roughly $125 million or so of capital that we have allocated for that this year.  So, that is all the overrides.

*       *       *

> ALLAN YOUNG, ANALYST, RAGING CAPITAL MANAGEMENT***: Just very simply, if we look at the Telemark coming on production now, the Clipper wells at the end of the year alongside some of the financing transactions you***

85

*have announced to-date, is it fairly clear that at the end of the year we should be at a production run rate, given current energy prices, where we are then able to fund capital plans going forward internally?*

PAUL BULMAHN: *Yes. I could give a longer answer, but the answer is yes*.

(emphasis added).

177.    The statements referenced above in ¶¶173-76 were false or misleading statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading because (a) Defendants knew or were severely reckless in not knowing, due in part to the lower production from the Telemark Hub, that ATP did not have, nor could it generate or borrow, the substantial funds (between $120 million and $150 million) necessary to connect the Clipper to the production facility, and therefore there would be no increase in production or operating cash flow from new Clipper production (*See* ¶¶61-80); (b) ATP was unable to meet its obligations, including mounting unpaid obligations to numerous vendors (starting as early as April 2007) (*See* ¶¶98(a)-(k), 100-102); (c) Defendants knew or were severely reckless in not knowing that ATP would be unable to meet its ORRI or NPI payments to third parties, which ATP began deliberately withholding in April 2012 (*See* ¶¶103-107; (d) Defendants knew or were severely reckless in not knowing that ATP could not continue to meet its obligations for the next twelve months;  (e) Defendants knew or were severely reckless in not knowing that the Company was in no position to "significantly reduce" its working capital deficit; and (f) Defendants knew or were severely reckless in not knowing that ATP could not finance its anticipated expenses, debt service, and other requirements for the remainder of 2012.    As Defendant Reese testified in the First Day Hearings, "Our loans do not allow us to incur any more mortgages;" "[p]rior to the [bankruptcy] filing, we did not have the ability to go borrow more money or encumber the

assets." *See* ¶95.  In fact, ATP was sinking into bankruptcy, ATP's liquidity was not expanding, and, as proved true, ATP could not meet its obligations for the next twelve months.

178.    Moreover, by this time Defendants knew, or were severely reckless in not knowing, that "[o]ur trade payables, other long-term obligations and related interest payment requirements and scheduled debt maturities in fact ***would***—not "could"—"render [ATP] unable to satisfy these or our other financial obligations" and ***will*** "limit our ability to obtain additional financing required to fund working capital and capital expenditures and for other general corporate purposes."

179.    Defendants and ATP also violated Item 303(a) of Regulation S-K in that they failed to disclose in the 2011 10-K, among other things, the accumulating, delinquent trade payables and its inability to obtain financing which could reasonably be expected to have a material adverse affect on the Company's results of operations and liquidity.

### P.    April 2012 IPAA Oil & Gas Investment Symposium

180.    On April 17, 2012, less than four months prior to the bankruptcy, Defendant Reese participated on behalf of ATP in the IPAA Oil & Gas Investment Symposium.  During the symposium, Reese made the following materially false and misleading statements:

> ***Growing production and cash flow. We will continue to do that. In doing so, we will continue to pay down some of the overrides and the net profits interest that we have. And the initial wells at Clipper, these have some of the highest production rates of any wells we've ever had in the Company. And these have been tested again, 16,000 barrels per day, 62% oil.***
>
> ***Liquidity is sound. I've heard all of the questions and comments about the liquidity. We ended first quarter with over $200 million in cash. We have no near-term maturities or maintenance financial covenants. They do not begin -- maturity doesn't start until 2015.***
>
> *       *       *
>
> ***Long-term capital and leverage. First-lien and second-lien debts have no maturities, they have no -- or no financial covenants, maintenance covenants. I***

**know a lot of people talk about our debt. I will spend time talking about that in the breakout session. But what I can say is I am not worried about the maturities of our debt.**

\*     \*     \*

This is our capital outlook for the year. We will spend about $400 million, $500 million this year. Part of that is going to be contributed by some of our vendors through existing NPI programs. And as you can see here, I have talked about most of these projects during the year, so I'm not going to spend a lot of time going over these specifically again.

Again, key investment highlights. **We are at an inflection point. I think ATP will be a very different company at the end of 2012 than we were at the end of 2011. Liquidity is sound.** We have deepwater operating experience, both here and the North Sea and soon to be in the Israeli area. A fleet of floating reusable deepwater structures, substantial asset value and an extremely strong alignment between the shareholders of the Company and the management of the Company.

(emphasis added).

181.    During the symposium, Defendant Reese presented a PowerPoint.  Slides from ATP's PowerPoint presentation included the following materially false and misleading representations:

- ATP is at an inflection point

  - Experiencing significant improvement in production rates and oil production mix

  - Substantial decline in infrastructure capital expenditures going forward

  - Growing production and cash flow further enhanced by the paydown of current NPIs and ORRIs, which results in increased cash flow to ATP

- Liquidity is sound

  - Estimated cash position of $200+ million at 3/31/2012

  - No near-term debt maturities or maintenance financial covenants

  - ORRI and NPI repayments tied directly to production revenues

  - Major infrastructure projects near complete

88

182.     The statements referenced above in ¶¶180-81 were false or misleading statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading because liquidity was not sound or strong.   In fact, as testified to by Reese, ATP had significant liquidity problems.  *See* ¶¶88-97.  Reese also testified that cash position as of March 31, 2012 was about $224 million, and at June 30, 2012, it was about $25 to $30 million.  ATP was unable to meet its obligations, including unpaid obligations to numerous vendors (starting as early as April 2007).  *See* ¶¶98(a)-(r), 100-102.  The number and amount of the delinquent invoices was now rapidly increasing.  *Id.*  ATP was deliberately withholding or ORRI and NPI payments owed to third parties (starting around April 2012).  *See* ¶¶103-107.  In addition, Defendants knew, or were severely reckless in not knowing, due in part to the lower production from the Telemark Hub, that there would be no growing production and cash flow because ATP did not have, nor could it generate or borrow, the substantial funds (between $120 million and $150 million) necessary to connect the Clipper to the production facility, and therefore there would be no increase in production or operating cash flow from new Clipper production.  *See* ¶¶61-80.  Defendants knew or were severely reckless in not knowing that ATP could not finance its anticipated expenses, debt service, and other requirements for the remainder of 2012.  As Defendant Reese testified in the First Day Hearings, "Our loans do not allow us to incur any more mortgages;" "[p]rior to the [bankruptcy] filing, we did not have the ability to go borrow more money or encumber the assets."  *See* ¶¶95

### Q.     <u>First Quarter 2012 Financial Results</u>

183.     On May 9, 2012, the Company issued an earnings press release for the first quarter ended March 31, 2012.  Defendants Bulmahn and Reese were listed as the individuals to

contact on the press release.  The Form 8-K to which it was attached was filed with the SEC on

May 10, 2012 and was signed by Defendant Reese.  The press release provided in part:

**Production and Operations Update**

\*     \*     \*

ATP expects production of 1.6MMBoe – 2.3MMBoe during second quarter 2012.
***ATP's two wells at Clipper (Green Canyon 300) are on schedule to begin
production in late third quarter or early fourth quarter 2012. Both wells were
drilled and completed in 2011, and ATP has begun preparatory work for the
installation of the Clipper pipeline during third quarter 2012.*** The two wells at
Clipper tested at a net 16 MBoe/day, 62% oil.

184.    The statement referenced above in ¶183 was a false or misleading statement of

material fact or omitted to state material facts necessary in order to make the statements made, in

the light of the circumstances under which they were made, not misleading because Defendants

knew or were severely reckless in not knowing, due in part to the lower production from the

Telemark Hub, that ATP did not have, nor could it generate or borrow, the substantial funds

(between $120 million and $150 million) necessary to connect the Clipper to the production

facility.  *See* ¶¶61-80.

185.    On May 10, 2012, the Company filed its 2012 1Q 10-Q with the SEC.  The 2012

1Q 10-Q was signed by Defendant Reese.  In addition, Defendants Bulmahn and Reese certified

the 2012 1Q 10-Q pursuant to the Exchange Act and the Sarbanes-Oxley Act.  The 2012 1Q 10-

Q disclosed in pertinent part:

**Note 3 — Risks and Uncertainties**

\*     \*     \*

The new wells helped us achieve production growth in 2011, ***and we forecast
overall production and operating cash flow growth in 2012 due to new
production from our Clipper property and from projected increases at our
Telemark Hub***. Production in the first quarter of 2012 is lower than in the fourth
quarter of 2011 primarily due to the Telemark well recompletion discussed above
which required us to take the well offline and normal production declines. While

90

cash flows were lower than previously projected due to lower than expected production rates, delays in bringing on new production and higher capital costs, we continued our development operations by supplementing our cash flows from operating activities with funds raised through various transactions (see the Consolidated Statement of Cash Flows.)

*      *      *

Our cash flow projections are highly dependent upon numerous assumptions including the timing and rates of production from our new wells, the sales prices we realize for our oil and natural gas, the cost to develop and produce our reserves, our ability to monetize our properties and future production through asset sales and financial derivatives, and a number of other factors, some of which are beyond our control. ***Our inability to increase near-term production levels and generate sufficient liquidity through the actions noted above <u>could</u> result in our inability to meet our obligations as they come due which would have a material adverse effect on us.*** In the event we do not achieve the projected production and cash flow increases, we will attempt to fund any short-term liquidity needs through other financing sources; however, there is no assurance that we will be able to do so in the future if required to meet any short-term liquidity needs. ***Despite continued production delays, we believe we can continue to meet our obligations for at least the next twelve months through a combination of cash flow from operations, continuing to sell or assign interests in our properties and selling forward our production through the financial derivatives markets, and if necessary, further delaying certain development activities.***

*      *      *

**Liquidity and Capital Resources**

*      *      *

***Despite actual and anticipated production delays, we believe we can continue to fund our projected capital expenditures and our existing obligations, including our long-term debt and other obligations (which include those to the noncontrolling interest and to our preferred shareholders), for at least the next twelve months, using projected cash flows from operations, cash on hand, asset monetizations which include the sale of working interests, NPIs and Overrides, and if necessary, additional forward sales of our production in the financial derivative markets***. In certain cases, we will also continue to work with certain vendors to extend out the timing of certain payments to preserve cash. With certain limitations, we may also delay certain anticipated development expenditures to further preserve cash if necessary. While some of the transactions we had planned for the remainder of 2012 have been completed or committed, others are still incomplete. Our ability to consummate those transactions is dependent on a number of factors including our production results, commodity

prices and general market conditions; therefore there is no assurance that we will be able to repeat these types of transactions in the future if they are required to meet our short-term liquidity needs. Our longer-term liquidity is also dependent on our production levels and the prevailing prices for oil and natural gas which have historically been very volatile. To mitigate future price volatility, we may continue to hedge the sales price of a portion of our future production.

*    *    *

By the end of 2012, our plan calls for us to incur $400 million to $500 million in total capital expenditures, excluding capitalized interest, of which $50 million to $70 million is expected to be contributed by vendors through existing NPI or deferral programs. As operator of most of our projects under development, within certain constraints we have the ability to influence the timing and extent of most of our capital expenditures should future market conditions warrant. ***We plan to finance anticipated expenses, debt service, development and abandonment requirements for the remainder of 2012 with cash on hand and funds generated by operating activities and, potentially, proceeds from other capital market transactions, other financings and possible sales of assets.***

*    *    *

As of March 31, 2012, we had a working capital deficit of approximately $267.9 million, a decrease of approximately $79.6 million from December 31, 2011. This deficit is the cumulative result of our capital expenditures exceeding our cash flows from operating and financing activities over the last three years as we invested heavily in infrastructure and wells expected to increase production and cash flow from operations in future periods. ***With the increased production we are forecasting and our efforts to seek partners for certain of our major capital intensive projects, we expect this working capital deficit to shrink during the remainder of 2012 and into 2013.***

***While we believe we can continue to meet our obligations for at least the next twelve months,*** our cash flow projections are highly dependent upon numerous assumptions including the timing and rates of production from our new wells, the sales prices we realize for our oil and natural gas, the cost to develop and produce our reserves, and a number of other factors, some of which are beyond our control. ***Our inability to increase near-term production levels and generate sufficient liquidity through the actions noted above <u>could</u> result in our inability to meet our obligations as they come due which would have a material adverse effect on us.*** In the event we do not achieve the projected production and cash flow increases, we will attempt to fund any short-term liquidity needs through more of the types financing transactions we have completed in the past; however, there is no assurance that we will be able to repeat these types of transactions even if they are required.

(emphasis added).

186.    On May 10, 2012, the Company held its earnings conference call for the first quarter 2012.  Defendants Bulmahn, Reese and Tate participated in the call.  During the call Defendants made the following materially misleading statements:

STEVEN KARPEL: So, if you look at your cash needs for the rest of the year, and to not be too painstaking, I won't go line item by line item, but needless to say the number's pretty large for the rest of the year, means you're probably out spending cash flow, and obviously the cash balance is stronger than it was at the year end and – I guess, part A is, if you can bridge the cash balance a little bit and tell us where those overrides are? And then the second portion is, you need – it looks like you need to raise some incremental capital. Can you put some numbers around what real incremental numbers you'll have and some – what the incremental capital will be because I believe the Octabuoy financing you refer to in here wouldn't necessarily be incremental?

<AL REESE: Steve, you asked a lot of questions there. Let me try to address them as I can. Incremental capital that we're going to be needing for the year, we have said we will continue our overriding program. We will continue our net profits interest program during the year. The overrides that we have done in the first quarter all relate to two properties, $100 million relates to the Clipper property. The balance of the override relates to a Gomez property and any net profits interest that we did in the first quarter; that relates to Telemark. I think we will continue to access both of those properties as we go through the year. Certainly, the need for doing that decreases significantly as we get into the third and the fourth quarter of this year with the Clipper well coming online, but to say that there is a specific number, I think we're not prepared to talk about that right now other than saying, *I think, we are very well within the financing capability.*

\*      \*      \*

PAUL BULMAHN:  I think it's appropriate to note, we are not pleased or satisfied with the first quarter, except for the completion and beginning production of the fourth well at Telemark. We have continued the work-over of a Telemark well to increase its production, that effort hopefully will be successful during the second quarter. *ATP has grappled with numerous timing issues, and yet, we have not missed an interest payment on our debt.  We have made every payment, including the most recent $90 million payment on May 1. We are looking forward to the third and fourth quarters,* having successfully drilled and completed two deep water wells at Clipper, which are scheduled to produce after the pipeline is laid and connected up.  And, we have continued to move forward with the work to tie them back to the Murphy Frontrunner platform.

\*      \*      \*

93

RICHARD TULLIS, ANALYST, CAPITAL ONE SOUTHCOAST, INC.: Al, just continuing with some financial questions, how much more do you anticipate the payables being reduced this year, 2Q through 4Q?  I see, I guess it was the working capital deficit was improved by, I guess, $100 million in the first quarter. How much more of that do you expect remainder of 2012?

AL REESE: I'm not going to put out a specific number, goal or target.  I think what you will see as we go through the second quarter and into the third quarter, there will -- it will essentially trend flat as we go through the development of Clipper, getting Clipper online, going through the exploration well in Israel.  As we begin to get into the third quarter, particularly into the fourth quarter, with the fact that we no longer will be working at Telemark, and all the production that we are talking about at Telemark, we will have full production, right now scheduled in third and fourth quarter, Clipper coming on in the end of the third, beginning of the fourth quarter.  *You will see a very significant shift in revenue increase and capital decrease.  As a result of that, I think you should see a very significant improvement beginning in the third quarter, but certainly during the fourth quarter.*

\*       \*       \*

JOE ALLMAN: Okay. That's helpful. And then could you just give us a list, I know folks have asked this in different questions, but just give us a list of the additional financing that you're planning for the rest of this year and even into 2013?

AL REESE: …Gomez, we were very successful in putting together an override forego, excuse me, for Clipper, $100 million item that is pre-funded and we'll basically pay for the pipeline installation that we're going to have there. Once that property comes on later this year, we'll have the opportunity. I'm not saying we're going to do it, but we'll have the opportunity to look at an additional override at that location.

\*       \*       \*

PAUL BULMAHN: Thank you, Brock.  And on that note, I think it's appropriate to move to the close.  *I think, just to reiterate, we are certainly looking forward to the third and fourth quarters, because, I think, the two deepwater wells at Clipper, which are scheduled to begin production in the third quarter, I think those wells will be material to the Company's interest.  We have also kept the Octabuoy platform construction moving forward, and I'm really proud of what we've been able to accomplish there, on both the construction and the financing front.   But I appreciate very much the relationship that we have with the Chinese.  We've established a number of relationships that we value, and also, I just underscore what Leland said when he noted the progress that we've been able to make in opening up operations in deepwater Israel, which is real upside to the company, if it's successful.*

94

(emphasis added).

187.     On June 20, 2012, ATP issued a press release on the Business Wire (listing Bulmahn and Reese as the contact persons), proudly announcing that ATP had closed a private placement to an institutional investor which enabled "ATP [to] Expand[] [its] Liquidity Position by $35 Million," and stating that the Company intends to use the proceeds for working capital. The Form 8-K to which the press release was attached was filed with the SEC on June 20, 2012 and signed by Defendant Reese.   The press release did not disclose the precarious financial condition of ATP that led to its bankruptcy filing less than two months later.

> ATP Oil & Gas Corporation (NASDAQ:ATPG) today announced that it has closed a private placement consisting of a $35 million unsecured convertible note and a warrant to purchase shares of ATP common stock to a single institutional investor.
>
> The note accrues interest at the rate of 8.0% per annum and matures December 20, 2013. Principal and interest are payable in four quarterly installments. ATP has the option to pay the installments in cash, shares of the company's common stock or a combination.
>
> The note is convertible at the option of the holder, in whole or in part, at any time into shares of ATP's common stock at an initial conversion price of $4.46 per share. If ATP elects to pay installments of principal and interest in shares of common stock then the conversion price will be the lesser of (i) the initial conversion price and (ii) 87% of the market price of the common stock on such installment payment date.
>
> In connection with the transaction, the purchaser also received a warrant exercisable for up to 3,923,767 shares of ATP's common stock at an initial exercise price of $6.69 per share. If, on the eighteen-month anniversary of the closing date the exercise price of the warrant is greater than the then current market price of the common stock, then, subject to certain conditions, the exercise price will be reset to the market price on that date. The warrant has a term of 5.5 years and may be exercised by the holder in whole or in part at any time after the six-month anniversary of the date of issuance.
>
> ATP intends to use the gross proceeds from the transaction of $35.0 million for working capital.
>
> Please refer to ATP's Form 8-K filed on June 20, 2012 for a more complete description of the transaction.

188.   The June 20, 2012 Form 8-K that the press release directed investors to contained only a summary of the terms of the transaction, and did not disclose the precarious financial condition of ATP.

On June 20, 2012, ATP Oil & Gas Corporation (the "Company") closed a private placement consisting of a $35 million principal amount Convertible Note and a Warrant to purchase 3,923,767 shares of the Company's common stock for gross proceeds of $35.0 million with an institutional investor pursuant to a Securities Purchase Agreement, dated as of June 20, 2012 (the "Securities Purchase Agreement"), by and between the Company and the institutional investor.

The Note accrues interest at the rate of 8.0% per annum and matures December 20, 2013, subject to extension under certain circumstances described in the Note. Principal and interest on the Note are payable in four quarterly installments in shares of the Company's common stock, cash or a combination thereof at the option of the Company. At the option of the holder, installment payments may be deferred to later installment payment dates or, provided certain conditions are satisfied, accelerated to an earlier installment payment date.

The Note is convertible at the option of the holder, in whole or in part, at any time into shares of the Company's common stock at an initial conversion price of $4.46 per share, subject to adjustment. If the Company elects to pay installments of principal and interest on the Note in shares of common stock then the conversion price will be the lesser of (i) the initial conversion price and (ii) 87% of the market price of the common stock on such installment payment date. The ability of the Company to issue shares of common stock upon conversion of the Note, whether at the option of the holder or the Company, is subject to the satisfaction or certain conditions including, but not limited to (i) the requirement that the number of shares issued upon conversion will not result in the holder of the Note becoming the beneficial owner of more than 4.99% of the outstanding shares of the Company's common stock and (ii) the requirement that the aggregate number of shares issued upon conversion of the Note and the exercise of the Warrant from time to time will not exceed the limit specified by the NASDAQ Stock Market Rules without obtaining prior approval of the Company's shareholders.

The Company has agreed in the Securities Purchase Agreement to seek shareholder approval to authorize the issuance, if necessary, upon conversion of the Note and the exercise of the Warrant of an amount of shares of common stock in excess of 20% of the shares of common stock of the Company currently outstanding.

The Warrant is exercisable for up to 3,923,767 shares of the Company's common stock at an initial exercise price of $6.69 per share, subject to adjustment. If on the eighteen-month anniversary of the issuance date, the exercise price of the Warrant

96

then in effect is greater than the then current market price, then the exercise price will be reset to the market price on such date, provided that if the shareholders have not approved of the issuance of the shares of common stock in excess of 20% of the shares of common stock currently outstanding pursuant to the conversion of the Note and exercise of the Warrant, such reset price shall not be less than $4.46. The Warrant has a term of 5.5 years and may be exercised by the holder in whole or in part at any time after the six-month anniversary of the issuance date.

The gross proceeds to the Company from the issuance and sale of the Note and Warrant will be $35.0 million. In connection with the private placement, the Company incurred expenses which included, without limitation, commissions to the placement agent, legal fees and other miscellaneous expenses, of approximately $1,650,000. The Company intends to use the net proceeds from the issuance and sale of the Note and Warrant for working capital purposes.

The sale of the Note and the Warrant was made in reliance on an exemption provided by Section 4(2) of the Securities Act of 1933, as amended (the "Securities Act"). The Note, the Warrant, the shares of common stock issuable upon conversion of the Note and upon exercise of the Warrant (collectively, the "Securities") have not been registered under the Securities Act and may not be offered or sold in the United States absent registration under the Securities Act and applicable state securities laws or an applicable exemption from those registration requirements, and all certificates representing the Securities are imprinted with a restrictive legend to that effect.

Pursuant to the Registration Rights Agreement entered into between the Company and the institutional investor, dated June 20, 2012, the Company has agreed to file and cause to become effective a registration statement with the Securities and Exchange Commission, registering the resale of the shares of common stock issuable upon conversion of the Note or the exercise of the Warrant. If the Company fails to file the registration statement or cause it to become effective within specified deadlines, or if the registration statement or the prospectus therein is not able to used by the holder to freely sell the shares of common stock, subject to certain exceptions, then the Company is required to make a cash payment to the holder in an amount equal to 1% of the aggregate purchase price of the Note and Warrant on the date of such registration default and each month thereafter until the registration default is cured or the shares are otherwise freely tradable by the holder without restriction pursuant to Rule 144.

The description of the private placement, the Securities Purchase Agreement, the Note, the Warrant, and the Registration Rights Agreement in this Current Report on Form 8-K does not purport to be complete and is qualified in its entirety by reference to the Securities Purchase Agreement filed as Exhibit 4.1, the Form of the Note filed as Exhibit 4.2, the Form of the Warrant filed as Exhibit 4.3, and the Registration Rights Agreement filed as Exhibit 4.4 (collectively, the "Transaction Documents"), all of which are incorporated herein by reference. The Transaction

Documents have been included to provide investors and security holders with information regarding their terms. They are not intended to provide any other factual information about the Company. The Transaction Documents contain certain representations, warranties and indemnifications resulting from any breach of such representations or warranties. Investors and security holders should not rely on the representations and warranties as characterizations of the actual state of facts because they were made only as of the respective dates of the Transaction Documents. In addition, information concerning the subject matter of the representations and warranties may change after the respective dates of the Transaction Documents, and such subsequent information may not be fully reflected in the Company's public disclosures.

189.   The statements referenced above in ¶¶185-88 were false or misleading statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading because (a) Defendants knew or were severely reckless in not knowing, due in part to the lower production from the Telemark Hub, that ATP did not have, nor could it generate or borrow, the substantial funds (between $120 million and $150 million) necessary to connect the Clipper to the production facility, and therefore there would be no increase in production or operating cash flow from new Clipper production (*See* ¶¶61-80); (b) ATP was unable to meet its obligations, including unpaid obligations to numerous vendors (starting as early as April 2007) (*See* ¶¶98(a)-(u), 100-102); (c) ATP was deliberately withholding or ORRI and NPI payments owed to third parties (starting around April 2012) (*See* ¶¶103-107); (d) Defendants knew or were severely reckless in not knowing that ATP could not continue to meet its obligations for the next twelve months; (e) ATP was not "well within its financing capabilities" (*See* ¶95); (f) the Clipper wells were not "pre-funded" (in fact, ATP was unable to finish the Clipper wells, and has acknowledged that their completion was the solution to its liquidity problems) (*See* ¶¶ 61-80); and (g) Defendants knew or were severely reckless in not knowing that ATP could not finance its anticipated expenses, debt service, and other requirements for the remainder of 2012.   As Defendant Reese testified in the First Day Hearings, "Our loans do not allow us to incur any

more mortgages;" "[p]rior to the [bankruptcy] filing, we did not have the ability to go borrow more money or encumber the assets."  *See* ¶95.

190.    Moreover, Defendant Bulmahn's statements that "ATP has grappled with numerous timing issues, and yet, we have not missed an interest payment on our debt.  We have made every payment" were misleading in that Defendants failed to disclose that ATP was falling far behind on paying its vendors and that delinquent trade payables were accumulating. (*See* ¶¶98-102).

191.    Defendants and ATP also violated Item 303(a) of Regulation S-K in that they failed to disclose in the 2012 1Q 10-Q, among other things, the accumulating, delinquent trade payables and its inability to obtain financing which could reasonably be expected to have a material adverse affect on the Company's results of operations and liquidity.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

192.    Throughout much of the Class Period ATP was in the process of trying to obtain financing, including financing from Chinese banks to fund its Octabuoy floating production facility for 2012 and into 2013.  Such financing was critical to the continued and future success of ATP.

193.    ATP raised the issue of financing multiple times on the quarterly earnings call with investors, including, on March 16, 2012, and on May 10 2012, prior to the filing of the petition in bankruptcy on August 17, 2012.   For example, Defendant Reese stated on the Q1 Earnings Call that the Company is "well along in those discussion. They are at a point where I feel very comfortable and we even say it in the press release that we feel optimistic about closing that.  That's probably a closing that occurs in…third quarter this year."

194.     As alleged herein, Defendants acted with scienter in that they: knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

195.     As set forth elsewhere herein in detail, Defendants Bulmahn, Reese, Godwin, and Tate, by virtue of their receipt of information reflecting the true facts regarding ATP, their control over, and/or receipt and/or modification of ATP's allegedly materially misleading misstatements, participated in the fraudulent scheme alleged herein.

196.     Further, Defendants Reese and Bulmahn were listed as the persons to contact on press releases, and, by virtue of their positions as CFO and CEO, respectively, would have approved press releases before issuance.

197.     Each Defendant was motivated to delay disclosing the true adverse facts based on ATP's need to raise the capital it needed to continue as a going concern.  ATP relied on its ability to raise funds and borrow money.  Without the availability of outside funding, the Company could not continue its operations.  Thus, instead of disclosing the known adverse facts as they became known, the Defendants delayed such disclosures.  As an example, the Defendants continuously represented that the necessary drilling permits would be forthcoming and that the Company's liquidity was sound, when they knew or were severely reckless in not knowing that was not the case.

## VIII.   LOSS CAUSATION

198.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a continuing course of conduct that artificially inflated the prices of ATP common stock and operated as a fraud or deceit on Class Period purchasers of ATP common stock by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed, or materialized, and became apparent to the market, the price of ATP common stock fell precipitously. As a result of their purchases of ATP common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

199.    By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of ATP's business and prospects, financial position, and results of operations. Defendants' false and misleading statements caused ATP common stock to trade at artificially inflated levels throughout the Class Period.

200.    The decline in value of the common was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the price decline of ATP common stock negates any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme and caused the subsequent significant decline in the value of ATP common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

201.    On November 8, 2011, ATP common stock closed at $10.50 per share on volume of 1,325,531.  At approximately 11:35 p.m. East Coast Time ("ET"), after the NASDAQ market

had closed trading for the day, ATP issued a press release announcing its Third Quarter 2011 financial results.  The press release was attached to a Form 8-K that was filed with the SEC on November 9, 2011.  The press release stated that ATP's "oil & gas production for the third quarter 2011 was 2.2 million [BOE], or 24,200 BOE per day."

202.   On November 9, 2011, at approximately 11:00 a.m. ET, while the NASDAQ market was open, ATP held a conference call with investors and analysts to discuss its third quarter 2011 financial results.  On that call, Defendants further discussed ATP's production:

> [DEFENDANT BULMAHN]:  Oil and gas production for the third quarter 2011 was 2.2 million barrels of oil equivalent compared to 1.9 million barrels for the third quarter 2010, a 15% increase. Revenues from oil and gas production were $170.1 million for the third quarter 2011 compared with $102.1 million for the third quarter 2010, a 67% increase. Oil represented 69% of total production for the third quarter 2011 compared to 58% of total production for the third quarter 2010.

*      *      *

> Q - RAFI KHAN: Leland, if you could perhaps reconcile the production of 31,000 and your target of 40,000 to 45,000 with your current production of 25,000 to 26,000, I mean, where are we losing the production? And the other question I had is can you give us an update and prospect for Atwater, Lady Bug, and Canyon Express. I've noticed in recent months the production on those wells has been even zero in some months.

> A - LELAND E. TATE: Yes, it's Leland here. I'll start out on the reconciliation and we'll start with the 31,000 and sort of work our way back. There are – we produce somewhere around 24,000 barrels a day out of the shelf, I'm sorry, out of deep water and we produce about one to two out of the shelf in the U.K.  Where we are now is 31,000 was roughly we were at 24,500 at year end – at quarter end last quarter and we **saw a well test that showed us about 7,000 barrels a day that would get added to that. And what happened was during the completion we got – the well test was indicating that. As we brought the well on production, what we saw was a completion efficiency where there was more wellbore drawdown near the well bore than what we had seen during the well test and as a result we can make on a routine basis about 3,500 barrels a day equivalent out of that well**. It's a stabilized and producing at that rate. It could produce more, but we've chosen to restrain it in order to make sure that we don't damage the gravel pack in anyway. So if you think about that, that gets you from 31 down to 27.5 or something like that.

102

\*      \*      \*

Q - RAFI KHAN: Are you anticipating the 3500 on the Mirage #2 to go back up to the 7,000 or are you looking at it staying at 3500?

A - LELAND E. TATE***: We will increase it some. I do not believe that it will go back to the 7,000 barrels a day based on the drawdown that we're seeing. What we are doing is we are slowly opening it up to see if we can get incremental production from it without taking the risk of damaging it. So, I wouldn't anticipate it going back to 7, but I believe it will come up a little bit.***

203.    The November 8, 2011 Press Release and the November 9, 2011 Conference Call disclosed that Defendant Reese's statements at the September 12, 2011 Rodman Renshaw Global Investment Conference, and to Bloomberg, as reported in the September 29, 2011 Bloomberg article, that ATP's production was increasing such that ATP could avoid defaulting on its $1.5 billion in debt were false and misleading.  In fact, at the time of Reese's statements, production from MC 941 #4 at the Telemark Hub was at most half of the 7,000 BOE per day disclosed in August 2011 and reinforced by Reese in his Bloomberg interview.

204.    The information disclosed in the November 8, 2011 Press Release and November 9, 2011 Conference Call was material to the market.  At approximately 11:07 a.m. EST, ATP common stock reached its intra-day high of $10.950 per share.  At approximately 11:15 a.m. EST, ATP common stock began to fall, eventually closing at $8.450 per share, down $2.05 per share, or 19.5% as compared to its previous days close, and down $2.50, or 22.8% from its November 9, 2011 intra-day high.  ATP's trading volume on November 9, 2011 was 5,854,461.  On November 9, 2011, the BI Global Oil Index closed at $65.53, down $4.66 or 6.64%, from its November 8, 2011 closing price of $70.19.

205.    As further evidence of the materiality of these disclosures, on November 10, 2011, Global Hunter Securities downgraded ATP common stock from Accumulate to Reduce, and cut its 12-month price target from $14.00 per share to $6.25 per share.  Also on November

10, 2011, Vivek Pal, an analyst at Knight Capital Group, Inc., stated that failure to reach the 41,000 barrels of daily output may signal a cash crunch that could hobble ATP's ability to make interest payments on its debt and bonds and finance oil developments.  On November 10, 2011, at approximately 4:13 p.m. ET, Bloomberg News issued an article titled "ATP Oil May Miss 2012 Interest Payment as Output Drops," reporting Mr. Pal's analysis and reporting that ATP may not be able to make interest payments on the Notes in May 2012.

206.    On November 10, 2011, ATP common stock continued to fall, closing at $7.250 per share, down $1.20 per share, or 14.2% from its previous closing price.  ATP's trading volume on November 10, 2011 was 6,582,236.  On November 10, 2011, the BI Global Oil Index closed at $66.82, up $1.29 or 1.97% from its previous close.

207.    On July 23, 2012, ATP stock closed at $2.66 per share on volume of 2,926,919 shares.  On July 23, 2012, after the NASDAQ market had closed for the day, Debtwire published an article reporting that ATP had retained Jefferies & Co. to advise it on heading off a potential liquidity squeeze because ATP was going to have trouble funding $89 million payment on the Notes due in November 2012.  Debtwire's article was also published on the Financial Times website FT.com at approximately 8:59 p.m. ET in article titled "ATP hires Jefferies to help address liquidity strain."

208.    The information disclosed in the July 23, 2012 Debtwire article was material to the market, disclosed Defendants' false and misleading statements, and, among other things, revealed to the market that contrary to Defendants' statements, ATP's liquidity was not strong, and ATP could not meet its obligations for the next twelve months.  On July 24, 2012, ATP common stock fell $0.28 per share, or 10.5%.  ATP's volume was 2,036,668.  On July 24, 2012,

the BI Global Oil Index closed at $57.20, down $1.15, or 1.97% from its previous close or $58.35.

209.    On July 26, 2012, ATP common stock closed at $1.95 per share on volume of 5,380,769.  Later that day, at approximately 5:07 p.m. and after the NASDAQ market had closed for the day, Bloomberg News published an article titled "ATP Bondholders Said to Seek Adviser as Debt Falls to Record Low" reporting that ATP's bondholders were "organizing a group to represent their interests in a potential restructuring" and had "interviewed potential advisers" to assist them.

210.    The information disclosed in the July 26, 2012 Bloomberg News article was material to the market, disclosed Defendants' false and misleading statements, and, among other things, revealed to the market that contrary to Defendants' statements, ATP's liquidity was not strong, and ATP could not meet its obligations for the next twelve months.  On July 27, 2012, ATP common stock fell $0.55 per share, or 28.2%, on volume of 7,847,120 shares.  On July 27, 2012, the BI Global Oil Index closed at $59.03, an increase of $1.30, or 2.25% from its previous close of $57.73.

211.    On August 10, 2012, ATP common stock opened at $1.50 per share.   At approximately 1:30 p.m., Bloomberg News reported that ATP had obtained $600 million in debtor-in-possession ("DIP") loan financing from Credit Suisse Group AG ahead of a possible bankruptcy filing.

212.    The information disclosed in the August 10, 2012 Bloomberg News report was material to the market, disclosed Defendants' false and misleading statements, and, among other things, further revealed to the market that contrary to Defendants' statements, ATP's liquidity was not strong, and ATP could not meet its obligations for the next twelve months.  As a result

of this disclosure, ATP's common stock price plummeted $1.13, or 75.8%, to close at $0.36 per share.  ATP's stock volume for August 10, 2012 was 23,427,920.  On August 10, 2012, the BI Global Oil Index closed at $60.19, down $0.38 or 0.63% from its previous close of $60.57.

213.   On August 17, 2012, ATP common stock closed at $0.4593 per share.   After trading on the stock market had closed for the day, ATP announced that it was filing for Chapter 11 bankruptcy.

214.   ATP's August 17, 2012 announcement was material to the market, disclosed Defendants' false and misleading statements, and, among other things, further revealed to the market that contrary to Defendants' statements, ATP's liquidity was not strong, and ATP could not meet its obligations for the next twelve months.  On August 20, 2012, the next trading day, as a result of this disclosure, ATP's common stock price fell $0.1593 per share, or 34.7%, to close at $0.30 per share.  ATP's stock volume on August 20, 2012 was 18,896,822.  On August 20, 2012, the BI Global Oil Index closed at $60.72, down $0.46 or 0.75% from its previous close of $61.18.

## IX.   NO SAFE HARBOR

215.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements set forth in this Complaint.  The statements alleged to be false or misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying relevant important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Cautionary language must truthfully

address specific risks, must exhaust the capacity of the false statements to mislead investors, and must disclose, as Defendants failed to do here, then existing adverse facts.  Alternatively, to the extent that the statutory safe harbor is intended to or does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or that the forward-looking statement was authorized and/or approved by an executive officer of ATP who knew that those statements were false when made.  In addition, to the extent any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and Defendants failed to update those statements which later became inaccurate.

216.   The statutory safe harbor provided for forward-looking statements under certain circumstances, moreover, does not apply to false statements or omissions of existing material facts.

## X.   APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET DOCTRINE

217.   Lead Plaintiffs are entitled to a presumption of reliance because the claims asserted herein against Defendants are predicated in part upon false statements of material fact and/or the omission to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, that Defendants had a duty to disclose.

218.   At all relevant times, the market for ATP common stock was an efficient market that promptly digested current information with respect to the Company from all publicly-

available sources and reflected such information in the prices of the Company's common stock. The market for ATP common stock was efficient because, inter alia, throughout the Class Period:

    a.  ATP common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

    b.  During the Class Period, there were approximately 52 million shares of ATP common stock outstanding, millions of shares of ATP common stock were traded on the open market; with trading in excess of a million shares a day on the vast majority of days during the Class Period;

    c.  As a regulated issuer, ATP filed periodic public reports with the SEC and the NASDAQ;

    d.  ATP regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as quarterly conference calls with investors, communications with the financial press and other similar reporting services, as well as presentations and various industry and market symposia and conferences; and

    e.  Securities analysts followed and published research reports regarding ATP that were publicly available to investors, including, securities analysts employed by the following firms, among others: Richard Tullis of Capital One; Joseph Allman of J.P. Morgan; Biju Perincheril of Jeffries & Company, Inc.; Curtis Trimble of MKM Partners; Stephen F. Berman of Pritchard Capital; Jeffrey P. Hayden of Rodman & Renshaw; Oliver Corlett of R.B. Pressprich & Co.; and James Hom of Miller Tabak Roberts Securities.  Each of these analysts wrote reports about ATP

that were distributed to the sales force and available to customers of their respective brokerage firms.  These reports were publicly available and entered the public marketplace.

219.   Throughout the Class Period, ATP was consistently followed by the market, including securities analysts as well as the business press. The market relies upon the Company's financial results and management to accurately present the Company's financial results.  During this period, ATP and the Individual Defendants continued to pump materially false information into the marketplace regarding the financial condition of the Company. This information was promptly reviewed and analyzed by the ratings agencies, analysts and institutional investors and assimilated into the price of the Company's common stock.

220.   As a result of the misconduct alleged herein (including defendants' misstatements and omissions of material facts), the market for ATP's common stock was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies.  Thus, Class members are presumed to have indirectly relied upon the misrepresentations and omissions of material facts for which defendants are each responsible.

221.   Lead Plaintiffs and other Class members justifiably relied on the integrity of the market price for the Company's common stock and were substantially damaged as a direct and proximate result of their purchases of ATP common stock at artificially inflated prices and the subsequent decline in the price of the common stock when the truth was disclosed.

222.   Had Lead Plaintiffs and other members of the Class known of the material adverse information not disclosed by Defendants, or been aware of the truth behind Defendants' material misstatements, they would not have purchased ATP common stock at artificially inflated prices.

223.    As a result, the market for ATP common stock promptly digested current information regarding ATP from all publicly available sources and reflected such information in ATP's common stock price.  Under these circumstances, all purchasers of ATP's common shares during the Class Period suffered similar injury through their purchase of shares at artificially inflated prices and a presumption of reliance applies.

## XI.    CAUSES OF ACTION

### COUNT I
### (Against All Defendants)
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder

224.    Lead Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

225.    Throughout the Class Period, Defendants, directly or indirectly, engaged in a common plan, scheme and continuing course of conduct described herein, pursuant to which it knowingly or recklessly engaged in acts, transactions, practices and a course of business which operated as a fraud upon Lead Plaintiffs and the other members of the Class; made various false statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading to Lead Plaintiffs and the other members of the Class; and employed manipulative or deceptive devices and contrivances in connection with the purchase and sale of ATP stock.

226.    The purpose and effect of Defendants' plan, scheme and course of conduct were to artificially inflate the price of ATP's stock and to artificially maintain the market price of ATP securities.

227.    Defendants had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Lead Plaintiffs and the other

members of the Class, or, in the alternative, acted with severely reckless disregard for the truth when it failed to ascertain and disclose the true facts in the statements made by it to members of the investing public, including Lead Plaintiffs and the Class, and the securities analysts.

228.    As a result of the foregoing, the market price of ATP securities was artificially inflated during the Class Period.   In ignorance of the falsity of Defendants' statements concerning the financial results, liquidity, and performance of ATP, Lead Plaintiffs and the other members of the Class relied, to their damage, on the statements described above and/or the integrity of the market price of ATP stock during the Class Period in purchasing ATP common stock at prices which were artificially inflated as a result of Class's false and misleading statements.

229.    Had Lead Plaintiffs and the other members of the Class known of the material adverse information that Defendants did not disclose, they would not have purchased ATP common stock at the artificially-inflated prices that they did.

230.    Defendants' concealment of this material information served only to harm Lead Plaintiffs and the other members of the Class who purchased ATP common stock in ignorance of the financial risk to them as a result of such nondisclosures.

231.    As a result of the wrongful conduct alleged herein, when the truth concerning the financial results, performance, and improper accounting of ATP was revealed to the investing public and the artificial inflation in the price of ATP stock was, as a result, reduced and ultimately removed, in a series of corrective disclosures and/or the materialization of the concealed risks, ATP's share price fell significantly and Lead Plaintiffs and other members of the Class suffered damages in an amount to be established at trial.

232.    By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to the Lead Plaintiffs and the other members of the Class for substantial damages that they suffered in connection with their purchase of ATP common stock during the Class Period.

**COUNT II**
**(Against All Defendants)**
**Liability Pursuant to Section 20(a) of the Exchange Act**

233.    Lead Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

234.    Each of the Individual Defendants, by virtue of their positions with ATP and their specific acts, was a controlling person of ATP within the meaning of Section 20(a) of the Exchange Act.

235.    They had the power and influence and exercised same to cause ATP to engage in the illegal conduct and practices complained of herein. Defendants were thereby and otherwise active and culpable participants in the fraud perpetrated by Defendants.

236.    By reason of the conduct of ATP as alleged in this Complaint, the Individual Defendants are liable for the aforesaid wrongful conduct of ATP and liable to Lead Plaintiffs and the Class for the substantial damages which they suffered in connection with their purchases or acquisitions of shares as a result of ATP's violations of the Exchange Act.

237.    By reason of such conduct, the Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.      Certifying Lead Plaintiffs as the Class Representatives and their counsel as Class Counsel;

C.      Declaring and determining that Defendants violated the federal securities laws by reason of their conduct as alleged herein;

D.      Awarding monetary damages against Defendants in favor of Lead Plaintiffs and the other members of the Class for all losses and damages suffered as a result of the acts and transactions complained of herein, together with prejudgment interest from the date of the wrongs to the date of the judgment herein;

E.      Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

F.      Granting such other and further relief as deemed appropriate by the Court.

## XIII.   <u>**JURY TRIAL DEMANDED**</u>

Lead Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

Dated:  February 18, 2014             **BARRASSO USDIN KUPPERMAN FREEMAN & SARVER, L.L.C.**

By:  /s/ *Stephen H. Kupperman*_____
Stephen H. Kupperman (LA Bar No. 7890)
909 Poydras Street, Suite 2400
New Orleans, LA 70112
Telephone: (504) 589-9700
Facsimile: (504) 589-9701
skupperman@barrassousdin.com

*Liaison Counsel*

William B. Federman (admitted *pro hac vice*)
Federman & Sherwood
10205 N Pennsylvania Ave

Oklahoma City, OK 73120
Tel:  (405) 235-1560
Fax: (405) 239-2112
Email: wbf@federmanlaw.com

-and-

2926 Maple Ave., Suite 200
Dallas, TX 75201

Lester L. Levy (admitted *pro hac vice*)
Patricia I. Avery (admitted *pro hac vice*)
Joshua W. Ruthizer (admitted *pro hac vice*)
Wolf Popper LLP
845 Third Avenue
New York, NY 10022
Tel:  (212) 759-4600
Fax:  (212) 486-2093

*Co-Lead Counsel for Lead Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on February 18, 2014 a copy of the above and foregoing has been filed using this Court's ECF procedure, which will send electronic noticing to all counsel of record.


*/s/ Stephen H. Kupperman*
Stephen H. Kupperman

114