UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FIREFIGHTERS PENSION & RELIEF                    CIVIL ACTION
FUND OF THE CITY OF NEW
ORLEANS, Individually and on
Behalf of All Others Similarly
Situated

VERSUS                                           NO: 13-3935, c/w
                                                 13-6083, 13-6084,
                                                 13-6233

T. PAUL BULMAHN, ET AL.                          SECTION: R

## ORDER AND REASONS

This case is a securities class action brought on behalf of
all persons who acquired ATP Oil and Gas Corporation ("ATP")
11.875% Senior Second Lien Exchange Notes ("Notes") traceable to an
allegedly false and misleading Form S-4 registration statement and
prospectus issued in connection with ATP's December 16, 2010
exchange offer ("the Exchange"). ATP filed for Chapter 11
Bankruptcy on August 17, 2012 and is not named as a defendant in
this action. Instead, plaintiffs sued ATP's senior executives and
board of directors, alleging violations of Sections 11, 12(a)(2),
and 15 of the Securities Act of 1933 ("Securities Act"). Defendants
T. Paul Buhlman, Albert L. Reese, Jr., and Keith R. Godwin
(collectively, the "Officer Defendants") have filed a motion to
dismiss plaintiffs' Amended Complaint for failure to state a
claim.[1] Defendants Chris A. Brisack, Arthur H. Dilly, Gerard J.

_____

[1] R. Doc. 133.

Swonke, Brent M. Longnecker, Walter Wendlandt, Burt A. Adams, George R. Edwards, and Robert J. Karow (collectively, the "Director Defendants") have likewise filed a motion to dismiss the Amended Complaint.[2] For the reasons that follow, the Court grants the motion and dismisses certain claims with prejudice and certain claims without prejudice with leave to amend.

I.    **BACKGROUND**

Before it filed for bankruptcy in 2012, ATP engaged in the acquisition, development, and production of oil and natural gas properties.[3] The company acquired and developed properties with proven undeveloped reserves in the Gulf of Mexico and the North Sea, but the majority of the company's business was in the Gulf of Mexico.[4] As of December 31, 2009, ATP had leasehold and other interests in 62 offshore blocks and 104 wells, of which ATP was then operating a total of 93.[5] As of March 16, 2010, ATP owned an interest in 36 platforms, including two floating production facilities: the *ATP Innovator*, located in the Gulf of Mexico at the company's Gomez Hub, and the *ATP Titan*, also in the Gulf of Mexico

---

[2] R. Doc. 136. Each set of defendants adopts the arguments of the other as its own.

[3] R. Doc. 75 at 2.

[4] *Id.*; Officer Defendants' Motion to Dismiss, R. Doc. 133-1 at 8.

[5] Prospectus, R. Doc. 133-2 at 4.

at ATP's Telemark Hub. As of the Registration Statement's effective date of December 16, 2010 ("the Effective Date"), construction on a third floating production facility, the Octabuoy, was underway in China for initial deployment at the company's Cheviot Hub in the North Sea.[6]

On April 19, 2010, ATP raised $1.5 billion by selling unregistered private notes to institutional investors in a transaction exempt from the registration requirements under the Securities Act.[7] The notes were Senior Second Lien Notes due in 2015. The Company and its institutional investors agreed to offer to exchange the unregistered private notes for "substantially identical notes registered under the Securities Act" within nine months.[8]

On April 20, 2010, the day following the private note offering, the drilling rig Deepwater Horizon exploded and sank in the Gulf of Mexico, fracturing the well's pipe and creating "the largest oil spill in U.S. history."[9] In response, the U.S. Department of the Interior issued two moratoria that halted all drilling at depths greater than 500 feet between May 6, 2010 and

---

[6] *Id.*

[7] ATP 4/23/2010 Form 8-K, R. Doc. 133-3 at 3.

[8] *Id.*

[9] R. Doc. 75 at 2; R. Doc. 133-2 at 7.

October 12, 2010.[10] Although the government eventually lifted the moratoria, it instituted new rules and regulations that conditioned the issuance of drilling permits on additional testing, training, and compliance with new safety requirements.[11] As of the Effective Date, the government had issued no new drilling permits, prompting members of the oil and gas industry to refer to this period of permitting delays as the "de facto moratorium."[12] Together, these three moratoria halted all of ATP's exploration and development operations in the Gulf of Mexico through 2010.[13]

On or about October 12, 2010, ATP filed the Registration Statement with the Securities and Exchange Commission ("SEC"), indicating its intent to exchange the $1.5 billion in unregistered private notes for the registered Senior Second Lien Exchange Notes at issue in this litigation.[14] Following a December 14, 2010 amendment, the SEC declared the Registration Statement effective, and the Exchange was effected on December 16, 2010.[15]

---

[10] R. Doc. 75 at 2-3; R. Doc. 133-2 at 7.

[11] R. Doc. 133-2 at 7.

[12] R. Doc. 75 at 3.

[13] *Id.*

[14] *Id.*; R. Doc. 133-2 at 1-2.

[15] R. Doc. 75 at 3.

The Prospectus[16] included a section titled "Risks Related to Our Business," which provided a detailed account of the Deepwater Horizon explosion and the resulting moratoria. It also described the new regulatory requirements for obtaining drilling permits. It cautioned that "[t]he U.S. governmental and regulatory response to the Deepwater Horizon drilling rig accident and resulting oil spill could have a prolonged and material adverse impact on our Gulf of Mexico operations." It also indicated that "[a]lthough Moratorium II has been lifted, we cannot predict with certainty when permits will be granted under the new requirements." Among numerous pages of warnings, discussed in greater detail below, the Prospectus contained the following warning:

> *New regulations already issued will,* and potential future regulations or additional statutory limitations, if enacted or issued, could, *require a change in the way we conduct our business, increase our costs of doing business or ultimately prohibit us from drilling for or producing hydrocarbons in the Gulf of Mexico. . . .*[17]

Ultimately, ATP did not survive and filed for Chapter 11 Bankruptcy on August 17, 2012.[18] In a declaration filed in the bankruptcy action, Defendant Albert Reese, Jr., ATP's Chief Financial Officer, summarized the adverse impact of the moratoria

---

[16] For all practical purposes, the Registration Statement and Prospectus contain the same information and are interchangeable.

[17] R. Doc. 133-2 at 7-12 (emphasis added).

[18] R. Doc. 75 at 1.

on ATP's business operations, describing the Deepwater Horizon explosion and oil spill as the "primary reason" for the company's ultimate failure:

> The delay on operations and the increasingly uncertain regulatory environment adversely affected ATP's operations and planned development that was necessary to service its additional debt. Despite statements that the moratoria had been lifted at various points in time, the government did not issue new deepwater drilling permits until February 28, 2011, thus effectively extending the moratorium. As a result, ATP was unable, despite access to funds, to drill and bring on-line six new wells during 2010 and 2011. In addition to the high costs of interrupted and discontinued drilling operations in deepwater, ATP continued to incur construction costs on the Octabuoy, its newest deepwater production platform, as a discontinuation of work of [sic] the platform would have led to significant escalation in cost-to-completion once work resumed. Moreover, as access to deepwater rigs became limited, ATP also experienced higher than expected costs in preserving its access to equipment during the moratoria.
>
> Overall, ATP's inability to complete various wells or commence pipeline construction when planned due to the shutdown in the Gulf created significant liquidity problems . . . .[19]

When asked whether "ATP [had] the liquidity and revenues at that time to absorb a lengthy moratorium," Reese responded "no."[20]

By May 24, 2013, the date of the filing of the initial complaint in this action, the Notes acquired by Lead Plaintiff

_____

[19] 08/17/12 Albert Reese Bankruptcy Declaration, R. Doc. 133-6 at 8, 10. The Court considers this declaration because plaintiffs quote and refer to it in their Amended Complaint. *See Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (indicating that courts may consider documents incorporated into the complaint by reference on a motion to dismiss).

[20] R. Doc. 75 at 9.

Plumbers and Pipefitters National Pension Fund and the Class were trading at just over 1% of par.[21]

Named Plaintiff Firefighters Pension & Relief Fund of the City of New Orleans ("Firefighters") filed this class action on May 24, 2013 on behalf of all persons who acquired the Notes traceable to the Registration Statement and Exchange.[22] On August 15, 2013, the Court appointed Plumbers and Pipefitters National Pension Fund ("Plumbers") as Lead Plaintiff.[23] Plumbers filed the Amended Complaint on October 10, 2013.[24] Plaintiff alleges that the Registration Statement was false and misleading in that it misrepresented and/or omitted material facts, including that:

(a) ATP did not have the liquidity and revenue to survive the moratoria;

(b) the proved oil and gas reserves as reported by ATP were false and misleading:

(c) there was no reasonable basis to believe, and defendants did not in fact believe, ATP's forecast of "a substantial increase in production over the next year as development wells are brought to production";

(d) ATP was in violation of its credit and debt agreements as it had entered into "disguised financings" with various entities, including at least eight conveyances that ATP has not admitted were in fact disguised financings;

---

[21] *Id.* at 3.

[22] R. Doc. 1.

[23] R. Doc. 63.

[24] R. Doc. 75.

(e) ATP was operating in violation of U.S. environmental laws by unlawfully discharging oil and an unpermitted chemical dispersant into the Gulf of Mexico; and

(f) the boilerplate "risk disclosures" utilized in the Registration Statement were themselves misleading.[25]

Plaintiff claims that its losses are a direct result of defendants' misrepresentations and omissions in the Registration Statement.[26]

The Officer and Director Defendants now seek to dismiss plaintiff's Amended Complaint for failure to state a claim.[27]

## II. STANDARD

To survive a Rule 12 (b)(6) motion to dismiss, the plaintiff must plead enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009).

---

[25] *Id.* at 3-4.

[26] *Id.* at 4.

[27] R. Docs. 133 and 136.

8

A legally sufficient complaint need not contain detailed factual allegations, but it must go beyond labels, legal conclusions, or formulaic recitations of the elements of a cause of action. *Id.* In other words, the face of the complaint must contain enough factual matter to raise a reasonable expectation that discovery will reveal evidence of each element of the plaintiff's claim. *Lormand*, 565 F.3d at 257. If there are insufficient factual allegations to raise a right to relief above the speculative level, or if it is apparent from the face of the complaint that there is an insuperable bar to relief, the Court must dismiss the claim. *Twombly*, 550 U.S. at 555.

In reviewing a motion to dismiss, the Court is limited to the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which the Court may take judicial notice. *See Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011). In securities cases, courts may take judicial notice of the contents of public disclosure documents that are filed with the SEC as required by law; however, "these documents may be considered only for the purpose of determining what statements they contain, and not for proving the truth of their contents." *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 384-85 (S.D. Tex. 2011) (citing *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1018 & n. 1 (5th Cir. 1996)).

## III. DISCUSSION

### A.    Section 11 Claim

Section 11 of the Securities Act applies to registered securities and imposes civil liability on the signatories to the registration statement and on the directors of the issuer when the registration statement is materially misleading or defective. *See Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 861 (5th Cir. 2003) (citing 15 U.S.C. § 77k). To succeed on a Section 11 claim, the plaintiff must show that the registration statement "contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . . ." *Id.* (quoting 15 U.S.C. § 77k(a)). "A 'material fact' is one which a reasonable investor would consider significant in the decision whether to invest, such that it alters the 'total mix' of information available about the proposed investment." *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1445 (5th Cir. 1993) (citing *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 207-08 (5th Cir. 1988)). A fact is not material if "a reasonable investor viewing the information in context would not have considered the investment significantly more risky as a result." *Id.* at 1446.

With respect to alleged omissions, an issuer need only disclose information that is either (1) necessary to make other statements not misleading, or (2) specifically required to be

disclosed by the securities laws. *See Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 212 n.6 (5th Cir. 2004) (citing *Oxford Asset Management Ltd. v. Jaharis*, 297 F.3d 1182, 1190 (11th Cir. 2002)). The "mere possession of material nonpublic information does not create a duty to disclose." *Id.* (quoting *Shaw v. Digital Equipment*, 82 F.3d 1194, 1202 (1st Cir. 1996)).

Section 11's "expansive" liability provisions create "'virtually absolute' liability for corporate issuers for even innocent material misstatements." *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 495 (5th Cir. 2005). Accordingly, a Section 11 plaintiff need not plead scienter, reliance, or fraud. *Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004). Nontheless, when a plaintiff's allegations are grounded in fraud, Rule 9(b)'s heightened pleading standards apply. *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th Cir. 2001) (citing *Melder v. Morris*, 27 F.3d 1097, 1100 n.6 (5th Cir. 1994)). *Accord Rombach*, 355 F.3d at 171; *Indiana State Dist. Council of Laborers & HOD Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 719 F.3d 498, 502-03 (6th Cir. 2013), *cert. granted*, 13-435, 2014 WL 801097 (U.S. Mar. 3, 2014).

Under Rule 9(b), a party "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The required conditions of a person's mind, however, may be alleged generally. *Id.* The Fifth Circuit "interprets Rule 9(b) strictly, requiring the plaintiff to specify the statements contended to be

fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.,* 565 F.3d 200, 207 (5th Cir. 2009) (citing *Williams v. WMX Tech., Inc.,* 112 F.3d 175, 177 (5th Cir. 1997)). In other words, "Rule 9(b) requires 'the who, what, when, where, and how' to be laid out." *Benchmark Elecs., Inc. v. J.M. Huber Corp.,* 343 F.3d 719, 723 (5th Cir. 2003) (quoting *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.,* 975 F.2d 1134, 1139 (5th Cir. 1992)). In cases concerning "omission of facts, Rule 9(b) typically requires the claimant to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the misrepresentations misleading." *Carroll v. Fort St. James Corp.,* 470 F.3d 1171, 1174 (5th Cir. 2006).

Merely disclaiming allegations of fraud is insufficient to exempt a claim from Rule 9(b)'s requirements "when the wording and imputations of the complaint are classically associated with fraud." *Rombach*, 355 F.3d at 172; *see also Omnicare*, 719 F.3d at 502-03 (applying Rule 9(b) despite fraud disclaimer in complaint when factual allegations were "indisputably immersed" in fraud) (quoting *Cal. Pub. Emps. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 160 (3d Cir. 2004)).

### 1. ATP's Alleged Omissions Concerning its Liquidity and Revenue

The Amended Complaint alleges that defendants omitted material facts concerning ATP's liquidity and revenue that were required by law to be stated in the Registration Statement. Specifically, plaintiff alleges

that the Registration Statement omitted that, due to the moratoria and the Telemark Hub's underperformance, ATP's liquidity was reasonably likely to decrease in a material way and ATP reasonably expected that the same factors would have a material adverse effect on ATP's revenue.

Plaintiff points to Regulation S-K as the source of defendants' affirmative obligation to disclose this information.[28] Regulation S-K Item 303(a)(1) requires an issuer to

[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way.

Item 303 (a)(3)(ii) further obligates the issuer to

[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

_____

[28] Conflating two distinct bases for liability, plaintiff frames the first section of the Amended Complaint as though it were about the omission of facts required to be stated by Item 303 while also arguing that the omissions are actionable because they were necessary to make other statements in the Prospectus not misleading. Moreover, the latter argument and the argument addressed in subsection 3 are two sides of the same coin: in subsection 3, plaintiff argues that a projection of increased hydrocarbon production was actionable because of omitted facts concerning liquidity and revenues, and here, plaintiff argues that those same omitted facts were actionable because they made the projection misleading.

Finally, Instruction No. 3 to Paragraph 303(a) elaborates on the scope of these obligations:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.

### i. The Moratoria

Plaintiff points out that as of 2009, 68% of ATP's net proved reserves were located in the Gulf of Mexico, and between 2009 and 2010, over 90% of ATP's production was concentrated in the Gulf. It alleges that defendants ran afoul of Item 303 because they failed to disclose that ATP "reasonably expected" the moratoria to affect liquidity and revenues in a material way. Plaintiff points to Reese's declaration and testimony in the bankruptcy proceedings that took place nearly two years after the Effective Date as evidence "that ATP knew in 2010 that it could not survive the moratoria."[29] As discussed above, Reese indicated in 2012 that the moratoria "created significant liquidity problems" and were the "primary reason" for ATP's failure. When asked whether ATP had the liquidity and revenues "at that time" to absorb a lengthy moratorium," Reese answered "no."

This claim is without merit. To the extent that the moratoria constituted a "known trend" that was reasonably likely to materially impact ATP's liquidity and revenues, ATP discussed the

---

[29] R. Doc. 75 at 7-8.

BP oil spill and resulting moratoria in great detail in the Prospectus.[30]

Plaintiff contends that ATP's disclosures were inadequate because they failed to discuss the impact that the moratoria *already* were having on ATP. It also contends that Item 303 requires issuers to disclose not only the known trends themselves, but *how* the trend or event is likely to affect liquidity or revenues, citing *Panther Partners, Inc. v. Ikanos Communications, Inc.*, 681 F.3d 114, 120-21 (2d Cir. 2012), and *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 718-19 (2d Cir. 2011).

First, defendants dedicated a significant portion of the Prospectus to a discussion of the moratoria's impact on ATP's operations as well as their possible future effects. The Prospectus contained the following disclosures regarding the manner in which the moratoria were already affecting ATP's operations:

> We have ongoing and planned drilling operations in the deepwater Gulf of Mexico, some of which were permitted prior to April 20, 2010, and some of which are not yet permitted. Such permits, among other required approvals, are necessary prior to commencement of offshore drilling operations. **Moratorium II has caused us to delay the third and fourth wells scheduled at our Telemark Hub and, even though Moratorium II has been lifted, any delays in the resumption of the permitting process may result in delays in our drilling operations scheduled in 2011 at our Gomez Hub. During June 2010, we agreed to terminate a contract for services of a drilling rig as a result of Moratorium I. Under the termination agreement, we obtained a full release from our obligations under the contract and incurred net costs of $8.7**

---

[30] R. Doc. 133-2 at 7-8.

**million reflected as contract termination costs on our
September 30, 2010 statement of operations. . . .**

The size of our operations and our capital expenditure budget
limits the number of properties that we can develop in any
given year. **Complications in the development of any single
major well or infrastructure installation may result in a
material adverse effect on our financial condition and results
of operations.** For instance, production delays are occurring
resulting from Moratorium I and Moratorium II as described
above in the first risk factor under "–Risks Related to Our
Business."[31]

With respect to the moratoria's potential future impact on

ATP's revenues and liquidity, the Prospectus contained the

following warnings:

**The U.S. governmental and regulatory response to the Deepwater
Horizon drilling rig accident and resulting oil spill could
have a prolonged and material adverse impact on our Gulf of
Mexico operations. . . .**

Although Moratorium II has been lifted, we cannot predict with
certainty when permits will be granted under the new
requirements. . . .

We project a substantial increase in production over the next
year as development wells are brought to production. Absent
alternative funding sources, achieving our projected
production growth is necessary to provide the cash flow
required to fund our capital plan and meet our existing
obligations, both over the next twelve months and on a longer
term basis. Our ability to execute our plan depends, in part,
on our ability to continue drilling for and producing
hydrocarbons in the Gulf of Mexico. Our plan is currently
based upon obtaining necessary drilling permits, and
successfully achieving commercial production from existing
wells presently scheduled to commence during the remainder of
2010 and 2011. Delays from difficulties receiving necessary
permits, reduced access to equipment and services, or bad
weather, could have a material adverse effect on our financial
position, results of operations and cash flows. In addition to

---

[31]    R. Doc. 133-2 at 8-10 (emphasis added).

the risks associated with achieving our projected production growth, additional regulatory requirements and increased costs for which funding must be secured, or a negative change in commodity prices and operating cost levels, could also have a material adverse effect on our financial position, results of operations and cash flows. While we are pursuing various other sources of funding, there is no assurance that these alternative sources will be available should any of the above risks or uncertainties materialize.

**If we are not able to generate sufficient funds from our operations and other financing sources, we may not be able to finance our planned development activity, acquisitions or service our debt.**

We have historically needed and will continue to need substantial amounts of cash to fund our capital expenditure and working capital requirements. . . .

**Delays in the development of or production curtailment at our material properties including at our Telemark Hub may adversely affect our financial position and results of operations.[32]**

Importantly, the financial statements contained in the Prospectus revealed that ATP had suffered a net loss of roughly $121.4 million in the nine months ending September 30, 2010.[33] And finally, when referring to the new permitting regulations that caused the de facto moratorium, the Prospectus unequivocally stated:

New regulations already issued will . . . require a change in the way we conduct our business, increase our costs of doing business *or ultimately prohibit us from drilling for or producing hydrocarbons in the Gulf of Mexico.[34]*

---

[32] *Id.* at 7-9 (emphasis in original).

[33] R. Doc. 137-5 at 42.

[34] R. Doc. 133-2 at 8 (emphasis added).

These statements plainly indicate (1) that the moratoria had halted much of ATP's drilling and production activity in the Gulf; (2) that development delays or curtailment of production at material properties such as the Telemark Hub might materially affect ATP's financial position and operating results; (3) that drilling and production activity was necessary to provide the cash flow required to fund ATP's capital plan and meet its existing obligations; (4) that ATP had suffered significant losses in 2010; (5) that ATP did not know when permits would issue or when it would be able to resume drilling; and (6) that the delays, coupled with the new regulatory framework for obtaining permits, could have material adverse effects on ATP's liquidity and revenues, including potentially ending ATP's drilling operations in the Gulf altogether. It was no secret that ATP's Gulf of Mexico operations were the firm's primary source of revenue.

Moreover, despite plaintiff's assertions, nothing in *Panther Partners* or *Litwin* would require an issuer to predict whether, two years down the road, it ultimately would be able to survive an ongoing negative event with an uncertain end date. In *Panther Partners*, the Court held that "the Registration Statement's generic cautionary language that '[h]ighly complex products such as those that [Ikanos] offer[s] frequently contain defects and bugs' was incomplete" when Ikanos "knew that . . . the chips that it had sold to . . . its largest customers and the largest source of its

revenues[ ] were defective, . . . and that it [may] therefore have to accept returns of all of the chips that it had sold to these two important customers," undermining customer confidence in the brand. 681 F.3d at 121-22. In *Litwin* (a case about materiality), the Court held that an issuer has an obligation to disclose publicly known, general trends, such as a decline in the real estate market, when those trends are likely to impact the issuer in particular for reasons that are not necessarily apparent to investors. 634 F.3d at 716-22. The Court concluded that the real estate market decline was material to the issuer's liquidity because of the issuer's significant residential real estate investments, and the Court concluded that the issuer had an obligation to make this connection for its investors in the registration statement. *Id.* Likewise, the issuer had a duty to disclose a portfolio company's loss of an exclusive customer agreement because the issuer had invested heavily in the portfolio company. *Id.* In essence, *Litwin* and *Panther Partners* require an issuer to disclose the *reasons* that the effects of a trend or event are or will be material for the issuer. They do not require the issuer to predict in mathematical terms the *extent* to which a known trend ultimately will affect revenues or liquidity.

Not satisfied with ATP's disclosures concerning the past and potential future effects of the moratoria, plaintiff argues that defendants "knew in 2010 that ATP did not have the liquidity and

19

revenues to survive a lengthy moratorium"[35] and should have disclosed that fact in the Registration Statement. It bases this conclusion on Reese's statements in the 2012 bankruptcy proceeding and on ATP's statements in a lawsuit filed against the United States after the Effective Date indicating that ATP had "incurred increased costs" and "additional expense[s]" in 2010 "[a]s a direct result" of the moratoria.[36] In essence, plaintiff would require defendants, at a time when the end date of the de facto moratorium was still unknown, to both foresee and publicly declare the inevitability of their bankruptcy some two years down the road, despite the fact that such prognosticating would most assuredly operate as a self-fulfilling prophecy.

As previously stated, there is no general duty to disclose all material, non-public information. *Kapps*, 379 F.3d at 212 n.6. The information must be either (1) necessary to make other statements in the registration statement not misleading, or (2) specifically required to be disclosed by the securities laws. *Id.* To the extent plaintiff argues that ATP's failure to disclose its future bankruptcy rendered its projection of increased hydrocarbon production in 2011 misleading,[37] such attempts to plead fraud by hindsight are impermissible and devoid of plausibility. To be

---

[35] R. Doc. 172 at 13; *see also* R. Doc. 75 at 8.

[36] R. Doc. 75 at 8.

[37] R. Doc. 75 at 8.

actionable, a statement or omission must be misleading at the time it was made. *In re MobileMedia Securities Litigation*, 28 F. Supp. 2d 901, 925 (D. N.J. 1998) (citing *Zucker v. Quasha*, 891 F. Supp. 1010 (1995), *aff'd*, 82 F.3d 408 (3d Cir. 1996)). "[O]missions that create a misleading impression—particularly one that is misleading only in hindsight—are not sufficient to constitute the basis of a securities action under section 11 or section 12(2)." *In re Bank of Boston Securities Litigation*, 762 F. Supp. 1525, 1538 (D. Mass. 1991). As the Seventh Circuit once observed,

> [t]he story in this complaint is familiar in securities litigation. At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy. The plaintiff contends that the difference must be attributable to fraud. "Must be" is the critical phrase, for the complaint offers no information other than the differences between the two statements of the firm's condition. Because only a fraction of financial determinations reflects fraud, plaintiffs may not proffer the different financial statements and rest. Investors must point to some facts suggesting that the difference is attributable to fraud. . . . Rule 9(b) required the district court to dismiss the complaint, which discloses none of the circumstances that might separate fraud from the benefit of hindsight. There is no "fraud by hindsight," in Judge Friendly's felicitous phrase, *Denny*, 576 F.2d at 470, and hindsight is all the DiLeos offer.

*DiLeo v. Ernst & Young*, 901 F.2d 624, 627-28 (7th Cir. 1990).

Here, plaintiff's allegations that defendants *knew* ATP would ultimately go bankrupt and purposefully withheld that information sound in fraud and are incompatible with plaintiff's statements in the Amended Complaint expressly disclaiming any and all allegations

of fraud or intentional misconduct.[38] Moreover, such claims are subject to Rule 9(b)'s heightened pleading requirements. Significantly, the Amended Complaint is devoid of allegations that ATP's affirmative disclosures misrepresented any aspect of the company's financial condition. Instead, plaintiff merely points out that when asked in 2012 whether "ATP [had] the liquidity and revenues at that time to absorb a lengthy moratorium," Reese responded "no." Plaintiff then concludes that each of the defendants must have known ATP's ultimate fate as early as 2010 simply because one defendant, with the benefit of hindsight, stated that ATP lacked the liquidity to survive a moratorium *that was still ongoing as of the Effective Date.* This argument is classic fraud-by-hindsight pleading and does not amount to a plausible allegation that the defendants had a duty to disclose ATP's future bankruptcy.

To the extent plaintiff argues that ATP's future bankruptcy somehow was *itself* a "known" trend or event triggering a duty to disclose under Item 303, this allegation also (1) amounts to an attempt to plead fraud by hindsight (2) is incompatible with plaintiff's fraud disclaimer, and (3) fails to plead defendants' knowledge with the requisite particularity. While Section 11 claims generally do not require proof of scienter, "[s]ome of the duties

---

[38] R. Doc. 75 at 22 ("Plaintiffs repeat and reallege each and every allegation contained above, except any allegation construed to allege fraud or intentional misconduct.").

of disclosures, the breaches of which Section 11 makes actionable, do require knowledge." *J & R Mktg., SEP v. Gen. Motors Corp.*, 549 F.3d 384, 392 (6th Cir. 2008). Item 303, which mandates the disclosure of "known" trends or events, "requires that a plaintiff plead, with some specificity, facts establishing that the defendant had actual knowledge of the purported trend." *Blackmoss Investments Inc. v. ACA Capital Holdings, Inc.*, No. 07-10528, 2010 WL 148617, at *9-10 (S.D.N.Y. Jan. 14, 2010) (holding on motion to dismiss that news articles and price indices published after defendant's IPO were insufficient evidence of defendant's knowledge of a rising foreclosure trend) (collecting cases); *accord J & R Mktg., SEP*, 549 F.3d at 392.

Plaintiff impermissibly lumps all defendants–both officers and outside directors alike–together and points to Reese's 2012 statements as evidence of the defendants' collective knowledge in 2010. This will not suffice. *Cf. In re Thornburg Mortgage, Inc. Sec. Litig.*, 824 F. Supp. 2d 1214, 1262 (D. N.M. 2011), *aff'd*, *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190 (10th Cir. 2013) (observing that plaintiffs' allegations that the defendants failed to disclose known trends as required by Item 303 "fail to differentiate between the Defendants, robbing their assertion of plausibility.") (collecting cases). Accordingly, the Court dismisses plaintiff's claim that ATP omitted material information concerning its ability to survive the moratoria.

## ii. *The Atwater Well's Underperformance*

Plaintiff also alleges that the Registration Statement was false and misleading because it omitted material facts relating to the poor performance of the Atwater well at ATP's Telemark Hub. As with its arguments relating to the moratoria, the Amended Complaint conflates two separate grounds for liability based on omissions. It is unclear whether plaintiff is alleging that defendants had a duty to disclose this information because of Item 303 or because it was necessary to make other statements in the Prospectus not misleading. At one point, the Amended Complaint alleges that the Registration Statement's projections of increased production in 2011 were misleading because it failed to disclose that the Atwater well lacked connectivity and was underperforming, suggesting that defendants are liable for omitting information necessary to make other statements not misleading. However, plaintiffs allege that the *reason* the statement is misleading was because ATP's liquidity and revenues were reasonably likely to be materially affected by Atwater's underperformance, suggesting a duty to report under Item 303.

ATP's risk disclosure warned generally that ATP "may experience production that is less than estimated and development costs that are greater than estimated in our reserve reports." With respect to the Telemark Hub in particular (which included the Atwater well), the risk disclosure stated that "production

curtailment at our material properties including at our Telemark Hub may adversely affect our financial position and results of operations." Plaintiff argues that this disclosure was itself misleading because

> it failed to disclose that production at Telemark was, as of the Effective Date, significantly below expectations and was already having a material adverse effect on ATP's financial position and results of operations and was expected to continue to do so into 2011.[39]

Defendants argue that the Securities Act's statute of limitations bars plaintiffs' claim. The Act provides that "[n]o action shall be maintained to enforce any liability created under [Section 11] of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. "This standard is generally referred to as "inquiry notice," and it applies "when a reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning."" *Sudo Properties, Inc. v. Terrebonne Parish Consol. Gov't*, 503 F.3d 371, 376 (5th Cir. 2007). In *Jensen v. Snellings*, the Fifth Circuit explained:

> A plaintiff who has learned of facts which would cause a reasonable person to inquire further must proceed with a reasonable and diligent investigation, and is charged with knowledge of all facts such an investigation would have disclosed. Investors are not free to ignore 'storm warnings' which would alert a reasonable investor to the possibility of

---

[39] R. Doc. 75 at 19-20.

> fraudulent statements or omissions in his securities
> transactions.

841 F.2d 600, 607 (5th Cir. 1988) (citations omitted).

Among the circumstances that may constitute a storm warning are "disclosures in the media, a sudden drop in stock price, filing for bankruptcy, an SEC investigation, and warnings in a prospectus." *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 384 (S.D. Tex. 2011), *aff'd sub nom. Harold Roucher Trust U/A DTD 9/21/72 v. Nocella*, 464 F. App'x 334 (5th Cir. 2012) (citing *In re Dynegy, Inc.*, 339 F. Supp. 2d 804, 845-46 (S.D. Tex. 2004)). This objective inquiry does not turn on a plaintiff's subjective awareness of the particular disclosure, as the "reasonable investor" is "presumed to have read prospectuses, quarterly reports and other information relating to their investments." *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, No. 00-4285, 2002 WL 33934282, at *24 (D.N.J. June 26, 2002) (quoting *Mathews v. Kidder*, 260 F.3d 239, 252 (3d Cir. 2001)). This standard also assumes knowledge of "publicly available news articles and analyst's reports." *Conwill v. Greenberg Traurig, L.L.P.*, No. 09-4365, 2010 WL 3021553, at *3 (E.D. La. July 29, 2010) (quoting *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 507 (3d Cir. 2006) (discussing storm warnings in the context of the Civil RICO statute of limitations). "An investor

need not have notice of the entire wrong being perpetrated to be on inquiry notice." *In re Franklin*, 782 F. Supp. 2d at 384.[40]

---

[40] In *Merck & Co. v. Reynolds*, 559 U.S. 633, 652-63 (2010), the Supreme Court held that "the 'discovery' of facts that put a plaintiff on 'inquiry notice' does not automatically begin the running of the limitations period" applicable to fraud claims brought under the Securities Exchange Act of 1934. Rather, the statute of limitations would begin to run "once the plaintiff did discover or a reasonably diligent plaintiff would have 'discover[ed] the facts constituting the violation'—whichever comes first." *Id.* at 653. In *City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc.*, the Second Circuit interpreted *Merck*'s holding to mean that the statute of limitations does not begin to run until a reasonably diligent investor would have discovered the facts necessary "to survive a 12(b)(6) motion to dismiss." 637 F.3d 169, 175 (2d Cir. 2011).

The parties dispute whether *Merck*'s holding also applies to the statute of limitations governing Securities Act claims. The issue has not been addressed in this Circuit and has been a source of considerable disagreement in others. *See NECA-IBEW Pension Trust Fund v. Bank of Am. Corp.*, No. 10-440, 2013 WL 620257, at *6 (S.D.N.Y. Feb. 15, 2013) ("District Judges within this District are not only split on whether *Merck* and *City of Pontiac* are applicable to claims brought under the Securities Act, they are even split on which view is the majority view.") (collecting cases). At least one district court in this circuit has implicitly concluded that *Merck*'s holding does not apply to Securities Act claims. *See In re Franklin*, 782 F. Supp. 2d at 383-84 (applying *Merck*'s standard to plaintiffs' Section 10(b) claims, but applying the traditional inquiry notice standard to their Section 11 claims). Courts taking this position typically do so because unlike the Exchange Act's limitations provision, which states that the clock begins to run only upon discovery of the "facts constituting the violation," the language of the Securities Act's provision indicates that the one-year period begins as soon as a reasonably diligent plaintiff should have discovered "the untrue statement or omission." 15 U.S.C. § 77m. But the *Franklin* court emphasized that *Merck*'s rationale for treating Exchange Act claims differently was that an Exchange Act plaintiff must provide evidence of scienter. *Id.* at 383. This would suggest that when Securities Act claims *also* require evidence of scienter (as plaintiff's Atwater claim would here if based on an alleged violation of Item 303), they, too, might be subject to the discovery rule articulated in *Merck.*

The Court need not resolve this question today. As explained

Determining when a plaintiff is deemed to be on inquiry notice is a "fact-intensive inquiry" that is "typically appropriate for consideration by a jury." *Sudo Properties, Inc.*, 503 F.3d at 376 (quoting *Margolies v. Deason*, 464 F.3d 547, 553 (5th Cir. 2006)). Defendants bear the heavy burden of demonstrating that "uncontroverted evidence irrefutably demonstrates when a plaintiff discovered or should have discovered the fraudulent conduct." *In re Franklin,* 782 F. Supp. 2d at 384.

Nevertheless, when "the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of a wrongdoing can be gleaned from the complaint and agency filings that are integral to the complaint, resolution of the issue on a motion to dismiss is appropriate." *In re Dynegy, Inc.*, 339 F. Supp. 2d at 847 (quoting *Dodds v. Cigna Securities, Inc.*, 12 F.3d 346, 352 n.3 (2d Cir. 1993)). *See also Miller v. Nationwide Life Ins. Co.*, 391 F.3d 698, 700 (5th Cir. 2004) (concluding that information in a publicly filed supplemental prospectus placed the plaintiff on constructive notice of misrepresentations in the original prospectus); *In re Ultrafem Inc. Securities Litigation,* 91 F. Supp. 2d 678, 692 (S.D.N.Y. 2000) ("Dismissal is appropriate when the facts from which knowledge may be imputed are clear from the pleadings and the public disclosures

_____

below, the disclosures that should have put plaintiff on notice of Atwater's poor performance also serve as evidence of the defendants' awareness of the well's declining production.

themselves."); *Pension Trust Fund for Operating Engineers v. Mortgage Asset Securitization Transactions, Inc.*, 730 F.3d 263, 271 (3d Cir. 2013) (affirming dismissal because "matters of public record . . . reveal that the claims in the Original Complaint were untimely").

Because plaintiff filed suit on May 24, 2013, the existence of information capable of putting plaintiff on inquiry notice of Atwater's performance problems on or before May 24, 2012 would bar this claim. Defendants point to a number of quarterly earnings conference calls starting in May 2010 in which Atwater's poor performance was discussed.[41] For the reasons that follow, the Court takes judicial notice of these earnings calls and concludes that plaintiff was on inquiry notice of Atwater's disappointing performance well before May 24, 2012.

Before examining the information disclosed in the earnings calls, the Court must determine whether it is appropriate to consider the calls on a Rule 12(b)(6) motion to dismiss. In deciding a motion to dismiss for failure to state a claim, courts typically must limit their inquiry to the facts stated in the complaint and the documents either attached to or incorporated in the complaint. *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996). "However, courts may also consider matters of which they may take judicial notice." *Id.* at 1017-18 (citing Fed.

---

[41] R. Doc. 133-1 at 19-20.

R. Evid. 201(d) ("The court may take judicial notice at any stage of the proceeding."). In *Lovelace*, the Fifth Circuit adopted the rule of other circuits that in securities cases, courts may take judicial notice of the contents of public disclosure documents that are filed with the SEC as required by law. *Id.* at 1018 & n. 1. More generally, however, the Federal Rules of Evidence permit courts to take judicial notice of any fact "not subject to reasonable dispute" because it either "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201.

Applying Rule 201, numerous district courts have taken judicial notice of earnings call transcripts when the parties did not dispute the accuracy of their contents. *See, e.g.*, *Rosenbaum Capital, LLC v. McNulty*, 549 F. Supp. 2d 1185, 1189-90 (N.D. Cal. 2008) ("This [earnings call] transcript . . . is publicly available and was disclosed to the market, and therefore is appropriate for judicial notice."); *California Pub. Employees' Ret. Sys.*, 2002 WL 33934282, at *13 (taking judicial notice when, "for the purposes of this motion, there is no material dispute as to the transcripts of the conference calls"); *In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*, No. 08-1919, 2009 WL 3246994, at *4 (W.D. Wash. Oct. 5, 2009) ("A court may also take judicial notice of . . . conference call transcripts.") (citing *In re Pixar Sec.*

*Litig.*, 450 F. Supp. 2d 1096, 1100 (N.D. Cal. 2006)); *Stevens v. InPhonic, Inc.*, 662 F. Supp. 2d 105, 128 (D.D.C. 2009) ("Other courts have further held that taking judicial notice of conference call transcripts is appropriate in order to "provide the full context in which the information was disclosed to the market."). *See also In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 864 (N.D. Cal. 2004) ("[T]he court may take judicial notice of information that was publicly available to reasonable investors at the time the defendant made the allegedly false statements.").

As with newspaper articles and analyst reports, courts consider earnings call transcripts not for the truth of the assertions contained therein, but as an indication of the information available to the public at the time. *See, e.g.*, *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1111 (N.D. Cal. 2009) ("The Court takes judicial notice of the fact that these statements [contained in conference call transcripts] were made on the dates specified, but not of the truth of the matters asserted therein."); *Belodoff v. Netlist, Inc.*, No. 07-00677, 2008 WL 2356699, at *4 (C.D. Cal. May 30, 2008) ("As Plaintiff does not dispute the accuracy of the transcript, the Court takes judicial notice of Defendants' Exhibit 8, only to the extent that it establishes what was said in the conference call, but not to determine the truth or falsity of the statements contained in the disputed documents."); *In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*, No.

08-1919, 2010 WL 4272567, at *1 (W.D. Wash. Oct. 12, 2010) ("The Court also takes notice of the [earnings call transcripts] solely for the purpose of getting 'an indication of what information was in the public realm at the time.'") (quoting *Von Saher v. Norton Simon Museum of Art*, 592 F.3d 954, 960 (9th Cir. 2010)); *Curry v. Hansen Med., Inc.*, No. 09-5094, 2012 WL 3242447, at *3 (N.D. Cal. Aug. 10, 2012) ("The Court takes judicial notice of . . . the conference calls for the fact that they were made on the dates specified, but not for the truth of the matters asserted therein."). Courts within this district have held similarly with respect to newspaper and magazine articles. *See, e.g.*, *U.S. ex rel. Lam v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 673, 680 (W.D. Tex. 2006) ("Courts have the power to take judicial notice of the coverage and existence of newspaper and magazine articles," as well as "the fact that the market is aware of information contained in news articles."); *Simms v. Jones*, No. 11-0248, 2011 WL 5978594, at *2 (N.D. Tex. Nov. 30, 2011) ("[T]he Court takes judicial notice of the articles for the limited purpose of showing what facts were disclosed to the public and will not otherwise consider them.").[42]

---

[42] *But see, e.g.*, *In re Bausch & Lomb, Inc. Sec. Litig.*, 01-CV-6190-CJS, 2003 WL 23101782, at *16-17 (W.D.N.Y. Mar. 28, 2003) (concluding without analysis that earnings call transcripts were not "a matter of which the Court may take judicial notice" when plaintiffs objected to defendants' request for judicial notice); *In re Michaels Stores, Inc. Sec. Litig.*, No. 03-0246, 2004 WL 2851782, at *2-3 (N.D. Tex. Dec. 10, 2004) (concluding that earnings call transcripts proffered by the defendant were "not publicly-filed disclosure documents of which the Court may

Here, the transcripts provided by the defendants were publicly available on LexisNexis within days or, at most, a few weeks, of the earnings calls,[43] and plaintiff does not dispute their accuracy. Accordingly, the Court concludes that it is appropriate to take judicial notice of the transcripts, not for the truth of the matters asserted in them, but to show what information was available to the reasonable investor.

The next question is whether a reasonable investor would have discovered the information disclosed in the earnings calls. As explained above, a reasonable investor is "presumed to have read prospectuses, quarterly reports *and other information relating to their investments*," *California Pub. Employees' Ret. Sys.*, 2002 WL 33934282, at *24 (emphasis added), including "publicly available news articles and analyst's reports," *Conwill*, 2010 WL 3021553, at *3. The Court is not aware of any cases directly addressing whether earnings calls constitute the type of "information relating to their investments" that investors are presumed to have read. That

_____

take judicial notice" without considering whether they otherwise were judicially noticeable under Rule 201); *Garden City Employees' Ret. Sys. v. Anixter Int'l, Inc.*, No. 09-5641, 2011 WL 1303387, at *14 (N.D. Ill. Mar. 31, 2011) ("[Earnings call] transcripts are not subject to judicial notice, as they are not 'historical documents, documents contained in public record, or reports, decisions, and regulations of administrative bodies.'").

[43] Each transcript reveals both the date of the corresponding earnings call and date on which the transcript was uploaded to LexisNexis.

being said, the Court sees no meaningful distinction between publicly available quarterly earnings calls and the SEC filings, news articles, press releases, and analyst reports with which investors are expected to be familiar.

The only question that remains, then, is whether a reasonable investor would have recognized the information disclosed in the earnings calls as a "storm warning" that the Atwater Well was underperforming. The complaint alleges that "[f]or months prior to the Exchange, ATP's Telemark hub was substantially underperforming due to the undisclosed fact that the Atwater well lacked connectivity," and that this poor performance "was a known trend or uncertainty that was then having and was reasonably likely to continue to have an unfavorable impact on ATP's revenues and liquidity."[44] It goes on to state that "production at Atwater began in March 2010 and performed substantially below projected performance levels, as the well's output declined precipitously to nearly nothing within a few months of coming online." Plaintiff argues that the "boilerplate" disclosure that ATP "may experience production that is less than estimated," in no way informed investors of the fact that ATP was already experiencing production materially less than anticipated at Telemark."

The earnings calls before and after the Effective Date disclosed that Atwater's performance was drastically below the test

---

[44] R. Doc. 75 at 10.

well projections, the production zone was relatively small, and that the well suffered compression problems. In a March 2010 earnings call, an analyst observed, and Leland Tate acknowledged, that "Atwater [had] tested a little bit over 10,000 BOEs per day but from two zones."[45] But Tate now projected that the Atwater well, which was to come online shortly, was likely to produce between 5,000 and 8,000 barrels per day "eventually."[46] He indicated that this projection assumed ATP could commingle the two zones.[47] Just two months later, ATP disclosed in a May 6, 2010 earnings call that Atwater was producing only a total of 3,000 to 4,000 barrels per day from both zones and that it was not expected to reach the production rates originally projected.[48] Tate disclosed that the production zone was only 50 feet.[49] During that call, Tate also revealed that ATP was dealing with ongoing "compression issues" at its Telemark Hub, which were in part to blame for a reduction in ATP's company-wide production rate.[50] At the time, Atwater was the only producing well at the Telemark Hub.

---

[45] R. Doc. 133-8 at 8.

[46] *Id.*

[47] *Id.*

[48] R. Doc. 133-9 at 4.

[49] *Id.* at 15.

[50] *Id.* at 10 ("[I]t is really about the facilities, and at Gomez we have had compression issues we have dealt with and continue. At Ladybug the same thing and then also at Telemark.").

ATP later disclosed that Atwater's production rate had fallen to 3500 to 3600 barrels per day by August 2010.[51]  In the August 2010 call, an analyst observed, and Tate did not dispute, that "the first well there [Atwater] tested from the two zones well above where the rates were when it was [combining] [sic] and where the current rate is."[52]  Tate acknowledged that the well was producing at rates lower than its test rates and explained that it "only had just over 50 feet perforated in it."[53]  In the same call, Reese acknowledged cost overruns at Telemark, with ATP's having spent the entire year's $340 to $350 million projected capital expenditure for the Telemark hub by the end of the second quarter with only one well online out of the planned four wells.[54] By November 2010, ATP disclosed that Atwater's production was down to 2500 to 3500 barrels.[55]  Thus, as of the Effective Date, ATP had already disclosed that Atwater was producing at about one-third of its tested rate, that the production zone was only 50 feet, and that the well had compression problems.

_____

[51] R. Doc. 133-10 at 3. Later in the call, Reese put that figure at 3000 to 4000 barrels per day. *Id.* at 21.

[52] *Id.* at 17.

[53] *Id.*

[54] *Id.* at 19.

[55] R. Doc. 133-11 at 7.

In a March 2011 earnings call, Reese announced that ATP spent $1 billion on the Telemark hub and had anticipated bringing in production of 50,000 barrels a day by the end of the year.[56] Instead, production at year end was 25,000 barrels per day[57] and Reese estimated a loss due to the BP oil spill of $350 million.[58] Further, when answering questions about ATP's non-recurring expenses of approximately $20 million in 2010, Tate disclosed that a large portion of those costs resulted from plugging the pipeline at the Atwater well in the fourth quarter of 2010, with production not resuming until February 2011.[59] According to Tate, the temporary plugging of Atwater resulted in the deferral of roughly 2000 to 3000 barrels of oil per day.[60] In May 2011, Tate revealed during another earnings call that roughly $8 million in costs from the plugging of the Atwater well ran over into the first quarter of 2011.[61] On the same call, an analyst posed the following question:

> [A]t Atwater 63, I know that well was in decline. Is that still producing, or is it just producing at a relatively low rate?

---

[56] R. Doc. 133-12 at 2.

[57] *Id.* at 13.

[58] *Id.* at 2.

[59] R. Doc. 133-12 at 2-3.

[60] *Id.* at 5.

[61] R. Doc. 133-13 at 3.

In response, Tate did not dispute that Atwater was in decline but stated that it and *another* well connected to the Telemark Hub *together* were producing a total of approximately 10,000 barrels per day.[62] The other well, the Mississippi Canyon 941 no. 3, was earlier reported to be produced from a zone three or four times larger than Atwater, and to be producing, as of November 2010, at a rate of 12,000 barrels per day.[63]

Then, in an August 2011 earnings call, Tate indicated that Atwater was averaging just 500 to 750 barrels a day on a quarterly basis:

> [JPMorgan Chase & Co Analyst] JOE ALLMAN: [I]n terms of AT63, what is that production running now, and has that well been disappointing and do you think you need to take a negative reserve revision on that well at the yearend [sic] of 2011?
>
> LELAND TATE: I do not think we will have a negative reserve revision there. **The well, when we drilled it, it was drilled into a fault block that we knew was not large; and it produced about as much as what was in that fault block.** It's still capable of production.
>
> The way we operate it, as you remember, Joe, there are two zones. We have one of the zones shut off because it was making some water. We have the other zone, which is a reservoir that is not a water drive reservoir. We produce it and shut it in and we actually let it build back up and we produce it and shut it in so that it will average on a quarterly basis probably 500 to 750 barrels a day.
>
> We produced the zone without the water instead of the other because of hydrates. We do not want to expose the lower pressure zones to the hydrates that might occur as a result of the water in the other zone. When we get this one depleted, we

---

[62] *Id.* at 6.

[63] R. Doc. 133-9 at 15; R. Doc. 133-11 at 2.

will then move to the higher pressure zone, which is the one
that has some water in it and put it back on production. . .
.

JOE ALLMAN: Leland, how long do you shut in the well during
that cycling process?

LELAND TATE: It usually takes a month to build up and then you
can flow it for a month. And then a month to build up a
schedule like that. And depending on how you hit in the
quarter, since we get measured every quarter, it can impact
that overall production.[64]

Tate again explained this process during ATP's November 2011

earnings call after an analyst asked why Atwater's production had

been zero in recent months:

LELAND TATE: As I explained at the last conference call, we
actually produce the Atwater 63 well on an every other month
basis as we shut it in. It will build back up to the pressure
where we produced it from the last time we he [sic] shut it in
and then we opened it back up and we can make roughly a
thousand barrels a day out of it every two to two and a half
months for a month or two. We will continue to do that. The
well continues to produce along that line.
What we are doing is depleting the latter part of the reserves
out of the fault block that we are in. We will recover some
where [sic] in the 85% to 90% [sic] of the reserves that we
had booked on that block so we are now just producing the last
pieces of those. We got the reserves we intended.[65]

Thus, as of the Effective Date, reasonable investors had

notice that Atwater was drilled into a fault block that was not

large, that production numbers had been reduced twice from initial

test well estimates to about one-third of the original estimate,

and that the well had pressure problems.  Further, reasonable

---

[64] R. Doc. 133-14 at 6 (emphasis added).

[65] R. Doc. 133-15 at 7-8.

investors were on constructive notice no later than November 2011 that the well's production continued to decline precipitously as it had before the Effective Date, that as of the Effective Date it was shut in, and that the well's size, configuration, production pattern, and problems were not new or unexpected to defendants as of the Effective Date. Combined with the disclosure in the prospectus that curtailment of production at properties like Telemark, where only the Atwater well was producing at the time, might adversely affect ATP's financial position and results of operations, these disclosures were sufficient to trigger the running of the statute of limitations. Because plaintiffs did not file suit within a year of November 2011, the claim is barred.

Plaintiff's claim would fail even if it were not barred by the statute of limitations, because the allegations in the complaint do not plausibly suggest that the failure to disclose Atwater's poor performance amounted to a material omission or rendered misleading ATP's projections of increased production. ATP had interests in 104 wells in the Gulf of Mexico alone, 93 of which were in operation. The Prospectus disclosed that

> actual development results are likely to differ from our estimates of our oil and gas reserves. We may experience production that is less than estimated and development costs that are greater than estimated in our reserve reports. Such differences may be material. . . . A variety of factors, both technical and market-related, can cause a well to become uneconomic or only marginally economic. In addition to their

cost, unsuccessful wells can hurt our effort to replace
reserves.[66]

The company was under no general obligation to provide updates
on the performance of each and every one of its wells. *Cf. TSC
Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448-449 (1976)
(warning that disclosure obligations that "bury the shareholders in
an avalanche of trivial information . . . [are] hardly conducive to
informed decision making."). Plaintiff argues that ATP nonetheless
should have provided information about *this* well, because trouble
at Atwater meant trouble for the entire Telemark Hub, which
accounted for 36% of ATP's total net proved reserves as of December
31, 2009. The thrust of plaintiff's argument is that Atwater's
connectivity problems should have indicated to ATP that *all* of the
wells at the company's Telemark Hub "were reasonably likely to **not**
produce to the levels ATP had projected," causing the company's
liquidity to decrease in a material way. But plaintiff's complaint
is devoid of allegations suggesting *why* a connectivity problem at
one well would indicate a likelihood of connectivity or pressure
issues with planned wells in other fields connected to the Telemark
Hub. When questioned about the basis for this conclusion at oral
argument, plaintiff's counsel was able to provide no further
insight, instead reminding the Court that it must accept the
allegations in the complaint as true on a motion to dismiss.

---

[66] R. Doc. 137-5 at 32, 34.

The Court must draw all inferences in favor of the plaintiff, but only when those inferences are reasonable. Further, it is the plaintiff's responsibility to plead factual content sufficient to demonstrate the plausibility of the allegations made in the complaint. *See Iqbal*, 556 U.S. at 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Without any supporting factual allegations, the Court cannot plausibly infer that one well's alleged connectivity issues meant that planned wells in other fields connected to the Telemark Hub also were likely to underperform. The Court therefore grants defendants' motion to dismiss this claim.

### 2. Alleged Misstatements Regarding ATP's Reported Proved Oil and Gas Reserves

ATP's Prospectus and Registration Statement incorporated by reference the Company's 2009 Form 10-K, which contained an estimate of proved oil and gas reserves as of December 31, 2009. Plaintiff claims that the incorporation of this figure–135 MMBoe–into the Registration Statement constituted a false or misleading statement because "[d]efendants had no reasonable basis to believe, and did not believe, the volume of "proved" oil and gas reserve figures reported in ATP's 2009 Form 10-K . . . complied with SEC regulations or were accurate as of the date the Registration Statement was declared effective."[67]

---

[67] R. Doc. 75 at 11.

Rule 4-10 of Regulation S-X prescribes financial accounting and reporting standards for oil and gas producing activities. *See* 17 C.F.R. § 210.4-10. Specifically, Rule 4-10(a)(22) reads:

Proved oil and gas reserves are those quantities of oil and gas, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible-from a given date forward, from known reservoirs, and under existing economic conditions, operating methods, and government regulations . . . . The project to extract the hydrocarbons must have commenced or the operator must be reasonably certain that it will commence the project within a reasonable time.

17 C.F.R. § 210.4-10(a)(22).

Plaintiff alleges that ATP's estimates were neither "sufficiently supported by geoscience and engineering data nor estimated with reasonable certainty to be economically producible, as required by SEC regulations," because ATP discovered that the Atwater well lacked connectivity *after* the estimates were produced but *before* the Effective Date.

Because this claim also turns on ATP's alleged failure to disclose the problems at Atwater, it too is barred by the statute of limitations. Even if that were not the case, the allegation fails to state a claim. The estimate was prepared by two independent petroleum engineering firms in accordance with SEC regulations and purports to be accurate as of December 31, 2009.[68] Plaintiff does not dispute that as of that date, the reserve estimates were reasonable based on then-existing "economic

[68] 2009 Form 10-K, R. Doc. 133-17 at 4.

conditions, operating methods, and government regulations" as required by Regulation S-X.[69] Instead, it alleges (for the first time in its opposition memorandum) that defendants should have updated this estimate before the Effective Date once it became apparent that the Atwater well lacked connectivity. They contend that because reserve figures must be based on then-existing conditions, Regulation S-X "contemplates the revision of reserve figures where conditions and regulations significantly change."[70] But that is not what the SEC regulations require. Rather, they require the issuer to "[d]isclose updated reserves tables as of the close of each fiscal year." 17 C.F.R. § 229.1202(a)(2)(Instruction 1). *See also* § 229.1203(a) and (b) ("Disclose the total quantity of proved undeveloped reserves at year end," and "[d]isclose material changes in proved undeveloped reserves that occurred during the year . . . ."). ATP held the reserve estimates out as reflecting conditions as of December 2009, and the Prospectus contained ample warnings that the estimate was imprecise, based on numerous assumptions, and likely to change. It read:

> **Our actual development results are likely to differ from our estimates of our oil and gas reserves. We may experience production that is less than estimated and development costs that are greater than estimated in our reserve reports. Such differences may be material.**

---

[69] R. Doc. 172 at 32-33.

[70] *Id.* at 33.

Estimates of our oil and natural gas reserves and the costs and timing associated with developing these reserves may not be accurate. Additionally at December 31, 2009 approximately 87% of our total proved reserves are classified as undeveloped. Development of these reserves may not yield the expected results, or the development may be delayed or the development costs may exceed our estimates, any of which may materially affect our financial position and results of operations. Development activity may result in downward adjustments or reserves or higher than estimated costs.

Our estimates of our proved oil and natural gas reserves and the estimated future net revenues from such reserves are based upon various assumptions, including assumptions required by the SEC relating to oil and natural gas prices, drilling and operating expenses, capital expenditures, taxes and availability of funds. This process requires significant decisions and assumptions in the evaluation of available geological, geophysical, engineering and economic data for each reservoir. Therefore, these estimates are inherently imprecise and the quality and reliability of this data can vary.

Any significant variance could materially affect the estimated quantities and PV-10 value of our reserves. Our properties may also be susceptible to hydrocarbon drainage from production by other operators on adjacent properties. In addition, we will likely adjust estimates of proved reserves to reflect production history, results of development, prevailing oil and natural gas prices and other factors, many of which are beyond our control. Actual production, revenues, taxes, development expenditures and operating expenses with respect to our reserves may vary materially from our estimates.[71]

Thus, ATP's failure to provide interim reserve estimates does not give rise to an independent basis for liability under Section 11. To the extent plaintiff alleges that the Atwater connectivity problems and drilling moratoria rendered historical data–including the reserve estimates–misleading, thus triggering a duty to

---

[71] R. Doc. 133-2 at 10 (emphasis in original).

disclose their existence and possible effects, this allegation is merely a restatement of plaintiffs' claim in Subsection 1 and requires no further discussion.

Plaintiff also contends that the reserve estimates were false and misleading because

the Cheviot Hub in the North Sea accounted for 29% of ATP's total net proved reserves as of December 31, 2009, yet at the time of the Exchange, ATP's production facility (the "Octabuoy") was being constructed in China and was not planned for deployment to Cheviot until at least 2012 (later pushed back to 2014/2015); . . .

It further alleges that

ATP was not reasonably certain to commence the Cheviot drilling project as ATP's own management was not reasonably certain ATP could survive the moratoria, let alone afford to construct, transport, and fully implement the custom-developed Octabuoy at Cheviot.[72]

Plaintiff again bases these allegations on Reese's declaration in 2012 that the moratoria "created significant liquidity problems" that were "exacerbated" by Octabuoy cost overruns.[73]

To the extent plaintiff alleges that a projected deployment date of 2012 did not constitute a "reasonable time" within which to produce the Cheviot Hub reserves, that allegation is barred by the statute of limitations, because the 2009 Form 10-K containing the reserve estimates *also* disclosed that the Octabuoy was slated to be

---

[72] R. Doc. 75 at 13.

[73] *Id.*

deployed in 2012.[74] Likewise, ATP's 2010 Form 10-K, released March 15, 2011, pushed the expected completion date back to 2014.[75] In any event, the purpose of the "reasonable time" requirement is only "to prevent a company from including, in proved reserves, projects in undeveloped areas for which it does not have the intent to develop." Modernization of the Oil and Gas Reporting Requirements, SEC Release No. 8935, 2008 WL 2549801, at *15 (June 26, 2008). Plaintiff does not allege that defendants did not intend to develop the North Sea reserves as of December 31, 2009.

In sum, the reserve estimates were reasonable when made, and defendants had no obligation to provide updated figures until the issuance of the 2010 Form 10-K in March 2011. Accordingly, plaintiff's allegations that the reserve estimates were false or misleading fail to state a claim, and the Court dismisses them with prejudice.

### 3. ATP's Projection of Increased Hydrocarbon Production in 2011

ATP's Prospectus stated it "project[ed] a substantial increase in production over the next year as development wells are brought into production." Plaintiff alleges that this statement was false or misleading because, due to the moratoria and the Atwater

---

[74] R. Doc. 137-9 at 28.

[75] R. Doc. 137-14 at 9, 30.

connectivity problem, "defendants had no reasonable basis to expect, and did not in fact expect, a substantial increase in production over the next year."[76]

Defendants point out that production *did* increase from 2010 to 2011. Specifically, ATP's 2011 Form 10-K reported a 17% increase in overall production.[77] Plaintiffs do not dispute the accuracy of this figure in their opposition memorandum; rather, they argue that 2011 10-K does not specify to what extent ATP's critical "development wells" contributed to this "overall" increase in production, "as opposed to other wells that were already producing and which were not the subject of ATP's statement."[78] But the statement in the Prospectus predicted a "substantial increase in production over the next year *as development wells are brought into production*." It did not limit the projection to development wells in particular, so the truth of the statement is to be judged by the overall increase in production, not just from development wells.

A defendant who makes a predictive statement that turns out to be true does not automatically escape liability, however, as the truth or falsity of a statement "is judged by the facts as they existed when the registration statement became effective." *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487,

---

[76] R. Doc. 75 at 13-14.

[77] R. Doc. 133-7 at 3, 4.

[78] R. Doc. 172 at 39.

518 n.28 (S.D.N.Y. 2013) (quoting *In re IPO Sec. Litig.*, 358 F. Supp. 2d 189, 205 (S.D.N.Y.2004)); *see also Pommer v. Medtest Corp.*, 961 F.2d 620, 623 (7th Cir. 1992) ("[J]ust as a statement true when made does not become fraudulent because things unexpectedly go wrong, so a statement materially false when made does not become acceptable because it happens to come true.").[79]

Nonetheless, plaintiff's claim fails because the PSLRA

---

[79] The ultimate truth of a predictive statement would, however, demonstrate the absence of a causal link between the prediction and any loss experienced by the plaintiffs. The absence of loss causation is an affirmative defense to a Securities Act claim. 15 U.S.C. § 77k(e); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 346 (S.D.N.Y. 2005). "[W]hen a successful affirmative defense appears on the face of the pleadings, dismissal under Rule 12(b)(6) may be appropriate." *Miller v. BAC Home Loans Servicing, L.P.*, 726 F.3d 717, 726 (5th Cir. 2013). As a matter of law, no harm can result from a prediction that ultimately comes true. *See McCarthy v. C-Cor Electronics, Inc.*, 909 F. Supp. 970, 975 (E.D. Pa. 1995)("The plaintiffs cannot demonstrate harm if the statements in the January Press Release later proved true."), *on reconsideration in part*, 929 F. Supp. 199 (E.D. Pa. 1996).

Although plaintiff does not appear to dispute the accuracy of the reported 17% increase in overall production, it argues that "factual determinations regarding to what extent defendants' projections were indeed realized . . . are, like so many of defendants' contentions, inappropriate for resolution on a motion to dismiss." The 17% increase was reported in ATP's publicly filed 2011 Form 10-K, a document which "may be considered only for the purpose of determining what statements [it] contain[s], and not for proving the truth of [its] contents." *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d at 384-85. Absent a concession from plaintiff that the reported 17% increase is accurate, the Court cannot dismiss on this basis without converting the motion into one for summary judgment, which it is not prepared to do. Nevertheless, to the extent that production did in fact increase in 2011, the absence of loss causation would be fatal to this claim on summary judgment.

requires specific allegations that defendants made the prediction with actual knowledge of its falsity, and plaintiff expressly disclaims such allegations. The Private Securities Litigation Reform Act ("PSLRA") created a "safe harbor" from liability for certain forward-looking statements contained in a registration statement. It provides that an individual defendant

> shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that—
>
> (A) the forward-looking statement is—
>
>> (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
>>
>> (ii) immaterial; or
>
> (B) the plaintiff fails to prove that the forward-looking statement--
>
>> (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or
>>
>> (ii) if made by a business entity; was—
>>
>>> (I) made by or with the approval of an executive officer of that entity; and
>>>
>>> (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 77z-2(c).

Because the provision is disjunctive, parts A and B must be considered separately. Thus, in the case of every predictive

50

statement, a plaintiff now must plead facts indicating that the defendant *actually knew* that the statement was either false or misleading. Simply alleging that the statement lacked a reasonable basis will not suffice. *See In re Newell Rubbermaid Inc. Sec. Litig.*, No. 99-6853, 2000 WL 1705279, at *10 (N.D. Ill. Nov. 14, 2000) ("[A] claim under the Securities Act involving forward-looking statements now appears to require, for all practical purposes, proof of scienter."). Indeed, plaintiff's burden here is actually greater than in the ordinary securities fraud case containing scienter-based claims. Scienter encompasses the "intent to deceive, manipulate, or 'defraud,' or that 'severe recklessness' in which the danger of misleading buyers or sellers ... is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *In re Houston Am. Energy Corp. Sec. Litig.*, 970 F. Supp. 2d 613, 619 (S.D. Tex. 2013) (citing 15 U.S.C. § 78u-4(b)(2) and *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 366 (5th Cir. 2004)). In contrast, a plaintiff seeking to overcome the PSLRA's safe harbor must plead more than severe recklessness; he or she must plead actual knowledge. *See Kurtzman v. Compaq Computer Corp.*, No. 99-779, 2000 WL 34292632, at *62 (S.D. Tex. Dec. 12, 2000) (observing that "actual knowledge" is "an even higher standard") (collecting cases).

Plaintiff does allege that defendants actually knew the prediction was false at the time it was made. Again, the problem is that plaintiff *also* expressly disclaimed any allegations of fraud in the Amended Complaint, instead suggesting that the claims sounded in negligence.[80] In *In re NovaGold Resources Inc. Securities Litigation*, the Court confronted the same situation and concluded that the plaintiffs could not plead actual knowledge while simultaneously disclaiming allegations of fraud:

> The consolidated complaint and plaintiff's brief, as discussed above, go to great pains to allege that misstatements in the Registration Statement resulted from negligence, not fraud, and to disclaim any intention that the Securities Act claims sound in fraud. Defendants by definition could not have been acting with negligence if they had actual knowledge that they were making false statements. Actual knowledge is the basis for a mental state supporting an allegation of fraud that involves the heightened pleading standards of Rule 9(b).

629 F. Supp. 2d 272, 295 (S.D.N.Y. 2009).

Faced with plaintiff's internally contradictory position, the Court must either: (1) accept plaintiff's fraud disclaimer and dismiss this claim for failure to allege actual knowledge of the falsity of the prediction, or (2) ignore the fraud disclaimer and apply the heightened pleading standards of Rule 9(b) and the PSLRA to plaintiff's allegations of actual knowledge. Even taking the latter approach, the Court must dismiss plaintiff's claim for failure to plead actual knowledge with the requisite particularity.

---

[80] R. Doc. 75 at 23 (emphasis added).

When a particular state of mind such as "actual knowledge" is an essential element of a claim, the plaintiff must,

> with respect to each act or omission alleged to violate [the Securities Act], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 77u-4(b)(2). The allegations also must be specific as to each individual defendant. *See Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 364 (5th Cir. 2004) (holding that group pleading is incompatible with the requirements of § 77u-4(b)(2)). Thus, plaintiff must plead specific facts giving rise to a strong inference that *each* defendant knew the statement was false or misleading when made. *See, e.g.*, *Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 372-73 (5th Cir. 2004); *In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1109 (D. Nev. 1998); *Ehlert v. Singer*, 85 F. Supp. 2d 1269, 1274 (M.D. Fla. 1999), *aff'd and remanded*, 245 F.3d 1313 (11th Cir. 2001).

Here, plaintiff generally alleges defendants' collective knowledge of ATP's inability to survive the moratoria based on after-the-fact statements of a single defendant. Once again, this allegation amounts to fraud-by-hindsight pleading even as to Reese, who made the statement. The statement says even less regarding the knowledge of the other defendants. *Cf. Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 867-68 (5th Cir. 2003) (analyst report compiled after effective date of prospectus based on interviews with company

management did not create inference of scienter, despite statements in report that the company's problems were present before the effective date).

To the extent plaintiff alleges that defendants knew the predicted growth in production was false or misleading because of the problems at Atwater, the argument is barred by the statute of limitations for the reasons discussed above. In any event, the complaint does not indicate which defendants knew of the well's poor performance or when they knew. *Cf. Rosenzweig*, 332 F.3d at 868 (no inference of scienter when allegations failed to identify who knew the information or when they knew); *see also Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 432 (5th Cir. 2002) ("A pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company.").

The PSLRA provides that if a plaintiff does not meet these stringent pleading requirements, the district court "shall," on defendant's motion, "dismiss the complaint." See 15 U.S.C. § 78u-4(b)(3); *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 407 (5th Cir. 2001).

For all of the foregoing reasons, plaintiff's claim that defendants' projection of increased production in 2011 was false or misleading fails to state a claim.

### 4. Defendants' Alleged Omissions Concerning the "Disguised Financings"

The Registration Statement acknowledged that "the indenture governing the notes" and ATP's "senior secured credit facility" contained covenants that "limited" ATP's ability to "incur or assume liens or additional debt."[81] It further stated:

> There can be no assurance that we will remain in compliance with the covenants under our debt agreements. A breach of any of these covenants could result in a default under our credit facility and/or the notes.[82]

Plaintiff alleges that this statement was false and misleading because it failed to state that in 2009 and 2010, defendants had engaged in "disguised financings" that caused ATP to be in violation of its credit and debt agreements as of the Effective Date, placing it at risk of default.[83] According to the Amended Complaint, these "disguised financings" consist of a number of overriding royalty interests ("ORRIs"), some in the form of net profits interests ("NPIs"), in hydrocarbons produced from various oil and gas leases. ATP granted the ORRIs and NPIs to certain vendors and investors in exchange for capital, goods, and services.[84]

This claim is without merit. The Prospectus stated:

---

[81] R. Doc. 137-5 at 23-24.

[82] *Id.* at 24.

[83] R. Doc. 75 at 15.

[84] *Id.* at 15-18.

We have granted and may grant in the future overriding royalty interests in the form of net profit interests and other similar long-term obligations with respect to certain of our oil and gas properties which constitute Collateral securing the notes and the related guarantees, which have the effect of reducing the value of such Collateral to the extent of such net profit interests and which could adversely affect the ability of the collateral agent, the trustee under the indenture or the holders of the notes to realize or foreclose on such Collateral.

At December 31, 2008 and 2009 and at September 30, 2010, we had net profits interests and other similar long-term obligations (including vendor deferrals and dollar-denominated overriding royalty interests) of $2.6 million, $274.9 million, and $495.2 million, respectively . . . .[85]

Likewise, ATP's 2009 10-K and September 30, 2010 10-Q, both of which were incorporated into the Prospectus by reference,[86] are replete with specific examples of the ORRIs and NPIs, and they disclose precisely how ATP accounted for them in their balance sheets and other financial statements.[87]

Even accepting as true plaintiff's conclusory allegation that the financing arrangements violated ATP's credit agreements and that ATP should have disclosed this fact, the claim is barred by the one-year statute of limitations. As discussed above, the Prospectus, 2009 10-K, and September 2010 10-Q disclosed the financing arrangements. Likewise, the Prospectus incorporated by reference ATP's April 29, 2010 and June 24, 2010 8-Ks, which

---

[85] R. Doc. 137-5 at 25.

[86] *Id.* at 6.

[87] R. Doc. 137-2 at 39, 40-41, 47-48, 51, 88-89, 104; R. Doc. 137-7 at 17, 39-40.

contained the indenture governing the Notes and the senior secured credit facility referred to in the Prospectus.[88] Because the terms of these covenants and details on the financing agreements were all part of the Prospectus, a diligent investor would have discovered the facts giving rise to this claim long before 2013. Accordingly, the Court dismisses this claim with prejudice.

### 5. ATP's Alleged Environmental Violations

The Registration Statement incorporated by reference ATP's Form 10-Q for the period ending September 30, 2010, which disclosed that ATP's new credit facility "contains an event of default if there has occurred a material adverse change with respect to the Company's compliance with environmental requirements and applicable laws and regulations." The Prospectus also included "environmental accidents or hazards" in a list of operating risks facing the oil and gas industry as a whole.[89] Plaintiff alleges that ATP "failed to disclose that, in violation of U.S. law, ATP had been unlawfully discharging oil and an unpermitted chemical dispersant into the Gulf of Mexico since *early October 2010*, and before then had been discharging another unpermitted chemical."[90] Plaintiff argues that the failure to disclose the alleged violations rendered the

---

[88] R. Doc. 137-4; R. Doc. 137-11.

[89] R. Doc. 137-5 at 34.

[90] R. Doc. 75 at 20 (emphasis in original).

statements in the prospectus misleading, because the alleged violations placed ATP in violation of its debt agreements as of the Effective Date.[91]

With respect to the 10-Q's statement about the risk of default, plaintiff conceded both in the briefing and at oral argument that ATP's creditors never found the company to be in violation of its debt agreements based on any alleged environmental regulations. In other words, the harm plaintiff feared would result from the failure to disclose the alleged violations never actually materialized. Again, the absence of loss causation is an affirmative defense to a Securities Act claim, 15 U.S.C. § 77k(e); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d at 346, and dismissal is appropriate when the defense appears on the face of the pleadings, *Miller*, 726 F.3d at 726. Accordingly, the lack of loss causation bars plaintiff's claim to the extent it is based on the statement in the Form 10-Q.

Plaintiff also fails to state a claim based on the boilerplate language about environmental risks facing the oil and gas industry. The parties' briefs point to a number of cases reaching conflicting conclusions as to whether a forward-looking recitation of risks can result in liability when those risks have already materialized. *See In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d

---

[91] *Id.*

58

524, 543-44 (S.D.N.Y. 2014) (collecting cases and concluding that "there is conflicting authority on the issue").

When an issuer reveals a firm-specific risk and asserts that it "may" affect the company's financial condition despite knowing that it already has done so, a stronger case exists for imposing liability. *See In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516-17 (S.D.N.Y. 2013) (risk warnings misleadingly represented that increased mobile usage and the company's product decisions *could* negatively impact revenues and revenue growth, when in fact they already had).

On the other hand, when the statement in question is merely a boilerplate list of risks affecting an industry as a whole, it is unlikely that a reasonable investor would interpret the list as an assurance of regulatory compliance. On this point, *In re FBR Inc. Securities Litigation* is instructive. There, the Court first questioned the notion that cautionary statements by themselves should support a claim for securities fraud. 544 F. Supp. 2d 346, 360-61 (S.D.N.Y. 2008). "Rather, courts generally assess cautionary language to determine whether that language insulates a defendant from liability under the 'bespeaks caution' doctrine."[92] *Id.* at 361. The Court criticized opinions in which "cautionary language generally inserted as a shield against liability is wielded as a

---

[92] The "bespeaks caution" doctrine is the common-law counterpart to the PSLRA safe harbor.

sword to impose liability on the theory that a boilerplate warning about risks of loss necessarily implies to investors that no loss has ever transpired." *Id.* It emphasized that in either case, a complaint fails to state a claim "if no reasonable investor could have been misled about the nature of the risk when he invested." *Id.* at 362 (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002)). It then concluded that

> defendants' boilerplate description of its regulatory risks could not have been misleading to a reasonable investor as the description "said nothing company-specific, and no reasonable investor would infer anything about the state of [the company's regulatory] compliance." *Anderson v. Abbott Labs.*, 140 F.Supp.2d 894, 905 (N.D. Ill. 2001). . . . Significantly, defendants never claimed that the company was in "full compliance with all regulations, or that it had no outstanding regulatory issues." *Id.* at 904. Of equal importance, defendants did not imply such full compliance by touting their compliance policies, *see Ballan* [*v. Wilfred Am. Educ. Corp.*]*, 720 F. Supp. at 245, or a special corporate culture regarding compliance, *see Lapin* [*v. Goldman Sachs Group, Inc.*]*, 506 F.Supp.2d at 240.

*Id; see also In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1048–49 & n. 13 (N.D. Cal. 2007) (finding, on a motion to dismiss, that the disclosure of standard market risk factors was not misleading); *Zeid v. Kimberley*, 930 F. Supp. 431 (N.D. Cal. 1996) ("boilerplate" warnings of market risk factors not actionable as a matter of law).

The full list of risks in ATP's Prospectus reads:

> The oil and natural gas business involves a variety of operating risks, including:
> - fires;
> - explosions;
> - blow-outs and surface cratering;

- uncontrollable flows of natural gas, oil and formation water;
- pipe, cement, subsea well or pipeline failures;
- casing collapses;
- embedded oil field drilling and service tools;
- abnormally pressured formations;
- environmental accidents or hazards, such as natural gas leaks, oil spills, pipeline ruptures and discharges of toxic gases; and
- hurricanes and other natural disasters.

No reasonable investor would interpret this list as an assurance of compliance with regulations intended to manage the included risks. This is especially true considering the list mentions environmental "accidents or hazards"-*not* the violation of environmental regulations-as an industry-specific risk. Accordingly, plaintiff fails to state a claim that the list was false or misleading.

**6. Claim that ATP's Risk Disclosures Were Themselves Misleading**

Plaintiff devotes a separate section of the Amended Complaint to reiterating that certain risk disclosures relating to the issues discussed in subsections 1-5 were themselves misleading because they warned of risks that had already transpired. Each of these four "boilerplate" risk disclosures was addressed in the corresponding subsection above. Accordingly, this claim warrants no further discussion.

**7. Requirement that Plaintiffs Plead Reliance With Respect to the Purchase of Certain Notes**

The Securities Act provides that a when an investor purchases a security

> after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement, then the right of recovery under this subsection shall be conditioned on proof that such person acquired the security relying upon such untrue statement in the registration statement or relying upon the registration statement and not knowing of such omission.

15 U.S.C. § 77k(a); *Rosenzweig*, 332 F.3d at 873. A plaintiff may establish reliance without proving that he read the registration statement, however. *Id.* Additionally, if an efficient market exists for the securities in question, "courts may presume that investors who traded securities in that market relied on public, material misrepresentations regarding those securities." *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 133 S. Ct. 1184, 1192-93, 1198 (2013).

Defendants point out that Named Plaintiff Firefighters and other putative class members purchased Notes after ATP's 2011 Form 10-K was released on March 15, 2012. Accordingly, they argue, it was required—and failed—to plead reliance on the alleged misstatements and omissions in the Registration Statement. The Registration Statement indicated that there was no active trading market for the Notes as of the Effective Date and that ATP did not plan to list them on any securities exchange.[93] As a result,

---

[93] R. Doc. 137-5 at 1.

defendants conclude that there was still no active trading market as of March 15, 2012, meaning that plaintiffs could not rely on the efficiency of the market to establish reliance.

Confusingly, defendants' argument addresses perceived deficiencies in Firefighters' *original* complaint, which was superceded by Lead Plaintiff Plumbers' Amended Complaint even before the filing of defendants' motions to dismiss. As the author of the Amended Complaint, Lead Plaintiff Plumbers contends that it "acquired Notes **before** March 15, 2012" and therefore is not required to plead reliance.[94] A review of Plumbers' schedule of securities transactions provided in support of its motion for appointment as lead plaintiff reveals that each of the listed purchases did, in fact, occur before March 2012.[95] Accordingly, Plumbers need not plead reliance as to their Notes.

Certain class members, including Named Plaintiff Firefighters, appear to have purchased Notes after March 15, 2012. This fact may prove problematic at the class certification stage, but it serves as no basis for dismissal.

**B.  Plaintiff's Section 12 Claim**

----

[94] R. Doc. 172 at 52 (emphasis in original).

[95] R. Doc. 29-4 at 5 (listing the date of Plumbers' Note purchases).

Section 12 of the Securities Act permits a purchaser to rescind a securities sale, whether or not the security is registered, if it is sold by means of a prospectus containing a material misstatement or omission. *See* 15 U.S.C. § 77l. The purchaser may recover against the immediate seller only. 15 U.S.C. § 77l (a)(2); *Rosenzweig*, 332 F.3d at 861. Plaintiff relies on the same alleged misstatements and omissions for both their Section 11 and Section 12 claims. Accordingly, this claim survives only to the extent that plaintiff's Section 11 claim survives. Because the Section 12 claim is derivative of plaintiff's Section 11 claim, and because the Court is allowing plaintiff to re-plead certain portions of the Section 11 claim, defendants' argument in favor of dismissing the Section 12 claim merits discussion. The Court concludes that plaintiff has failed to state a claim that defendants violated Section 12 of the Act.

The Supreme Court has interpreted the statute's reference to the "seller" of the security to mean either an "owner who passed title, or other interests in the security, to the buyer for value," or a person who "successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter v. Dahl*, 486 U.S. 622, 647 (1988).

Plaintiff does not argue that the individual defendants passed title to the buyers. Moreover, the Exchange expired on January 28,

2011, meaning any Notes purchased after that date would have been acquired on the secondary market. All of Lead Plaintiff's notes were purchased on or after that date.

Citing a number of district court opinions from outside this circuit, plaintiff argues that merely signing the Registration Statement qualifies as "solicitation" sufficient to render the defendants sellers under Section 12. Plaintiff further argues that defendants' role in the Exchange went beyond merely signing the document, as they were obligated by the terms of the Registration Statement to use their "commercially reasonable efforts to file the registration statement" and make it effective, as well as to "cause the Exchange Offer to be consummated."[96]

These arguments ignore Fifth Circuit precedent that clearly requires more. In *Rosenzweig*, the Court expressly rejected the argument that signing the Registration Statement suffices for solicitation. 332 F.3d at 871. "To count as 'solicitation,' the seller must, at a minimum, directly communicate with the buyer." *Id.* (citing *Craftmatic Sec. Litigation v. Kraftsow*, 890 F.2d 628, 636 (3d Cir. 1989) ("The purchaser must demonstrate direct and active participation in the solicitation of the immediate sale to hold the issuer liable as a § 12[(a)](2) seller.") (alteration added)). Because plaintiff failed to allege that the individual defendants "assumed the 'unusual' role of becoming a 'vendor's

---

[96] R. Doc 172 at 55-56.

agent,' or otherwise actively solicited the plaintiffs to purchase," the Court affirmed dismissal of the claim. *Id.* (citing *Lone Star Ladies Inv. Club v. Schlotzsky's, Inc.*, 238 F.3d 363 (5th Cir. 2001)). *See also Pinter*, 486 U.S. at 650 n.26 (distinguishing Section 11(a), which "explicitly enumerates the various categories of persons involved in the registration process who are subject to suit," including every person who signed the registration statement, from Section 12(a), which contains no such provisions).

Plaintiff seeks to distinguish *Rosenzweig* and *Lone Star Ladies* on the ground that they involved firm commitment underwritings. This is a distinction without a difference, because the existence of a firm commitment underwriting affects only whether the issuer must have engaged in solicitation to be held liable under Section 12. It does not affect the standard for what actually qualifies as solicitation. *See In re Harmonic, Inc., Sec. Litig.*, No. 00-2287, 2006 WL 3591148, at *14 (N.D. Cal. Dec. 11, 2006) ("[T]his distinction affects only who passes title, and does not determine what constitutes 'solicitation.'"). And in this case, because all of Lead Plaintiff's Notes were acquired from third-party vendors and not from defendants, it is undisputed that defendants must have solicited the purchase of the Notes to be liable. Accordingly, plaintiff's failure to allege that defendants did anything other than sign the Registration Statement and cause it to become effective forecloses their Section 12 claim.

## C. Plaintiff's Section 15 Claim

Section 15 imposes joint and several liability on defendants who are control persons liable under Sections 11 and 12. 15 U.S.C. § 77o; *Rosenzweig*, 332 F.3d at 862. Accordingly, the two components of Section 15 liability are an underlying violation of Sections 11 or 12 and "control person" status. As a result, liability under Section 15 is limited to the extent that plaintiff's Section 11 claim survives.[97]

Only the Director Defendants dispute their status as control persons. For the purposes of the securities laws, "control" means "possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405; *Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1990). In the Fifth Circuit,

> a plaintiff may assert control-person liability by alleging either that the control person had the power to control the controlled person or to influence corporate policy; actual exercise of control and/or participation in a violation of § 11 need not be alleged.

*In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 877 (S.D. Tex. 2004) (citing *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945,

---

[97] Again, the Court addresses the sufficiency of plaintiff's Section 15 claim because plaintiff will be permitted to amend the complaint and re-plead portions of its Section 11 claim.

957-958 (5th Cir. 1981), and *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 619-620 (5th Cir. 1993)).

Here, plaintiff alleges that defendants,

> as members of ATP's Board of Directors, had the authority to, *inter alia*: adopt resolutions; declare and pay dividends to owners of ATP common stock; adopt, amend and repeal ATP's bylaws; and establish committees of the board of directors and appoint members thereto. The Individual Defendants also held considerable amounts of ATP's common stock, . . . .[98]

While director status alone will not subject a defendant to liability under § 15, "influence over the direction of the company will." *In re Dynegy*, 339 F. Supp. 2d at 877 (citing *Dennis*, 918 F.2d at 509-510). The ability to adopt bylaws and the ownership of substantial voting shares certainly would permit an individual to influence a company's policies. Accordingly, plaintiffs have alleged control person liability as to both the Officer and Director Defendants.

## IV.  CONCLUSION

For the foregoing reasons, the Court GRANTS defendants' motion and DISMISSES plaintiff's claims. The following Section 11 claims are dismissed WITH PREJUDICE: (1) that the defendants violated Item 303 by failing to disclose the alleged problems at the Atwater well; (2) that the proved oil and gas reserves as reported by ATP were false and misleading; (3) that ATP's forecast of "a

---

[98] R. Doc. 75 at 26.

substantial increase in production over the next year as development wells are brought to production" was false or misleading because defendants failed to disclose the alleged problems at Atwater; (4) that defendants failed to disclose that ATP was in violation of its credit and debt agreements due to "disguised financings" with various entities; (5) that defendants failed to disclose that ATP was operating in violation of U.S. environmental laws; and (6) that the boilerplate "risk disclosures" utilized in the Registration Statement were themselves misleading. The Court also dismisses plaintiff's Section 12 claim WITH PREJUDICE. The following claims are dismissed WITHOUT PREJUDICE: (1) that the defendants violated Item 303 by failing to disclose that ATP did not have the liquidity and revenue to survive the moratoria; and (2) that ATP's forecast of "a substantial increase in production over the next year as development wells are brought to production" was false or misleading because defendants knew that ATP lacked the liquidity and revenues to survive the moratoria. The Court also dismisses plaintiff's Section 15 claim WITHOUT PREJUDICE. Although plaintiff adequately pleaded control person status, the claim is entirely derivative of plaintiff's Section 11 claim. Accordingly, dismissal is required, but plaintiff may revive the claim if it chooses to amend.

To the extent the Court has granted leave to amend, the amended complaint must be filed within 21 days of the entry of this order.

New Orleans, Louisiana, this __26th__ day of September, 2014.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE