UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FIREFIGHTERS PENSION & RELIEF                CIVIL ACTION
FUND OF THE CITY OF NEW
ORLEANS, Individually and on
Behalf of All Others Similarly
Situated

VERSUS                                       NO: 13-3935, c/w
                                             13-6083, 13-6084,
                                             13-6233

T. PAUL BULMAHN, ET AL.                      SECTION: R


                        **ORDER AND REASONS**

     This case is a securities class action brought on behalf of
all persons who purchased the common stock of ATP Oil & Gas
Corporation in the public market during the period December 16,
2010 through ATP's bankruptcy filing on August 17, 2012. Because
it is in bankruptcy proceedings, ATP is not named as a defendant
in this action. Instead, court-appointed Lead Plaintiffs Brian M.
Neiman, William R. Kruse, and the Moshe Issac Foundation ("Lead
Plaintiffs"), individually and on behalf of the class, are suing
ATP's senior executives, alleging violations of Sections 10(b)
and 20(a) of the Securities Exchange Act of 1934, as well as SEC
Rule 10b-5 promulgated thereunder. Defendants T. Paul Buhlman,
Albert L. Reese, Jr., Keith R. Godwin, and Leland E. Tate filed a
motion to dismiss plaintiffs' Consolidated Class Action Complaint
for failure to state a claim on March 27, 2014.[1] For the reasons
that follow, the Court grants the motion with leave to amend.

_____

     [1] R. Doc. 180.

**I.   BACKGROUND**

Before filing for bankruptcy in 2012, ATP engaged in the acquisition, development, and production of oil and natural gas properties.[2] The company acquired and developed properties with proven undeveloped reserves in the Gulf of Mexico and the North Sea, but the majority of the company's business was in the Gulf of Mexico.[3] As of December 31, 2009, ATP had leasehold and other interests in 62 offshore blocks and 104 wells in the Gulf of Mexico, of which ATP was then operating a total of 93.[4] As of March 16, 2010, ATP owned an interest in 36 oil platforms, including two floating production facilities: the *ATP Innovator*, located in the Gulf of Mexico at the company's Gomez Hub, and the *ATP Titan*, also in the Gulf of Mexico at ATP's Telemark Hub.[5] When ATP filed for bankruptcy, construction on a third floating production facility, the Octabuoy, was underway in China for initial deployment at the company's Cheviot Hub in the North Sea.[6] ATP described its floating production facilities as "fundamental to [its] hub strategy and business plan."[7]

---

[2] R. Doc. 173 at 16.

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] *Id.* at 16-17.

[7] *Id.* at 17.

2

On April 19, 2010, ATP raised $1.5 billion by selling unregistered private notes to institutional investors in a transaction exempt from the registration requirements under the Securities Act.[8] On April 20, 2010, the day following the private note offering, the drilling rig Deepwater Horizon exploded and sank in the Gulf of Mexico, fracturing the well's pipe and creating "the largest oil spill in the history of the Gulf of Mexico."[9] In response, the U.S. Department of the Interior issued two moratoria that halted all drilling at depths greater than 500 feet between May 6, 2010 and October 12, 2010.[10] Although the moratoria were eventually lifted, the government instituted new rules and regulations that conditioned the issuance of drilling permits on additional testing, training, and compliance with new safety requirements.[11] The Minerals Management Service did not issue any drilling permits until February 2011, prompting members of the oil and gas industry to refer to this period of permitting delays as the "de facto moratorium."[12] ATP did not receive its first permit after the moratoria until March 18, 2011. Together, these three moratoria halted all of ATP's exploration and development operations in the Gulf of Mexico through early

---

[8] *Id.* at 35; Prospectus, R. Doc. 180-5 at 1.

[9] R. Doc. 173 at 18.

[10] *Id.*

[11] *Id.*; R. Doc. 180-5 at 2.

[12] R. Doc. 173 at 18-19.

2011.[13] The delay resulted in tens of millions of dollars in interruption and standby costs for ATP, while at the same time delaying anticipated revenues from the wells ATP had planned to complete and bring on line for production.[14] ATP had spent in excess of $1 billion in infrastructure construction and other capital expenditures related to five such wells.[15]

Between April and December 2011, ATP issued three press releases announcing the drilling and completion of two wells at Green Canyon ("GC") Block 300 ("Clipper") in the deepwater Gulf of Mexico.[16] Upon completion of the "Clipper Project," ATP announced in its December 12, 2011 press release that tests of the two wells revealed that they were capable of producing 22,000 barrels oil equivalent ("Boe"), per day.[17] Each of these press releases was signed by Bulmahn and Reese.

In order to monetize the value in those reserves, ATP needed to build a pipeline from the Clipper wells to the nearest production platform, which was 16 miles away. The December press release stated that ATP expected to complete the pipeline in the third quarter of 2012.[18]

---

[13] *Id.* at 18-22.

[14] *Id.* at 20-22.

[15] *Id.* at 22.

[16] *Id.* 22-23; press releases dated April 7, 2011, August 7, 2011, and December 12, 2011.

[17] *Id.* at 23.

[18] *Id.*

On or about October 12, 2010, ATP filed a Registration Statement and Prospectus with the Securities and Exchange Commission ("SEC"), indicating its intent to exchange the $1.5 billion in unregistered private notes for equivalent registered notes.[19] Defendants Bulmahn, Reese, and Godwin signed the Registration Statement. Following a December 14, 2010 amendment, the Registration Statement was declared effective by the SEC, and the Exchange was effected on December 16, 2010.[20]

The Prospectus[21] contained a section titled "Risks Related to Our Business," which provided a detailed account of the Deepwater Horizon explosion and the resulting moratoria. It also described the new regulatory requirements for obtaining drilling permits. It cautioned that "[t]he U.S. governmental and regulatory response to the Deepwater Horizon drilling rig accident and resulting oil spill could have a prolonged and material adverse impact on our Gulf of Mexico operations." It also indicated that "[a]lthough Moratorium II has been lifted, we cannot predict with certainty when permits will be granted under the new requirements." As discussed in further detail below, the Prospectus went on to provide a lengthy explanation of these risks. Importantly, it contained the following warning:

---

[19] *Id.* at 33; R. Doc. 180-5 at 1.

[20] R. Doc. 173 at 33.

[21] For all practical purposes, the Registration Statement and Prospectus contain the same information and are interchangeable.

5

> *New regulations already issued will,* and potential future regulations or additional statutory limitations, if enacted or issued, could, *require a change in the way we conduct our business, increase our costs of doing business or ultimately prohibit us from drilling for or producing hydrocarbons in the Gulf of Mexico. . . .*[22]

On August 24, 2011, ATP issued a press release announcing the first production from Mississippi Canyon ("MC") Block 941 #4 (also referred to as MC Block 941 A-2) in the deepwater Gulf of Mexico.[23] The #4 well was one of three wells brought on production at the Telemark Hub location utilizing the ATP Titan floating platform. The press release was signed by defendants Bulmahn and Reese and indicated that

> [t]he well delivered on ATP's original expectations with an initial rate exceeding 7,000 Boe per day. . . . Company-wide production now exceeds 31,000 Boe per day. . . . We have finally realized the planned material production revenue of this well that has been much anticipated for 16 months. . . . The greater-than-a-billion-dollar investment at Telemark reflects ATP's continuing commitment to develop America's energy resources."[24]

On September 26, 2011, Moody's published a report stating that ATP had a "high likelihood" of restructuring.[25] Bloomberg News reported on the Moody's analysis on September 29, 2011 in an article titled "ATP $1.5 Billion of Debt Falls to Yield 23.4%, Trace Data Show":

---

[22] R. Doc. 180-3 at 3 (emphasis added).

[23] R. Doc. 173 at 25.

[24] *Id.*

[25] *Id.* at 26.

ATP shows a "high likelihood" it may face some type of restructuring, analysts from Moody's Investors Service wrote in a Sept. 26 report. The company's asset base and cash flows are "not sufficient to cover" the second-lien notes, according to the report. Moody's assigns a Caa2 grade to ATP with a "negative" outlook.[26]

The same day, Bloomberg News also published defendant Reese's response in an article titled "ATP Says New Gulf of Mexico Oil Wells to Stave Off Default."[27] The article stated in part:

ATP Oil & Gas, one of the first oil explorers allowed to resume drilling in the U.S. Gulf of Mexico after the Deepwater Horizon disaster, expects to pump enough oil from new wells during the next three years to avoid defaulting on $1.5 billion in debt.

Moody's Investors Service this week said ATP shows a "high likelihood" it may have to restructure its debt because its cash flow and asset base are insufficient to cover notes maturing in 2015. The company's $1.79 billion in net debt exceeds that of 97% of Houston-based ATP's U.S. peers, according to data compiled by Bloomberg.

ATP expects to begin production from new wells at its Telemark field this year, followed by additional output at the Clipper and Gomez projects in 2012, Entrada in 2013 and Cheviot a year later, said Albert L. Reese, ATP's chief financial officer. All of those fields are in the Gulf of Mexico, except Cheviot, which is in the U.K.

"All of that is before the bonds come due in 2015, so I don't know what Moody's is talking about," Reese said today in a telephone interview. "I can't fight rumors or reports, all I can do is continue to deliver on the promises we've made. Our expectation is that everything is going to be fine."[28]

---

[26] *Id.*

[27] *Id.*

[28] *Id.*

Lead Plaintiffs allege that contrary to Reese's words of assurance, "everything was not fine." According to data available on the Bureau of Ocean Energy Management's website, MC Block 941, which already contained two producing wells, produced an average of 9,379 Boe per day in July 2011, the last full month before ATP announced its first production from Well #4.[29] In September 2011, the first full month after Well #4's first production, Block 941 produced an average of 12,117 Boe per day. Plaintiffs reason that if, consistent with the initial production rate, Well #4 had continued to produce 7,000 Boe per day, Block 941's overall daily production in September should have been 16,692 Boe per day.[30] Plaintiffs apparently assume that production from the two other wells at Block 941 remained constant, so that Well #4 must have been producing no more than an average of 2,738 Boe per day when Reese gave his interview to Bloomberg in September–approximately 61% less than the 7,000 Boe initially announced by ATP.[31]

On November 8, 2011, ATP issued a press release announcing its Third Quarter 2011 Results, in which it disclosed that overall oil and gas production for the period was only 24,200 Boe per day, in contrast to the 31,000 per day that was announced in August.[32] The following day, ATP held its third quarter earnings

---

[29] *Id.* at 27-28.

[30] *Id.* at 28.

[31] *Id.*

[32] *Id.* at 29.

conference call. During the call, defendant Tate disclosed that
although Well #4 had initially tested at 7,000 Boe per day,
issues with wellbore drawdown were negatively affecting the
well's completion efficiency, causing the well to produce only
about 3,500 Boe per day "on a routine basis." Although Tate
believed that ATP could bring production at Well #4 back up "a
little bit," he did not anticipate that the well would return to
producing 7,000 Boe per day.[33]

Also on November 9, 2011, J.P. Morgan published a report
expressing concern about ATP's third quarter performance, which
read in part:

> Given that company-wide production before the third Telemark
> well was 24-25 Mboepd and that 3Q11 production averaged only
> 24.2 Mboepd, it appears that ATPG experienced a problem with
> one or more of its wells. Although the August 24 31+ Mboepd
> figure likely was a spot rate, overall 3Q11 production still
> appears low, in our opinion. The lack of production details in
> the ops update and today's earnings release gives us concern
> about the performance at Gomez and/or Telemark.[34]

Following these disclosures regarding ATP's production rates,
ATP's common stock fell to $8.45 per share on November 9, 2011, a
drop of $2.05 from the previous day's closing price and $2.50
from its November 9 intra-day high. On November 10, the stock
continued to fall, closing at $7.25 per share.[35]

---

[33] *Id.* at 30.

[34] *Id.* at 31.

[35] *Id.*

In addition to the decline in value of ATP's common stock, plaintiffs allege that the lower production from Well #4 cost ATP crucial revenue that it needed to complete the pipeline to the Clipper wells—approximately $20.5 million in September and October 2011 by plaintiffs' calculations.[36] Plaintiffs further allege that the lower production at Telemark created even more financial problems for ATP, because the company would need to shut the wells down to repair them in order to increase production. When ATP filed for bankruptcy in August 2012, Reese indicated that "declining production" was one of the reasons ATP could not survive the moratoria, putting ATP "in the untenable position of running out of cash before it could complete the Clipper Wells project and generate the revenues necessary to begin remedying the situation."[37]

On June 1, 2012, ATP issued a press release announcing that Matt McCarroll had joined ATP as its new Chief Executive Officer and that he had demonstrated his commitment to the company by purchasing one million shares of its common stock at market price.[38] Bulmahn was to continue to serve as Chairman of the Board of Directors, as well as in the newly created position of Executive Chairman of ATP. Six days later, however, McCarroll

---

[36] *Id.* at 31-32.

[37] *Id.* at 32.

[38] *Id.*

resigned his position and rescinded his stock purchase. In a June 7, press release, ATP cited a failure "to reach a mutually agreeable employment agreement" as the reason for McCarroll's departure.[39] Defendants Bulmahn and Reese were listed as the contact persons on both press releases, and Reese signed the Form 8-K to which each press release was attached.

Reese testified at ATP's bankruptcy hearing that ATP pursued numerous avenues of potential financing in order to improve the company's liquidity, including sales of assets, taking on partners, the sale of overriding royalty interests ["ORRIs"] and net profit interests ["NPIs"], equity raises, and borrowing against its equity positions in the ATP Titan and the ATP Innovator.[40] Despite incurring additional debt obligations, including an increase in its first lien credit facility by $150 million and the sale of $185 million in ORRIs in the first quarter of 2012, ATP ultimately succumbed to the liquidity constraints caused by the moratoria and the company's production problems. The company's cash position deteriorated from $224 million at the end of the first quarter of 2012 to between $25 and $30 million by the end of the second quarter.[41] Reese later

---

[39] *Id.* at 33.

[40] *Id.* at 39.

[41] *Id.*

said that "[p]rior to the [bankruptcy] filing, we did not have the ability to go borrow more money or encumber the assets."[42]

Plaintiffs allege that ATP's stock "plummeted" from $1.49 to a closing price of $0.36 on August 10, 2012 "amid reports that the Company may file for bankruptcy."[43] ATP filed for Chapter 11 Bankruptcy on August 17, 2012, reporting total debts of $3.49 billion and assets of $3.64 billion.[44] ATP issued a press release announcing the bankruptcy filing, in which it indicated its intent to continue operating during its financial restructuring using $618 million in debtor-in-possession funding. The press release stated in part:

> The primary reason for the reorganization began with the Macondo well blowout in April 2010 and the imposition beginning in May 2010 of the moratoria on drilling and related activities in the Gulf of Mexico. These events prevented ATP from bringing to production in 2010 and in early 2011 six development wells that would have added significant production to ATP. As of the date of this filing, three of these wells are yet to be drilled. Had ATP been allowed to drill and complete these wells ATP believes it would have provided a material production change in 2010 continuing to today. This projected increase in production should have substantially increased cash flows, shareholder value and allowed the company the ability to withstand normal operational issues experienced by owners of oil and gas properties in the Gulf of Mexico. In addition, these incremental cash flows would have mitigated or prevented the need to enter into many of the financings ATP has closed since the imposition of the moratoria-financings that require relatively high rates of return and monthly payments.[45]

---

[42] *Id.* at 39.

[43] *Id.* at 52.

[44] *Id.* at 52.

[45] *Id.* at 52-53.

On August 20, 2012, the next trading day, ATP's common stock price fell $0.1593 per share to close at $0.30 per share.[46]

In a declaration filed in the bankruptcy action, Reese summarized the adverse impact of the moratoria on ATP's business operations, describing the Deepwater Horizon explosion and oil spill as the "primary reason" for the company's ultimate failure:

ATP finds itself with over $2 billion of indebtedness and less than $10 million in cash as of the Petition Date. . . . The delay on operations and the increasingly uncertain regulatory environment adversely affected ATP's operations and planned development that was necessary to service its additional debt. Despite statements that the moratoria had been lifted at various points in time, the government did not issue new deepwater drilling permits until February 28, 2011, thus effectively extending the moratorium. As a result, ATP was unable, despite access to funds, to drill and bring on-line six new wells during 2010 and 2011. In addition to the high costs of interrupted and discontinued drilling operations in deepwater, ATP continued to incur construction costs on the Octabuoy, its newest deepwater production platform, as a discontinuation of work of the platform would have led to significant escalation in cost-to-completion once work resumed. Moreover, as access to deepwater rigs became limited, ATP also experienced higher than expected costs in preserving its access to equipment during the moratoria.

During 2010 and 2011, ATP had commenced and was in the process of drilling and completing six wells in its program, all of which were disrupted by the moratoria . . . . When the moratorium was effectively lifted in March 2011, ATP received permits and attempted to generate production from these projects as quickly as possible. By February 2012, ATP was able to complete the Mississippi Canyon 941 A-1, A-2, and Mississippi Canyon 942 A-3 wells in its Telemark field and connect them to the ATP Titan. To date, because of liquidity constraints, ATP has not been able to return to drill the Mississippi Canyon 305 well, which is on a very large dry gas reservoir producing through the Canyon Express pipeline

---

[46] *Id.* at 53.

system, or either of the Gomez #9 and #10 wells, both of which would have tied in to the ATP Innovator. . . .

Overall, ATP's inability to complete various wells or commence pipeline construction when planned due to the shutdown in the Gulf created significant liquidity problems, which were exacerbated by less than expected production rates at ATP's Telemark Hub and cost overruns on the Octabuoy. ATP's management, with the assistance of various outside professionals, closely monitored these challenging conditions and evaluated potential alternatives to improve ATP's liquidity position. . . .

Despite ATP's best efforts, it was unable to overcome the impact of the moratoria when ongoing project construction costs, declining oil prices and less than anticipated production put it in the untenable position of running out of cash before it could complete the Clipper Wells project and generate the revenues necessary to begin remedying its situation. In the period leading up to the Petition Date, ATP found itself facing a severe liquidity crisis, with a cash position of less than $10 million and a substantial backlog of trade payables and amounts due under overriding royalties and net profit interests totaling, the aggregate, over $70 million,[47] along with substantial payments due on the Second Lien Notes later this fall. ATP's inability to make current payments on many of its obligations have resulted in a number of notices of default and lawsuits from its creditors, with some seeking prejudgment relief (such as temporary restraining orders or writs of sequestration) that could further restrict the Company's short-term cash flow and liquidity.[48]

When asked at the First Day Hearings whether "ATP [had] the liquidity and revenues at that time to absorb a lengthy moratorium," Reese responded "No. We could not."

Testimony at the First Day Hearings further revealed that ATP had retained Mayer Brown LLP to advise the company on a

---

[47] According to plaintiffs, Reese clarified at the First Day Hearing on August 21, 2012 that this number was actually $170 million.

[48] R. Doc. 173 at 36-37.

potential bankruptcy no later than the last week of June 2012, and it hired Jefferies & Co. "in the middle of July" 2012 for the purpose of "addressing and considering DIP [debtor in possession] financing."[49]

As the bankruptcy action has progressed, legal proceedings both inside and outside the bankruptcy reveal numerous creditors seeking remedies against ATP for unpaid obligations. Plaintiffs' Consolidated Class Action Complaint lists 21 different vendors and service providers that have sued ATP for unpaid invoices dating back as far as 2007 and totaling more than $63.3 million.[50] In the majority of these lawsuits, however, the goods and services for which ATP failed to pay do not predate early 2012. Moreover, plaintiffs allege that ATP had to renegotiate payment schedules to some of its vendors,[51] and the complaint fails to indicate whether payments to these 21 vendors actually were overdue at the time ATP filed for bankruptcy, or whether they were among the payments ATP was able to renegotiate.

Additionally, both before and during the class period, ATP sold ORRIs and NPIs to various investors and vendors. Under the terms of these agreements, ATP was obligated to pay a portion of its oil revenues to the interest holders within 30 days of

---

[49] *Id.* at 38.

[50] *Id.* at 40-45.

[51] *Id.* at 46.

receiving them.[52] Plaintiffs allege that ATP's management began withholding payments from some of the interest holders in order to preserve cash. At the bankruptcy hearing, Reese testified that he, Bulmahn, Tate, and Godwin collectively would have made the decision not to distribute these funds.[53] Plaintiffs allege that ATP failed to make approximately $23.2 million in ORRI and NPI payments to five interest holders between April and August 2012.[54]

On April 20, 2013, ATP filed a lawsuit against the Department of the Interior.[55] The allegations shed additional light on the moratoria's effects on ATP's operations:

> The Oil Spill and its devastating effects had real and lasting significance in the way ATP plans and conducts business. . . . [T]he direct and consequential damages flowing from the spill forced the Company into a Chapter 11 Bankruptcy. This is a monumental change of fortune for a company that in the days leading up to the spill was recognized in the financial bond markets as a company on the rise that was well-positioned for a strong 2010 and 2011. Instead, as a result of the spill, ATP's projected revenue streams for these years were deferred and certain revenue streams were lost entirely. While ATP's actual and projected cash flow was significantly impacted by the spill, ATP's obligations and expenses were not similarly constrained. . . . The oil spill and the aftermath of the spill impacted ATP's development and implementation of numerous oil and gas production projects, as well as devastated its cash flow, credit rating, borrowing capacity, overall liquidity and caused other impacts.[56]

---

[52] *Id.* at 42.

[53] *Id.* at 49.

[54] *Id.* at 50-51.

[55] R. Doc. 173 at 22.

[56] *Id.* at 34-35.

On August 5, 2013, Brian Neiman filed a class action complaint in the Southern District of Texas asserting Section 10(b) violations against defendants. Shortly thereafter, Brian Stackhouse filed a similar complaint in the Southern District of Texas. In addition, Thomas Mansfield filed a Section 10(b) class action complaint against defendants in the Eastern District of Louisiana. The actions were transferred to the Eastern District of Louisiana and consolidated,[57] and the Court appointed Neiman, Kruse, and the Moshe Issac Foundation as Lead Plaintiffs.[58] Lead Plaintiffs filed this Consolidated Class Action Complaint on February 18, 2014, in which they identify 27 different statements that they allege were false or misleading for failure to disclose ATP's well performance issues and liquidity problems.[59] Specifically, plaintiffs allege that defendants:

(a) failed to disclose the effects of the moratoria on ATP in the Registration Statement and the company's Forms 10-K and 10-Q, in violation of Item 303(a) of Regulation S-K;

(b) failed to disclose at the September 12, 2011 Rodman Renshaw Global Investment Conference and in Reese's September 29, 2011 interview with Bloomberg News that Well 941 #4 was no longer producing the announced 7,000 Boe per day;

(c) misleadingly projected that ATP would complete the Clipper Wells pipeline in the third quarter of 2012 and touted the wells' plentiful reserves despite knowing that ATP lacked the funds to complete the pipeline project;

---

[57] R. Docs. 77, 78, 105.

[58] R. Doc. 129.

[59] R. Doc. 173.

(d) falsely stated in various SEC filings, earnings calls and conferences that ATP's liquidity was "strong" and "sound" and that the company was not at risk of bankruptcy, despite the fact that (1) Well 941 #4 was underperforming, (2) ATP lacked the funds to complete the Clipper pipeline in order to access the revenue stream it expected from the wells' production, and (3) ATP was running out of cash, forcing the company to negotiate delayed payments to certain vendors and to withhold ORRI and NPI payments from investors.[60]

Defendants moved to dismiss the complaint, asserting that plaintiffs' allegations fail to meet the heightened pleading requirements under the Private Securities Litigation Reform Act.[61]

## II.   STANDARD

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009).

---

[60] R. Doc. 184 at 5-12.

[61] R. Doc. 180-1.

A legally sufficient complaint need not contain detailed factual allegations, but it must go beyond labels, legal conclusions, or formulaic recitations of the elements of a cause of action. *Id.* In other words, the face of the complaint must contain enough factual matter to raise a reasonable expectation that discovery will reveal evidence of each element of the plaintiff's claim. *Lormand*, 565 F.3d at 257. If there are insufficient factual allegations to raise a right to relief above the speculative level, or if it is apparent from the face of the complaint that there is an insuperable bar to relief, the Court must dismiss the claim. *Twombly*, 550 U.S. at 555.

In reviewing a motion to dismiss, the Court is limited to the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which the Court may take judicial notice. *See Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011). In securities cases, courts may take judicial notice of the contents of public disclosure documents that are filed with the SEC as required by law; however, "these documents may be considered only for the purpose of determining what statements they contain, and not for proving the truth of their contents." *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 384-85 (S.D. Tex. 2011) (citing *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1018 & n.1 (5th Cir. 1996)).

III. DISCUSSION

A.    Section 10(b) Claim

To survive a motion for dismissal, plaintiffs must allege
facts entitling them to relief for their substantive cause of
action. Section 10(b) of the Securities Exchange Act of 1934
makes it unlawful for a person to:

> use or employ, in connection with the purchase or sale of any
> security . . . any manipulative or deceptive device or
> contrivance in contravention of such rules and regulations as
> the [Securities and Exchange] Commission may prescribe as
> necessary or appropriate in the public interest or for the
> protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5 makes it unlawful for any person,
directly or indirectly, to:

> make any untrue statement of material fact or to omit to state
> a material fact necessary in order to make the statements
> made, in the light of the circumstances under which they were
> made, not misleading . . . in connection with the purchase or
> sale of any security.

17 C.F.R. § 240.10b-5.

Accordingly, to state a claim under Section 10(b) and Rule
10b-5, a plaintiff must adequately allege, in connection with the
purchase or sale of securities, "(1) a misstatement or an
omission (2) of material fact (3) made with scienter (4) on which
plaintiff relied (5) that proximately caused [the plaintiff's]
injury." *Nathenson v. Zonagen Inc.,* 267 F.3d 400, 406-07 (5th
Cir. 2001) (citing *Tuchman v. DSC Commc'ns,* 14 F.3d 1061, 1067
(5th Cir. 1994)). "A 'material fact' is one which a reasonable
investor would consider significant in the decision whether to

20

invest, such that it alters the 'total mix' of information available about the proposed investment." *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1445 (5th Cir. 1993). A fact is not material if "a reasonable investor viewing the information in context would not have considered the investment significantly more risky as a result." *Id.* at 1446.

A plaintiff asserting a claim for securities fraud must also plead his claim in accordance with the particularity requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4. The relevant provision of the PSLRA provides:

> In any private action arising under this title in which the plaintiff alleges that the defendant
>
> (A) made an untrue statement of a material fact; or
>
> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
>
> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1). The Fifth Circuit has held that the PSLRA's pleading requirement "incorporates, at a minimum, the pleading standard for fraud actions under Federal Rule of Civil Procedure 9(b)." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005) (citing *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 865 (5th Cir. 2003)); *ABC Arbitrage Plaintiffs Group*

*v. Tchuruk,* 291 F.3d 336, 349–50 (5th Cir. 2002) ("[W]e have observed that '[t]he effect of the PSLRA in this respect is to *at a minimum,* incorporate the standard for pleading fraud under Fed.R.Civ.P. 9(b).'"(quoting *Nathenson,* 267 F.3d at 412)). To satisfy Rule 9(b), a plaintiff must specify each allegedly fraudulent statement, the speaker, when and where the statement was made and why the statement was false or misleading. *Fin. Acquisition Partners LP v. Blackwell,* 440 F.3d 278, 287 (5th Cir. 2006); *Plotkin,* 407 F.3d at 696. This heightened pleading standard serves an important screening function in securities fraud suits. It "provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims and then attempting to discover unknown wrongs." *Melder v. Morris,* 27 F.3d 1097, 1100 (5th Cir. 1994) (quoting *Tuchman,* 14 F.3d at 1067).

The scienter element of a Section 10(b) claim can be satisfied by establishing either intent to defraud or severe recklessness. *Fin. Acquisition Partners,* 440 F.3d at 287; *Nathenson,* 267 F.3d at 408. Severe recklessness, for purposes of Section 10(b)'s scienter element, is "'limited to those highly unreasonable omissions or representations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and

that present a danger of misleading buyers or sellers which is either known to the defendant or so obvious that the defendant must have been aware of it.'" *Nathenson,* 267 F.3d at 408 (quoting *Broad v. Rockwell,* 642 F.2d 929, 961-62 (5th Cir. 1981)).

The PSLRA also requires that a plaintiff "state with particularity facts giving rise to a strong inference" of scienter with respect to each allegedly false or misleading statement. 15 U.S.C. § 78u-4(b)(2). This requirement "alters the usual contours of a Rule 12(b)(6) ruling." *Lormand*, 565 F.3d at 239. Instead of drawing all reasonable inferences in the plaintiff's favor, the Court "must take into account plausible inferences opposing as well as supporting a strong inference of scienter." *Id.* This includes any "nonculpable explanations for the defendant's conduct." *Central Laborers' Pension Fund v. Integrated Elec. Servs., Inc.*, 497 F.3d 546, 551 (5th Cir. 2007). "The inference of scienter must ultimately be 'cogent and compelling,' not merely 'reasonable' or 'permissible,'" in light of other explanations. *Lormand*, 565 F.3d at 239; *see also Central Laborers*, 497 F.3d at 551. In other words, a reasonable person must find the inference of scienter to be "at least as compelling as any opposing inference one could draw from the facts alleged." *Central Laborers*, 497 F.3d at 551.

A plaintiff may satisfy the heightened pleading requirement by alleging facts showing a motive to commit fraud and a clear

opportunity to do so, or by identifying circumstances indicating conscious or reckless behavior by defendants, so long as the totality of allegations raises a strong inference of fraudulent intent. *See Tuchman,* 14 F.3d at 1068. Although the strong-inference pleading standard does not license courts to resolve disputed facts at the motion to dismiss stage, it does permit the Court to "engage in some weighing of the allegations to determine whether the inferences toward scienter are strong or weak." *Central Laborers*, 497 F.3d at 551 (quoting *Rosenzweig*, 332 F.3d at 867). When a complaint fails to plead scienter in conformity with the PSLRA, the Court must dismiss it.  15 U.S.C. § 78u-4(b)(3)(A).

### 1. Group Pleading

Defendants argue that plaintiffs improperly rely on the "group pleading doctrine." Under the group pleading doctrine, a plaintiff is permitted to rely on a presumption that certain public statements issued by a company are the collective work of a group of company insiders. The Fifth Circuit has described the group pleading doctrine as follows:

> Instead of being required to plead that a defendant actually made, authored or approved an offending statement in a corporate communication, the "group pleading" doctrine in its broadest form allows unattributed corporate statements to be charged to one or more individual defendants based solely on their corporate titles. Under this doctrine, the plaintiff need not allege any facts demonstrating an individual defendant's participation in the particular communication containing the misstatement or omission where the defendants are "insiders or affiliates" of the company. . . . Therefore,

24

the "group pleading" doctrine would allow the plaintiff to plead the first element of a section 10(b) case against an individual defendant without citing particular facts connecting the defendant to the alleged fraud.

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 363 (5th Cir. 2004) (internal citation omitted).

In *Southland,* the Fifth Circuit rejected the group pleading doctrine as inconsistent with the PSLRA's pleading and scienter requirements. *See id.* at 364. The Court concluded that, under the PSLRA, an unattributed corporate statement can be charged to an individual corporate officer only if "specific factual allegations link the individual to the statement at issue," such as "a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document, containing the statement." *Id.* at 365.

Plaintiffs respond by pointing out that they identified the speaker of every oral statement, the signatories to each relevant SEC filing and the listed contact persons for each press release. This information plainly suffices to attribute those statements to their respective authors. The Court does not, however, assign liability for those statements to defendants other than their authors, regardless of whether plaintiffs alleged that other defendants knew of the statement's falsity.

What defendants actually contest are plaintiffs' attempts to lump them together for the purposes of pleading scienter, often

basing allegations of knowledge on the defendants' high-level management positions.[62] In conjunction with other facts, an officer's position in the company may support an inference of scienter, but it is not enough standing alone. *See Ind. Elec. Workers' Pension Trust Fund v. Shaw Group, Inc.*, 537 F.3d 527, 535 (5th Cir. 2008) ("[T]his court's caselaw makes clear that "pleading[s] of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions with the company." (quoting *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002))).[63] Likewise,

---

[62] *See, e.g.*, R. Doc. 173 at 28 ("Defendants Bulmahn, Godwin and Tate, by virtue of their high level management positions, were also aware of the problems at the Telemark Hub and their effect on ATP's liquidity problems."); *id.* at 53 ("All the Defendants knew the false and misleading nature of the statements and omissions alleged herein, particularly by reason of their executive positions at ATP, and that the problems discussed herein would seriously impair ATP's business and financial condition and results.").

[63] The Fifth Circuit's recent decision in *Spitzberg v. Houston American Energy Corp.*, 758 F.3d 676, 685 n.13 (5th Cir. 2014), does not undermine this assertion. In *Spitzberg*, the plaintiffs alleged that by virtue of their positions at Houston American, two officer defendants either had actual knowledge of the falsity of their statements or acted with reckless disregard for the truth. *Id.* The panel agreed with the district court that, "due to the extremely small size of the company at issue," plaintiffs' reliance on the collective knowledge of the corporation's officers was permissible. *Id.* As the preceding district court opinion made clear, plaintiffs' allegations of scienter did not rest solely on the defendants' positions in the company. Rather, plaintiffs indicated that Houston American had only three employees, all of whom were officers, and the suit focused on alleged misstatements pertaining to "the first and only well that this small company, . . . was drilling at the time . . . ." *In re Houston American Energy Corp. Secs. Litig.*, 970 F. Supp. 2d 613, 653 (S.D. Tex. 2013), *reversed on other grounds by Spitzberg*, 758 F.3d at 676. All three officers sat on the two

plaintiffs' allegation that defendants had periodic meetings to discuss ATP's budget does not, without more, create an inference of scienter. *Cf. Southland*, 365 F.3d at 370-71 (noting that "[a]n unsupported general claim of the existence of company reports reflecting contrary information is insufficient to survive a motion to dismiss"); *Goldstein v. MCI WorldCom*, 340 F.3d 238, 253 (5th Cir. 2003) (allegations that defendants received daily, weekly, and monthly financial reports that apprised them of the company's true financial status were insufficient and overly general) (citing *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002)).

With this in mind, the Court will address the sufficiency of plaintiffs' scienter allegations as necessary below.

### 2. Allegations that Defendants Failed to Disclose the Effects of the Moratoria on ATP

---

committees tasked with drilling and producing the well. *Id.* Moreover, plaintiffs provided the statements of five confidential witnesses deeply involved with the project who indicated that the officers discussed the well's progress with other committee members "almost daily" and participated in a vote to sidetrack the well after it encountered problems. *Id.* "Thus," the district court reasoned, "an inference of scienter as to these two Individual Defendants could arise from the pleadings, based on specific information purportedly shared and argued about among the few committee members and testified to by the Confidential Witnesses, . . ." *Id.* at 654.

ATP, unlike Houston American, had approximately 60 employees during the relevant time period. Moreover, as discussed in further detail below, plaintiffs often rely exclusively on defendants' positions in the company to create an inference of collective scienter without discussing their individual involvement in the company's operations.

Item 303 of Regulation S-K requires the authors of certain corporate statements to disclose any known trends, events, or uncertainties that are (1) reasonably likely to result in a material increase or decrease in liquidity, or (2) reasonably expected to have a materially unfavorable impact on revenues or income from operations. 17 C.F.R. § 229.303. These disclosures must appear in the non-financial portions of registration statements and prospectuses, as well as in annual and quarterly reports filed on Forms 10-K and 10-Q, respectively, with the discussion to "focus specifically on material events and uncertainties known to management that would cause reported financial information not to necessarily be indicative of future operating results or of future financial condition." *Id.* § 229.303(a), Instruction 3. The duty arises only when the "trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 6835, Exchange Act Release No. 26,831, Investment Company Act Release No. 16,961, 43 SEC Docket 1330 (May 18, 1989).

Plaintiffs allege that defendants violated Item 303 by failing to disclose "the true extent of the affect [sic] the moratoria was having [sic] on ATP's revenues, cash flows, liquidity and operations and how it could reasonably be expected

to materially and adversely affect same in the future."[64] They allege that defendants failed to make these disclosures in the following documents: (1) the 2010 Registration Statement and Prospectus relating to the December 16, 2010 exchange offer; (2) ATP's 2010 Form 10-K; (3) ATP's 2011 Form 10-K; and (4) ATP's Forms 10-Q covering the first, second, and third quarters of 2011, as well as the first quarter of 2012.[65]

Because Item 303 creates an affirmative obligation to disclose certain information, liability under the provision is not tied to any particular statement contained in the relevant SEC filing; rather, liability exists when a defendant fails to disclose the information at issue. Though plaintiffs point to particular statements in these documents that they believe were misleading for reasons addressed elsewhere in the complaint, the allegations relating to Item 303 are scant. With respect to the Registration Statement and Prospectus, plaintiffs state only that defendants failed to disclose that, at the time the Registration Statement was declared effective, defendants "knew that ATP had inadequate liquidity and that their proposed drilling program

---

[64] R. Doc. 173 at 55.

[65] Defendant Tate did not sign any of these documents, so any alleged falsehoods contained within them may not be attributed to him. Bulmahn, Reese, and Godwin each signed the Prospectus and the Forms 10-K. Only Reese signed the Forms 10-Q, but both Bulmahn and Reese certified them pursuant to the Exchange Act and the Sarbanes-Oxley Act.

would not proceed in 2010."[66] In discussing the 2010 Form 10-K and the Forms 10-Q for the first, second, and third quarters of 2011, they stated only that ATP "failed to disclose . . . that the moratoria were having and could reasonably be expected to continue to have an 'especially profound' impact on ATP, severely impacting revenues and liquidity.[67]

As defendants point out, the very information that Plaintiffs claim is omitted was actually disclosed in the Company's SEC disclosures in plain English throughout the Class Period.  To the extent that the moratoria constituted a "known trend" that was reasonably likely to have a material impact on ATP's liquidity and revenues, ATP discussed the BP oil spill and resulting moratoria in great detail in the Prospectus.[68] Further, defendants dedicated a significant portion of the Prospectus to a discussion of the moratoria's impact on ATP's operations as well as their possible future effects. The Prospectus contained the following disclosures regarding the manner in which the moratoria were already affecting ATP's operations:

> We have ongoing and planned drilling operations in the deepwater Gulf of Mexico, some of which were permitted prior to April 20, 2010, and some of which are not yet permitted. Such permits, among other required approvals, are necessary prior to commencement of offshore drilling operations. Moratorium II has caused us to delay the third and fourth wells scheduled at our Telemark Hub and, even though

---

[66] R. Doc. 173 at 58.

[67] *Id.* at 63, 65, 71, 81.

[68] R. Doc. 180-3 at 1-2.

Moratorium II has been lifted, any delays in the resumption of the permitting process may result in delays in our drilling operations scheduled in 2011 at our Gomez Hub. During June 2010, we agreed to terminate a contract for services of a drilling rig as a result of Moratorium I. Under the termination agreement, we obtained a full release from our obligations under the contract and incurred net costs of $8.7 million reflected as contract termination costs on our September 30, 2010 statement of operations. . . .

The size of our operations and our capital expenditure budget limits the number of properties that we can develop in any given year. Complications in the development of any single major well or infrastructure installation may result in a material adverse effect on our financial condition and results of operations. For instance, production delays are occurring resulting from Moratorium I and Moratorium II as described above in the first risk factor under "Risks Related to Our Business."[69]

With respect to the moratoria's potential future impact on ATP's revenues and liquidity, the Prospectus contained the following warnings:

**The U.S. governmental and regulatory response to the Deepwater Horizon drilling rig accident and resulting oil spill could have a prolonged and material adverse impact on our Gulf of Mexico operations. . . .**

Although Moratorium II has been lifted, we cannot predict with certainty when permits will be granted under the new requirements. . . .

We project a substantial increase in production over the next year as development wells are brought to production. Absent alternative funding sources, achieving our projected production growth is necessary to provide the cash flow required to fund our capital plan and meet our existing obligations, both over the next twelve months and on a longer term basis. Our ability to execute our plan depends, in part, on our ability to continue drilling for and producing hydrocarbons in the Gulf of Mexico. Our plan is currently based upon obtaining necessary drilling permits, and successfully achieving commercial production from existing

---

[69] R. Doc. 133-2 at 8, 10.

wells presently scheduled to commence during the remainder of 2010 and 2011. Delays from difficulties receiving necessary permits, reduced access to equipment and services, or bad weather, could have a material adverse effect on our financial position, results of operations and cash flows. In addition to the risks associated with achieving our projected production growth, additional regulatory requirements and increased costs for which funding must be secured, or a negative change in commodity prices and operating cost levels, could also have a material adverse effect on our financial position, results of operations and cash flows. While we are pursuing various other sources of funding, there is no assurance that these alternative sources will be available should any of the above risks or uncertainties materialize.

**If we are not able to generate sufficient funds from our operations and other financing sources, we may not be able to finance our planned development activity, acquisitions or service our debt.**

We have historically needed and will continue to need substantial amounts of cash to fund our capital expenditure and working capital requirements. . . .

**Delays in the development of or production curtailment at our material properties including at our Telemark Hub may adversely affect our financial position and results of operations.**[70]

Importantly, the financial statements contained in the Prospectus revealed that ATP had suffered a net loss of roughly $121.4 million in the nine months ending September 30, 2010.[71] And finally, when referring to the new permitting regulations that caused the de facto moratorium, the Prospectus unequivocally stated:

New regulations already issued will . . . require a change in the way we conduct our business, increase our costs of

---

[70] *Id.* at 7-9 (emphasis in original).

[71] R. Doc. 137-5 at 42.

doing business or ultimately prohibit us from drilling for
or producing hydrocarbons in the Gulf of Mexico.[72]

The later filings repeated the information regarding the
Macondo explosion and moratoria. In addition, they updated
investors as the situation developed, discussing the costs ATP
incurred as a result of the delays as well as its financing
arrangements in order to preserve cash in the absence of a stable
revenue stream:

2010 10-K

- We have incurred substantial costs caused by the deepwater
  drilling moratoriums and subsequent drilling permit delays.
  For example, during 2010 a side-track well operation in
  7,000 feet of water was interrupted when Moratorium I was
  imposed and work on that project stopped, resulting in the
  early termination of a drilling contract. In the course of
  obtaining a full release from our obligations under the
  contract, we incurred net costs of $8.7 million, which are
  reflected as drilling interruption costs on our Consolidated
  Statements of Operations. Because the necessary drilling
  permits were not issued, drilling interruption costs also
  include $14.9 million of stand-by costs for a drilling rig
  and support operations at our Gomez Hub and Telemark Hub
  properties.

- Our cash flows were significantly negatively impacted by the
  drilling moratoriums, as we incurred the additional costs
  noted above and at the same time were unable to place on
  production three wells during 2010 that were originally part
  of the 2010 development program. We funded our 2010
  activities through a combination of new debt financings, the
  sale or conveyance of economic interests in selected
  properties and financing arrangements with our suppliers.

- During this period we financed significant portions of our
  development program with transactions entered into with our
  suppliers and their affiliates. We have conveyed to certain
  suppliers net profits interests in our Telemark Hub, Gomez
  Hub and Clipper oil and gas properties in exchange for
  development services. We have also negotiated with certain

---

[72] R. Doc. 133-2 at 8.

other vendors involved in the development of the Telemark Hub and Clipper to partially defer payments for a period of twelve months. . . . These types of financial arrangements preserve our current cash and allow us to pay from the proceeds of future production.

• Our 2011 development plans in the Gulf of Mexico, as well as our longer term business plan, are dependent on receiving approval for deepwater drilling and other permits submitted to the BOEM. . . . [T]here is no assurance that [the permits] will be received in time to benefit our 2011 results or that permits will be issued in the future.

2011 10-K

• Since May 2010 when the federal government imposed the first of a series of moratoriums on drilling in the Gulf of Mexico, we have faced unparalleled difficulties in obtaining permits to continue our development programs. Prior to the moratoriums, we anticipated developing and bringing to production three additional wells at our Telemark Hub and two additional wells at our Gomez Hub by the end of 2010. It has taken until the first quarter of 2012 for us to bring to production all of the three additional wells at the Telemark Hub and, during the third quarter of 2011, the two wells planned for the Gomez Hub were postponed to late 2012/early 2013 as the required permits had not yet been received.[73]

• The new wells placed on production have taken longer to complete and bring to production than originally planned and one of them has not produced at rates that were previously projected. In addition, we have incurred capital and operating costs higher than we expected primarily due to additional regulations imposed since the Deepwater Horizon incident and the requirement to perform sidetracks on two of the wells.

• Additional adverse regulatory responses could have a material adverse impact on our financial position, results of operation and cash flows.

• The year 2011 has been challenging for us. As we began 2011 the moratoriums on drilling in the Gulf of Mexico had been lifted but there had been no permits issued for new

---

[73] ATP's 2011 Third Quarter 10-Q also disclosed this information, except that at that time, only two of the three Telemark wells had been brought to production.

deepwater drilling to any company. We had two wells out of a scheduled four wells producing at our Telemark Hub and the prospects of receiving permits for the next two wells was uncertain. The drilling of two additional wells at our Gomez Hub had been deferred to future periods because of the moratoriums. Clearly, the moratoriums had impacted us.

• [W]e have been and continue to be negatively impacted by the drilling moratoriums. New rules and regulations have made it more expensive than in the past for certain development operations. Acquisition of leases has become more expensive. The permitting process and the subsequent drilling now take longer. While greater certainty is present as we enter 2012 than when we entered 2011, that certainty includes longer permitting times, more rules and regulations and higher costs.

<u>1st Quarter 2012 10-Q</u>

• Since May 2010 when the federal government imposed the first of a series of moratoriums on drilling in the Gulf of Mexico, we have faced unprecedented difficulties in obtaining permits to continue our development programs. Prior to the moratoriums, we anticipated developing and bringing to production three additional wells at our Telemark Hub and two additional wells at our Gomez Hub by the end of 2010.  Because of the moratoriums and permitting delays, it has taken until the first quarter of 2012 for us to bring to production the three additional wells at the Telemark Hub and the two wells planned for the Gomez Hub have been postponed.  The new Telemark wells have taken longer to complete and bring to production than originally planned and one of them has not produced at rates that were previously projected.  We are currently recompleting this well in hopes of bringing on new sand and increasing production; however, this operation which in mid-March had been expected to be completed in the first quarter of 2012 has encountered downhole difficulties and is now expected to be completed in the second quarter of 2012.  In addition, we have incurred capital and operating costs higher than we expected primarily due to additional regulations imposed since the Deepwater Horizon incident and the requirements to perform sidetracks on two of the wells.

• Production in the first quarter of 2012 is lower than in the forth quarter of 2011 primarily due to the Telemark well recompletion discussed above which required us to take the well offline and normal production declines.  While cash flows were lower than previously projected due to lower than expected production rates, delays in bringing on new

production and higher capital costs, we continued our
development operations by supplementing our cash flows from
operating activities with funds raised through various
transactions (see the Consolidated Statement of Cash Flows).

- As of March 31, 2012, we had a working deficit of $267.9
million.  To preserve our development momentum in the
negative working capital environment that we experienced
throughout 2011, we increased our term loans, issued
convertible perpetual preferred stock, granted net profits
interest ("NPIs" discussed below) to certain of our vendors,
sold NPIs and dollar-denominated overriding royalty
interests ("Overrides" discussed below) in our properties to
investors, and entered into prepaid swaps against our future
production that provided cash proceeds to us at closing.  We
negotiated with the constructor of the hull of the Octabuoy
in China to defer the majority of our payments until the
hull is ready to be moved to the North Sea, currently
scheduled to begin during 2013 with production commencing in
2014.  A similar arrangement is in place for the Octabuoy
topside equipment, which is being constructed by the same
company in China.  We have continued this practice of
managing capital and seeking financing proceeds in a
negative working capital environment during the first
quarter of 2012.  We increased our term loans, sold NPIs and
Overrides in our properties to investors, and entered into
prepaid swaps against our future production that provided
cash proceeds to us at closing.

- Our inability to increase near-term production levels and
generate sufficient liquidity through the actions noted
above could result in our inability to meet our obligations
as they come due which would have a material adverse effect
on us.  In the event we do not achieve the projected
production and cash flow increases, we will attempt to fund
any short-term liquidity needs through other financing
sources; however, there is no assurance that we will be able
to do so in the future if required to meet any short-term
liquidity needs.

By reading these disclosures, a reasonable investor would
understand that the moratoria were already having a material
adverse impact on ATP's liquidity and revenue and that they were
likely to continue to do so in the future.

Plaintiffs respond that ATP's "boilerplate" risk disclosures were inadequate because they failed to "alert investors to the severe negative impact on ATP's Gulf Operations *that had already occurred* (and of which Defendants were aware) and were themselves materially false or misleading in light of the known impacts discussed herein."[74] With respect to the 2010 Form 10-K and 2011 Forms 10-Q, plaintiffs do not explain which impacts had already occurred that ATP failed to identify, and as discussed above, the statements disclosed numerous then-existing negative effects of the moratoria. Instead, plaintiffs appear to argue that ATP's disclosures stating that the moratoria *could* have a severe negative impact on ATP[75] were misleading, because the defendants already knew that ATP would not survive the effects of the moratoria. In support of this assertion, plaintiffs point to Reese's admissions at the bankruptcy hearing in August 2012 that (1) ATP did not "have the liquidity or revenues at that time to absorb a lengthy moratorium"; (2) the "primary reason" for the company's failure began with the Macondo explosion in 2010; (3) the permitting and construction delays caused by the moratoria "created significant liquidity problems" for ATP; and (4) ATP's drilling program, which contemplated drilling six wells in 2010 and 2011, could not "proceed given the moratorium." They further

---

[74] R. Doc. 184 at 12 (emphasis in original).

[75] *See, e.g., id.* at 57.

37

allege that a confidential witness ("CW1") informed them "that the moratoria cost the Company $1 million a day without hardly any revenue being generated." CW1 was a 15-year employee of ATP, hired by Bulmahn, who worked "in several capacities, including technical and managerial capacities," through at least the time of the bankruptcy filing.

The facts alleged fail to create a strong inference that defendants knew of ATP's eventual bankruptcy. Defendants correctly point out that "fraud cannot be proved by hindsight," *Southland*, 365 F.3d at 383, and Reese's account of ATP's demise, given in the 2012 bankruptcy proceeding with the benefit of hindsight, says nothing of his (much less of his co-defendants') knowledge in 2010, 2011, and early 2012 of ATP's ultimate fate. Reese did not testify that he *knew* in 2010 that ATP would not survive. Rather, in the aftermath of the bankruptcy, Reese quite obviously was able to conclude that ATP's revenues and liquidity had been insufficient to survive the moratoria. Plaintiffs' argument is classic fraud-by-hindsight pleading and does not create a strong inference that the defendants could have predicted ATP's future bankruptcy.

Moreover, the statement of CW1 "that the moratoria cost the Company $1 million a day without hardly any revenue being generated" is vague and reveals no new information, especially since ATP's SEC filings discussed the negative effects of the moratoria in considerable detail. Plaintiffs do not allege that

defendants misrepresented ATP's costs or revenues in the company's financial statements. These financial statements actually indicate that the company generated approximately $345 million in revenues during the moratoria.[76] The Court does not consider these filings for the truth of their contents on a motion to dismiss. It does note, however, that plaintiffs did not dispute the accuracy of this figure after it was cited by the defendants in their motion to dismiss.[77]

Plaintiffs allege that the 2011 Form 10-K and 2012 First Quarter Form 10-Q ran afoul of Item 303 by failing to disclose, "among other things, the accumulating, delinquent trade payables and [ATP's] inability to obtain financing which could reasonably be expected to have a material adverse affect [sic] on the Company's results of operations and liquidity."[78]

Reese indicated at the bankruptcy hearing that at some point leading up to the filing, ATP no longer had the ability to borrow money or further encumber its assets. But at least through June

_____

[76] 2010 Form 10-K, R. Doc. 180-4 at 5; 2010 1Q 10-Q, R. Doc. 180-14 at 3.

[77] Plaintiffs' argument that defendants "knew or were severely reckless in not knowing that ATP would not have a "substantial increase in production over the next year" is likewise without merit, because plaintiffs do not allege with particularity why this prediction was false or misleading. Specifically, they omit any particularized allegations that ATP in fact failed to achieve an increase in production in 2011. They also do not allege the falsity of ATP's financial statements indicating a 17% increase in overall production in 2011.

[78] R. Doc. 173 at 103.

2012, ATP was, by plaintiff's own account, continuing to obtain financing. As plaintiffs point out, ATP incurred "additional debt obligations, including the sale of $185 million in overrides in the first quarter of 2012,"[79] and on June 20, 2012, ATP announced that it had closed a private placement to an institutional investor that provided the company with an additional $35 million in working capital. Accordingly, plaintiffs' argument that ATP should have disclosed in the 2011 Form 10-K and the 2012 First Quarter Form 10-Q that it could no longer obtain financing is without merit.

As for the allegedly delinquent trade payables, ATP disclosed that it had "significant debt, trade payables, and other long-term obligations." It further disclosed that these obligations could:

- make it more difficult or render us unable to satisfy these or our other financial obligations; . . .

- increase our vulnerability to general adverse economic and industry conditions; . . .

- limit our ability to obtain additional financing required to fund working capital and capital expenditures and for other general corporate purposes.[80]

It further stated that ATP

cannot provide assurance that our business will generate sufficient cash flow or that future financings will be available to provide sufficient proceeds to meet these obligations. The inability to meet our financial obligations

---

[79] *Id.* at 39.

[80] R. Doc. 180-3 at 14, 19.

and commitments will impede the successful execution of our business strategy and the maintenance of our economic viability.[81]

ATP's 2012 First Quarter Form 10-Q reflected accounts payable in the amount of $295.6 million.[82] ATP further disclosed that it was "work[ing] with certain vendors to extend out the timing of certain payments to preserve cash."[83] In light of these disclosures, it was no secret that ATP had significant accounts payable; that they materially affected ATP's liquidity; and that ATP needed to delay some of those payments to preserve cash. As discussed above, plaintiffs list 21 lawsuits against ATP seeking to recover on unpaid invoices. But all of these suits were filed *after* ATP's bankruptcy, and the complaint does not indicate whether ATP had withheld or postponed these payments *without the vendors' consent* before the date of the bankruptcy.[84] Both plaintiffs and defendants acknowledge that ATP renegotiated payment schedules with a number of its vendors in order to extend

---

[81] *Id.*

[82] R. Doc. 180-9 at 2.

[83] R. Doc. 173 at 88.

[84] At oral argument, counsel for plaintiff suggested that payment on these types of invoices typically is due within 30 days. He argued that the failure to make full payment within that period on any invoice would render ATP in default on the obligation, whether or not the vendor consented to a new payment schedule. The Court sees no reason why ATP should be required to declare itself in default if the vendor consents to payment at a later date, especially since it should have been apparent to the reasonable investor that ATP did not accumulate the significant accounts payable disclosed in its financial statements within the 30 days immediately preceding each of those statements.

the payment deadlines.[85] Accordingly, plaintiffs' list of dates
on which the uncompensated services were provided serves as no
indication that the payments were being withheld without the
consent of the vendors at the time ATP released its 2011 Form 10-
K or 2012 First Quarter Form 10-Q. The Court will not read into
the securities laws a general obligation to disclose something as
routine as the renegotiation of payment schedules on invoices.

In any event, plaintiffs fail to state how the fact that the
trade payables were allegedly overdue constituted a trend or
event that was reasonably likely to materially affect ATP's
liquidity or revenues.[86] ATP disclosed the existence of its trade
payables and their probable effects on the company, and it is
unclear how or if the fact that some of the payments might have
been overdue would affect ATP's liquidity or revenues
differently.

---

[85] Moreover, it is implausible that companies such as
Greystar Corporation, mentioned on page 36 of the complaint,
would have continued to provide services and materials to ATP up
to the date of the bankruptcy if ATP was in default on its
payments for services dating back to 2007. The only reasonable
inference is that ATP had arranged to pay Greystar on some future
date. And in fact, counsel for plaintiffs admitted at oral
argument that ATP had renegotiated its payment schedule with this
vendor.

[86] There is no general duty to disclose all material, non-
public information. *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207,
212 n.6 (5th Cir. 2004) (discussing disclosure obligations in the
context of a plaintiff's Section 11 Securities Act claim).
Consequently, the statement must either fall under Item 303's
disclosure requirements or be necessary to make other,
affirmative statements not misleading.

*3. Defendants' Alleged Failure to Disclose Problems at ATP's Telemark Hub*

On August 24, 2011, ATP issued a press release announcing the first production from MC Block 941 #4 at "an initial rate exceeding 7,000 Boe per day"[87] and that ATP's company-wide production "now exceeds 31,000 Boe per day." The press release quoted Bulmahn stating that

> We have finally realized the planned material production revenue of this well that has been much anticipated for 16 months. . . . The greater-than-a-billion-dollar investment at Telemark reflects ATP's continuing commitment to develop America's energy resources.[88]

On September 12, 2011, Reese gave a speech at the Rodman Renshaw Global Investment Conference ("RRGI Conference") in which he reiterated that ATP's "most recent report" set overall production at 31,000 Boe per day including "the new Telemark well."[89] On September 29, 2011, in response to the Moody's report stating that ATP had a "high likelihood" of restructuring, Reese gave an interview to Bloomberg News in which he indicated that ATP expected to pump enough oil from new wells over the coming three years to avoid defaulting on its $1.5 billion in debt. The article stated in part:

> ATP expects to begin production from new wells at its Telemark field this year, followed by additional output at the Clipper and Gomez projects in 2012, Entrada in 2013 and Cheviot a year

---

[87] R. Doc. 173 at 25.

[88] *Id.*

[89] *Id.* at 72.

43

later, said Albert L. Reese, ATP's chief financial officer. .
. .

"All of that is before the bonds come due in 2015, so I don't
know what Moody's is talking about," Reese said today in a
telephone interview. "I can't fight rumors or reports, all I
can do is continue to deliver on the promises we've made. Our
expectation is that everything is going to be fine.[90]

Lead Plaintiffs allege that contrary to Reese's words of
assurance, "everything was not fine." According to data available
on the Bureau of Ocean Energy Management's ("BOEM") website, MC
Block 941 was producing only 2,738 Boe per day more in September
2011 than in July 2011, the last full month before Well #4 was
put in production.[91]

On November 8, 2011, ATP issued a press release announcing
its Third Quarter 2011 Results, in which it disclosed that
overall oil and gas production was only 24,200 Boe per day, in
contrast to the 31,000 per day that was announced in August.[92]
The following day, ATP held its third quarter earnings conference
call. During the call, defendant Tate disclosed that although
Well #4 had initially tested at 7,000 Boe per day, issues with
wellbore drawdown were negatively affecting the well's completion
efficiency, causing the well to produce only about 3,500 Boe per
day "on a routine basis." Although Tate believed that ATP could
bring production at Well #4 back up "a little bit," he did not

---

[90] *Id.*

[91] *Id.*

[92] *Id.* at 29.

anticipate that the well would return to producing 7,000 Boe per day.

Plaintiffs allege that defendants' failure to disclose the lower production figures rendered Reese's statements to Moody's and at the RRGI Conference misleading. Defendants argue that the BOEM data does not demonstrate that the #4 well was producing 2,783 Boe per day, or even 3,500 Boe per day, in September 2011. They reason that the decline in Block 941's production may have been due to the declining performance of one or both of the other wells at MC Block 941. In fact, defendant Tate disclosed in the company's 2011 third quarter earnings call that the MC 941 #1 well had lower production due to water production.

Plaintiffs respond that even if the problems were occurring at one or both of the other two wells, the less-than-anticipated production at Block 941 undermined the accuracy of the company-wide production figure of 31,000 Boe per day. As a result, they argue, Reese's reference to the 31,000 figure at the conference, and his assertion in the Bloomberg interview that ATP would "continue to deliver on the promises" it had made, were false or misleading. Drawing all reasonable inferences in favor of the plaintiffs, the Court accepts for the purposes of this motion that production at Well #4 fell below the initial rate of 7,000 Boe per day as early as September 2011. The allegation is consistent with Reese's explanation for the lower production numbers for the quarter, which concluded at the end of September.

45

At the very least, it is undisputed that overall production at the end of the quarter was below the 31,000 Boe per day announced in late August.

The allegations nonetheless fail to state a claim. First, disclosure of the lower production numbers was not necessary to make Reese's statements in the September 29, 2011 interview with Bloomberg News not misleading. His assurances in response to the Moody's report focused on ATP's expectation that it would "begin production from *new wells* at its Telemark field this year, followed by additional output at the Clipper and Gomez projects in 2012, Entrada in 2013 and Cheviot a year later, . . . ."[93] There is no reference to Well #4 or the previously announced production rate of 31,000 Boe per day. In fact, the statement appears to be entirely forward looking, referring only to wells that were not yet producing. It simply was not necessary to discuss Well #4's performance in order to make this statement not misleading.

With respect to Reese's statements at the RGGI Conference, plaintiffs have failed to allege facts creating a strong inference that Reese[94] knew or was reckless in not knowing that

---

[93] R. Doc. 173 at 72 (emphasis added).

[94] The complaint also states that "Bulmahn, Godwin and Tate, by virtue of their high level management positions, were also aware of the problems at the Telemark Hub and their effect on ATP's liquidity problems." As discussed above, the PSLRA forbids group pleading, and the Court will not attribute Reese's statements to the other defendants. In any event, plaintiffs may not plead scienter simply by virtue of a defendant's position within the company. *Ind. Elec. Workers' Pension Trust Fund*, 537 F.3d at 535.

Well #4's production rate and/or company-wide production were
lower on September 12 than on August 24.

Before turning to Reese's alleged knowledge and involvement
in company operations, the Court briefly addresses plaintiffs'
allegations regarding defendants' motive to commit securities
fraud. The Fifth Circuit has held that evidence of a defendant's
motive and opportunity to commit fraud, without more, is
insufficient to withstand a motion to dismiss. *Southland*, 365
F.3d at 368 (citing *Goldstein v. MCI WorldCom*, 340 F.3d 238, 250-
51 (5th Cir. 2003)). Nonetheless, "appropriate allegations of
motive and opportunity may meaningfully enhance the strength of
the inference of scienter." *Id.* (quoting *Nathenson*, 267 F.3d at
412). Plaintiffs attempt to create such an inference by alleging
that defendants sought to "delay disclosing the true adverse
facts based on ATP's need to raise the capital it needed to
continue as a going concern."[95] But "[m]otives that are generally
possessed by most corporate directors and officers do not
suffice; instead, plaintiffs must assert a concrete and personal
benefit to the individual defendants resulting from the fraud."
*Gissin v. Endres*, 739 F. Supp. 2d 488, 503 (S.D.N.Y. 2010)
(quoting *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001));
*see also Indiana Elec. Workers'*, 537 F.3d at 544 ("Scienter in a
particular case may not be footed solely on motives universal to
corporate executives.") (citing *Novak v. Kasaks*, 216 F.3d 300,

---

[95] R. Doc. 173 at 104.

307 (2d Cir. 2000)); *In re PXRE Group, Ltd. Secs. Litig.*, 600 F. Supp. 2d 510, 531-32 (S.D.N.Y. 2009) (holding that the desire to maintain a high credit rating in order to raise money that was "desperately needed" to "protect the very survival" of the company was not the type of "concrete and personal" benefit required by the Second Circuit). *But see Goldstein v. MCI WorldCom*, 340 F.3d 238, 242, 250 (5th Cir. 2003) (company's need to complete a "crucial" $129 billion merger with Sprint gave the company a motive to inflate its financial results). Insufficient motives include "(1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation." *Kalnit*, 264 F.3d at 139.

Here, the motives cited by plaintiffs are too general to create an inference of scienter. Moreover, ATP and Reese discussed the decrease in production--both at Well #4 and company-wide--in the press release and earnings call covering the very quarter in which Well #4 first came online. That the disclosure came less than two months after the allegedly false statements, in connection with the earliest quarterly earnings report following the initial announcement of 31,000 Boe per day, weighs against an inference of fraudulent intent. Nothing in the complaint suggests that Reese had anything at all to gain by lying about the production numbers in September, only to turn around and discuss them candidly in early November.

48

Unlike motives that are common to all corporate officers, allegations that defendants "misrepresented corporate performance to inflate stock prices while they sold their own shares" might serve as adequate evidence of motive. *Id.* It would not be enough for defendants to simply sell stock, however; those sales must have occurred "in suspicious amounts or at suspicious times." *Southland*, 365 F.3d at 368.

As defendants point out, there is no allegation that the defendants sold any ATP stock during the class period or otherwise profited from their alleged scheme. In fact, defendants argue, they collectively lost over $100 million as a result of ATP's bankruptcy. *See id.* at 369 (noting that a lack of suspicious sales "undermines an inference of scienter").

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Gissin*, 739 F. Supp. 2d at 503 (quoting *Kalnit*, 264 F.3d at 142); *accord R2 Investments LDC v. Phillips*, 401 F.3d 638, 644-45 (5th Cir. 2005). *See also Nathenson*, 267 F.3d at 411 (noting that allegations of motive and opportunity provide "an analytical device for assessing the logical strength of the inferences arising from particularized facts pleaded by a plaintiff to establish the necessary mental state"). Plaintiffs fail to carry this burden.

49

With respect to the allegations relating to Block 941, the complaint states only that "[d]efendant Reese, as the CFO of ATP, was in a position to know of the problems at the Telemark Hub, that those problems were exacerbating ATP's significant liquidity problems, and that everything was not going to be fine."[96] It further cites Reese's testimony at the bankruptcy hearing that "from a business side, the executive side, financial side [he was] very, very well informed."[97] Elsewhere in the complaint, plaintiffs point to Reese's bankruptcy declaration, which indicated that "ATP's management . . . closely monitored" a number of "challenging conditions," including "less than expected production rates at ATP's Telemark Hub."[98]

As stated before, however, allegations of scienter "may not rest on the inference that defendants must have been aware of the misstatement based on their positions with the company." *Ind. Elec. Workers' Pension Trust Fund*, 537 F.3d at 535 (quoting *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002)); *cf. Southland*, 365 F.3d at 379 (defendant's position as CEO since company's start, coupled with his sale throughout the class period of over 40% of his stock, as well his personal involvement in promoting the contract about which he allegedly made misleading statements, "suffice[d], albeit only barely so, to

---

[96] R. Doc. 173 at 76.

[97] *Id.* at 28.

[98] *Id.* at 37.

50

create a strong inference of the requisite scienter"). Likewise, allegations that a defendant is well-informed about the company's business do not suffice to demonstrate what a particular defendant knew at a given point in time. *See Indiana Elec. Workers'*, 537 F.3d at 535 (defendant's "hands-on management style . . . coupled with his alleged boast that "there is nothing in this company that I don't know," are insufficient to support a strong inference of scienter," because "[s]uch statements lack specificity about what [defendant] may have known or, for that matter, was reckless not to have known.") (citing *Goldstein*, 340 F.3d at 251); *see also Financial Acquisition Partners*, 440 F.3d at 287 ("Corporate officers are *not* liable for acts solely because they are officers, even where their day-to-day involvement in the corporation is pleaded."). For the same reason, plaintiffs may not rest their inference of scienter on the statements of CW1 that the defendants would "discuss ATP's budget" once every month to three months. *See Southland,* 365 F.3d at 370-71 (noting that allegations that defendants received daily, weekly, and monthly financial reports that appraised them of the company's true financial status were insufficient and overly general) (citing *Goldstein*, 340 F.3d at 253).

The foregoing analysis of plaintiffs' scienter allegations would apply with equal force to Reese's September 29, 2011 statement in the Bloomberg interview even if that claim were not otherwise barred. Citing *Plotkin v. IP Axess Inc.*, 407 F.3d 690,

700 (5th Cir. 2005), plaintiffs argue that it "is reasonable to infer that Reese would have familiarized himself with 941 #4's production output prior to making his statement refuting Moody's." But in *Plotkin*, the Fifth Circuit merely held that it was reasonable to assume that a small, "struggling" corporation would have become familiar with the financial condition of its strategic partners before announcing purchase orders from the partners that were expected to result in a thirty-fold increase in the corporation's annual revenues. *Id.* Moreover, Plotkin "alleged specific facts about the agreements," including facts clearly showing that the strategic partners were not equipped to make such a large purchase. *Id.* Here, it is not obvious that Reese would follow up on the production levels of a single well (or even block of wells) before either (1) repeating the recently announced company-wide production numbers at an investment conference, when those numbers were only about two and a half weeks old at the time, or (2) making general, optimistic statements in the Bloomberg article that focused on ATP's three-year strategy for five separate oil fields.

Because disclosure of the declining production rates was not necessary to make Reese's Bloomberg interview not misleading, and because plaintiffs have failed to create a strong inference of Reese's scienter with respect to either statement, the Court dismisses this claim.

*4. Defendants' Projections Regarding the Clipper Wells Pipeline*

Plaintiffs allege that a number of statements were false or misleading because they either projected that the Clipper pipeline would be complete in the third quarter of 2012 or touted the plentiful reserves at the Clipper well sites. Plaintiffs further allege that "[i]n truth, ATP did not have nearly the funds necessary to bring those reserves into production." Reese testified at the bankruptcy hearing that "for a year or so" he knew that ATP was "going to need substantial funds in order to complete the Clipper project."[99] He quantified those funds at approximately $140 to $150 million, with $120 million in costs remaining at the time of ATP's bankruptcy filing.[100] He further stated that "[o]ngoing project construction costs, declining oil prices and less than anticipated production put [ATP] in the untenable position of running out of cash before it could complete the Clipper Wells project." Plaintiffs allege that all four defendants "were, by virtue of their high level management positions, aware of the necessity to bring the Clipper wells online and ATP's lack of funds to complete the pipeline."[101]

Plaintiffs identify the following allegedly false or misleading statements with respect to the Clipper pipeline:

---

[99] R. Doc. 173 at 24.

[100] *Id.* at 39-40.

[101] *Id.*

- September 12, 2011 RRGI Conference, Reese speaking: "The nine and the ten well, the two wells at Clipper, I think those are pretty decent wells that we will be doing because those will already be completed, it's just pipeline and a couple other opportunities that we would like – look at."[102]

- November 8, 2011 Press Release for Third Quarter 2011 Financial Results, Bulmahn and Reese listed as contact persons: confirmed reserves at GC 300 #4 and announced flow test results for GC 300 #2 ST #1 before indicating that "[t]he pipeline lay barge for the Clipper wells is contracted for third quarter 2012 and will tie in both the GC 300 #4 and #2 wells to the Murphy Oil operated Front Runner production facility. ATP operates Clipper and presently owns a 100% working interest."[103]

- 2011 3Q 10-Q, signed by Reese and certified by Bulmahn and Reese: "We have also drilled two wells at Clipper-one has been completed, and the second is scheduled to be completed by the end of 2011-with pipeline construction and first production expected in the second half of 2012."[104]

- November 9, 2011 3Q Earnings Call, Tate speaking: "The answer on Clipper is the lay barge is contracted for late in July and we have no reason to believe that it won't stay on schedule. It actually could be earlier than that, but that's the schedule that we were working towards. It will take 30 days to 60 days to actually get the pipeline laid and the facilities hooked up. So I would say late third quarter is not an unreasonable time for startup at Clipper. Al [Reese] can talk more about the potential financing of the pipeline. . . . [Reese speaking:] I think if you look back in our last several quarters we continue to operate at better than $100 million of cash. As we have moved through this period of the moratorium now that the moratorium is behind us, we have wanted to maintain as much cash as we can to be able to get the next well on at Telemark [and] to get the Clipper projects done. I think as we go into 2012 we may have a little more cushion of being able to maintain such a large cash balance."[105]

---

[102] *Id.* at 72.

[103] *Id.* at 76.

[104] *Id.* at 78.

[105] *Id.* at 79.

- January 4, 2012 Pritchard Capital Partner LLC Energize Conference, Reese speaking: "Between now and 2015, we expect to have . . . Clipper in full production, which will be [2012]"[106]

- February 27, 2012 JP Morgan High Yield & Leveraged Finance Conference, Reese giving a PowerPoint presentation: "Produced 24.6 Mboe/d in 2011 and expect significant uplift in production in 2012 with key new wells at Telemark and Clipper."[107]

- Year 2011 Earnings Press Release, dated March 15, 2012, listing Bulmahn and Reese as contacts: "Capital spending for 2012 includes ongoing expenditures related to ATP's Telemark Hub described above and the completion of the Clipper pipeline targeted for completion in late third quarter or early fourth quarter 2012. Once installed, this pipeline will connect the two Clipper wells to a host platform. The wells were completed and tested at a combined rate of 16 Mboe per day, net to ATP, in 2011. ATP expects to fund these projects through cash flow and additional sources of liquidity already announced or planned, such as expansion of its first lien and selection of partners to join in property developments."[108]

- 2011 10-K, filed March 15, 2012, signed by Bulmahn, Reese and Godwin and certified by Bulmahn and Reese: "Later in 2012, we expect to complete a pipeline that will bring to production the two new wells at our Clipper project. . . . We expect with . . . the two new Clipper wells expected to be placed on production later in the year, we will generate higher operating cash flows in 2012 than in 2011."[109]

- April 17, 2012 IPAA Oil & Gas Investment Symposium, Reese speaking: "And the initial wells at Clipper, these have some of the highest production rates of any wells we've ever had in the Company. And these have been tested again, 16,000 barrels per day, 62% oil."[110]

---

[106] *Id.* at 81.

[107] *Id.* at 84.

[108] *Id.* at 85.

[109] *Id.* at 86, 88.

[110] *Id.* at 91.

- May 9, 2012 First Quarter 2012 Earnings Press Release, Bulmahn and Reese listed as contacts: "ATP's two wells at Clipper (Green Canyon 200) are on schedule to begin production in late third quarter or early fourth quarter 2012. . . . ATP has begun preparatory work for the installation of the Clipper pipeline during third quarter 2012."[111]

- 2012 1Q 10-Q, filed May 10, 2012, signed by Reese and certified by Bulmahn and Reese: "[W]e forecast overall production and operating cash flow growth in 2012 due to new production from our Clipper property and from projected increases at our Telemark Hub."[112]

- 1Q 2012 Earnings Call, May 10, 2012, Reese speaking: "We will continue our net profits interest program during the year. The overrides that we have done in the first quarter all relate to two properties,$100 million relates to the Clipper property. The balance of the override relates to a Gomez property and any net profits interest that we did in the first quarter; that relates to Telemark. I think we will continue to access both of those properties as we go through the year. Certainly, the need for doing that decreases significantly as we get into the third and the fourth quarter of this year with the Clipper well coming online . . . ."[113]

Plaintiffs allege that these statements were misleading because defendants knew or were reckless in not knowing that "ATP did not have, nor could it generate or borrow, the substantial funds necessary to connect the Clipper to the production facility, and that the Clipper would not come online in 2012."[114]

The projections relating to the completion of the Clipper pipeline are forward-looking statements. As such, each contains

---

[111] *Id.* at 94.

[112] *Id.* at 94.

[113] *Id.* at 98.

[114] *Id.* at 80.

three implicit assertions of fact that may or may not be true at
the time the statement is made. These include (1) that the
speaker genuinely believes the statement is accurate; (2) that
there is a reasonable basis for that belief; and (3) that the
speaker is unaware of any undisclosed facts that would tend
seriously to undermine the accuracy of the statement. *In re
Anadarko Petroleum Corp. Class Action Litig.*, 957 F. Supp. 2d
806, 831 (S.D. Tex. 2013) (quoting *Rubinstein v. Collins*, 20 F.3d
160, 170 (5th Cir. 1994)). At the same time, the forward-looking
nature of the Clipper pipeline comments renders them subject to
the PSLRA's safe harbor provision. *See Southland*, 365 F.3d at
371. This provision protects defendants from liability for
certain projections, statements of future economic performance,
and statements of plans or objectives for future operations. *Id.*
Under the first prong of the statutory safe harbor, there is no
liability if, and to the extent that, the statement is: (i)
"identified as a forward-looking statement, and is accompanied by
meaningful cautionary statements identifying important factors
that could cause actual results to differ materially from those
in the forward-looking statement,"[115] or (ii) immaterial. 15

---

[115] Oral statements can qualify for the safe harbor if (1)
the statement is accompanied by a cautionary statement that the
"particular" oral statement is forward-looking and that actual
results could differ materially (essentially a formality as to
the form of the statement); (ii) the statement is accompanied by
an oral statement that additional information that could cause
actual results to differ materially is contained in a readily-
available written document; (iii) the statement identifies the
document or portion thereof containing the additional

U.S.C. § 78u-5(c)(1)(A). A cautionary statement is "meaningful" if it provides "substantive company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Southland*, 365 F.3d at 372 (internal quotation marks omitted). "Although a defendant is under no duty to disclose every fact or assumption underlying a prediction, he must disclose material, firm-specific adverse facts that affect the validity or plausibility of that prediction." *Lormand*, 565 F.3d at 249 (quoting *Rubinstein*, 20 F.3d. at 170).

Under the second prong, a defendant avoids liability if the plaintiff fails to prove that the statement was made with actual knowledge that the statement was false or misleading.  15 U.S.C. § 78u-5(c)(1)(B). Because the second prong places the burden of proof on the plaintiff, the PSLRA effectively requires proof of actual knowledge-not just recklessness-in the case of every forward-looking statement. *See In re Anadarko*, 957 F. Supp. 2d at 831 n.13 ("If the statements are covered by the statutory 'safe harbor' provision, Plaintiffs would be required to show intent to deceive, and not merely recklessness.") (citing *Nathenson*, 267 F.3d at 409). Accordingly, for each predictive statement, plaintiffs must plead specific facts giving rise to a strong inference that the defendant responsible for the statement

---

information; and (iv) the identified document itself contains appropriate cautionary language.  15 U.S.C. § 78u-5(c)(2).

*actually knew* that at least one of the three implicit assertions contained in the prediction was false.

With these principles in mind, the Court will address two sets of defendants' statements separately: (1) those made before the conclusion of the first quarter of 2012, and (2) those made after March 31, 2012.

Statements Made Before March 31, 2012

Plaintiffs fail to plead with particularity contemporaneous facts demonstrating actual knowledge of the falsity of these predictions. In their opposition brief, plaintiffs respond to defendants' attack on this claim by pointing to Reese's statements at the bankruptcy hearing that A) he was aware for at least a year that the Clipper pipeline would cost $140-$150 million, and B) that "ongoing construction costs, declining oil prices and less than anticipated production put [ATP] in the untenable position of running out of cash before it could complete the Clipper Wells project."[116] That ATP faced setbacks, eventually causing the company to run out of cash, does nothing to demonstrate that Reese or any other defendant knew in 2011 or early 2012 that this would happen before the Clipper pipeline could be completed. *See Gissin*, 739 F. Supp. 2d at 501-02 (S.D.N.Y. 2010) (noting that "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically

_____

[116] R. Doc. 184 at 10.

identify the reports or statements containing this information," and "[m]ere allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.") (internal quotation marks omitted).

Recalling the three implicit assertions contained in each prediction, plaintiffs present no contemporaneous facts that would speak to whether any of the defendants genuinely believed their predictions at the time they made them.[117]

Nor do plaintiffs present any facts demonstrating that defendants knew their projections lacked a reasonable basis. They do not allege facts that would dispute or otherwise undermine Reese's prediction that ATP would have more than $100 million in cash going into 2012. And in fact, the complaint cites and relies on Reese's testimony indicating that ATP *did* have more than $150 million in cash in early 2012--$224 million as of March 31, to be precise. It was only over the course of the next quarter that ATP's cash supply began to dwindle, and plaintiffs present no facts suggesting whether or why this rapid decline should have been foreseeable.

Moreover, the very statements cited by plaintiffs disclose that ATP had executed a $100 million ORRI on Clipper:

---

[117] Again, plaintiffs' reliance on Reese's statements at the bankruptcy hearing amounts to an impermissible attempt to plead fraud by hindsight. In any event, these statements are attributable only to Reese and say nothing of the other defendants' knowledge or lack thereof.

What we expect to do, and this is all signed, sealed, and ready to be closed next week, is an additional $100 million. This will be on Clipper. This is for essentially the $100 million that will be used for the installation of the pipeline that is scheduled to take place beginning in the third quarter of this year. We've obviously got some expenses before then – ordering the pipe, getting some of the engineering and things done there. But that is a $100 million override that should close sometime next week.[118]

Plaintiffs do not allege that Reese was lying about this ORRI or its intended purpose. Further, statements cited by plaintiffs indicate that ATP anticipated the addition of "as much as $100 million of additional liquidity" from the expansion of its first lien in the first quarter of 2012, and that it was in "active discussions about bringing partners in on both Clipper and Cheviot."[119] Again, according to plaintiffs' complaint, ATP announced on March 9, 2012 that it had increased its First Lien expansion by $150 million; that it had received an additional $60 million from asset sales; and that it expected to receive an additional $100 million from asset transactions scheduled to close in March 2012.[120] ATP stated in its 2011 10-K, filed on March 15, 2012, that it believed it could fund its projected capital expenditures, including the Clipper project:

---

[118] R. Doc. 173 at 89. *See also id.* at 98 ("[W]e were very successful in putting together an override . . . for Clipper, $100 million item that is pre-funded and we'll basically pay for the pipeline installation that we're going to have there. . . . I'm not saying we're going to do it, but we'll have the opportunity to look at an additional override at that location.")

[119] *Id.* at 82.

[120] *Id.* at 85.

> [U]sing projected cash flows from operations, proceeds from the recently announced committed increase in our First Lien term loans, asset monetizations which include the sale of working interests, net profit interests and overriding royalty interests, and if necessary, additional forward sales of our production in the financial derivative markets. In certain cases, we will also continue to work with certain vendors to extend out the timing of certain payments to preserve cash.[121]

Defendants may have been misguided or even negligent in their optimism, but the allegations evince neither recklessness nor an intent to mislead investors into believing that the Clipper project could be completed when defendants in fact knew it would not.

Finally, plaintiffs point to no *undisclosed* facts that would seriously undermine defendants' predictions.[122] As discussed above, ATP made ample disclosures regarding the effects of the moratoria on ATP's business, and in light of those disclosures, it was widely known that ATP was highly leveraged and actively seeking additional working capital. Moreover, not once have plaintiffs alleged that ATP misrepresented its financial condition in its financial statements or balance sheets. *Cf. Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 868 (5th Cir. 2003) ("It is difficult to form a 'strong inference' of scienter from the alleged undercapitalization of a company when plaintiffs

---

[121] *Id.* at 88.

[122] As previously stated, the Court discredits plaintiffs' allegations regarding the outstanding trade payables, because ATP disclosed their existence and plaintiffs have not alleged that they were being withheld without the vendor's consent before the bankruptcy.

appear to concede that the company accurately disclosed its capital structure and financial obligations in its prospectus.").

In *R2 Investments LDC*, the Fifth Circuit concluded that the plaintiffs' allegations of fraudulent intent were "simply not sufficient, given [defendant's] expectation of a variety of outside funding sources and absent any allegation of motive, to raise a strong inference that in making the tender offer any of the defendants acted with an 'intent to deceive, manipulate or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it.'" 401 F.3d at 645 (quoting *Southland*, 365 F.3d at 366). Here, plaintiffs themselves allege that ATP was in the process of obtaining additional capital through equity raises, borrowing against its equity positions in the Titan and Innovator, and sales of assets, ORRIs, and NPIs, even incurring $185 million in new override obligations in the first quarter of 2012 alone.[123] And it was no secret to investors that ATP would have to rely on these types of financing in order to complete the Clipper project. ATP's 2011 10-K, filed on March 15, 2012 and quoted in plaintiffs' complaint, stated that ATP believed it could fund its projected capital expenditures, including the Clipper project,

> using projected cash flows from operations, proceeds from the recently announced committed increase in our First Lien term

---

[123] R. Doc. 173 at 39 (citing Reese's bankruptcy testimony and the 2012 1Q 10-Q).

loans, asset monetizations which include the sale of working interests, net profit interests and overriding royalty interests, and if necessary, additional forward sales of our production in the financial derivative markets. In certain cases, we will also continue to work with certain vendors to extend out the timing of certain payments to preserve cash.[124]

In light of the foregoing, the Court concludes that plaintiffs have failed to allege facts creating a strong inference that any of the defendants knew[125] before the second quarter of 2012 that ATP would run out of cash before completing the Clipper pipeline.

Statements Made After March 31, 2012

For the same reasons, the Court likewise finds that plaintiffs have failed to present specific, contemporaneous facts creating a strong inference of scienter that defendants knew that their optimistic predictions about Clipper made after March 31, 2012 were contradicted by undisclosed information.  As to the April 17, 2012 IPAA Investment Symposium statement by Reese concerning the tested production levels of the Clipper wells, plaintiffs make no allegation of fact to indicate why this statement is false or misleading.  Accordingly, plaintiffs fail to state a claim with respect to this statement.

---

[124] *Id.* at 88.

[125] Again, because these statements were forward looking, plaintiffs' allegations must create a strong inference of actual knowledge, not just recklessness.

Plaintiffs contend that defendants' statements about the Clipper project in a May 9, 2012 and May 10, 2012 press release and earnings call, respectively, and in the 2012 first quarter 10-Q, were false or misleading and rely on the proximity of the August 17, 2012 bankruptcy, the decline in ATP's cash position by June 30, 2012, ATP's eventual inability to finance the Clipper project, the alleged decision to withhold ORRI payments in April 2012, and the existence of unpaid vendors.  The Court finds that plaintiffs have failed to state a claim with these allegations because they do not contain facts creating a strong inference of scienter.  Plaintiffs have not plausibly alleged facts suggesting that because ATP's cash position dropped by the end of the second quarter of 2012, defendants must have known this would happen at the time the first quarter results were issued.  ATP's first quarter 2012 10-Q reported that ATP had increased its cash position from $65 million at the end of 2011 to $224 million at the first quarter of 2012 through increased borrowing, granting additional NPIs and overrides, and prepaid swaps against production.  Plaintiffs do not attack these statements.  Further, there are no specific facts alleged as to what defendants knew on May 9 or 10, 2012 that was different from five weeks earlier on March 31, 2012 about ATP's cash position.  Plaintiffs reliance on ATP's eventual inability to borrow money to argue that defendants knew on May 9 and 10, 2012 that it could not borrow money is belied by plaintiffs' own allegations that ATP raised an

additional $35 million in June 2012 through a note transaction
with an institutional investor. If ATP knew that it could not
borrow money in May, why was it still trying to do so in June?
In addition, plaintiffs' allegation that defendants decided in
April 2012 to withhold $24 million in ORRI payments is based on a
pleading filed in March of 2013 in ATP's bankruptcy proceeding[126]
in which Macquarie Investments LLC ("Macquarie"), the ORRI
holder, admitted that it did not expect to be paid until May 25,
2012, and that it filed a lawsuit in the Eastern District of
Louisiana on August 7, 2012 alleging that its ORRI was due May
25, 2012, and giving notice of default thirty days before filing
suit.[127] While certain other ORRI's allegedly were unpaid at the
time of bankruptcy, they do not date from April 2012, but instead
appear to run from the end of May 2012. Further, the total
Macquarie expected by the end of May 2012 was approximately $7
million, which would not suggest that defendants knew that ATP
would not be able to obtain financing for the completion of the
Clipper as of May 9 or May 10, 2012, even if they decided by then
to withhold payments due at the end of the month. This is

---

[126] Complaint, *In re ATP Oil & Gas Corp.*, No. 12-36187
(Bankr. S.D. Tex. Mar. 8, 2013), ECF Doc. No. 1. The Court
considers this complaint because plaintiffs quote and refer to it
in their Amended Complaint. *See Randall D. Wolcott, M.D., P.A.
v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (indicating that
courts may consider documents incorporated into the complaint by
reference on a motion to dismiss).

[127] La. R.S. 31:212.21 requires written notice before suit
for nonpayment of royalties or production payments and gives the
obligor 30 days from written notice to cure the nonpayment.

particularly true since, according to the statements plaintiffs rely on, ATP was looking for money in terms of overrides and net profit interests in Clipper, which would not be payable until its wells were producing.  ATP also disclosed more than once that it worked in the past with vendors to whom it granted interests in production to defer payments in order to preserve cash and stated in its first quarter 10-Q for 2012 that it would continue to do so.

Finally, the forward looking statements in the first quarter 10-Q and in the May 10, 2012 earnings call forecasting production and cash flow growth in 2012 due to projected production from Clipper are accompanied by risk disclosures that were sufficiently substantial and meaningful to satisfy the PSLRA safe harbor requirements.  The 10-Q incorporates the risk factors disclosed in ATP's 2011 annual report discussed earlier.  In addition, the 10-Q provided firm-specific factors that could render ATP unable to fund its capital expenditures.  It disclosed a $267 million working capital deficit at the end of the first quarter, despite the infusion of $155 million of additional loan proceeds and $185 million in new NPIs, overrides, and production swaps.  The 10-Q disclosed that the two wells at the Gomez Hub had been postponed and that the Telemark wells had taken longer to bring into production than planned.  In addition, one Telemark well, which did not produce at the rates expected, was being reworked.  Instead of being complete in the first quarter as ATP

67

had hoped, the operation had to be continued into the second
quarter of 2012 because of downhole difficulties that would delay
production and increase capital costs.  Thus, delays in
increasing Telemark's production from this well and increased
costs would extend into the second quarter.  Cash flows were
lower than projected for the first quarter because of reduced
production, delays, and higher capital costs.  To continue
development in face of a deficit in working capital, ATP
disclosed that it had to continue to increase term loans, sell
NPIs and overrides, enter prepaid production swaps for cash, and
delay capital commitments.  ATP revealed that its costs of
financing its obligations would be higher going forward.  It
explained that its cash flow projections were dependent on
numerous assumptions, including its ability to monetize its
properties and future production.  It also disclosed that if it
did not achieve the projected production and cash flow increases,
it would attempt to fund short-term liquidity through other
financing sources, but "there is no assurance that we will be
able to do so if required to meet any short-term liquidity
needs."[128]  ATP  stated that it was highly leveraged and subject
to "significant constraints" by having to service its debt and
comply with loan obligations that made it economically
vulnerable.  It pointed out that its cash flows from production
were significantly burdened by certain financings and derivative

---

[128] R. Doc. 180-9 at 9, 28.

transactions that required ATP to make payments from the proceeds or net profits from the sale of production.  These statements adequately disclosed firm-specific risk factors that could derail ATP's plans for Clipper.[129]

For all of the foregoing reasons, plaintiffs fail to state a claim regarding defendants' statements about the Clipper pipeline after March 31, 2012.

5.  *Defendants' Statements Regarding ATP's Liquidity and Ability to Continue as a Going Concern*

Throughout the class period, defendants assured investors that ATP's financial position was secure and that its liquidity was "strong" and "sound." On multiple occasions throughout the class period, they predicted that ATP would be able to continue paying its debts for at least 12 months, and they repeatedly rejected any suggestion of bankruptcy.[130] For example, during the class period, defendants made the following statements and predictions:

- January 5, 2011, Reese: ATP "ha[s] a strong liquidity position" and has "strong liquidity to do everything that we've been talking about."[131]

---

[129] The Court has already addressed the deficiency in plaintiffs' arguments about the existence of unpaid vendors.

[130] R. Doc. 173 at 58-99.

[131] *Id.* at 59.

- March 15, 2011, Bulmahn: "Through creative, albeit expensive financing, we are now liquid and solvent."[132]

- March 15, 2011, Reese: "We feel very comfortable with our liquidity position for the entire 2011 as we go into 2012. That's either with or without permits from a liquidity standpoint."

- March 16, 2011, Bulmahn, Reese, and Godwin: "Should the permitting process in the Gulf of Mexico continue to be delayed, we believe we can continue to meet our existing obligations for at least the next twelve months," assuming production levels, commodity prices, and operating costs remained near their current levels.[133]

- April 13, 2011, Bulmahn: "ATP's liquidity is strong. . . . [G]oing forward we will be able to manage leverage and liquidity at levels satisfactory to the market."[134]

- July 19, 2011, Reese: "We've got growing production. We're already over where we were last year."[135]

- August 9, 2011, Bulmahn: "ATP's liquidity remains strong as we produce our reserves, we are reducing our debt with payments to NPI and Override interest holders. In fact, because of increased production and higher oil prices, ATP is paying back its debt at an accelerated pace and even had to recognize additional interest expense this quarter."[136]

- August 9, 2011, Tate: "I believe we are sound and healthy, and we certainly are not flirting with bankruptcy at all. That I think we certainly are on sound footing and moving forward well and making things happen globally as well."[137]

- September 12, 2011, Reese: "[W]e honestly believe that [ATP's] shares are probably undervalued"; ATP has "a solid

---

[132] *Id.*

[133] *Id.* at 61.

[134] *Id.* at 63.

[135] *Id.* at 66.

[136] *Id.* at 68.

[137] *Id.* at 69.

capital position"; ATP's "debt is married with our production program."[138]

- September 29, 2011, Reese: "I can't fight rumors [of bankruptcy] or reports, all I can do is continue to deliver on the promises we've made. Our expectation is that everything is going to be fine."[139]

- November 9, 2011, Bulmahn and Reese: "While we believe we can continue to meet our obligations for at least the next twelve months, our cash flow projections are highly dependent upon numerous assumptions including the timing and rates of production from our new wells, the sales prices we realize for our oil and natural gas, the cost to develop and produce our reserves, and a number of other factors, some of which are beyond our control."[140]

- November 10, 2011, Reese: Statement in interview with *Wall Street Journal* that suggestions ATP was sinking into bankruptcy were "punitive," and that "[r]ight now we believe we have complete control of our destiny and we have no plans to miss any interest payments."[141]

- January 4, 2012, Reese: ATP's "entire debt is completely covered by our proved reserves. And sitting on top of that is the infrastructure, some more proved reserves, as well as probable reserves."; "A strong capital position [and] the fact that most of our 2012 projects are completely discretionary."[142]

- March 15, 2012, Bulmahn, Reese, Godwin: "We believe we can continue to meet our obligations for at least the next twelve months through a combination of cash flow from operations, continuing to sell or assign interests in our properties and selling forward our production through the financial derivatives markets, and if necessary, further delaying certain development activities."[143]

---

[138] *Id.* at 72-73.

[139] *Id.* at 75.

[140] *Id.* at 77.

[141] *Id.* at 80.

[142] *Id.* at 82.

[143] *Id.* at 87.

- April 17, 2012, Reese: "Growing production and cash flow. We will continue to do that. In doing so, we will continue to pay down some of the overrides and the net profits interest. . . . Liquidity is sound. I've heard all of the questions and comments about the liquidity. We ended first quarter with over $200 million in cash. We have no near-term maturities or maintenance financial covenants."[144]

- May 10, 2012, Bulmahn and Reese: "[W]e forecast overall production and operating cash flow growth in 2012 due to new production from our Clipper property and from projected increases at our Telemark Hub. . . . Despite continued production delays, we believe we can continue to meet our obligations for at least the next twelve months through a combination of cash flow from operations, continuing to sell or assign interests in our properties and selling forward our production through the financial derivatives markets, and if necessary, further delaying certain development activities."[145]

- May 10, 2012, Bulmahn: "ATP has grappled with numerous timing issues, and yet, we have not missed an interest payment on our debt. We have made every payment, including the most recent $90 million payment on May 1. We are looking forward to the third and fourth quarters. . . ."[146]

Plaintiffs argue that these statements were false or misleading in light of (1) ATP's lack of liquidity, an allegation they base on Reese's statements at the bankruptcy hearing and defendants' low cash position as of June 2012; (2) the "drastic" drop in Well 941 #4's production; (3) ATP's lack of funds to complete the Clipper project; (4) the fact that ATP was "forced" to negotiate with certain vendors to delay payments; (5) the allegedly delinquent trade payables; (6) the defendants' decision

---

[144] *Id.* at 91.

[145] *Id.* at 95.

[146] *Id.* at 97.

to withhold ORRI and NPI payments; and (7) the fact that at some point leading up to the bankruptcy, ATP no longer had the ability to borrow money or further encumber its assets.

Certain of these statements are neither opinions nor projections; rather, they are declarations of historical or then-existing fact, readily capable of verification. As to such statements, however, plaintiffs do not provide any information as to why the statements are false. For example, the complaint does not explain why Reese's July 2011 statements that production was growing and that ATP was "already over where [it was] last year" were false. Plaintiffs may not simply conclude that such statements *must* be false just because a certain well was underperforming, or ATP was having to borrow money. Similarly, plaintiffs take issue with Bulmahn's statement in August 2011 that

> liquidity remains strong as we produce our reserves, we are reducing our debt with payments to NPI and Override interest holders. In fact, because of increased production and higher oil prices, ATP is paying back its debt at an accelerated pace and even had to recognize additional interest expense this quarter.[147]

Plaintiffs' bald assertion that "liquidity was not strong" does not demonstrate the falsity of specific assertions regarding the making of debt payments. Likewise, plaintiffs fail to present facts that contradict Bulmahn's assertion that ATP had not missed an interest payment on its debt or Reese's statements that as of

---

[147] R. Doc. 173 at 68.

January 2012, ATP's reserves covered its debt and that most 2012 projects were discretionary. Nor have plaintiffs presented facts that show Reese's April 17, 2012 statement that ATP ended the first quarter of 2012 with over $200 million in cash or that its debt had no near term maturities or maintenance covenants were untrue.  Rule 9(b) and the PSLRA plainly require specific facts indicating why *each* statement was false or misleading. *Spitzberg*, 2014 WL 3442515, at *4 (citing 15 U.S.C. § 78u-4(b)(1)); *see also Gissin v. Endres*, 739 F. Supp. 2d 488, 501-02 (S.D.N.Y. 2010) (noting that the complaint must "state with particularity the specific facts in support of [plaintiffs'] belief that [defendants'] statements were false when made," and that "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."). The Court therefore disregards these statements in determining whether plaintiffs have stated a claim regarding defendants' representations concerning ATP's liquidity and future prospects.

The rest of the statements are either forward-looking statements, such as the predictions as to whether ATP will be able to continue paying its debts for the next 12 months, or opinions, such as the defendants' assessments that liquidity was "strong" or "sound." Like predictions, statements of opinion include three implicit factual assertions: (1) that the speaker genuinely believes the statement; (2) that he had a reasonable

basis for that belief; and (3) that he was not aware of any
undisclosed facts that tended to seriously undermine the accuracy
of his statement. *See United States v. Causey*, CRIM. H-04-025-SS,
2005 WL 2647976, at *28 (S.D. Tex. Oct. 17, 2005) (noting that
defendant's assertions that Enron's liquidity was "fine," and
"better than fine ... strong," contained the three implied
factual assertions). Again, the Court considers the statements
made before March 31, 2012 separately from those made between
April 1, 2012 and ATP's bankruptcy filing.


Statements Made Before March 31, 2012:

    Of the reasons plaintiffs assert that defendants' statements
were false or misleading, the following allegations relate to
statements made before April 2012: (1) ATP's liquidity was not
strong, as evidenced by Reese's statements at the bankruptcy
hearing; (2) Well 941 #4 experienced a "drastic" drop in
production; (3) ATP lacked the funds to complete the Clipper
project; (4) ATP was "forced" to negotiate with certain vendors
to delay payments; and (5) ATP allegedly had delinquent trade
payables.

    Each of these allegations fails to support an inference that
the defendants knew or were reckless in not knowing that their
statements were false at the time they made them. First, as
discussed, Reese's assertion at the bankruptcy that ATP lacked
the liquidity and revenues to survive a lengthy moratorium was

75

made with the benefit of hindsight and does not shed light on his state of mind before the bankruptcy, much less on the state of mind of his co-defendants. As for his statement that the delays created liquidity problems, that was no secret; in fact, the cash shortage caused by the permitting delays was what prompted ATP to borrow so much money, which it fully disclosed.

Second, Well 941 #4's lower production rate was disclosed in November 2011 and thus does not serve as an "undisclosed fact that would tend seriously to undermine the accuracy of the statements" either after November 2011 or before August 26, 2011, when the 7,000 Boe figure was first announced. With regard to any statements made in the interim period, as discussed above, plaintiffs do not adequately allege that any of the defendants knew of the change in the well's production rate at the time the statements were made. In any event, it makes no sense to suggest that optimistic statements regarding the company's liquidity lacked a reasonable basis because of one well's poor performance; either there was a reasonable basis for concluding that liquidity was strong or there was not, and that fact could be ascertained not by looking at Well #4's production rate, but by comparing ATP's cash on hand to its need for capital at the time a particular statement was made. Assuming ATP's financial statements were accurate (and plaintiffs do not dispute that they were), any investor then or now could check defendants'

optimistic opinions regarding liquidity against the most recent quarterly report.

Third, for the reasons discussed in subsection 4, the Court rejects plaintiffs' conclusory assertion that defendants knew throughout the entire class period that ATP would not be able to pay for the Clipper pipeline in the third quarter of 2012. And fourth, regardless of whether ATP was "forced" to negotiate with vendors to delay payments, or whether this was a voluntary aspect of its strategy to preserve capital, ATP always disclosed that it was engaging in these negotiations, and the delayed payments were improving rather than harming ATP's liquidity by preserving cash.[148] *Cf. Nakkhumpun v. Taylor*, No. 12-CV-01038-CMA-CBS, 2013

---

[148] The statements of plaintiffs' second confidential witness ("CW2") do not support an inference of scienter. Courts must discount allegations from confidential sources, as their anonymity frustrates the process of weighing competing plausible inferences. *Indiana Elec. Workers'*, 537 F.3d at 535 (citing *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 756-57 (7th Cir. 2007)). At a minimum, "such sources must be described with sufficient particularity to support the probability that a person in the position occupied by the source . . . would possess the information pleaded . . . ." *Id.* (quoting *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 353 (5th Cir. 2002)). The complaint states that CW2 is or was a credit manager for "one of the largest oil field service company creditors of ATP." It further states that "in or around 2011 its service agreement with ATP had to be renegotiated due to, among other reasons, ATP's inability to pay money owed according to the terms of its contract." This statement does not even identify with particularity the year in which the alleged renegotiation occurred, much less the basis for CW2's conclusion that ATP was "unable" to pay the creditor according to the terms of the original contract. Even if the Court were to accord this statement full weight, it adds nothing to the analysis, because ATP fully disclosed that it was renegotiating some of its payment schedules, and as discussed above, this action would *improve*--not harm--ATP's liquidity.

WL 5446081, at *6 (D. Colo. Sept. 30, 2013) (rather than demonstrating defendants' knowledge that their company was not "in a far better financial situation," decisions to delay paying vendors, sell assets, and raise capital through an equity offering to avoid bankruptcy were likely viewed by defendants as "contributing to an improving financial situation" at the company).

Finally, ATP always disclosed that it had substantial trade payables.

Plaintiffs do not allege that defendants "cooked the books," nor do they point to specific financial information that would contradict or even undermine defendants' optimistic assessments of the numbers. And many of defendants' statements were just that--their own interpretations of the publicly filed financial results for ATP in various 10-Qs and 10-Ks. *Cf. Gissin*, 739 F. Supp. 2d at 511-12 (statement that "[t]he company continues to maintain a strong balance sheet," which was accompanied by a reference to the company's amount of available cash, was not actionable where the defendant "was speaking in the context of an earning conference call analyzing the financial quarter ending December 31, 2007, and was in fact summarizing [the company's] undisputed SEC disclosures"). And again, "[i]t is difficult to form a 'strong inference' of scienter" from ATP's alleged liquidity problems when plaintiffs do not allege that ATP

misrepresented the information in its financial statements.
*Rosenzweig*, 332 F.3d at 868.

The fact is, investors *knew* that ATP was highly leveraged
and that it needed to borrow money, sell assets, and enter into
various financing transactions to preserve liquidity. ATP
disclosed this fact often and in considerable detail. Plaintiffs
simply do not point to any undisclosed facts that would seriously
undermine their projections regarding ATP's future prospects.
Moreover, that ATP was highly leveraged does not mean it was not
liquid. ATP's numerous financing arrangements, asset sales,
agreements to delay payments to vendors, and sales of ORRIs do
not demonstrate that the defendants felt ATP was experiencing a
liquidity crisis or that it would not be able to pay its
obligations for the next 12 months. Rather, they suggest that
defendants had crafted a strategy they felt would allow ATP to
survive the effects of the moratoria. *Cf. R2 Investments LDC*, 401
F.3d at 645 (holding that rather than suggesting that defendants
knew the company lacked the cash to complete a required note
repurchase, company's order of a cash transfer from its European
subsidiaries suggested that defendants were aware of a
contingency plan to ensure company would complete the
repurchase).


Statements Made After March 31, 2012:

The Court likewise concludes that plaintiffs have failed to state a claim with respect to defendants' predictions and statements of opinion made after the first quarter of 2012 regarding ATP's liquidity and ability to pay its debts. The reasons this claim fails are essentially the same as the reasons for which the Court granted defendants' motion as to statements regarding the Clipper pipeline that were made after March 31, 2012.

Plaintiffs challenge these post-first quarter 2012 statements as false or misleading based on the proximity of the August 17, 2012 bankruptcy filing, the decline in ATP's cash position by June 30, 2012, its eventual inability to borrow money before the bankruptcy, the existence of unpaid vendors, and ATP's alleged withholding of ORRI payments beginning in April 2012.

As to Reese's statement on April 17, 2012 that ATP's liquidity was "sound," plaintiffs have pleaded no specific facts to create an inference that he knew of undisclosed information that would seriously undermine his optimistic opinion about ATP's liquidity. Although plaintiffs rely on ATP's diminished cash balance at the end of June, they allege no facts to indicate that 17 days after the end of the first quarter, which ATP finished with cash of $224 million, Reese knew that cash would be down to $25 million by the end of June. Plaintiffs also rely on ATP's inability to borrow more money before filing for bankruptcy in August 2012. But plaintiffs plead no specific facts to suggest

why Reese had to know this four months earlier.  Further,
plaintiffs point to ATP's statement that it raised $35 million in
June 2012 through a note transaction with an institutional
investor, which undermines the assertion that Reese knew in April
2012 that ATP could not raise money to maintain liquidity.
Further, plaintiffs rely on defendants' alleged decision to begin
withholding certain ORRI payments in April 2012.  As noted
earlier, the recipient of the ORRI acknowledged that it did not
expect to be paid until May 25, 2012 and that it did not send a
notice of default until July of 2012.  Plaintiffs have not
plausibly alleged that Reese knew that ATP could not pay these or
other overrides by April 17, 2012.  Lastly, plaintiffs have not
shown that Reese's statement that ATP ended the first quarter
with over $200 million in cash was false or that his statement
that ATP's debt did not have near-term maturities or maintenance
financial covenants on its debt was false.  Thus, plaintiffs fail
to state a claim regarding Reese's April 17, 2012 statement.

As to Buhlmahn's statement on May 10, 2012 that ATP has not
missed an interest payment on its debt and had made a $90 million
interest payment on May 1, 2012, plaintiffs allege no specific
facts to suggest that these statements were false or misleading
when made.

Finally, the May 10, 2012 statement in ATP's first quarter
10-Q for 2012 that defendants believed that they could continue
to meet ATP's obligations for the next 12 months through a

combination of cash flow from operations, continuing to sell
interests in its properties, selling production in the derivative
market, and delaying development activities is a forward-looking
statement.  This statement was accompanied by risk disclosures
that were sufficiently substantial and meaningful to satisfy the
Exchange Act's Safe Harbor provision.  First, the 10-Q
incorporated the risk disclosures of the 2011 annual report.  The
10-Q also disclosed that ATP's ability to pay its obligations as
they became due was dependent on its ability to increase near-
term production levels and generate sufficient liquidity in a
deficit working capital environment.  It disclosed potential
impediments on both the production and liquidity fronts.  On the
production side, it noted that production in 2012 was lower than
in the last quarter of 2011, that two wells at Gomez had been
postponed, and that it had reworked a disappointing Telemark
well, which would increase capital costs and not be completed
until the second quarter of 2012.  As to capital, it noted that
ATP had a working capital deficit of $267 million despite
increasing its first lien debt funding by $155 million and
issuing $185 million in ORRIs primarily on Clipper and Gomez in
the first quarter.  It disclosed that cash flows were down from
projections because of lower production rates, delays, and higher
capital costs.  The 10-Q stated that ATP was highly leveraged and
economically vulnerable because of the need to service its debt
and manage long-term obligations.  It specifically pointed to the

significant burdens on its future net cash flows from the
financing transactions that required payments from the proceeds
of production.  It warned:

> Our inability to increase near-term production levels and
> generate sufficient liquidity through the actions noted
> above could result in our inability to meet our
> obligations as they come due which would have a material
> adverse effect on us.  In the event we do not achieve the
> projected production and cash flow increases, we will
> attempt to fund any short-term liquidity needs through
> other financing sources; however, there is no assurance
> that we will be able to do so in the future if required
> to meet any short-term liquidity needs.[149]

Further, plaintiffs have not alleged specific facts
indicating that at the time of these disclosures defendants knew
or had reason to know that their prediction was false or
misleading.  Plaintiffs have not stated what facts defendants
knew on May 10, 2012 that would indicate an awareness that their
cash position would significantly erode by June 30, 2012.
Further, plaintiffs' allegation that defendants had already
decided to withhold $24 million in ORRI payments is not supported
by the materials it cites, as plaintiffs point to no ORRI on
which payment was expected that had gone unpaid by May 10, 2012.
Further, the allegation that defendants knew that they could not
borrow more money is not supported by specific facts and is
belied by plaintiffs' allegation that ATP sought and obtained $35
million in additional capital through a note transaction a month
later.  Alleging that ATP filed bankruptcy three months later is

---

[149] R. Doc. 180-9 at 28.

simply alleging fraud by hindsight.[150]  For all the foregoing reasons, plaintiffs have failed to state a claim with respect to defendants' May 10, 2012 prediction that ATP would be able to meet its obligations for the next 12 months through a combination of cash flow from operations, continuing to sell or assign interests in ATP's properties, forward sales of production, and delaying certain development activities.

### B. Section 20(a) Claim

Section 20(a), codified at 15 U.S.C. § 78t(a), provides: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person . . . ." 15 U.S.C. § 78t(a); *see also Tarica v. McDermott Int'l, Inc.*, CIV.A.99-3831, 2000 WL 1346895 (E.D. La. Sept. 19, 2000). Control person liability under section 20(a) requires an underlying violation of the Exchange Act. *See R2 Inv. LDC v. Phillips,* 401 F.3d 638, 641 (5th Cir. 2005).

Here, defendants do not dispute their status as control persons.  Nevertheless, because the Court has found that plaintiffs failed to allege an Exchange Act violation, plaintiffs' Rule 20(a) claim likewise fails.

---

[150] The Court has already dispensed with plaintiffs' argument about the existence of unpaid vendors.

84

**IV. CONCLUSION**

For the foregoing reasons, the Court GRANTS defendants' motion to dismiss plaintiffs' Exchange Act and Section 20(a) claims without prejudice and with leave to amend within 21 days of this order.  The Court also notes that the Consolidated Class Action Complaint that was the subject of this ruling often listed pages and pages of block quotes followed by a list of purported reasons that the statements on the preceding pages were false and misleading.  This type of pleading does not satisfy the PSLRA requirements that plaintiffs identify each statement alleged to be misleading and the reasons why the particular statement was misleading when made.  The Court cautions plaintiffs to avoid this type of pleading if they elect to amend the complaint.

New Orleans, Louisiana, this __21st__ day of November, 2014.


_____*Sarah Vance*_____

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE