**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| FIREFIGHTER'S PENSION & RELIEF FUND OF THE CITY OF NEW ORLEANS, <br><br> Plaintiff, <br><br> vs. <br><br> T. PAUL BULMAHN, ET AL., <br><br> Defendants. | CIVIL ACTION NO.  13-3935 c/w No(s). 13-6083, 13-6084 and 13-6233 <br><br> CHIEF JUDGE SARAH S. VANCE, Section R MAGISTRATE JUDGE SALLY SHUSHAN, Division 1 <br><br> **COMPLAINT – CLASS ACTION** <br><br> **Pertains to Nos. 13-6083, 13-6084 and 13-6233** |

<u>**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**</u>

## TABLE OF CONTENTS

I.   INTRODUCTION AND OVERVIEW ........................................................... 2

II.  JURISDICTION AND VENUE .................................................................. 6

III. PARTIES ........................................................................................ 6

    A.   Lead Plaintiffs .......................................................................... 6

    B.   Defendants ............................................................................... 8

    C.   Non-Party ATP ......................................................................... 10

IV.  CLASS ACTION ALLEGATIONS ............................................................ 10

V.   FACTUAL BACKGROUND .................................................................... 12

    A.   Background on ATP and Its Business .............................................. 12

    B.   The Deepwater Horizon Explosion and Resulting Moratoria .................. 14

    C.   ATP's Post Deepwater Horizon Explosion Activities ........................... 17

        (1)   The Clipper Project ............................................................ 17

        (2)   The Telemark Hub .............................................................. 20

    D.   Matt McCarroll's Six Day Tenure as CEO ........................................ 27

    E.   ATP's Undisclosed Deteriorating Financial Condition and Liquidity Crisis ... 29

        (1)   The Bankruptcy Action Has Revealed That During The Class Period, The Defendants Knew That ATP Was In A Liquidity Crisis And Could Not Survive The Moratoria ........................................................ 29

        (2)   The Bankruptcy Action Has Revealed That ATP Had Unpaid Obligations During The Class Period .................................................... 38

        (3)   The Bankruptcy Action Has Revealed that ATP Failed to Pay Overriding Royalty Interests and Net Profit Interests During the Later Part of the Class Period ................................................................... 44

        (4)   The Bankruptcy Action Has Revealed that ATP's Debt Wholly Encumbered the Value of Its Assets ......................................... 49

    F.   ATP Files for Bankruptcy ............................................................ 53

VI.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ... 55

A.     Relevant Disclosure Requirements ....................................................... 57

     (1)     Regulation S-K, Item 303 ...................................................... 57

     (2)     SEC Rule 10b-5(b) ................................................................. 59

B.     The Registration Statement ................................................................... 60

C.     January 5, 2011 Pritchard Capital Partners Energize Conference ....................... 62

D.     Year End 2010 Financial Results ....................................................... 64

E.     April 2011 Independent Petroleum Association of American ("IPAA") Oil & Gas Investment Symposium New York Conference ..................................... 66

F.     First Quarter 2011 Financial Results ................................................... 68

G.     July 2011 Global Hunter Securities Energy, China, Metals and Mining Conference ........................................................................................... 69

H.     Second Quarter 2011 Financial Results .............................................. 70

I.     August 2011 EnerCom Incorporated The Oil & Gas Conference ..................... 74

J.     September 2011 Rodman Renshaw Global Investment Conference ................... 75

K.     September 2011 Moody's Report and Response ................................... 79

L.     Third Quarter 2011 Financial Results ................................................. 81

M.     January 4, 2012 Pritchard Capital Partner LLC Energize Conference ................ 88

N.     February 2012 JP Morgan High Yield & Leveraged Finance Conference.......... 91

O.     Year End 2011 Financial Results ....................................................... 93

P.     April 2012 IPAA Oil & Gas Investment Symposium ......................................... 99

Q.     First Quarter 2012 Financial Results ................................................. 103

R.     June 2012 Announcements of the Hiring and Resignation of Matt McCarroll .. 109

VII.     ADDITIONAL SCIENTER ALLEGATIONS ................................................ 112

VIII.     LOSS CAUSATION ............................................................................... 113

IX.     NO SAFE HARBOR ............................................................................... 120

X.      APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET
        DOCTRINE ................................................................................................................ 121

XI.     CAUSES OF ACTION ............................................................................................... 123

COUNT I (Against All Defendants) Violation of Section 10(b) of the Exchange Act and Rule
        10b-5  Promulgated Thereunder ....................................................................... 123

COUNT II (Against All Defendants) Liability Pursuant to Section 20(a) of the Exchange Act 125

XII.    PRAYER FOR RELIEF .............................................................................................. 126

XIII.   JURY TRIAL DEMANDED ....................................................................................... 126

Court-appointed Lead Plaintiffs Brian M. Neiman, William R. Kruse, and the Moshe Issac Foundation ("Lead Plaintiffs"), individually and on behalf of all other persons and entities who purchased the common stock of ATP Oil & Gas Corporation ("ATP" or the "Company") in the public market during the period December 16, 2010 through the Company's bankruptcy filing on August 17, 2012, inclusive (the "Class Period") and who were damaged thereby, by and through their undersigned attorneys, allege the following based upon personal knowledge as to Lead Plaintiffs' own acts, and upon information and belief as to all other matters.

Lead Plaintiffs' allegations are based on the investigation conducted by and through Lead Plaintiffs' attorneys, which included, among other things:  (a) a review and analysis of ATP's public filings with the United States Securities and Exchange Commission ("SEC"); (b) a review and analysis of certain wire and press releases, public statements, and other publications disseminated by or concerning ATP and the defendants named herein and related parties; (c) a review and analysis of ATP's press conferences, analyst conference calls, conferences, presentations, and corporate website; (d) a review and analysis of other publicly available information concerning ATP and the defendants named herein; (e) a review of filings in ATP's Bankruptcy Action (as defined herein); and (f) interviews with individuals possessing specific, personal knowledge of the facts alleged herein, including former ATP employees (individually, "Confidential Witness" or "CW," and collectively, the "Confidential Witnesses" or "CWs"). Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      INTRODUCTION AND OVERVIEW

1.      This federal securities class action concerns the collapse of ATP, a company that, prior to its bankruptcy, was engaged in the acquisition, development, and production of oil and natural gas properties.[1]  Prior to 2010, ATP sought to acquire and develop properties with proven undeveloped reserves in the Gulf of Mexico and North Sea.  The majority of ATP's business was in the Gulf of Mexico.

2.      On April 20, 2010, the Deepwater Horizon, a deepwater drilling rig operating in the Outer Continental Shelf ("OCS") in the Gulf of Mexico exploded, burned for two days, and sank, resulting in the largest oil spill in the history of the Gulf of Mexico.  As a result of the Deepwater Horizon explosion, the United States Department of the Interior ("DOI") issued two moratoria that essentially halted all drilling in water depths greater than 500 feet in the Gulf of Mexico between May 6, 2010 and October 12, 2010.  Although both moratoria were eventually lifted, as of December 16, 2010, no new deepwater drilling permits had been issued, resulting in what was referred to in the industry as a "*de facto* moratorium."  It was not until February 2011 when the first permit was issued after the moratoria, and ATP was not issued a permit until on or about March 18, 2011.

---

[1] Lead Plaintiffs respectfully re-urge and re-allege all of the claims and allegations set forth in the Consolidated Class Action Complaint, Dkt. No. 173, as if copied herein *in extenso* and *in toto*.  Lead Plaintiffs incorporate by reference these claims and allegations for the sole purpose of preserving those claims for any appeal (if necessary).  *See, e.g., Carrol v. Fort James Corp.*, 470 F.3d 1171, 1175 (5th Cir. 2006) (finding similar clause in amended complaint, incorporating by reference dismissed claims alleged in an earlier complaint, sufficient to preserve dismissed claims for appeal); *Canal Ins. Co. v. Coleman*, 625 F.3d 244, 246 n.2 (5th Cir. 2010) an amended complaint "supersedes [the] original complaint and renders it of no legal effect 'unless the amended complaint specifically refers to and adopts or incorporates by reference the earlier pleading'") (quoting *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994).

3.      On or about October 12, 2010, ATP filed a Form S-4 Registration Statement (the "Registration Statement") with the SEC, indicating its intent to issue 11.875% Senior Second Lien Exchange Notes (the "Notes"), and exchange those notes for $1.5 billion of privately placed notes which had been sold by ATP in April 2010 (the "Exchange").   After one amendment on December 14, 2010, the Company filed a Prospectus (the "Prospectus") on December 16, 2010 on Form 424B3, which was declared effective by the SEC on the same day.   Pursuant to the Registration Statement and Prospectus, ATP executed the Exchange.

4.      The Registration Statement and Prospectus contained materially false and misleading statements and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. ATP and the Defendants continued to make these, and other, materially false and misleading statements and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading throughout the Class Period in SEC filings, press conferences, and other public statements.   For example, Defendants repeatedly characterized ATP's liquidity as "strong" or "sound," and assured investors that it could meet all obligations for the next twelve months.   However, at the time these statements were made, ATP was in a liquidity crisis, and was unable to meet its current obligations.   ATP was in a zone of insolvency from May 2010 forward, was delaying payments to vendors and routine maintenance to manage cash flow, and was constantly negotiating to provide vendors with overriding royalty interests or net profit interests instead of payment. Defendants knew, or were severely reckless in not knowing, of these circumstances.

5.      Moreover, on April 17, 2012, less than four months prior to the bankruptcy, Defendant Reese described ATP's liquidity as "sound."   And on May 10, 2012, just over a

month before ATP hired bankruptcy advisors and just three months before the Company filed for bankruptcy, Defendant Bulmahn misleadingly stated "we believe we can continue to fund our projected capital expenditures and our existing obligations, including our long-term debt and other obligations . . ., for at least the next twelve months."   In truth, however, when this statement was made ATP was way behind on paying its trade payables and was in the process of unlawfully withholding millions of dollars of overriding royalty interests and net profit interests proceeds from the holders of those interests.

6.      On June 1, 2012, Matt McCarroll accepted the position of Chief Executive Officer of ATP.  Shortly thereafter, McCarroll abruptly resigned after discovering ATP's finances were a "disaster," far worse than he had believed when he accepted the position; and after management refused his advice to begin restructuring immediately.   On June 7, 2010, Defendants' falsely attributed McCarroll's resignation to the failure "to reach a mutually agreeable employment agreement."

7.      On August 17, 2012, ATP announced that it was filing for Chapter 11 bankruptcy. The Company reported total debts of $3.49 billion and assets of $3.64 billion.  It announced that it was going to continue operating during its financial restructuring using $618 million in debtor-in-possession ("DIP") funding.  The bankruptcy case is styled *In re ATP Oil & Gas Corp.*, Case No. 12-36187 (Bankr. S.D. Tex.) (the "Bankruptcy Action").   Once ATP's true financial condition started being revealed through a series of partial disclosures culminating in ATP's bankruptcy, the price of ATP common stock fell, causing the Class damages.

8.      In addition, Defendant Albert L. Reese, Jr. ("Reese"), the Chief Financial Officer ("CFO") of ATP, made false statements concerning ATP's production rates and cash flow in September 2011.  On September 12, 2011, Defendant Reese spoke at the Rodman Renshaw

4

Global Investment Conference, and stated that ATP was producing "31,000 barrels [per day] that's with the new Telemark well."

9.      On September 26, 2011, Moody's Investors Service ("Moody's") issued a report that stated ATP had a "high likelihood" of restructuring and its asset base and its cash flow was "not sufficient to cover" ATP's second-lien notes.  The Moody's report was also published in a September 29, 2011 Bloomberg News report.  In response, Defendant Reese gave an interview to Bloomberg News, which published an article on September 29, 2011 stating that ATP "expects to pump enough oil from new wells during the next three years to avoid defaulting on $1.5 billion in debt."  Defendant Reese was quoted as saying "I can't fight rumors or reports, all I can do is continue to deliver on the promises we've made."

10.     However, at the time of Defendant Reese's presentation to the Rodman Renshaw Global Investment Conference, Bloomberg News interview, and the Bloomberg article's publication, ATP's production was falling, and in fact below the 31,000 barrels per day production figure ATP had disclosed publicly in August 2011.  Reese, as well as the other Defendants, received weekly email reports detailing well specific and company-wide production levels, and therefore knew or were severely reckless in not knowing about the lower production and its negative effect on ATP's liquidity and cash flow.  When the truth about ATP's production was revealed in November 2011, the price of ATP's common stock fell, causing the Class damages.

11.     As a result of the materially false and misleading misstatements and omissions detailed herein, the price of the Company's stock fell from $15.36 at the beginning of the Class Period to $0.30 at the time of the bankruptcy filing.

## II.   JURISDICTION AND VENUE

12.   The claims alleged herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a)), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.110b-5.

13.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

14.   This Court has personal jurisdiction over all Defendants named herein because they conducted business in, resided in, and/or were citizens of this District during the Class Period.  In addition, Defendants have consented to the personal jurisdiction of this District by moving the Southern District of Texas to transfer this litigation to this District.

15.   Venue is proper in this Court pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b), as a substantial part of the events or omissions giving rise to the claims alleged herein, including the dissemination of materially false and misleading statements and reports prepared by or with the participation, acquiescence, encouragement, cooperation, or assistance of Defendants, occurred, at least in part, in this District.  In addition, Defendants purposefully availed themselves of the benefits of this District by, among other things, moving the Southern District of Texas to transfer this litigation to this District.

## III.   PARTIES

### A.   Lead Plaintiffs

16.   On December 6, 2013, the Court appointed Brian M. Neiman, William Kruse, and the Moshe Issac Foundation to serve as Lead Plaintiffs for the Class in this consolidated class action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

17.   Brian M. Neiman purchased ATP common stock in reliance on Defendants' materially false and misleading statements and omissions of material facts and/or the integrity of

the market for ATP common stock at artificially inflated prices during the Class Period, and suffered economic loss and damages when the truth about ATP that was misrepresented and omitted during the Class Period was revealed to the market.  The certification of Brian M. Neiman, with a detailed listing of transactions in ATP common stock during the Class Period, was filed with this Court on November 5, 2013.  (Dkt. No. 103-2.)

18.    William R. Kruse purchased ATP common stock in reliance on Defendants' materially false and misleading statements and omissions of material facts and/or the integrity of the market for ATP securities at artificially inflated prices during the Class Period, and suffered economic loss and damages when the truth about ATP that was misrepresented and omitted during the Class Period was revealed to the market.   In addition, William Kruse has an assignment of claim from his wife, Deborah L. Kruse, who also purchased ATP common stock in reliance on Defendants' materially false and misleading statements and omissions of material facts and/or the integrity of the market for ATP common stock at artificially inflated prices during the Class Period, and suffered economic loss and damages when the truth about ATP that was misrepresented and omitted during the Class Period was revealed to the market.   The certification of William R. Kruse and his assignment of claim from Deborah L. Kruse, with detailed listings of transactions in ATP common stock during the Class Period, was filed with this Court on November 5, 2013.  (Dkt. No. 103-2.)

19.    The Moshe Issac Foundation purchased ATP common stock in reliance on Defendants' materially false and misleading statements and omissions of material facts and/or the integrity of the market for ATP common stock at artificially inflated prices during the Class Period,  and suffered economic loss and damages when the truth about ATP that was misrepresented and omitted during the Class Period was revealed to the market.   The

certification of Robert Konig, the Comptroller of the Moshe Issac Foundation, with a detailed listing of transactions in ATP common stock during the Class Period, was filed with this Court on October 24, 2013.  (Dkt. No. 95-4.)

### B.   Defendants

20.    Defendant T. Paul Bulmahn ("Bulmahn") served as the Chairman, Chief Executive Officer ("CEO") of ATP, and a Director of ATP since May 2008.  Prior to that point, he served as Chairman and President of ATP since he founded ATP in 1991.  During the Class Period, Bulmahn signed the Registration Statement, ATP's annual report for the year ended December 31, 2010 on Form 10-K, filed with the SEC on March 16, 2011 ("2010 10-K"), and ATP's annual report for the year ended December 31, 2011 on Form 10-K, filed with the SEC on March 15, 2012 ("2011 10-K").  In addition, during the Class Period, Bulmahn certified, as Principal Executive Officer, pursuant to Rule 13a-14(a) of the Exchange Act, and certified pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"), the following filings with the SEC by ATP:  the 2010 10-K; the 2011 10-K; ATP's quarterly report for the three month period ended March 31, 2011 on Form 10-Q, filed with the SEC on May 10, 2011 (the "2011 1Q 10-Q"); ATP's quarterly report for the three month period ended June 3, 2011 on Form 10-Q, filed with the SEC on August 9, 2011 (the "2011 2Q 10-Q"); ATP's quarterly report for the three month period ended September 30, 2011 on Form 10-Q, filed with the SEC on November 9, 2011 (the "2011 3Q 10-Q"); and ATP's quarterly report for the three month period ended March 31, 2012 on Form 10-Q, filed with the SEC on May 10, 2012 (the "2012 1Q 10-Q").

21.    Defendant Albert L. Reese, Jr. served as the CFO of ATP since March 1999.  Prior to that point, he served, in a consulting capacity, as ATP's director of finance from 1991 through March 1999.  During the Class Period, Reese signed the Registration Statement, ATP's

2010 10-K; ATP's 2011 1Q 10-Q; ATP's 2011 2Q 10-Q; ATP's 2011 3Q 10-Q; ATP's 2011 10-K; and ATP's 2012 1Q 10-Q.  In addition, during the Class Period, Reese certified, as Principal Financial Officer, pursuant to Rule 13a-14(a) of the Exchange Act, and certified pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act, the 2010 10-K, the 2011 10-K, and each of the foregoing Form 10-Qs.  During the Class Period, Reese also signed each Form 8-K that was filed with the SEC (press releases issued by ATP were filed with the SEC as an exhibit to Form 8-Ks).

22.     Defendant Keith R. Godwin ("Godwin") served as ATP's Chief Accounting Officer since April 2004.  Prior to that point, he served as Controller and Vice President from August 2000 to March 2004 and as Controller from 1997 to July 2000.  During the Class Period, Godwin signed the Registration Statement, ATP's 2010 10-K, and ATP's 2011 10-K.

23.     Defendant Leland E. Tate ("Tate") served as the President of ATP since May 2008.  Prior to that point, he served as ATP's Chief Operating Officer ("COO") since December 2003 and Sr. Vice President, Operations since August 2000.  During the Class Period, Tate made certain false and misleading statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading .

24.     The individuals listed in paragraphs 20 through 23 are referred to herein collectively as the "Defendants."  The Defendants participated in a fraudulent scheme and course of business that operated as a fraud or deceit upon purchasers of ATP common stock, by disseminating materially false and misleading statements and/or concealing material adverse facts.   The scheme deceived the investing public regarding ATP's accounting, business, revenues, earnings, liquidity, present and future prospects, growth, operations and the intrinsic

value of ATP's securities and induced members of the Class to purchase ATP common stock at artificially-inflated prices and caused them to be damaged when the truth about ATP was revealed and ATP's stock price dropped significantly.

### C.   Non-Party ATP

25.     ATP is a Texas Corporation with its principal place of business located at 4600 Post Oak Place, Suite 100, Houston, Texas during the Class Period.  During the Class Period, ATP common stock traded and was listed on the NASDAQ stock market under the symbol "ATPG".  ATP common stock currently trades on the Over-the-Counter ("OTC") market under the symbol "ATPAQ".  During the Class Period, ATP's common stock was part of the BI Global Independent E&Ps and Integrated Oils Index ("BI Global Oil Index").  Due to ATP's bankruptcy filing, ATP is not a party to this action.

## IV.   CLASS ACTION ALLEGATIONS

26.     Lead Plaintiffs bring this action as a class action on behalf of a Class, consisting of all persons who purchased ATP common stock on the public market during the Class Period and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of ATP, at all relevant times, members of their families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

27.     This action is brought pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3).

28.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are potentially thousands of members in the proposed Class.  During the Class Period,

approximately 52 million shares of ATP common stock were outstanding and actively traded on the NASDAQ.  The proposed Class may be identified from records maintained by ATP or its transfer agent and may be notified of the pendency of this action by mail using a form of notice similar to that customarily used in securities class actions.

29.    Lead Plaintiffs' claims are typical of the claims of the members of the Class. Lead Plaintiffs purchased ATP common stock on the public market during the Class Period and were damaged by Defendants' violations of the Exchange Act.  All members of the Class are similarly affected by Defendants' wrongful conduct.

30.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests antagonistic to or in conflict with the Class they seek to represent.

31.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.    whether Sections 10(b) or 20(a) the Exchange Act, or Rule 10b-5 promulgated thereunder, were violated by Defendants' acts as alleged herein;

b.    whether ATP's filings with the SEC, including the Registration Statement, the Prospectus, and its quarter-end and year-end reports, the documents referenced therein, and/or subsequent public statements by Defendants on behalf of ATP were materially false or misleading;

c.    whether Defendants acted with scienter in misrepresenting and/or omitting to state material facts;

     d.   whether the market price of ATP common stock was artificially inflated due to the material misrepresentations and/or non-disclosures complained of herein; and

     e.   to what extent Lead Plaintiffs and members of the Class have sustained damages and the proper measure of damages.

32.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## V.    FACTUAL BACKGROUND

### A.    Background on ATP and Its Business

33.    Prior to its bankruptcy, ATP was engaged in the acquisition, development, and production of oil and natural gas properties. ATP sought to acquire and develop properties with proven undeveloped reserves in the Gulf of Mexico and North Sea that were economically attractive, but not strategic to major or large independent exploration-oriented oil and gas companies. ATP also had licenses for exploration in the Mediterranean Sea.

34.    The majority of ATP's business was in the Gulf of Mexico. ATP operated and maintained 90% of its oil and gas wells in the Gulf of Mexico. As of December 31, 2009, ATP had leasehold and other interests in 62 offshore blocks and 104 wells, including 19 subsea wells, in the Gulf of Mexico. A "well" is the hole drilled in the earth/ocean floor to access oil or natural gas below. A "block" is "an acreage sub-division that measures approximately 10 x 20 kilometers, forming part of a quadrant." ATP operated 93 of the wells, and 95% of the subsea wells. ATP also had interests in 11 blocks and three subsea wells in the North Sea.

35.      According to ATP's 2010 10-K, as of December 31, 2010, ATP had 55 full-time employees in its Houston office, 7 full-time employees in its U.K. office and 2 full-time employees in its Netherlands office.   According to ATP's 2011 10-K, ATP had 59 full-time employees in its Houston office, 7 full-time employees in its U.K. office and 2 full-time employees in its Netherlands office.

36.      As of March 2010, ATP owned an interest in 36 oil platforms, including two production facilities named the ATP Innovator and the ATP Titan.  A "platform" is an offshore structure that is permanently fixed to the seabed.  A "floating production facility" is a floating vessel used for the processing of hydrocarbons and the storage of oil that can be moved from location to location.   According to the Registration Statement and Prospectus, "[t]he floating production facilities have longer useful lives than the underlying reserves and are capable of redeployment to new producing locations upon depletion of the reserves where they were initially deployed. Accordingly, they are expected to be moved several times over their useful lives."   ATP was also building a third floating production facility, the Octabuoy, in China, which, according to the Registration Statement and Prospectus, was for "for initial deployment at our Cheviot Hub in the U.K. North Sea during 2012."

37.      As of March 16, 2010, both the ATP Innovator and ATP Titan were operating in the Gulf of Mexico.  The ATP Innovator was operating at ATP's Gomez Hub, and the ATP Titan was operating at ATP's Telemark Hub.  The Telemark Hub and the Gomez Hub were production "hubs" that enabled ATP to drill and extract oil and natural gas from multiple wells from a single production facility (the Titan and the Innovator).  One of the blocks at the Telemark Hub was Mississippi Canyon ("MC") Block 941.

38.     In the Registration Statement and Prospectus, ATP stated that "[t]hese floating production facilities are fundamental to our hub strategy and business plan. The presence of these facilities creates a competitive advantage for us in connection with considering possible additional acquisitions in a large area surrounding each installation."

39.     In addition to its Telemark Hub and Gomez Hub, ATP was developing its "Clipper" project, an ATP exploration and drilling operation in the Gulf of Mexico located at Green Canyon ("GC") Blocks 299, 300, and 344.

**B.      The Deepwater Horizon Explosion and Resulting Moratoria**

40.     On April 20, 2010, a well blowout from the ultra-deepwater drilling rig Deepwater Horizon, which was operating in the OCS in the Gulf of Mexico, resulted in an explosion, a two day fire, and the sinking of the drilling rig, which caused the largest oil spill in the history of the Gulf of Mexico.

41.     In response, on May 6, 2010, the DOI instructed the Minerals Management Service (the "MMS") to stop issuing drilling permits for OCS wells and to suspend existing OCS drilling permits issued after April 20, 2010, until May 28, 2010.  Then, on May 28, 2010, DOI issued a moratorium that essentially halted all drilling in water depths greater than 500 feet in the Gulf of Mexico ("Moratorium I").  Moratorium I was originally scheduled to last for six months, but was later judicially enjoined.

42.     In response to the injunction against Moratorium I, on July 12, 2010, the DOI issued a second moratorium ("Moratorium II") that (i) specifically superseded Moratorium I, (ii) suspended all existing operations in the Gulf of Mexico and other regions of the OCS utilizing a subsea blowout preventer ("BOP") or a surface BOP on a floating facility, and (iii) suspended pending and future permits to drill wells involving the use of a subsurface BOP or a surface BOP on a floating facility.

14

43.     Moratorium II was lifted on October 12, 2010.   However, no new deepwater drilling permits were issued until February 2011, resulting in what was referred to in the industry as a "de facto moratorium."   The moratoria halted all or most of ATP's operations in the Gulf of Mexico.   ATP was not issued a permit until on or about March 18, 2011, which it announced in a press release of that date.

44.     As alleged in a lawsuit filed by ATP against the United States government,[2] prior to DOI's imposition of the suspension orders and moratoria, ATP's drilling plans for 2010 included the following: (a) to drill and complete a well on the MC 305 Lease (MC 305 Well No. SS002 ST 2) in the spring of 2010 using the Diamond Ocean Confidence drilling rig; (b) to continue drilling wells on the MC 941 Lease (MC 941 Wells Nos. 3 and 4) and the MC 942 Lease (MC 942 Well No. 2) in the spring and early summer of 2010 using the Nabors 202 Platform Rig from the Titan Platform; (c) to drill wells on the MC 711 Lease (MC 711 Well Nos. 9 and 10) after hurricane season in 2010, using the Diamond Ocean Victory Rig; (d) to produce oil and/or gas from the wells on the MC 941 Lease and the MC 942 Lease through the use of the Titan Platform; and (e) to produce oil and/or gas from the wells on the MC 711  Lease  through the  use  of  the  Innovator Platform.

45.     As further alleged by ATP in its lawsuit against the United States government, throughout the moratoria and thereafter, ATP was obligated on the Nabors/ATP Contract and on the Diamond/ATP Ocean Victory Contract.  Even though no drilling could take place, ATP continued to pay Nabors for the Nabors 202 Rig and Diamond Offshore for Ocean Victory Rig. According to ATP, for use of the Nabors 202 Platform Rig, ATP agreed to pay a day rate of

---

[2] Complaint, *ATP Oil & Gas Corp. v. USA*, Case No. 12-379 (U.S. Fed. Claims Ct. June 14, 2012).

$64,500.  According to ATP, for use of the Ocean Confidence, ATP agreed to pay a day rate and standby daily rate of $500,000.   ATP acquired the use of the Ocean Confidence *via* an assignment of rights from Murphy Exploration & Production Company U.S.A.  According to ATP, for use of the Ocean Victory, ATP agreed to pay a day rate and standby daily rate of $540,000.   ATP was, however, able to negotiate a restructure of the Diamond/ATP Ocean Victory Contract, but still paid Diamond substantial sums over the balance of such contract.

46.    In its lawsuit against the United States government, ATP described the effect of the moratoria on the Company:

- From the initiation of the first moratorium until ATP received the permit to drill the MC 941 Well No. 4 on March 11, 2011 (a period of more than nine months), ATP was prohibited from conducting drilling activities on such well.

- ATP planned to use the Nabors 202 Rig to drill wells on the MC 941 Lease and MC 942 Lease. ATP continued to pay Nabors under the Nabors/ATP 202 Contract even though it was prevented from using the Nabors 202 Rig as a result of the moratoria and permitting delays which ensued after the October 12 Directive. The cost to ATP for the Nabors 202's idle time caused by the moratoria and unreasonable permitting delays is in excess of $13 million.

- ATP terminated the ATP/Murphy Assignment at a cost to ATP of in excess of $8 million. ATP continued to pay Diamond Offshore under the Diamond/ATP Ocean Victory Contract even though it was prevented from using the Ocean Victory Rig as a result of the moratoria and permitted delays which ensued after the October 12 Directive. The cost to ATP for the Ocean Victory's idle time caused by the suspensions, moratoria, and the DOI's subsequent delays is in excess of $25 million.

- The imposition of the moratoria caused ATP's Titan Platform and the Innovator Platform essentially to be under-utilized, while ATP continued to incur operating costs for those platforms at the higher anticipated utilization rate. Damages for such costs are believed to be in the millions of dollars. In addition, the imposition of the moratoria caused ATP to incur additional lease operating expenses for the Titan and Innovator Platforms that will service wells on the MC 711 Lease, the MC 941 Lease, and the MC 942 Lease due to the delay in drilling and completing wells planned at the time of the moratoria.

Damages for such additional costs are believed to be in the millions of dollars.

- ATP had already incurred drilling costs for the MC 305 Well No. SS002 ST 2 when the DOI directed ATP to suspend operations. In addition, due to the suspension, moratoria, and the current lack of available rigs to drill and complete such well, ATP has lost the opportunity to produce the gas reserves from the reservoir such well was intended to access. Damages for such costs and lost are believed to exceed $22 million.

47.     As alleged in another lawsuit filed by ATP[3] related to the effects of the Moratoria, ATP had spent in excess of $1 billion in infrastructure construction and other capital expenditures related to five of the above mentioned wells, but was denied the planned cash flows from these wells.

48.     The suspension and the moratoria interrupted or delayed anticipated revenues from wells ATP planned to drill and complete and bring on line for production. Following imposition of the suspensions and the moratoria, ATP went into the financial markets to obtain additional working capital to operate. The financing costs to ATP for such working capital were in the millions of dollars.

C.      **ATP's Post Deepwater Horizon Explosion Activities**

(1)     ***The Clipper Project***

49.     As discussed herein, ATP numerous times stated that it expected the Clipper wells to come online for production in the third or fourth quarters of 2012.  ATP further alluded to the plentiful reserves at the Clipper well sites.  However, to monetize the value in those reserves, ATP had to build a pipeline to the nearest production platform, the Murphy Oil platform called the Frontrunner, which was located approximately 16 miles away in the Gulf of Mexico.  As

---

[3] Complaint for Damages, *ATP Oil & Gas Corp. v. BP Exploration & Production, Inc.*, Case No. 13-01962-JB-SS (E.D. La. Apr. 20, 2013).

stated under oath by Defendant Reese, the revenues that would result from completion of the Clipper project were "necessary to begin remedying" ATP's poor financial situation due to the moratoria. As stated by Defendant Reese during the First Day Hearings, the total cost of the project was approximately $140 to $150 million, with approximately $120 million left at the time ATP filed for bankruptcy. Defendant Reese further testified that he was aware of that cost "for a year or so" (approximately August 2011) before ATP declared bankruptcy.

50. ATP, however, lacked the liquidity and cash flow to complete the pipeline and commence production from the Clipper wells. In truth, ATP was already in a liquidity crisis at the time these statements were made. Further, ATP had already financed large portions of its interest in its wells, and as a result would not have the funds necessary to bring those Clipper wells and plentiful reserves into production. As Reese testified under oath, "[o]ngoing project construction costs, declining oil prices and less than anticipated production put [ATP] in the untenable position of running out of cash before it could complete the Clipper Wells project."

51. ATP's lack of liquidity and inability to complete the Clipper Project are supported by the statements of CW3 and CW4. CW3 is a certified public accountant ("CPA") who worked in ATP's accounting and finance department from June 2010 to October 2011. CW3 worked with the ATP finance group on the production model to incorporate it into the accounting done to generate the Company's financial projections. As a result, CW3 was familiar with some of the financing deals ATP had entered into to secure capital during the moratorium. CW3 explained that a primary reason he/she left ATP in October 2011 was because of ATP's poor financial condition; CW3 thought the Company was over-leveraged and was not financially solid. CW3 reported that prior to his/her departure from ATP, "it was clear to see that cash flow was hampered and costs kept growing." CW3 believed that ATP was having serious liquidity

problems.  CW3 stated that ATP entered into deals to secure cash in exchange for a share of future revenues on a number of wells.  According to CW3, these deals left ATP "really exposed" because "even if those [wells] produced like gangbusters, they don't have a right to that money – their cash flows are already spoken for."  CW3 also stated that he/she saw ATP engaged in a lot of these deals all at once, in a short period of time (the 16 months CW3 worked at ATP), and just after the Company had received $1.5 billion in cash from its bonds issue.  CW3 stated that this meant ATP was having serious problems with liquidity, stating that any company that had enough cash for the next year wouldn't have engaged in deals that subjected them to such steep rates and such high payments.  CW3 interacted with Bulmahn on a regular basis.  CW3 also frequently interacted with Godwin and Reese.  CW3 said that these executives could have known that ATP would not survive and cited to the following signs of serious trouble at ATP: "Debt kept piling up – multiple sources of debt were on the balance sheet. In my opinion they couldn't expand any further because they'd sold off their ownership in a lot of properties to do finance deals, to get cash flow. ***Even in projections when they showed cash coming in, it was already spent on their debt.***"

52.     CW4 was the Vice President of Production at ATP from June 2001 until October 2013.  CW4 reported to Defendant Tate until May 2008, and from that point reported to George Morris, ATP's Chief Operating Officer.  CW4 confirmed that the liquidity problems identified by CW3 continued into 2012.  CW4 stated that ATP routinely delayed maintenance work in order to manage its cash flow.  CW4's department was asked to do this more often in the last two years of ATP's existence.  CW4 stated that it was ATP's COO, George Morris, who made the request to put off maintenance and do the work at a later date.  CW4 also stated that putting off payments to vendors was another routine way that ATP handled cash shortages.  According to

CW4, this too picked up in ATP's last two years.   CW4 oversaw invoices in amounts over $150,000.  CW4 received calls from these vendors asking to be paid throughout CW4's tenure at ATP.  In the last two years of ATP's existence, these calls increased notably, CW4 explained.

53.     ATP's executives, including Defendants' Bulmahn, Reese, Tate, and Godwin knew, or were severely reckless in not knowing, of these liquidity problems and ATP's inability to complete the Clipper project because they attended the meetings to discuss financing of ATP's projects.  CW5 was a CPA and an accounting supervisor at ATP  from March 2008 until May 2010.   CW5 reported to ATP's controller, Scott Heflin, who reported to Defendant Godwin. CW5 stated that discussions and decisions on financing of projects occurred entirely at the executive level.

54.     ATP never completed the Clipper wells prior to filing for bankruptcy.  In fact, as stated by Defendant Reese testified during the First Day Hearings, of the approximate $140 to $150 million needed to complete the pipeline for the Clipper well,  $120 million in costs were left at the time of ATP's bankruptcy filing.

### (2)     *The Telemark Hub*

55.     On August 24, 2011, ATP issued a press release announcing the first production from MC Block 941 #4 at the Telemark Hub:

> ATP Oil & Gas Corporation (NASDAQ:ATPG) today announced first oil production at its Mississippi Canyon ("MC") Block 941 A-2 (#4) well in the deepwater Gulf of Mexico. The MC Block 941 A-2 well is located on the Mirage Field and is the third well brought on production at the Telemark Hub location utilizing the ATP Titan floating drilling and production platform. ***The well delivered on ATP's original expectations with an initial rate exceeding 7,000 Boe per day.*** When drilled, the A-2 well encountered four Miocene sands that are approximately 500 feet structurally higher than the same sands in the MC 941 A-1 well. The A-2 well is completed at a measured depth of 17,600 feet in the C and D sands. All permits to immediately begin drilling the fourth well, MC 942 #2, have been approved with production projected later this year. ***Company-wide production now exceeds 31,000 Boe per day.***

> "Bringing the third Telemark Hub well to first production again demonstrates ATP's technical expertise and safe operations in the deepwater Gulf of Mexico," said T. Paul Bulmahn, ATP Chairman and CEO. ***"We have finally realized the planned material production revenue of this well that has been much anticipated for 16 months.*** This well was already drilled to 12,000 feet and cased prior to the Macondo spill and became subject to the moratorium. The greater-than-a-billion-dollar investment at Telemark reflects ATP's continuing commitment to develop America's energy resources."

(emphasis added).

56.     On September 12, 2011, Defendant Reese spoke on behalf of ATP at the Rodman Renshaw Global Investment Conference.  During the conference Reese re-confirmed that ATP was producing 31,000 BOE per day.

> You can see the numbers we have here, 21,000 barrels last year; first half of this year about 25,000 barrels, ***most recent report, we said 31,000 barrels that's with the new Telemark well***. On later this year, we do expect to add the last well at Telemark that should be on by the end of this year, sort of Christmas present and New Year's present and Thanksgiving Day present, too early to tell.

(emphasis added).

57.     On September 26, 2011, Moody's published its report stating that ATP had a "high likelihood" of restructuring.   Bloomberg News reported on the Moody's analysis on September 29, 2011 in an article titled "ATP $1.5 Billion of Debt Falls to Yield 23.4%, Trace Data Show":

> ATP shows a "high likelihood" it may face some type of restructuring, analysts from Moody's Investors Service wrote in a Sept. 26 report. ***The company's asset base and cash flows are "not sufficient to cover" the second-lien notes, according to the report.*** Moody's assigns a Caa2 grade to ATP with a "negative" outlook.

The Bloomberg News article further indicated that ATP bond yields "soar[ed] to 23.4% as Moody's cites restructuring 'likelihood.'"

58.     Defendant Reese promptly issued a response to the Moody's article, in which he disputed the criticism of ATP by Moody's, and indicated that increasing production would raise

enough money to pay for the 2015 bonds when they came due.  On Thursday September 29,

2011, Bloomberg News published Defendant Reese's response in an article titled "***ATP Says***

***New Gulf of Mexico Oil Wells to Stave Off Default.***"  The article stated, in relevant part:

> ATP Oil & Gas, one of the first oil explorers allowed to resume drilling in the
> U.S. Gulf of Mexico after the Deepwater Horizon disaster, expects to pump
> enough oil from new wells during the next three years to avoid defaulting on $1.5
> billion in debt.
>
> Moody's Investors Service this week said ATP shows a "high likelihood" it may
> have to restructure its debt because its cash flow and asset base are insufficient to
> cover notes maturing in 2015. The company's $1.79 billion in net debt exceeds
> that of 97 percent of Houston-based ATP's U.S. peers, according to data compiled
> by Bloomberg.
>
> ATP expects to begin production from new wells at its Telemark field this year,
> followed by additional output at the Clipper and Gomez projects in 2012, Entrada
> in 2013 and Cheviot a year later, said Albert L. Reese, ATP's chief financial
> officer. All of those fields are in the Gulf of Mexico, except Cheviot, which is in
> the U.K.
>
> "All of that is before the bonds come due in 2015, so I don't know what Moody's
> is talking about," Reese said today in a telephone interview. "I can't fight rumors
> or reports, all I can do is continue to deliver on the promises we've made. Our
> expectation is that everything is going to be fine."

(emphasis added).

59.     Reese's statement that "I can't fight rumors or reports, all I can do is continue to

deliver on the promises we've made" was an implicit reinforcement of ATP's prior statement

that company-wide production was 31,000 BOE per day and production from MC Block 941 #4

was 7,000 BOE per day.  Reese's statement also served as a denial that ATP had a high

likelihood of undergoing some type of restructuring.

60.     However, contrary to Reese's statements, the new Telemark well was not

producing 7,000 BOE per day and ATP was not producing 31,000 BOE per day.  According to

data for the MC 941 well obtained from the MMS/Bureau of Ocean Energy Management,

Regulation and Enforcement ("BOEM"), at the time of Reese's statements to Bloomberg, the

well at MC Block 941 #4 was producing significantly less than the excess of 7,000 barrels of oil equivalent ("BOE") per day that ATP announced in August 2011.  The Company was also in the zone of insolvency, as alleged by the bankruptcy trustee in his August 2014 Complaint.

61.     According to the data available on the BOEM production data search website,[4] MC Block 941 produced the following amounts of oil and natural gas in 2011:

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Production Data**<br>**Searched by Lease Number and Production Year**<br>**Sorted by Default Sort** | | | | | | | | | |
| Lease Number | Production Month | Production Year | Lease Oil Production*(BBL)* | Lease Gas-Well-Gas Production*(MCF)* | Lease Condensate Production*(BBL)* | Lease Oil-Well-Gas Production*(MCF)* | Lease Water Production*(BBL)* | Producing Completions | Lease Max Water Depth*(meters)* |
| G16661 | 1 | 2011 | 294,251 | 0 | 0 | 343,964 | 124 | 1 | 1,325 |
| G16661 | 2 | 2011 | 260,755 | 0 | 0 | 290,917 | 3,758 | 1 | 1,325 |
| G16661 | 3 | 2011 | 280,533 | 0 | 0 | 326,296 | 10,541 | 1 | 1,325 |
| G16661 | 4 | 2011 | 260,063 | 0 | 0 | 302,423 | 0 | 1 | 1,325 |
| G16661 | 5 | 2011 | 268,629 | 0 | 0 | 305,314 | 23,985 | 1 | 1,325 |
| G16661 | 6 | 2011 | 244,996 | 0 | 0 | 267,262 | 25,811 | 1 | 1,325 |
| G16661 | 7 | 2011 | 247,245 | 0 | 0 | 261,093 | 29,913 | 1 | 1,325 |
| G16661 | 8 | 2011 | 235,519 | 0 | 0 | 245,378 | 31,324 | 2 | 1,325 |
| G16661 | 9 | 2011 | 312,225 | 0 | 0 | 307,884 | 28,986 | 2 | 1,325 |
| G16661 | 10 | 2011 | 298,301 | 0 | 0 | 293,653 | 31,212 | 2 | 1,325 |
| G16661 | 11 | 2011 | 279,688 | 0 | 0 | 277,351 | 34,396 | 2 | 1,325 |
| G16661 | 12 | 2011 | 190,709 | 0 | 0 | 198,082 | 43,997 | 1 | 1,325 |

62.     In July 2011, the last full month before ATP announced the first production from MC Block 941 #4, MC Block 941 produced 247,245 barrels ("BBLS") of crude oil and 261,093 thousand cubic feet ("MCF") of natural gas (equivalent to 43,516 BOE)[5], for a total of 290,761 BOE, or 9,379 BOE per day (31 days).

63.     MC Block 941 #4 was brought online and produced its first oil and gas on or about August 24, 2011.

64.     In September 2011, the first full month after ATP announced the first production from MC Block 941 #4, MC Block 941 produced 312,225 BBL of oil and 307,884 MCF of gas

---

[4] www.data.boem.gov/homepg/data_center/production/production/master.asp.  The BOEM lease number for the MC Block 941 was OCS-G16661.

[5] ATP's 2010 10-K and 2011 10-K stated that "Natural gas is converted into [BOE] based on [6,000 cubic feet of natural gas] to one barrel of crude oil or other liquid hydrocarbons."

(equivalent to 51,314 BOE), equal to a total of 363,539 BOE, or 12,117 BOE per day (30 days). If the 7,000 BOE per day (210,000 for September) of production from MC Block 941 #4 announced by ATP in August 2011 were added to MC Block 941's total July 2011 production, then the total production from MC Block 941 should have been approximately 500,761 BOE (less any expected decline in the wells online in July 2011) or 16,692 BOE per day.

65.     Therefore, when Defendant Reese made his statements in September 2011, MC Block 941 #4 was producing only 2,738 BOE per day (12,117-9,379), or 4,262 BOE per day *less* than the 7,000 BOE per day announced by ATP in August 2011 (7,000-2,738), and ATP was producing less than 31,000 BOE per day.

66.     It was not until November 8 and 9, 2011 that ATP finally disclosed the production problems at MC Block 941 #4, that MC Block 941 #4 was producing less than 7,000 BOE per day, and that ATP was producing less than 31,000 BOE per day.  In fact, as disclosed in ATP's November 8, 2011 Third Quarter 2011 Earnings Press Release and in ATP's November 9, 2011 Third Quarter 2011 Earnings Conference Call, ATP was producing only 24,200 BOE per day, and MC Block 941 #4 was producing only 3,500 BOE per day.  *See* ¶252.

67.     After ATP's lower Company-wide and MC Block 941 #4 production, which undermined Defendant Reese's reinforcement of the August 2011 production announcement, were disclosed on November 8 and 9, 2011, the price of ATP's common stock fell significantly. On November 9, 2011, ATP's common stock closing price was $8.450 per share, a drop of $2.05, or 19.5%, from the previous day's closing price, and a drop of $2.50, or 22.8%, from its November 9, 2011 intra-day high.  On November 10, 2011, the price of ATP's common stock continued to fall, closing at $7.250 per share, down $1.20 per share, or 14.2% from its previous closing price.

68.     The lower production from MC Block 941 #4 at the Telemark Hub cost ATP revenue it needed to complete the Clipper wells connecting pipeline.  ATP needed between $120 and $150 million to complete the pipeline from the Clipper wells to the production facility. Without that pipeline, ATP could not monetize the large reserves present at the Clipper wells. ATP's bankruptcy counsel, Charles S. Kelly ("Kelly"), and Defendant Reese acknowledged during the First Day Hearings that the only way to solve ATP's liquidity crisis was to bring the Clipper wells online.  As stated by Defendant Reese in his declaration in support of the First Day Motions, "declining production" was one of the reasons ATP was "unable to overcome the impact of the moratoria" and "put [ATP] in the untenable position of running out of cash before it could complete the Clipper Wells project and generate the revenues necessary to begin remedying the situation."

69.     At that time, the average price of West Texas Intermediate Crude Oil ("WTI"), according to the Report of Collarini Associates ("Collarini") attached to ATP's 2011 10-K, was $96.16 per barrel.  Applying the lower production amount of 3,500 BOE from MC Block 941 #4 announced by Defendant Tate in the November 9, 2011 conference call (¶252), and assuming that the entire amount was crude oil (although some would be natural gas), ATP was generating approximately $336,560 less per day in September and October 2011, or $20,530,160 in total over this two month period, than the public was led to believe after ATP's August 2011 announcement and Defendant Reese's September 2011 Bloomberg interview.[6]

---

[6] This calculation likely under-values the loss in revenue because, as stated in ATP's November 9, 2011 Third Quarter 2011 Earnings Press Release, "ATP continues to sell a majority of its oil production from both Gomez and Telemark hubs at prices of Louisiana Light Sweet pricing, the LLS pricing, currently trading at a substantial premium of approximately $17 per barrel to West Texas Intermediate pricing, WTI."

70.     The lower production from Telemark would further cost ATP when ATP would need to shut the wells down to repair them and try and increase production.

71.     Defendants Bulmahn, Reese, Godwin and Tate knew, or were severely reckless in not knowing, about the reduced production from MC Block 941 #4 and ATP's lower company-wide production.   CW4 stated that CW4's staff at each of ATP's wells generated a weekly production report containing the output for that well.   CW4's department then emailed those weekly production reports to Defendants Bulmahn, Reese, Tate and Godwin.   The emails contained both company-wide production levels and production levels from individual wells. CW3 confirmed the existence of these reports, stating that he saw either weekly or monthly reports, and that these reports would have been available to Defendants Bulmahn, Reese, Godwin, and Tate.   CW4 was confident that Defendants Bulmahn, Reese, Tate and Godwin had knowledge of the lower production levels at the Telemark well (which included MC 941 #4).

72.     CW4 also headed weekly production meetings every Tuesday, at which production levels were discussed.   Prior to the Class Period, Tate attended these meetings, and during the Class Period, George Morris (COO) attended.   Given CW5's statement that discussions and decisions about financing occurred entirely at the executive level, it is reasonable to infer that the executives discussed production, its generated cash flow, MC Block 941 #4, and its lack of material production revenue amongst themselves.

73.     CW6, who worked as ATP's Vice President of Finance from 2002 through 2010, explained that Bulmahn, Reese, Tate, and Godwin were very involved in decisions related to Telemark.   CW6 further described ATP's business strategy and financing as very risky, including the decision to make further investments in Telemark by going deeper into debt.   As CW6 put it, "you can't bet the whole company on a single project and use debt to finance it"

explaining that "if something goes wrong, you have no options."  In meetings with Bulmahn, Reese, Tate and Godwin, CW6 said, "I'm totally against this," referring to the further investment in Telemark through debt financing.  CW6 compared ATP's strategy of accruing so much debt to gambling in a Las Vegas casino.  CW6 said that one reason he/she left ATP was that CW6 thought the Company was taking too many financial risks.

74.     In addition, Defendant Reese testified at the First Day Hearings that, with respect to the day-to-day operations of the Company, "from a business side, the executive side, financial side [Reese was] very, very well informed."

**D.      Matt McCarroll's Six Day Tenure as CEO**

75.     On June 1, 2012, ATP issued a press release announcing that Mr. Matt McCarroll had joined ATP as Chief Executive Officer, replacing Defendant Bulmahn.

76.     Less than a week later, on June 7, 2012, the new CEO, Mr. McCarroll, abruptly resigned his position, and his purchase of 1 million shares of ATP stock touted only a few days before was rescinded.

77.     While Defendants attributed the almost immediate resignation of Mr. McCarroll to the purported fact that ATP "was unable to reach a mutually agreeable employment agreement with Mr. McCarroll" (ATP's June 7, 2012 press release), McCarroll's own statements show that he resigned his position with ATP because the Company's financial situation was far worse than he -- and necessarily even more so, investors -- understood when he accepted the CEO position and because the Company's management refused to take his advice to begin restructuring immediately.

78.     In an article entitled "Fieldwood CEO offers insight on eye-popping Apache deal" published in the *Houston Business Journal* on July 26, 2013, the author and McCarroll explained:

27

Not long after Matt McCarroll sold off his 4-year-old Houston company, Dynamic Offshore Resources Inc., in February 2012, he figured out he wasn't so good at retirement.

So, in short order, McCarroll was recruited to be CEO of Houston's ATP Oil & Gas Corp. (Nasdaq: ATPG). That lasted four days.

***"I went there knowing it was a turnaround situation, but not realizing until I got there how bad things were. <u>I recommended to the board they start restructuring immediately, and they weren't willing to do it,</u>" he said.***

(emphasis added).

79.     The Honorable Marvin Isgur, the judge presiding over ATP's bankruptcy proceeding, agreed with Mr. McCarroll's assessment:

> But you will recall, those -- most of you have been here as long as I've been here on this case -- that, in the beginning, ***we had a Debtor [ATP] that filed bankruptcy far too late; far, far, too late***. They had used NPI and ORRI proceeds in violation of those agreements. Whether or not that was in violation of -- you know, taking somebody else's money is a question we'll, someday, have to resolve.
>
> ***The Debtor [ATP] had no money.***

(emphasis added.)[7]

80.     Further, although ostensibly declining to provide information in aid of Plaintiffs' investigation, in a brief exchange with Plaintiffs' investigator in December 2014, Mr. McCarroll shed light on the financial condition of ATP during the first week of June 2012, and the reason for his resignation, as summarized below:

- When asked what he found when he saw ATP's books, McCarroll said, "***I left after three days, that says it all.***"

- When asked if ***ATP's finances were a disaster, he said, "Yes."***

- When asked if ATP's executives knew that ATP's finances were a disaster, he said he had no comment.

---

[7] Hearing Transcript at 393, *In re ATP Oil & Gas Corp.*, Case No. 12-36187 (Bankr. S.D. Tex. June 26, 2013) (Doc. No. 2126).

### E. ATP's Undisclosed Deteriorating Financial Condition and Liquidity Crisis

81.     Despite the Defendants' public assurances to the contrary, the moratoria had a profound, negative impact on ATP's liquidity and ability to continue as a going concern. According to ATP's lawsuit against DOI:

> The Oil Spill and its devastating effects had real and lasting significance in the way ATP plans and conducts business. …[T]he direct and consequential damages flowing from the spill forced the Company into a Chapter 11 Bankruptcy. This is a monumental change of fortune for a company that in the days leading up to spill was recognized in the financial bond markets as a company on the rise that was well-positioned for a strong 2010 and 2011. Instead, as a result of the spill, ATP's projected revenue streams for these years were deferred and certain revenue streams were lost entirely. While ATP's actual and projected cash flow was significantly impacted by the spill, ATP's obligations and expenses were not similarly constrained.
>
> *       *       *
>
> [T]he oil spill and the aftermath of the spill impacted ATP's development and implementation of numerous oil and gas production projects, as well as devastated its cash flow, credit rating, borrowing capacity, overall liquidity and caused other impacts.

### (1) *The Bankruptcy Action Has Revealed That During The Class Period, The Defendants Knew That ATP Was In A Liquidity Crisis And Could Not Survive The Moratoria*

82.     During the August 21, 2012 hearing (the "First Day Hearings") on the Bankruptcy Action's First Day Motions (the "First Day Motions"), ATP's bankruptcy counsel, Charles Kelly, acknowledged that the moratoria in the Gulf of Mexico had an "especially profound" impact on ATP.  It interrupted ATP's drilling operations, at significant cost to ATP, while also blocking "ATP's ability to generate those new cash flows while the company continued to endure significant financing costs," Kelly said.  ATP's proposed program to drill six wells in 2010 and 2011 "was not able to proceed given the moratorium."

83.     On August 17, 2012, Defendant Reese submitted a declaration in support of the First Day Motions in the Bankruptcy Action.  That declaration indicated that ATP's problems

29

were pervasive, long-standing and well known to the Defendants.   The Declaration stated in

pertinent part that:

> As detailed further below, due to adverse operational exigencies stemming from the 2010 Gulf drilling moratoria as well as subsequent events, ATP finds itself with over $2 billion of indebtedness and less than $10 million in cash as of the Petition Date. ***However, the path to considerable, short-term improvement is clear, as the Debtor has a very promising, already-drilled project – the "Clipper Wells" project – to which it simply has to complete a pipeline. At the time of completion of such pipeline, originally scheduled for October 2012, the Debtor's cash position should measurably improve***, and much of the relief sought in the First Day Pleadings is targeted toward meeting this paramount goal as soon as possible.

> \*      \*      \*

> When the moratorium was effectively lifted in March 2011, ATP received permits and attempted to generate production from these projects as quickly as possible. By February 2012, ATP was able to complete the Mississippi Canyon 941 A-1, A-2, and Mississippi Canyon 942 A-3 wells in its Telemark field and connect them to the *ATP Titan*. ***To date, because of liquidity constraints, ATP has not been able to return to drill the Mississippi Canyon 305 well, which is on a very large dry gas reservoir producing through the Canyon Express pipeline system, or either of the Gomez #9 and #10 wells, both of which would have tied in to the ATP Innovator.***

> \*      \*      \*

> ***Overall, ATP's inability to complete various wells or commence pipeline construction when planned due to the shutdown in the Gulf created significant liquidity problems, which were exacerbated by less than expected production rates at ATP's Telemark Hub and cost overruns on the Octabuoy. ATP's management, with the assistance of various outside professionals, closely monitored these challenging conditions and evaluated potential alternatives to improve ATP's liquidity position.*** ATP diligently sought to solicit potential partners, joint operators, or investors with respect to its foreign operations to share in the development costs of its North Sea and Eastern Mediterranean oil and gas properties. Although it is generally recognized that the reserves and operations of ATP's foreign affiliates have significant value, ATP has not yet been able to complete a transaction with any parties that will bring in enough financing to complete the construction of the necessary infrastructure to start generating new production from these foreign deepwater operations.

> \*      \*      \*

> *Despite ATP's best efforts, it was unable to overcome the impact of the moratoria when ongoing project construction costs, declining oil prices and less than anticipated production put it in the untenable position of running out of cash before it could complete the Clipper Wells project and generate the revenues necessary to begin remedying its situation. In the period leading up to the Petition Date, ATP found itself facing a severe liquidity crisis, with a cash position of less than $10 million and a substantial backlog of trade payables and amounts due under overriding royalties and net profit interests totaling, in the aggregate, over $70 million[$170 million[8]], along with substantial payments due on the Second Lien Notes later this fall. ATP's inability to make current payments on many of its obligations have resulted in a number of notices of default and lawsuits from its creditors, with some seeking prejudgment relief (such as temporary restraining orders or writs of sequestration) that could further restrict the Company's short-term cash flow and liquidity.*

(emphasis added).  Defendants Bulmahn, Tate and Godwin, knew, or were severely reckless in not knowing, of the existence of these pervasive problems during the Class Period, including ATP's liquidity crisis.  As described by CW5, all decisions regarding finance were made only among ATP's executives.  Further, as described by CW4, ATP routinely delayed maintenance and put off payments to vendors to manage its cash flow.  This instruction came from the executive level of ATP, from the COO George Morris.

84.     According to bankruptcy counsel Kelly, the inability "to drill those wells in that time frame off of the company's business plan shortly after receiving funding of that 1.5 billion dollars second lien [in April 2010], the effects were especially profound on ATP." "As it is a much smaller company than its principal competitors in the Gulf, it has a heavier concentration of operations in the deep water Gulf of Mexico," Kelley said.

85.     When asked at the First Day Hearings, "[H]ow important is it for ATP's business plan to be able to continue to add new revenues and new reserves," Defendant Reese replied:

---

[8] Reese clarified in his testimony during the First Day Hearing that number was actually $170 million.

Oh, it's very -- it's very important. For example, in the business plan that we had for the bondholders [noteholders]. During the latter part of 2010 -- excuse me, 2009 and early part of 2010, we were producing around either side of 15,000 barrels per day. By the time -- our projection was by the time we got into the early part of 2011, that was going to be close to either side of 60,000 barrels a day. What actually happened was we produced around 25,000 barrels a day during those quarters.

86.     Defendant Reese further admitted in testimony during the First Day Hearings that ATP knew it could not survive the moratoria.  When asked "Did ATP have the liquidity and revenues at that time to absorb a lengthy moratorium?" he responded "No.  We could not."

87.     Defendant Reese also testified at the First Day Hearings that Jefferies & Co. ("Jefferies") was retained "in the middle of July" 2012 for the purpose of "addressing and considering DIP [debtor in possession] financing."  He further testified that at this time, ATP had a "strained liquidity position" and "a serious cash flow shortage."  *ATP further retained Mayer Brown LLP to advise it on a potential bankruptcy no later than the last week of June 2012*, as admitted by the bankruptcy proceeding testimony of John Burton Echols, a consultant retained in that process.

88.     Reese further testified at the First Day Hearings that he knew *"for a year or so" that ATP was "going to need substantial funds in order to complete the Clipper project."*  He quantified those funds at approximately $140 to $150 million dollars, with $120 million in costs left at the time of ATP's bankruptcy filing.  He also testified that ATP pursued numerous avenues to borrow money or otherwise obtain financing, including sales of assets throughout 2012, sales of some of the OCS properties, sales of foreign entities, taking on partners, considerations of additional overrides and net profits interests, equity raises, and borrowing against its equity positions in the ATP Titan and ATP Innovator.  Yet despite incurring additional debt obligations, including the sale of $185 million in overrides in the first quarter of

2012,[9] ATP could not generate sufficient capital to maintain operations, let alone complete the Clipper project.

89.   "Our loans do not allow us to incur any more mortgages," Reese testified, adding," "[p]rior to the [bankruptcy] filing, we did not have the ability to go borrow more money or encumber the assets."

90.   Reese testified that ATP's cash position as of March 31, 2012 was about $224 million, and at June 30, 2012, it was about $25 to $30 million.   The Company had quickly burned through the $185 million raised from overrides during the first quarter and was left in largely the same position as if it had not raised the money at all and in no position to raise any more money.

91.   Defendant Bulmahn blamed the moratoria for the Company's bankruptcy, saying, in an interview with a *Forbes Magazine* reporter, that it was "directly attributable to what the government did to us."   *See Forbes Magazine*, "As Oil Company Files For Bankruptcy, CEO Blames Obama" (August 18, 2012).   However, such losses were substantially quantifiable during the Class Period and Defendants dramatically understated the true impact of the moratoria on its deep water operations in the Gulf of Mexico.   Indeed, during the Class Period, Defendants' misrepresented the Company's business prospects, financial condition and liquidity.

92.   Also, on August 15, 2014, the court-appointed Bankruptcy Trustee, who had access to all of the Company's books and records, filed a lawsuit against Defendants' Bulmahn, Reese, Tate and Godwin that evidences they either knew, or were severely reckless in not knowing, that ATP was in a liquidity crisis in May 2010 and could not survive the moratoria.

---

[9] This figure was disclosed by ATP in the Company's 2012 1Q 10-Q, filed with the SEC on May 10, 2012.

Specifically, the Bankruptcy Trustee alleged that ATP was in the zone of insolvency by May 2010, and during the Class Period the Defendants over-monetized ATP's production through $600 million in overriding royalty interests ("ORRIs") and net profits interests ("NPIs")[10] at the expense of the Company's long term viability:

> 46. ***Shortly after the Oil Spill, as early as May 2010, ATP began to have problems with liquidity due to the Oil Spill and foreseeable government response and entered the zone of insolvency, which the Directors and Officers knew. Rather than tighten the belt, Defendants failed to appropriately adjust ATP's business practices to respond to the impending insolvency. Defendants failed to make any of the necessary, obvious and prudent strategic adjustments due the effects of the Oil Spill on ATP's future cash flows and revenues for operations. Following, May 2010, ATP's debts remained greater than its assets at fair valuation, and its financial condition steadily worsened until its eventual demise.***

*       *       *

> 51. More specifically, between January 1, 2012 and June 30, 2012, ATP revised its reserve value for Cheviot from $702.5 million in proved undeveloped reserves to $25.5 million.

> 52. In that same time frame, ATP revised its reserve value for Cheviot from $1,120.1 million in probable undeveloped reserves down to $583.8 million.

*       *       *

> 60. Faced with a need for cash due to the lost and deferred revenue caused by the Oil Spill and their wasteful spending and mismanagement of the company on numerous projects that failed to adequately recognize the severity of the effects of the Oil Spill, Defendants authorized or ratified desperate financing of over $600 million to provide ATP short term cash at the expense of its long term viability. Defendants authorized or ratified the over-monetization of inground hydrocarbons through the purported sale of net profits interests (herein "NPI") and overriding royalty interests (herein "ORRI") in order to pay past due obligations. Defendants

---

[10] Both prior to and during the Class Period ATP sold ORRIs and NPIs to various third parties. During the Class Period, ATP was obligated to pay revenues to those interest owners, among others, within 30 days of receiving the proceeds. ATP was not authorized to use, borrow, appropriate, or transfer the proceeds attributable to the third party interest owners for any purpose except delivery of the proceeds.

34

burdened ATP's current and long-term assets for immediate cash to continue operations after the Oil Spill to ATP's detriment.

61.  The Trustee's position is that these were not truly NPIs or ORRIs, but were loans or executory contracts. This disguised financing was done to evade the requirements of a credit agreement ATP entered into with Credit Suisse after the Oil Spill. ATP had no authority to borrow money with which to fund the capital development of its properties, so it called the loans NPI or ORRI to hide them from Credit Suisse.

62. Whether properly considered loans, NPI and ORRI is irrelevant with respect to the actions of Defendants in authorizing or ratifying these transactions. ***Defendants ignored ATP's future in responding to the impacts of the Oil Spill and foreseeable government response, worsening the inevitable damage resulting from the Oil Spill and destroying any long term prospects for the company. Defendants crippled ATP's ability to profit in the future and cannibalized its assets for short term gains because of the need for immediate cash created by lost and deferred revenue and increased costs due to the Oil Spill and foreseeable government response. The burden placed on these assets by Defendants was so great that they could only be sold for de minimus value when ATP filed for bankruptcy.***

(Emphasis added).[11]

93.     Indeed, ATP's existing production was so burdened by NPIs and ORRIs that it drastically curtailed its ability to obtain further financing and threatened its very existence.

94.     In particular, the Gomez properties were so encumbered by ORRIs that ATP abandoned the properties during the bankruptcy proceeding because it was losing millions of dollars every month from operating the properties.  In particular on May 22, 2013, ATP filed a motion seeking to abandon the Gomez Properties and to reject the related executory contracts and leases.  ATP revealed that operating the Gomez properties was costing it millions of dollars per month:

4. The Debtor's [ATP's] Gomez properties are deepwater leases involving all or parts of three offshore blocks, including Mississippi Canyon ("MC") 711, 754 and

---

[11] Plaintiff's Original Complaint, *Tow v. Bulmahn, et al.,* Case No. 14-3275 (Bankr. S.D. Tex. Aug. 15, 2014) (Doc. No. 1).

755 (collectively, the Gomez Properties"). The Debtor [ATP] owns 100% of the working interests in the MC 711 and 755 blocks and a 75% working interest in block MC 754. Block MC 711 of the Gomez Properties is now producing; additional undrilled locations with proved reserves are also located on block MC 711.

5. In the months following the Petition Date, the Debtor [ATP] operated the Gomez Properties at a steep cost, while production revenues rapidly declined. From any gross revenues of production on the Gomez Properties, the Debtor [ATP] was required to make substantial distributions to the U.S. Government and to permanent royalty holders [*etc.*]. …

6. In addition, on account of any monthly hydrocarbon production, the Debtor [ATP] also is required to make payments to the holders of term ORRIs (to whom amounts are payable within 30-60 days following production, depending on the terms agreed to by the Debtor [ATP] prior to the Petition Date (each, an "ORRI Payment")). And as noted above, with respect to the Gomez Properties, the burdens of the ORRI Payments are substantial, and their effect on cash flow is particularly severe: ***prior to the Petition Date, the Debtor [ATP] entered into agreements by which almost 75% of the gross revenues from any production that occurs from the Gomez Properties must be distributed to such term ORRI holders.***

7. ***For the first six months of this Chapter 11 case, although the Debtor [ATP] was cashflow positive from Gomez production for such period before accounting for these payments, the Debtor's overall cash position declined after giving effect to such payments.*** And beginning with their March 2013 hydrocarbon payments, the Debtor [ATP] determined that it would be cash-flow negative even before such payments, and after accounting for such payments, would incur losses that were likely to exceed $5 million per month.

(Emphasis added).[12]

95.      On June 19, 2013, the bankruptcy court entered an order allowing ATP to abandon the Gomez properties.  The court observed that ATP loses millions of dollars a month from operating the properties:

---

[12] Debtor's Motion for Entry of an Order Pursuant to 11 U.S.C. §365(A) Authorizing Rejection of Certain Unexpired Leases and Executory Contracts Related to the Debtor's Gomez Properties and Abandonment of Any Interests Relating Thereto, *In re ATP Oil & Gas Corp.,* Case No. 12-36187 (Bankr. S.D. Tex. May 22, 2013) (Doc. No. 1902).

> The Gomez Properties are among the many properties ATP owns or in which it has an interest. The Gomez Properties consist of a floating offshore platform along with a network of wells and gathering facilities. ***Prior to filing bankruptcy, ATP entered into a series of sales or financing arrangements in which ATP lost its right to the bulk of the cash proceeds from hydrocarbon production at the Gomez Properties.***
>
> ***It is undisputed that even at times when hydrocarbons are being produced, ATP loses millions of dollars each month from operating the Gomez Properties (as it is not entitled to retain all of the proceeds of the hydrocarbon production).***

(Emphasis added).[13]

96.     As all financing decisions were handled solely at the executive level, Defendants Bulmahn, Reese, Tate and Godwin knew, or were severely reckless in not knowing, of the effect that these transactions were having on ATP.

97.     Also, Defendant Reese admitted his high level of knowledge of these transactions during the Bankruptcy Action.  In response to a question posed at the First Day Hearing, "Could you explain…your role and familiarity with ATP's day-to-day operations," Defendant Reese responded:  "Certainly. As it relates to the financing side, I am the Chief Financial Officer and heavily involved with that, all of our financings.…So certainly from a business side, the executive side, financial side very, very well informed."

98.     Reese further testified that "I was involved deeply in alternative financings."  As Reese acknowledged in his Declaration, "ATP's management, with the assistance of various outside professionals, closely monitored these challenging conditions and evaluated potential alternatives to improve ATP's liquidity position."

---

[13] Memorandum Opinion at 1, *In re ATP Oil & Gas Corp.,* Case No. 12-36187 (Bankr. S.D. Tex. June 19, 2013) (Doc. No. 2078).

(2)   *The Bankruptcy Action Has Revealed That ATP Had Unpaid Obligations During The Class Period*

99.   Despite Defendants' claims throughout the Class Period that ATP's liquidity was sound and strong, and statements as late as May 10, 2012 that ATP "believe[s] we can continue to fund our projected capital expenditures and our existing obligations . . ., for at least the next twelve months," it is clear that ATP was insolvent and not current in paying its obligations as they became due.  For instance legal proceedings both inside and outside the bankruptcy reveal numerous creditors seeking remedies against ATP for unpaid obligations:

a.   Greystar Corporation ("Greystar") provided fishing services, labor, equipment, machinery, materials and supplies to ATP prior to and during the Class Period. ATP failed to pay Greystar for certain services, labor, and equipment starting as early as ***April 19, 2007 through August 17, 2012***, in the aggregate amount of $6,510,143.66.[14]

b.   Bristow U.S., LLC ("Bristow") provided labor, equipment, services, and supplies to ATP during the Class Period.  ATP failed to pay Bristow for invoices dating back at least as early as ***August 31, 2010***, in the aggregate amount of $4,326,877.[15]

c.   Schlumberger Technology Corporation ("Schlumberger") provided services to ATP prior to and during the Class Period.  According to documents filed in an

---

[14] *See* Barry Graham Oil Service, LLC's Complaint for Declaratory Judgment Regarding Validity, Priority, and to Enforce Liens, *Greystar Corporation v. ATP Oil & Gas Corp.,* Case No. 13-03199 (Bankr. S.D. Tex. Aug 16, 2013) (Doc. No. 1).

[15] *See* Complaint for Enforcement of Liens, *Bristow U.S., LLC v. ATP Oil & Gas Corp.*, Case No. 13-03182 (Bankr. S.D. Tex. Aug. 6, 2013) (Doc. No. 1); *see also* Plaintiff's Original Complaint, *In re ATP Oil & Gas Corp.* (Bankr. S.D. Tex. Oct. 15, 2012) (Doc. No. 1).

adversary proceeding against ATP, the Company still owes Schlumberger for services dating back as early as ***March 31, 2011 and continuing through at least May 2012***, in the aggregate amount of $12,136,680.53.[16]

    d.  SEACOR Marine LLC ("SEACOR") provided services to ATP during the Class Period.  According to documents filed in an adversary proceeding, ATP is indebted to SEACOR for services it provided as early as ***June 1, 2011 through July 15, 2012***, in the aggregate amount of $7,082,519.76.[17]

    e.  Nabors Offshore Corporation ("NOC") provided services to ATP during the Class Period.  ATP failed to pay NOC for invoices from ***December 1, 2011 through August 2012*** in the aggregate amount of $16,141,970.14.[18]

    f.  Supreme Service & Specialty Co. Inc. ("Supreme") provided services to ATP during the Class Period.  According to documents filed in an adversary

---

[16] *See* Schlumberger Technology Corporation, Nabors Offshore Corporation, and Supreme Service & Specialty Co. Inc.'s Original Complaint for Declaratory Judgment Regarding Validity, Priority, and Extent of Liens Under Bankruptcy Rule 7001 and to Enforce Liens Against Certain Term Overriding Royalty Interests and Net Profits Interests in Telemark Leases, *Schlumberger Technology Corporation, et al. v. ATP Oil & Gas Corp.,* Case No. 13-03190 (Bankr. S.D. Tex. Aug. 13, 2013) (Doc. No. 1); *see also Schlumberger Technology Corporation, et al. v. ATP Oil & Gas Corp.*, Case No. 13-3212 (Bankr. S.D. Tex. Aug. 20, 2013) (Doc. No. 1).

[17] *See* Plaintiff's Original Complaint, *SEACOR Marine, LLC v. ATP Oil & Gas, et al.,* Case No. 13-03247 (Bankr. S.D. Tex. Sept. 5, 2013) (Doc. No. 1).

[18] *See* Schlumberger Technology Corporation, Nabors Offshore Corporation, and Supreme Service & Specialty Co. Inc.'s Original Complaint for Declaratory Judgment Regarding Validity, Priority, and Extent of Liens Under Bankruptcy Rule 7001 and to Enforce Liens Against Certain Term Overriding Royalty Interests and Net Profits Interests in Telemark Leases, *Schlumberger Technology Corporation, et al. v. ATP Oil & Gas Corp.,* Case No. 13-03190 (Bankr. S.D. Tex. Aug. 13, 2013) (Doc. No. 1); *see also* Nabors Offshore Corporation's Original Complaint for Declaratory Judgment Regarding Validity, Priority, and Extent of Liens Under Bankruptcy Rule 7001 and to Enforce Liens, *Nabors Offshore Corporation v. ATP Oil & Gas Corp.*, Case No. 13-03186 (Bankr. S.D. Tex. Aug. 9, 2013) (Doc. No. 1).

proceeding against ATP, the Company still owes Supreme for services dating back to *January 18, 2012*, in the aggregate amount of $909,024.94.[19]

g.  Seatrax, Inc. ("Seatrax") provided services to ATP during the Class Period.  ATP failed to pay Seatrax for services provided from *January 31, 2012 through July 31, 2012* in the aggregate amount of $238,954.82.[20]

h.  Harvey Gulf International Marine, LLC ("Harvey Gulf") provided towing and transportation services to ATP from May 31, 2009 until April 7, 2012.  ATP failed to pay Harvey Gulf for services it provided from *February 14, 2012 until April 7, 2012* in the aggregate amount of $2,885,133.50.[21]

i.  Hornbeck Offshore Services, LLC ("Hornbeck") provided labor, equipment, services, and supplies to ATP from November 27, 2009 until August 17, 2012.  ATP failed to pay Hornbeck for services it provided from *February 22, 2012 to August 17, 2012* in the aggregate amount of $4,775,478.94.[22]

---

[19] *See* Supreme Service & Specialty Co. Inc.'s Complaint for Enforcement of Liens, *Supreme Service & Specialty Co. Inc. v. ATP Oil & Gas Corp.*, Case No. 13-03192 (Bankr. S.D. Tex. Aug. 13, 2013) (Doc. No. 1).

[20] *See* Seatrax, Inc.'s Original Complaint for Judgment Regarding Validity, Priority, and Extend of Liens Under Bankruptcy Rule 7001(2) and to Enforce Liens, *Seatrax, Inc. v. ATP Oil & Gas Corp.*, Case No. 13-03293 (Bankr. S.D. Tex. Oct. 18, 2013) (Doc. No. 1).

[21] *See* Complaint to Determine Validity, and Priority of Liens and Request for Declaratory Judgment of Harvey Gulf International Marine, LLC, *Harvey Gulf International Marine, LLC v. ATP Oil & Gas Corp.*, Case No. 13-03244 (Bankr. S.D. Tex. Sept. 4, 2013) (Doc. No. 1).

[22] *See* Complaint to Determine Validity, and Priority of Liens and Request for Declaratory Judgment of Hornbeck Offshore Services, LLC, *Hornbeck Offshore Services, LLC v. ATP Oil & Gas Corp.*, Case No. 13-03221 (Bankr. S.D. Tex. Aug. 26, 2013) (Doc. No. 1).

j.  Gulf Offshore Logistics, LLC ("GOL") provided services to ATP during the Class Period.  ATP failed to pay GOL for services provided from *March 1, 2012 to August 17, 2012* in the aggregate amount of $1,137,825.[23]

k.  Exterran Energy Solutions, L.P., ("Exterran") provided services to ATP prior to and during the Class Period.  ATP failed to pay for services provided by Exterran dating back to *March 1, 2012* in aggregate amounts of $243,229.16.[24]

l.  ERA Helicopters, LLC ("ERA") provided ATP with transportation services from May 2005 through August 14, 2012.  ATP failed to pay for services from *March 1, 2012 through August 17, 2012*, in the aggregate amount of $2,495,548.44.[25]

m.  Ken-Vac Corporation ("KVC") provided services to ATP from July 2009 through the Class Period.  ATP failed to pay KVC for services it provided from *March 12, 2012 through August 13, 2012,* in the aggregate amount of $236,766.48.[26]

n.  Blanchard Contractors, Inc. ("Blanchard Contractors") provided labor, equipment, services, and supplies to ATP.  ATP failed to pay Blanchard Corporation for

---

[23] *See* Gulf Offshore Logistics, LLC's Original Complaint for Judgment Regarding Validity, Priority, and Extent of Liens, *Gulf Offshore Logistics, LLC v. ATP Oil & Gas Corp.*, Case No. 13-03191 (Bankr. S.D. Tex. Aug. 13, 2013) (Doc. No. 1).

[24] *See* Exterran Energy Solutions, L.P.'s Original Complaint for Declaratory Judgment Regarding Validity, Priority, and Extent of Liens Under Bankruptcy Rule 7001(2) and to Enforce Liens, *Exterran Energy Solutions, L.P. v. ATP Oil & Gas Corp.*, Case No. 13-03308 (Bankr. S.D. Tex. Nov. 7, 2013) (Doc. No. 1).

[25] *See* Complaint to Determine Validity, and Priority of Liens and Request for Declaratory Judgment of ERA Helicopters, LLC, *ERA Helicopters, LLC v. ATP Oil & Gas Corp.*, Case No. 13-03201 (Bankr. S.D. Tex. Aug. 16, 2013) (Doc. No. 1).

[26] *See* Ken-Vac Corporation's Original Complaint for Judgment Regarding Validity, Priority, and Extent of Liens Under Bankruptcy Rule 7001(2) and to Enforce Liens, *Ken-Vac Corporation v. ATP Oil & Gas Corp.*, Case No. 13-03266 (Bankr. S.D. Tex. Sept. 19, 2013) (Doc. No. 1).

various invoices dated from **March 21, 2012 through May 23, 2012** in the aggregate amount of $66,655.95.[27]

o.  Expeditors and Production Services, Inc. ("EPS") provided materials and services to ATP during the Class Period.  According to documents filed in an adversary proceeding against ATP, the Company failed to pay EPS for materials and services from **March 27, 2012 to August 9, 2012**, in the aggregate amount of $194,437.91.[28]

p.  Martin Holdings, LLC ("Martin Holdings") provided services to ATP from February 28, 2007 through August 18, 2012.  ATP failed to pay Martin Holdings for services it provided from **March 27, 2012 to August 17, 2012** in the aggregate amount of $253,932.12.[29]

q.  Barry Graham Oil Service ("Barry Graham") provided services to ATP during the Class Period.  ATP failed to pay for services provided from **April, 3, 2012 to August 16, 2012**, in the aggregate amount of $896,605.33.[30]

---

[27] *See* Complaint for Enforcement of Liens, *Blanchard Contractors, Inc. v. ATP Oil & Gas Corp.*, Case No. 13-03217 (Bankr. S.D. Tex. Aug. 23, 2013) (Doc. No. 1).

[28] *See* Complaint to Determine Validity Amount, and Priority of Liens and Request for Declaratory Judgment of Expeditors and Production Services, Inc EPS, Cargo Handlers Company, Inc. and EPS Logistics Company, Inc., *Expeditors and Production Services, Inc. v. ATP Oil & Gas Corp.*, Case No. 13-03187 (Bankr. S.D. Tex. Aug. 12, 2013) (Doc. No. 1).

[29] *See* Martin Holdings, LLC's Original Complaint for Judgment Regarding Validity, Priority, and Extent of Liens Under Bankruptcy Rule 7001(2) and to Enforce Liens, *Martin Holdings, LLC v. ATP Oil & Gas Corp.*, Case No. 13-03194 (Bankr. S.D. Tex. Aug. 14, 2013) (Doc. No. 1).

[30] *See* Barry Graham Oil Service, LLC's Complaint for Judgment Regarding Validity, Priority, and to Enforce Liens, *Barry Graham Oil Service v. ATP Oil & Gas Corp.*, Case No. 13-03242 (Bankr. S.D. Tex. Sept. 3, 2013) (Doc. No. 1).

r.  Offshore Service Vessels, LLC ("Offshore") provided services to ATP from November 11, 2009 through the Class Period.  ATP failed to pay Offshore for services from ***April 13, 2012 to April 15, 2012*** in the aggregate amount of $122,650.00.[31]

s.  C-Port/Stone, LLC ("CPS") provided services to ATP from November 10, 2010 and continuing through the Class Period.  ATP failed to pay CPS for services performed from ***May 1, 2012 to August 17, 2012***, in the aggregate amount of $1,501,530.66.[32]

t.  RC Logistics, LLC ("RC Logistics") provided services to ATP during the Class Period.  ATP failed to pay RC Logistics for services it provided from ***May 3, 2012 through July 30, 2012***, in the aggregate amount of $422,445.25.[33]

u.  Gulf Coast Chemical, LLC ("Gulf Coast") provided services to ATP during the Class Period.  ATP failed to pay Gulf Coast for services it provided from ***June 1, 2012 through August 4, 2012***, in the aggregate amount of $868,239.59.[34]

100.  These unpaid invoices, most of which were for services rendered in 2011 or early 2012, amounted to more than $63.3 million, unpaid by ATP.

---

[31] *See* Plaintiff' Original Complaint, *Offshore Service Vessels, LLC v. ATP Oil & Gas Corp.*, Case No. 13-03247 (Bankr. S.D. Tex. Sept. 5, 2013) (Doc. No. 1).

[32] *See* C-Port/Stone LLC's Original Complaint for Judgment Regarding Validity, Priority, and Extent of Liens Under Bankruptcy Rule 7001(2) and to Enforce Liens, *C-Port/Stone, LLC v. ATP Oil & Gas Corp.*, Case No. 13-03195 (Bankr. S.D. Tex. Aug. 14, 2013) (Doc. No. 1).

[33] *See* RCL's Complaint for Declaratory Judgment Regarding Validity, Priority, and Extent of Liens Under Bankruptcy Rule 7001(2) and to Enforce Liens, *RC Logistics, LLC v. ATP Oil & Gas Corp.*, Case No. 13-03273 (Bankr. S.D. Tex. Sept. 24, 2013) (Doc. No. 1).

[34] *See* Complaint for Enforcement of Liens, *Gulf Coast Chemical, LLC v. ATP Oil & Gas Corp.*, Case No. 13-03267 (Bankr. S.D. Tex. Sept. 19, 2013) (Doc. No. 1).

101.    ATP's unpaid obligations, and the Defendants' knowledge of ATP's lack of liquidity, are supported by the statements of CW4 and CW3, as well as CW1.

102.    CW1 is a former employee of ATP, hired by Bulmahn, who worked at ATP for approximately 15 years (including through the filing of ATP's Bankruptcy Action) in several capacities, including technical and managerial capacities.  CW1 stated that Defendant Bulmahn would hold periodic meetings for staff in the board room where he would discuss ATP's budget. The meetings would range in frequency from once every month to once every three months. During these meetings, Defendant Bulmahn would state that ATP was tight on funds and in a bind, but that everything was okay.  CW1 stated that during his employment at ATP, ATP had continual liquidity problems, and bills were typically paid anywhere between 60 and 120 days. CW1 further stated that during the moratorium, ATP was spending approximately $1 million per day without hardly any revenue coming in.

103.    Further, CW2, a credit manager of one of the largest oil field service company creditors of ATP, stated that in or around 2011 its service agreement with ATP had to be renegotiated due to, among other reasons, ATP's inability to pay money owed according to the terms of its contract.  CW2 further stated that the service agreement was renegotiated to allow ATP to make payments on a periodic (and less frequent) basis, which allowed ATP to continue drilling wells at a time when it did not have the funds to pay its debts on a current basis.

**(3)    *The Bankruptcy Action Has Revealed that ATP Failed to Pay Overriding Royalty Interests and Net Profit Interests During the Later Part of the Class Period***

104.    During the latter part of the Class Period, ATP failed to pay proceeds to its ORRI and NPI owners.   Indeed, the following testimony from Defendant Reese admits this fact, and explains that the decision to withhold distribution of the proceeds was made by management and

specifically included Defendants Reese, Bulmahn, Tate, and Godwin, as was consistent with

ATP making all financial decisions at the executive level:

> Q:      Turning to the NPI/ORRI issue, were a lot of these – weren't some of these NPIs given to vendors?

> A:      The – in 2009, I believe, yes. There were some given to vendors. That would have been the Diamond Override. I think we refer to it as the Bristow Override, and Airlog and those. Those are the only ones that were true vendors.

> Q:      I thought you said Seacorp (phonetic) and some other vendors?

> A:      Seacorp could have been one of the ones.

> Q:      Okay. Weren't those in essence trade creditor financings?

> A:      Those were entered into prior to the service being performed and for the service that was performed, they received a like amount of dollars and a net profits interest.

> Q:      Wasn't it true you were default well in advance of filing this bankruptcy in some of these NPIs and overrides?

> A:      ***Yes. We had failed to make some payments.***

> Q:      So interest and default fees and all that stuff had already occurred prior to the filing of the bankruptcy, correct?

> A:      You're asking for a technical judgment, and I'm not sure I'm completely qualified to do that, but in general, yes. There were default letters that had been issued and demand for payments and things of that nature.

> Q:      And were some lawsuits filed, correct?

> A:      Yes.

*      *      *

> Q:      Mr. Reese, my name is Rhett Campbell and I represent NGP Capital. And I'm sure you know that NGP Capital is a purchaser of certain term override royalty interests at Gomez and Telemark, correct?

> A:      Yes.

> Q:      And you probably know that we have been assigned a 10.8 percent net revenue interest at Gomez and a five percent net revenue interest at Telemark; is that right?

45

A:      Those numbers sound correct.

Q:      ***And I believe that the May production proceeds attributable to our net revenue interests were not distributed to us; is that correct?***

A:      ***I believe that is correct.***

Q:      That's the amount that should have been distributed on July 31?

A:      That's what I was trying to think – Yes, that would be correct.

Q:      Right. And we believe that that's right at 1.5 million; is that roughly correct?

A:      I believe that number is directionally with what I remember. I don't remember the specific amount.

Q:      Yes, sir. Now my specific question is, when the proceeds of production come in that are attributable – I'm sure that you get one check – for Gomez for the purchase of – well, probably for gas and oil and NGL. Probably three different checks, if I had to guess.

A:      That would be correct.

Q:      Okay. And when you get one of those checks from the purchaser of production does it – what kind of an account does it go into?

A:      It would go into our general receipt account.

Q:      General what?

A:      General receipts. Just general account.

Q:      Generally receipts, okay. Is it segregated at all? Is there – In other words, we believe that money belongs to us, the 10.8 percent of it belongs to us. So does that go into a segregated account or is it co-mingled with –

A:      No, it's co-mingled.

Q:      Co-mingled. And then it is ultimately distributed to the parties who are entitled to receive it?

A:      Yes, it is.

Q:      Except that on July 31st it did not?

A:      Correct.

Q:      Okay. And who made the decision not to distribute the money on July 31st?

A:      There was no one person that made that decision.

Q:      Well, what would be the group of people that decided that?

A:      *It would have been effectively the management of the company. At that particular point in time we were basically in a position where we needed to decide what cash we were going to be able to use.*

Q:      Okay. And who would be the individuals in management that made that decision?

A:      *Well, it would start with Paul Bulmahn who is the chairman – executive chairman, I'm sorry. He changed title recently. Executive chairman. Leland Tate who's president, myself, Keith Godwin who's chief accounting officer. Those would probably be the primary people that would be involved in that decision process.*

Q:      Yes, sir. And did each of those individuals actually have a discussion about whether to distribute the funds or whether to use them for some other purpose?

A:      We would have had general meetings to determine which checks were going to be issued on which particular day.

                              *        *        *

THE COURT: Let me. Mr. Reese, when you-all made those decisions about not – well you made the decision to utilize the funds that would have otherwise gone to the ORRI or the NPI, did the same people make the decisions as to all?

MR. REESE: Yes.

(emphasis added).

105.    Thus, according to this admission from Defendant Reese, ATP's financial position had become so dire during the Class Period that by May 2012, Defendants Bulmahn, Reese, Tate and Godwin made the desperate knowing decision to unlawfully retain ORRI and NPI owed to third parties so that such proceeds could be used to pay ATP's management's salaries and operations. In fact, at the time these proceeds were being withheld, Defendants materially misled investors by stating that "we have not missed an interest payment . . . we have

47

made every payment" and further stated that "we believe we can continue to meet our obligations for at least the next twelve months." *See* ¶¶230-231.

106.    Had ATP's liquidity truly been "strong" or "sound" as Defendants had repeatedly stated to investors (¶¶152, 165, 221, 226), Defendants would not have resorted to unlawful conversion just to keep the Company afloat.

107.    Set forth below is a summary of ATP's unpaid ORRIs and NPIs:

a.    On May 22, 2009, ATP executed and delivered a conveyance of overriding royalty interest to Diamond Offshore Company ("Diamond") in exchange for drilling services provided by Diamond.  The conveyance agreement was amended five times.  ATP failed to pay net profit amounts due on July 30, 2012 and August 17, 2012 in the amounts of $2,518,123.14 and $3,093,211.53, respectively.[35]

b.    As explained *supra* Bristow provided services to ATP.  As part of the service arrangement, Bristow owned ORRIs in certain property.  ATP failed to pay Bristow for the periods ending June 20, 2012 and July 31, 2012 in the amounts of $438,044.54 and $139,875.73.[36]

c.    On February 1, 2012, Keba Energy LLC ("Keba") paid ATP approximately $25 million for an overriding royalty interest in certain properties.  ATP failed to pay

---

[35] *See* Diamond Offshore Company's Complaint for Declaratory Judgment and Alternative Relief Against ATP Oil & Gas Corporation, *Diamond Offshore Company v. ATP Oil & Gas Corp.*, Case No. 12-03425 (Bankr. S.D. Tex. Dec. 20, 2012) (Doc. No. 1).

[36] *See* Complaint for Enforcement of Liens, *Bristow U.S., LLC v. ATP Oil & Gas Corp.*, Case No. 13-03182 (Bankr. S.D. Tex. Aug. 6, 2013) (Doc. No. 1); *see also* Plaintiff's Original Complaint, *In re ATP Oil & Gas Corp.* (Bankr. S.D. Tex. Oct. 15, 2012) (Doc. No. 1).

Keba the proceeds due to it from the ORRI from May 2012 through June 2012 in an aggregate amount of $2,579,293.86.[37]

d. Macquarie Investments LLC ("MILLC") owned several ORRIs, whereby ATP was obligated to pay MILLC for production proceeds. Beginning in April 2012, ATP failed to pay MILLC for proceeds in an aggregate amount of $7,930,441.61 million.[38]

e. As explained *supra* SEACOR provided services to ATP. As part of the service agreement, SEACOR owned ORRIs in certain property. ATP failed to pay SEACOR for proceeds in the amount of $6,591,433.30.[39]

108. Accordingly, ATP failed to transfer approximately $23.2 million in proceeds to the rightful interest holders and instead converted these proceeds for its own use in funding operations.

### (4)   *The Bankruptcy Action Has Revealed that ATP's Debt Wholly Encumbered the Value of Its Assets*

109. It is clear from what transpired in the bankruptcy proceeding that. during the Class Period, ATP did not have enough, if any, unencumbered value left in its assets to take on any more significant debt, certainly not the amount needed to complete and connect the Clipper pipeline before running out of funds. It is further evident that the value of ATP's assets were not what Defendants had led investors to believe.

---

[37] *See* Original Complaint, *Keba Energy LLC v. ATP Oil & Gas Corp.*, Case No. 12-03517 (Bankr. S.D. Tex. Oct. 2, 2012) (Doc. No. 1).

[38] *See* Original Complaint, *Macquarie Investments LLC v. ATP Oil & Gas Corp.*, Case No. 13-03055 (Bankr. S.D. Tex. March 18, 2013) (Doc. No. 1).

[39] *See* Plaintiff's Original Complaint, *SEACOR Marine, LLC v. ATP Oil & Gas Corp.*, Case No. 12-03450 (Bankr. S.D. Tex. Oct. 26, 2012) (Doc. No. 1).

110.    Ultimately, all of ATP's Gulf properties were sold or abandoned in the bankruptcy proceeding.  The Gomez properties were abandoned because they were so burdened by ORRIs that ***ATP was <u>losing money</u> simply by operating them***.   The Telemark and Clipper properties were sold to the lenders that provided DIP financing in exchange for forgiveness of the DIP loan and the DIP lenders' assumption and payment of certain liabilities and burdens, connected to the properties sold. The sale left most of ATP's secured creditors (other than the DIP lenders) and all of its unsecured creditors and equity holders high and dry with zero recovery.

111.    According to testimony in the bankruptcy proceeding, the sale of the Gulf properties brought in approximately $1.4 to $1.5 billion in "value" to the bankruptcy estate.[40] But it brought in ***no cash***, save $1.8 million that would be used to wind down the estate.[41] Instead, the value was accounted for through the extinguishment of debt and other obligations as follows: $690 million, of the $800 million, owed to the DIP lenders;  $330 million from NPIs and ORRIs burdening the properties acquired by the DIP lenders; $300 million for a loan secured by the ATP Titan; and $100-200 million for future decommissioning obligations.[42]

112.    Following the sale of the Gulf properties (and the abandonment of Gomez), ATP's bankruptcy estate was still burdened by $1.5 billion in second lien notes, which together

---

[40] Hearing Transcript at 125-36, 391 *In re ATP Oil & Gas Corp.,* Case No. 12-36187 (Bankr. S.D. Tex. June 26, 2013) (Doc No. 2126).

[41] Hearing Transcript at 125-36, *In re ATP Oil & Gas Corp.,* Case No. 12-36187 (Bankr. S.D. Tex. June 26, 2013) (Doc No. 2126); Hearing Transcript at 77-78, *In re ATP Oil & Gas Corp.,* Case No. 12-36187 (Bankr. S.D. Tex. June 24, 2013) (Doc No. 2100).

[42] Hearing Transcript at 125-36, 199, *In re ATP Oil & Gas Corp.,* Case No. 12-36187 (Bankr. S.D. Tex. June 26, 2013) (Doc No. 2126); Hearing Transcript at 77-78, *In re ATP Oil & Gas Corp.,* Case No. 12-36187 (Bankr. S.D. Tex. June 24, 2013) (Doc No. 2100).

with other obligations totaled approximately $2 billion.[43]   With no value left in the Estate following the sale, the case was eventually converted to Chapter 7.

113.    Thus, the true value of ATP's oil and gas properties was far less than what was presented in its annual, quarterly, and other reports that were published and available to market participants, and far less than what was needed by ATP to continue as a going concern.   As the Honorable Marvin Isgur, the judge presiding over ATP's bankruptcy proceeding, observed:

> But you will recall, those – most of you have been here as long as I've been here on this case – that, in the beginning, *we had a Debtor [ATP] that filed bankruptcy far too late; far, far, too late. They had used NPI and ORRI proceeds in violation of those agreements.* Whether or not that was in violation of – you know, taking somebody else's money is a question we'll, someday, have to resolve.
> *The Debtor [ATP] had no money*.

(Emphasis added).[44]

114.    Even prior to the sale of the Gulf properties discrepancies arose between the valuation of ATP's oil and gas properties prepared by Collarini Associates, which was published to the market with ATP's 2011 10-K on March 15, 2012, and the valuation of ATP's oil and gas properties prepared by Netherland Sewell Associates, reserve engineers selected by the DIP lenders to perform an independent valuation.   A condition precedent to receiving advances of portions of the remaining available funding under the DIP financing agreement was the delivery of a satisfactory reserve report.   The reserve report relied upon initially for the DIP financing was the one prepared by Collarini.   However, the engineering report delivered to the DIP Lenders by their Approved Petroleum Engineer (Netherland Sewell), showed PV-10 values at certain wells

---

[43] Hearing Transcript at 345-50, *In re ATP Oil & Gas Corp.,* Case No. 12-36187 (Bankr. S.D. Tex. June 26, 2013) (Doc No. 2126).

[44] Hearing Transcript at 393, *In re ATP Oil & Gas Corp.,* Case No. 12-36187 (Bankr. S.D. Tex. June 26, 2013) (Doc No. 2126).

***drastically below levels*** set forth in the DIP Credit Agreement.  The Netherland Sewell report

was prepared in late August or early September 2012.[45]  The document was filed under seal in

the bankruptcy court and as best Plaintiffs can determine it has never been released to the public.

115.    The materially lower value determined by Netherland Sewell constituted a

Specified Event (as defined in the DIP Credit Agreement) which occurred on or about October 9,

2012.

> The occurrence of the Specified Event triggered, among other things, (i) the
> requirement that the Debtor satisfy certain milestones with regard to the sale of its
> assets, (ii) certain restrictions on the availability of further funding…, and (iii)
> certain restrictions on the use of funds.  While the occurrence of a Specified Event
> is not itself a default under the DIP Credit Agreement, the failure to satisfy any
> milestone would result in a default allowing the DIP Lenders to discontinue
> access to the Collateral Account and withhold further funding under the DIP
> Financing. The sales milestones required, among other things, that the Debtor
> prepare a data room and begin dissemination of an information memorandum
> with respect to a sale of substantially all of its assets to third parties within 20
> days of the Specified Event (i.e., on or about October 29, 2012).[[46]]

116.    This caused ATP to file on November 26, 2012 an emergency motion in the

bankruptcy court to amend the DIP Credit Agreement[47]:

> In order to avoid certain of the consequences associated with the occurrence of
> the Specified Event, the Debtor has engaged in protracted discussions with the
> DIP Lenders on the terms of an amendment to the DIP Credit Agreement. The
> result of these arms-length, good faith negotiations is Amendment No. 2.

---

[45] Hearing Transcript at 289, *In re ATP Oil & Gas Corp.,* Case No. 12-36187 (Bankr. S.D. Tex.
June 26, 2013) (Doc No. 2126).

[46] Debtor's Emergency Motion for Entry of an Order Pursuant to Bankruptcy Code Sections 105,
361, 362, 363, 364 and 507 Authorizing the Debtor to Enter Into Amendment No. 2 to the DIP
Credit Agreement at 4, *In re ATP Oil & Gas Corp.,* Case No. 12-36187 (Bankr. S.D. Tex. Nov.
26, 2012) (Doc No. 910).

[47] Debtor's Emergency Motion for Entry of an Order Pursuant to Bankruptcy Code Sections 105,
361, 362, 363, 364 and 507 Authorizing the Debtor to Enter Into Amendment No. 2 to the DIP
Credit Agreement, *In re ATP Oil & Gas Corp.,* Case No. 12-36187 (Bankr. S.D. Tex. Nov. 26,
2012) (Doc No. 910).

117.    On December 3, 2012 the official committee of the unsecured equity holders moved to unseal the Netherland Sewell report and to appoint an examiner,[48] stating (in relevant part):

> This case cries out for an examiner. ***Barely three months after the Debtor commenced this case claiming that the company suffered from a mere liquidity hiccup, we are now told that <u>the Debtor's reserves are valued drastically less than what the Debtor has previously reported publicly</u> and that, now, the only way forward is a fire-sale liquidation to satisfy the demands of the DIP Lenders (defined below). It doesn't add up.***

(Emphasis added).[49]

118.    Ultimately, the bankruptcy court did not appoint an examiner because the motion was eventually withdrawn without prejudice. However, it is clear that ATP's assets were fair less valuable than had been publicly disclosed, as evidenced by the valuation ascribed to the assets in the bankruptcy proceeding.   Indeed, even after nearly $800 million in loans from the DIP lenders, ATP was unable to turn things around, and the ATP estate was still approximately $2 billion in debt, leaving no recovery for ATP's creditors (other than the DIP lenders) or equity holders.

**F.    ATP Files for Bankruptcy**

119.    Unfortunately for ATP's shareholders and creditors, Defendants could not continue to support their house of cards, even though they were not paying debts and misappropriating third party production proceeds.

---

[48] *In re ATP Oil & Gas Corp.,* Case No. 12-36187 (Bankr. S.D. Tex. Nov. 26, 2012) (Doc. Nos. 952-53).

[49] Official Committee of Equity Security Holder's Emergency Motion for the Appointment of an Examiner at 2, *In re ATP Oil & Gas Corp.,* Case No. 12-36187 (Bankr. S.D. Tex. Nov. 26, 2012) (Doc No. 953).

120.    On August 10, 2012, ATP's stock price plummeted, closing at $0.36, down $1.13 from its opening price of $1.49, amid reports that the Company may file for bankruptcy.

121.    On August 17, 2012, ATP announced that it was filing for Chapter 11 bankruptcy. The Company reported total debts of $3.49 billion and assets of $3.64 billion and announced that it was going to continue operating during its financial restructuring, using $618 million in DIP funding.

122.    ATP's press release stated that:

HOUSTON, TX – August 17, 2012 – (Business Wire) – ATP Oil & Gas Corporation (NASDAQ: ATPG) today announced that it has filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas. ATP has taken this action in order to undertake a comprehensive financial restructuring. ATP expects its oil and gas operations to continue in the ordinary course throughout the reorganization process and sees the reorganization as a helpful step towards deleveraging the company to position it for future development of its assets. ATP believes that the rights and protections afforded it by a court-supervised reorganization process, including the ability to access new financing, will provide ATP with the time and flexibility it needs to fully address its financial challenges and position ATP for long-term viability.

The primary reason for the reorganization began with the Macondo well blowout in April 2010 and the imposition beginning in May 2010 of the moratoria on drilling and related activities in the Gulf of Mexico. These events prevented ATP from bringing to production in 2010 and in early 2011 six development wells that would have added significant production to ATP. As of the date of this filing, three of these wells are yet to be drilled. Had ATP been allowed to drill and complete these wells ATP believes it would have provided a material production change in 2010 continuing to today. This projected increase in production should have substantially increased cash flows, shareholder value and allowed the company the ability to withstand normal operational issues experienced by owners of oil and gas properties in the Gulf of Mexico. In addition, these incremental cash flows would have mitigated or prevented the need to enter into many of the financings ATP has closed since the imposition of the moratoria — financings that require relatively high rates of return and monthly payments.

123.    On August 20, 2012, the next trading day, ATP's common stock price fell $0.1593 per share, or 34.7%, to close at $0.30 per share.

## VI.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

124.    Throughout the Class Period, Defendants made multiple misstatements of material fact and failed to disclose material facts, as detailed more completely herein.  The revelations of these misrepresentations and omissions had a material, adverse impact on ATP and caused the value of its common stock to decline.

125.    The Defendants in this action are the ATP executives who prepared and signed ATP's SEC filings, and made other statements, including statements in ATP press releases, ATP investor conference calls, and ATP investor presentations.  In violation of the Exchange Act, Defendants are liable for having, during the Class Period, issued inaccurate material and misleading statements and omitted material facts which were necessary to be disclosed in order to make the statements that were made not misleading.  As alleged herein, Defendants Bulmahn, Reese, Godwin, and Tate knew, or were severely reckless in not knowing, of the misleading nature of the statements and omissions they made.

126.    For example, even late in the Class Period, the Defendants continued to proclaim ATP's "strong" liquidity, strong capital position, and impending completion of the Clipper project, while the truth was that ATP was in the zone of insolvency (starting in May 2010), and ATP was in a liquidity crisis.

| False Public Statement | True Situation |
|---|---|
| • Reese 1/5/2011 – "We do have a strong liquidity position." ¶143.<br>• Bulmahn 3/15/2011 – "We are now liquid and solvent." ¶146.<br>• Bulmahn 4/13/2011 – "ATP's liquidity is strong." ¶152.<br>• Bulmahn 8/9/2011 – "ATP's liquidity remains strong…" ¶165. | • As of May 2010, ATP was in a zone of insolvency and its debts were greater than its assets at fair valuation. ¶92.  ATP's financial condition steadily worsens until its eventual demise. ¶¶40-118.<br>• Starting in August 2010, the frequency of ATP delaying routine maintenance and payments to vendors to manage cash flow increased. ¶52. |

| False Public Statement | True Situation |
|---|---|
| • <u>Tate 11/9/2011</u> – "We have no reason to believe that [Clipper pipe lay barge] won't stay on schedule." ¶194. | • As of August 2011, Reese and ATP know that ATP will need $140 to $150 million to complete the Clipper project.  ¶49.  $120 million remained at the time of the Bankruptcy.  *Id.*.  This means that management made the decision not to spend the necessary funds on the Clipper project. |
| • <u>Reese 1/4/2012</u> – "Our entire debt is completely covered by our proved reserves…Clipper production to commence later in the year" ¶199. | • As of May 2010, ATP's debts were greater than its assets at fair valuation. ¶92. |
| • <u>Bulmahn 3/16/2012</u> – "We continue to expand our liquidity."  ¶218.<br>• <u>Reese 4/17/2012</u> – "Growing production and cash flow.  We will continue to do that.  We will continue to pay down some of the [ORRIs and NPIs] that we have…Liquidity is sound."  ¶221. | • As of May 2010, ATP was in a zone of insolvency and its debts were greater than its assets at fair valuation.  ¶92.  ATP's financial condition steadily worsens until its eventual demise.  ¶¶40-118.<br>• Starting in August 2010, the frequency of ATP delaying routine maintenance and payments to vendors to manage cash flow increased.  ¶52.<br>• On June 7, 2012, McCarroll resigns his position because ATP's finances are a "disaster," the Company's financial situation is much worse than he believed when he accepted the position one week earlier, and ATP's management refuses his advice to begin restructuring immediately.  ¶¶78, 80. |

| False Public Statement | True Situation |
|---|---|
| • <u>Reese 5/10/2012</u> – "We are very well within our financing capability…We were very successful in putting together an override for…Clipper, $100 million item that is pre-funded…" ¶231.<br>• <u>Bulmahn 5/10/2012</u> – "I think, just to reiterate, we are certainly looking forward to the third and fourth quarters, because, I think, the two deepwater wells at Clipper, which are scheduled to begin production in the third quarter, I think those wells will be material to the Company's interest." ¶231. | • As of May 2010, ATP was in a zone of insolvency and its debts were greater than its assets at fair valuation.  ¶92.  ATP's financial condition steadily worsens until its eventual demise.  ¶¶40-118.<br>• Starting in August 2010, the frequency of ATP delaying routine maintenance and payments to vendors to manage cash flow increased.  ¶92.<br>• Clipper is <u>not pre-funded</u>.  As of August 2011, Reese and ATP know that ATP will need $140 to $150 million to complete the Clipper project.  ¶49.  $120 million remained at the time of the Bankruptcy.  *Id.*<br>• By May 2012, ATP begins purposely withholding ORRI and NPI payments.  ¶¶104-105.<br>• On June 7, 2012, McCarroll resigns his position because ATP's finances are a "disaster," the Company's financial situation is much worse than he believed when he accepted the position one week earlier and ATP's management refuses his advice to begin restructuring immediately.  ¶¶78, 80. |

## A.    Relevant Disclosure Requirements

### (1)    *Regulation S-K, Item 303*

127.    SEC Regulation S-K (and SEC Forms S-4, 10-K and 10-Q) requires disclosure of certain information, including information required to be disclosed under Item 303(a) and (b) of Regulation S-K (17 C.F.R. §229.303), in the non-financial-statement portions of registration statements filed on SEC Form S-4 under the Securities Act and annual reports filed on SEC Form 10-K and quarterly reports filed on SEC Form 10-Q under the Exchange Act. 17 C.F.R. §229.10.

128.    For full fiscal years (*i.e.* annual statements on Form 10-K and registration statements on Form S-4), Item 303(a) requires the registrant to make the following disclosures:

(1) Liquidity… Identify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way.

\*    \*    \*

(3) Results of operations.

\*    \*    \*

(ii) Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

129.    For interim periods (*i.e.* quarterly reports on Form 10-Q), Item 303(b), 17 C.F.R. §303(b), requires disclosure of material changes in those items listed in Item 303(a), including known trends and uncertainties.

130.    Instruction 3 to paragraph 303(a) provides that "[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." 17 C.F.R. §229.303(a), Instruction 3.  The SEC's interpretive release regarding Item 303 clarifies that the Regulation imposes a disclosure duty "where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 6835, Exchange Act Release No. 26,831, Investment Company Act Release No. 16,961, 43 SEC Docket 1330 (May 18, 1989).

131.    Instruction 5 to Item 303(a) defines "liquidity" for purposes of Item 303(a) as "the ability of an enterprise to generate adequate amounts of cash to meet the enterprise's needs for cash."  Liquidity has been described by financial experts as "the ability or ease with which [a company can] timely meet its financial obligations and fund its operations with cash on hand,

assets readily convertible to cash on hand, cash from operations, or readily accessible sources of debt." *See, e.g., In re Vivendi Universal, S.A. Sec. Litig.,* 634 F. Supp. 2d 352, 366 (S.D.N.Y. 2009).

132.    For ATP, there were three primary sources of cash flow – cash from operations (*i.e.,* net income); cash from investing activities (proceeds from the sale of property, plant, equipment); and cash from financing activities (proceeds from additional debt/equity).

133.    Because of ATP's highly leveraged operations, which required ATP to bear significant financing costs, its debt restrictions on encumbering its assets, and its heavy concentration (90%) of its operations in the Gulf of Mexico, the moratoria prevented ATP from generating the cash flows necessary to finance its operations.  Defendants failed to disclose in the Registration Statement and the Forms 10-K and 10-Q that the moratoria were currently having and would continue to have an "especially profound" negative impact on ATP's revenues, cash flows, liquidity and operations, an impact which, according to the Bankruptcy Trustee, caused ATP's financial condition to be in a steady state of decline.

### (2)    *SEC Rule 10b-5(b)*

134.    SEC Rule 10b-5, promulgated under Section 10(b) of the Exchange Act, makes it unlawful in connection with the sale of a security

> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading….

135.    Specifically, under the applicable SEC rules and regulations governing the preparation of the Registration Statement and the financial statements and subsequent related SEC filings, the Defendants materially misstated and/or omitted to state material facts regarding the true severity of the problems facing the Company's business operations, revenues and liquidity.

B.     <u>**The Registration Statement**</u>

136.     On or about October 12, 2010, ATP filed its Registration Statement with the SEC, indicating its intent to issue the Notes and execute the Exchange. ATP filed one amendment to the Registration Statement on December 14, 2010. The Registration Statement was signed by Defendants Bulmahn, Reese and Godwin.

137.     In the Company's Registration Statement released on October 12, 2010 and declared effective on December 16, 2010 (the "Effective Date"), the Company stated, with respect to the Company's business operations and revenue:

> ***We project a substantial increase in production over the next year as development wells are brought to production.*** Absent alternative funding sources, achieving our projected production growth is necessary to provide the cash flow required to fund our capital plan and meet our existing obligations, both over the next twelve months and on a longer term basis. Our ability to execute on our plan depends, in part, on our ability to continue drilling for and producing hydrocarbons in the Gulf of Mexico. ***Our plan is currently based upon resuming suspended activities upon the expiration of Moratorium II currently scheduled to occur on November 30, 2010, obtaining necessary drilling permits, and successfully achieving expected commercial production from existing wells presently scheduled for completion during the remainder of 2010 and the first quarter of 2011. Delays in resuming those activities due to circumstances such as an extension of Moratorium II, delays in receiving necessary permits, reduced access to equipment and services, or weather delays, <u>could</u> have a material adverse effect on our financial position, results of operations and cash flows.*** In addition to the risks associated with achieving our projected production growth, additional regulatory requirements and increased costs for which funding must be secured, or a negative change in commodity prices and operating cost levels, could also have a material adverse effect on our financial position, results of operations and cash flows. While we are pursuing various other sources of funding, including bringing partners into our projects, there is no current assurance that these alternative sources will be available should any of the above risks or uncertainties materialize.
>
> Depending on their duration and extent, these developments could have a material adverse affect on our results of operations, cash flows and liquidity.

(emphasis added).

138.    The Company released its Prospectus on December 16, 2010. The Prospectus contained identical, or very nearly identical, language to the Registration Statement. The Prospectus did not contain any corrections or additional information that would render the above-quoted language from the Registration Statement complete, accurate, or otherwise not false, inaccurate, and/or misleading.

139.    The following statements from the Registration Statement and Prospectus were false statements of material fact and/or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading:

- "Delays in resuming those activities due to circumstances such as an extension of Moratorium II, delays in receiving necessary permits, reduced access to equipment and services, or weather delays, could have a material adverse effect on our financial position, results of operations and cash flows," and

- "We project a substantial increase in production over the next year as development wells are brought into production."

140.    These statements were materially false or misleading because the Defendants (including Bulmahn, Reese, and Godwin) knew, or were severely reckless in not knowing, that ATP was in a liquidity crisis and would not survive the moratoria.  As alleged by the Bankruptcy Trustee, ATP was in the zone of insolvency by May 2010; Defendants failed to make any of the necessary, obvious and prudent strategic adjustments due to the moratoria; ATP's debts were greater than its assets at fair valuation; ATP's financial condition was steadily worsening; and Defendants were cannibalizing ATP's assets for short term cash, such that ATP would not survive the moratoria.  *See* ¶¶92-118.  As testified to and stated during the Bankruptcy Action, ATP had "significant liquidity problems" and did not have the liquidity to survive a lengthy moratorium.  *See* ¶¶83, 86.  As described by the CWs, ATP was in a liquidity crisis for at least the two years prior to its Bankruptcy.  *See* ¶¶51-52; *see also* ¶¶92, 102-105.  In fact, ATP was

already unable to meet certain obligations, failing to pay certain vendors as early as April 2007. *See* ¶99(a).  ATP also delayed routine maintenance and put off payments to vendors due to limited cash flow, and both of these actions increased during the two years prior to ATP filing for bankruptcy.  *See* ¶52.  The liquidity crisis was so bad that in the 16 months after issuing the Notes, ATP sold a significant portion of the future production from its wells in exchange for services and immediate cash, which would prevent ATP from further expanding its production and increasing cash flow to a level that would resolve the crisis.  *See* ¶51.  Decisions regarding financing were made entirely at the executive level, and the instruction to delay routine maintenance came from that level – COO George Morris.  *See* ¶52.  It is reasonable to infer that these actions, and ATP's liquidity crisis and its effects on ATP's financing, were discussed regularly by the executives, including the Defendants.

141.    In violation of Item 303, Defendants Bulmahn, Reese, and Godwin never disclosed that, at the time the Registration Statement was declared effective, they knew that ATP had inadequate liquidity, was in the zone of insolvency, and that ATP's proposed drilling program would not proceed in 2010.

142.    Thus, in the false and/or misleading statements specified above, Defendants either dramatically downplayed the truth or did not disclose the truth at all.

### C.    January 5, 2011 Pritchard Capital Partners Energize Conference

143.    On January 5, 2011, Defendant Reese spoke on behalf of ATP at the Pritchard Capital Partners Energize Conference.   During the conference, Defendant Reese made the following materially false or misleading statements:

> We've had consistent reserve growth throughout every cycle you can think of in pricing from $147 oil to probably $20 oil during that period of time, and gas has been just as dramatic with the issues that have hit the industry during 2010 -- talk about those little bit.  We have proven, we have forecasted production growth. You can see our production growth for this year, and as we go into next year, ***we***

*do have a strong liquidity position*. And we have in what else -- what you'll see here at the very end -- kind of what I think is a very compelling valuation for the Company itself.

*   *   *

*Strong liquidity to do everything that we've been talking about.*

*   *   *

*We do have a strong liquidity position and let's face it, one of the reasons the stock price I think continues to linger is because of the moratorium*. As the moratorium and the impact gets relieved, I think that uncertainty is going to be reduced. You've seen that happen over the past few weeks, just this week alone with the letter from the BOEM.

144.   The following statements that were false statements of material fact and/or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading:

- "[W]e have a strong liquidity position,"

- "Strong liquidity to do everything that we've been talking about," and

- "We do have a strong liquidity position and let's face it, one of the reasons the stock price I think continues to linger is because of the moratorium."

145.   These statements were materially false or misleading because the Defendants (including Reese) knew, or were severely reckless in not knowing, that ATP was in a liquidity crisis, and that ATP's liquidity was not "strong," as described *supra* in ¶143, including, as numerous CWs explained, ATP was in a liquidity crisis (¶¶51-52, 102), that ATP was already unable to meet many of its debt obligations (¶¶51-52, 102-103), that ATP delayed routine maintenance and payments to vendors due to limited cash flow (¶52), and that ATP was forced to sell a significant portion of its future production from its wells to finance drilling projects, which prevented ATP from increasing its cash flow (¶¶51, 73, 92-95, 109-118).

### D.    Year End 2010 Financial Results

146.    On March 15, 2011, the Company held its year-end 2010 earnings conference call.  Defendants Bulmahn, Reese and Tate participated in the call.  During the call Defendants made the following materially false or misleading statements:

> PAUL BULMAHN:   Despite the moratorium from last May through last week, ATP increased its production year-over year just not to the exception[al] level it would have been without the BP spill and governmental over-reaction.  ***Through creative, albeit expensive financing, we are now liquid and solvent.*** Our operational excellence and prowess are safe environmentally sound drilling stands ready to perform. We have maintained a consistent schedule of construction of the Cheviot/Octabuoy, ATP's second $1 billion dollar Hub, this one designed for the North Sea. . . . . ***Not only have we been surviving during this period of time, we have expanded a foundational base to accelerate ATP's strategy into the future***. We are well positioned for success with a deep water permit we expect to receive at any time.

> *      *      *

> VIVEK PAU: In terms of liquidity, do you expect to go into the market in terms of first lien debt or equity for the remainder of the year…Or do you have enough? Yeah.

> AL REESE: This is Al Reese. We have -- on our first lien debt we have already put in place the expansion of our first lien debt. That goes from $150 million to $210 million, so that piece is already done. There are no plans at this point to do any equity transaction this year.

> VIVEK PAU: ***So that $60 million additional and first lien would be enough to cover your cash-flow requirements for the remainder of the year?***

> AL REESE: ***Yes, with the existing cash that we have, with that, with the Titan facility. Some other things that we're currently looking at, we feel very comfortable with our liquidity position for the entire 2011 as we go into 2012. That's either with or without permits from a liquidity standpoint.***

(emphasis added.)

147.    The following statements were false statements of material fact and/or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading:

- "Through creative, albeit expensive financing, we are now liquid and solvent,"

- "Not only have we been surviving during this period of time, we have expanded a foundational base to accelerate ATP's strategy into the future," and

- "[W]e feel very comfortable with our liquidity position for the entire 2011 as we go into 2012. That's either with or without permits from a liquidity standpoint."

148.   These statements were materially false or misleading because the Defendants (including Bulmahn and Reese) knew, or were severely reckless in not knowing, that ATP was in a liquidity crisis and therefore was not "liquid and solvent," that ATP had not "expanded a foundational base," and that ATP's liquidity was not sufficient to weather 2011 without drilling permits, for reasons described in ¶140, including that numerous CWs explained that ATP was in a liquidity crisis (¶¶51-52, 102), that ATP was already unable to meet many of its debt obligations (¶¶51-52, 102-103), that ATP delayed routine maintenance and payments to vendors due to limited cash flow (¶52), and that ATP was forced to sell a significant portion of its future production from its wells to finance drilling projects, which prevented ATP from increasing its cash flow (¶¶51, 73, 92-95, 109-118).

149.   On March 16, 2011, the Company filed its 2010 10-K with the SEC.  The 2010 10-K was signed by Defendants Bulmahn, Reese and Godwin.  In addition, Defendants Bulmahn and Reese certified the 2010 10-K pursuant to the Exchange Act and the Sarbanes Oxley Act. The 2010 10-K disclosed that in at least three different sections (1A. Risk Factors, Risks and Uncertainties, and Liquidity and Capital Resources), that:

> **Should the permitting process in the Gulf of Mexico continue to be delayed, we believe we can continue to meet our existing obligations for at least the next twelve months; however, absent alternative funding sources, our ability to do so is dependent on maintaining existing production levels from our currently producing wells and maintaining commodity prices and operating costs near current levels.** …

(emphasis added).

150.     These statements were false or misleading statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading because Defendants (including Bulmahn, Reese, and Godwin) knew, or were severely reckless in not knowing, that ATP could not continue to meet its obligations for the next twelve months, and in fact was not meeting its obligations at the time, as described *supra* in ¶¶140, 145, 148, and that these effects were reasonably likely to continue materially, negatively affect ATP's liquidity and results of operations.

151.     Defendants and ATP also violated their disclosure duties under Item 303(a) of Regulation S-K in that they failed to disclose in its 2010 10-K that true, negative, and severe effects of the moratoria on ATP's liquidity and ability to meet its current obligations, as described in ¶¶140, 145, 148.

### E.     April 2011 Independent Petroleum Association of American ("IPAA") Oil & Gas Investment Symposium New York Conference

152.     On April 13, 2011, Defendant Bulmahn spoke on behalf of ATP at the IPAA Oil & Gas Investment Symposium New York Conference.  During the conference, Bulmahn made the following materially false or misleading statements:

> Our diversified asset base of international reserves and reusable deepwater platforms have a current value exceeding $7.7 billion. ***ATP's liquidity is strong,*** and we are presently reducing our debt with NPI and override payments. As recently as March 2011, ATP increased first-lien capacity by adding $60 million of liquidity.  We also lowered our interest rate from 11% to 9% and we moved out our maturities by four months to January 2015.

> We were able to add a further $50 million of liquidity from the ATP Titan, also in March. And ATP will continue to pursue monetization strategies for other infrastructure assets.

With major capital expenses already incurred to bring Telemark production online, ***going forward we will be able to manage leverage and liquidity at levels satisfactory to the market***. To maintain our capital structure, we will continue our active oil and gas hedging program and maintain a comprehensive insurance program. But significantly, with higher oil prices coupled with significantly higher production, this should result in a substantial increase to our EBITDA and our cash flow for 2011.

*        *        *

***The first 10 years we developed every project with project financing, which means that a failure would have pulled the plug on the company. Now that we're public, our stock is still valued as if the company will fail, despite the fact that we are presently paying down our debt with NPI payments and we have additional strong liquidity.***

(emphasis added.)

153.     The following statements were false statements of material fact and/or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading:

- "ATP's liquidity is strong,"

- "going forward we will be able to manage leverage and liquidity at levels satisfactory to the market," and

- "we are presently paying down our debt with NPI payments and we have additional strong liquidity"

154.     These statements were materially false or misleading because the Defendants (including Bulmahn) knew, or were severely reckless in not knowing, that ATP's liquidity was not strong, and ATP was not able to manage liquidity at levels satisfactory to the market, as described *supra* in ¶140, including that ATP was in a liquidity crisis (¶¶51-52, 73, 92, 102-105), that ATP was already unable to meet many of its debt obligations (¶¶51-52, 102), that ATP delayed routine maintenance and payments to vendors due to limited cash flow (¶52), and that ATP was forced to sell a significant portion of its future production from its wells to finance drilling projects, which prevented ATP from increasing its cash flow (¶¶51, 73, 92-95, 109-118).

67

F.   **First Quarter 2011 Financial Results**

155.   On May 10, 2011, the Company filed its 2011 1Q 10-Q with the SEC.  The 2011 1Q 10-Q was signed by Defendant Reese.  In addition, Defendants Bulmahn and Reese certified the 2011 1Q 10-Q pursuant to the Exchange Act and the Sarbanes-Oxley Act.  The 2011 1Q 10-Q disclosed in pertinent part:

> **Risks and Uncertainties**
>
> … ***Should the permitting process in the Gulf of Mexico continue to be delayed, we believe we can continue to meet our existing obligations for at least the next twelve months based on maintaining <u>existing production levels</u> from our currently producing wells with commodity prices and operating costs near current levels.***
>
> **Liquidity and Capital Resources**
>
> …***Whether or not the well is brought on production in 2011 will have a significant impact on our cash flows for the remainder of the year. Even so, we believe we can continue to meet our existing obligations for at least the next twelve months based on maintaining existing production levels from our currently producing wells and maintaining commodity sales prices and operating costs near current levels.*** … We have historically obtained various other sources of funding to supplement our cash flow from operations and we will continue to pursue them in the future, however, there is no assurance that these alternative sources will be available should these risks and uncertainties materialize.

 (emphasis added).

156.   The following statement was a false statement of material fact and/or omitted to state material facts necessary in order to make the statement, in the light of the circumstances under which it was made, not misleading:

- "[W]e believe we can continue to meet our existing obligations for at least the next twelve months based on maintaining existing production levels from our currently producing wells with commodity prices and operating costs near current level."

157.   This statement was false or misleading because the Defendants (including Bulmahn and Reese) knew, or were severely reckless in not knowing, that ATP was in a liquidity

crisis, could not meet its existing obligations through existing production levels, and in fact was not meeting its obligations at the time, for the reasons discussed *supra* in ¶¶140, 145, 148, 154. In fact, even though ATP managed to increase production levels from where they were in May 2011, by one year later, ATP had taken on considerably more debt and had resorted to unlawfully withholding ORRI and NPI payments just to delay bankruptcy by an additional couple of months.  ¶¶104-105.

158.   Defendants and ATP also violated their disclosure duties under Item 303(a) of Regulation S-K in that they failed to disclose the true, negative, and severe effects of the moratoria on ATP's liquidity and ability to meet its current obligations, as described in ¶¶140, 154, 157, and that it was likely to materially impact liquidity and results of operations going forward.

### G.   July 2011 Global Hunter Securities Energy, China, Metals and Mining Conference

159.   On July 19, 2011, Defendant Reese spoke on behalf of ATP at the Global Hunter Securities Energy, China, Metals and Mining Conference.  During the conference, Defendant Reese emphasized the strength of ATP's operations and dismissed any concerns over drilling in the Gulf of Mexico, making the following materially false or misleading statements:

> We have done a liquidity operation in the second quarter. We did a convertible preferred offering; $172 million here. Really the key of this particular thing was that we also put in place a capped call.

> \*       \*       \*

> We have also done a couple of overrides. ***The question would be -- we didn't think you needed liquidity; wh[y] did you do that? I will address it head on.***

> And the answer is this. We are in the Gulf of Mexico deepwater. I fully expect to have the permits. I fully expect to have the third well on at Telemark. We fully expect this to be a light hurricane season. I will go into all the reasons why we would not necessarily need to do any form of capital raise.

On the other hand, I am 62 years old. I have been in this business for a long, long time. I am seeing some people in the audience that have been in and around for a long, long time also. And things can happen.

***This literally does nothing more than improve our liquidity. It protects us in the event there are any issues in the Gulf of Mexico this year. And in the longer term, as we begin to see more and more permitting become available, that gives us the ability to move forward with other operations.***

160.    The following statements were false statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading:

- "We have also done a couple of overrides. The question would be -- we didn't think you needed liquidity; wh[y] did you do that?," and

- "This literally does nothing more than improve our liquidity. It protects us in the event there are any issues in the Gulf of Mexico this year. And in the longer term, as we begin to see more and more permitting become available, that gives us the ability to move forward with other operations."

161.    These statements were materially false or misleading because the Defendants (including Defendant Reese) knew, or were severely reckless in not knowing, that ATP's decision to take overrides was not simply to "to protect [ATP]," for the reasons discussed *supra* in ¶¶140, 154, 157.  Indeed, CW3 explained ATP "sold off their ownership in a lot of properties to do finance deals, to get cash flow." ¶51.  As a result, CW3 explained "[e]ven in projections when they showed cash coming in, it was already spent on their debt."  ¶51.

### H.    Second Quarter 2011 Financial Results

162.    On August 9, 2011, the Company filed its 2011 2Q 10-Q with the SEC.  The 2011 2Q 10-Q was signed by Defendant Reese.  In addition, Defendants Bulmahn and Reese certified the 2011 2Q 10-Q pursuant to the Exchange Act and the Sarbanes-Oxley Act.  The 2011 2Q 10-Q disclosed in pertinent part:

**Risks and Uncertainties**

*… **Should the regulatory process in the Gulf of Mexico continue to cause delays, we believe we can continue to meet our existing obligations for at least the next twelve months based on forecasted production levels and the continuation of commodity sales prices and operating costs near current levels.***

**Liquidity and Capital Resources**

*   *   *

*… **We believe we can continue to meet our existing obligations for at least the next twelve months based on forecasted production levels and the continuation of commodity sales prices and operating costs near current levels.*** …* We have historically obtained various other sources of funding to supplement our cash flow from operations and we will continue to pursue them in the future, however, there is no assurance that these alternative sources will be available should these risks and uncertainties materialize.

(emphasis added).

163.   The following statements were false statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading:

- "We believe we can continue to meet our existing obligations for at least the next twelve months based on forecasted production levels and the continuation of commodity sales prices and operating costs near current levels."

These statements were materially false or misleading because the Defendants (including Bulmann and Reese) knew, or were severely reckless in not knowing, that ATP was in a liquidity crisis, that ATP could not meet its existing obligations through reasonably forecasted production levels, and in fact was not meeting its obligations at the time, for the reasons discussed *supra* at ¶¶140, 154, 157, 161, including that Defendants' actions to sell ATP's ownership interests in several wells substantially reduced the Company's ability to benefit from production revenue. ¶¶51, 73, 92-95, 109-118.

164.    Defendants and ATP also violated their disclosure duties under Item 303(a) of Regulation S-K in that they failed to disclose in its 2011 2Q 10-Q the true, negative, and severe effects of the moratoria on ATP's liquidity and ability to meet its current obligations, as described in ¶¶140, 154, 157, 161, 163, and that these effects were likely to affect ATP's liquidity and results of operations going forward.

165.    That same day, on August 9, 2011, the Company held its earnings conference call for the second quarter ended June 30, 2011.  Defendants Bulmahn, Reese and Tate participated in the call.  During the call Defendants made the following materially false or misleading statements:

PAUL BULMAHN:   Regarding our financial performance, ***ATP's liquidity remains strong as we produce our reserves, we are reducing our debt with payments to NPI and Override interest holders. In fact, because of increased production and higher oil prices, ATP is paying back its debt at an accelerated pace and even had to recognize additional interest expense this quarter. Revenues from oil and gas production are on target to expectations, although ATP had to forgo 15 months of material production revenues and the earnings loss is higher due to one-time impairments and other adjustments.  In the wake of everything going on in the financial markets, we are managing all controllable elements and addressing everything we can impact.***

\*        \*        \*

CHUCK BENNETT, ANALYST, IBC: Good morning, guys. I waited a long time, I almost forgot what I had to ask you.  Most of my questions were asked, so I'm glad you saved the best for last.  So, right now, I know you're not going to comment on your stock or anything, but for the last three or four months, you have been getting beaten down pretty good from $16, $17 a share.  And it seems like the perception out there is that they think that -- they are basically pricing in bankruptcy on the Company.  I own a lot of the debt, I've see the bonds come down, but what is horrible is the stock.  Now, that being said, I question, what would you say, and it's a masters position, you've got about a 35% short position, what would you say is the short position out there as something to end of this call on?  Because I've got to tell you guys, there is a big position betting against you.  And if we're going to end this call now, what would you say, a few positives that you would tell the short position just before they would leave?

LELAND TATE: I think that's an excellent question, and ***I think it is safe to say that we are very bullish on where we are right now,*** and going forward having

just drilled a highly successful Clipper well and with the efforts at Gomez and Telemark and the days that we are away from bringing the Telemark well on, I recognize that the last 15 months when we have been unable to bring on this material production to the Company, during that period of time, we've had to do a number of efforts to try to continue to keep the Company going in the face of the delay that we have had in being able to address these two wells, both of which were pre-drilled to 12,000 feet in case.

I think we certainly have very strong emotions about the fact we were unable to address that simple effort for this many months, and I believe those two wells alone, when they come on, and we anticipate both of them coming on before the end of the year, I believe that we'll reestablish what the position ATP should have been in 15 months ago. ***And I believe we are sound and healthy, and we certainly are not flirting with bankruptcy at all. That I think we certainly are on sound footing and moving forward well and making things happen globally as well.***

(emphasis added).

166.   The following statements were false statements of material fact and/or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading:

- "ATP's liquidity remains strong as we produce our reserves, we are reducing our debt with payments to NPI and Override interest holders," and

- "I believe we are sound and healthy, and we certainly are not flirting with bankruptcy at all. That I think we certainly are on sound footing and moving forward well and making things happen globally as well."

167.   These statements were false or misleading statements because Defendants (including Bulmahn and Tate) knew, or were severely reckless in not knowing, that ATP did not have strong liquidity, and was not sound and healthy, was in the zone of insolvency, and its assets at fair valuation were less than its debts, as described *supra* in ¶¶140, 154, 157, 161, 163.

I.        **August 2011 EnerCom Incorporated The Oil & Gas Conference**

168.     On August 17, 2011, Defendant Bulmahn spoke on behalf of ATP at the EnerCom Incorporated The Oil & Gas Conference.  During the conference, Defendant Bulmahn made the following materially false or misleading statements:

> Clipper, you may have seen an announcement last week, and we will go into that a little bit more, with follow-ons from Entrada and Green Canyon 37 as we move into future years. ***Basically what we've done is timed these assets to meet our cash flow -- to work within our cash flows and be able to develop them.***

(emphasis added).

169.     These statements were false statements of material fact and/or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading because the Defendants (including Bulmahn) knew, or were severely reckless in not knowing, that ATP's liquidity constraints were a substantial hindrance to ATP's ability to develop the Clipper wells, and that ATP (at the time these statements were made) has nowhere near the funds necessary to develop the wells, and, as alleged by the Bankruptcy Trustee, ATP's debts were greater than its assets at fair valuation, as discussed *supra* in ¶¶92-95.  For instance, ATP was in a zone of insolvency, and Defendants were cannibalizing ATP's assets for short term gain, crippling ATP's ability to profit and bring in cash to complete the Clipper pipeline.  *See* ¶¶51, 73, 92-95, 109-118.

170.     Indeed, by the time ATP filed for bankruptcy in August 2012, the Company had expended only around $20 million of the needed $140 million to $150 million to complete the Clipper pipeline.  Accordingly, Bulmahn's statement that ATP "timed these assets to meet our cash flow" was materially misleading and lacked a reasonable basis in fact.

### J.    September 2011 Rodman Renshaw Global Investment Conference

171.    On September 12, 2011, Defendant Reese spoke on behalf of ATP at the Rodman Renshaw Global Investment Conference.  During the conference Reese talked favorably about the quality and strength of ATP's operations and financial condition and downplayed any concern about development or debt maturity, making the following materially false or misleading statements:

> You can see the numbers we have here, 21,000 barrels last year; first half of this year about 25,000 barrels, *most recent report, we said 31,000 barrels that's with the new Telemark well*. On later this year, we do expect to add the last well at Telemark that should be on by the end of this year, sort of Christmas present and New Year's present and Thanksgiving Day present, too early to tell.

> But what we do think is it will be on by the end of this year that will move us toward that 40,000 barrel per day exit rate as we end this year. *As you look in the next year*, we do expect that we would like to and I'll say we'd like to get the next two wells done at Telemark or excuse me, not Telemark, at Gomez. The nine and the ten well, *the two wells at Clipper, I think those are pretty decent wells that we will be doing because those will already be completed, it's just pipeline* and a couple other opportunities that we would look like -- look at.

> So as you look at us in the past, you look at us where we are today, where we expect to end this year and where you expect us to be going by the end of this year and in the next year, I think you see production up into the right and not just by 2 and 5%, but going from 21 to 25 to 40 and then beyond that on barrels per day.

> *        *        *

> But Telemark will be fully developed by the end of this year. As we go into Gomez in 2012, we'll add the nine of the ten well hopefully and also we'll start looking at 710. And let's assume that that's a successful well and maybe it comes on in 2012 or 2013. Cheviot that I talked about out in the North Sea, that's scheduled for first production in '14.

> *        *        *

> We expect by the end of 2012 most of these overrides and NPIs will be off the books. Still have a few that will extinguish -- that will go into 2010. Excuse me -- 2012, but most of these will be gone by the end of 2012.

> *        *        *

75

On the other hand, oil got prices stay good, production stays 40ish thousand barrels a day and greater then I think you'll see a lot of these properties come in. As time goes through the remainder of this year, well you will begin to see us put numbers around here, but this is really what we are focused on for next year. ***CapEx will be within the cash flow of the Company.***

In summary, we have got a strong reserve base, for barrels, for BOE of proved and probable reserves per share. ***Production expects to be ramping not from exploration that we hope to hit, but from execution of properties that we have. And we have got a solid capital position, our debt is married with our production program, is married with our development program.***

(emphasis added).

172.    The following statements were false statements of material fact or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading:

- "[M]ost recent report, we said 31,000 barrels that's with the new Telemark well,"

- "But what we do think is it will be on by the end of this year that will move us toward that 40,000 barrel per day exit rate as we end this year,"

- "So as you look at us in the past, you look at us where we are today, where we expect to end this year and where you expect us to be going by the end of this year and in the next year, I think you see production up into the right and not just by 2 and 5%, but going from 21 to 25 to 40 and then beyond that on barrels per day," and

- "Production expects to be ramping not from exploration that we hope to hit, but from execution of properties that we have."

173.    These statements were materially false or misleading because Defendants (including Reese) knew, or were severely reckless in not knowing, that at the time Reese made these statements, ATP's company-wide production was significantly less than 31,000 BOE per day and its production from MC Block 941 #4 was significantly less than 7,000 BOE per day. Defendant Reese knew, or was severely reckless in not knowing, of the significantly lower production because of his receipt of weekly production reports, which detailed well and

company-wide production, and the fact that Reese and the other Defendants were very involved in decisions related to Telemark. *See* ¶¶72-73. Further, Reese testified under oath in the Bankruptcy Proceeding that he was "very, very well informed." *See* ¶¶97, 98. Given these facts, Reese also had no reasonable basis to predict that production would be ramping up or that ATP would reach 40,000 BOE per day by the end of the year.

174.   Further, given that ATP, through Defendant Bulmahn, characterized MC Block 941 #4 as providing ATP with "material production revenue," ATP was under an obligation to correct the falsity of its company-wide 31,000 BOE per day production and 7,000 BOE per day production from MC Block 941 #4 once ATP chose to speak about the subject, such as Reese's statement at Rodman Renshaw Global Investment Conference, than wait until the next quarterly announcement.

175.   In addition, the following statement was a false statement of material fact and/or omitted to state material facts necessary in order to make the statement, in the light of the circumstances under which it was made, not misleading:

- "As you look in the next year…the two wells at Clipper, I think those are pretty decent wells that we will be doing because those will already be completed, it's just pipeline."

176.   This statement was materially false or misleading because the Defendants (including Reese) knew, or were reckless in not knowing, that because of ATP's severe liquidity problems, as described *supra* in ¶¶140, 154, 157, 161, 173, the Clipper project would not be completed within the next year and misleadingly downplayed the difficulty that completion of the pipeline posed when he stated that "it's just pipeline." As Defendant Reese testified during the First Day Hearings, the total cost of the project was approximately $140 to $150 million (costs that Reese testified he was aware of since approximately August 2011). However, at the time ATP filed for bankruptcy in August 2012 the Company had expended only about $20

million toward the Clipper pipeline. Moreover, given the lower production numbers from MC Block 941 #4, lower production company-wide production numbers, and the resulting lower revenue, all Defendants' (including Defendant Reese) receipt of weekly production reports, and with decisions regarding financing being made entirely at the executive level, Defendant Reese knew, or was severely reckless in not knowing, that the Clipper project could not be completed within the next year. *See* ¶¶72, 73, 97-98. As stated by Defendant Reese in his declaration in support of the First Day Motions, "declining production" was one of the reasons ATP was "unable to overcome the impact of the moratoria" and "put [ATP] in the untenable position of running out of cash before it could complete the Clipper Wells project and generate the revenues necessary to begin remedying the situation." *See* ¶¶68, 83.

177.     Finally, the following statements were false or misleading statements of material fact and/or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading:

- "CapEx will be within the cash flow of the Company," and

- "[W]e have got a solid capital position, our debt is married with our production program, is married with our development program."

178.     These statements were materially false or misleading because the Defendants (including Reese) knew, or were reckless in not knowing, for the reasons stated *supra* in ¶¶140, 154, 157, 161, 173, 176, that ATP was in a liquidity crisis, ATP's debts were greater than its assets at fair valuation, that given this crisis and the lower production from MC Block 941 #4 CapEx would not be within the cash flow of ATP, and ATP did not have a solid capital position. In addition, ATP was failing to meet additional obligations. *See* ¶99(a)-(d).

K.      **September 2011 Moody's Report and Response**

179.    On September 26, 2011, Moody's issued a report stating that ATP had a "high

likelihood" of restructuring.   On September 29, 2011, Bloomberg News published an article

covering the Moody's report:

> ATP shows a "high likelihood" it may face some type of restructuring, analysts
> from Moody's Investors Service wrote in a Sept. 26 report. ***The company's asset
> base and cash flows are "not sufficient to cover" the second-lien notes,
> according to the report.*** Moody's assigns a Caa2 grade to ATP with a "negative"
> outlook.

180.    Due to the nature of ATP's business, it received its cash flows from the

recovery (pumping) and sale of oil and gas from its wells.   *See, e.g.,* 2011 2Q 10-Q ("As an

independent oil and gas producer, our revenue, profitability, cash flows, and future rate of

growth are substantially dependent on prevailing prices for oil and natural gas.").   According to

the 2011 2Q 10-Q, ATP also supplemented its cash flows from operations from various other

sources, including financing and investing activities.

181.    On Thursday September 29, 2011, Bloomberg published an article, based upon an

interview with Defendant Reese, and including quotes from Defendant Reese, which responded

to Moody's concerns:

> ***ATP Says New Gulf of Mexico Oil Wells to Stave Off Default***
>
> ***ATP Oil & Gas, one of the first oil explorers allowed to resume drilling in the
> U.S. Gulf of Mexico after the Deepwater Horizon disaster, expects to pump
> enough oil from new wells during the next three years to avoid defaulting on
> $1.5 billion in debt.***
>
> Moody's Investors Service this week said ATP shows a "high likelihood" it may
> have to restructure its debt because its cash flow and asset base are insufficient to
> cover notes maturing in 2015. The company's $1.79 billion in net debt exceeds
> that of 97 percent of Houston-based ATP's U.S. peers, according to data compiled
> by Bloomberg.
>
> ATP expects to begin production from new wells at its Telemark field this year,
> followed by additional output at the Clipper and Gomez projects in 2012, Entrada

in 2013 and Cheviot a year later, said Albert L. Reese, ATP's chief financial officer. All of those fields are in the Gulf of Mexico, except Cheviot, which is in the U.K.

"*All of that is before the bonds come due in 2015, so I don't know what Moody's is talking about," Reese said today in a telephone interview. "I can't fight rumors or reports, all I can do is continue to deliver on the promises we've made. Our expectation is that everything is going to be fine*."

(emphasis added).

182.     Reese's statement in response to the Bloomberg article and Moody's report that "I can't fight rumors or reports, all I can do is continue to deliver on the promises we've made" was an implicit reinforcement of his (and ATP's) prior statements that ATP was producing 31,000 BOE per day and that MC 941 #4 was producing 7,000 BOE a day.  This is especially true because Reese's statement was made in response to a report concerning ATP's cash flows. Therefore, the statement was materially false or misleading for the same reasons described in ¶¶140, 154, 157, 161, 173, 176.  Reese's statement was also a denial that ATP was likely to face some type of restructuring.  In actuality, ATP was producing significantly less than 31,000 BOE per day and MC Block 941 #4 was producing significantly less than the previously announced 7,000 BOE per day.

183.     Further, given that ATP, through Defendant Bulmahn, characterized MC Block 941 #4 as providing ATP with "material production revenue," ATP was under an obligation to correct the falsity of its company-wide 31,000 BOE per day production and 7,000 BOE per day production from MC Block 941 #4 once ATP chose to speak about the subject, such as Reese's interview with Bloomberg.

184.     Moreover, in light of the substantially reduced production from the Telemark Hub, Defendant Reese was aware of then-existing adverse facts that undermined ATP's ability to complete the Clipper and Gomez projects and to cover ATP's $1.5 billion debt.  Further, ATP

was in a liquidity crisis, a fact that Reese knew, or was severely reckless in not knowing, as described *supra* in ¶¶140, 154, 157, 161, 173, 176.  Accordingly, Defendant Reese's statement that ATP "expects to pump enough oil from new wells during the next three years to avoid defaulting on $1.5 billion in debt" lacked a reasonable basis in light of the materially decreased production rates.  At the very least, Reese was required to disclose the decreased production rates in order to make his statement that ATP "expects to pump enough oil from new wells during the next three years to avoid defaulting on $1.5 billion in debt" not materially misleading.  Further, as alleged by the Bankruptcy Trustee, ATP's debts were greater than its assets at fair value.

185.    In addition, Reese's entire interview to Bloomberg was materially false or misleading because it was made in response to the statement that ATP's "asset base and cash flows are "not sufficient to cover" the second-lien notes," and, as alleged by the Bankruptcy Trustee, ATP's debts were greater than its assets at fair valuation.

## L.    <u>Third Quarter 2011 Financial Results</u>

186.    On November 8, 2011, the Company issued an earnings press release for the third quarter ended August 31, 2011.  Defendants Bulmahn and Reese were listed as individuals to contact on the press release.  The Form 8-K to which it was attached was filed with the SEC on November 9, 2011 and signed by Defendant Reese.  The press release provided in part:

> The second Clipper well, located at Green Canyon (GC) 300 #4, in approximately 3,450 feet of water, encountered 56 feet of logged net oil pay confirming reserves previously booked. The 9-5/8 inch casing has been set at 15,778 feet measured depth through the pay intervals. The well will now be completed and tested. In July 2011, ATP successfully completed and flow tested the first Clipper well, GC 300 #2 ST #1, at a rate of 45.6 MMcf per day and 4,656 Bbls per day. ***The pipeline lay barge for the Clipper wells is contracted for third quarter 2012 and will tie in both the GC 300 #4 and #2 wells to the Murphy Oil operated Front Runner production facility. ATP operates Clipper and presently owns a 100% working interest.***

(emphasis added).

187.    The following statement was a false statement of material fact and/or omitted to state material facts necessary in order to make the statement, in the light of the circumstances under which it was made, not misleading:

- "The pipeline lay barge for the Clipper wells is contracted for third quarter 2012 and will tie in both the GC 300 #4 and #2 wells to the Murphy Oil operated Front Runner production facility."

This statement was materially false or misleading because Defendants (including Bulmahn and Reese) knew, or were severely reckless in not knowing, that ATP was in a liquidity crisis, as described *supra* in ¶¶140, 154, 157, 161, 173, 176, 184, and would not be able to complete the Clipper project in the third quarter of 2012.   As stated by Defendant Reese during the First Day Hearings, the total cost of the project was approximately $140 to $150 million, with approximately $120 million left at the time ATP filed for bankruptcy.   Defendant Reese further testified that he was aware of that cost "for a year or so" (approximately August 2011) before ATP declared bankruptcy.   Given the lower production numbers from MC Block 941 #4, lower production company-wide production numbers, and the resulting lower revenue, all Defendants' (including Defendant Reese) receipt of weekly production reports, and with decisions regarding financing being made entirely at the executive level, Defendant Reese knew, or was severely reckless in not knowing, that the Clipper project could not be completed within the next year.   As stated by Defendant Reese in his declaration in support of the First Day Motions, "declining production" was one of the reasons ATP was "unable to overcome the impact of the moratoria" and "put [ATP] in the untenable position of running out of cash before it could complete the Clipper Wells project and generate the revenues necessary to begin remedying the situation."  *See* ¶¶68, 83; *see also* ¶¶51, 73, 92-95, 109-118.

188.    On November 9, 2011, the Company filed its 2011 3Q 10-Q with the SEC.   The 2011 3Q 10-Q was signed by Defendant Reese.   In addition, Defendants Bulmahn and Reese

certified the 2011 3Q 10-Q pursuant to the Exchange Act and the Sarbanes-Oxley Act.  The 2011

3Q 10-Q disclosed in pertinent part:

### Risks and Uncertainties

*We have also drilled two wells at Clipper—one has been completed, and the second is scheduled to be completed by the end of 2011—with pipeline construction and first production expected in the second half of 2012.*

*       *       *

*While we believe we can continue to meet our obligations for at least the next twelve months, our cash flow projections are highly dependent upon numerous assumptions including the timing and rates of production from our new wells, the sales prices we realize for our oil and natural gas, the cost to develop and produce our reserves, and a number of other factors, some of which are beyond our control. Our inability to increase near-term production levels and generate sufficient liquidity through the actions noted above <u>could</u> result in our inability to meet our obligations as they come due which would have a material adverse affect on us.* In the event we do not achieve the projected production and cash flow increases, we will attempt to fund any short-term liquidity needs through more of these type transactions; however, there is no assurance that we will be able to repeat these types of transactions in the future if they are required to meet any short-term liquidity needs.

### Liquidity and Capital Resources

*So far in 2011, we have obtained additional financing from term loans and other sources as discussed below, placed on production the third well at our Telemark Hub and have re-entered and completed drilling the fourth Telemark Hub well, the MC Block 942 #2. We expect these new wells will generate sufficient cash flows to fund subsequent development projects and service our long-term debt and other obligations. We believe we can continue to meet our existing obligations for at least the next twelve months based on forecasted production levels and the continuation of commodity sales prices and operating costs near current levels.* In the event we do not achieve the projected production and cash flow increases, we will attempt to fund any short-term liquidity needs through more of these type transactions; however, there is no assurance that we will be able to repeat these types of transactions in the future if they are required to meet our short-term liquidity needs.

*       *       *

*While we believe we can continue to meet our obligations for at least the next twelve months, our cash flow projections are highly dependent upon numerous assumptions including the timing and rates of production from our new wells,*

83

*the sales prices we realize for our oil and natural gas, the cost to develop and produce our reserves, and a number of other factors, some of which are beyond our control. Our inability to increase near-term production levels and generate sufficient liquidity through the actions noted above <u>could</u> result in our inability to meet our obligations as they come due which would have a material adverse affect on us.* In the event we do not achieve the projected production and cash flow increases, we will attempt to fund any short-term liquidity needs through more of these type transactions; however, there is no assurance that we will be able to repeat these types of transactions in the future if they are required to meet any short-term liquidity needs.

 (emphasis added).

189.    The following statement was a false statement of material fact and/or omitted to state material facts necessary in order to make the statement, in the light of the circumstances under which it was made, not misleading:

- "We have also drilled two wells at Clipper—one has been completed, and the second is scheduled to be completed by the end of 2011—with pipeline construction and first production expected in the second half of 2012."

190.    This statement was materially false or misleading because Defendants (including Reese and Bulmahn) knew or were severely reckless in not knowing, that ATP was in a liquidity crisis and did not have the funds to complete the Clipper project in the second half of 2012, as described *supra* in ¶¶140, 154, 157, 161, 173, 176, 184, 187.

191.    The following statement were false statements of material fact and/or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they was made, not misleading:

- "We expect these new wells will generate sufficient cash flows to fund subsequent development projects and service our long-term debt and other obligations. We believe we can continue to meet our existing obligations for at least the next twelve months based on forecasted production levels and the continuation of commodity sales prices and operating costs near current levels," and

- "While we believe we can continue to meet our obligations for at least the next twelve months…"

192.    These statements were materially false or misleading because Defendants (including Reese and Bulmahn) knew or were severely reckless in not knowing, that ATP was in a liquidity crisis, was not generating and could not generate sufficient cash flow to fund subsequent development projects, and was not meeting and could not meet its existing obligations for the next twelve months, as discussed *supra* in ¶¶140 154, 157, 161, 173 176, 184, 187, and would likely have a material negative effect on ATP's liquidity and results of operations going forward.

193.    Defendants and ATP also violated their disclosure duties under Item 303(a) of Regulation S-K in that they failed to disclose in its 2011 3Q 10-Q the true, negative, and severe effects of the moratoria on ATP's liquidity and ability to meet its current obligations, as described in ¶¶140 154, 157, 161, 173 176, 184, 187.

194.    On November 9, 2011, the Company held its earnings conference call for the third quarter ended September 30, 2011.  Defendants Bulmahn, Reese and Tate participated in the call. During the call Defendants made the following materially false or misleading statements:

STEPHEN CARPELL:  And then the second one is just the progress where you are on the Clipper pipeline and then getting financing there for some sort of monetization weather its pipeline or some interest in the field?

\*       \*       \*

LELAND TATE: Yeah. ***The answer on Clipper is the lay barge is contracted for late in July*** <u>***and we have no reason to believe that it won't stay on schedule***</u>***. It actually could be earlier than that, but that's the schedule that we were working towards.*** It will take 30 days to 60 days to actually get the pipeline laid and the facilities hooked up. So I would say late third quarter is not an unreasonable time for startup at Clipper. Al can talk more about the potential financing of the pipeline.

\*       \*       \*

AL REESE: I think if you look back in our last several quarters we continue to operate at better than $100 million of cash.  As we have moved through this period of the moratorium now that the moratorium is behind us, we have wanted

to maintain as much cash as we can to be able to get the next well on at Telemark
to get the Clipper projects done.  *I think as we go into 2012 we may have a little
more cushion of being able to maintain such a large cash balance.*  But that has
been the primary reason, that is because of the uncertainty surrounding where we
were going and being able to get these wells on.

(emphasis added.)

195.    The following statements were false statements of material fact and/or omitted to

state material facts necessary in order to make the statements, in the light of the circumstances

under which they was made, not misleading:

- "The answer on Clipper is the lay barge is contracted for late in July and
  we have no reason to believe that it won't stay on schedule. It actually
  could be earlier than that, but that's the schedule that we were working
  towards.  It will take 30 days to 60 days to actually get the pipeline laid
  and the facilities hooked up. So I would say late third quarter is not an
  unreasonable time for startup at Clipper," and

- "I think as we go into 2012 we may have a little more cushion of being
  able to maintain such a large cash balance."

196.    These statements were materially false or misleading because Defendants

(including Reese and Tate) knew, or were severely reckless in not knowing, that ATP was in a

liquidity crisis, would not be able to complete the Clipper project by late third quarter 2012 (and

hence there was reason to believe it would stay on schedule), and ATP would not generate

sufficient cash to add more cushion, as discussed *supra* at ¶¶140 154, 157, 161, 173 176, 184,

187.

197.    Moreover, during this time, Defendant Reese dismissed the suggestion the

Company might file bankruptcy as "punitive."  As reported in a November 10, 2011 *Wall Street

Journal* article, published after the market closed, entitled "ATP CFO Says Oil & Gas Co. in

Control of Destiny:"

On Thursday [November 10, 2011], Global Hunter Securities put out a note
downgrading the bonds on "bankruptcy concerns." The firm's analysts have said
they value ATP at about $3.15 billion.

> *ATP Chief Financial Officer Al Reese Jr. said in an interview Thursday that while the Gulf of Mexico-focused explorer has seen tough times since last summer's oil spill there, suggestions that the company is sinking into bankruptcy are "punitive."*
>
> *"Right now we believe we have complete control of our destiny and we have no plans to miss any interest payments,"* Mr. Reese said.

(emphasis added).

198.    The statement that "suggestions that the company is sinking into bankruptcy are 'punitive'" was a false statement of material fact and/or omitted to state material facts necessary in order to make the statement, in the light of the circumstances under which it was made, not misleading because Defendants (including Reese) knew, or were severely reckless in not knowing, that ATP was in a liquidity crisis and that the possibility of bankruptcy was real and certainly the suggestion that it was possible was far from "punitive."  As the Bankruptcy Trustee alleged in its lawsuit against the Defendants, ATP was in the zone of insolvency by May 2010, ATP's debts were greater than its assets at fair valuation, and ATP's financial condition steadily worsened during the Class Period as a result of the Defendants knowing actions.  *See* ¶92. Further, as CW3 explained, by October 2011 there were signs of serious trouble, including the possibility of bankruptcy.  CW3 stated that "[d]ebt kept piling up – multiple sources of debt were on the balance sheet. In my opinion they couldn't expand any further because they'd sold off their ownership in a lot of properties to do finance deals, to get cash flow. Even in projections when they showed cash coming in, it was already spent on their debt." *See* ¶51.  ATP was also in a liquidity crisis for the reasons described *supra* in ¶¶140 154, 157, 161, 173 176, 184, 187.

**M.**     **January 4, 2012 Pritchard Capital Partner LLC Energize Conference**

199.    On January 4, 2012, Defendant Reese spoke on behalf of ATP at the Pritchard

Capital Partner LLC "Energize" Conference.  During the presentation Reese made the following

materially misleading statements:

> So when it comes to the assets of the Company, the assets are still strong and
> intact. You can see here, on the proved and probable reserve base -- and this is
> based on last year's reserve report, SEC pricing as of last year updated for strip
> pricing now. ***But what you see is that our entire debt is completely covered by
> our proved reserves. And sitting on top of that is the infrastructure, some more
> proved reserves, as well as the probable reserves. Net debt and total obligations
> of $2.4 billion; you'll see a chart in the back in the appendix that lays that out.
> But when it comes to a valuation of ATP, this is where we think that you will
> find that there is a very strong, compelling value of the Company.***
>
> ***Our long-term patient corporate structure -- a lot of the things that they are
> talking about is our ability to make interest payments, the ability to focus on our
> maturity of the bonds. These occur in 2015. Between now and 2015, we expect
> to have Telemark in full production, which will be '12, Clipper in full
> production which will be '12, Entrada at full production, which will be 2013 or
> 2014, and then Cheviot at full production beginning sometime in 2014, 2015.
> Those are the production ramps that we see occurring prior to any form of
> maturity associated with any of our bonds, and the key component on here is in
> red at the bottom, that there is no financial maintenance covenants, and
> facilities can be expanded***.
>
> As we look at our first lien basket capacity right now and we look at our PV-10,
> what you find is that we are expecting maybe as much as $100 million of
> additional liquidity will be added through the first lien basket based on our initial
> PV-10 estimates. That's not final at this point. It could be more than that, it could
> be less than that. ***But as we look at it today, when you look at liquidity, and this
> would be first-quarter liquidity, we're looking at close to $100 million of
> additional capacity.***
>
> \*         \*         \*
>
> Options for funding our 2012 capital budget, operating cash flow we, do expect
> strong improvement for once Telemark comes on and gets into full production.
> ***Clipper production will commence later in the year***. First lien expansion capacity
> -- I already mentioned $100 million, more or less, that you'll see during the first
> quarter. Partnerships -- we are in active discussion discussions about bringing
> partners in on both Clipper and on Cheviot. And we are continuing to tap the NPI
> and the override markets. We've already closed the $15 million; we did it quietly
> at the end of last year, just last week. This is an existing override owner that liked

what he saw and wanted to put some additional capital to work, and we are always working on monetizations of some of our infrastructure.

In summary, we've got a strong reserve base, over 200 million of proved and probable reserves, 59% oil, in total, so we are an extremely oily company. 6.6 billion of proved and probable reserves -- I would expect that. No promises, I would expect that number to creep up as we get into our final reserve report, plus the infrastructure, a 98% success rate. Israel represents a very low cost, very high reward opportunity. Production is ramping. We do expect that to continue up and to the right in 2012, both from Clipper and at Telemark. *And a strong capital position in the fact that most of our 2012 projects are completely discretionary. We've got many levers to pull to either bring in cash or to reduce CapEx. And the debt that we have that people seem to be so worried about has no maintenance covenants at all that we associate to it.*

(emphasis added).

200.    The following statements were false statements of material fact and/or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading:

- "Clipper in full production which will be '12," and

- "Clipper production will commence later in the year."

201.    These statements were materially false or misleading because Defendants (including Reese) knew, or were severely reckless in not knowing, that ATP was in a liquidity crisis and would not be able to complete the Clipper project by the end of 2012.  As described by the CWs, ATP was in a liquidity crisis for at least the two years prior to its Bankruptcy.  *See* ¶¶51-52, 73; *see also* ¶¶92-95, 109-118.    ATP's liquidity problems were so bad that in the 16 months after issuing the Notes, ATP sold a significant portion of its interests in its wells, which would prevent ATP from expanding its production and increasing cash flow to a level that would resolve the crisis.  *See* ¶51.  *Indeed, by August 2012 – the time Defendants projected for completion of the Clipper pipeline (¶188) – ATP had spent only approximately $20 million (of the $140 million to $150 million needed) toward completion of the Clipper pipeline.*  Moreover,

given the lower production numbers from MC Block 941 #4, lower production company-wide production numbers, and the resulting lower revenue, all Defendants' (including Defendant Reese) receipt of weekly production reports, and with decisions regarding financing being made entirely at the executive level, Defendant Reese knew, or was severely reckless in not knowing, that the Clipper project could not be completed within the year.  As stated by Defendant Reese in his declaration in support of the First Day Motions, "declining production" was one of the reasons ATP was "unable to overcome the impact of the moratoria" and "put [ATP] in the untenable position of running out of cash before it could complete the Clipper Wells project and generate the revenues necessary to begin remedying the situation."  *See* ¶¶68, 83.

202.    In addition, the following statements were false statements of material fact and/or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading:

- "But as we look at it today, when you look at liquidity, and this would be first-quarter liquidity, we're looking at close to $100 million of additional capacity," and

- "And a strong capital position in the fact that most of our 2012 projects are completely discretionary.  We've got many levers to pull to either bring in cash or to reduce CapEx."

203.    These statements were materially false or misleading because Defendants (including Reese) knew, or were severely reckless in not knowing, that ATP was in a liquidity crisis, ATP's debts were greater than its assets at fair value, that ATP did not and could not have $100 million of additional liquidity capacity, and that ATP did not have many levers to pull to either bring in cash or reduce CapEx.  These statements were false and misleading for the same reasons described in ¶201.

204.    In addition, the statement "[b]ut what you see is that our entire debt is completely covered by our proved reserves," was a false statement of material fact and/or omitted to state

material facts necessary in order to make the statement, in the light of the circumstances under which it was made, not misleading, because, as alleged by the Bankruptcy Trustee, ATP's debts were greater than its assets at fair valuation, and ATP's proved reserves were overvalued. *See* ¶92; *see also* ¶¶51, 93-95, 109-118.

205.   During the presentation, Defendant Reese showed PowerPoint slides that included the following materially false and misleading representations:

Production ramping

- Expect growth to accelerate in 2012 as more wells come online

- Telemark to achieve full production status

- Clipper will add new production

Solid capital position

- Most 2012 capital projects are discretionary

- Many levers to pull to fund capital spending as needed

- Debt has no maintenance covenants

206.   The statements that "Clipper will add new production" and "many levers to pull to fund capital spending as needed" were false or misleading statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading because Defendants (including Reese) knew, or were severely reckless in not knowing, for the reasons described *supra* in ¶¶201-204, that ATP was in a liquidity crisis, the Clipper wells would not be completed by the end of 2012, and ATP did not have many levers to pull to fund capital spending.

### N.   February 2012 JP Morgan High Yield & Leveraged Finance Conference

207.   On February 27, 2012, Defendant Reese participated on behalf of ATP in the JP Morgan High Yield & Leveraged Finance Conference.   At the conference, Defendant Reese

made a PowerPoint presentation, which included the following materially false and misleading representations:

Growing production and cash flow

- Produced 24.6 MBoe/d in 2011 and *expect significant uplift in production in 2012 with key new wells at Telemark and Clipper*

- Production 70% liquids in 2Q11 and *benefits from attractive realizations*

- Higher oil prices coupled with *higher production expected to result in cash flow growth* over time in addition to increased per unit margins

(emphasis added.)

208.   These statements were false statements of material fact or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading because Defendants (including Reese) knew, or were severely reckless in not knowing, that ATP did not have the funds to complete the Clipper project and therefore would not be realizing production benefits from Clipper in 2012, that revenues from production were not and would not translate into benefits for ATP (but would be consumed by interest holders), and that ATP would not have higher production that would lead to increased cash flow.  As previously discussed, ATP was in a liquidity crisis that prevented the Company from funding the Clipper pipeline.  ¶¶50-52, 92, 102-105.  ATP's liquidity problems were exacerbated by the lack of the material production revenue.  ¶¶50, 60-70.  The liquidity crisis was so bad that it caused ATP to sell a significant portion of its future production from its wells, which prevented ATP from expanding its production and increasing cash flow to a level that would resolve the crisis.  ¶¶51, 92-95, 109-118.  As CW3 explained, "[e]ven in projections when they showed cash coming in, it was already spent on [ATP's] debt." ¶51.  As stated by Defendant Reese in his declaration in support of the First Day Motions, "declining production" was one of the reasons ATP was "unable to overcome the impact of the moratoria" and "put

[ATP] in the untenable position of running out of cash before it could complete the Clipper Wells project and generate the revenues necessary to begin remedying the situation." *See* ¶¶50, 83. In truth, the Clipper project was barely funded, and by August 2012 – the time Defendants projected for completion of the Clipper pipeline (¶188) – ATP had spent only approximately $20 million, of the required $140 million to $150 million, toward completion of the Clipper pipeline due to ATP's severe liquidity problems. Given the lower production numbers and the resulting lower revenue, that Defendants' (including Defendant Reese) receipt of weekly production reports, that ATP had given future projection revenues to third-parties in exchange for temporary funding, and that decisions regarding financing being made entirely at the executive level, Defendant Reese knew, or was severely reckless in not knowing, that the Clipper project could not be completed within the year and that higher productions would not result in benefits or cash flow growth to ATP.

## O.   Year End 2011 Financial Results

209.     On March 15, 2012, the Company issued an earnings press release for the year ended December 31, 2011. Defendants Bulmahn and Reese were listed as the individuals to contact on the press release. The Form 8-K to which it was attached was filed with the SEC on March 16, 2011 and was signed by Defendant Reese. The press release provided in part:

**Production and Operations Update**

*     *     *

***Capital spending for 2012 includes ongoing expenditures related to ATP's Telemark Hub described above and the completion of the Clipper pipeline targeted for completion in late third quarter or early fourth quarter 2012. Once installed, this pipeline will connect the two Clipper wells to a host platform***. The wells were completed and tested at a combined rate of 16 MBoe per day, net to ATP, in 2011. Other 2012 capital spending projects include continued construction of the Octabuoy floating production platform which will serve the

Cheviot project, additional wells late in 2012 at the Gomez field and ATP's first well in the deepwater offshore Israel area.

***ATP expects to fund these projects through cash flow and additional sources of liquidity already announced or planned, such as the expansion of its first lien and selection of partners to join in property developments.***

(emphasis added).

210.     The following statements were false statements of material fact or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which it was made, not misleading:

- "Capital spending for 2012 includes . . . the completion of the Clipper pipeline targeted for completion in late third quarter or early fourth quarter 2012. Once installed, this pipeline will connect the two Clipper wells to a host platform. The wells were completed and tested at a combined rate of 16 MBoe per day, net to ATP, in 2011," and

- "ATP expects to fund these projects through cash flow and additional sources of liquidity already announced or planned…."

211.     These statements were materially false or misleading because Defendants (including Bulmahn and Reese) knew, or were severely reckless in not knowing, that ATP was in a liquidity crisis and would not be able to complete the Clipper pipeline by late third quarter or early fourth quarter 2012, would not receive the benefits of the revenue from those tested wells and proved reserves, and would not be able to fund the Clipper project and the Telemark wells through cash flow and then-existing or planned financing.  These statements were false and misleading for the same reasons described in ¶¶140, 154, 157, 161, 173, 176, 184, 187, 208.  For example, at the time of Defendants' statements, the Clipper pipeline was barely funded (¶49), ATP had incurred tremendous amounts of debt (¶¶99, 109-118), Telemark was not meeting production expectations (¶¶60-70), and an increasingly substantial portion of ATP's future revenues from production were promised to third-parties (¶¶51, 92-95, 99, 109-118).  Indeed, had funding for completion of the Clipper pipeline been in place, ATP would have expended

more than just $20 million (of the required $140 to $150 million) toward the project by August 2012, nor would Defendants have resorted to unlawfully converting royalty payments that were owed to third parties just to stave off bankruptcy for a few more months.  ¶¶104-105.

212.    Further, as stated by Honorable Marvin Isgur, the judge presiding over ATP's bankruptcy proceeding, ATP filed for bankruptcy "far, far too late" and "had no money."  It is reasonable to infer, given all facts in the Complaint, that this situation existed at this time, within five months prior to ATP's bankruptcy filing.

213.    That same day, on March 15, 2012, the Company filed its 2011 10-K with the SEC.  The 2011 10-K was signed by Defendants Bulmahn, Reese and Godwin.  In addition, Defendants Bulmahn and Reese certified the 2011 10-K pursuant to the Exchange Act and the Sarbanes-Oxley Act.  The 2011 10-K disclosed in pertinent part:

*2012 Operational Objectives*

In the Gulf of Mexico, a primary goal was bringing to production the fourth well at our Telemark Hub. This was accomplished on February 26, 2012. We will continue workover operations on two other wells at the Telemark Hub in an effort to continue to increase production from this location. ***Later in 2012, we expect to complete a pipeline that will bring to production the two wells at our Clipper project.*** These two wells were completed and tested during 2011. ***Workover operations are scheduled at our Gomez Hub and additionally, we are planning to drill of two new Gomez wells starting in late 2012. In the North Sea we are scheduled to begin a development operation at our Blythe location late in 2012. We will continue the construction of our Octabuoy floating production facility with construction completion scheduled in 2013. In Israel we are scheduled to begin drilling our first well during the second quarter of 2012. Additional opportunities in our three core areas plus other opportunities in new areas may be pursued based on available capital, partners and personnel.*** All of our 2012 development plans in the Gulf of Mexico are dependent upon receiving deepwater drilling, pipeline, completion and other permits from the BOEM. While we believe it is likely that we will receive permits in 2012 allowing us to execute our plans, there is no assurance that the permits will be received in time to impact our 2012 results of operations.

*      *      *

**Risks and Uncertainties**

*       *       *

Our cash flow projections are highly dependent upon numerous assumptions including the timing and rates of production from our new wells, the sales prices we realize for our oil and natural gas, the cost to develop and produce our reserves, our ability to monetize our properties and future production through asset sales and financial derivatives, and a number of other factors, some of which are beyond our control. ***Our inability to increase near-term production levels and generate sufficient liquidity through the actions noted above <u>could</u> result in our inability to meet our obligations as they come due which would have a material adverse affect on us.*** In the event we do not achieve the projected production and cash flow increases, we will attempt to fund any short-term liquidity needs through other financing sources; however, there is no assurance that we will be able to do so in the future if required to meet any short-term liquidity needs. ***We believe we can continue to meet our obligations for at least the next twelve months through a combination of cash flow from operations, continuing to sell or assign interests in our properties and selling forward our production through the financial derivatives markets, and if necessary, further delaying certain development activities.***

*       *       *

**Liquidity and Capital Resources**

*Overview*

Historically, we have funded our acquisition and development activities through a combination of bank borrowings, proceeds from equity offerings, cash from operations, the sale or conveyance of interests in selected properties, vendor financings, and proceeds of forward sales of our production in the financial derivatives market. . . . ***We expect with these new wells and workovers we will be performing on existing wells in the first quarter and the two new Clipper wells expected to be placed on production later in the year, we will generate higher operating cash flows in 2012 than in 2011.***

***We believe we can continue to fund our projected capital expenditures and our existing obligations, including our long-term debt and other long-term obligations, for at least the next twelve months, using projected cash flows from operations, proceeds from the recently announced committed increase in our First Lien term loans, asset monetizations which include the sale of working interests, net profits interests and overriding royalty interests, and if necessary, additional forward sales of our production in the financial derivative markets*** ….

96

214.   The following statements were false statements of material fact or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading:

- "Later in 2012, we expect to complete a pipeline that will bring to production the two wells at our Clipper project. These two wells were completed and tested during 2011," and

- "We expect with these new wells and workovers we will be performing on existing wells in the first quarter and the two new Clipper wells expected to be placed on production later in the year, we will generate higher operating cash flows in 2012 than in 2011."

215.   These statements were materially false or misleading because Defendants (including Bulmahn, Reese, and Godwin) knew, or were severely reckless in not knowing, that ATP was in a liquidity crisis and would not be able to complete the Clipper pipeline in 2012, and would not generate higher operating cash flows, as discussed *supra* at ¶211.

216.   In addition, the following statements were false statements of material fact or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading:

- "We believe we can continue to meet our obligations for at least the next twelve months…," and

- "We believe we can continue to fund our projected capital expenditures and our existing obligations, including our long-term debt and other long-term obligations, for at least the next twelve months…"

217.   These statements were materially false or misleading because Defendants knew, or were severely reckless in not knowing, that ATP was in a liquidity crisis, could not meet its current obligations, would not be able to meet its obligations for the next twelve months, and in fact was not meeting its current obligations, as discussed *supra* in ¶¶140 154, 157, 161, 173 176, 184, 187, 208, 211.  Indeed, as found by the judge in ATP's bankruptcy proceeding, ATP "filed for bankruptcy far too late; far, far, too late" because ATP "had no money."  ¶113.

218.   On March 16, 2012, the Company held its earnings conference call for the year ended December 31, 2012.   Defendants Bulmahn, Reese and Tate participated in the call. During the call Defendants made the following materially false or misleading statements, among others:

> PAUL BULMAHN:   Regarding ATP's 2011 results, I will be brief to enable us to move to questions rapidly.   Our revenues were up 57%.   Production in 2011 was a 17% increase our expenses were managed down.   The value of proved reserves were up.   Cash flow is improving.   ***And we continue to expand our liquidity*** after bringing the fourth Telemark well on production.

> \*        \*        \*

> AL REESE: Sure.   Let me go through the liquidity transactions that we have executed this quarter. . . .   What we expect to do, and this is all signed, sealed, and ready to be closed next week, is an additional $100 million.   This will be on Clipper. ***This is for essentially the $100 million that will be used for the installation of the pipeline that is scheduled to take place beginning in the third quarter of this year.*** We've obviously got some expenses before then -- ordering the pipe, getting some of the engineering and things done there.   But that is a $100 million override that should close sometime next week.   And that is, obviously, a very major component of the roughly $125 million or so of capital that we have allocated for that this year.   So, that is all the overrides.

> \*        \*        \*

> ALLAN YOUNG, ANALYST, RAGING CAPITAL MANAGEMENT***: Just very simply, if we look at the Telemark coming on production now, the Clipper wells at the end of the year alongside some of the financing transactions you have announced to-date, is it fairly clear that at the end of the year we should be at a production run rate, given current energy prices, where we are then able to fund capital plans going forward internally?***

> PAUL BULMAHN: ***Yes. I could give a longer answer, but the answer is yes***.

(emphasis added).

219.   The following statements were false statements of material fact or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading:

- "And we continue to expand our liquidity," and

- Defendant Bulmahn's answer of "Yes. I could give a longer answer, but the answer is yes" to Mr. Young's question.

220.   These statements were materially false or misleading because Defendants (including Bulmahn and Reese) knew, or were severely reckless in not knowing, that ATP was in a liquidity crisis, was not expanding its liquidity, and would not be able to fund capital plans going forward internally.   These statements were false and misleading for the same reasons described in ¶217.   Further, As Defendant Reese testified in the First Day Hearings, "Our loans do not allow us to incur any more mortgages;" "[p]rior to the [bankruptcy] filing, we did not have the ability to go borrow more money or encumber the assets." *See* ¶89.

### P.    April 2012 IPAA Oil & Gas Investment Symposium

221.   On April 17, 2012, less than four months prior to the bankruptcy, Defendant Reese participated on behalf of ATP in the IPAA Oil & Gas Investment Symposium.   During the symposium, Reese made the following materially false and misleading statements:

> ***Growing production and cash flow. We will continue to do that. In doing so, we will continue to pay down some of the overrides and the net profits interest that we have. And the initial wells at Clipper, these have some of the highest production rates of any wells we've ever had in the Company. And these have been tested again, 16,000 barrels per day, 62% oil.***

> ***Liquidity is sound. I've heard all of the questions and comments about the liquidity. We ended first quarter with over $200 million in cash. We have no near-term maturities or maintenance financial covenants. They do not begin -- maturity doesn't start until 2015.***

*      *      *

> Long-term capital and leverage. First-lien and second-lien debts have no maturities, they have no -- or no financial covenants, maintenance covenants. *I know a lot of people talk about our debt. I will spend time talking about that in the breakout session. But what I can say is I am not worried about the maturities of our debt.*

*      *      *

This is our capital outlook for the year. We will spend about $400 million, $500 million this year. Part of that is going to be contributed by some of our vendors through existing NPI programs. And as you can see here, I have talked about most of these projects during the year, so I'm not going to spend a lot of time going over these specifically again.

Again, key investment highlights. ***We are at an inflection point. I think ATP will be a very different company at the end of 2012 than we were at the end of 2011. Liquidity is sound.*** We have deepwater operating experience, both here and the North Sea and soon to be in the Israeli area. A fleet of floating reusable deepwater structures, substantial asset value and an extremely strong alignment between the shareholders of the Company and the management of the Company.

(emphasis added).

222.     The following statements were false statements of material fact or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading:

- "Growing production and cash flow. We will continue to do that. In doing so, we will continue to pay down some of the overrides and the net profits interest that we have,"

- "Liquidity is sound. I've heard all of the questions and comments about the liquidity. We ended first quarter with over $200 million in cash. We have no near-term maturities or maintenance financial covenants. They do not begin -- maturity doesn't start until 2015," and (again)

- "Liquidity is sound."

223.     These statements were materially false or misleading because Defendants (including Reese) knew, or were severely reckless in not knowing, that ATP was in a liquidity crisis, did not have and would not have growing cash flow, and did not have "sound liquidity," for the reasons discussed *supra* in ¶¶140 154, 157, 161, 173 176, 184, 187, 208, 211, 217, 220. In addition, by this time, the Defendants were purposely withholding payments for ORRIs and NPIs, and ATP was unable to meet other additional obligations, failing to pay certain vendors as early as April 2007.  See ¶99(a)-(r).  The number and amount of the delinquent invoices was now rapidly increasing.  *Id.*  Further, as stated by Honorable Marvin Isgur, the judge presiding over

ATP's bankruptcy proceeding, ATP filed for bankruptcy "far, far too late" and "had no money."

¶113.  It is reasonable to infer, given all facts in the Complaint, that this situation existed at this time, within four months prior to ATP's bankruptcy filing.

224.    In addition, the following statement was a false statement of material fact and/or omitted to state material facts necessary in order to make the statement, in the light of the circumstances under which it was made, not misleading:

- And the initial wells at Clipper, these have some of the highest production rates of any wells we've ever had in the Company. And these have been tested again, 16,000 barrels per day, 62% oil."

225.    This statement was materially false or misleading because Defendants (including Reese) knew, or were severely reckless in not knowing, that ATP was in a liquidity crisis and would not be able to complete the Clipper project by the end of 2012 and would not receive the revenue of these tested reserves.  This statement was false and misleading for the same reasons described in ¶¶140 154, 157, 161, 173 176, 184, 187, 208, 211, 217, 220, and because as stated by Defendant Reese during the First Day Hearings, the total cost of the project was approximately $140 to $150 million, with approximately $120 million left at the time ATP filed for bankruptcy.  Defendant Reese further testified that he was aware of that cost "for a year or so" (approximately August 2011) before ATP declared bankruptcy.  Given the lower production numbers from MC Block 941 #4, lower production company-wide production numbers, and the resulting lower revenue, all Defendants' (including Defendant Reese) receipt of weekly production reports, and with decisions regarding finances occurring entirely at the executive level, Defendant Reese knew, or was severely reckless in not knowing, that the Clipper project could not be completed within the next year.  As stated by Defendant Reese in his declaration in support of the First Day Motions, "declining production" was one of the reasons ATP was "unable to overcome the impact of the moratoria" and "put [ATP] in the untenable position of

running out of cash before it could complete the Clipper Wells project and generate the revenues necessary to begin remedying the situation."  *See* ¶¶68, 83.

226.    During the symposium, Defendant Reese made a PowerPoint presentation.  Slides from ATP's PowerPoint presentation included the following materially false and misleading representations:

- ATP is at an inflection point

  - *Experiencing significant improvement in production rates and oil production mix*

  - Substantial decline in infrastructure capital expenditures going forward

  - *Growing production and cash flow further enhanced by the paydown of current NPIs and ORRIs, which results in increased cash flow to ATP*

- *Liquidity is sound*

  - Estimated cash position of $200+ million at 3/31/2012

  - No near-term debt maturities or maintenance financial covenants

  - ORRI and NPI repayments tied directly to production revenues

  - *Major infrastructure projects near complete*

227.    The following statements were false statements of material fact or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading:

- "Experiencing significant improvement in production rates and oil production mix,"

- "Growing production and cash flow further enhanced by the paydown of current NPIs and ORRIs, which results in increased cash flow to ATP,"

- "Liquidity is sound," and

- "Major infrastructure projects near complete."

228.    These statements were materially false or misleading because Defendants (including Reese) knew, or were severely reckless in not knowing, that ATP was in a liquidity crisis, did not have and would not have growing cash flow, did not have sound liquidity," was purposely withholding payments for overrides and net profit interests, and knew that major infrastructure projects (such as Clipper) were not near complete as evidenced by the fact that ATP had expended only $20 million of the needed $140 to $150 million to complete the Clipper pipeline.  These statements were false and misleading for the same reasons described in ¶¶140 154, 157, 161, 173 176, 184, 187, 208, 211, 217, 220, 225.

### Q.    First Quarter 2012 Financial Results

229.    On May 9, 2012, the Company issued an earnings press release for the first quarter ended March 31, 2012.  Defendants Bulmahn and Reese were listed as the individuals to contact on the press release.  The Form 8-K to which it was attached was filed with the SEC on May 10, 2012 and was signed by Defendant Reese.  The press release provided in part:

**Production and Operations Update**

\*      \*      \*

ATP expects production of 1.6MMBoe – 2.3MMBoe during second quarter 2012. ***ATP's two wells at Clipper (Green Canyon 300) are on schedule to begin production in late third quarter or early fourth quarter 2012. Both wells were drilled and completed in 2011, and ATP has begun preparatory work for the installation of the Clipper pipeline during third quarter 2012.*** The two wells at Clipper tested at a net 16 MBoe/day, 62% oil.

230.    On May 10, 2012, the Company filed its 2012 1Q 10-Q with the SEC.  The 2012 1Q 10-Q was signed by Defendant Reese.  In addition, Defendants Bulmahn and Reese certified the 2012 1Q 10-Q pursuant to the Exchange Act and the Sarbanes-Oxley Act.  The 2012 1Q 10-Q disclosed in pertinent part:

**Note 3 — Risks and Uncertainties**

*        *        *

The new wells helped us achieve production growth in 2011, ***and we forecast overall production and operating cash flow growth in 2012 due to new production from our Clipper property and from projected increases at our Telemark Hub***. Production in the first quarter of 2012 is lower than in the fourth quarter of 2011 primarily due to the Telemark well recompletion discussed above which required us to take the well offline and normal production declines. While cash flows were lower than previously projected due to lower than expected production rates, delays in bringing on new production and higher capital costs, we continued our development operations by supplementing our cash flows from operating activities with funds raised through various transactions (see the Consolidated Statement of Cash Flows.)

*        *        *

Our cash flow projections are highly dependent upon numerous assumptions including the timing and rates of production from our new wells, the sales prices we realize for our oil and natural gas, the cost to develop and produce our reserves, our ability to monetize our properties and future production through asset sales and financial derivatives, and a number of other factors, some of which are beyond our control. ***Our inability to increase near-term production levels and generate sufficient liquidity through the actions noted above <u>could</u> result in our inability to meet our obligations as they come due which would have a material adverse effect on us.*** In the event we do not achieve the projected production and cash flow increases, we will attempt to fund any short-term liquidity needs through other financing sources; however, there is no assurance that we will be able to do so in the future if required to meet any short-term liquidity needs. ***Despite continued production delays, we believe we can continue to meet our obligations for at least the next twelve months through a combination of cash flow from operations, continuing to sell or assign interests in our properties and selling forward our production through the financial derivatives markets, and if necessary, further delaying certain development activities.***

*        *        *

**Liquidity and Capital Resources**

*        *        *

***Despite actual and anticipated production delays, we believe we can continue to fund our projected capital expenditures and our existing obligations, including our long-term debt and other obligations (which include those to the noncontrolling interest and to our preferred shareholders), for at least the next twelve months, using projected cash flows from operations, cash on hand, asset***

104

*monetizations which include the sale of working interests, NPIs and Overrides, and if necessary, additional forward sales of our production in the financial derivative markets*. In certain cases, we will also continue to work with certain vendors to extend out the timing of certain payments to preserve cash. With certain limitations, we may also delay certain anticipated development expenditures to further preserve cash if necessary. While some of the transactions we had planned for the remainder of 2012 have been completed or committed, others are still incomplete. Our ability to consummate those transactions is dependent on a number of factors including our production results, commodity prices and general market conditions; therefore there is no assurance that we will be able to repeat these types of transactions in the future if they are required to meet our short-term liquidity needs. Our longer-term liquidity is also dependent on our production levels and the prevailing prices for oil and natural gas which have historically been very volatile. To mitigate future price volatility, we may continue to hedge the sales price of a portion of our future production.

*      *      *

As of March 31, 2012, we had a working capital deficit of approximately $267.9 million, a decrease of approximately $79.6 million from December 31, 2011. This deficit is the cumulative result of our capital expenditures exceeding our cash flows from operating and financing activities over the last three years as we invested heavily in infrastructure and wells expected to increase production and cash flow from operations in future periods. *With the increased production we are forecasting and our efforts to seek partners for certain of our major capital intensive projects, we expect this working capital deficit to shrink during the remainder of 2012 and into 2013.*

*While we believe we can continue to meet our obligations for at least the next twelve months,* our cash flow projections are highly dependent upon numerous assumptions including the timing and rates of production from our new wells, the sales prices we realize for our oil and natural gas, the cost to develop and produce our reserves, and a number of other factors, some of which are beyond our control. *Our inability to increase near-term production levels and generate sufficient liquidity through the actions noted above <u>could</u> result in our inability to meet our obligations as they come due which would have a material adverse effect on us.* In the event we do not achieve the projected production and cash flow increases, we will attempt to fund any short-term liquidity needs through more of the types financing transactions we have completed in the past; however, there is no assurance that we will be able to repeat these types of transactions even if they are required.

(emphasis added).

231.   On May 10, 2012, the Company held its earnings conference call for the first

quarter 2012.   Defendants Bulmahn, Reese and Tate participated in the call.   During the call

Defendants made the following materially misleading statements:

> AL REESE: . . . .   We will continue our net profits interest program during the year. The overrides that we have done in the first quarter all relate to two properties, $100 million relates to the Clipper property. The balance of the override relates to a Gomez property and any net profits interest that we did in the first quarter; that relates to Telemark. I think we will continue to access both of those properties as we go through the year. Certainly, the need for doing that decreases significantly as we get into the third and the fourth quarter of this year with the Clipper well coming online, but to say that there is a specific number, I think we're not prepared to talk about that right now other than saying, ***I think, we are very well within the financing capability.***
>
> *   *   *
>
> PAUL BULMAHN:   I think it's appropriate to note, we are not pleased or satisfied with the first quarter, except for the completion and beginning production of the fourth well at Telemark. We have continued the work-over of a Telemark well to increase its production, that effort hopefully will be successful during the second quarter. ***ATP has grappled with numerous timing issues, and yet, we have not missed an interest payment on our debt.   We have made every payment, including the most recent $90 million payment on May 1. We are looking forward to the third and fourth quarters,*** having successfully drilled and completed two deep water wells at Clipper, which are scheduled to produce after the pipeline is laid and connected up.   And, we have continued to move forward with the work to tie them back to the Murphy Frontrunner platform.
>
> *   *   *
>
> JOE ALLMAN: Okay. That's helpful. And then could you just give us a list, I know folks have asked this in different questions, but just give us a list of the additional financing that you're planning for the rest of this year and even into 2013?
>
> AL REESE: …Gomez, we were very successful in putting together an override forego, excuse me, ***for Clipper, $100 million item that is pre-funded and we'll basically pay for the pipeline installation that we're going to have there***. Once that property comes on later this year, we'll have the opportunity. I'm not saying we're going to do it, but we'll have the opportunity to look at an additional override at that location.
>
> *   *   *

PAUL BULMAHN: Thank you, Brock. And on that note, I think it's appropriate to move to the close. ***I think, just to reiterate, we are certainly looking forward to the third and fourth quarters, because, I think, the two deepwater wells at Clipper, which are scheduled to begin production in the third quarter, I think those wells will be material to the Company's interest.***

(emphasis added).

232.   The following statements false statements of material fact or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading:

- "ATP's two wells at Clipper (Green Canyon 300) are on schedule to begin production in late third quarter or early fourth quarter 2012. Both wells were drilled and completed in 2011, and ATP has begun preparatory work for the installation of the Clipper pipeline during third quarter 2012" (May 9, 2012 press release),

- "[W]e forecast overall production and operating cash flow growth in 2012 due to new production from our Clipper property and from projected increases at our Telemark Hub" (May 10, 2012 Form 10-Q),

- "[W]e were very successful in putting together an override forego, excuse me, for Clipper, $100 million item that is pre-funded and we'll basically pay for the pipeline installation that we're going to have there" (May 10, 2012 earnings conference call), and

- "[T]he two deepwater wells at Clipper, which are scheduled to begin production in the third quarter, I think those wells will be material to the Company's interest" (May 10, 2012 earnings conference call).

233.   These statements were materially false or misleading because Defendants (including Reese and Bulmahn) knew, or were severely reckless in not knowing that ATP was in a liquidity crisis and could not afford to complete the Clipper pipeline, the pipeline was not pre-funded, the Clipper wells would not begin production in the later third quarter or early fourth quarter 2012, and ATP would not receive the revenue from those tested wells and proved reserves, as explained *supra* at ¶¶140 154, 157, 161, 173 176, 184, 187, 208, 211, 217, 220.   As Defendant Reese testified in the First Day Hearings, by August 2012 ATP had only put $20

million toward completion of the Clipper pipeline (which required an investment of $140 to $150 million), ATP's "loans do not allow [them] to incur any more mortgages," and "[p]rior to the [bankruptcy] filing, [ATP] did not have the ability to go borrow more money or encumber the assets." *See* ¶¶49, 89.  Indeed, ATP was by this point wrongfully withholding payments to third-party interest holders just to cover day to day operational costs (¶¶104-105), making Defendants' statements that the Clipper pipeline would be completed by the third or fourth quarter of 2012 that much more fraudulent or (at the very least) severely reckless.   Further, as stated by Honorable Marvin Isgur, the judge presiding over ATP's bankruptcy proceeding, ATP filed for bankruptcy "far, far too late" and "had no money."  It is reasonable to infer, given all facts in the Complaint, that this situation existed at this time, within three months prior to ATP's bankruptcy filing.

234.    In addition, the following statements were false statements of material fact or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading:

- "[W]e believe we can continue to meet our obligations for at least the next twelve months" (May 10, 2012 Form 10-Q),

- "[W]e believe we can continue to fund our projected capital expenditures and our existing obligations, including our long-term debt and other obligations (which include those to the noncontrolling interest and to our preferred shareholders), for at least the next twelve months" (May 10, 2012 Form 10-Q),

- "I think, we are very well within the financing capability" (May 10, 2012 earnings conference call), and

- "ATP has grappled with numerous timing issues, and yet, we have not missed an interest payment on our debt.  We have made every payment, including the most recent $90 million payment on May 1. We are looking forward to the third and fourth quarters" (May 10, 2012, earnings conference call).

235.     These statements were materially false or misleading because Defendants (including Bulmahn and Reese) knew, or were severely reckless in not knowing, that ATP was in a liquidity crisis, could not meet its current obligations, and could not meet its obligations for the next twelve months.  These statements were false and misleading for the same reasons described in ¶233, including that the Company by this point was unlawfully withholding ORRI and NPI payments.  Moreover, the falsity of these statements is further evidenced by the fact that Matt McCarroll, who ATP hired to serve as CEO on June 1, 2012, quit within 3 business days because of the massive financial problems at ATP.   As Defendant Reese testified in the First Day Hearings, by August 2012 ATP had only put $20 million toward the Clipper pipeline (which required an investment of $140 to $150 million), ATP's "loans do not allow [them] to incur any more mortgages," and "[p]rior to the [bankruptcy] filing, [ATP] did not have the ability to go borrow more money or encumber the assets."  *See* ¶¶49, 89.  Indeed, ATP was by this point wrongfully withholding payments to third-party interest holders just to cover day to day operational costs (¶¶104-105), making Defendants' statement that "we have made every payment" and assurances that the Clipper pipeline would be completed by the third or fourth quarter of 2012 that much more fraudulent or (at the very least) severely reckless.  A few weeks later, McCarroll informed the Board that they needed to restructure "immediately."  *See* ¶78.

### R.     June 2012 Announcements of the Hiring and Resignation of Matt McCarroll

236.     On June 1, 2012, ATP issued a press release announcing that Mr. Matt McCarroll had joined ATP as Chief Executive Officer, replacing Defendant Bulmahn.   Defendants Bulmahn and Reese were listed as the individuals to contact on the press release.  The Form 8-K to which the press release was attached was filed with the SEC on June 8, 2012 and signed by Defendant Reese.  The press release stated, in relevant part:

> ATP Oil & Gas Corporation (NASDAQ: ATPG) today announced that Mr. Matt McCarroll has joined ATP as Chief Executive Officer of ATP Oil & Gas Corporation.
>
> ATP Chairman T. Paul Bulmahn stated, "We are very pleased to add Matt to our leadership team. His successful and proven talent in offshore property development is an asset to ATP. His experience in the offshore Gulf of Mexico will be invaluable to moving forward our Clipper and Telemark properties in addition to our international properties. Matt's commitment to ATP has already been shown by his purchase today of 1,000,000 shares of our common stock directly from ATP at market price."

237.    The press release made false or misleading statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they was made, not misleading because Defendants (including Bulmahn and Reese) knew, or were severely reckless in not knowing, that ATP and Mr. McCarroll had not agreed upon an employment agreement, and that fact should have been disclosed in the press release. In fact, less than a week later, on June 7, 2012, the new CEO, Mr. McCarroll, abruptly resigned his position, and his purchase of 1 million shares of ATP stock touted only a few days before was rescinded.  ATP's June 7, 2012 press release announcing the resignation disclosed:

> On June 1, 2012, ATP Oil & Gas Corporation (NASDAQ: ATPG) announced that Mr. Matt McCarroll replaced Mr. T. Paul Bulmahn as Chief Executive Officer of the company. Mr. Bulmahn continues to serve as Chairman and also in the newly created position of Executive Chairman of ATP. However, as of today, June 7, 2012, *the company announced that it was unable to reach a mutually agreeable employment agreement with Mr. McCarroll* and effective today he has submitted his resignation. In conjunction with his resignation, the previously announced purchase of shares from the company by Mr. McCarroll mentioned in the June 1, 2012 press release was rescinded.

(emphasis added).

238.    ATP personnel indicated on the June 7th release as the contact persons for the release were Defendants Bulmahn and Reese.  The Form 8-K to which the press release was

attached, and which made the same disclosures as the release, was filed with the SEC on June 8, 2012 and signed by Defendant Reese.

239.    On the news of McCarroll's resignation, ATP's stock price fell $0.53 to close at $5.31 on June 8, 2012, a decline of 9.1% from the previous day's closing price, on unusually high volume. The price of ATP's stock continued to decline, closing at $4.93 on June 11, 2012, the next trading day, and continued to fall before closing at $4.015 per share on June 13, 2012, four trading days after the announcement of McCarroll's resignation.

240.    Further, the statement that ATP "was unable to reach a mutually agreeable employment agreement with Mr. McCarroll" was a false statement of material fact or omitted to state material facts necessary in order to make the statement, in the light of the circumstances under which it was made, not misleading because Defendants (including Bulmahn and Reese) knew, or were severely reckless in not knowing, that the true reason for Mr. McCarroll's departure was that ATP's finances were a "disaster," and that Mr. McCarroll wanted to begin restructuring immediately but the ATP Board, including Defendant Bulmahn, would not agree. ¶78.  Indeed, in an article entitled "Fieldwood CEO offers insight on eye-popping Apache deal" published in the *Houston Business Journal* on July 26, 2013, McCarroll is quoted as saying: ***"I went there knowing it was a turnaround situation, but not realizing until I got there how bad things were. I recommended to the board they start restructuring immediately, and they weren't willing to do it***."   Further, McCarroll (although ostensibly declining to provide information in aid of Plaintiffs' investigation), in a brief exchange with Plaintiffs' investigator in December 2014 confirmed that ATP's finances were a "disaster" and stated, "I left after three days, that says it all."

## VII.   ADDITIONAL SCIENTER ALLEGATIONS

241.   Throughout much of the Class Period ATP was in the process of trying to obtain financing, including financing from Chinese banks to fund its Octabuoy floating production facility for 2012 and into 2013.  Such financing was critical to the continued and future success of ATP.

242.   ATP raised the issue of financing multiple times on the quarterly earnings call with investors, including, on March 16, 2012, and on May 10 2012, prior to the filing of the petition in bankruptcy on August 17, 2012.   For example, Defendant Reese stated on the Q1 Earnings Call that the Company is "well along in those discussion. They are at a point where I feel very comfortable and we even say it in the press release that we feel optimistic about closing that.  That's probably a closing that occurs in…third quarter this year."

243.   Defendants acted with scienter in that they: knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

244.   As set forth elsewhere herein in detail, Defendants Bulmahn, Reese, Godwin, and Tate, by virtue of their receipt of information reflecting the true facts regarding ATP, their control over, and/or receipt and/or modification of ATP's allegedly materially misleading misstatements, participated in the fraudulent scheme alleged herein.

245.   Further, Defendants Reese and Bulmahn were listed as the persons to contact on press releases, and, by virtue of their positions as CFO and CEO, respectively, would have approved press releases before issuance.

246.     When viewed individually, and certainly when viewed collectively, the allegations herein evidence a strong and cogent inference of the Defendants' intent to defraud or severe recklessness.  These allegations include, but are not limited to, that Defendants Bulmahn, Reese, Godwin, and Tate:  received weekly production reports evidencing well specific and company-wide production levels; made all decisions concerning financing for projects; as alleged by the court-appointed Bankruptcy Trustee, knew that ATP was in a zone of illiquidity by May 2010, and took actions in response to the moratoria that worsened the damage and destroyed any long term prospects for ATP.

247.     Each Defendant was motivated to delay disclosing the true adverse facts based on ATP's need to raise the capital it needed to continue as a going concern.  ATP relied on its ability to raise funds and borrow money.  Without the availability of outside funding, the Company could not continue its operations.  Thus, instead of disclosing the known adverse facts as they became known, the Defendants delayed such disclosures.  As an example, the Defendants continuously represented that the necessary drilling permits would be forthcoming and that the Company's liquidity was sound, when they knew or were severely reckless in not knowing that was not the case.

## VIII.   LOSS CAUSATION

248.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a continuing course of conduct that artificially inflated the prices of ATP common stock and operated as a fraud or deceit on Class Period purchasers of ATP common stock by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed, or materialized, and became apparent to the market, the price of ATP common stock fell precipitously. As a result of

their purchases of ATP common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

249.    By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of ATP's business and prospects, financial position, and results of operations. Defendants' false and misleading statements caused ATP common stock to trade at artificially inflated levels throughout the Class Period.

250.    The decline in value of the common was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the price decline of ATP common stock negates any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme and caused the subsequent significant decline in the value of ATP common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

251.    On November 8, 2011, ATP common stock closed at $10.50 per share on volume of 1,325,531. At approximately 11:35 p.m. East Coast Time ("ET"), after the NASDAQ market had closed trading for the day, ATP issued a press release announcing its Third Quarter 2011 financial results. The press release was attached to a Form 8-K that was filed with the SEC on November 9, 2011. The press release stated that ATP's "oil & gas production for the third quarter 2011 was 2.2 million [BOE], or 24,200 BOE per day."

252.   On November 9, 2011, at approximately 11:00 a.m. ET, while the NASDAQ market was open, ATP held a conference call with investors and analysts to discuss its third quarter 2011 financial results.  On that call, Defendants further discussed ATP's production:

[DEFENDANT BULMAHN]:  Oil and gas production for the third quarter 2011 was 2.2 million barrels of oil equivalent compared to 1.9 million barrels for the third quarter 2010, a 15% increase. Revenues from oil and gas production were $170.1 million for the third quarter 2011 compared with $102.1 million for the third quarter 2010, a 67% increase. Oil represented 69% of total production for the third quarter 2011 compared to 58% of total production for the third quarter 2010.

*       *       *

Q - RAFI KHAN: Leland, if you could perhaps reconcile the production of 31,000 and your target of 40,000 to 45,000 with your current production of 25,000 to 26,000, I mean, where are we losing the production? And the other question I had is can you give us an update and prospect for Atwater, Lady Bug, and Canyon Express. I've noticed in recent months the production on those wells has been even zero in some months.

A - LELAND E. TATE: Yes, it's Leland here. I'll start out on the reconciliation and we'll start with the 31,000 and sort of work our way back. There are – we produce somewhere around 24,000 barrels a day out of the shelf, I'm sorry, out of deep water and we produce about one to two out of the shelf in the U.K.  Where we are now is 31,000 was roughly we were at 24,500 at year end – at quarter end last quarter and we *saw a well test that showed us about 7,000 barrels a day that would get added to that. And what happened was during the completion we got – the well test was indicating that. As we brought the well on production, what we saw was a completion efficiency where there was more wellbore drawdown near the well bore than what we had seen during the well test and as a result we can make on a routine basis about 3,500 barrels a day equivalent out of that well*. It's a stabilized and producing at that rate. It could produce more, but we've chosen to restrain it in order to make sure that we don't damage the gravel pack in anyway. So if you think about that, that gets you from 31 down to 27.5 or something like that.

*       *       *

Q - RAFI KHAN: Are you anticipating the 3500 on the Mirage #2 to go back up to the 7,000 or are you looking at it staying at 3500?

A - LELAND E. TATE*: We will increase it some. I do not believe that it will go back to the 7,000 barrels a day based on the drawdown that we're seeing. What we are doing is we are slowly opening it up to see if we can get incremental*

*production from it without taking the risk of damaging it. So, I wouldn't anticipate it going back to 7, but I believe it will come up a little bit.*

253.    The November 8, 2011 Press Release and the November 9, 2011 Conference Call disclosed that Defendant Reese's statements at the September 12, 2011 Rodman Renshaw Global Investment Conference that ATP was producing 31,000 BOE per day with MC Block 941 #4, and his reinforcement of that false statement in his statements to and reported by Bloomberg.  In fact, at the time of Reese's statements, production from MC 941 #4 at the Telemark Hub was at most half of the 7,000 BOE per day disclosed in August 2011, and ATP was producing significantly less than 31,000 BOE per day.

254.    The information disclosed in the November 8, 2011 Press Release and November 9, 2011 Conference Call was material to the market.  At approximately 11:07 a.m. EST, ATP common stock reached its intra-day high of $10.950 per share.  At approximately 11:15 a.m. EST, ATP common stock began to fall, eventually closing at $8.450 per share, down $2.05 per share, or 19.5% as compared to its previous days close, and down $2.50, or 22.8% from its November 9, 2011 intra-day high.  ATP's trading volume on November 9, 2011 was 5,854,461.  On November 9, 2011, the BI Global Oil Index closed at $65.53, down $4.66 or 6.64%, from its November 8, 2011 closing price of $70.19.

255.    As further evidence of the materiality of these disclosures, on November 10, 2011, Global Hunter Securities downgraded ATP common stock from Accumulate to Reduce, and cut its 12-month price target from $14.00 per share to $6.25 per share.  Also on November 10, 2011, Vivek Pal, an analyst at Knight Capital Group, Inc., stated that failure to reach the 41,000 barrels of daily output may signal a cash crunch that could hobble ATP's ability to make interest payments on its debt and bonds and finance oil developments.  On November 10, 2011, at approximately 4:13 p.m. ET, Bloomberg News issued an article titled "ATP Oil May Miss

2012 Interest Payment as Output Drops," reporting Mr. Pal's analysis and reporting that ATP may not be able to make interest payments on the Notes in May 2012.

256.   On November 10, 2011, ATP common stock continued to fall, closing at $7.250 per share, down $1.20 per share, or 14.2% from its previous closing price.  ATP's trading volume on November 10, 2011 was 6,582,236.  On November 10, 2011, the BI Global Oil Index closed at $66.82, up $1.29 or 1.97% from its previous close.

257.   On June 7, 2012, ATP common stock closed at $5.84 per share on volume of 255,678 per share.  On June 7, 2012, after the NASDAQ market had closed for the day, ATP issued its press release announcing that Mr. McCarroll had resigned as CEO of ATP and that his purchase of 1 million shares from the company had been rescinded.

258.   The information disclosed in the June 7, 2012 press release was material to the market, and disclosed Defendants' false and misleading statements that Mr. McCarroll had in fact joined ATP and that his hiring was not subject to completion of an agreeable employment contract.  On June 8, 2012, ATP common stock fell $0.53 per share, or 9.1%.  ATP's volume was 1,057,412.  On June 8, 2012, the BI Global Oil Index closed at $56.80, down $0.08, or 0.14% from its previous close of $56.88.  The price of ATP's stock continued to decline, closing at $4.93 on June 11, 2012, $4.58 per share on June 12, 2012, and $4.02 per share on June 13, 2012.  The BI Global Oil Index closed at  $55.25 on June 11, 2012, $56.14 on June 12, 2012, and $54.89 on June 13, 2012.

259.   On July 23, 2012, ATP stock closed at $2.66 per share on volume of 2,926,919 shares.  On July 23, 2012, after the NASDAQ market had closed for the day, Debtwire published an article reporting that ATP had retained Jefferies & Co. to advise it on heading off a potential liquidity squeeze because ATP was going to have trouble funding $89 million payment on the

Notes due in November 2012.  Debtwire's article was also published on the Financial Times website FT.com at approximately 8:59 p.m. ET in article titled "ATP hires Jefferies to help address liquidity strain."

260.   The information disclosed in the July 23, 2012 Debtwire article was material to the market, disclosed Defendants' false and misleading statements, and, among other things, revealed to the market that contrary to Defendants' statements, ATP's liquidity was not strong, that ATP could not meet its obligations for the next twelve months, and that ATP would not complete the much-touted Clipper project.  On July 24, 2012, ATP common stock fell $0.28 per share, or 10.5%.  ATP's volume was 2,036,668.  On July 24, 2012, the BI Global Oil Index closed at $57.20, down $1.15, or 1.97% from its previous close or $58.35.

261.   On July 26, 2012, ATP common stock closed at $1.95 per share on volume of 5,380,769.  Later that day, at approximately 5:07 p.m. and after the NASDAQ market had closed for the day, Bloomberg News published an article titled "ATP Bondholders Said to Seek Adviser as Debt Falls to Record Low" reporting that ATP's bondholders were "organizing a group to represent their interests in a potential restructuring" and had "interviewed potential advisers" to assist them.

262.   The information disclosed in the July 26, 2012 Bloomberg News article was material to the market, disclosed Defendants' false and misleading statements, and, among other things, revealed to the market that contrary to Defendants' statements, ATP's liquidity was not strong, that ATP could not meet its obligations for the next twelve months, and that ATP would not complete the much-touted Clipper project.  On July 27, 2012, ATP common stock fell $0.55 per share, or 28.2%, on volume of 7,847,120 shares.  On July 27, 2012, the BI Global Oil Index closed at $59.03, an increase of $1.30, or 2.25% from its previous close of $57.73.

263.   On August 10, 2012, ATP common stock opened at $1.50 per share.   At approximately 1:30 p.m., Bloomberg News reported that ATP had obtained $600 million in debtor-in-possession ("DIP") loan financing from Credit Suisse Group AG ahead of a possible bankruptcy filing.

264.   The information disclosed in the August 10, 2012 Bloomberg News report was material to the market, disclosed Defendants' false and misleading statements, and, among other things, further revealed to the market that contrary to Defendants' statements, ATP's liquidity was not strong, that ATP could not meet its obligations for the next twelve months, and that ATP would not complete the much-touted Clipper project.   As a result of this disclosure, ATP's common stock price plummeted $1.13, or 75.8%, to close at $0.36 per share.   ATP's stock volume for August 10, 2012 was 23,427,920.   On August 10, 2012, the BI Global Oil Index closed at $60.19, down $0.38 or 0.63% from its previous close of $60.57.

265.   On August 17, 2012, ATP common stock closed at $0.4593 per share.   After trading on the stock market had closed for the day, ATP announced that it was filing for Chapter 11 bankruptcy.

266.   ATP's August 17, 2012 announcement was material to the market, disclosed Defendants' false and misleading statements, and, among other things, further revealed to the market that contrary to Defendants' statements, ATP's liquidity was not strong, that ATP could not meet its obligations for the next twelve months, and that ATP would not complete the much-touted Clipper project.   On August 20, 2012, the next trading day, as a result of this disclosure, ATP's common stock price fell $0.1593 per share, or 34.7%, to close at $0.30 per share.   ATP's stock volume on August 20, 2012 was 18,896,822.   On August 20, 2012, the BI Global Oil Index closed at $60.72, down $0.46 or 0.75% from its previous close of $61.18.

## IX.   <u>NO SAFE HARBOR</u>

267.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements set forth in this Complaint.  The statements alleged to be false or misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying relevant important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Cautionary language must truthfully address specific risks, must exhaust the capacity of the false statements to mislead investors, and must disclose, as Defendants failed to do here, then existing adverse facts.  Alternatively, to the extent that the statutory safe harbor is intended to or does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or that the forward-looking statement was authorized and/or approved by an executive officer of ATP who knew that those statements were false when made.  In addition, to the extent any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and Defendants failed to update those statements which later became inaccurate.

268.   The statutory safe harbor provided for forward-looking statements under certain circumstances, moreover, does not apply to false statements or omissions of existing material facts.

## X.   APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET DOCTRINE

269.     Lead Plaintiffs are entitled to a presumption of reliance because the claims asserted herein against Defendants are predicated in part upon false statements of material fact and/or the omission to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, that Defendants had a duty to disclose.

270.     At all relevant times, the market for ATP common stock was an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the prices of the Company's common stock. The market for ATP common stock was efficient because, inter alia, throughout the Class Period:

  a.   ATP common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

  b.   During the Class Period, there were approximately 52 million shares of ATP common stock outstanding, millions of shares of ATP common stock were traded on the open market; with trading in excess of a million shares a day on the vast majority of days during the Class Period;

  c.   As a regulated issuer, ATP filed periodic public reports with the SEC and the NASDAQ;

  d.   ATP regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as quarterly conference calls with investors, communications

with the financial press and other similar reporting services, as well as presentations and various industry and market symposia and conferences; and

e.  Securities analysts followed and published research reports regarding ATP that were publicly available to investors, including, securities analysts employed by the following firms, among others: Richard Tullis of Capital One; Joseph Allman of J.P. Morgan; Biju Perincheril of Jeffries & Company, Inc.; Curtis Trimble of MKM Partners; Stephen F. Berman of Pritchard Capital; Jeffrey P. Hayden of Rodman & Renshaw; Oliver Corlett of R.B. Pressprich & Co.; and James Hom of Miller Tabak Roberts Securities.  Each of these analysts wrote reports about ATP that were distributed to the sales force and available to customers of their respective brokerage firms.  These reports were publicly available and entered the public marketplace.

271.  Throughout the Class Period, ATP was consistently followed by the market, including securities analysts as well as the business press. The market relies upon the Company's financial results and management to accurately present the Company's financial results.  During this period, ATP and the Individual Defendants continued to pump materially false information into the marketplace regarding the financial condition of the Company. This information was promptly reviewed and analyzed by the ratings agencies, analysts and institutional investors and assimilated into the price of the Company's common stock.

272.  As a result of the misconduct alleged herein (including defendants' misstatements and omissions of material facts), the market for ATP's common stock was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the-

market" theory applies.  Thus, Class members are presumed to have indirectly relied upon the misrepresentations and omissions of material facts for which defendants are each responsible.

273.    Lead Plaintiffs and other Class members justifiably relied on the integrity of the market price for the Company's common stock and were substantially damaged as a direct and proximate result of their purchases of ATP common stock at artificially inflated prices and the subsequent decline in the price of the common stock when the truth was disclosed.

274.    Had Lead Plaintiffs and other members of the Class known of the material adverse information not disclosed by Defendants, or been aware of the truth behind Defendants' material misstatements, they would not have purchased ATP common stock at artificially inflated prices.

275.    As a result, the market for ATP common stock promptly digested current information regarding ATP from all publicly available sources and reflected such information in ATP's common stock price.  Under these circumstances, all purchasers of ATP's common shares during the Class Period suffered similar injury through their purchase of shares at artificially inflated prices and a presumption of reliance applies.

## XI.    CAUSES OF ACTION

### COUNT I
### (Against All Defendants)
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder

276.    Lead Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

277.    Throughout the Class Period, Defendants, directly or indirectly, engaged in a common plan, scheme and continuing course of conduct described herein, pursuant to which it knowingly or recklessly engaged in acts, transactions, practices and a course of business which

operated as a fraud upon Lead Plaintiffs and the other members of the Class; made various false statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading to Lead Plaintiffs and the other members of the Class; and employed manipulative or deceptive devices and contrivances in connection with the purchase and sale of ATP stock.

278.   The purpose and effect of Defendants' plan, scheme and course of conduct were to artificially inflate the price of ATP's stock and to artificially maintain the market price of ATP securities.

279.   Defendants had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Lead Plaintiffs and the other members of the Class, or, in the alternative, acted with severely reckless disregard for the truth when it failed to ascertain and disclose the true facts in the statements made by it to members of the investing public, including Lead Plaintiffs and the Class, and the securities analysts.

280.   As a result of the foregoing, the market price of ATP securities was artificially inflated during the Class Period.  In ignorance of the falsity of Defendants' statements concerning the financial results, liquidity, and performance of ATP, Lead Plaintiffs and the other members of the Class relied, to their damage, on the statements described above and/or the integrity of the market price of ATP stock during the Class Period in purchasing ATP common stock at prices which were artificially inflated as a result of Class's false and misleading statements.

281.   Had Lead Plaintiffs and the other members of the Class known of the material adverse information that Defendants did not disclose, they would not have purchased ATP common stock at the artificially-inflated prices that they did.

282.    Defendants' concealment of this material information served only to harm Lead Plaintiffs and the other members of the Class who purchased ATP common stock in ignorance of the financial risk to them as a result of such nondisclosures.

283.    As a result of the wrongful conduct alleged herein, when the truth concerning the financial results, performance, and improper accounting of ATP was revealed to the investing public and the artificial inflation in the price of ATP stock was, as a result, reduced and ultimately removed, in a series of corrective disclosures and/or the materialization of the concealed risks, ATP's share price fell significantly and Lead Plaintiffs and other members of the Class suffered damages in an amount to be established at trial.

284.    By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to the Lead Plaintiffs and the other members of the Class for substantial damages that they suffered in connection with their purchase of ATP common stock during the Class Period.

## COUNT II
### (Against All Defendants)
### Liability Pursuant to Section 20(a) of the Exchange Act

285.    Lead Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

286.    Each of the Individual Defendants, by virtue of their positions with ATP and their specific acts, was a controlling person of ATP within the meaning of Section 20(a) of the Exchange Act.

287.    They had the power and influence and exercised same to cause ATP to engage in the illegal conduct and practices complained of herein. Defendants were thereby and otherwise active and culpable participants in the fraud perpetrated by Defendants.

288.    By reason of the conduct of ATP as alleged in this Complaint, the Individual Defendants are liable for the aforesaid wrongful conduct of ATP and liable to Lead Plaintiffs and the Class for the substantial damages which they suffered in connection with their purchases or acquisitions of shares as a result of ATP's violations of the Exchange Act.

289.    By reason of such conduct, the Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Certifying Lead Plaintiffs as the Class Representatives and their counsel as Class Counsel;

C.    Declaring and determining that Defendants violated the federal securities laws by reason of their conduct as alleged herein;

D.    Awarding monetary damages against Defendants in favor of Lead Plaintiffs and the other members of the Class for all losses and damages suffered as a result of the acts and transactions complained of herein, together with prejudgment interest from the date of the wrongs to the date of the judgment herein;

E.    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

F.    Granting such other and further relief as deemed appropriate by the Court.

## XIII.    <u>JURY TRIAL DEMANDED</u>

Lead Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

Dated:  January 20, 2015          **BARRASSO USDIN KUPPERMAN FREEMAN &
SARVER, L.L.C.**

By:  /s/ *Stephen H. Kupperman*
Stephen H. Kupperman (LA Bar No. 7890)
909 Poydras Street, Suite 2400
New Orleans, LA 70112
Telephone: (504) 589-9700
Facsimile: (504) 589-9701
skupperman@barrassousdin.com

*Liaison Counsel*

William B. Federman (admitted *pro hac vice*)
Federman & Sherwood
10205 N Pennsylvania Ave
Oklahoma City, OK 73120
Tel:  (405) 235-1560
Fax: (405) 239-2112
Email: wbf@federmanlaw.com

-and-

2926 Maple Ave., Suite 200
Dallas, TX 75201

Lester L. Levy (admitted *pro hac vice*)
Patricia I. Avery (admitted *pro hac vice*)
Joshua W. Ruthizer (admitted *pro hac vice*)
Wolf Popper LLP
845 Third Avenue
New York, NY 10022
Tel:  (212) 759-4600
Fax:  (212) 486-2093

*Co-Lead Counsel for Lead Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2015 a copy of the above and foregoing has been filed

using this Court's ECF procedure, which will send electronic noticing to all counsel of record.

_/s/ Stephen H. Kupperman_
Stephen H. Kupperman