UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FIREFIGHTERS PENSION & RELIEF                    CIVIL ACTION
FUND OF THE CITY OF NEW
ORLEANS, Individually and on
Behalf of All Others Similarly
Situated

VERSUS                                           NO: 13-3935, c/w
                                                 13-6083, 13-6084,
                                                 13-6233

T. PAUL BULMAHN, ET AL.                          SECTION: R

<u>**ORDER AND REASONS**</u>

This case is a securities class action brought on behalf of
all persons who acquired ATP Oil and Gas Corporation ("ATP")
11.875% Senior Second Lien Exchange Notes ("Notes") traceable to an
allegedly false and misleading Form S-4 registration statement and
prospectus issued in connection with ATP's December 16, 2010
exchange offer ("the Exchange").  ATP filed for Chapter 11
Bankruptcy on August 17, 2012 and is not named as a defendant in
this action.  Instead, plaintiff sued ATP's senior executives and
board of directors, alleging violations of Sections 11 and 15 of
the Securities Act of 1933 ("Securities Act").  Defendants T. Paul
Buhlman, Albert L. Reese, Jr., and Keith R. Godwin (collectively,
the "Officer Defendants") have filed a motion to dismiss
plaintiff's Second Amended Complaint for failure to state a claim.[1]
Defendants Chris A. Brisack, Arthur H. Dilly, Gerard J. Swonke,

_____

[1] R. Doc. 206.

Brent M. Longnecker, Walter Wendlandt, Burt A. Adams, George R. Edwards, and Robert J. Karow (collectively, the "Director Defendants") have likewise filed a motion to dismiss the Second Amended Complaint.[2] For the reasons that follow, the Court grants defendants' motions and dismisses plaintiff's Second Amended Complaint with prejudice.

## I.    BACKGROUND

Before it filed for bankruptcy in 2012, ATP engaged in the acquisition, development, and production of oil and natural gas properties.[3] The company acquired and developed properties with proven undeveloped reserves in the Gulf of Mexico and the North Sea, but the majority of the company's business was in the Gulf of Mexico. As of December 31, 2009, ATP had leasehold and other interests in 62 offshore blocks and 104 wells, of which ATP was then operating a total of 93.[4] Additionally, as of March 16, 2010, ATP owned an interest in 36 platforms, including two floating production facilities: the *ATP Innovator*, located in the Gulf of Mexico at the company's Gomez Hub, and the *ATP Titan*, also in the Gulf of Mexico at the company's Telemark Hub.

---

[2] R. Doc. 209. The Director Defendants adopt the Officer Defendants' arguments as their own.

[3] R. Doc. 199 at 6.

[4] R. Doc. 206-2 at 8.

On April 19, 2010, ATP raised $1.5 billion by selling unregistered private notes to institutional investors in a transaction exempt from the registration requirements under the Securities Act.[5]  The notes were Senior Second Lien Notes due in 2015.  ATP agreed to offer to exchange the unregistered private notes for "substantially identical notes registered under the Securities Act" within nine months.[6]

On April 20, 2010, the day after the private note offering, the drilling rig *Deepwater Horizon* exploded and sank in the Gulf of Mexico, fracturing the well's pipeline and creating "the largest oil spill in U.S. history."[7]   In response, the United States Department of the Interior issued two moratoria that halted all drilling at depths greater than 500 feet between May 6, 2010 and October 12, 2010.[8]  Although the Department of Interior lifted the moratoria on October 12, 2010, it instituted new rules and regulations that conditioned the issuance of drilling permits on additional testing, training, and compliance with new safety requirements.[9] As of February 2011, the Department of Interior had issued no new drilling permits, prompting members of the oil and

---

[5] ATP's April 23, 2010 Form 8-K, R. Doc. 133-3 at 3.

[6] *Id.*

[7] R. Doc. 199 at 10.

[8] R. Doc. 206-2 at 30.

[9] *Id.*

gas industry to refer to this period of permitting delays as the "de facto moratorium."[10]  Together these three moratoria halted all of ATP's exploration and development operations in the Gulf of Mexico through 2010.[11]

On October 12, 2010, ATP filed the Registration Statement with the Securities and Exchange Commission ("SEC"), indicating its intent to exchange the $1.5 billion in unregistered private notes for the registered Senior Second Lien Exchange Notes at issue in this litigation.[12] Following a December 14, 2010 amendment, the SEC declared the Registration Statement effective, and the Exchange was effected on December 16, 2010 ("the Effective Date").[13]

The Prospectus[14] included a section titled "Risks Related to Our Business," which provided a detailed account of the Deepwater Horizon explosion and the resulting moratoria.  It also described the new regulatory environment in the Gulf of Mexico, cautioning that "[t]he U.S. government and regulatory response to the Deepwater Horizon drilling rig accident and resulting oil spill could have a prolonged and material adverse impact on our Gulf of

---

[10] R. Doc. 199 at 11.

[11] *Id.*

[12] R. Doc. 206-2.

[13] *Id.*

[14] For all practical purposes, the Registration Statement and Prospectus contain the same information and are interchangeable.

4

Mexico operations."  It also warned that "[a]lthough Moratorium II has been lifted, we cannot predict with certainty when permits will be granted under the new requirements."  Among numerous pages of cautionary language, the Prospectus contained the following statement:

> We project a substantial increase in production over the next year as development wells are brought to production. Absent alternative funding sources, achieving our projected production growth is necessary to provide the cash flow required to fund our capital plan and meet our existing obligations, both over the next twelve months and on a longer term basis.[15]

Ultimately, ATP did not survive and filed for Chapter 11 bankruptcy on August 17, 2012.[16]  In a declaration filed in the bankruptcy action, defendant Albert Reese, Jr., ATP's Chief Financial Officer, summarized the adverse impact of the moratoria on ATP's business operations, describing the Deepwater Horizon explosion and oil spill as the "primary reason" for the company's failure:

> The delay on operations and the increasingly uncertain regulatory environment adversely affected ATP's operations and planned development that was necessary to service its additional debt.  Despite statements that the moratoria had been lifted a various points in time, the government did not issue new deepwater drilling permits until February 28, 2011, thus effectively extending the moratorium.  As a result, ATP was unable, despite access to funds, to drill and bring online six new wells during 2010 and 2011.  In addition to the high costs of interrupted and discontinued drilling operations in

---

[15] R. Doc. 206-2 at 30-31.

[16] R. Doc 199 at 16.

deepwater, ATP continued to incur construction costs on the Octabuoy, its newest deepwater production platform, as a discontinuation of work o[n] the platform would have led to significant escalation in cost-to-completion once work resumed.  Moreover as access to deepwater rigs became limited, ATP also experienced higher than expected costs in preserving its access to equipment during the moratoria.

Overall, ATP's inability to complete various wells or commence pipeline construction when planned due to the shutdown in the Gulf created significant liquidity problems . . . .[17]

When asked whether "ATP [had] the liquidity and revenues at that time to absorb a lengthy moratorium," Reese responded, "no."[18]

By May 24, 2013, the date plaintiff filed the initial complaint in this action, the Notes acquired by Lead Plaintiff Plumbers and Pipefitters National Pension Fund were trading at just 1% over par.[19]

Named Plaintiff Firefighters Pension & Relief Fund of the City of New Orleans ("Firefighters") filed this class action on May 24, 2013 on behalf of all persons who acquired the Notes traceable to the Registration Statement and Exchange.[20]  On August 15, 2013, the

---

[17] August 17, 2012 Albert Reese Bankruptcy Declaration, R. Doc. 133-6 at 8,10.  The Court considers this declaration because plaintiff quotes and refers to it in their Second Amended Complaint.  *See Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (indicating that courts may consider documents incorporated into the complaint by reference on a motion to dismiss).

[18] R. Doc. 199 at 16.

[19] *Id.* at 4.

[20] R. Doc. 1.

Court appointed Plumbers and Pipefitters National Pension Fund as Lead Plaintiff.[21]  Lead Plaintiff filed its First Amended Complaint on October 10, 2013.[22]  The First Amended Complaint alleged that the Registration Statement was false and misleading in that it misrepresented and/or omitted material facts, including that:

(a) ATP did not have the liquidity and revenue to survive the moratoria;

(b) the proved oil and gas reserves as reported by ATP were false and misleading;

(c) there was no reasonable basis to believe, and defendants did not in fact believe, ATP's forecast of "a substantial increase in production over the next year as development wells are brought to production";

(d) ATP was in violation of its credit and debt agreements as it had entered into "disguised financings," including at least eight conveyances that ATP has not admitted were in fact disguised financings;

(e) ATP was operating in violation of U.S. environmental laws by unlawfully discharging oil and unpermitted chemical dispersant into the Gulf of Mexico; and

(f) the boilerplate "risk disclosures" utilized in the Registration Statement were themselves misleading.[23]

On December 18, 2013, the Officer and Director Defendants moved to dismiss plaintiff's First Amended Complaint.[24]  The Court granted the defendants' motion to dismiss on September 26, 2014,

---

[21] R. Doc. 63.

[22] R. Doc. 75.

[23] *Id.* at 3-4.

[24] R. Docs. 133 and 136.

7

but gave plaintiff leave to replead several of the dismissed claims. Specifically, the Court dismissed the following claims without prejudice and with leave to amend:

> (1) that defendants violated Item 303 by failing to disclose that ATP did not have the liquidity and revenue to survive the moratoria; (2) that ATP's forecast of "a substantial increase in production over the next year as development wells are brought to production" was false or misleading because defendants knew that ATP lacked the liquidity and revenues to survive the moratoria.[25]

The Court dismissed with prejudice plaintiff's Section 12 claim and the following Section 11 claims:

> (1) that the defendants violated Item 303 by failing to disclose the alleged problems at the Atwater well; (2) that the proved oil and gas reserves as reported by ATP were false and misleading; (3) that ATP's forecast of "a substantial increase in production over the next year as development wells are brought to production" was false or misleading because defendants failed to disclose the alleged problems at Atwater; (4) that defendants failed to disclose that ATP was in violation of its credit and debt agreements due to "disguised financings" with various entities; (5) that defendants failed to disclose that ATP was operating in violation of U.S. environmental laws; and (6) that the boilerplate "risk disclosures" utilized in the Registration Statement were themselves misleading.[26]

On November 3, 2014, plaintiff filed its Second Amended Complaint.[27] Although the Court granted plaintiff leave to replead two of its previously dismissed claims, plaintiff reasserted only one of its claims: the Registration Statement was false and

---

[25] R. Doc. 196 at 69.

[26] *Id.*

[27] R. Doc. 199.

misleading in that it misrepresented and/or omitted material facts regarding the Registration Statement's projection of "a substantial increase in production over the next year as development wells are brought to production."[28]   The Court permitted plaintiff to replead that this projection was false "because defendants knew that ATP lacked the liquidity and revenues to survive the moratoria."[29] Plaintiff was not permitted to replead that the projection was false because of problems at Atwater.[30]   Nonetheless, plaintiff continues to rely on Atwater despite the Court's ruling.  Plaintiff also seeks to hold the Director Defendants liable as "control persons" under Section 15 of the Act.  15 U.S.C. § 77o(a).

The Officer and Director Defendants now move the Court to dismiss plaintiff's Second Amended Complaint for failure to state a claim.[31]

---

[28] *Id.* at 15-16.  The Second Amended Complaint also realleges all claims and allegations set forth in the First Amended Complaint "for the sole purpose of preserving those claims for any appeal."  *Id.* at 3 n.1.  Realleging the claims the Court dismissed with prejudice is unnecessary for the purpose of preserving such claims for appeal, and, therefore, the Court will not address the previously dismissed claims.  *See Williams v. Wayne*, 533 F.3d 360, 365 (5th Cir. 2008) ("A plaintiff, by filing an amended complaint after a dismissal with leave to amend, is not barred from raising on appeal the correctness of the dismissal order.") (internal quotations and citations omitted).

[29] R. Doc. 196 at 69.

[30] *Id.*

[31] R. Docs. 206 and 209.

## II.  STANDARD

To survive a Rule 12 (b)(6) motion to dismiss, the plaintiff must plead enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff.  *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009).

A legally sufficient complaint need not contain detailed factual allegations, but it must go beyond labels, legal conclusions, or formulaic recitations of the elements of a cause of action.  *Id.*  In other words, the face of the complaint must contain enough factual matter to raise a reasonable expectation that discovery will reveal evidence of each element of the plaintiff's claim.  *Lormand*, 565 F.3d at 257.  If there are insufficient factual allegations to raise a right to relief above the speculative level, or if it is apparent from the face of the complaint that there is an insuperable bar to relief, the Court must dismiss the claim.  *Twombly*, 550 U.S. at 555.

In reviewing a motion to dismiss, the Court is limited to the complaint, its proper attachments, documents incorporated into the

10

complaint by reference, and matters of which the Court may take judicial notice.  *See Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011).  In securities cases, courts may take judicial notice of the contents of public disclosure documents that are filed with the SEC as required by law; however, "these documents may be considered only for the purpose of determining what statements they contain, and not for proving the truth of their contents."  *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 384-85 (S.D. Tex. 2011) (citing *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1018 & n.1 (5th Cir. 1996)).

## III. Discussion

### A.   Statutory Framework

The Securities Act of 1933, 15 U.S.C. § 77a, *et seq.*, protects investors by ensuring that companies issuing securities (known as "issuers") make a "full and fair disclosure of information" relevant to the public offering.  *Pinter v. Dahl*, 486 U.S. 622, 646 (1988).  The linchpin of the Act is the registration requirement, which prevents issuers from offering securities unless they have filed a registration statement.  *See* 15 U.S.C. §§ 77d, 77e.  The Act mandates that the registration statement contain specified information about both the company itself and the security for sale.  *Id.* at §§ 77g, 77aa.  Section 11 of the Act promotes compliance with the registration requirement by giving purchasers

a right of action against an issuer for material misstatements or omissions contained in a registration statement:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security . . . [may] sue.

*Id.* at § 77k(a). "A 'material fact' is one which a reasonable investor would consider significant in the decision whether to invest, such that it alters the 'total mix' of information available about the proposed investment." *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1445 (5th Cir. 1993) (quoting *Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 207-08 (5th Cir. 1988)). A fact is not material if "a reasonable investor viewing the information in context would not have considered the investment significantly more risky as a result." *Id.* at 1446.

With respect to alleged omissions, an issuer need only disclose information that is either (1) necessary to make other statements not misleading, or (2) specifically required to be disclosed by the securities laws. *See Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 212 n.6 (5th Cir. 2004) (citing *Oxford Asset Mgmt. Ltd. v. Jaharis*, 297 F.3d 1182, 1190 (11th Cir. 2002)). The "mere possession of material nonpublic information does not create a duty to disclose." *Id.* (quoting *Shaw v. Digital Equip.*, 82 F.3d 1194, 1202 (1st Cir. 1996)).

12

Section 11's "expansive" liability provisions create "'virtually absolute' liability for corporate issuers for even innocent material misstatements." *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 495 (5th Cir. 2005). Accordingly, a Section 11 plaintiff need not plead scienter, reliance, or fraud. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983). Nonetheless, when a plaintiff's allegations are grounded in fraud, Federal Rule of Civil Procedure 9(b) applies. *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th Cir. 2001). Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The Fifth Circuit "interprets Rule 9(b) strictly, requiring the plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (citing *Williams v. WMX Tech., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997)). In cases concerning "omissions of facts, Rule 9(b) typically requires the claimant to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the misrepresentations misleading." *Carroll v. Fort St. James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006).

Finally, "in order to check frivolous, lawyer-driven litigation," *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp. Inc.*, 537 F.3d 527, 532 (5th Cir. 2008), Congress passed the Private Securities Litigation Reform Act ("PSLRA") and placed heightened pleading requirements on plaintiffs pursuing federal securities fraud suits.  15 U.S.C. §§ 78u-4, *et seq.*; *see also Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 365 (5th Cir. 2004) ("[T]he PSLRA requires the plaintiffs to distinguish among those they sue and enlighten each defendants as to his or her particular part in the alleged fraud.").  The PSLRA also created a "safe harbor" from liability for certain forward-looking statements contained in a registration statement.  The safe harbor provision states that a defendant

> shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that-
>
> > (A) the forward-looking statement is-
> >
> > > (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
> > >
> > > (ii) immaterial; or
> >
> > (B) the plaintiff fails to prove that the forward-looking statement--
> >
> > > (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

14

      (ii) if made by a business entity; was-

          (I) made by or with the approval of an executive officer of that entity; and

          (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 77z-2(c). Because this provision is disjunctive, parts (A) and (B) must be considered separately. *See Southland*, 365 F.3d at 372 ("The safe harbor has two independent prongs: one focusing on the defendant's cautionary statements and the other on the defendant's state of mind.");[32] *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010) ("The safe harbor is written in the disjunctive; that is, a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading."). The PSLRA further provides that "[o]n any motion to dismiss based upon [the safe-harbor provision], the court shall consider any statement cited in the complaint and cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant." 15 U.S.C. §

---

[32] Any suggestion to the contrary in *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 244 (5th Cir. 2009), conflicts with the Fifth Circuit's earlier holding in *Southland* and does not bind this Court. *Rios v. City of Del Rio*, 444 F.3d 417, 425 n.8 (5th Cir. 2006) ("[W]here two previous holdings or lines of precedent conflict the earlier opinion controls and is the binding precedent in this circuit . . . .").

77z-2(e). If a plaintiff does not meet these standards, the PSLRA states that the district court "shall," on defendant's motion, "dismiss the complaint." 15 U.S.C. § 78u-4(b)(3). *See also Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 728 (7th Cir. 2004) ("The PSLRA creates rules that judges must enforce at the outset of the litigation. . . . .").

B. *ATP's Allegedly Misleading Projection of a Substantial Increase in Production*

The Second Amended Complaint alleges that the Prospectus's projection of a "substantial increase in production over the next year as development wells are brought to production" was misleading because defendants did not believe, and had no reasonable basis to believe, that production would actually increase.[33] Plaintiff alleges that defendants did not believe, and had no reasonable basis to believe, this projection because (1) ATP did not submit permit applications for its Gomez #9 and #10 wells to the government until June 2011, thereby ensuring that the Gomez wells would not contribute to the projected production increase in 2011, (2) ATP did not conduct "exploratory testing that would have allowed ATP to accurately estimate production from [the company's] Telemark [Hub]," (3) "the lack of connectivity at [ATP's] Atwater [well] suggested that the Company's production projections at Telemark's other new wells would not be met," and (4) ATP did not

---

[33] R. Doc. 199 at 17-18.

16

have the financial resources to bring the Telemark and Gomez projects to production.[34]

The Court specifically notes that plaintiff was permitted to replead their claim that defendants did not believe or have a reasonable basis to believe the forecasted increase in production only on the grounds that defendants knew they lacked liquidity to survive the moratorium. The Court did not permit plaintiff to reallege claims regarding Atwater or any other basis for why the prediction was false and misleading. Plaintiff now makes allegations that exceed the scope of the Court's order. For this reason alone, except for an allegation regarding a lack of resources, this claim is dismissable. These allegations are also insufficient on other grounds.

Plaintiff must meet the stringent standards of the PSLRA, as the Prospectus explicitly identified the projection of a substantial production increase as a "forward-looking statement[] under the Private Securities Litigation Reform Act of 1995."[35] Accordingly, the PSLRA's safe-harbor provision forecloses liability in this case if (1) ATP's projection of a substantial production increase "is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from" the projection, or (2) "the plaintiff fails

---

[34] *Id.* at 18-19.

[35] R. Doc. 206-2 at 5.

to prove that the forward-looking statement . . . was made with actual knowledge by that person that the statement was false or misleading." 15 U.S.C. § 77z-2(c).

These pleading requirements are not affected by the recent Supreme Court decision in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 135 S. Ct. 1318 (2015). In *Omnicare*, the Supreme Court analyzed when an issuer may be held liable under Section 11 for a statement of opinion (as opposed to a factual statement) in a registration statement. *Id.* at 1324. Because the opinion statements in *Omnicare* centered on the lawfulness of the issuer's existing contracts, *id.* at 1323, the Supreme Court had no occasion to address projections or other forward-looking statements. Accordingly, *Omnicare* does not change the statutory safe harbor for forward-looking statements or lessen the plaintiff's pleading burden under the PLSRA.

> 1. *Plaintiff has Failed to Adequately Plead Actual Knowledge*

To plead a cause of action under the PSLRA safe harbor provision, a plaintiff must plead facts indicating that a defendant actually knew that the statement was either false or misleading. *See Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1324 n.14 (2011) ("Under the PSLRA, if the alleged misstatement or omission is a 'forward-looking statement,' the required level of scienter is 'actual knowledge.'"). Moreover, to plead actual knowledge under the PSLRA, a plaintiff must "state with

18

particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 77u-4(b)(2).

The Second Amended Complaint is sprinkled with conclusory allegations that defendants "did not believe, and had no reason to believe" the projection of a substantial increase in production.[36] As an initial matter, alleging that defendants had no reason to believe, or lacked a reasonable basis for, the projection is insufficient under the PSLRA's safe harbor provision. *See Southland*, 365 F.3d at 371 ("To avoid the safe harbor, plaintiffs must plead facts demonstrating that the statement was made with actual knowledge of its falsity."); *Golesorkhi v. Green Mountain Coffee Roasters, Inc.*, 973 F. Supp. 2d 541, 555 (D. Vt. 2013) ("Because the safe harbor specifies an actual knowledge standard for forward-looking statements, the scienter requirement for forward-looking statements is stricter than for statements of current fact. Whereas liability for [misleading statements of

---

[36] *See, e.g.*, R. Doc. 199 at 3 ("The Registration Statement utilized in connection with the Exchange was false and misleading in that it misrepresented and/or omitted material facts, including that there was no reasonable basis to believe, and defendants did not in fact believe, ATP's forecast of 'a substantial increase in production over the next year as development wells are brought to production.'"); *id.* at 18 ("Defendants' statements projecting 'a substantial increase in production over the next year as development wells are brought to production' were materially false and misleading because defendants knew that, having no reasonable basis for the projection, the statements were materially false and misleading.").

current fact] requires a showing of either knowing falsity or recklessness, liability for [forward-looking statements] attaches only upon proof of knowing falsity."). Additionally, plaintiff's conclusory allegation that "defendants" did not believe the projection is insufficient for two separate reasons. First, the Fifth Circuit has rejected the "group pleading doctrine," and the Court therefore cannot "construe allegations contained in [the] Complaint against the 'defendants' as a group as properly imputable to any particular individual defendant unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded." *Southland*, 365 F.3d at 365. Second, plaintiff's conclusory allegation that all defendants did not believe the projection, standing alone, is insufficient to survive a motion to dismiss. *Iqbal*, 556 U.S. at 686-87 (holding that plaintiff cannot merely "plead the bare elements of his cause of action," including defendant's mental state, "and expect his complaint to survive a motion to dismiss"). Instead, to survive a motion to dismiss, "plaintiffs must plead facts demonstrating that the statement was made with actual knowledge of [the projection's] falsity." *Southland*, 365 F.3d at 371.

The Second Amended Complaint alleges that defendants did not believe the projection for four reasons: (1) ATP did not submit permit applications for its Gomez #9 and #10 wells until June 2011, thereby ensuring that the Gomez wells would not contribute to the

20

projected production increase in 2011; (2) ATP did not conduct "exploratory testing" at wells attached to the Telemark Hub and therefore could not "accurately estimate" production from these wells; (3) "connectivity" problems at ATP's Atwater well suggested that other wells attached to the Telemark Hub would also have less than anticipated production; and (4) ATP did not have the financial resources to complete the Telemark and Gomez projects.[37]

Plaintiff has failed to address the concerns the Court expressed in its order dismissing plaintiff's First Amended Complaint that the Prospectus projected a substantial increase in production "as development wells are brought to production," not a substantial increase in production as the Telemark and Gomez in particular are brought to production.[38]   Plaintiff attempts to remedy this problem by referring to oral statements ATP allegedly made in the spring of 2010 stating that the "2011 production increase was to be driven by new wells at Telemark and Gomez."[39] Section 11, however, imposes liability only for misstatements or omissions contained in a registration statement itself, and plaintiff cannot rewrite the Registration Statement by referencing

---

[37] R. Doc. 199 at 18–19.

[38] R. Doc. 196 at 48 ("[ATP's projection] did not limit the projection to development wells in particular, so the truth of the statement is to be judged by the overall increase in production, not just from development wells.").

[39] R. Doc. 199 at 9.

21

extrinsic statements. *See In re Sterling & Foster Co., Inc., Sec. Litig.*, 222 F. Supp. 2d 216, 267 (E.D.N.Y. 2002) (dismissing plaintiff's Section 11 claim to the extent that it was based on extrinsic statements not contained in the registration statement itself).

Nevertheless, even overlooking plaintiff's failure to address this issue, the Court finds that the allegations in the Second Amended Complaint fail to give rise to an inference that defendants actually disbelieved the projection. First, plaintiff alleges that defendants did not believe the projection because ATP did not submit permit applications for Gomez #9 and #10 wells until June of 2011, thereby ensuring that the Gomez wells could not contribute to a production increase in 2011.[40] Absent allegations that defendants are clairvoyant, defendants' failure to submit the Gomez permits until June 2011 cannot support an inference that defendants knew, some seven months earlier in December 2010, that the Gomez wells would not contribute to the projected production increase in 2011. *See Plotkin v. IP Axess Inc.*, 407 F.3d 690, 698 (5th Cir. 2005) ("We subscribe to the rule that a Plaintiff cannot charge Defendants with intentionally misleading their investors about facts Defendants may have become aware of after making allegedly misleading statements to the public.") (internal quotation and citation omitted). Thus, without any factual allegations

---

[40] *Id.* at 15.

supporting the proposition that defendants knew in December 2010 that they would not submit the Gomez permits until June 2011, the Court finds that ATP's alleged failure to submit permits until June 2011 does not give rise to an inference that defendants subjectively disbelieved the projected production increase in December 2010. *See In re IPO Sec. Litig.*, 358 F. Supp. 2d 189, 205 (S.D.N.Y. 2004) ("The truth of a statement made in the registration statement is judged by the facts as they existed when the registration statement became effective.").

Next, plaintiff alleges that defendants knew the projection was false because ATP did not conduct "exploratory testing" necessary to "accurately estimate" future production from several wells attached to the Telemark Hub.  In other words, plaintiff argues that defendants did not believe the projected increase because there was testing they should have conducted and did not do it.[41]  As will be discussed in detail below, defendants disclosed that they based their projections on estimates prepared by independent, third-party petroleum engineers.[42] Defendants' alleged failure to conduct additional testing at the Telemark Hub does not

---

[41] *Id.* at 13.

[42] *See*  R. Doc. 206-2 at 137 ("The information incorporated by reference into this prospectus regarding estimates of the oil and gas reserves of ATP Oil and Gas Corporation and related future net cash flows and the present values thereof were based upon reserve reports prepared by Ryder Scott Company, L.P. and Collarini Associates, each independent petroleum engineers.").

support an inference of actual knowledge as to the projection's falsity. Under the PSLRA's safe harbor, the question is not whether the defendants' projection was supported by all available testing. *See Bartesch v. Cook*, 941 F. Supp. 2d 501, 509 (D. Del. 2013) (holding that plaintiff's allegation that defendants' projection "lacked any reasonable basis" was insufficient in light of plaintiff's "fail[ure] to allege that any of the defendants had actual knowledge of its falsity"). Instead, the question is whether the defendants had actual knowledge that the projection was false. *Southland*, 365 F.3d at 371 ("To avoid the safe harbor, plaintiffs must plead facts demonstrating that the statement was made with actual knowledge of its falsity."). The upshot of plaintiff's allegation of a lack of testing is that ATP lacked allegedly available knowledge of Telemark's production potential. This allegation might support an inference of negligence, but it falls far short of showing that defendants possessed actual knowledge that the projection was false. This is especially true as plaintiff does not allege that defendants consciously decided to forego additional testing because they knew that the testing would undermine the projection.

Third, plaintiff alleges that defendants knew the projection was false because alleged "connectivity" problems at ATP's Atwater well suggested that other wells attached to the Telemark Hub would

also produce less than originally projected.[43]  Plaintiff bolsters this contention with a statement from a confidential witness who opines that "Atwater's poor production was a warning sign for the entire Telemark Hub, suggesting that the projections for the remaining Telemark wells might be inaccurate.  This is because of the close geographic proximity and geological make-up of the Telemark wells."[44]  As the Court previously dismissed *with prejudice* plaintiff's allegation "that ATP's forecast of a substantial increase in production over the next year as development wells are brought to production was false or misleading because defendants failed to disclose the alleged problems at Atwater" as time barred, this allegation must be disregarded.[45]  Even if the Court considered it, it does not raise a plausible inference that defendants knew that the projection was false.  Plaintiff does not explain how the confidential witness achieved this geological understanding of Telemark's geological makeup.  And the confidential witness's opinion that Atwater's connectivity issues "*suggest[ed]* that the projections for the remaining Telemark wells *might* be inaccurate" does not even give rise to an inference that the confidential

---

[43] R. Doc. 199 at 15.

[44] *Id.*  According to the complaint, the confidential witness worked as an ATP Vice-President from 2001 until December 2012, was responsible for ATP's development, managed project teams, and led weekly meetings at ATP's headquarters for each of ATP's projects.  *Id.* at 13.

[45] R. Doc. 196 at 68-69.

witness possessed actual knowledge that the projection was false, let alone speak to the defendants' level of scienter.  Indeed, plaintiff does not allege that the confidential witness disclosed his alleged insight to any of the defendants, nor does plaintiff plead any facts supporting an inference that defendants shared in the confidential witness's view of the geology.  That this allegation derives from a confidential source further detracts from its weight in the Court's scienter analysis.  *Ind. Elec. Workers' Pension Trust Fund v. Shaw Grp., Inc.*, 537 F.3d 527, 535 (5th Cir. 2008) (holding that allegations deriving from confidential sources deserve less weight in the court's scienter analysis because "anonymity frustrates" the court's ability to "weigh the strength of plaintiffs' favored inference in comparison to other possible inferences") (internal citation and quotation omitted).

Finally, plaintiff alleges that defendants did not believe the projection because defendants knew in December 2010 that ATP did not have the financial resources to survive the moratoria and would eventually file for bankruptcy in August 2012.[46]  In support of this theory, plaintiff cites defendant Albert Reese's August 17, 2012 bankruptcy testimony in which Reese responded "no" when asked whether "ATP [had] the liquidity and revenues at that time to absorb a lengthy moratorium."[47]  Plaintiff also borrows an

---

[46] *Id.* at 19-20.

[47] *Id.* at 16.

allegation from Bankruptcy Trustee Rodney Tow's Chapter 7 complaint that "[s]hortly after the Oil Spill, as early as May 2010, ATP began to have problems with liquidity due to the Oil Spill and foreseeable government response and entered the zone of insolvency, which the Directors and Officers knew."[48]   Thus, plaintiff alleges that defendants knew that ATP would not achieve the projected production increase because defendants allegedly knew in December 2010 that ATP would file for bankruptcy in August 2012.

Conspicuously absent from plaintiff's complaint is any allegation that ATP misrepresented its financial position in the Prospectus or the SEC filings incorporated by reference therein. Plaintiff fails to offer any explanation as to why defendants must have known that ATP was doomed to fail while the market, armed with the same financial data, failed to reach this conclusion.   Without any allegation that defendants possessed financial data that the market did not, plaintiff's attempt to impute actual knowledge to defendants amounts to nothing more than pleading fraud-by-hindsight. *See Plotkin*, 407 F.3d at 698 ("We subscribe to the rule that a plaintiff cannot charge defendants with intentionally misleading their investors about facts defendants may have become aware of after making allegedly misleading statements to the public."); *In re Verifone Sec. Litig.*, 11 F.3d 865, 869 (9th Cir. 1993) ("Absent allegations that [the issuer] withheld financial

---

[48] *Id.*

data or other existing facts from which forecasts are typically derived, the alleged omissions are not of material actual, facts."); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1420 (9th Cir. 1994) ("In sum, [plaintiffs'] argument distills to a contention that [the corporation] should have predicted the collapse in sales that occurred in 1987, long after the [securities] offering. The corporation had no duty to do so."). As the Court explained in its order dismissing plaintiff's First Amended Complaint:

> [P]laintiff merely points out that when asked in 2012 whether "ATP [had] the liquidity and revenues at that time to absorb a lengthy moratorium," Reese responded "no." Plaintiff then concludes that each of the defendants must have known ATP's ultimate fate as early as 2010 simply because one defendant, with the benefit of hindsight, stated that ATP lacked the liquidity to survive a moratorium *that was still ongoing as of the Effective Date*. This argument is classic fraud-by-hindsight pleading . . . .[49]

Plaintiff's adoption of an allegation from the Bankruptcy Trustee's August 2014 Chapter 7 complaint does not alter the analysis. The Trustee's allegation that ATP was in an undefined "zone of insolvency" as early as May 2010 is nothing more than an unproven allegation filed in an adversarial proceeding more than four years after the SEC deemed the Registration Statement at issue here effective. Plaintiff cites nothing from the Trustee's complaint alleging that defendants possessed any previously undisclosed

---

[49] R. Doc. 196 at 22.

information or providing any other factual support for plaintiff's contention that defendants knew in December 2010 that ATP would file for bankruptcy or be insolvent two years later in August 2012. Accordingly, the Court finds that the Bankruptcy Trustee's complaint does not alter the Court's scienter analysis. *See Southland*, 365 F.3d at 383 ("[B]ecause fraud cannot be proved by hindsight, subsequent lawsuits are unpersuasive of scienter, as they do not show what any particular individual knew . . . at the time . . . .").

In sum, the Court has considered all of plaintiff's allegations individually and cumulatively and finds that plaintiff has failed to plead sufficient facts to give rise to an inference that defendants possessed actual knowledge that the projection of a substantial increase in production was false or misleading at the time it was made. Accordingly, the Court finds that plaintiff has failed to plead actual knowledge as required by the PSLRA. 15 U.S.C. §§ 77u-4(b)(2), 77z-2(c)(1)(B)(i).

> 2. *The Prospectus Provided Meaningful Cautionary Language*

Even if plaintiff had adequately pleaded actual knowledge, the Court finds that the first prong of the PSLRA's safe harbor precludes liability because the Registration Statement's projection of a substantial increase in production is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could

cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 77z-2(c)(1)(A)(I).

"To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Slayton*, 604 F.3d at 772. In the Fifth Circuit, "very vague and general" cautionary statements that do not "disclose the specific risks and their magnitude" will not suffice. *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 246-47 (5th Cir. 2009). Instead, to fall within the safe harbor provision, an issuer must give "substantive company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Southland*, 365 F.3d at 372; *see also Inst. Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 256 (3d Cir. 2009) ("To suffice, the cautionary statements must be substantive and tailored to the specific future performances, estimates or opinion in the prospectus which the plaintiffs challenge.").

Here, plaintiff challenges defendants' projection of "a substantial increase in production over the next year as development wells are brought to production."[50] The projection is

---

[50] R. Doc. 199 at 17-18.

located in a twenty-page section of the Prospectus entitled "Risk Factors."[51]   Placed in its proper context, the projection reads:

> We project a substantial increase in production over the next year as development wells are brought to production. Absent alternative funding sources, achieving our projected production growth is necessary to provide the cash flow required to fund our capital plan and meet our existing obligations, both over the next twelve months and on a longer term basis. <u>Our ability to execute our plan depends, in part, on our ability to continue drilling for and producing hydrocarbons in the Gulf of Mexico.</u> Our plan is currently based upon obtaining necessary drilling permits, and successfully achieving commercial production from existing wells presently scheduled to commence during the remainder of 2010 and 2011. <u>Delays from difficulties receiving necessary permits, reduced access to equipment and services, or bad weather, could have a material adverse effect on our financial position, results of operations and cash flow</u>. In addition to the risks associated with achieving our projected production growth, additional regulatory requirements and increased costs for which funding must be secured, or a negative change in commodity prices and operating cost levels, could have a material adverse effect on our financial position, results of operations and cash flows. While we are pursuing other sources of funding, there is no assurance that the alternative sources will be available should any of the above risks or uncertainties materialize.[52]

The "Risk Factors" section also specifically notes that "delays in the development of or production curtailment at our material properties, <u>including at our Telemark Hub</u> may adversely affect our financial position and results of operations."[53]

---

[51] R. Doc. 206-2 at 21-41.

[52] *Id.* at 31.

[53] *Id.* at 33.

In the "Risk Factors" section, ATP also warned that its estimates of its oil and gas reserves were just that, estimates:

> Our actual development results are likely to differ from our estimates of our oil and gas reserves.  We may experience production that is less than estimated and development costs that are greater than estimated in our reserve reports.   Such differences may be material. Estimates of our oil and natural gas reserves and the costs and timing associated with developing these reserves may not be accurate.  Additionally, at December 31, 2009 approximately 87% of our total proved reserves are classified as undeveloped.   Development of these reserves may not yield the expected results, or the development may be delayed or the development costs may exceed our estimates, any of which may materially affect our financial position and results of operations. Development activity may result in downward adjustment of reserves or higher than estimated costs.
>
> Our estimates of our proved oil and natural gas reserves and the estimated future net revenues from such reserves are based upon various assumptions, including assumptions required by the SEC relating to oil and natural gas prices, drilling and operating expenses, capital expenditures, taxes and availability of funds.  This process requires significant decisions and assumptions in the evaluation of available geological, geophysical, engineering and economic data for each reservoir. Therefore, these estimates are inherently imprecise and the quality and reliability of this data can vary.[54]

ATP also warned of the inherent risk in the development of deep-sea oil and gas reserves:

> Our development activities may be unsuccessful for many reasons, including cost overruns, equipment shortages, and mechanical difficulties.  Moreover, the successful drilling of a natural gas or oil well does not ensure a profit on investment.  A variety of factors, both technical and market-related, can cause a well to become uneconomic or only marginally economic.  In addition to

---

[54] *Id.*

their cost, unsuccessful wells can hurt our efforts to replace reserves.[55]

With respect to the permitting status of its development wells, ATP warned:

> Although Moratorium II has been lifted, <u>we cannot predict with certainty when permits will be granted under the new requirements.</u>[56]
>
> &#42;   &#42;   &#42;
>
> We have ongoing and planned drilling operations in the deepwater Gulf of Mexico, some of which were permitted prior to April 20, 2010, and some of which are not yet permitted. Such permits, among other required approvals, are necessary prior to commencement of offshore drilling operations. Moratorium II has caused us to delay the third and fourth wells scheduled at our Telemark Hub and, <u>even though Moratorium II has been lifted, any delays in the resumption of the permitting process may result in delays in our drilling operations scheduled in 2011 at our Gomez Hub.</u>[57]

And with respect to its financial situation, ATP stated:

> We may not be able to generate sufficient cash flow and may not be able to borrow funds in amounts sufficient to enable us to service our indebtedness, or to meet our working capital and capital expenditure requirements. If we are not able to generate sufficient cash flow from operations or borrow sufficient funds to service our indebtedness, we may be required to sell assets or issue equity, reduce capital expenditures, or refinance all or a portion of our existing indebtedness. We may not be able to refinance our indebtedness, sell assets or issue equity, or borrow more funds on terms acceptable to us, if at all.

---

[55] *Id.* at 35.

[56] *Id.* at 30.

[57] *Id.* at 31.

> We currently have a substantial amount of indebtedness.
> As of September 30, 2010, we have total debt of
> approximately 1,784.0 million . . . . Our ability to
> satisfy our financial obligations and commitments depends
> on our future operating performance and on economic,
> financial, competitive and other factors, many of which
> are beyond our control.  We cannot provide assurance that
> our business will generate sufficient cash flow or that
> future financings will be available to provide sufficient
> proceeds to meet these obligations.  The inability to
> meet our financial obligations and commitments will
> impede the successful execution of our business strategy
> and the maintenance of our economic viability.[58]

Finally, ATP warned of the risk that an inability to obtain capital

might force it to curtail operations:

> If we are not able to generate sufficient funds from our
> operations and other financing sources, we may not be
> able to finance our planned development activity,
> acquisitions or service our debt. We have historically
> needed and will continue to need substantial amounts of
> cash to fund our capital expenditure and working capital
> requirements. Our ongoing capital requirements consist
> primarily of funding development and exploration of or
> oil and gas reserves.
>
>         \*    \*    \*
>
> We have been dependent on debt and equity financing to
> fund our cash needs that were not funded from operations
> or the sale of assets.  Since mid-2008 the capital
> markets in the United States and the remainder of the
> world have been in disarray.  There have been capital
> market transactions completed, but they have been very
> expensive compared to historical levels.  In addition,
> low commodity prices production problems, disappointing
> drilling results and other factors beyond our control
> could reduce our funds from operations and may restrict
> our ability to obtain additional financing or to pay
> interest and principal on our debt obligations.
> Furthermore, we have incurred losses in the past that may
> affect our ability to obtain financing.  Quantifying or
> predicting the likelihood of any or all of these

---

[58] *Id.* at 22.

occurring is difficult in the current domestic and world economy. For these reasons, financing may not be available to us in the future on acceptable terms or at all. <u>In the event additional capital is required but not available on acceptable terms, we would curtail our acquisitions, drilling, development and other activities or could be forced to sell some of our assets on an untimely basis.</u>[59]

Tellingly, plaintiff attempts to cherry-pick other arguably generic warnings in the Prospectus and then argue that "much of defendants' cautionary language was boilerplate."[60] Although the Court agrees that several of the warnings selected by plaintiff fail to meet the Fifth Circuit's "substantive company-specific warning" standard,[61] *Southland*, 365 F.3d at 372, this argument is nothing but a strawman. The issue is whether defendants' warnings, as a whole, provided "substantive company-specific warnings based on a realistic description of the risks applicable to the particular circumstances." *Southland*, 365 F.3d at 372. That plaintiff's selected warnings, standing alone and out of context, fail to meet this standard is of no consequence. As the Court stated in its order dismissing plaintiff's First Amended Complaint,

> [t]hese [warnings] plainly indicate (1) that the moratoria had halted much of ATP's drilling and production activity in the Gulf; (2) that development

---

[59] *Id.* at 31-32.

[60] R. Doc. 216 at 42.

[61] *See* R. Doc. 206-2 at 42 ("The oil and natural gas business involves many uncertainties and operating risks that can prevent us from realizing profits and can cause substantial losses.").

delays or curtailment of production at material
properties such as the Telemark Hub might materially
affect ATP's financial position and operating results;
(3) that drilling and production activity was necessary
to provide the cash flow required to fund ATP's capital
plan and meet its existing obligations; (4) that ATP
suffered significant losses in 2010; (5) that ATP did not
know when permits would issue or when it would be able to
resume drilling; and (6) that the delays, coupled with
the new regulatory framework for obtaining permits, could
have material adverse effects on ATP's liquidity and
revenues, including potentially ending ATP's drilling
operations in the Gulf altogether.[62]

The Prospectus also warned that delays and permitting interruptions
could adversely effect the development of the Gomez wells in
particular.[63]   Thus, the Court finds that ATP's projection of a
substantial increase in production was coupled with more than
adequate cautionary language to bring the projection within the
protection of the PSLRA's safe harbor provision.  *See Asher*, 377
F.3d at 734 (7th Cir. 2004) ("The PSLRA does not require the most
helpful caution; it is enough to identify important factors that
could cause actual results to differ materially from those in the
forward-looking statement.  That means that it is enough to point
to the principal contingencies that could cause actual results to
depart from the projection."); *In re Donald J. Trump Casino Sec.
Litig.-Taj Mahal Litig.*, 7 F.3d 357, 364 (3d Cir. 1993) (affirming

---

[62] R. Doc. 196 at 18.

[63] R. Doc. 206-2 at 31 ("[E]ven though Moratorium II has
been lifted, any delays in the resumption of the permitting
process may result in delays in our drilling operations scheduled
in 2011 at our Gomez Hub.").

district court's dismissal because "[t]he prospectus here took considerable care to convey to potential investors the extreme risks inherent in the venture while simultaneously carefully alerting the investors to a variety of obstacles the Taj Mahal would face, all of which were relevant to the potential investor's decision concerning purchase of the bonds").

Plaintiff's final argument is that the risks that defendants warned of in their cautionary language had already come to pass, and that "warnings of risks that have already occurred are not meaningful."[64] More specifically, plaintiff alleges that ATP's warning that achieving the projected production increase depended on "obtaining necessary drilling permits, and successfully achieving commercial production from existing wells presently scheduled to commence during the remainder of 2010 and 2011," was not meaningful and was itself misleading because (1) it misled investors regarding "the status of the permitting process with respect to the Gomez wells," and (2) it misled investors because "production estimates for the Telemark Hub could not be relied on in light of the poor performance at [the] Atwater" well.[65]

As an initial matter, the Court has already dismissed plaintiff's claim that the cautionary language was itself

---

[64] R. Doc. 216 at 44.

[65] R. Doc. 199 at 20-21.

misleading with prejudice.[66]   Moreover, even if these claims were properly before the Court, plaintiff has failed to allege facts that the risks ATP warned of had already come to pass so as to take the cautionary language out of the PSLRA's safe harbor protection. *Cf. Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981), *aff'd in part and rev'd in part*, 459 U.S. 375 (1983) (holding that to "warn that the untoward may occur when the event is contingent is prudent; to caution that is is only possible for the unfavorable events to happen when they have already occurred is deceit"); *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516-17 (S.D.N.Y. 2013) (holding that risk warnings misleadingly represented that increased mobile usage and the company's product decisions *could* negatively impact revenues and revenue growth, when in fact they already had).

With regard to plaintiff's Gomez permitting claim, plaintiff provides no explanation as to how the cautionary language warned of a risk that had already come to pass, as the Prospectus simply warned that the projected production increase was contingent on receiving the required permits.  The Prospectus disclosed that, as of the Effective Date, ATP did not have the permits for the Gomez wells, that the moratoria had frozen the permitting process through 2010, and that any delays in resuming the permitting process could

---

[66] R. Doc. 196 at 69.

result in delays in ATP's drilling plans at the Gomez Hub.[67]
Indeed, plaintiff's Second Amended Complaint acknowledges that ATP
did not receive any drilling permits until March 18, 2011, some
three months after the Effective Date.[68]  The Court fails to see how
ATP's warning that the projected production increase was contingent
on receiving the necessary permits warned of a risk that had
already come to pass, when plaintiff acknowledges that, as of the
Effective Date, ATP had not received any of the permits required to
commence its planned drilling activities at the Gomez Hub.
Plaintiff seems to be arguing that the warning was nevertheless
inadequate because it implied that the delays would be solely
attributable to the moratoria and the government.  Plaintiff's
factually unsupported allegation that the permitting delay was
caused solely by ATP's tardy submission of the permit application
does not render ATP's December 2010 warning as to future permitting
delays ineffective or otherwise inadequate.  *See Asher*, 377 F.3d at
732 ("[T]he cautions need not identify what actually goes wrong and
causes the projections to be inaccurate; prevision is not
required."); *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir.
1999) ("When an investor has been warned of risks of a significance
similar to that actually realized, she is sufficiently on notice of

---

[67] R. Doc. 206-2 at 31.

[68] R. Doc. 199 at 11.

the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward.").

Second, with regard to plaintiff's claim that the warnings were ineffective because "production estimates for the Telemark Hub could not be relied on in light of the poor performance at Atwater,"[69] this is merely a regurgitation of plaintiff's substantive claim regarding the alleged connectivity problems at Atwater. The Court has already dismissed this claim with prejudice and it warrants no further discussion.[70] Plaintiff also argues that the Prospectus's warning that "[d]elays in the development of or production curtailment at our material properties including at our Telemark Hub may adversely effect our financial position and results of operations" warned of a risk that had already come to pass because "the Company's production estimates at Telemark were already unreliable because of ATP's lack of exploratory testing."[71] This argument is a non-sequitur; ATP's alleged failure to conduct additional testing would not mean that the unfavorable event warned of, *i.e.*, curtailment of production at Telemark, had already occurred as of the effective date. In other words, plaintiff fails to plausibly allege why testing not done (which means whatever the testing would show was not available) necessarily indicated that

---

[69] *Id.* at 21.

[70] R. Doc. 196 at 69.

[71] R. Doc. 216 at 45.

production curtailment or development delays (the risks warned of) existed in fact as of the effective date.  Thus, the Court fails to see how ATP's alleged failure to conduct exploratory testing renders the Prospectus's warning about the risk of future production curtailment misleading.

To the extent that plaintiff is arguing that ATP's warning mislead investors because it suggested that ATP's projections were based on all available testing, the Prospectus fully disclosed the basis for the production estimates, stating:

> Our actual development results are likely to differ from our estimates of our oil and gas reserves.  We may experience production that is less than estimated and development costs that are greater than estimated in our reserve reports.  Such differences may be material. Estimates of our oil and natural gas reserves and the costs and timing associated with developing these reserves may not be accurate.  Additionally, at December 31, 2009 approximately 87% of our total proved reserves are classified as undeveloped.  Development of these reserves may not yield the expected results, or the development may be delayed or the development costs may exceed our estimates, any of which may materially affect our financial position and results of operations. Development activity may result in downward adjustment of reserves or higher than estimated costs.
>
> Our estimates of our proved oil and natural gas reserves and the estimated future net revenues from such reserves are based upon various assumptions, including assumptions required by the SEC relating to oil and natural gas prices, drilling and operating expenses, capital expenditures, taxes and availability of funds.  This process requires significant decisions and assumptions in the evaluation of available geological, geophysical, engineering and economic data for each reservoir.

Therefore, these estimates are inherently imprecise and
the quality and reliability of this data can vary.[72]

Plaintiff does not challenge the accuracy of ATP's underlying data
or provide any explanation as to why ATP was not entitled to rely
on the estimates of third-party petroleum engineers in making its
projection.[73] Once again, plaintiff does not allege that defendants
knew that the additional testing would invalidate or otherwise
undermine the independent petroleum engineers' estimates. Thus, in
light of the foregoing, it is clear that defendants fully apprised
plaintiff of the basis for ATP's projections, and plaintiff cannot
be heard to complain that ATP failed to warn investors about the
uncertainty of its oil and gas reserve estimates. Plaintiff's
allegation that defendants should have conducted additional testing
does not give rise to liability under Section 11. *See In re Magnum
Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 292 (S.D.N.Y.
2014) ("Mere allegations of corporate mismanagement are not
actionable.") (citing *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462,
479 (1977)).

---

[72] *Id.* at 33.

[73] *See* Prospectus, R. Doc. 206-2 at 137 ("The information
incorporated by reference into this prospectus regarding
estimates or the oil and gas reserves of ATP Oil and Gas
Corporation and related future net cash flows and the present
values thereof were based upon reserve reports prepared by Ryder
Scott Company, L.P. and Collarini Associates, each independent
petroleum engineers.").

42

Thus, for the foregoing reasons, the Court finds that ATP's projection of a substantial increase in production was accompanied by "substantive company-specific warnings." *Southland*, 365 F.3d at 372. The projection therefore falls within the safe-harbor provision for forward-looking statements and defendants cannot be held liable under Section 11. 15 U.S.C. § 77z-2(c)(1)(A)(I).

   C. *Plaintiff's Section 15 Claim Against the Director Directors*

Plaintiff's sole theory of liability against the Director Defendants is under Section 15 of the Securities Act. Section 15 imposes liability on persons who "control[] any person liable under" Section 11. 15 U.S.C. § 77o(a). Because the Court finds that plaintiff has failed to plead a Section 11 claim, plaintiff's Section 15 claim against the Director Defendants also fails as a matter of law. *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 863 (5th Cir. 2003).


**IV. CONCLUSION**

For the foregoing reasons, the Court GRANTS defendants' motions and DISMISSES plaintiff's claims with prejudice.


New Orleans, Louisiana, this __14th__ day of August, 2015.


                    _____
                         SARAH S. VANCE
                    UNITED STATES DISTRICT JUDGE

43