## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

FIREFIGHTERS PENSION &
RELIEF FUND OF THE CITY OF
NEW ORLEANS, Individually and
on Behalf of All Others Similarly
Situated

CIVIL ACTION

VERSUS

NO: 13-3935, c/w 13-6083, 13-6084, 13-6233

T. PAUL BULMAHN, ET AL.

SECTION: R

## ORDER AND REASONS

    This case is a securities class action brought on behalf of all persons who purchased ATP Oil & Gas Corporation's common stock in the public market between December 16, 2010 and ATP's bankruptcy filing on August 17, 2012 ("the Class Period"). Because it is in bankruptcy proceedings, ATP is not named as a defendant in this action. Instead, court-appointed Lead Plaintiffs Brian M. Neiman, William R. Kruse, and the Moshe Issac Foundation ("Lead Plaintiffs"), individually and on behalf of the class, are suing ATP's senior executives, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as well as SEC Rule 10b-5 promulgated thereunder. Defendants T. Paul Buhlman, Albert L. Reese, Jr., Keith R. Godwin, and Leland E. Tate filed a motion to dismiss plaintiffs' Consolidated Class Action

Complaint for failure to state a claim on March 6, 2015.[1]  For the reasons that follow, the Court grants the motion.

## I.   BACKGROUND

Before filing for bankruptcy in 2012, ATP engaged in the acquisition, development, and production of oil and natural gas properties.[2]  The company acquired and developed properties with proven undeveloped reserves in the Gulf of Mexico and the North Sea, but the majority of the company's business was in the Gulf of Mexico.[3]  As of December 31, 2009, ATP had leasehold and other interests in 62 offshore blocks and 104 wells in the Gulf of Mexico, of which ATP was then operating a total of 93.[4]  As of March 16, 2010, ATP owned an interest in 36 oil platforms, including two floating production facilities: the *ATP Innovator*, located in the Gulf of Mexico at the company's Gomez Hub, and the *ATP Titan*, also in the Gulf of Mexico at the company's Telemark Hub.[5]  When ATP filed for bankruptcy in August 2012, construction on a third floating production facility, the *Octabuoy*, was underway in China

---

[1] R. Doc. 221.

[2] R. Doc. 214 at 16.

[3] *Id.*

[4] *Id.*

[5] *Id.* at 17.

for initial deployment at the company's Cheviot Hub in the North Sea.[6]  ATP described its floating production facilities as "fundamental to [its] hub strategy and business plan."[7]

On April 19, 2010, ATP raised $1.5 billion by selling unregistered private notes to institutional investors in a transaction exempt from the registration requirements under the Securities Act.[8]  On April 20, 2010, the day after the private note offering, the drilling rig Deepwater Horizon exploded and sank in the Gulf of Mexico, fracturing the well's pipe and creating "the largest oil spill in the history of the Gulf of Mexico."[9]  In response, the U.S. Department of the Interior issued two moratoria that halted all drilling at depths greater than 500 feet between May 6, 2010 and October 12, 2010.[10]  Although the moratoria were eventually lifted, the Government instituted new rules and regulations that conditioned the issuance of drilling permits on additional testing, training, and compliance with new safety requirements.[11]  The Minerals Management Service did not issue any drilling permits until

---

[6] *Id.* at 18.

[7] *Id.* at 14.

[8] *Id.* at 7; Prospectus, R. Doc. 221-2.

[9] R. Doc. 214 at 6.

[10] *Id.*

[11] *Id.*

February 2011, prompting members of the oil and gas industry to refer to this period of permitting delays as the "de facto moratorium."[12]  ATP did not receive its first permit after the moratoria until March 18, 2011.  Together, these three moratoria halted all of ATP's exploration and development operations in the Gulf of Mexico through early 2011.  The delay resulted in tens of millions of dollars in interruption and standby costs for ATP, while at the same time delaying anticipated revenues from the wells ATP had planned to complete and bring on line for production.[13]  Indeed, during the moratoria ATP spent over $1 billion in infrastructure construction and other capital expenditures related to five such wells.[14]

Between April and December 2011, ATP issued three press releases announcing the drilling and completion of two wells at Green Canyon ("GC") Block 300 ("Clipper") in the deepwater Gulf of Mexico.[15]  Upon completion of the "Clipper Project," ATP announced in its December 12, 2011 press release that tests of the two wells revealed that they were capable of producing 22,000 barrels oil equivalent ("Boe") per day.[16]  In order to monetize the value of the

[12] *Id.*

[13] *Id.* at 20-21

[14] *Id.* at 21.

[15] R. Doc. 173 at 22-23; press releases dated April 7, 2011, August 7, 2011, and December 12, 2011.

[16] *Id.* at 23.

Clipper wells, ATP needed to build a pipeline from the Clipper wells to the nearest production platform 16 miles away.  The December press release stated that ATP expected to complete the pipeline in the third or fourth quarter of 2012.[17]

On October 12, 2010, ATP filed a Registration Statement and Prospectus with the Securities and Exchange Commission ("SEC"), indicating its intent to exchange the $1.5 billion in unregistered private notes for equivalent registered notes.[18]  Defendants Bulmahn, Reese, and Godwin signed the Registration Statement.  Following a December 14, 2010 amendment, the SEC declared the Registration Statement effective, and the Exchange was effected on December 16, 2010.[19]

The Prospectus[20] contained a section titled "Risks Related to Our Business," which provided a detailed account of the Deepwater Horizon explosion and the resulting moratoria.  It also described the new regulatory requirements for obtaining drilling permits.  It cautioned that "[t]he U.S. governmental and regulatory response to the Deepwater Horizon drilling rig

---

[17] *Id.  See also* R. Doc. 214 at 21.

[18] *Id.* at 7; R. Doc. 221-2.

[19] R. Doc. 214 at 7.

[20] R. Doc. 221-1.  For all practical purposes, the Registration Statement and Prospectus contain the same information and are interchangeable.

accident and resulting oil spill could have a prolonged and material adverse impact on our Gulf of Mexico operations." It also indicated that "[a]lthough Moratorium II has been lifted, we cannot predict with certainty when permits will be granted under the new requirements." As discussed in further detail below, the Prospectus went on to provide a lengthy explanation of these risks. Importantly, it contained the following warning:

> *New regulations already issued will,* and potential future regulations or additional statutory limitations, if enacted or issued, could, *require a change in the way we conduct our business, increase our costs of doing business or ultimately prohibit us from drilling for or producing hydrocarbons in the Gulf of Mexico. . . .*[21]

On August 24, 2011, ATP issued a press release announcing the first production from Mississippi Canyon ("MC") Block 941 #4 (also referred to as MC Block 941 A-2) in the deepwater Gulf of Mexico.[22] The #4 well was one of three wells brought on production at the Telemark Hub location utilizing the *ATP Titan* floating platform. The press release was signed by defendants Bulmahn and Reese and indicated that

> [t]he well delivered on ATP's original expectations with an initial rate exceeding 7,000 Boe per day. . . . Company-wide production now exceeds 31,000 Boe per day. . . . We have finally realized the planned material production revenue of this well that has been much anticipated for 16 months. . . . The greater-than-a-billion-dollar investment at

---

[21] *Id.* at 31 (emphasis added).

[22] R. Doc. 214 at 24.

6

Telemark reflects ATP's continuing commitment to develop America's energy resources.[23]

On September 12, 2011, Reese spoke on ATP's behalf at the Rodman Renshaw Global Investment Conference.[24]  Specifically, Reese stated:

You can see the numbers we have here, 21,000 barrels last year; first half of this year about 25,000 barrels, most recent report we said 31,000 barrels that's with the new Telemark well.  On later this year, we do expect to add the last well at Telemark that should be on by the end of this year, sort of Christmas present and New Year's present and Thanksgiving Day present, too early to tell.[25]

On September 26, 2011, Moody's Investor Services ("Moody's") published a report stating that ATP had a "high likelihood" of restructuring.[26] Bloomberg News reported on the Moody's analysis on September 29, 2011 in an article titled "ATP $1.5 Billion of Debt Falls to Yield 23.4%, Trace Data Show":

ATP shows a "high likelihood" it may face some type of restructuring, analysts from Moody's Investors Service wrote in a Sept. 26 report. The company's asset base and cash flows are "not sufficient to cover" the second-lien notes, according to the report. Moody's assigns a Caa2 grade to ATP with a "negative" outlook.[27]

---

[23] *Id.* at 24-25.

[24] *Id.* at 25.

[25] *Id.*

[26] *Id.*

[27] *Id.*

On September 29, 2011, Bloomberg News published defendant Reese's response to the Moody report in an article titled "ATP Says New Gulf of Mexico Oil Wells to Stave Off Default."[28]  The article stated in part:

> ATP Oil & Gas, one of the first oil explorers allowed to resume drilling in the U.S. Gulf of Mexico after the Deepwater Horizon disaster, expects to pump enough oil from new wells during the next three years to avoid defaulting on $1.5 billion in debt.

> Moody's Investors Service this week said ATP shows a "high likelihood" it may have to restructure its debt because its cash flow and asset base are insufficient to cover notes maturing in 2015. The company's $1.79 billion in net debt exceeds that of 97% of Houston-based ATP's U.S. peers, according to data compiled by Bloomberg.

> ATP expects to begin production from new wells at its Telemark field this year, followed by additional output at the Clipper and Gomez projects in 2012, Entrada in 2013 and Cheviot a year later, said Albert L. Reese, ATP's chief financial officer. All of those fields are in the Gulf of Mexico, except Cheviot, which is in the U.K.

> "All of that is before the bonds come due in 2015, so I don't know what Moody's is talking about," Reese said today in a telephone interview. "I can't fight rumors or reports, all I can do is continue to deliver on the promises we've made. Our expectation is that everything is going to be fine."[29]

Lead Plaintiffs allege that contrary to Reese's words of assurance, "everything was not fine."  According to data available on the Bureau of Ocean Energy Management's website, MC Block 941, which already contained two producing wells, produced an average of 9,379 Boe per day in July 2011, the

---

[28] *Id.* at 26.

[29] *Id.*

8

last full month before ATP announced its first production from Well #4.[30]  In September 2011, the first full month after Well #4's first production, Block 941 produced an average of 12,117 Boe per day.  Plaintiffs reason that if, consistent with the initial production rate, Well #4 had continued to produce 7,000 Boe per day, Block 941's overall daily production in September should have been 16,692 Boe per day.[31] Plaintiffs apparently assume that production from the two other wells at Block 941 remained constant, so that Well #4 must have been producing no more than an average of 2,738 Boe per day when Reese gave his interview to Bloomberg in September—approximately 61 percent less than the 7,000 Boe ATP initially announced.[32]

On November 8, 2011, ATP issued a press release announcing its Third Quarter 2011 Results, in which it disclosed that overall oil and gas production for the period was only 24,200 Boe per day, in contrast to the 31,000 per day it announced in August.[33]  The following day, ATP held its third quarter earnings conference call. During the call, defendant Tate disclosed that although Well #4 had initially tested at 7,000 Boe per day, issues with

---

[30] *Id.* at 27-28.

[31] *Id.* at 28.

[32] *Id.*

[33] *Id.* at 28.

wellbore drawdown were negatively affecting the well's completion efficiency, causing the well to produce only about 3,500 Boe per day.[34]

Following these disclosures regarding ATP's production rates,  ATP's common stock fell to $8.45, decreasing by $2.05 from the previous day's closing price and $2.50 from its November 9 intra-day high.[35]  On November 10, ATP's stock fell an additional $1.20, closing at $7.25 per share.[36]

In addition to the decline in value of ATP's common stock, plaintiffs allege that the lower production from Well #4 cost ATP crucial revenue that it needed to complete the pipeline to the Clipper wells--approximately $20.5 million in September and October 2011 by plaintiffs' calculations.[37]  Plaintiffs further allege that the lower production at Telemark created even more financial problems for ATP, because the company would need to shut the wells down to repair them in order to increase production.  When ATP filed for bankruptcy in August 2012, Reese indicated that "declining production" was one of the reasons ATP could not survive the moratoria, putting ATP "in the untenable position of running out of cash before it could complete the Clipper

---

[34] *Id.*; R. Doc. 221-15.

[35] R. Doc. 214 at 28.

[36] *Id.*

[37] *Id.* at 29.

Wells project and generate the revenues necessary to begin remedying the situation."[38]

On June 1, 2012, ATP issued a press release announcing that Matt McCarroll had joined ATP as its new Chief Executive Officer and that he had demonstrated his commitment to the company by purchasing one million shares of its common stock at market price.[39] Six days later, however, McCarroll resigned his position and rescinded his stock purchase.  In a June 7, press release, ATP cited a failure "to reach a mutually agreeable employment agreement" as the reason for McCarroll's departure.[40]  Defendants Bulmahn and Reese were listed as the contact persons on both press releases, and Reese signed the Form 8-K to which each press release was attached.

Reese testified at ATP's bankruptcy hearing that ATP pursued numerous avenues of potential financing to improve the company's liquidity, including sales of assets, taking on partners, the sale of overriding royalty interests ["ORRIs"] and net profit interests ["NPIs"], equity raises, and borrowing against its equity positions in the *ATP Titan* and the *ATP Innovator*.[41] Despite

---

[38] *Id.*

[39] *Id.* at 31.

[40] *Id.*

[41] *Id.* at 34.

incurring additional debt obligations, including an increase in its first lien credit facility by $150 million and the sale of $185 million in ORRIs in the first quarter of 2012, ATP ultimately succumbed to the liquidity constraints caused by the moratoria and the company's production problems.  The company's cash position deteriorated from $224 million on March 31, 2012 to between $25 and $30 million by June 30, 2012.[42]  Reese later said that "[p]rior to the [bankruptcy] filing, we did not have the ability to go borrow more money or encumber the assets."[43]

Plaintiffs allege that ATP's stock "plummeted" from $1.49 to a closing price of $0.36 on August 10, 2012 "amid reports that the Company may file for bankruptcy."[44]  ATP filed for Chapter 11 bankruptcy protection on August 17, 2012, reporting total debts of $3.49 billion and assets of $3.64 billion.[45]  ATP issued a press release announcing the bankruptcy filing, in which it indicated its intent to continue operating during its financial restructuring using $618 million in debtor-in-possession funding.  The press release stated in part:

The primary reason for the reorganization began with the Macondo well blowout in April 2010 and the imposition beginning in May 2010 of the

---

[42] *Id.* at 37.

[43] *Id.*

[44] *Id.* at 58.

[45] *Id.*

moratoria on drilling and related activities in the Gulf of Mexico. These events prevented ATP from bringing to production in 2010 and in early 2011 six development wells that would have added significant production to ATP. As of the date of this filing, three of these wells are yet to be drilled. Had ATP been allowed to drill and complete these wells ATP believes it would have provided a material production change in 2010 continuing to today. This projected increase in production should have substantially increased cash flows, shareholder value and allowed the company the ability to withstand normal operational issues experienced by owners of oil and gas properties in the Gulf of Mexico. In addition, these incremental cash flows would have mitigated or prevented the need to enter into many of the financings ATP has closed since the imposition of the moratoria–financings that require relatively high rates of return and monthly payments.[46]

On August 20, 2012, the next trading day, ATP's common stock price fell $0.1593 per share to close at $0.30 per share.[47]

In a declaration filed in the bankruptcy action, Reese summarized the adverse impact of the moratoria on ATP's business operations, describing the Deepwater Horizon explosion and oil spill as the "primary reason" for the company's ultimate failure:

As detailed further below, due to adverse operational exigencies stemming from the 2010 Gulf drilling moratoria as well as subsequent events, ATP finds itself with over $2 billion of indebtedness and less than $10 million in cash as of the Petition Date. . . .

When the moratorium was effectively lifted in March 2011, ATP received permits and attempted to generate production from these projects as quickly as possible.  By February 2012, ATP was able to complete the

---

[46] *Id.*

[47] *Id.*

Mississippi Canyon 941 A-1, 1-2, and Mississippi Canyon 942 A-3 wells in its Telemark field and connect them to the *ATP Titan*. . . .

Overall, ATP's inability to complete various wells or commence pipeline construction when planned due to the shutdown in the Gulf created significant liquidity problems, which were exacerbated by less than expected production rates at ATP's Telemark Hub and cost overruns on the Octabuoy. ATP's management, with the assistance of various outside professionals, closely monitored these challenging conditions and evaluated potential alternatives to improve ATP's liquidity position. ATP diligently sought to solicit potential partners, joint operators, or investors with respect to its foreign operations to share in the development costs of its North Sea and Eastern Mediterranean oil and gas properties. Although it is generally recognized that the reserves and operations of ATP's foreign affiliates have significant value, ATP has not yet been able to complete a transaction with any parties that will bring in enough financing to complete the construction of the necessary infrastructure to start generating new production from these foreign deepwater operations.

Despite ATP's best efforts, it was unable to overcome the impact of the moratoria when ongoing project construction costs, declining oil prices and less than anticipated production put it in the untenable position of running out of cash before it could complete the Clipper Wells project and generate the revenues necessary to begin remedying its situation. In the period leading up to the Petition Date, ATP found itself facing a severe liquidity crisis, with a cash position of less than $10 million and a substantial backlog of trade payables and amounts due under overriding royalties and net profit interests totaling, in the aggregate, over [$170] million, along with substantial payments due on the Second Lien Notes later this fall. ATP's inability to make current payments on many of its obligations have resulted in a number of notices of default and lawsuits from its creditors, with some seeking prejudgment relief (such as temporary restraining orders or writs of sequestration) that could further restrict the Company's short-term cash flow and liquidity.[48]

---

[48] *Id.* at 34-35.

When asked at the First Day Hearings whether "ATP [had] the liquidity and revenues at that time to absorb a lengthy moratorium," Reese responded "No. We could not."

Testimony at the First Day Hearings further revealed that ATP had retained Mayer Brown LLP to advise the company on a potential bankruptcy no later than the last week of June 2012, and it hired Jefferies & Co. "in the middle of July" 2012 for the purpose of "addressing and considering DIP [debtor in possession] financing."[49]

As the bankruptcy action has progressed, legal proceedings both inside and outside the bankruptcy reveal numerous creditors seeking remedies against ATP for unpaid obligations.  Plaintiffs' Consolidated Class Action Complaint lists 21 different vendors and service providers that have sued ATP for unpaid invoices dating back as far as 2007 and totaling more than $63.3 million.[50]  In the majority of these lawsuits, however, the goods and services for which ATP failed to pay do not predate early 2012. Moreover, plaintiffs allege that ATP had to renegotiate payment schedules to some of its vendors,[51] and the complaint fails to indicate whether payments to these 21 vendors

---

[49] *Id.* at 36.

[50] *Id.* at 42-47.

[51] *Id.* at 48.

actually were overdue at the time ATP filed for bankruptcy, or whether they were among the payments ATP was able to renegotiate.

Additionally, both before and during the class period, ATP sold ORRIs and NPIs to various investors and vendors. Plaintiffs allege that ATP's management began withholding payments from some of the interest holders in order to preserve cash.[52] At the bankruptcy hearing, Reese testified that he, Bulmahn, Tate, and Godwin collectively would have made the decision not to distribute these funds.[53] Plaintiffs allege that ATP failed to make approximately $23.2 million in ORRI and NPI payments to five interest holders between April and August 2012.[54]

On August 5, 2013, Brian Neiman filed a class action complaint in the Southern District of Texas asserting that defendants violated Section 10(b) of the Securities Exchange Act of 1934. Shortly thereafter, Brian Stackhouse filed a similar complaint in the Southern District of Texas. In addition, Thomas Mansfield filed a Section 10(b) class action complaint against defendants in the Eastern District of Louisiana. The actions were transferred to the Eastern

---

[52] *Id.* at 48-49.

[53] *Id.* at 51.

[54] *Id.* at 53.

District of Louisiana and consolidated,[55] and the Court appointed Neiman, Kruse, and the Moshe Issac Foundation as Lead Plaintiffs.[56]  Lead Plaintiffs filed their First Amended Consolidated Class Action Complaint on February 18, 2014, in which they identified 27 different statements they contend were false or misleading because the statements failed to disclose ATP's well performance issues and liquidity problems.[57]  After the Court dismissed plaintiffs' First Amended Complaint without prejudice, plaintiffs filed their Second Amended Complaint realleging that defendants:

(a) failed to disclose the effects of the moratoria on ATP in the Registration Statement and the company's Forms 10-K and 10-Q, in violation of Item 303(a) of Regulation S-K;

(b) failed to disclose at the September 12, 2011 Rodman Renshaw Global Investment Conference and in Reese's September 29, 2011 interview with Bloomberg News that Well 941 #4 was no longer producing the announced 7,000 Boe per day;

(c) falsely stated in various SEC filings, earnings calls, and conferences that ATP's liquidity was "strong" or "sound" and that the company could continue to meets its obligations for the next twelve months despite the fact that (1) Well 941 #4 was underperforming, (2) ATP lacked funds to complete the Clipper pipeline project to access the revenue stream it expected from the wells' production, and (3) ATP was running out of cash, forcing the company to negotiate delayed payments to certain vendors, delay routine maintenance, and withhold ORRI and NPI payments from investors;

---

[55] R. Docs. 77, 78, 105.

[56] R. Doc. 129.

[57] R. Doc. 173.

(d) misleadingly projected that ATP would complete the Clipper Wells pipeline in the third quarter of 2012 and touted the wells' plentiful reserves despite knowing that ATP lacked the funds to complete the pipeline project; and

(e) misled investors about the reasons behind Matt McCarroll's June 7, 2012 resignation from his position as ATP's CEO.[58]

Defendants now move to dismiss the Second Amended Complaint, asserting that plaintiffs' allegations fail to meet the heightened pleading requirements under the Private Securities Litigation Reform Act.[59]

## II.   STANDARD

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff.  *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009).

---

[58] R. Doc. 234 at 9-11.

[59] R. Doc. 221-1.

A legally sufficient complaint need not contain detailed factual allegations, but it must go beyond labels, legal conclusions, or formulaic recitations of the elements of a cause of action. *Id.* In other words, the face of the complaint must contain enough factual matter to raise a reasonable expectation that discovery will reveal evidence of each element of the plaintiff's claim. *Lormand*, 565 F.3d at 257. If there are insufficient factual allegations to raise a right to relief above the speculative level, or if it is apparent from the face of the complaint that there is an insuperable bar to relief, the Court must dismiss the claim. *Twombly*, 550 U.S. at 555.

In reviewing a motion to dismiss, the Court is limited to the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which the Court may take judicial notice. *See Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011). In securities cases, courts may take judicial notice of the contents of public disclosure documents that are filed with the SEC as required by law; however, "these documents may be considered only for the purpose of determining what statements they contain, and not for proving the truth of their contents." *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 384-85 (S.D. Tex. 2011) (citing *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1018 & n.1 (5th Cir. 1996)).

## III.   DISCUSSION

### A.   Section 10(b)

To survive a motion for dismissal, plaintiffs must allege facts entitling them to relief for their substantive cause of action.   Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for a person to:

> use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5 makes it unlawful for any person, directly or indirectly, to:

> make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

Accordingly, to state a claim under Section 10(b) and Rule 10b-5, a plaintiff must adequately allege, in connection with the purchase or sale of securities, "(1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately caused [the plaintiff's] injury." *Nathenson v. Zonagen Inc.,* 267 F.3d 400, 406-07 (5th Cir. 2001) (citing *Tuchman v. DSC Commc'ns,* 14 F.3d 1061, 1067 (5th Cir. 1994)). "A 'material fact' is one which a reasonable investor would consider significant

in the decision whether to invest, such that it alters the 'total mix' of information available about the proposed investment." *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1445 (5th Cir. 1993). A fact is not material if "a reasonable investor viewing the information in context would not have considered the investment significantly more risky as a result." *Id.* at 1446.

A plaintiff asserting a claim for securities fraud must also plead his claim in accordance with the particularity requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4. The relevant provision of the PSLRA provides:

> In any private action arising under this title in which the plaintiff alleges that the defendant
>
> (A) made an untrue statement of a material fact; or
>
> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
>
> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1). The Fifth Circuit has held that the PSLRA's pleading requirement "incorporates, at a minimum, the pleading standard for fraud actions under Federal Rule of Civil Procedure 9(b)." *Plotkin v. IP Axess Inc.,* 407 F.3d 690, 696 (5th Cir. 2005) (citing *Rosenzweig v. Azurix Corp.,* 332

F.3d 854, 865 (5th Cir. 2003)); *ABC Arbitrage Plaintiffs Grp. v. Tchuruk,* 291 F.3d 336, 349-50 (5th Cir. 2002) ("[W]e have observed that '[t]he effect of the PSLRA in this respect is to *at a minimum,* incorporate the standard for pleading fraud under Fed.R.Civ.P. 9(b).'"(quoting *Nathenson,* 267 F.3d at 412)).  To satisfy Rule 9(b), a plaintiff must specify each allegedly fraudulent statement, the speaker, when and where the statement was made, and why the statement was false or misleading.  *Fin. Acquisition Partners LP v. Blackwell,* 440 F.3d 278, 287 (5th Cir. 2006); *Plotkin,* 407 F.3d at 696.  This heightened pleading standard serves an important screening function in securities fraud suits.  It "provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims and then attempting to discover unknown wrongs." *Melder v. Morris,* 27 F.3d 1097, 1100 (5th Cir. 1994) (quoting *Tuchman,* 14 F.3d at 1067).

In the Fifth Circuit, "the required state of mind for scienter is an intent to deceive, manipulate, defraud or severe recklessness."  *Owens v. Jastrow*, 789 F.3d 529, 535-36 (5th Cir. 2015) (quoting *Lormand*, 565 F.3d at 251). Severe recklessness, for purposes of Section 10(b)'s scienter element, is

> limited to those highly unreasonable omissions or representations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present

a danger of misleading buyers or sellers which is either known to the defendant or so obvious that the defendant must have been aware of it.

*Nathenson,* 267 F.3d at 408 (quoting *Broad v. Rockwell,* 642 F.2d 929, 961-62 (5th Cir. 1981)).

The PSLRA also requires that a plaintiff "state with particularity facts giving rise to a strong inference" of scienter with respect to each allegedly false or misleading statement. 15 U.S.C. § 78u-4(b)(2). This requirement "alters the usual contours of a Rule 12(b)(6) ruling." *Lormand*, 565 F.3d at 239. Instead of drawing all reasonable inferences in the plaintiff's favor, the Court "must take into account plausible inferences opposing as well as supporting a strong inference of scienter." *Id.* This includes any "nonculpable explanations for the defendant's conduct." *Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.*, 497 F.3d 546, 551 (5th Cir. 2007). "The inference of scienter must ultimately be 'cogent and compelling,' not merely 'reasonable' or 'permissible,'" in light of other explanations. *Lormand*, 565 F.3d at 239; *see also Cent. Laborers'*, 497 F.3d at 551. In other words, a reasonable person must find the inference of scienter to be "at least as compelling as any opposing inference one could draw from the facts alleged." *Cent. Laborers'*, 497 F.3d at 551. In reviewing a plaintiff's scienter allegations, a court must "assess all the allegations holistically," not in isolation. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007).

A plaintiff may satisfy the heightened pleading requirement by alleging facts showing a motive to commit fraud and a clear opportunity to do so, or by identifying circumstances indicating conscious or reckless behavior by defendants, so long as the totality of allegations raises a strong inference of fraudulent intent. *See Tuchman,* 14 F.3d at 1068. Although the strong-inference pleading standard does not license courts to resolve disputed facts at the motion to dismiss stage, it does permit the court to "engage in some weighing of the allegations to determine whether the inferences toward scienter are strong or weak." *Cent. Laborers*', 497 F.3d at 551 (quoting *Rosenzweig*, 332 F.3d at 867). When a complaint fails to plead scienter in conformity with the PSLRA, the court must dismiss it. 15 U.S.C. § 78u–4(b)(3)(A).

Finally, the PSLRA's "safe-harbor" provision protects defendants from liability for certain projections, statements of future economic performance, and statements of plans or objectives for future operations. 15 U.S.C. § 78u-5(I). More specifically, the PSLRA's safe-harbor provision states that a defendant

> shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that
>
> > (A) the forward-looking statement is-

24

> > (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
>
> > (ii) immaterial; or
>
> > (B) the plaintiff fails to prove that the forward-looking statement-
>
> > > (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading . . . .

15 U.S.C. § 78u-5(c)(1). Because this provision is disjunctive, parts (A) and (B) must be considered separately. *See Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 372 (5th Cir. 2004) ("The safe harbor has two independent prongs: one focusing on the defendant's cautionary statements and the other on the defendant's state of mind.");[60] *Slayton v. Am. Exp. Co.,* 604 F.3d 758, 766 (2d Cir. 2010) ("The safe harbor is written in the disjunctive; that is, a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading."). Thus, under the first prong of the

---

[60] Any suggestion to the contrary in *Lormand v. US Unwired, Inc.,* 565 F.3d 228, 244 (5th Cir. 2009), conflicts with the Fifth Circuit's earlier holding in *Southland* and does not bind this Court. *Rios v. City of Del Rio,* 444 F.3d 417, 425 n.8 (5th Cir. 2006) ("[W]here two previous holdings or lines of precedent conflict the earlier opinion controls and is the binding precedent in this circuit . . . .").

statutory safe-harbor, there is no liability if, and to the extent that, the statement is identified as a forward looking statement, and is accompanied by meaningful cautionary language.[61]  A cautionary statement is "meaningful" if it provides "substantive company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Southland*, 365 F.3d at 372.  "Although a defendant is under no duty to disclose every fact or assumption underlying a prediction, he must disclose material, firm-specific adverse facts that affect the validity or plausibility of that prediction." *Lormand*, F.3d at 249.

Under the second prong, a defendant avoids liability if the plaintiff fails to prove that the statement was made with actual knowledge that the statement was false or misleading.  15 U.S.C. § 78u-5(c)(1)(B).  Because the second-prong places the burden of proof on the plaintiff, the PSLRA effectively requires plaintiffs to prove actual knowledge--not just recklessness--in the

---

[61] Oral statements can qualify for the safe harbor if (1) the statement is accompanied by a cautionary statement that the "particular" oral statement is forward-looking and that actual results could differ materially (essentially a formality as to the form of the statement); (2) the statement is accompanied by an oral statement that additional information could cause actual results to differ materially is contained in a readily-available written document; (3) the statement identifies the document or portion thereof containing the additional information; and (4) the identified document itself contains appropriate cautionary language.  15 U.S.C. § 78u-5(c)(2).

case of every forward-looking statement.  *See In re Anadarko*, 957 F. Supp. 2d 806, 831 n.13 (S.D. Tex. 2013) ("If the statements are covered by the statutory 'safe harbor' provision, Plaintiffs would be required to show intent to deceive, and not merely recklessness.") (citing *Nathenson*, 267 F.3d at 409). Accordingly, for each predictive statement, plaintiffs must plead specific facts giving rise to a strong inference that the defendant responsible for the forward-looking statement actually knew that the prediction was false.  *See Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1324 n.14 (2011) ("Under the PSLRA, if the alleged misstatement or omission is a 'forward-looking statement,' the required level of scienter is 'actual knowledge.'")*.*

## B.   Plaintiffs' Claims

The Second Amended Complaint alleges that defendants are liable for seventeen different false or misleading statements made between December 2010 and June 2012.[62]  These allegedly false and misleading statements can be grouped into five categories:

(1) defendants failed to disclose the effects of the moratoria on ATP in the Registration Statement and the company's Forms 10-K and 10-Q, in violation of Item 303(a) of Regulation S-K;

(2) defendants failed to disclose at the September 12, 2011 Rodman Renshaw Global Investment Conference and in Reese's September 29, 2011 interview with Bloomberg News that Well 941 #4 was no longer producing the announced 7,000 Boe per day;

---

[62] R. Doc. 214 at 3.

(3) defendants falsely stated in various SEC filings, earnings calls, and conferences that ATP's liquidity was "strong" and "sound" and that the company could continue to meets its obligations for the next twelve months despite the fact that (1) Well 941 #4 was underperforming, (2) ATP lacked the funds to complete the Clipper pipeline in order to access the revenue stream it expected from the wells' production, and (3) ATP was running out of cash, forcing the company to negotiate delayed payments to certain vendors, delay routine maintenance, and withhold ORRI and NPI payments from investors;

(4) defendants misleadingly projected that ATP would complete the Clipper Wells pipeline in the third quarter of 2012 and touted the wells' plentiful reserves despite knowing that ATP lacked the funds to complete the pipeline project; and

(5) defendants misled investors about the reasons behind Matt McCarroll's June 7, 2012 resignation from his position as ATP's CEO.[63]

The Court will address each category of allegedly false or misleading statements in turn.

### 1.   Allegations that Defendants Failed to Disclose the Effects of the Moratoria on ATP

Plaintiffs allege that ATP's December 16, 2010 Registration Statement, March 16, 2011 10-K Filing, and Forms 10-Q covering the first, second, and third quarters of 2011 violated Item 303 of Regulation S-K by failing to disclose "the true, negative, and severe effects of the moratoria on ATP's liquidity and ability to meet its current obligations, and that [the moratoria]

---

[63] R. Doc. 234 at 9-11.

was likely to materially impact liquidity and results of operations going forward."[64]

Item 303 of Regulation S-K requires the authors of certain corporate statements to disclose any known trends, events, or uncertainties that are (1) reasonably likely to result in a material increase or decrease in liquidity, or (2) reasonably expected to have a materially unfavorable impact on revenues or income from operations. 17 C.F.R. § 229.303. These disclosures must appear in the non-financial portions of registration statements and prospectuses, as well as in annual and quarterly reports filed on Forms 10-K and 10-Q, respectively, with the discussion to "focus specifically on material events and uncertainties known to management that would cause reported financial information not to necessarily be indicative of future operating results or of future financial condition." *Id.* § 229.303(a), Instruction 3. The duty to disclose arises only when the "trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." Management's Discussion and Analysis of Financial Condition

---

[64] R. Doc. 214 at 66, 70, 73, 76, 89. Defendant Tate did not sign any of these documents, so any alleged falsehoods contained within these documents may not be attributed to him. Bulmahn, Reese, and Godwin each signed the Registration Statement and the Forms 10-K. Only Reese signed the Forms 10-Q, but both Bulmahn and Reese certified them pursuant to the Exchange Act and the Sarbanes-Oxley Act.

and Results of Operations, Exchange Act Release No. 26,831, Investment Company Act Release No. 16, 961, 43 SEC Docket 1330 (May 18, 1989).

Because Item 303 creates an affirmative obligation to disclose certain information, liability under the provision is not tied to any particular statements contained in the relevant SEC filing; rather, liability exists when a defendant fails to disclose information covered by Item 303. Thus, although plaintiffs characterize several of the statement contained in the Registration Statement, Form 10-K, and Forms 10-Q as misleading, plaintiffs make scant allegations regarding information ATP allegedly failed to disclose in these documents. With respect to the Registration Statement and Prospectus,[65] plaintiffs state only that defendants failed to disclose that, at the time the Registration Statement was declared effective, defendants "knew that ATP had inadequate liquidity and that their proposed drilling program would not proceed in 2010."[66] With respect to the 2010 Form 10-K and the Forms 10-Q for the first, second and third quarters of 2011, plaintiffs allege that ATP "failed to disclose the true, negative, and severe effects of the moratoria on ATP's liquidity and ability to meet its current obligations, and that [the

_____

[65] For all practical purposes, the Registration Statement and Prospectus contain the same information and are interchangeable.

[66] R. Doc. 214 at 66.

moratoria] was likely to materially impact liquidity and results of operations going forward."[67]

As the Court held in its order dismissing plaintiffs' First Amended Complaint, the very information that plaintiffs claim is omitted is actually disclosed in ATP's SEC disclosures in plain English throughout the Class Period. Indeed, to the extent that the moratoria constituted a "known trend" that was likely to have a material impact on ATP's liquidity and revenues, ATP discussed the BP Oil Spill and the resulting moratoria in great depth in the Prospectus.[68] The Prospectus provided the following disclosures regarding the moratoria's current impact on ATP:

> We have ongoing and planned drilling operations in the deepwater Gulf of Mexico, some of which were permitted prior to April 20, 2010, and some of which are not yet permitted. Such permits, among other required approvals, are necessary prior to commencement of offshore drilling operations. Moratorium II has caused us to delay the third and fourth wells scheduled at our Telemark Hub and, even though Moratorium II has been lifted, any delays in the resumption of the permitting process may result in delays in our drilling operations scheduled in 2011 at our Gomez Hub. During June 2010, we agreed to terminate a contract for services of a drilling rig as a result of Moratorium I. Under our termination agreement, we obtained a full release of our obligations under the contract and incurred net costs of $8.7 million reflected as contract termination costs on our September 30, 2010 statement of operations . . . .

---

[67] *Id.* at 70, 73, 76, 89.

[68] R. Doc. 221-2 at 30-31.

The size of our operations and our capital expenditure budget limits the number of properties that we can develop in any given year. Complications in the development of any single major well or infrastructure installation may result in a material adverse effect on our financial condition and results of operations.  For instance, production delays are occurring resulting from Moratorium I and Moratorium II as described above in the first risk factor under "Risks Related to Our Business."[69]

With respect to the moratoria's potential future impact on ATP's

revenues and liquidity, the Prospectus warned:

**The U.S. governmental and regulatory response to the Deepwater Horizon drilling rig accident and resulting oil spill could have a prolonged and material adverse impact on our Gulf of Mexico operations . . . .**

Although Moratorium II has been lifted, we cannot predict with certainty when permits will be granted under the new requirements . . . .

We project a substantial increase in production over the next year as development wells are brought to production.  Absent alternative funding sources, achieving our projected production growth is necessary to provide the cash flow required to fund our capital plan and meet our existing obligations, both over the next twelve months and on a longer term basis.  Our ability to execute our plan depends, in part, on our ability to continue drilling for and producing hydrocarbons in the Gulf of Mexico.  Our plan is currently based on obtaining necessary drilling permits, and successfully achieving commercial production form existing wells presently scheduled to commence during the remainder of 2010 and 2011.  Delays from difficulties receiving necessary permits, reduced access to equipment and services, or bad weather, could have a material adverse effect on our financial position, results of operations and cash flows.  In addition to the risks associated with achieving our projected production growth, additional regulatory requirements and increased costs for which funding must be secured, or a negative change in commodity prices and operating cost levels, could also have a material

---

[69] *Id.* at 33.

adverse effect on our financial position, results of operations and cash flows.  While we are pursuing various other sources of funding, there is no assurance that the alternative sources will be available should any of the above risks or uncertainties materialize.

**If we are not able to generate sufficient funds from our operations and other financing sources, we may not be able to finance our planned development activity, acquisitions or service our debt.**

We have historically needed and will continue to need substantial amounts of cash to fund our capital expenditure and working capital requirements . . . .

**Delays in the development of or production curtailment at our material properties including at our Telemark Hub may adversely affect our financial position and results of operations.**[70]

The Prospectus's financial statement also disclosed that ATP had suffered a net loss of roughly $121.4 million in the nine months ending September 30, 2010.[71] Finally, when referring to the new permitting environment that caused the *de facto* moratorium that was ongoing when the Registration Statement was declared effective, the Prospectus unequivocally stated:

New regulations already issued will, and potential future regulations or additional statutory limitations, if enacted or issued, could, require a change in the way we conduct our business, increase our costs of doing business or ultimately prohibit us from drilling for or producing hydrocarbons in the Gulf of Mexico.[72]

---

[70] *Id.* at 30-32.

[71] *Id.* at 43.

[72] *Id.* at 31.

33

ATP's later filings repeated these warnings and updated investors as the situation developed, disclosing the costs ATP incurred as a result of the moratoria, as well as the financing arrangements ATP made to preserve cash in the absence of revenues from operations.  ATP's 2010 10-K stated:

**We have incurred substantial costs caused by the deepwater drilling moratoriums and subsequent drilling permit delays**. For example, during 2010 a side-track well operation in 7,000 feet of water was interrupted when Moratorium I was imposed and work on that project stopped, resulting in the early termination of a drilling contract.  In the course of obtaining a full release from our obligations under the contract, we incurred net costs of $8.7 million, which are reflected as drilling interruption costs on our Consolidated Statements of Operations.  Because the necessary drilling permits were not issued, drilling interruption costs also include $14.9 million of stand-by costs for a drilling rig and support operations at our Gomez Hub and Telemark Hub properties.

**[O]ur cash flows were significantly negatively impacted by the drilling moratoriums, as we incurred the additional costs noted above and at the same time were unable to place on production three wells during 2010 that were originally part of the 2010 development program.** We funded our 2010 activities through a combination of new debt financings, the sale or conveyance of economic interests in selected properties and financing arrangements with our suppliers.

**During this period we financed significant portions of our development program with transactions entered into with our suppliers and their affiliates.  We have conveyed to certain suppliers net profits interests in our Telemark Hub, Gomez Hub, and Clipper oil and gas properties in exchange for development services.  We have also negotiated with certain other vendors in the development of the Telemark Hub and Clipper to partially defer payments for a period of twelve months . . . . These types of financial arrangements preserve**

**our current cash and allow us to pay from the proceeds of future production.**

Our 2011 development plans in the Gulf of Mexico, as well as our longer term business plan, are dependent on receiving approval for deepwater drilling and other permits submitted to the BOEM . . . . [T]here is no assurance that [the permits] will be received in time to benefit our 2011 results or that permits will be issued in the future.[73]

ATP's First Quarter 2011 Form 10-Q updated investors regarding the status of permits and further disclosed ATP's continuing efforts to preserve cash:

Our 2011 development plans in the Gulf of Mexico as well as our longer term business plan are dependent on receiving additional approvals for deepwater drilling and other permits under applications which have been and will be submitted to the Bureau of Ocean Energy Management Regulation and Enforcement of the Department of the Interior.  In the first quarter of 2011, we received permits to drill the third well at Telemark and to complete drilling of a well at Green Canyon.  Drilling of the third well at Telemark is already underway.  **Also, while we believe we can satisfy the permitting requirements for the additional planned 2011 wells, which will allow us to significantly increase our production from current levels, there is no assurance that they will be received in time to benefit our 2011 results or that the permits will be issued in the future**. . . . The size of our operations and our capital expenditures budget limit the number of properties that we can develop in a given year.  A substantial portion of our current production is concentrated among relatively few wells located offshore in the Gulf of Mexico and in the North Sea, which are characterized by production declines more rapid than found in conventional offshore properties. As a result, we are particularly vulnerable to a near-term severe impact resulting from unanticipated complications in the development of, or production from, any single material well or infrastructure installation, including lack of sufficient capital, delays in receiving necessary drilling and operations permits, increased regulation, reduced access to equipment and services, mechanical or operational failures or bad weather**.   Any**

---

[73] R. Doc. 221-5 at 37-38.

**unanticipated significant disruption to, or decline in, our current production levels or prolonged negative changes in commodity prices or operating cost levels could have a material adverse effect on our financial position, results of operations and cash flows and our ability to meet our commitments as they come due.  We have historically obtained various other sources of funding to supplement our cash flow from operations and we will continue to pursue them in the future, however, there is no assurance that these alternative sources will be available should these risks and uncertainties materialize**.

We have been financing a significant portion of our development program with transactions entered into with our suppliers and financial institutions that either defer payments to future periods or will be repaid based on production through or from the revenues or net profits generated from future production.  **While these financing transactions have enabled us to continue the development of our properties and preserve cash, they will significantly burden the future net cash flows from our production until these obligations are satisfied.**[74]

The Company's Second Quarter 2011 Form 10-Q repeated these warnings and

discussed the ongoing impacts of the moratoria on ATP:

Events that occurred in 2010 and regulations that were enacted in 2010 and 2011 have had a major impact on our operations and ability to move forward with development plans.

\*   \*   \*

Although Moratorium II has been lifted and we have received two permits to develop wells at our Telemark and Clipper properties, we cannot predict with certainty when additional permits will be granted under the new requirements.

\*   \*   \*

[74] R. Doc. 221-7 at 25.

During the first six months of 2011, we also obtained a significant additional financing and commitments to finance from term loans and other transactions.  In the second quarter 2011, we conveyed dollar-denominated overriding royalty interests and dollar-denominated overriding royalty interests in the form of net profit interests in the Gomez Hub and the Telemark Hub for aggregate net proceeds of $70.3 million.  These Overrides and NPIs obligate us to deliver a percentage of the proceeds from the future sale of hydrocarbons in the specified proved properties until the purchaser recovers it original investment, plus an overall rate of return.  In June 2011 we also closed a perpetual preferred stock offering that provided net proceeds of $123.3 million, net of discount, related option contract costs and issuance costs.

*   *   *

Drilling interruption costs were $1.2 million and $8.7 million in the second quarter of 2011 and 2010, respectively. **They consist of stand-by costs for drilling operations at our Telemark and Gomez Hubs resulting from the deepwater drilling moratoriums and subsequent drilling permit delays caused by the April 2010 Macondo incident in the Gulf of Mexico.  These costs are expected to continue.**[75]

Finally, ATP's Third Quarter 2011 Form 10-Q repeated that the BP Oil spill and the resulting moratoria "had a major impact on [ATP's] operations and ability to move forward with development plans."[76]  ATP also stated:

Since May 2010 when the federal government imposed the first of a series of moratoriums in the Gulf of Mexico, we have faced unparalleled difficulties in obtaining permits to continue our development program. Prior to the moratoriums, we anticipated developing and bringing to production three additional wells at our Telemark Hub and two additional wells at our Gomez Hub by the end of 2010.  As of September 30, 2011, we have been able to bring to production two additional wells

---

[75] R. Doc. 221-9 at 26-31.

[76] R. Doc. 221-13 at 28.

at the Telemark Hub and the third well has been drilled to total depth . . . . During the third quarter, the two wells planned for the Gomez Hub were postponed to late 2012/early 2013 as permits have not yet been received for these two wells.

*   *   *

In addition, we have incurred capital and operating costs higher than we expected primarily due to additional regulations imposed since the deepwater Macondo incident and the requirement to sidetrack the two wells. . . . While cash flows were lower than previously projected due to lower than expected production rates, the delays in bringing on new production and higher costs, we continued our development operations by supplementing our cash flows from operating activities with funds raised through various financing transactions.[77]

As the foregoing makes clear, ATP fully informed investors of the current impact, and likely future impact, of the moratoria in each of the challenged SEC filings.  ATP's SEC filings apprised the market that the company was facing liquidity issues, that it was negotiating payment terms with its vendors, that it was experiencing permitting delays and increased costs, and that it was selling overriding royalty interests and net profit interests to make up for lost income and pay for its drilling projects.  Plaintiffs' claim that ATP failed to disclose the impacts of the moratoria in violation of Item 303 is therefore without merit.  *In re Progress Energy, Inc. Sec. Litig.*, 371 F. Supp. 2d 548, 552 (S.D.N.Y.2005) ("[I]t is indisputable that there can be no omission where the allegedly omitted facts are disclosed.") (internal citation omitted).

---

[77] *Id.* at 28-29.

In response, plaintiffs argue that ATP's disclosures were themselves misleading and incomplete because ATP did not disclose that it was then unable to meet its obligations, that ATP was "insolvent or practically insolvent," or that defendants "knew that the ORRI and NPI interests that ATP sold substantially hindered ATP's ability to improve or even maintain its financial situation."[78]  In support of their theory that ATP failed to disclose that it was then unable to meet its obligations, plaintiffs rely on a statement from a confidential witness who states that ATP "routinely delayed maintenance work in order to manage its cash flow" and "also stated that putting off payments to vendors was another routine way that ATP handled cash shortages."[79]   As an initial matter, ATP repeatedly disclosed that it was renegotiating payments with vendors in order to preserve cash.[80]  ATP also

---

[78] R. Doc. 234 at 21.

[79] R. Doc. 214 at 23.

[80] *See, e.g.,* 2010 Form 10-K, R. Doc. 221-5 at 37 ("We have also negotiated with certain other vendors involved in the development of the Telemark Hub and Clipper to partially delay payments for a period of twelve months. . . . We have arranged with the fabricator of the floating production facility to defer $121.5 million of payments until 2011 and the remainder until 2012.  These types of financial arrangements preserve our current cash and allow us to pay from the proceeds of future production."); 2011 Second Quarter Form 10-Q, R. Doc. 221-9 at 13-14 ("In the Gulf of Mexico, in addition to the NPIs exchanged for development services described above, we have negotiated with certain other vendors involved in the development of the Telemark and Gomez Hubs to partially defer payments over a twelve-month period beginning with first production.").

fully apprised investors that it had "significant debt, trade payables, and other long-term obligations."[81]   ATP further disclosed that these debts could "reduce funds available for other purposes" and strain ATP's ability to secure financing "required to fund working capital and capital expenditures and for other general corporate purposes."[82]   Thus, although ATP did not specifically disclose that it was delaying routine maintenance to preserve cash, ATP fully disclosed that it was pursuing various options to preserve cash and increase its liquidity.   Because ATP fully apprised investors of its intention and efforts to preserve cash, the Court will not read into the securities laws a general obligation to disclose the details of ATP's maintenance practices.   *See Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 212 n.6 (5th Cir. 2004) ("[T]he mere possession of material nonpublic information does not create a duty to disclose.") (quoting *Shaw v. Digital Equip.*, 82 F.3d 1194, 1202 (1st Cir. 1996)).

With respect to plaintiffs' claim that ATP failed to disclose that it was "insolvent or practically insolvent," plaintiffs fail to allege any contemporaneous facts supporting their claim that ATP was insolvent or practically insolvent at the time ATP submitted the challenged SEC filings.   To support their claim that ATP was insolvent or practically insolvent during the

---

[81] 2010 Form 10-K, R. Doc. 221-5 at 18.

[82] *Id.*

relevant periods, plaintiffs rely on an allegation lifted from Rodney Tow's

August 15, 2014 complaint[83] filed in the bankruptcy proceedings:

> Shortly after the Oil Spill, as early as May 2011, ATP began to have problems with liquidity due to the Oil Spill and foreseeable government response and entered the zone of insolvency, which the Directors and Officers knew.[84]

Rodney Tow's bankruptcy allegations, filed in an adversarial proceeding more

than two years after ATP filed for bankruptcy, and more than three and a half

years after ATP's 2010 10-K filing, fail to create a strong inference that

defendants knew that ATP was insolvent, or "practically insolvent," when the

company filed its disclosure statements with the SEC.  Defendants correctly

point out that "fraud cannot be proved by hindsight," *Southland*, 365 F.3d at

383, and plaintiffs' use of Rodney Tow's allegations, made in 2014 with the

benefit of hindsight, is classic fraud-by-hindsight pleading.  Indeed, plaintiffs

do not challenge the accuracy of ATP's financial disclosures in any of the SEC

filings.  Nor do plaintiffs provide any factual allegations that ATP withheld

financial data or otherwise failed to disclose the required financial

information.  Item 303 imposes a duty to disclose trends only if they are

---

[83] On June 26, 2014, ATP's Chapter 11 petition was converted to a Chapter 7 proceeding.  Shortly thereafter, the Bankruptcy Court appointed Rodney Tow as bankruptcy trustee.  Rodney Tow filed a complaint against Bulmahn, Tate, Reese, and Godwin, among others, on August 15, 2014.

[84] R. Doc. 214 at 38.

"presently known to management."  Plaintiffs' reference to ATP's August 2012 bankruptcy, and the bankruptcy trustee's August 2014 complaint, do not give rise to an inference that defendants knew that ATP was insolvent, or practically insolvent, when defendants filed the challenged disclosures with the SEC.  *Southland*, 365 F.3d at 383 ("[B]ecause fraud cannot be proved by hindsight, subsequent lawsuits are unpersuasive of scienter, as they do not show what any particular individual knew . . . at the time . . . .").  Absent plausible allegations that defendants knew that ATP was insolvent or practically insolvent at the time they filed the relevant disclosures with the SEC, plaintiffs have failed to plead that defendants violated Item 303.

Finally, plaintiffs claim that defendants' disclosures were inadequate under Item 303 because the SEC filings failed to disclose that the "ORRI and NPI interests that ATP sold substantially hindered ATP's ability to improve or even maintain its financial situation."[85]  To be clear, plaintiffs do not allege that defendants failed to disclose that ATP sold ORRIs and NPIs to bolster the company's short-term liquidity.  Instead, plaintiffs allege that defendants failed to disclose the alleged effects of these ORRIs and NPIs.  Once again, however, the information that plaintiffs contend ATP omitted in violation of Item 303 was disclosed in plain English in the relevant SEC filings.  For

---

[85] R. Doc. 234 at 21.

example, the 2011 First Quarter 10-Q disclosed that while the sale of ORRIs and NPIs "have enabled us to continue the development of our properties and preserve cash, they will significantly burden the future net cash flows from our production until these obligations are satisfied."[86] Similarly, ATP's 2010 Form 10-K stated that ATP "cannot provide assurance that our business will generate sufficient cash flow or that future financings will be available to provide sufficient proceeds to meet these obligations.  The inability to meet our financial obligations and commitments will impede successful execution of our business strategy and the maintenance of our economic viability."[87]

In light of the foregoing, it is clear that ATP disclosed the current and likely future impact of the moratoria, and plaintiffs have thus failed to plead that ATP omitted this information in violation of Item 303.

### 2. Defendants' Alleged Failure to Disclose Less than Expected Production at ATP's Telemark Hub

On August 24, 2011, ATP issued a press release announcing the first production from Telemark's newest well, MC Block 941 #4, at "an initial rate exceeding 7,000 Boe per day," and that ATP's company-wide production "now

---

[86] R. Doc. 221-7 at 25.

[87] R. Doc. 221-5 at 18.

exceeds 31,0000 Boe per day."[88]  The press release quoted Bulmahn stating that

> We have finally realized the planned material production revenue of this well that has been much anticipated for 16 months . . . .  The greater-than-a-billion-dollar investment at Telemark reflects ATP's continuing commitment to develop America's energy resources.[89]

Less than three weeks later, on September 12, 2011, Reese gave a speech at the Rodman Renshaw Global Investment Conference ("RRGI Conference") in which he reiterated that ATP's "most recent report" set overall production at 31,000 Boe per day including "the new Telemark well."[90]  On September 29, 2011, Moody's published a report stating that ATP had a "high likelihood" of restructuring.  The same day, Bloomberg News published Reese's response to the Moody report stating, in relevant part:

> Moody's Investor Service this week said ATP shows a "high likelihood" it may have to restructure its debt because its cash flow and asset base are insufficient to cover notes maturing in 2015.  The company's $1.79 billion in net debt exceeds that of 97 percent of Houston-based ATP's U.S. peers, according to data complied by Bloomberg.
>
> ATP expects to begin production from new wells at its Telemark field this year, followed by additional output at the Clipper and Gomez projects in 2012, Entrada in 2013 and Cheviot a year later, said Albert L. Reese, ATP's chief financial officer.  All of those fields are in the Gulf of Mexico, except Cheviot, which is in the U.K.

---

[88] R. Doc. 214 at 24.

[89] *Id.* at 24-25.

[90] *Id.* at 25.

"All of that is before the bonds come due in 2015, so I don't know what Moody's is talking about," Reese said today in a telephone interview. "I can't find rumors or reports, all I can do is continue to deliver on the promises we've made. Our expectation is that everything is going to be fine."[91]

On November 8, 2011, ATP issued a press release announcing its Third Quarter 2011 results, in which it disclosed that company-wide production was only 24,200 Boe per day, in contrast to the 31,000 Boe per day that was announced in August.[92] ATP further disclosed that MC Block 941 #4 was producing only 3,500 Boe per day, in contrast to the 7,000 Boe per day that was announced in August.[93]

Lead Plaintiffs allege that Reese's September 12, 2011 reiteration of ATP's "most recent report"--meaning the August 24, 2011 press release--and Reese's September 29, 2011 statement that "all I can do is continue to deliver on the promises we've made" were misleading because data available on the Bureau of Ocean Energy Management's ("BOEM") website indicated that MC Block 941, as a whole, produced only 2,738 Boe per day more in September 2011 than in July 2011, the last full month before Well #4 began producing.[94]

---

[91] *Id.* at 26.

[92] *Id.* at 28.

[93] *Id.*

[94] *Id.* at 27-28.

45

Thus, assuming production remained constant at the other two wells located in MC Block 941, plaintiffs contend that Reese's reiteration of the August 24, 2011 report and statement that ATP will "continue to deliver on the promises we've made" were misleading because BOEM's data suggests that MC 941 #4 produced only 2,738 Boe per day and that ATP's company-wide production was only 24,200 Boe per day for the month of September.[95]  A confidential witness, CW4, also states that his staff emailed weekly production reports to Bulmahn, Reese, Tate and Godwin and discussed production levels with defendants at weekly production meetings.[96] Plaintiffs bolster CW4's account with the statement of yet another confidential witness, CW3, who states that "he saw either weekly or monthly reports," and that these reports "would have been available to Defendants Bulmahn, Reese, Godwin, and Tate."[97] Plaintiffs further rely on Reese's testimony in the Bankruptcy proceeding that he was "very, very well informed" to support an inference that Reese knew, or was reckless in not knowing, that production at MC 941 #4 had declined.[98]

---

[95] *Id.*

[96] *Id.* at 30.

[97] *Id.*

[98] *Id.* at 31.

As an initial matter, plaintiffs' reliance on the BOEM data for the proposition that MC 941 #4 was producing 2,738 Boe per day on September 12, 2011 is flawed for two reasons.  First, plaintiffs inexplicably assume that production remained constant at the other two wells at MC 941, such that any decline in production from the block cumulatively must have come from MC 941 #4 only.  Plaintiffs provide no explanation or defense for this assumption.  Second, and more importantly, the BOEM data provides block production on a monthly basis.  Thus, while the BOEM data might support plaintiffs' argument that production at MC 941 #4 had declined by the end of September, it does not support the proposition that production at MC 941 #4 must have declined to 2,738 by September 12, 2011, only twelve days into the BOEM's reporting period.

Nevertheless, even assuming that production at MC 941 #4 had declined significantly by September 12, 2011, the Court finds that discussing MC 941 #4's production rate was not necessary to make Reese's September 12 and September 29, 2011 states not misleading.  With respect to Reese's September 12, 2011 statement at the RGGI Conference, Reese merely reiterated that in ATP's "most recent report, we said 31,000 barrels that's with the new Telemark well."[99]  Reese's restatement of the August 24 production levels a

---

[99] *Id.* at 25.

mere two and a half weeks later does not constitute a false or misleading statement. Reese merely restated a historical fact, which plaintiffs do not allege to be false. Moreover, Reese explicitly stated that he was referencing ATP's most recent report--meaning the August 24th report--not ATP's current production numbers. Indeed, Reese said nothing about current production from MC 941 #4 at the RGGI Conference and ATP was under no general obligation to provide weekly updates on the performance of each and every one of its wells. *Cf. TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448-49 (1976) (warning that disclosure obligations that would "bury the shareholders in an avalanche of trivial information . . . [are] hardly conducive to informed decision making"); *Gallagher v. Abbott Laboratories*, 269 F.3d 806, 809 (7th Cir. 2001) ("Much of plaintiffs' argument reads as if firms have an absolute duty to disclose all information material to stock prices as soon as news comes into their possession. Yet that is not the way the securities laws work. We do not have a system of continuous disclosure."). Thus, Reese's alleged failure to give investors a week-by-week update as to the production rate of specific wells does not render Reese's restatement of ATP's August 24, 2011 production report misleading.

The Court reaches the same conclusion regarding plaintiffs' allegation that Reese's September 29, 2011 statement that "all I can do is continue to

48

deliver on the promises we've made" was "an implicit reinforcement" of ATP's August 24, 2011 production report.[100]  Once again, this allegation fails to state a claim because disclosure of the lower production levels was not necessary to make Reese's statements in the September 29, 2011 interview with Bloomberg News not misleading.  His assurances in response to the Moody report focused on ATP's expectation that it would be able to cover its debt based on "production from *new wells* at its Telemark field this year, followed by additional output at the Clipper and Gomez projects in 2012, Entrada in 2013 and Cheviot a year later . . . ."[101]  There is no reference whatsoever to MC 941 #4 or the previously announced production rate of 31,000 Boe per day.  Thus, Reese's September 29, 2011 statements did not reinforce, explicitly or implicitly, the company's August 24, 2011 production report.  Instead, Reese's September 29, 2011 statements appear to be entirely forward-looking, referring only to wells that ATP anticipated bringing to production during the next three years.  Accordingly, discussing MC 941 #4's performance was simply not necessary in order to make Reese's September 29, 2011 interview not misleading.

---

[100] *Id.* at 26.

[101] *Id.*

Case 2:13-cv-03935-SSV-SS   Document 239   Filed 11/23/15   Page 50 of 90


Moreover, even if the September 12 and 29, 2011 statements could be construed as "implicit reinforcements" of the August 24, 2011 production report, the Court finds that plaintiffs have failed to plead sufficient facts to create an inference that defendants knowingly or recklessly misled investors. Before turning to the allegations regarding confidential witnesses, the Court briefly addresses plaintiffs' failure to address the Court's concerns regarding the absence of defendants' motive to commit securities fraud.  The Fifth Circuit has held that "appropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter."  *Southland*, 365 F.3d at 368; *see also Nathenson*, 267 F.3d at 411 (noting that allegations of motive and opportunity provide "an analytical device for assessing the logical strength of the inferences arising from particularized facts pleaded by a plaintiff to establish the necessary mental state").  The Second Amended Complaint is devoid of any allegations regarding defendants' motive to mislead investors.   Indeed, defendants have previously represented that they lost approximately $100 million as a result of ATP's bankruptcy.  Moreover, the Second Amended Complaint acknowledges that the information Reese allegedly omitted on September 12 and September 29, 2011 was fully disclosed in ATP's Third Quarter results on November 8, 2011.[102]  Nothing in plaintiffs'

---

[102] *Id.* at 28.

50

Second Amended Complaint suggests that defendants had anything to gain by misleading investors about the production numbers in September, only to turn around and discuss them candidly in early November.  *Id.* at 369 (noting that a lack of suspicious sales "undermines an inference of scienter").

Although failure to plead motive and intent is not dispositive of a securities fraud claim, a plaintiff must nevertheless plead "strong circumstantial evidence" of defendants' "conscious misbehavior or recklessness."  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).  In other words, "[w]here . . . the plaintiff has not alleged a clear motive for the alleged misstatements or omissions, the strength of its circumstantial evidence of scienter must be correspondingly greater."  *R2 Invs. LCS v. Phillips*, 401 F.3d 638, 644 (5th Cir. 2005).  Plaintiffs fail to carry this burden. Indeed, plaintiffs attempt to make their case with confidential witnesses's statements that the witnesses were "confident" that defendants "had knowledge of the lower production levels at the Telemark well," that defendants received weekly or monthly email updates regarding well production rates, and that "discussions and decisions about financing occurred entirely at the executive level."[103]  Because these allegations derive from confidential witnesses, they are of limited value in balancing the competing

---

[103] *Id.* at 30.

inferences of scienter. *See Ind. Elec. Workers'*, 537 F.3d at 535 (holding that allegations deriving from confidential sources deserve less weight in the court's scienter analysis because "anonymity frustrates" the court's ability to "weight the strength of plaintiffs' favored inference in comparison to other possible inferences") (internal citation omitted); *Higginbotham v. Baxter Intern., Inc.*, 495 F.3d 753, 757 (7th Cir. 2007) (holding that the district court must "discount allegations that the complaint attributes to five confidential witnesses," and that "[u]sually the discount will be steep"). Plaintiffs also attempt to bolster these allegations by pointing to defendants' positions in the company and their alleged attendance at weekly production meetings. Neither of these allegations give rise to a strong inference of scienter. *See Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006) ("Corporate officers are *not* liable for acts solely because they are officers, even where their day-to-day involvement in the corporation is pleaded.") (emphasis in original); *Ind. Elec. Workers'*, 537 F.3d at 535 (defendant's "hands-on management style . . . coupled with his alleged boast that 'there is nothing in this company that I don't know,' are insufficient to support a strong inference of scienter," because "[s]uch statements lack specificity about what [defendant] may have known, or for that matter, was reckless not to have known"). Thus, in light of ATP's disclosure and discussion of the Telemark

Hub's production decline in November 2011, the Court finds that plaintiffs fail to plead sufficient facts giving rise to a strong inference that defendants knowingly or recklessly misled investors regarding Telemark's production in September 2011.

### 3. Defendants' Statements Regarding ATP's Liquidity and Ability to Complete the Clipper Project

At various points in the class period, defendants assured investors that ATP's financial position was secure and that its liquidity was "strong" and "sound." On multiple occasions, defendants predicted that ATP would be able to continue paying its debts for at least 12 months, and they repeatedly rejected any suggestion of bankruptcy. Plaintiffs allege that the following statements regarding ATP's financial state were false or misleading:

- January 5, 2011 Pritchard Capital Partners Energize Conference, Reese speaking: ATP "[h]as a strong liquidity position" and has "strong liquidity to do everything that we've been talking about."[104]

- March 15, 2011 Year End 2010 Conference Call, Bulmahn speaking: "Through creative, albeit expensive financing, we are now liquid and solvent. . . . Not only have we been surviving during this period of time, we have expanded a foundational base to accelerate ATP's strategy into the future."[105]

- March 15, 2011 Year End 2010 Conference Call, Reese speaking: "[W]e feel very comfortable with our liquidity position for the entire 2011 as we

---

[104] *Id.* at 66.

[105] *Id.* at 68.

go into 2012.  That's either with or without permits from a liquidity standpoint."[106]

• March 16, 2011 Form 10-K for 2010, signed by Bulmahn, Reese and Godwin and certified by Bulmahn and Reese: "Should the permitting process in the Gulf of Mexico continue to be delayed, we believe we can continue to meet our existing obligations for at least the next twelve months; however, absent alternative funding sources, our ability to do so is dependent on maintaining existing production levels from our currently producing wells and maintaining commodity prices and operating costs near current levels. . . ."[107]

• April 13, 2011 IPAA Oil & Gas Investment Symposium, Bulmahn speaking: "ATP's liquidity is strong . . . Going forward we will be able to manage leverage and liquidity at levels satisfactory to the market . . . . [W]e are presently paying down our debt with NPI payments and we have additional strong liquidity."[108]

• May 10, 2011 First Quarter 2011 Form 10-Q, signed by Reese and certified by Reese and Bulmahn: "[W]e believe we can continue to meet our existing obligations for at least the next twelve months based on maintaining existing production levels from our currently producing wells with commodity prices and operating costs near current level."[109]

• July 19, 2011 Global Hunter Securities Energy Conference, Reese speaking: "We have also done a couple of overrides.  The question would be –- we didn't think you needed liquidity; wh[y] did you do that? . . . This literally does nothing more than improve our liquidity.  It protects us in the event there are any issues in the Gulf of Mexico this year.  And in the longer term, as we begin to see more and more permitting become

---

[106] *Id.*

[107] *Id.* at 69.

[108] *Id.* at 71.

[109] *Id.* at 72.

available, that gives us the ability to move forward with other operations."[110]

• August 9, 2011 Second Quarter 2011 Form 10-Q, signed by Reese and certified by Bulmahn and Reese: "We believe we can continue to meet our existing obligations for at least the next twelve months based on forecasted production levels and the continuation of commodity sales prices and operating costs near current levels."[111]

• August 9, 2011 Earnings Conference Call, Bulmahn speaking: "ATP's liquidity remains strong as we produce our reserves, we are reducing our debt with payments to NPI and Override interest holders. . . . I believe we are sound and healthy, and we certainly are not flirting with bankruptcy at all.  That I think we certainly are on sound footing and moving forward well and making things happen globally as well."[112]

• September 12, 2011 RRGI Conference, Reese speaking: "CapEx will be within the cash flow of the Company. . . . [W]e have got a solid capital position, our debt is married with our production program, is married with our development program."[113]

• September 29, 2011 Bloomberg Article, Reese speaking: "I can't fight rumors or reports, all I can do is continue to deliver on the promises we've made.  Our expectation is that everything is going to be fine."[114]

• November 9, 2011 Third Quarter 2011 Form 10-Q, signed by Reese and certified by Bulmahn and Reese: "We expect these new wells will generate sufficient cash flows to fund subsequent development projects and service our long-term debt and other obligations.  We believe we can continue to meet our existing obligations for at least the next twelve

---

[110] *Id.* at 74.

[111] *Id.* at 75.

[112] *Id.* at 77.

[113] *Id.* at 82.

[114] *Id.* at 84.

months based on forecasted production levels and the continuation of commodity sales prices and operating costs near current levels."[115]

• November 9, 2011 Earnings Conference Call, Reese speaking: "I think as we go into 2012 we may have a little more cushion of being able to maintain such a large cash balance."[116]

• November 10, 2011 *Wall Street Journal* article, quoting Reese: "[S]uggestions that the company is sinking into bankruptcy are 'punitive.' Right now we believe we have complete control of our destiny and we have no plans to miss any interest payments."[117]

• January 4, 2012 Pritchard Capital Partner LLC Energize Conference, Reese speaking: "But as we look at it today, when you look at liquidity, and this would be first-quarter liquidity, we're looking close to $100 million of additional capacity. . . . And a strong capital position in the fact that most of our 2012 projects are completely discretionary. We've got many levers to pull to either bring in cash or to reduce CapEx. . . .[B]ut what you see is that our entire debt is completely covered by our proved reserves."[118]

• March 15, 2012 Year-End Form 10-K for 2011, signed by Bulmahn, Reese and Godwin and certified by Bulmahn and Reese: "We believe we can continue to fund our projected capital expenditures and our existing obligations, including our long-term debt and other long-term obligations, for at least the next twelve months."[119]

• March 16, 2012 Earnings Conference Call, Bulmahn and Reese speaking: "And we continue to expand liquidity. . . ."[120]

---

[115] *Id.* at 88.

[116] *Id.* at 90.

[117] *Id.* at 91.

[118] *Id.* at 94.

[119] *Id.* at 101.

[120] *Id.* at 102-103.

- April 17, 2012 IPAA Oil & Gas Investment Symposium, Reese speaking: "Growing production and cash flow.  We will continue to do that.  In doing so, we will continue to pay down some of the overrides and the net profits interest that we have. . . . Liquidity is sound.  I've heard all of the questions and comments about the liquidity.  We ended first quarter with over $200 million in cash.  We have no near-term maturities or maintenance financial covenants.  They do not begin--maturity doesn't start until 2015."[121]

- May 10, 2012 Form 10-Q for First Quarter 2012, signed by Reese and certified by Bulmahn and Reese: "[W]e believe we can continue to fund our projected capital expenditures and our existing obligations, including our long-term debt and other obligations, for at least the next twelve months."[122]

Plaintiffs also allege that a number of statements were false or misleading because they either projected that the Clipper pipeline would be complete in the third quarter of 2012 or touted Clipper's plentiful reserves. Plaintiffs allege that these statements were false or misleading because "ATP . . . lacked the liquidity and cash flow to complete the pipeline and commence production from the Clipper wells."[123]  More specifically, plaintiffs identify the following allegedly false or misleading statements with respect to the Clipper pipeline:

- August 17, 2011 EnerCom Inc. Oil and Gas Conference, Bulmahn speaking: "Clipper, you may have seen an announcement last week, and

---

[121] *Id.* at 104.

[122] *Id.* at 112.

[123] *Id.* at 22.

we will go into that a little bit more, with follow-ons from Entrada and Green Canyon 37 as we move into future years.  Basically what we've done is timed these assets to meet our cash-flow--to work within our cash flows and be able to develop them."[124]

- September 12, 2011 RRGI Conference, Reese speaking: "The nine and ten well, the two wells at Clipper, I think those are pretty decent wells that we will be doing because those will already be completed, its just pipeline and a couple other opportunities that we would like - look at."[125]

- November 8, 2011 Press Release for Third Quarter 2011 Financial Results, Bulmahn and Reese listed as contact persons: confirmed reserves at GC 300 #4 and announced flow test results for GC 300 #2 ST #1 before indicating that "[t]he pipeline lay barge for the Clipper wells is contracted for third quarter 2012 and will tie in both the GC 300 #4 and #2 wells to the Murphy Oil operated Front Runner production facility."[126]

- November 9, 2011 Form 10-Q for Third Quarter 2011, signed by Reese and certified by Bulmahn and Reese: "We have also drilled two wells at Clipper--one has been completed, and the second is scheduled to be completed by the end of 2011--with pipeline construction and first production expected in the second half of 2012."[127]

- November 9, 2011 Earnings Conference Call, Tate speaking: "The answer on Clipper is the lay barge is contracted for late in July and we have no reason to believe that it won't stay on schedule.  It actually could be earlier than that, but that's the schedule that we were working towards. It will take 30 days to 60 days to actually get the pipeline laid and the facilities hooked up.  So  I would say late third quarter is not an unreasonable time for startup at Clipper.  Al [Reese] can talk more about the potential financing of the pipeline. . . . [Reese speaking:] I think if

---

[124] *Id.* at 78.

[125] *Id.* at 79.

[126] *Id.* at 85.

[127] *Id.* at 88.

you look back in our last several quarters we continue to operate at better than $100 million in cash.  As we have moved through this period of the moratorium now that the moratorium is behind us, we have wanted to maintain as much cash as we can to be able to get the next well on at Telemark [and] to get the Clipper projects done.  I think as we go into 2012 we may have a little more cushion of being able to maintain such a large cash balance."[128]

- January 1, 2012 Pritchard Capital Partner LLC Energize Conference, Reese speaking: "Between now and 2015, we expect to have Telemark in full production, which will be [20]12, Clipper in full production which will be [20]12, Entrada at full production, which will be 2013 or 2014, and then Cheviot at full production beginning sometime in 2014, 2015. . . . Clipper production will commence later this year."[129]

- February 27, 2012 JP Morgan High Yield & Leveraged Finance Conference, Reese speaking: "[ATP] [p]roduced 24.6 Mboe/d in 2011 and expect[s] significant uplift in production in 2012 with key new wells at Telemark and Clipper."[130]

- March 15, 2012 Year End 2011 Earnings Press Release, listing Bulmahn and Reese as contacts: "Capital spending for 2012 includes ongoing expenditures related to ATP's Telemark Hub described above and the completion of the Clipper pipeline targeted for completion in late third quarter or early fourth quarter 2012.  Once installed, this pipeline will connect the two Clipper wells to a host platform . . . . ATP expects to fund these projects through cash flow and additional sources of liquidity already announced or planned . . . ."[131]

- 2011 Form 10-K, filed March 15, 2012, signed by Bulmahn, Reese and Godwin and certified by Bulmahn and Reese: "Later in 2012, we expect to complete a pipeline that will bring to production the two wells at our

---

[128] *Id.* at 89-90.

[129] *Id.* at 92.

[130] *Id.* at 96.

[131] *Id.* at 97.

Clipper project. These two wells were completed and tested during 2011 . . . . We expect with these two new wells and workovers we will be performing on existing wells in the first quarter and the two new Clipper wells expected to be placed on production later in the year, we will generate higher operating cash flows in 2012 than in 2011."[132]

• April 17, 2012 IPAA Oil & Gas Symposium, Reese speaking: "And the initial wells at Clipper, these have some of the highest production rates of any wells we've ever had in the Company. And these have been tested again, 16,000 barrels per day, 62% oil."[133]

• May 9, 2012 Press Release for First Quarter 2012, Bulmahn and Reese listed as contacts: "ATP's two wells at Clipper (Green Canyon 300) are on schedule to begin production in late third quarter or early fourth quarter 2012. Both wells were drilled and completed in 2011, and ATP has begun preparatory work for the installation of the Clipper pipeline during third quarter 2012."[134]

• May 10, 2012 Form 10-Q, signed by Reese and certified by Bulmahn and Reese: "[W]e forecast overall production and operating cash flow growth in 2012 due to new production from our Clipper property and from projected increases at our Telemark Hub."[135]

• May 10, 2012 Earnings Conference Call, Reese speaking: "[W]e were very successful in putting together an override forego, excuse me, for Clipper, $100 million item that is pre-funded and we'll basically pay for the pipeline installation that we're going to have there . . . . [T]he two deepwater wells at Clipper, which are scheduled to begin production in the third quarter, I think those wells will be material to the Company's interest."[136]

---

[132] *Id.* at 101.

[133] *Id.* at 103.

[134] *Id.* at 111.

[135] *Id.*

[136] *Id.*

In sum, plaintiffs allege that defendants falsely stated that ATP's liquidity was sound, that they believed ATP could continue to meets its obligations for the next twelve months, and that ATP was not "flirting with bankruptcy" when defendants knew, or were reckless in not knowing, that ATP was in a "liquidity crisis" and did not have the liquidity to survive the moratoria. Similarly, plaintiffs allege that defendants falsely stated that the Clipper wells would be brought to production in the third or fourth quarter of 2012 when defendants knew, or recklessly did not know, that ATP did not have the liquidity to complete the Clipper pipeline. Plaintiffs allege that defendants knew, or recklessly did not know, that ATP was "in the zone of insolvency" or was "insolvent or practically insolvent"[137] because:

(1) Rodney Tow's Bankruptcy Trustee Complaint, filed August 15, 2014, alleges that "[s]hortly after the oil spill, as early as May 2010, ATP began to have problems with liquidity . . . and entered the zone of insolvency, which the Directors and Officers knew;"[138]

(2) several confidential witnesses opine that "ATP had continual liquidity problems," that ATP renegotiated the terms of its credit service agreements to preserve funds,[139] and that the "Company was over-leveraged and was not financially solid;"[140]

---

[137] R. Doc. 234 at 21.

[138] R. Doc. 214 at 38.

[139] *Id.*

[140] *Id.* at 22.

(3) according to yet another confidential witness, ATP delayed maintenance work and negotiated delayed payments to vendors to preserve cash;[141]

(4) ATP sold ORRIs and NPIs to vendors which substantially hampered the company's ability to generate cash flow;[142]

(5) that, "by May 2012," defendants decided to withhold ORRI and NPI payments due third parties in order to preserve cash;[143]

(6) ATP's assets turned out to be insufficient to cover its liabilities and, on June 26, 2014, ATP's Chapter 11 bankruptcy petition was converted to Chapter 7;[144] and

(7) the Judge presiding over the Bankruptcy proceedings stated on June 26, 2013 that ATP "filed for bankruptcy far too late."[145]

As an initial matter, the projections relating to the Clipper pipeline and defendants' statements that "we expect to continue to meet our obligations for the next twelve months" are forward-looking statements. As such, each statement contains three implicit assertions of fact that may or may not be true at the time the statement is made. These include (1) that the speaker genuinely believes the statement is accurate; (2) that there is a reasonable basis for that belief; and (3) that the speaker is unaware of any undisclosed

---

[141] *Id.* at 24.

[142] *Id.*

[143] *Id.* at 50-51.

[144] *Id.* at 55.

[145] *Id.*

facts that would tend to seriously undermine the accuracy of the statement. *In re Anadarko Petroleum Corp. Class Action Litig.*, 957 F. Supp. 2d at 831 (quoting *Rubinstein v. Collins*, 20 F.3d 160, 170 (5th Cir. 1994)).  At the same time, however, the forward looking nature of defendants' statements renders them subject to the PSLRA's safe harbor provision.  *Southland*, 365 F.3d at 371.  The PSLRA's safe harbor protects defendants from liability for certain projections, statements of future economic performance, or statements of plans or objectives for future operations.  *Id.*  Under the first prong of the statutory safe harbor, there is no liability if, and to the extent that, the statement is: (i) "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement,"[146] or (ii) immaterial.  15 U.S.C. § 78u-5(c)(1)(A). A cautionary statement is "meaningful" if it provides "substantive company-specific warnings based on a realistic description of the risks applicable to the

---

[146] Oral statements can qualify for the safe harbor if (1) the statement is accompanied by a cautionary statement that the "particular" oral statement is forward-looking and that actual results could differ materially; (2) the statement is accompanied by an oral statement that additional information that could cause actual results to differ materially is contained in a readily available written document; (3) the statement identifies the document or portion thereof containing the additional information, and (5) the identified document itself contains appropriate cautionary language.  15 U.S.C. § 78u-5(c)(2).

particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Southland*, 365 F.3d at 372. "Although a defendant is under no duty to disclose every fact or assumption underlying a prediction, he must disclose material, firm-specific adverse facts that affect the validity or plausibility of that prediction." *Lormand*, 565 F.3d at 249.

Under the second prong of the PSLRA, a defendant avoids liability if the plaintiff fails to prove that the statement was made with actual knowledge that the statement was false or misleading. 15 U.S.C. § 78u-(c)(1)(B). Because the second prong places the burden of proof on the plaintiff, the PSLRA effectively requires proof of actual knowledge--not just recklessness--in the case of every forward-looking statement. *See In re Anadarko*, 957 F. Supp. 2d at 831 n.13 ("If the statements are covered by the statutory safe harbor provision, Plaintiffs would be required to show intent to deceive, and not merely recklessness.") (citing *Nathenson*, 267 F.3d at 409). Accordingly, for each predictive statement, plaintiffs must plead specific facts giving rise to a strong inference that the defendant responsible for the statement *actually knew* that at least one of the three implicit assertions contained in the prediction was false.

In addition, several of the statements plaintiffs challenge contain statements of historical, readily verifiable fact.[147]  Plaintiffs, however, do not allege that any of defendants' factual statements are false.   The Second Amended Complaint is devoid of any allegations that defendants "cooked the books" or otherwise misrepresented any of ATP's financial information. Instead, plaintiffs' main challenge is to defendants' optimistic assessment or interpretation of ATP's financial data.   Defendants' optimism does not render them liable for securities fraud.   *See Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) ("People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage.").   Indeed, ATP disclosed its financial data to the public in its Form 10-K's and Form 10-Q's, and plaintiffs do not challenge the accuracy of any of these financial disclosures.   That plaintiffs do not challenge ATP's financial disclosures weighs against a finding

---

[147] *See* R. Doc. 214 at 76 ("ATP's liquidity remains strong as we produce our reserves, we are reducing our debt with payments to NPI and Override interest holders.   In fact, because of increased production and higher oil prices, ATP is paying back its debt at an accelerated pace and even had to recognize additional interest expense this quarter."); *id.* at 92 ("But what you see is that our entire debt is completely covered by our proved reserves.   And sitting on top of that is the infrastructure, some more proved reserves, as well as the probable reserves.   Net debt and total obligations of $2.4 billion you'll see a chart in the back in the appendix that lays that out.").

of scienter.  *See Rosenzweig*, 332 F.3d at 868 ("Importantly, plaintiffs do not allege that [defendant] falsely represented its capital structure, or its debts to Enron. . . . It is difficult to form a 'strong inference' of scienter from the alleged undercapitalization of a company where plaintiffs appear to concede that the company accurately disclosed its capital structure and financial obligations in its prospectus."); *Gissin v. Endres*, 739 F. Supp. 2d 488, 511-12 (S.D.N.Y. 2010) (holding that defendant's statement that "the company continues to maintain a strong balance sheet" is not actionable when defendant "was . . . summarizing [the company's] undisputed SEC disclosures").

Finally, many of the statements regarding ATP's liquidity situation are statements of opinion.  With respect to such statements, both parties cite principles articulated in the a recent Supreme Court opinion, *Omnicare, Inc. v. Laborers Dist. Counsel Indus. Pension Fund*, 135 S. Ct. 1318 (2015).  There, the Supreme Court held, in the context of a claim under Section 11 of the Securities Act of 1933 that a statement of opinion may be actionable in two limited circumstances: (1) as an untrue statement of material fact, if the opinion is both objectively false and not genuinely believed by the defendant; or (2) as misleading, if the defendant omits material facts underlying the basis for the opinion and "those facts conflict with what a reasonable investor would take from the statement itself."  *Id.* at 1329.  It is not clear, however, that the

Supreme Court's analysis in *Omnicare* extends to securities fraud claims under Section 10(b) of the Securities Act of 1934.  Section 11 of the 1933 Act and Section 10(b) of the 1934 differ in significant ways.  For instance, while a Section 11 plaintiff need not plead scienter, reliance, or fraud, *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983), scienter is an essential element of a Section 10(b) cause of action.  *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 406-07 (5th Cir. 2001) (citing *Tuchman v. DSC Commc'ns*, 14 F.3d 1061, 1067 (5th Cir. 1994)).  That *Omnicare* concerned a strict liability statute suggests that the Supreme Court's reasoning--which contemplates liability for statements of opinions that are genuinely held but misleading to a reasonable investor--does not directly apply to the statute at issue here.[148]  In addition, as indicated in this opinion, many of the defendants' statements were forward-

[148]Nonetheless, the Court notes that since *Omnicare* was decided, a number of courts have applied *Omnicare* to securities fraud claims--often without analyzing the differences in the statutory schemes.  *See e.g.*, *Nakkhumpum v. Taylor*, 782 F.3d 1142, 1159 (10th Cir. 2015) (citing *Omnicare* in a securities fraud case for the proposition that "an opinion is considered false if the speaker does not actually or reasonably hold that opinion"); *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA*, No. 13-CV-1094, 2015 WL 1474984, at *14-15 (S.D.N.Y. March 31, 2015 (applying *Omnicare* to claims under Section 10(b) and Section 18 of the Exchange Act).  Other courts have cited *Omnicare* as instructive or as persuasive authority.  *See e.g.*, *In re Merck & Co., Inc. Sec., Derivatives & "ERISA" Litig.*, No. CIV.A 05-1151 SRC, 2015 WL 2250472, at *11 n.7 (D.N.J. May 13, 2015) (noting that while "*Omnicare*, actually, is not directly applicable" to plaintiff's Section 10(b) claims, "*Omnicare*'s analysis of its discussion of misleading opinions is, to some extent, instructive on the viability of [those] claims as to the opinion-based" statements).

looking in nature.  Because the opinion statements at issue in *Omnicare* centered on the lawfulness of the issuer's existing contracts, 135 S. Ct. at 1323, the Supreme Court's decisions did not address or modify the PLSRA's safe harbor for forward-looking statements.

Accordingly, the Court will not apply the *Omnicare* test to defendants' forward-looking statements of opinion.  With respect to such statements, plaintiffs must meet the pleading requirements for forward-looking statements under the PLSRA, as discussed above.  In the case of non-forward-looking opinion statements, the Court will use *Omnicare* as guidance and will consider the relevant principles articulated in the Supreme Court's decision.  *See In re Merck & Co., Inc. Sec., Derivatives & "ERISA" Litig.*, No. CIV.A 05-1151 SRC, 2015 WL 2250472, at *11 n.7 (D.N.J. May 13, 2015) (noting that while "*Omnicare*, actually, is not directly applicable" to plaintiff's Section 10(b) claims, "*Omnicare*'s analysis of its discussion of misleading opinions is, to some extent, instructive on the viability of [those] claims as to the opinion-based" statements).

With these principles in mind, the Court turns to the alleged reasons defendants knew, or recklessly did not know, that ATP lacked the liquidity to survive the moratoria and complete the Clipper pipeline project.  First, plaintiffs cite Rodney Tow's August 14, 2014 Bankruptcy Trustee complaint for

the proposition that ATP entered the "zone of insolvency" as early as May 2010, and that the defendants knew this.[149]  Plaintiffs do not copy any factual allegations from the complaint, but nevertheless argue that the Court should attach substantial weight to Rodney Tow's allegations because he "had access to all of the Company's books and records," which "evidences that [defendants] either knew, or were severely reckless in not knowing, that ATP was in a liquidity crisis in May 2010 and could not survive the moratoria."[150] The allegations in Rodney Tow's complaint provide no support for an inference that defendants were aware that ATP was in the "zone of insolvency" during the class period.   Untested allegations filed in an adversarial proceeding more than two years after ATP filed for bankruptcy, and more than three-and-a-half years after the beginning of the class period, provide no insight into what the defendants knew, or recklessly did not know, at any given point in time during the class period.  *Southland*, 365 F.3d at 383 ("[B]ecause fraud cannot be proved by hindsight, subsequent lawsuits are unpersuasive of scienter, as they do not show what any particular individual knew . . . at the time. . . .").  Moreover, the portions that plaintiffs lifted from Rodney Tow's complaint fail to provide any factual support for his conclusion that

---

[149] R. Doc. 214 at 38.

[150] *Id.*

defendants knew ATP was in the zone of insolvency as early as May 2010.  If Rodney Tow's access to ATP's books and records provided a factual basis for his allegations, why didn't plaintiffs copy the factual allegations as well? Absent any factual allegations to support his claim that defendants knew that ATP was in the "zone of insolvency" as early as May 2010, Rodney Tow's August 14, 2014 Bankruptcy Trustee complaint fails to provide an inference that defendants knew, or recklessly did not know, that ATP lacked the liquidity to survive the moratoria or complete the Clipper pipeline.

Next, plaintiffs allege that defendants knew, or recklessly did not know, that ATP lacked the liquidity to survive the moratoria and complete the Clipper pipeline project because several confidential witnesses who worked for ATP believed that ATP was in a "liquidity crisis" during the class period.  In essence, plaintiffs allege that defendants knew, or recklessly did not know, that ATP lacked the liquidity to survive the moratoria and complete the Clipper project because other ATP employees believed that ATP was in financial trouble.[151] This is insufficient.  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1332 (2015) ("As we have explained, an investor cannot state a claim by alleging only that the opinion was wrong.").

---

[151] *See, e.g.,* R. Doc. 214 at 22 ("CW3 thought the Company was over-leveraged and was not financially solid. . . . CW3 believed that ATP was having serious liquidity problems."); *id.* at 31 ("CW6 compared ATP's strategy of accruing so much debt to gambling in a Las Vegas casino.").

Plaintiffs and the confidential witnesses's bald assertion that "liquidity was not strong" does not demonstrate that ATP was "in the zone of insolvency", nor do they speak to the state of mind of any particular defendant.  That some of ATP's employees disagreed, perhaps even reasonably so, with defendants regarding ATP's ability to continue operating and complete the Clipper pipeline does not give rise to an inference that defendants knew, or were reckless in not knowing, that ATP would eventually fail. *See Shurkin v. Golden State Vintners Inc.*, 471 F. Supp. 2d 998, 1017 (N.D. Cal. 2006) ("Furthermore, as for the C[onfidential] W[intness] accounts, at best Plaintiff makes allegations that several GSV employees disagreed with the business decisions and financial reports of GSV upper management.  [These allegations] fail to establish that the statements in the December 23 Proxy Statement were false or that the officers who provided [the statements] . . . knew it to be false or were deliberately reckless in providing the information.").  Indeed, the Second Amended Complaint alleges that confidential witness #1 attended meetings where Bulmahn "would state that ATP was tight on funds and in a bind, but that everything was okay."[152]  Although plaintiffs allege that several confidential witnesses disagreed with Bulmahn's assurances, this disagreement does not give rise to an inference that defendants knew or

---

[152] *Id.* at 48.

recklessly did not know that ATP lacked the liquidity to complete the Clipper pipeline or survive the moratoria.  Instead, confidential witness #1's account of Bulmahn's assurances supports an inference that defendants remained optimistic about ATP's future notwithstanding the liquidity crunch caused by the moratoria.  *See Shields*, 25 F.3d at 1129 ("[M]isguided optimism is not a cause of action, and does not support an inference of fraud.").

Plaintiffs also allege that defendants knew or recklessly did not know that ATP lacked sufficient liquidity to finish the Clipper pipeline or survive the moratoria because, throughout the class period, ATP delayed routine maintenance projects and was "forced" to negotiate delayed payments with some of its vendors.  This allegation fails to give rise to an inference that defendants knew or recklessly did not know that ATP lacked sufficient liquidity for several reasons.  First, defendants cannot be liable for failing to disclose ATP's efforts to delay payments because the company repeatedly disclosed that it was engaging in negotiations, and would continue to engage in negotiations, with vendors to delay payments.[153]  Second, rather than demonstrating defendants' knowledge that ATP was destined to fail, ATP's

---

[153] *See, e.g.*, 2010 Form 10-K, R. Doc. 221-5 at 37 ("We have also negotiated with certain other vendors involved in the development of the Telemark Hub and Clipper to partially defer payments for a period of twelve months."); 2012 First Quarter 10-Q, R. Doc. 221-23 ("In certain cases, we will also continue to work with certain vendors to extend out the timing of certain payments to preserve cash.").

efforts to delay payment most naturally gives rise to an inference that defendants believed they could stave off bankruptcy and complete the Clipper pipeline by finding ways to preserve cash. *See Nakkhumpun v. Taylor*, Civ. A. No. 12-1038, 2013 WL 5446081, at *10 (D. Colo. Sept. 30, 2013), *aff'd in part and rev'd in part by Nakkhumpun v. Taylor*, 782 F.3d 1142 (10th Cir. 2015) (rather than demonstrating defendants' knowledge that their company was not "in a far better financial situation," more compelling inference is that defendants viewed decisions to delay paying vendors, sell assets, and raise capital through equity offering to avoid bankruptcy as "contributing to an improving financial situation").  If defendants knew that ATP was destined to fail, why bother negotiating with vendors to defer payment?  Similarly, if defendants knew that ATP would not have the liquidity to finish the Clipper pipeline, why delay routine maintenance to preserve cash? In sum, defendants fully disclosed that ATP was negotiating with vendors and making every effort to preserve cash, and such disclosures weigh against an inference of scienter. *Owens*, 789 F.3d at 540 ("Even as to those alleged misstatements that occurred after the 'red flags' were apparent, the red flags were disclosed to the public, which negates the inference that defendants acted with scienter."). Thus, the Court finds that ATP's efforts to preserve cash weigh against, rather than for, an inference of scienter.

Plaintiffs' allegation that defendants knew or recklessly disregarded ATP's "liquidity crisis" because ATP was "forced" to sell ORRIs and NPIs to vendors fails to create an inference of scienter for the same reason. First, defendants fully disclosed the ATP was engaging in such transactions in an effort to increase liquidity.[154]   Defendants also disclosed that these transactions placed significant burdens on ATP's future cash flows.[155] Moreover, that ATP engaged in such transactions to increase liquidity and preserve cash weighs against an inference that defendants knew that ATP lacked sufficient liquidity to survive the moratoria or fund the Clipper pipeline. Indeed, ATP explicitly stated that it entered into these transactions for the express purpose of preserving cash in order to fund the Clipper pipeline and

---

[154] *See, e.g.,* Year 2010 Form 10-K, R. Doc. 221-5 at 37-38 ("We have conveyed to certain suppliers net profit interests in our Telemark Hub, Gomez Hub, and Clipper oil and gas properties in exchange for development services. . . . These types of financial arrangements preserve our current cash and allow us to pay from the proceeds of future production."); 2011 First Quarter Form 10-Q, R. Doc. 221-7 at 25 ("We have been financing a significant portion of our development program with transactions entered into with our suppliers and financial institutions that . . . will be repaid based on production through or from the revenues or net profits generated from future production.").

[155] *Id.* at 25 ("While these financing transactions have enabled us to continue the development of our properties and preserve cash, they will significantly burden the future net cash flows from our production until these obligations are satisfied.").

other capital expenditures.[156]  Once again, if defendants knew that ATP lacked the liquidity to survive the moratoria or finish the Clipper pipeline, why sell NPIs and ORRIs in an effort to bolster the company's liquidity?  Thus, the Court finds that ATP's sale of ORRIs and NPIs weighs against an inference that defendants knew, or recklessly did not know, that ATP lacked the liquidity to survive the moratoria or finish the Clipper pipeline.  *See Owens*, 789 F.3d at 539 ("The desire to raise capital in the normal course of business does not support a strong inference of scienter because virtually all corporate insiders share this goal.").

Next, plaintiffs allege that "by May 2012" defendants decided to withhold ORRI and NPI payments due third parties in order to preserve cash. Plaintiffs base this claim on Reese's testimony in the bankruptcy proceedings:

> Q:        Turning to the NPI/ORRI issue, were a lot of these - weren't some of these NPIs given to vendors?
>
> Reese:    The - in 2009, I believe, yes.  There were some given to vendors.  That would have been the Diamond Override.  I think we refer to it as the Bristow Override, and Airlog and those.  Those are the only ones that were true vendors.

---

[156] Form 10-Q for First Quarter 2012, R. Doc. 221-23 at 34 ("As discussed, we have conveyed to certain vendors and investors NPIs and Overrides in our Telemark Hub, Gomez Hub and Clipper oil and gas properties in exchange for development services, equipment and cash. . . . These arrangements allow us to match our development cost cash flows with those from production.  During the first quarter of 2012, we sold for an aggregate $185.0 million certain Overrides in our Gomez Hub and Clipper property, which is currently being developed.").

* * *

Q:          Wasn't it true you were default well in advance of this
            bankruptcy in some of these NPIs and overrides?

Reese:      Yes.  We had failed to make some payments.

* * *

Q:          And I believe that the May production proceeds attributable
            to our net revenue interests were not distributed to us; is
            that correct?

Reese:      I believe that is correct.

Q:          That's the amount that should have been distributed on July
            31 [2012]?

Reese:      That's what I was trying to think - Yes, that would be correct.

* * *

Q:          Co-mingled.  And then it is ultimately distributed to the
            parties who are entitled to receive it?

Reese:      Yes, it is.

Q:          Except that on July 31st it did not?

Reese:      Correct.[157]

Reese further testified that he, Bulmahn, Tate, and Godwin would have made

the decision to withhold ORRI and NPI payments.[158] Plaintiffs thus allege that

"ATP's financial position had become so dire during the Class Period that by

---

[157] R. Doc. 214 at 49-50.

[158] *Id.*

May 2012, Defendants Bulmahn, Reese, Tate and Godwin made the desperate knowing decision to unlawfully retain ORRI and NPI owed to third parties. . . ."[159]

Plaintiffs' allegation that defendants had already decided to withhold ORRI payment "by May 2012" is not supported by the material it cites, as plaintiffs point to no ORRI on which payment was expected that had gone unpaid by May 10, 2012.[160]   Although Reese admits that defendants did withhold ORRI payments, the testimony plaintiffs cite indicates that defendants did not withhold any ORRI payments until July 31, 2012, more than two months after the last statements plaintiffs allege to be false or misleading.  That defendants elected to withhold an ORRI payment in July does not demonstrate that defendants knew in May that ATP would not have the liquidity to survive the moratoria or complete the Clipper pipeline.  *See Plotkin,* 407 F.3d at 698 ("We subscribe to the rule that a Plaintiff cannot charge Defendants with intentionally misleading their investors about facts Defendants may have become aware of after making allegedly misleading

---

[159] *Id.* at 51.

[160] May 10, 2012 is the date ATP released its 2012 First Quarter results.  Defendants' statements in the May 10, 2012 Form 10-Q and in a May 10, 2012 earnings conference call are the last statements challenged by plaintiffs regarding ATP's liquidity or ability to complete the Clipper pipeline.

statements to the public."); *Lormand*, 565 F.3d at 254 (defining impermissible fraud-by-hindsight pleading as an attempt to plead "earlier knowledge based only on the situation that later came to pass") (quoting *Rodriguez-Ortiz v. Margo Caribe, Inc.*, 490 F.3d 92, 95 (1st Cir. 2007)). This is especially true as plaintiffs do not dispute the accuracy of Reese's bankruptcy testimony that "ATP's cash position as of March 31, 2012 was about $224 million, and at June 30, 2012, it was about $25 to $30 million."[161] Nor do plaintiffs dispute the accuracy of Bulmahn's statement in a May 10, 2012 earnings conference call that "we have not missed an interest payment on our debt [and] [w]e have made every payment, including the most recent $90 million payment on May 1."[162] Thus, the Court finds that the most natural and compelling inference from Reese's bankruptcy testimony regarding the withheld ORRI payments is that defendants decided to withhold the payments sometime in July after ATP's cash position had dwindled to $25 or $30 million. Plaintiffs have not alleged any contemporaneous facts that would support a competing inference. Because "fraud cannot be proved by hindsight, *Southland*, 365 F.3d at 383, the Court finds that defendants' alleged decision to withhold ORRI payments does not support an inference that defendants knew, or recklessly did not know,

---

[161] *Id.* at 37.

[162] *Id.* at 112.

that ATP lacked the liquidity to survive the moratoria or complete the Clipper project at the time they made the challenged statements. *See Keeney v. Larkin*, 306 F. Supp. 2d 522, 534 (D. Md. 2003) ("Here, Keeney does not allege any facts to demonstrate that Defendants knew they would not be able to make the October bond interest payment at the time of the May disclosure. Accordingly, these allegations are examples of 'fraud by hindsight' and do not meet the pleading requirements of Rule 9(b).").

Finally, plaintiffs point to ATP's August 14, 2012 bankruptcy and various developments in the bankruptcy proceeding as evidence that defendants must have known that ATP was doomed to run out of money before it completed the Clipper pipeline. First, plaintiffs quote the bankruptcy judge's June 23, 2013 statement that "we had a debtor [ATP] that filed bankruptcy far too late."[163] Second, plaintiffs allege that ATP had wholly encumbered the value of its assets and, after all of ATP's assets were sold, outstanding obligations totaled approximately $2 billion.[164] Third, plaintiffs point to Reese's testimony in the bankruptcy proceedings that indicated that only $20 million had been spent

---

[163] *Id.* at 32.

[164] *Id.* at 55.

toward the Clipper project and that Reese had known "for about a year" that the project would cost approximately $150 million.[165]

As an initial matter, ATP's August 2012 bankruptcy does not provide grounds for an inference that defendants knew that ATP lacked the liquidity to survive the moratoria or finish the Clipper pipeline by the end of 2012. Although ATP's August 2012 bankruptcy demonstrates that defendants were ultimately wrong regarding ATP's ability to survive the moratoria and finance the Clipper pipeline, it does not tend to show that defendants were aware of undisclosed facts that undermined their statements at the time such statements were made. *Shields*, 25 F.3d at 1129 ("This technique is sufficient to allege that defendants were wrong; but misguided optimism is not a cause of action, and does not support an inference of fraud.").  Plaintiffs cannot simply point to ATP's eventual demise and cry fraud because defendants failed to predict the company's collapse. *See Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("Allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."); *Rombach*, 355 F.3d at 176 (affirming district court's rejection of claim that defendant "faced a liquidity crisis" because "[p]laintiffs do not allege facts and circumstances that would

---

[165] *Id.* at 36.

support an inference that defendants knew of specific facts that are contrary to their public statements"). Plaintiffs' reliance on Reese's and the bankruptcy judge's statements during the bankruptcy proceedings likewise fail to create an inference that, at the time defendants made the challenged statements, defendants were aware, or were recklessly unaware, of undisclosed facts that rendered the statements false or misleading. *See Hutchinson v. Perez*, Civ. A. No. 1073, 2012 WL 5451258, at *5 (S.D.N.Y. Nov. 8, 2012) ("While these [bankruptcy] declarations show that the company's financial position was increasingly precarious during the Class Period, they do not . . . show that Defendants had knowledge of or access to contradictory facts.").

Plaintiffs attempt to circumvent the prohibition on pleading fraud by hindsight by citing the Fifth Circuit's statement in *Plotkin v. IP Axess, Inc.* that "the fact that a business files for bankruptcy on 'Day Two,' may, under the right surrounding circumstances, provide grounds for inferring that the business was performing poorly on 'Day One.'" *Id.* at 698. In *Plotkin*, the Fifth Circuit held that even though the plaintiff relied on events that post-dated the allegedly misleading press releases, the events "are so temporally connected that they shed light on the financial condition of the companies at the time of the announcements and bolstered [plaintiff's] suspicion that, at the time AGPI and Lynxus entered into contracts with Ipaxess, those companies

could not perform their obligations." *Id.* at 697-98.   The Court went on to note that "[f]urther discovery may refute the inferences, but it is not unwarranted to infer that when a company's big deal collapses so fast, something was amiss at the outset." *Id.*   Here, ATP filed for bankruptcy in August 2012, and plaintiffs allege that the Company's bankruptcy demonstrates that, contrary to defendants' representations, ATP was in the "zone of insolvency" as early as May 2010.  Thus, "Day Two" is August 17, 2012 and "Day One" is May 2010.   ATP's bankruptcy and the alleged "zone of insolvency" are not "so temporally connected" so as to warrant a departure from the general prohibition on pleading fraud by hindsight.   More importantly, the "right surrounding circumstances" are not present here such that ATP's bankruptcy on August 17, 2012 might support an inference that ATP was in peril at all times during the Class Period.   ATP's liquidity was fluid throughout the Class Period, and plaintiffs acknowledge that defendants repeatedly engaged in a variety of financing transactions throughout the Class Period to increase ATP's cash on hand.   Indeed, the Second Amended Complaint quotes Reese's bankruptcy testimony that ATP had approximately $224 million in cash as of March 31, 2012, a mere four-and-a-half months before ATP filed for bankruptcy.[166]   That ATP ultimately ran out of money in

---

[166] R. Doc. 214 at 37.

August 2012 does not provide grounds for an inference that defendants knew this would be the case during the Class Period. *See Podraza v. Whiting*, ___ F.3d ___, 2015 WL 3824936, at *10 (8th Cir. June 22, 2015) (affirming district court's conclusion that "the allegations here are largely premised upon hindsight" and that "[i]n the absence of specific facts showing Defendants knew of [the Company's] impending bankruptcy . . . the stronger inference is one of nonfraudulent intent").

Plaintiffs' final allegation is that a report authored in August or September 2012 by petroleum engineer Netherland Sewell demonstrates that ATP had wholly encumbered the value of its assets and that "ATP's assets were far less valuable than had been publicly disclosed."[167]  The Court fails to see how a third party report, prepared after ATP filed for bankruptcy, provides any inference that defendants were aware of undisclosed facts that tended to undermine their statements during the class period. *AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC*, 254 F. Supp. 2d 373, 386-87 (S.D.N.Y. 2003) ("Indeed, reliance on a third party report issued two months after the [corporation's] bankruptcy undercuts any assertion that it could be a basis to judge the material truthfulness of accounts balances before [the company] declared bankruptcy, and constitutes inactionable fraud by hindsight.").  The

---

[167] *Id.* at 57.

difference between ATP's valuation in its 2011 Form 10-K, published March 15, 2012, and Netherland Sewell's valuation, prepared sometime in August or September 2012, further fails to provide an inference of knowing or reckless deceit because, according to plaintiffs, ATP's March 15 valuation was not prepared by defendants, but instead by a third party, Collarini Associates. Accordingly, the Court finds that the difference between Collarini Associates valuation and Netherland Sewell's valuation of ATP's assets does not provide grounds for an inference that defendants knowingly or recklessly misled investors.

In sum, the Court has cumulatively evaluated all of plaintiffs' allegations and finds that plaintiffs fail to plead contemporaneous facts giving rise to a compelling inference that defendants knowingly or recklessly misled investors regarding ATP's liquidity or ability to complete the Clipper pipeline.

### 4.   *Matt McCarroll's Tenure as CEO*

Plaintiffs' final claim is that defendants knowingly or recklessly misled investors regarding Matt McCarroll's brief tenure as ATP's CEO.[168]  On June 1, 2012, ATP issued a press release announcing that Matt McCarroll "has joined ATP as Chief Executive Officer."[169]  The press release further stated that

---

[168] *Id.* at 113.

[169] *Id.* at 114.

"Matt's commitment to ATP has already been shown by his purchase today of 1,000,000 shares of our common stock directly from ATP at market price."[170] The press release listed Reese and Bulmann as the contact persons on the press release.  The Form 8-K to which the press release was attached was filed with the SEC on June 8, 2012 and was signed by Reese.  Plaintiffs allege that the press release was misleading because defendants knew, or were severely reckless in not knowing, that ATP and Matt McCarroll had not yet agreed upon an employment agreement.[171]

Less than a week later, on June 7, 2012, ATP issued a second press release which stated:

> On June 1, 2012, ATP Oil and Gas Corporation announced that Mr. Matt McCarroll replaced Mr. T. Paul Bulmahn as Chief Executive Officer of the company.  Mr. Bulmahn continues to serve as Chairman and also in the newly created position of Executive Chairman of ATP.  However, as of today, June 7, 2012, the company announced that it was unable to reach a mutually agreeable employment agreement with Mr. McCarroll and effective today he has submitted his resignation.  In conjunction with his resignation, the previously announced purchase of shares from the company by Mr. McCarroll mentioned in the June 1, 2012 press release was rescinded.[172]

Plaintiffs contend that this press release was also misleading because, according to plaintiffs, the "true reason for Mr. McCarroll's departure was that

---

[170] *Id.*

[171] *Id.*

[172] *Id.*

ATP's finances were a disaster, and that Mr. McCarroll wanted to begin restructuring immediately but the ATP Board, including Defendant Bulmahn, would not agree."[173]  In support of their position, plaintiffs cite a June 26, 2013 article published in the *Houston Business Journal* in which McCarroll is quoted as saying "I went there knowing it was a turnaround situation, but not realizing until I got there how bad things were.  I recommended to the board they start restructuring immediately, and they weren't willing to do it."[174]

The Court finds that plaintiffs have failed to plead the existence of an actionable misstatement or omission with respect to either press release.  Under the securities laws, "a defendant is not required to disclose all known information, but only information that is necessary to make other statements not misleading."  *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 212 N.6 (5th Cir. 2004) (quoting *Craftmatic Securities Litigation v. Kraftsow*, 890 F.2d 628, 640 (3d Cir. 1989)).  Although plaintiffs fault defendants for the June 1 statement that McCarroll "has joined ATP as Chief Executive Officer," that statement was accurate and complete.  Plaintiffs' complaint indicates that McCarroll was in fact engaged to serve as ATP's CEO and that he served in that capacity for a period of time.  This is evidenced by McCarroll's purchase of one

---

[173] *Id.*

[174] *Id.*

million shares of ATP stock, his recommendation to the board that the company restructure, and his submission of a "resignation," effective June 7, 2012. "[A]lleged misstatements and omissions must be considered in the full context in which they were made." *William L. Thorp Revocable Trust v. Ameritas Inv. Corp.*, 57 F. Supp. 3d 508, 520 (E.D.N.C. 2014) (citing *Gasner v. Bd. of Sup'rs of the Cty. of Dinwiddie, Va.*, 103 F.3d 351, 358 (4th Cir. 1996)). Given the context here--a press release announcing that McCarroll "had joined ATP"--defendants were not required to disclose all of the details of McCarroll's employment situation in order to avoid conveying a misleading impression. Thus, the June 1, 2012 press release does not contain an actionable misstatement.

As for the June 7, 2012 announcement of McCarroll's resignation, that statement was not misleading because it was evident that there had been a parting of ways. The press release made clear that McCarroll had "submitted his resignation" after less than one week on the job and that he had rescinded his purchase of one millions shares of ATP stock. Although plaintiffs take issue with the characterization that the parties were "unable to reach a mutually agreeable employment agreement," that statement adequately conveyed that there was an area of disagreement between McCarroll and ATP's management. Moreover, according to plaintiffs' complaint, ATP's stock price

decreased by $0.53, or 9%, from the previous day's closing price on the news of McCarroll's departure,[175] suggesting that the market took ATP's inability to reach an employment agreement with McCarroll as an unfavorable sign.  For these reasons, the Court finds that plaintiffs have not alleged facts that demonstrate that defendants had a duty to provide any more detail on the reason for McCarroll's departure.

Accordingly, the Court finds that, viewed holistically, plaintiffs' allegations fail to give rise to a compelling inference that defendants knowingly or recklessly misled investors about the effects of the moratoria, production levels at the Telemark Hub, or ATP's liquidity and its ability to complete the Clipper project.  The Court also finds that plaintiffs have failed to plead that defendants made any actionable misstatement or omission regarding Matt McCarroll's tenure as ATP's CEO.  Thus, the Court finds that plaintiffs have failed to plead violations of the Section 10(b) of the Securities Exchange Act of 1934.

It is true that ATP's financial position deteriorated rapidly after the issuance of the May 10, 2012 Form 10-Q for the First Quarter of 2012, which gives plaintiffs' hindsight argument some appeal with respect to statements made during May 2012.  The relevant financial statements from this period

---

[175] *Id.* at 115.

revealed an extremely leveraged, and increasingly cash poor company. They also make clear that by the end of July 2012, the bottom had fallen out, leaving ATP in an untenable financial position. If defendants' May 2012 statements were to be judged on a recklessness standard, the Court may well have reached a different result. But because defendants' statements in May 2012 concerning ATP's liquidity and its ability to complete the Clipper pipeline were forward-looking in nature, the standard is actual knowledge. *See Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1324 n.14 (2011) ("Under the PSLRA, if the alleged misstatement or omission is a 'forward-looking statement,' the required level of scienter is 'actual knowledge.'"). Plaintiffs' allegations are simply not sufficient to demonstrate that defendants actually knew that the outcome they envisioned would not actually come to pass. Indeed, many of plaintiffs' claims--including the allegation that defendants continued to borrow money in June 2012, even after McCarroll advised the board of the need to restructure--suggest that defendants did not know that ATP was doomed, notwithstanding the company's mounting difficulties. That defendants misjudged the gravity of ATP's peril does not mean that they actually knew that ATP would not survive or that they intended to defraud the public.

**B. Section 20(a) Claim**

Section 20(a), codified at 15 U.S.C. § 78t(a), provides: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person . . . ." 15 U.S.C. § 78t(a); *see also Tarica v. McDermott Int'l, Inc.*, CIV.A.99-3831, 2000 WL 1346895 (E.D. La. Sept. 19, 2000). Control person liability under section 20(a) requires an underlying violation of the Exchange Act. *See R2 Inv. LDC v. Phillips,* 401 F.3d 638, 641 (5th Cir. 2005).

Here, defendants do not dispute their status as control persons. Nevertheless, because the Court finds that plaintiffs fail to allege an Exchange Act violation, plaintiffs' Rule 20(a) claim likewise fails.


**IV.   CONCLUSION**

For the foregoing reasons, and for the reasons stated in the Court's November 21, 2014 Order and Reasons dismissing plaintiffs' First Amended Complaint, the Court GRANTS defendants' motion to dismiss plaintiffs' Exchange Act and Section 20(a) claims with prejudice.

New Orleans, Louisiana, this 23rd day of November, 2015.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE